No. 18-10953-A

## In The United States Court Of Appeals
## For The Eleventh Circuit

## CROWLEY MARITIME CORPORATION

*Plaintiff-Appellant,*

v.

## NATIONAL UNION FIRE INSURANCE
## COMPANY OF PITTSBURGH, PA.,

*Defendant-Appellee.*

On Appeal From The Judgment Of The
United States District Court For The Middle District Of Florida
At Civil Action No. 3:16-cv-01011-TJC-JBT

## APPENDIX OF APPELLANT
## VOLUME II of IV

John D. Shugrue
Thomas A. Marrinson
Emily E. Garrison
REED SMITH LLP
10 South Wacker Drive, 40th Floor
Chicago, IL 60606-7507
Telephone: (312) 207-1000
Facsimile: (312) 207-6400
jshugrue@reedsmith.com
tmarrinson@reedsmith.com
egarrison@reedsmith.com

*Counsel for Plaintiff-Appellant*

# INDEX TO APPELLANT'S APPENDIX

**Document Description**                                        **Docket/ Tab #**

## VOLUME I

Civil Docket Sheet for Case No. 3:16-cv-01011 .............................          A

Crowley's Complaint .......................................................................          1

Executive and Organization Liability Insurance Policy Number
061-36-48 .......................................................................................          1-1

National Union's Memorandum in Support of its Motion to
Dismiss ...........................................................................................          16

Crowley's Opposition to National Union's Motion to Dismiss ........          20

Declaration of Steven Ficon in Support of Crowley's Opposition
to National Union's Motion to Dismiss ...........................................          20-1

July 22, 2015 Letter from Crowley to National Union (Ex. A to
Doc. 20-1) ......................................................................................          20-2

August 3, 2015 Letter from National Union to Crowley (Ex. B to
Doc. 20-1) ......................................................................................          20-3

Declaration of Emily Garrison in Support of Crowley's
Opposition to National Union's Motion to Dismiss .........................          20-4

April 24, 2015 Order Denying Thomas Farmer's Motion to
Suppress (Ex. A to Doc. 20-4) ..........................................................          20-5

Excerpts from the April 24, 2015 Transcript in the Trial of
Thomas Farmer  (Ex. B to Doc. 20-4) ..............................................          20-6

December 6, 2012 Email from E. Garrison to M. Duffy (Ex. I to
Doc. 20-4) ......................................................................................          20-13

Reply of National Union In Support of Its Motion to Dismiss ......... 25

National Union's Answer and Affirmative Defenses ........................ 35

Certificate of Service (Volume I)

## VOLUME II

Crowley's Supplemental Memorandum in Opposition to National
Union's Motion to Dismiss / For Summary Judgment ...................... 36

Declaration of Emily Garrison in Support of Crowley's
Supplemental Memorandum ............................................... 36-1

Search Warrant Affidavit (Ex. A to Doc. 36-1) ................................ 36-2

Excerpts from the March 16, 2017 Deposition of S. Ficon (Ex. B
to Doc. 36-1) ...................................................................... 36-3

Expert Witness Report of William F. Jung (Ex. C to Doc. 36-1) ...... 36-4

April 25, 2008 Notice Letter (Ex. D to Doc. 36-1) ........................... 36-5

May 27, 2008 Letter from M. Conboy to S. Ficon (Ex. E to Doc.
36-1) ................................................................................ 36-6

Arbitration Decision and Award (Ex. F to Doc. 36-1) ...................... 36-7

National Union's Motion for Summary Disposition in the
Arbitration (Ex. G to Doc. 36-1)....................................... 36-8

Excerpts from the Transcript of Proceedings in the Arbitration
(Ex. H to Doc. 36-1)........................................................ 36-9

March 29, 2013 Order in *In the Matter of Search Warrant for
Crowley Liner Services Inc.* (Ex. I to Doc. 36-1) .............................. 36-10

Certificate of Service (Volume II)

# VOLUME III

March 5, 2013 Letter from M. Duffy to T. Reed (Ex. J to Doc. 36-1) ..................................................................... 36-11

December 9, 2011 Order in *In the Matter of Search Warrant for Crowley Liner Services Inc.* (Ex. K to Doc. 36-1)............................. 36-12

National Union's Responses to Crowley's First Set of Requests for Admission (Ex. L to Doc. 36-1)................................................... 36-13

Expert Witness Report of Ty Sagalow (Ex. M to Doc. 36-1)............ 36-14

Expert Witness Report of Thomas R. Newman (Ex. N to Doc. 36-1) ..................................................................... 36-15

April 16, 2008 Order in *In the Matter of Search Warrant for Crowley Liner Services Inc.* (Ex. P to Doc. 36-1) ............................ 36-17

June 30, 2008 Letter from T. Reed to M. Conboy (Ex. Q to Doc. 36-1) ..................................................................... 36-18

Nov. 26, 2008 Letter from S. Ficon to D. Sweeney (Ex. R to Doc. 36-1) ..................................................................... 36-19

Feb. 2, 2009 Letter from M. Conboy to S. Ficon (Ex. S to Doc. 36-1) ..................................................................... 36-20

Sept. 30, 2009 Letter from S. Ficon to M. Conboy, including attachments (Ex. T to Doc. 36-1)....................................................... 36-21

July 18, 2012 Letter from T. Reed to M. Conboy (Ex. U to Doc. 36-1) ..................................................................... 36-22

May 7, 2008 Email from S. Ficon to E. Conlon (Ex. V to Doc. 36-1) ..................................................................... 36-23

June 30, 2008 Letter from T. Reed to M. Conboy (Ex. W to Doc. 36-1) ..................................................................... 36-24

May 22, 2008 email from E. Conlon to M. Conboy (Ex. X to Doc. 36-1) ................................................. 36-25

June 9, 2010 Letter from E. Joseph O'Neil to C. Dolan (Ex. Y to Doc. 36-1) ......................................... 36-26

Aug. 12, 2010 Letter from E. Joseph O'Neil to S. Ficon (Ex. Z to Doc. 36-1) ........................................ 36-27

Aug. 28, 2012 Letter from M. Duffy to R. Reed (Ex. AA to Doc. 36-1) ................................................. 36-28

Excerpts from the March 3, 2017 Deposition of M. Conboy (Ex. BB to Doc. 36-1).................................. 36-29

Excerpts from the March 17, 2017 Deposition of M. Graffeo (Ex. CC to Doc. 36-1).................................. 36-30

Oct. 16, 2015 Letter from M. Duffy to T. Reed (Ex. DD to Doc. 36-1) ................................................. 36-31

Certificate of Service (Volume III)

## VOLUME IV

July 22, 2015 Letter from S. Ficon to M. Graffeo (Ex. EE to Doc. 36-1) ................................................. 36-32

Aug. 3, 2015 Letter from M. Graffeo to S. Ficon (Ex. FF to Doc. 36-1) ................................................. 36-33

Aug. 12, 2013 Order from *United States of America v. Thomas Farmer* (Ex. GG to Doc. 36-1) ............................................. 36-34

Excerpts from the March 8, 2017 Deposition of W. Jung (Ex. HH to Doc. 36-1) ...................................... 36-35

National Union's Supplemental Memorandum in Support of its Converted Motion for Summary Judgment ....................................... 37

Crowley's Response to National Union's Supplemental
Memorandum ...................................................................................     40

Declaration of Emily Garrison in Support of Crowley's Response
to National Union's Supplemental Memorandum ............................     40-1

Excerpts from the March 14, 2017 Deposition of Ty Sagalow (Ex.
A to Doc. 40-1) ...............................................................................     40-2

National Union's Response to Crowley's Supplemental
Memorandum in Opposition to National Union's Motion for
Summary Judgment............................................................................     43

Transcript of June 20, 2017 Motion Hearing.....................................     49

February 8, 2018 Order......................................................................     53

February 9, 2018 Judgment...............................................................     54

Certificate of Service (Volume IV)

# Doc. 36

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

| | | |
|---|---|---|
| CROWLEY MARITIME CORPORATION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 3:16-cv-01011-TJC-JBT |
| v. | ) | |
| | ) | Judge Timothy J. Corrigan |
| NATIONAL UNION FIRE INSURANCE | ) | |
| COMPANY OF PITTSBURGH, PA., | ) | |
| | ) | |
| Defendant. | ) | |

**CROWLEY'S SUPPLEMENTAL MEMORANDUM IN OPPOSITION TO NATIONAL UNION'S MOTION TO DISMISS/FOR SUMMARY JUDGMENT (DKT. 6, 28)**

Charles B. Lembcke
Florida Bar No. 140285
Email: cbl@cbllaw.com
Law Offices of Charles B. Lembcke, P.A.
1300 Riverplace Blvd
Suite 605
Jacksonville, FL 32207
Telephone: (904) 355-5467
Facsimile: (904) 633-9328

*Admitted Pro Hac Vice:*
John D. Shugrue
Thomas A. Marrinson
Emily E. Garrison
REED SMITH LLP
10 South Wacker Drive, 40th Floor
Chicago, IL 60606-7507
Telephone: (312) 207-1000
Facsimile: (312) 207-6400

# TABLE OF CONTENTS

**Page**

I.     SUPPLEMENTAL FACTUAL BACKGROUND............................................................. 2

II.    LEGAL STANDARD.................................................................................................... 5

III.   CROWLEY'S SUIT IS NOT BARRED BY *RES JUDICATA* ......................................... 5

    A.     There is No Identity of the Causes of Action ......................................... 5

    B.     Applying *Res Judicata* Would Not Lead to an Equitable Result........................... 7

IV.    THE STATUTE OF LIMITATIONS DOES NOT BAR CROWLEY'S SUIT ................. 9

V.     NU'S RUN-OFF ENDORSEMENT ARGUMENT SHOULD BE REJECTED............. 13

VI.    CONCLUSION............................................................................................................ 15

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aeacus Real Estate Ltd. v. 5th Ave. Real Estate Dev.*,
　948 So. 2d 834 (Fla. 4th DCA 2007) ......................................................................7

*AmerisourceBergen Corp. v. Ace American Ins. Co.*,
　100 A.3d 283 (Pa Super. 2014) ..............................................................................5

*Carroll v. TheStreet.com, Inc.*,
　2014 WL 5474061 (S.D. Fla. July 07, 2014) ........................................................12

*Celotex Corp. v. Catrett*,
　477 U.S. 317 (1986) ................................................................................................5

*Empire Fire & Marine Ins. Co. v. J. Transp., Inc.*,
　880 F.2d 1291 (11th Cir. 1989) ...........................................................................8, 9

*Foley v. Wells Fargo Bank, N.A.*,
　849 F.Supp.2d 1345 (S.D.Fla. 2012) ...................................................................14

*Goldberg v. Nat'l Union Fire Ins. Co.*,
　143 F. Supp. 3d 1283 (S.D. Fla. 2015) ................................................................11

*Grissom v. Commercial Union Ins. Co.*,
　610 So. 2d 1299 (Fla. 1st DCA 1992) ..................................................................10

*Lozman v. City of Riviera Beach, Fla.*,
　713 F.3d 1066 (11th Cir. 2013) ..............................................................................5

*Machules v. Dep't of Admin.*,
　523 So. 2d 1132 (Fla. 1988) .................................................................................12

*MapleWood Partners, LP. v. Indian Harbor Ins. Co.*,
　295 F.R.D. 550 (S.D. Fla. 2013) ..........................................................................11

*Medical Depot, Inc. v. RSUI Indem. Co.*,
　2016 WL 5539879 (Del. Super  Sept. 29, 2016) ....................................................5

*Millennium Labs., Inc. v. Allied World Assurance.*,
　165 F. Supp. 3d 931 (S.D.Cal. 2016) .....................................................................7

*Morales v. Zenith Ins. Co.*,
　2010 WL 2293199 (M.D. Fla. June 8, 2010) ........................................................10

*Patton v. Triad Guar. Ins. Corp.*,
    277 F.3d 1294 (11th Cir. 2002) ...............................................................................5

*Starling v. R.J. Reynolds Tobacco Co.*,
    845 F. Supp. 2d 1215 (M.D. Fla. 2011).................................................................12

*State St. Bank & Trust Co. v. Badra*,
    765 So.2d 251 (Fla. 4th DCA 2000) ..................................................................6, 7

*Universal Const. Co. v. City of Fort Lauderdale*,
    68 So. 2d 366 (Fla. 1953)......................................................................................7

**Rules**

Fed. R. Civ. P. 56..........................................................................................................5

The discovery and expert disclosures that followed the Court's conversion of National Union's ("NU") motion into one for summary judgment have only served to confirm that NU cannot meet its heavy burden of establishing its entitlement to the extraordinary relief it seeks. Neither *res judicata* nor the statute of limitations defense raised by NU bars Crowley's suit for the defense costs it paid on behalf of Thomas Farmer, a former Crowley employee, in response to a federal criminal antitrust investigation (the "DOJ Investigation") that focused on Mr. Farmer, who ultimately was acquitted of any wrongdoing.

The undisputed facts show that Mr. Farmer was insured by NU's Policy, that an FBI search warrant affidavit (the "Affidavit") written by the prosecuting agency in 2008 identified Mr. Farmer as a person against whom a covered criminal proceeding might be brought, and that substantial legal costs thereafter were incurred for Mr. Farmer's defense. Such circumstances are so clearly covered that they should not give rise to any coverage dispute. But here, NU argues that it should be absolved of its clear coverage obligations because – through no fault of Crowley – the Affidavit that NU insisted it had to examine to determine coverage was judicially sealed and thus its contents were unavailable to any of the parties until years later. NU's motion asks this Court to exercise its equity powers to deprive a blameless insured of bargained-for coverage and stretch the statute of limitations beyond all bounds Florida law has placed on it. This Court should decline NU's invitation to re-write Florida law and deny NU's motion.

There are multiple reasons why NU cannot meet its burden of showing through undisputed facts that *res judicata* applies based on a prior Arbitration between the parties and the January 2013 Award that resulted. **<u>First</u>**, the undisputed facts show that the Arbitration involved *<u>only</u>* the limited issue of whether the documents that were available and had been presented to NU at the time of the Arbitration constituted a Claim as defined by the Policy. **<u>Second</u>**, the

1

undisputed facts show that after entry of the Award, the facts and conditions fundamentally changed, in that the previously sealed and unavailable Affidavit became unsealed and available to the parties only after the Arbitration.  **Third**, NU cannot establish, as it must, that applying *res judicata* would be equitable.  To the contrary, there is nothing "equitable" about depriving Crowley of coverage for defense costs the Policy was designed to cover, especially in light of the unusual circumstances of this case.

NU's statute of limitations defense also fails for multiple reasons.  **First**, the limitations period on NU's denial with respect to the Affidavit could not have started running (much less have expired) before 2015, when Crowley was first able to obtain and present the previously sealed Affidavit to NU.  **Second**, Florida law establishes that the limitations period did not begin running until NU's defense obligations under the Policy were completed, which did not occur until Mr. Farmer's acquittal in 2015.  **Third**, Florida law equitably and statutorily tolls the statute of limitations because the sealed Affidavit was unavailable through no fault of Crowley, and NU promised to consider new information that became available to Crowley.

NU's motion should be denied for each of the above reasons, as well as those set forth below and in Crowley's Opposition to NU's Motion to Dismiss (Dkt. 20), which Crowley incorporates by reference as if fully set forth herein.

## I.     **SUPPLEMENTAL FACTUAL BACKGROUND**

The search warrant served on April 17, 2008 in connection with the DOJ Investigation specifically authorized search of the files, phone records, and other documents of Mr. Farmer at Crowley's corporate office.  (Ex. A.)[1]  As plainly stated on its face, the search warrant was issued based on "facts to support a finding of Probable Cause" that were contained in an

---

[1] Exhibits A through HH are attached to the accompanying Declaration of Emily E. Garrison.

"Attached Affidavit" of an FBI Special Agent.  (*Id.*; Ex. B, Ficon Dep. at 57:19-58:10.)  Pursuant

to regular practice and an *in camera* request from the prosecuting authority, the court issuing the

search warrant sealed the case file and Affidavit from public disclosure.  (Ex. C, Jung Report at

7; Ex. A; Ex. P.)   Neither Mr. Farmer nor Crowley had access to the sealed material.  (*Id.*)

Crowley promptly provided NU with the search warrant (with its reference to the

supporting Affidavit), advised NU that the "charges that may have lead to" the search warrant

were under seal, and sought NU's payment of Mr. Farmer's defense costs.  (Ex. D; Dkt. 35 at ¶

18.)  On May 27, 2008, NU denied coverage "based solely upon the documentation currently

available" on the grounds that the search warrant by itself did not qualify as a Claim.  NU,

however, also informed Crowley that it would "accept this matter as a notice of circumstances"

based on the "materials submitted to date" and invited Crowley to submit "further information or

documentation." (Ex. E at 3-4.)

In the face of continuing costs for Mr. Farmer's defense, which NU refused to pay,

Crowley instituted the Arbitration on March 7, 2012.  (Garrison Decl. at ¶ 9.)  As the Arbitration

Panel observed, the "decisive issue" it addressed was whether the documents evidencing the DOJ

Investigation that had been made available to Crowley and presented to NU were "sufficient to

constitute a 'Claim' as that term is defined" in the Policy.  (Ex. F at 5.)  The Affidavit, still under

seal, was not available during the Arbitration.  (*Id.* at 2.)  The parties and the Panel explicitly

recognized that the Arbitration was narrowly limited to the issue of whether the documents that

Crowley had submitted to NU, which ***did not include the Affidavit***, qualified as a Claim.  (Ex. G

at 6-7; Ex. H, Arbitration Transcript at 197:18-198:12, 362:17-363:4, 488:23-489:10, 536:21-

537:6, 541:4-14, 624:8-625:12, 628:5-13, 653:4-8, 660:15-19.)  The Arbitration Award issued in

January 2013 found only that ***the specific documents*** that "Crowley submitted to National

Union" prior to the Award "did not constitute a Claim," and the "triggering event specified in the Policy ***has not yet been presented to National Union***."  (Ex. F (emphasis added.))  The contents of the sealed Affidavit could not have been and were not considered by the Panel.

In March 2013, after the Award, the Affidavit was unsealed ***only*** for the use of Mr. Farmer's defense team.  (Exs. I; GG.)[2]  With limited exceptions not relevant here, the partial unsealing order (which itself was sealed and not known to Crowley), barred use or possession of the Affidavit by anyone other than Mr. Farmer's defense team.  (*Id.*)  At the DOJ's specific request, the unsealing order also required that the Affidavit "shall remain sealed after defense counsel have been provided with copies, so that the defendant's right to a fair trial will be protected and the ongoing investigation will not be frustrated." (*Id.*)[3]

The Affidavit was not unsealed or made publicly available until April 24, 2015, during Mr. Farmer's trial.  (Ex. L at No. 17; D.I. 20-4 at ¶¶ 4-5.)  After Mr. Farmer's acquittal, the Affidavit was provided to Crowley for the first time.  (D.I. 20-1.)  In July 2015, Crowley tendered the Affidavit to NU as proof of its prior assertions that a Claim had been made in April 2008 against Mr. Farmer, but NU refused to accept coverage.  (Exs. EE; FF.)  Thus, although both Crowley and NU knew an Affidavit existed since April 2008, it did not become available to either party until 2015.  (Ex. C at 7-8; Ex. B at 45:18-47:21.)  The April 16, 2008 Affidavit plainly identifies Mr. Farmer in writing as an individual against whom a criminal proceeding may be commenced, such that a Claim was made against Mr. Farmer as of that date. (Ex. C at 8;

---

[2] NU may argue, without merit, that Mr. Farmer himself, rather than Crowley, should have provided the Affidavit to NU when it was unsealed for Mr. Farmer, but the strict sealing orders prevented Mr. Farmer from disclosing the Affidavit to Crowley or NU. (Ex. C at 7-8; Ex. B at 45:18-47:21.)  Moreover, NU asserted that Mr. Farmer himself had no right to present a claim to NU given that Crowley was paying his legal fees. (Exs. J, AA.)

[3] The Affidavit previously had been made available to Franke Peake, another target of the DOJ Investigation, but only after his indictment and as part of the government's discovery, and subject to the same type of disclosure restrictions later imposed on Mr. Farmer. (Ex. K.)

Ex. M, Sagalow Report at ¶¶ 54-69; Ex. N, Newman Report at ¶ 34.)[4]

## II.      LEGAL STANDARD

Summary judgment should be granted only if there is no genuine issue of material fact in dispute and a party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56; *see also Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).  In examining NU's Motion, the Court must draw all reasonable inferences in Crowley's favor.  *Patton v. Triad Guar. Ins. Corp.*, 277 F.3d 1294, 1296 (11th Cir. 2002).  Summary judgment cannot be granted because NU has failed to establish through undisputed facts the elements of its *res judicata* and statute of limitations defenses.

## III.     CROWLEY'S SUIT IS NOT BARRED BY *RES JUDICATA*

The undisputed facts show that NU cannot meet its burden of establishing two of the required elements of *res judicata*: (1) identity of the causes of action in the Arbitration and this case; and (2) that application of *res judicata* would be equitable.  *Lozman v. City of Riviera Beach, Fla.*, 713 F.3d 1066, 1074 (11th Cir. 2013).

### A.      There is No Identity of the Causes of Action

In determining whether the causes of action in two cases are identical, a court analyzes whether "the facts or evidence necessary to maintain the suit are the same in both actions."  *Id. Res judicata* will not apply when such analysis reveals that "other facts or conditions intervene[d] before the second suit, furnishing a new basis for the claims and defenses of the

---

[4] NU's reply states that the issue of whether the Affidavit is a Claim made against Mr. Farmer as of April 16, 2008 is "not raised by [NU's] motion."  (D.I. 25 at fn. 1.)  NU does not contest this issue, nor could it, because the Policy language in subsection (3) of the Claim definition does not include any requirement that an investigation involve formal service upon or receipt of a specific document by an Insured for a Claim to exist.  It requires only that an Insured Person be "identified in writing by such investigating authority as a person against whom a proceeding … may be commenced."  There is no requirement that the Insured Person be served with or receive a copy of the writing.  (Ex. O, Policy at §2(b); Dkt. 35 at ¶ 6; Ex. M, Sagalow Report at ¶¶ 62-69, 79-81.)  *See Medical Depot, Inc. v. RSUI Indem. Co.*, 2016 WL 5539879, at *8 (Del. Super. Sept. 29, 2016) (unserved complaint constituted a Claim where insured knew about the filing of that complaint); *AmerisourceBergen Corp. v. Ace American Ins. Co.*, 100 A.3d 283, 287 (Pa Super. 2014) (service requirement in other subparts of the definition of Claim "demonstrates that the parties knew how to include a service requirement when they so desired.").  This is precisely why NU has sought to avoid coverage via the non-merits defenses of *res judicata* and the statute of limitations.

respective parties." *State St. Bank & Trust Co. v. Badra*, 765 So.2d 251, 254 (Fla. 4th DCA 2000). That is exactly what happened here. New facts and conditions intervened because the Arbitration arose from – and the Award was based on – NU's refusal to provide coverage ***based solely on the contents of the documents presented to NU at the time of the Arbitration***. (*See* Exs. E, F, Y-AA.) The facts presented to and considered by the Panel thus necessarily involved ***only*** the issue of whether the documents available to the parties at the time of the Arbitration – which did not include the Affidavit – constituted a Claim. In fact, NU explicitly told the Panel that it should ***not*** consider the Affidavit or speculate about its contents given its unavailability. (Ex. G at 6-7; Ex. H at 628:5-13 ("The issue is whether these specific documents that were submitted to National Union in 2008 qualified [as a Claim]"); 660:15-19.) The Panel accepted NU's argument, explaining in its Award that "none of the writings presented" or the "materials Crowley submitted" before the Arbitration were a Claim and that "the triggering event" for coverage had "***not yet*** been presented to National Union." (Ex. F at 5, 7, 9.)

It is undisputed that Crowley could not obtain and present the sealed Affidavit to the Arbitration Panel. The Affidavit was subject to strict sealing orders in the U.S. District Courts in both Jacksonville and Puerto Rico that prevented Crowley from accessing or viewing the Affidavit until it was moved into evidence during Mr. Farmer's trial on April 24, 2015. (Ex. I; Ex. P; Ex. B at 45:18-47:21.) NU makes no showing that the Affidavit could have been unsealed as to Crowley given that the DOJ investigation and prosecution remained ongoing. (Ex. C at 7; Ex. I; Ex. K; Ex. HH, Jung Dep. at 107:8-114:14.)

Against this backdrop, NU tries to spin the key changed fact – the sealed, unavailable Affidavit becoming available ***after*** the Arbitration – as mere "belated discovery of *old* facts." (Dkt. 25 at 4 (emphasis in original.)) NU's position is meritless, and ignores: (1) the basis of

NU's earlier coverage position; (2) the positions NU took in the Arbitration; and (3) the Arbitration Award, all of which centered on the ***unavailability*** of the Affidavit and its contents, not the mere ***existence*** of the Affidavit.  The judicial unsealing and availability of the Affidavit and its contents is a new and intervening fact of critical importance that formed a new basis for Crowley's claims in this litigation.  *See State St. Bank*, 765 So.2d at 254; *see also Millennium Labs., Inc. v. Allied World Assurance.*, 165 F. Supp. 3d 931, 933 (S.D.Cal. 2016) (treating recently unsealed documents as "new evidence" meriting reconsideration of prior decision).  NU's *res judicata* defense fails for this reason alone.

### B.        Applying *Res Judicata* Would Not Lead to an Equitable Result

NU's *res judicata* defense also fails for the independent reason that applying the doctrine here would "inflict pernicious results," a fact NU cannot disprove.  *Universal Const. Co. v. City of Fort Lauderdale,* 68 So. 2d 366, 369 (Fla. 1953); *Aeacus Real Estate Ltd. v. 5th Ave. Real Estate Dev.,* 948 So. 2d 834, 835 (Fla. 4th DCA 2007).  Crowley seeks only to have NU do what its Policy was intended to do: pay the reasonable defense costs of an Insured Person after he was identified by the prosecuting agency in writing as a person against whom a criminal proceeding may be brought.  Applying *res judicata* would inequitably allow NU to reverse course by: (1) first persuading the Arbitration Panel to base its decision only on documents that were available and presented to NU at the time of the Arbitration; and (2) then persuading this Court to ignore the very document, unavailable during the Arbitration, that compels a different outcome and that NU convinced the Panel not to consider.  There is nothing equitable about such a result.

In trying to show that the result it seeks is somehow "equitable," NU makes three meritless arguments.  **<u>First</u>**, NU argues that depriving its insured of coverage – even where the Policy would not, by its own terms, allow such a result – is somehow fair because Crowley entered into a plea agreement in connection with the DOJ Investigation.  But the defense costs

Crowley seeks from NU have nothing to do with its own involvement in the DOJ Investigation. Rather, they are the costs of defending Mr. Farmer, who was ***acquitted*** of any wrongdoing.  The Policy expressly forbids NU from asserting a defense it might have for covering a Claim against one insured (Crowley) as a defense against a Claim against another insured (Farmer).  (Ex. O at End'ts. 9, 23.)[5]  If Crowley had refused to pay Mr. Farmer's legal fees, Mr. Farmer would be seeking reimbursement directly from NU, further demonstrating the irrelevance of Crowley's plea agreement to the issue of whether it is equitable for NU to dodge paying ***Mr. Farmer's*** defense costs.  NU cannot rely on principles of "equity" to deny coverage when its Policy expressly prohibits it from denying coverage for one Insured based on the conduct of another Insured.

   **Second**, NU argues that the result it seeks is somehow "equitable" because Crowley "chose to file" the Arbitration before the underlying proceeding against Mr. Farmer was concluded and it could get access to the Affidavit.  But the law has long recognized that both insurers and insureds seek declarations of insurance policy rights and obligations before final disposition of an underlying claim and thus has limited how *res judicata* applies to such proceedings.  *See Empire Fire & Marine Ins. Co. v. J. Transp., Inc.,* 880 F.2d 1291, 1296 (11th Cir. 1989) ("ordinary principles of *res judicata* cannot be applied automatically to declaratory judgments").  Here, faced with Mr. Farmer's mounting legal bills during a long-running criminal investigation, NU's refusal to pay, and no certainty as to when the Affidavit would be unsealed and made available to Crowley, it was entirely appropriate for Crowley to seek relief against NU

---

[5] The Policy accomplishes such severability between insureds in two different ways: (1) the exclusions that bar coverage for "criminal acts" or "improper personal profit" explicitly state that they apply only if there is a final adjudication adverse to "***the*** insured," not one adverse to "***any*** insured"; and (2) the Policy has a "Severability of Exclusions" clause stating that "the facts pertaining to . . . any Insured shall not be imputed to any other Insured Person." (Ex. M, Sagalow Report at ¶¶ 99-110; Ex. O at Endt's  9, 23.)

when it did, based on the documents available at the time.   To prevent an unfair application of *res judicata* in the analogous scenario of a declaratory judgment action, the Eleventh Circuit has held that re-litigation will be barred only as to issues "actually litigated and necessary to the judgment rendered."   *Id.*   Here, the actual issue litigated in the Arbitration was whether the documents presented **at that time**, not including the Affidavit, constituted a Claim.   Indeed, the Award expressly held that the "triggering event" establishing the existence of a Claim had "not yet" been presented to NU – a holding effectively making a declaration as to the sufficiency of the materials presented to date, but not excluding that Crowley could later prove the existence of a Claim by presenting other documents.

**Finally**, NU focuses narrowly on "fairness" to itself, misrepresenting the facts to argue that it would be "unfair" to require NU to cover Mr. Farmer's defense costs because NU had "no opportunity" to review or control them.   This argument is disingenuous.   Crowley immediately notified NU of the DOJ Investigation, and both Crowley and Mr. Farmer's counsel provided NU with updates and defense cost invoices, asked NU to provide its outside counsel litigation guidelines, and offered to discuss with NU the details of the work done for Mr. Farmer. (Exs. D, Q-X.)   NU ignored these communications, even though the Policy expressly gave NU the right to advance payment of Mr. Farmer's defense costs, while reserving its right to later deny coverage and to recoup all such advancements.   (Ex. M at ¶¶ 88-89; Ex. BB at 36:23-37:12, 60:9-63:22; Ex. CC at 34:12-35:6.)   NU is not being treated "unfairly" at all.   NU chose to sit on its hands and provided no input.   Its attempt to use *res judicata* to reach an inequitable result should be rejected.

## IV.   THE STATUTE OF LIMITATIONS DOES NOT BAR CROWLEY'S SUIT

NU's statute of limitations defense should be rejected for three independent reasons.

**First,** NU's attempts to mischaracterize Crowley's position by twisting it into a "late discovery

of breach" argument lacks basis.  Crowley does not argue that it did not "discover" NU's breach of the Policy until 2015.  Rather, NU's breach is its 2015 refusal to accept the contents of the unsealed Affidavit as establishing a Claim after it first became available.  Crowley's Complaint was filed well within the five-year statute of limitations for this breach.  NU's argument is further undermined by its assertion that there was no "continuing breach" because "the arbitration panel decided in January 2013 that NU did not have a continuing duty to do anything with respect to defense costs." (D.I. 25 at 8.)  NU thus concedes that the breach for which Crowley seeks recovery in this action occurred *after* the 2013 Arbitration, when Crowley presented the Affidavit to NU in 2015.

Moreover, NU's attempt to argue that its breach occurred in 2008 – and only in 2008 – ignores the facts.  NU's 2008 coverage position was explicitly "based upon the materials submitted to date," and was subject to the caveat that NU remained "willing to reevaluate coverage based on any additional information" that Crowley submitted "at any time."  (Ex. E; *see also* Exs. S, Y-AA.)   That is exactly what Crowley did in 2015.  NU's argument is classic "heads I win, tails you lose" – NU asserts that because the Arbitration was completed before the Affidavit was unsealed publicly, *res judicata* bars Crowley's claim made after the unsealing; but if Crowley had waited for the unsealing before proceeding, according to NU, Crowley's claim would be barred because of the running of the statute of limitations.

**<u>Second</u>**, where, as here, an insurer breaches its defense obligation, the statute of limitations does not begin to run until the insured's "liabilities or rights have been finally and fully adjudicated" in the underlying matter. *Grissom v. Commercial Union Ins. Co.*, 610 So. 2d 1299, 1309–10 (Fla. 1st DCA 1992) (citation omitted); *Morales v. Zenith Ins. Co.*, 2010 WL 2293199, at *2 (M.D. Fla. June 8, 2010).  Here, Mr. Farmer's rights in connection with the DOJ

Investigation were not "finally and fully adjudicated" until his 2015 acquittal.[6]

Attempting to avoid this aspect of Florida law, NU makes the curious argument that this case is not about the cost of defending the "criminal case," as if some distinction can be made between "full and final adjudication" of the pre-indictment DOJ Investigation of Mr. Farmer and "full and final adjudication" of his criminal trial. (Dkt. 25 at 7.) But the entire criminal proceeding against Mr. Farmer, from 2008 until his 2015 acquittal, was a single criminal case brought solely and continuously by the same prosecuting agency for the same alleged antitrust violations. (Ex. C at 8-9.) The Policy makes no distinction regarding NU's defense obligations as to covered pre-indictment investigations and post-indictment proceedings. Moreover, the Policy makes clear that there could be no "full and final adjudication" until after Mr. Farmer's trial ended insofar as it contains a provision that would have allowed NU to seek repayment of advanced defense costs, including those for pre-indictment proceedings, if Mr. Farmer had been convicted of a deliberate crime. (Ex. O at End't. 9.) Because NU might have been able to claw back Mr. Farmer's defense costs after his trial, there cannot have been a full and final adjudication for coverage purposes until the end of his trial. There is no basis for NU's attempt to divide the case into two proceedings for purposes of determining when the underlying case against him was "fully and finally adjudicated."

**Third,** even if NU is correct that the statute of limitations should be calculated from its May 27, 2008 correspondence, the facts show that the statute of limitations should be equitably **and** statutorily tolled for the entire 1,169 days between May 27, 2013 (when NU says the five-

---

[6] Although the Policy provides for payment of defense costs rather than a duty to defend, this distinction makes no difference under Florida law. *Goldberg v. Nat'l Union Fire Ins. Co.*, 143 F. Supp. 3d 1283, 1293 (S.D. Fla. 2015); *MapleWood Partners, LP. v. Indian Harbor Ins. Co.*, 295 F.R.D. 550, 601 (S.D. Fla. 2013). NU tries to shrug off these cases as merely holding that the duty to defend and the duty to advance defense costs are "congruent." But these cases go farther, finding that the duties are functionally equivalent in that they are analyzed under the same standard, triggered at the same time, and require the same response from the insurer. *Id.*

year statute of limitations ran) and August 8, 2016 (the date Crowley filed this suit).

NU misstates Florida law in arguing that equitable tolling only applies in the administrative context. *Carroll v. TheStreet.com, Inc.*, 2014 WL 5474061, *6 (S.D. Fla. July 07, 2014) (rejecting argument that equitable tolling applies only in administrative proceedings and holding that "equitable tolling may be used by courts to prevent injustice," including in the civil context). Florida courts recognize equitable tolling, including in the civil context, where a plaintiff either: (1) "has in some extraordinary way been prevented from asserting his rights;" or (2) has been "misled or lulled into inaction." *Machules v. Dep't of Admin.*, 523 So. 2d 1132, 1134 (Fla. 1988); *Starling v. R.J. Reynolds Tobacco Co.*, 845 F. Supp. 2d 1215, 1236-40 (M.D. Fla. 2011).

Both of these circumstances exist here. The judicial sealing and unavailability of the Affidavit for seven years, through no fault of Crowley, constitutes an "extraordinary circumstance" warranting the application of equitable tolling. *See Starling*, 845 F. Supp. 2d at 1236-40; *Carroll*, 2014 WL 5474061 at *6. Moreover, NU cannot credibly argue the logically inconsistent positions that there is no Claim until an insured has access to and can present its insurer with the contents of the Claim, but that the statute of limitations still runs against the insured during the period that the insured cannot obtain such access. The concept of equitable tolling was designed to avoid precisely such an unfair result.

Likewise, NU's continued invitations to Crowley to submit material for further consideration "at any time" lulled Crowley into believing that it did not need to file any action against NU based on the Affidavit until after it became available. NU and its counsel, Peabody & Arnold, explicitly invited Crowley to submit additional documents, telling Crowley that "[w]e remain willing to reevaluate coverage" and stating if "you have additional information you

would like to provide, we continue to welcome you to ***do so at any time.***"  (Ex. Y; *see also* Exs. E, S.)  Indeed, NU accepted coverage for Mr. Farmer's defense costs on a going-forward basis after a February 2013 plea offer to him. (Ex. J.)  This certainly confirmed that NU would live up to its prior commitment to review additional materials, whenever they were submitted, even after the Arbitration.

Moreover, Florida statutes tolled the statute of limitations here for 1,307 days.  Pursuant to Fla. Stat. Ann. § 95.051(g), which tolls the statute during the "pendency of … [an] arbitral proceeding pertaining to a dispute that is the subject of the action," the statute was tolled for 328 days, from March 7, 2012 (when the arbitration commenced), to January 29, 2013, (when the Award was issued).[7]  Pursuant to Fla. Stat. Ann. § 95.051(f), which tolls the statute during the "payment of any part of … liability founded on a written instrument," the statute was tolled for a further 979 days, from February 18, 2013, when NU first agreed to pay Mr. Farmer's post-indictment defense costs, until October 24, 2015, the last date on which NU paid any of Mr. Farmer's defense costs.  (Ex. J; Ex. CC at 72:10-23; Ex. DD.)

Because the statute of limitations was equitably and statutorily tolled, NU's statute of limitations defense should be rejected.  At minimum, issues of fact exist as to whether NU's conduct equitably or statutorily tolls the statute of limitations, and its motion should be denied for this reason as well.

## V.      NU'S RUN-OFF ENDORSEMENT ARGUMENT SHOULD BE REJECTED

NU's untimely argument that the Run-Off Endorsement somehow bars coverage also must be rejected.  As an initial matter, NU did not concoct this argument until it filed its reply,

---

[7] NU mistakenly argues that Crowley cannot rely on this provision because Crowley's opposition to application of *res judicata* somehow necessarily implies that this case and the Arbitration pertain to different disputes.  Not so. Crowley's opposition to *res judicata* is based on the undisputed fact that critical new facts and conditions (*e.g.*, the unsealing of the Affidavit) intervened between the Arbitration and the filing of this case.

and it should be rejected on this basis alone.  *See, e.g., Foley v. Wells Fargo Bank, N.A.*, 849 F.Supp.2d 1345, 1349 (S.D.Fla. 2012).  Even if this were not the case, the Run-Off Endorsement clearly does not bar coverage here.  The Run-Off Endorsement gives Crowley from November 1, 2007 to November 1, 2013 to provide written notice of "any Claim made" during that period. (Ex. O at End't 14.)  NU's argument, however, relies on the flawed premise that Crowley did not give notice of the Claim against Mr. Farmer until 2015.  (Dkt. 25 at 6.)[8]  But Crowley reported the DOJ Investigation *in 2008, not 2015*.  Indeed, NU expressly admitted that the DOJ Investigation was "submitted to National Union as [a] Claim[] under the Policy."  (Ex. E.)

Crowley's notice included the search warrant, which identified the sealed Affidavit as supporting the finding of probable cause, and also noted that the "charges" leading to the Search Warrant existed, but were sealed.  (Exs. A; D.)  To be sure, Crowley was unable to submit evidence regarding the *contents of the Claim* (the Affidavit) until 2015, but that is not the same as failing to report *the existence of the Claim* until 2015.  The Run-Off Endorsement requires only that the insured provide written notice "of a Claim," and nowhere provides that the contents of the Claim, especially when unavailable, must be provided.

NU's position also ignores the fact that NU *accepted* Crowley's April 25, 2008 notice of the DOJ Investigation as a "notice of circumstances" pursuant to clause 7(c) of the Policy, which provides that if Crowley gives notice under Clause 7(c), then a "subsequently made" Claim that is "arising out of, based upon or attributable to such circumstances or alleging any Wrongful Act which is the same as or related to… such circumstances, *shall be considered made at the time such notice of such circumstances was given*."  (Ex. O at §7(c).)  The import of clause 7(c) is clear: any Claim – including the Affidavit – later asserted or unsealed and presented to NU – is

---

[8] In so arguing, NU once again bends itself in knots to avoid coverage because this argument, too, is inconsistent with NU's assertion that the statute of limitations began running in 2008.

"considered made when the notice of circumstances was given" (*i.e.*, April 25, 2008) because it involves the same or related Wrongful Acts as those involved in the April 2008 notice to NU. (Ex. M at ¶ 96.)

Finally, even though it was NU that first asserted that the DOJ Investigation triggered the "notice of circumstances" provision, NU now proffers an expert who asserts that the "notice of circumstances" does not apply to the Affidavit because the Affidavit "was dated ***prior to*** the notice of circumstances, so … it clearly is not a Claim ***subsequently made***." (Ex. N at ¶ 34 (emphasis in original.)) NU again takes a "heads I win, tails you lose" position. In NU's view, the Affidavit could never trigger coverage under the Policy because: (1) during the Policy period, the contents were unavailable so it could not be a Claim during the Policy period; and (2) after the Policy period, the "notice of circumstances" provision would not apply because the Affidavit was dated before Crowley's first notice on April 25, 2008. This hyper-technical position perverts the purpose of the notice of circumstances provision, which is to expand coverage under the Policy, not narrow it. (Ex. M at ¶¶ 93-98.)[9]

## VI.    CONCLUSION

For the foregoing reasons, Crowley respectfully requests that the Court deny NU's motion and grant such other and further relief as the Court may deem appropriate.

Dated: April 17, 2017                                 CROWLEY MARITIME CORPORATION

                                                      By:    /s/ John D. Shugrue
                                                             One of Its Attorneys

---

[9] If anything, NU's position proves Crowley's assertion that the Affidavit is a Claim first made on April 17, 2008, the date of the Affidavit. It is indisputable that the Affidavit is a Claim, and in arguing that the Affidavit is not a Claim ***subsequent*** to Crowley's first notice (Ex. N at ¶ 34), NU concedes that this Claim must have been made ***prior*** to that notice.

Charles B. Lembcke
Florida Bar No. 140285
Email: cbl@cbllaw.com
Law Offices of Charles B. Lembcke, P.A.
1300 Riverplace Blvd
Suite 605
Jacksonville, FL 32207
Telephone:  (904) 355-5467
Facsimile:  (904) 633-9328

*Admitted Pro Hac Vice:*
John D. Shugrue
Thomas A. Marrinson
Emily E. Garrison
REED SMITH LLP
10 South Wacker Drive, 40th Floor
Chicago, IL  60606-7507
Telephone:  (312) 207-1000
Facsimile:  (312) 207-6400

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that this document and all attachments thereto filed through the ECF system will be sent electronically to registered participants and paper copies will be sent to those indicated as non-registered participants on April 17, 2017.

/s/ Emily E. Garrison
Attorney for Plaintiff

**Doc. 36-1**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
### JACKSONVILLE DIVISION

CROWLEY MARITIME CORPORATION,    )
    )
    Plaintiff,    )
    )    Case No. 3:16-cv-01011-TJC-JBT
    v.    )
    )    **DEMAND FOR JURY TRIAL**
NATIONAL UNION FIRE INSURANCE    )
COMPANY OF PITTSBURGH, PA.,    )
    )
    Defendant.    )

## DECLARATION OF EMILY E. GARRISON

I, Emily E. Garrison, declare as follows:

1.    I have personal knowledge of the facts stated in this declaration.  I am over 18 years of age and could testify competently to the matters set forth herein if called upon to do so.

2.    I am an attorney at law duly licensed to practice before all courts in the State of Illinois, as well as the United States District Court for the Northern District of Illinois.  I am an attorney with the law firm Reed Smith LLP, attorneys of record for Crowley in this lawsuit.

3.    I submit this declaration in support of Crowley Maritime Corporation's ("Crowley") Supplemental Memorandum in Opposition to National Union Fire Insurance Company of Pittsburgh, Pa.'s ("National Union") Motion to Dismiss/For Summary Judgment (Dkt. 6, 28) in the above-captioned lawsuit.

4.    Attached hereto as Exhibit A is the Search Warrant and attached Affidavit which I obtained from Public Access to Court Electronic Records ("PACER") and which PACER

identified as being a true and correct copy of the records from the case captioned *United States of America v. Thomas Farmer,* Case No. 3:13-cr-00163 (District of Puerto Rico).

5.      Attached hereto as Exhibit B is a true and correct copy of excerpts from the March 16, 2017 deposition of Steven Ficon in this matter.

6.      Attached hereto as Exhibit C is a true and correct copy of the Expert Report of William F. Jung in this matter.

7.      Attached hereto as Exhibit D is a true and correct copy an April 25, 2008 Letter to AIG Domestic Claims, Inc., attaching an April 23, 2008 e-mail from Steve Ficon of Crowley and pages 31-33 of the March 3, 2017 deposition of Maureen Conboy in this matter.

8.      Attached hereto as Exhibit E is a true and correct copy of a May 27, 2008 letter from Maureen Conboy with AIG to Steve Ficon and pages 41-42 of the March 3, 2017 deposition of Maureen Conboy in this matter.

9.      Crowley instituted the prior arbitration that resulted in the January 29, 2013 Award on March 7, 2012.

10.     Attached hereto as Exhibit F is a true and correct copy of the January 29, 2013 Arbitration Decision and Award entered in the Arbitration between Crowley and National Union, Case No. 33-195 Y 00084 12.

11.     Attached hereto as Exhibit G is a true and correct copy of National Union's Motion for Summary Disposition submitted in the Arbitration.

12.     Attached hereto as Exhibit H are true and correct copies of excerpts from the transcript of the proceedings in the Arbitration.

13.     Attached hereto as Exhibit I are true and correct copies of a March 29, 2013 *In Camera* Order and related Motion to Disclose Search Warrant, Search Warrant Application and

Affidavit, and Related Documents from the case captioned as *In the Matter of Search Warrant for: Crowley Liner Services, Inc.*, Case No. 3:08-mj-1092 (M.D. Fla.).

14.     Attached hereto as Exhibit J is a true and correct copy of a March 5, 2013 letter produced by National Union in this matter bearing bates numbers NU003891-93.

15.     Attached hereto as Exhibit K are true and correct copies of a December 9, 2011 *In Camera* Order and related Motion to Disclose Search Warrant, Search Warrant Application and Affidavit, and Related Documents from the case captioned as *In the Matter of Search Warrant for: Crowley Liner Services, Inc.*, Case No. 3:08-mj-1092 (M.D. Fla.).

16.     Attached hereto as Exhibit L is a true and correct copy of National Union's Responses to Crowley's First Set of Requests for Admission in this matter.

17.     Attached hereto as Exhibit M is a true and correct copy of the Expert Witness Report of Ty R. Sagalow in this matter.

18.     Attached hereto as Exhibit N is a true and correct copy of the Expert Witness Report of Thomas R. Newman in this matter.

19.     Attached hereto as Exhibit O is a true and correct copy of Executive and Organization Liability Insurance Policy bearing policy number 061-36-48.

20.     Attached hereto as Exhibit P are true and correct copies of April 16, 2008 *In Camera* Order and related Motion to Seal Search Warrant Application and Affidavit from the case captioned as *In the Matter of Search Warrant for: Crowley Liner Services, Inc.*, Case No. 3:08-mj-1092 (M.D. Fla.).

21.     Attached hereto as Exhibit Q is a true and correct copy of a June 30, 2008 letter from Terrance Reed to Maureen Conboy and pages 61-62 of the March 3, 2017 deposition of Maureen Conboy in this matter.

22.     Attached hereto as Exhibit R is a true and correct copy of a November 26, 2008 letter from Steven Ficon to Dan Sweeney of Crowley's broker, AON and pages 65-67 of the March 3, 2017 deposition of Maureen Conboy in this matter.

23.     Attached hereto as Exhibit S is a true and correct copy of a February 3, 2009 letter from Maureen Conboy to Steven Ficon and pages 66-67 of the March 3, 2017 deposition of Maureen Conboy in this matter.

24.     Attached hereto as Exhibit T is a true and correct copy of a September 30, 2009 letter from Steven Ficon to Maureen Conboy and pages 70-71 of the March 3, 2017 deposition of Maureen Conboy in this matter.

25.     Attached hereto as Exhibit U is a true and correct copy of a July 18, 2012 letter from Terrance Reed to Maureen Conboy.

26.     Attached hereto as Exhibit V is a true and correct copy of a May 7, 2008 email from Steven Ficon to Edward Conlon and pages 37-38 of the March 17, 2017 deposition of Michele Graffeo in this matter.

27.     Attached hereto as Exhibit W is a true and correct copy of a June 30, 2008 letter from Terrance Reed to Maureen Conboy and pages 62-63 of the March 3, 2017 deposition of Maureen Conboy in this matter.

28.     Attached hereto as Exhibit X is a true and correct copy of a May 22, 2008 email from Edward Conlon to Maureen Conboy attaching a March 13, 2008 letter from Mark Rosenblum to Edward Conlon and pages 49-50 of the March 17, 2017 deposition of Michele Graffeo in this matter.

29.     Attached hereto as Exhibit Y is a true and correct copy of a June 9, 2010 letter from E. Joseph O'Neil, counsel for National Union to Catherine J. Dolan of Crowley's broker, AON and pages 65-66 of the March 17, 2017 deposition of Michele Graffeo in this matter.

30.     Attached hereto as Exhibit Z is a true and correct copy of an August 12, 2010 letter produced by National Union in this matter bearing bates numbers NU003811-12.

31.     Attached hereto as Exhibit AA is a true and correct copy of an August 28, 2012 letter from Michael Duffy to Terrance Reed.

32.     Attached hereto as Exhibit BB is a true and correct copy of excerpts from the March 3, 2017 deposition of Maureen Conboy in this matter.

33.     Attached hereto as Exhibit CC is a true and correct copy of excerpts from the March 3, 2017 deposition of Michele Graffeo in this matter.

34.     Attached hereto as Exhibit DD is a true and correct copy of an October 16, 2015 letter from Michael Duffy to Terrance Reed and pages 101-102 of the March 17, 2017 deposition of Michele Graffeo in this matter.

35.     Attached hereto as Exhibit EE is a true and correct copy of a July 22, 2015 letter from Steven Ficon to Michele Graffeo and pages 76-77 of the March 17, 2017 deposition of Michele Graffeo in this matter.

36.     Attached hereto as Exhibit FF is a true and correct copy of an August 3, 2015 letter from Michele Graffeo to Steven Ficon and page 77 of the March 17, 2017 deposition of Michele Graffeo in this matter.

37.     Attached hereto as Exhibit GG is an August 12, 2013 Order which I obtained from Public Access to Court Electronic Records and which PACER identified as being a true and

correct copy of the records from the case captioned *United States of America v. Thomas Farmer,* Case No. 3:13-cr-00163 (District of Puerto Rico).

38.      Attached hereto as Exhibit HH is a true and correct copy of excerpts from the March 8, 2017 deposition of William Jung in this matter.

I declare the foregoing to be true and accurate to the best of my knowledge under the penalty of perjury.


Executed on April 17, 2017

_____
Emily E. Garrison

**Doc. 36-2**

# EXHIBIT A

AO 106 (Rev. 7/87) Affidavit for Search Warrant

CERTIFIED A TRUE COPY
SHERYL L. LOESCH, CLERK
U. S. DISTRICT COURT

By: _Jessica_____

Deputy Clerk

# UNITED STATES DISTRICT COURT

## MIDDLE DISTRICT OF FLORIDA

In the Matter of the Search of
(Name, address or brief description of person, property or premises to be searched)

CROWLEY LINER SERVICES, INC.
9487 Regency Square Boulevard
Jacksonville, Florida 32225-8126

**APPLICATION AND AFFIDAVIT
FOR SEARCH WARRANT**

CASE NUMBER: 3:08-mj-1092-JRK

I, Byron Thompson, being duly sworn, depose and say:

I am a Special Agent with the Federal Bureau of Investigation, and have reason to believe

that ☐ on the person of or ☒ on the property or premises known as (name, description and/or location)

See Attachment A

involving which there is an offense under investigation in the Middle District of Florida, there is now concealed a certain person or property, namely

See Attachment B

which is (state one or more bases for search and seizure set forth under Rule 41(b) of the Federal Rules of Criminal Procedure)

☒ property that constitutes evidence of the commission of a criminal offense

☐ contraband, the fruits of crime, or things otherwise criminally possessed

☒ property designed or intended for use or which is or had been used as the means of committing a criminal offense

☐ person for whose arrest there is probable cause, or who is unlawfully restrained

concerning violations of Title 15, United States Code, Sections 1.

The facts to support a finding of Probable Cause are as follows:

### SEE ATTACHED AFFIDAVIT

Continued on the attached sheet and made a part hereof: ☒ Yes ☐ No

_____
Signature of Affiant
Byron Thompson

Sworn to before me and subscribed in my presence

Date: April 16, 2008 at 6:15 p.m.

at Jacksonville, Florida
City and State

The Honorable James R. Klindt
United States Magistrate Judge
Name & Title of Judicial Officer

_____
Signature of Judicial Officer

DISTRICT of PUERTO RICO
03:13-CR-00182 (DRD)
Government Exhibit
A

CROW002731

<u>ATTACHMENT A</u>
<u>DESCRIPTION OF PREMISES TO BE SEARCHED</u>

The office area to be searched is more particularly described as the corporate office of CROWLEY LINER SERVICES, INC., located within their building identified as 9487 Regency Square Boulevard, Jacksonville, Florida 32225-8126. The search will be limited to the areas where CROWLEY's management, pricing, and sales personnel, and their respective administrative staff sit and work; and all computer rooms and areas (including the contents of any network or e-mail server), document storage areas, filing cabinets, filing containers, and safes on the premises that are large enough to contain business records, files, correspondence, calendars, and other documents.

The CROWLEY office building is located within the North Regency Executive Park. The office park complex is bordered on three sides by Regency Square Boulevard, Gilmore Heights Road and Regency Square Boulevard North. CROWLEY's office building is one of two similarly designed structures on the office park property. The building is a 5-story structure with a glass and concrete exterior. The building's exterior appearance consists of glass panels that wrap around the building on each floor level without separation. At each floor level, there is a concrete exterior layer separating floors beneath from the floors above. The concrete surface is a light tan, or off-white color. The second floor level overhangs the first floor in several areas and is supported by columns.

CROWLEY's main entrance is on the north side of the building. The entrance exterior is all glass and has glass doors on either side of a reception station. Access to the facility through these locked doors is effected through the receptionist or by

an employee's electronic card-key. There are additional secured doors at the rear, courtyard area.

In order to minimize the prospect of the removal and subsequent destruction of any of the documents and records identified in Attachment B to the Search Warrant, the search will include the briefcases, laptop computers, hand-held computers, cell phones, Blackberries, and other movable document containers found on the premises described above, and in the possession of, or readily identifiable as belonging to CROWLEY management, pricing, or sales personnel including, but not limited to ROB GRUNE, TOM FARMER, JOHN KELLEY, and TONY LUSIS. Photographs of the premises are incorporated below:



CROW002733



Figure 1 – CROWLEY Office, Front of building with sign and CROWLEY emblem



Figure 2 – CROWLEY Office, southeast side, rear of building

CROW002734



Figure 3 – CROWLEY main entrance, northwest side

CROW002735

## ATTACHMENT B
## DESCRIPTION OF PROPERTY TO BE SEIZED

The following documents created on or after January 1, 2002:

A.  Notes, memoranda, correspondence, reports, and other records and documentation relating to any agreement, meeting, conversation, or other communication between or among management, pricing, or sales personnel CROWLEY LINER SERVICES, INC., including, but not limited to ROB GRUNE ("GRUNE"), TOM FARMER ("FARMER"), JOHN KELLEY ("KELLEY"), and TONY LUSIS ("LUSIS") and any employee or agent of a SEA STAR LINE, LLC, and HORIZON LINES, LLC.

B.  Notes, memoranda, correspondence, reports, price sheets or lists, and other records or documentation relating to the customer allocations or divisions, market shares, and contract negotiations or bid proposals, including, but not limited to the prices, surcharges, and costs offered to any customer.

C.  Final or draft bid files, proposals, purchase orders, contracts, correspondence, estimate work sheets and other documents used to prepare bids or quotes submitted to prospective purchasers of coastal freight transportation services between the United States and Puerto Rico.

D.  All appointment records, diaries, calendars, and other documents used to record schedules, meetings, conversations, or other events by or for CROWLEY management, pricing, or sales

CROW002736

personnel including, but not limited to GRUNE, FARMER, KELLEY and LUSIS.

E.  All telephone charge and toll records, including cellular telephone records for CROWLEY management, pricing, or sales personnel including, but not limited to GRUNE, FARMER, KELLEY and LUSIS.

F.  All address books (including electronic address books, such as devices commonly referred to as electronic organizers and Blackberries); message logs; or other indicia of notation of messages and telephone numbers and calls of CROWLEY management, pricing, or sales personnel including, but not limited to GRUNE, FARMER, KELLEY and LUSIS.

As used above, the terms records, documents, programs, documentation, applications or materials include but are not limited to records, documents, programs, applications or materials created, modified or stored in any form, including any optical, electrical, electronic or magnetic form (such as any information on an optical, electrical, electronic or magnetic storage device), including floppy disks, hard disks, ZIP disks, CD-ROMs, optical disks, backup tapes, printer buffers or other device memory buffers, smart cards, memory calculators, pagers, personal digital assistants such as Palm Pilot hand-held computers, e-mail servers, as well as opened and unopened e-mail messages and any printouts or readouts from any optical, electrical, electronic or magnetic storage device; any handmade form (such as writing, drawing or painting); any mechanical form (such as printing or typing); any photographic form (such as microfilm,



CROW002737

microfiche, prints, slides, negatives, videotapes, motion pictures or photocopies); or any voice form (including answering machine tapes and opened and unopened voicemail messages).

-3-

CROW002738

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

IN THE MATTER OF
SEARCH WARRANT FOR:                          CASE NO.

CROWLEY LINER SERVICES, INC.
9487 Regency Square Boulevard                FILED UNDER SEAL
Jacksonville, Florida 32225-8126

<u>AFFIDAVIT IN SUPPORT OF SEARCH WARRANT</u>

Your affiant, Byron Thompson, being first duly sworn, states that the
following is true to the best of his knowledge and belief:

I.    **AFFIANT**

1.    I am a Special Agent with the Federal Bureau of Investigation ("FBI")
and have been so employed for more than 12 years. I am assigned to the FBI Field
Office in Jacksonville, Florida.

2.    As a Special Agent with the FBI, my responsibilities include the
investigation of federal antitrust, corporate fraud, securities, public corruption,
bank fraud, money laundering, and mail and wire fraud statutes. I have also
investigated numerous computer crime violations to include computer intrusions,
Internet-related fraud and served 3 years as a full-time computer forensic examiner
for the FBI. Based on my training, experience, and participation in these types of
investigations, I am familiar with the techniques used by persons engaged in such
unlawful activities to carry out such activities.

3.    I am authorized to investigate violations of the laws of the United
States, and I am a law enforcement officer with the authority to execute warrants
issued in the name of the United States. In conjunction with my service for the

CROW002739

FBI, I have conducted and participated in the execution of numerous search warrants, including search warrants executed on corporate offices and similar business locations.

## II.     SUMMARY OF THE INVESTIGATION

4.     Since February 2008, I have been the lead case agent in a joint investigation by the FBI and the Department of Justice ("DOJ") into a conspiracy, that appears to have been in existence since at least 2002 and has continued to the present ("relevant period"), to allocate market share and customers, fix prices, and rig bids in violation of 15 U.S.C. § 1 (Sherman Act)

5.     Section 1 of the Sherman Act, 15 U.S.C. § 1, makes unlawful "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations..." Thus, the Sherman Act prohibits every conspiracy, agreement, understanding, plan or scheme, between two or more horizontal competitors, to: (a) fix, set, raise, lower, maintain, stabilize, or otherwise affect prices; (b) rig bids; or (c) allocate customers or territories. The agreement itself is the crime.

6.     The corporate subjects of the investigation are coastal water freight carriers. Coastal water freight carriers transport goods between the mainland United States and the noncontiguous states and territories of the United States, including Puerto Rico. This search warrant application is made in furtherance of this investigation.

7.     The facts set forth in this affidavit are based upon information obtained during this investigation from a senior executive who is presently working



CROW002740

for a coastal water freight carrier, SEA STAR LINE, LLC, and cooperating with this investigation ("CW-1"); emails and documents obtained by CW-1; emails and documents obtained by execution of search warrants on Internet Service Providers; consensual audio and video recordings made by CW-1; other law enforcement officers; publicly available records and information; and information gained through my training and experience.

8. CW-1 is negotiating a cooperation agreement with the DOJ. If CW-1 receives a cooperation agreement and abides by the terms of his/her cooperation agreement, the DOJ will not prosecute him/her for any involvement he/she may have had in the coastal water freight transportation conspiracy.

9. Based on my investigation, experience, and training, I believe the information provided by CW-1 is credible and reliable. CW-1 has been advised that he/she must provide full, complete, and truthful cooperation to the United States. Further, the information provided by CW-1 is based on first-hand knowledge and has been corroborated through my review of contemporaneously written documents, consensual audio and video recordings made by CW-1, evidence obtained through the execution of search warrants on Internet Service Providers, information provided by others, and by publicly available information.

10. CW-1 is in a unique position to provide information in that CW-1 and the subjects of the investigation, discussed below, all worked within the corporate office of SEA STAR and were all directly involved in and/or were knowledgeable about the pricing communications occurring between SEA STAR and other companies. Based on my interviews with CW-1, described more fully later in this

-3-



affidavit, I believe CW-1 worked in close physical proximity to SEA STAR's Senior Vice President of Yield Management, PETER A. BACI, and through casual office conversation and observation knows that BACI has had email and telephone conversations with the Vice President of Pricing & Yield Management for CROWLEY LINER SERVICES, INC., TONY FARMER, about pricing and shipping rates between the two competitor coastal freight carriers, SEA STAR and CROWLEY. In a specific example discussed in paragraphs 74 and 75 of this affidavit, CW-1 participated in a consensual audio recording with BACI, the content of which I have listened to, in which BACI, FARMER and GREG GLOVER, a Vice President of HORIZON LINES, LLC, all exchange communications on pricing and pledge agreements to allocate market share between the competitor companies they represent. During an interview with CW-1 on March 13, 2008, CW-1 told me that BACI previously worked for CROWLEY for more than five (5) years, ending in approximately 1999. CW-1 also told me that BACI has known FARMER much longer than he has been acquainted with GLOVA, and that FARMER works from CROWLEY's office building near Regency Mall in Jacksonville, Florida. Based upon this information and emails I have reviewed, which are described further in this affidavit in paragraph 76, I believe it is probable that document evidence will be located within individual offices for CROWLEY management and within the areas occupied by sales and pricing personnel.

11.    This affidavit is submitted for the limited purpose of establishing probable cause in support of the application for a search warrant; thus, it does not set forth each and every fact learned by me or others during the course of this investigation or known to the United States at this time.

-4-

III.   SUBJECTS OF THIS INVESTIGATION

12.   The subjects of this investigation include companies that sell coastal water freight services, as well as certain officers and employees of those companies. These subjects include, but are not limited to:

  a.   SEA STAR LINE, LLC ("SEA STAR"). SEA STAR is a coastal water freight carrier and carries freight between the United States and Puerto Rico. It is 90 percent owned by SaltChuk Resources, a Seattle-based company, and 10 percent owned by Taino Star, a company based in Puerto Rico. SEA STAR's corporate office is based at 100 Bell Tel Way, Suite 300, Jacksonville, Florida 32216.

    i.   FRANK PEAKE ("PEAKE"). During the relevant period, PEAKE was President and Chief Operating Officer of SEA STAR and worked in SEA STAR's Jacksonville, Florida office.

    ii.   PETER A. BACI ("BACI"). During the relevant period, BACI was Senior Vice President of Yield Management for SEA STAR, reported to PEAKE, and worked in SEA STAR's Jacksonville, Florida office.

    iii.   CARL FOX ("FOX"). During some of the relevant period, FOX was Senior Vice President of Sales, Customer Service & Marketing for SEA STAR, reported to PEAKE, and worked in SEA STAR's Jacksonville, Florida office.

    iv.   NED LAGOY ("LAGOY"). During the relevant period, LAGOY was Vice President of Puerto Rico for SEA STAR,

-5-



CROW002743

reported to PEAKE, and worked in SEA STAR's San Juan, Puerto Rico office.

v. NEIL PERLMUTTER ("PERLMUTTER"). During the relevant period, PERLMUTTER was Senior Vice President of Finance for SEA STAR, reported to PEAKE, and worked in SEA STAR's Jacksonville, Florida office.

vi. ALEX CHISHOLM ("CHISHOLM"). During the relevant period, CHISHOLM was Assistant Vice President of Pricing for SEA STAR, reported to BACI, and worked in SEA STAR's Jacksonville, Florida office.

vii. MIKE NICHOLSON ("NICHOLSON"). During the relevant period, NICHOLSON was Assistant Vice President of Pricing for SEA STAR, reported to BACI, and worked in SEA STAR's Jacksonville, Florida office.

viii. EDWARD PRETRE ("PRETRE"). During the relevant period, PRETRE was Pricing Director - North for SEA STAR and worked in SEA STAR's Port Elizabeth, New Jersey office. During most of the relevant period, PRETRE reported directly to BACI, but since 2007 he has reported to CHISHOLM.

ix. WILLIAM BYRNES ("BYRNES"). During the relevant period, BYRNES was Director of Northeast Sales for SEA STAR and worked from a home-office in his house in Allentown, New Jersey.

-6-



CROW002744

  x. CRISTINA COLON ("COLON"). During the relevant period, COLON was Assistant Vice President of Puerto Rico Sales for SEA STAR, reported to LAGOY, and worked in SEA STAR's San Juan, Puerto Rico office.

b. HORIZON LINES, LLC ("HORIZON"). HORIZON is a coastal water freight carrier and carries freight between the United States and Puerto Rico. It is a wholly owned subsidiary of Charlotte, North Carolina-based Horizon Lines Holding Corporation. Horizon Lines Holding Corporation is a subsidiary of Horizon Lines, Inc., also based in Charlotte. HORIZON's corporate office is based at 4064 Colony Road, Suite 200, Charlotte, North Carolina 28211.

  i. GABRIEL SERRA ("SERRA"). During the relevant period, SERRA was Senior Vice President and General Manager, Puerto Rico of HORIZON and worked in HORIZON's Guaynabo, Puerto Rico office.

  ii. GREG GLOVA ("GLOVA"). During the relevant period, GLOVA was a Vice President of HORIZON and worked in HORIZON's Charlotte, North Carolina office.

  iii. SAM RAYMOND ("RAYMOND"). During the relevant period, RAYMOND was employed by HORIZON.

c. CROWLEY LINER SERVICES, INC. ("CROWLEY"). CROWLEY is a coastal water freight carrier and carries freight between the United States and Puerto Rico. It is a wholly owned subsidiary of Oakland, California-based Crowley Maritime

-7-



CROW002745

Corporation. CROWLEY's corporate office is based at 9487 Regency Square Boulevard, Jacksonville, Florida 32225-8126.

    i.    ROB GRUNE ("GRUNE"). During the relevant period, GRUNE was employed as a Senior Vice President of Pricing for CROWLEY and worked in CROWLEY's Jacksonville, Florida office.

    ii.    TOM FARMER ("FARMER"). During the relevant period, FARMER was employed as Vice President of Pricing & Yield Management of CROWLEY and worked in CROWLEY's Jacksonville, Florida office.

    iii.    JOHN KELLEY ("KELLEY"). During the relevant period, KELLEY was employed as Area Sales Manager, West and worked in CROWLEY's Jacksonville, Florida office. *I reviewed the company's website and observed KELLEY was listed as CROWLEY's Area Sales Manager, WES B.D.*

    iv.    TONY LUSIS ("LUSIS") During the relevant period, LUSIS was involved with pricing, and worked in CROWLEY's Jacksonville, Florida office.

13.    I make this affidavit in support of an application by the United States for a search warrant for the business offices, secretarial areas, document storage areas, and computers and electronic devices of CROWLEY which is located at 9487 Regency Square Boulevard, Jacksonville, Florida 32225-8126 (more fully described in Attachment A which is incorporated herein by reference), and which contain and conceal documents (more fully described in Attachment B, which is incorporated herein by reference) that constitute evidence of a conspiracy to allocate market

-8-



share and customers, to raise, fix and maintain coastal freight rates, and to rig bids in the coastal freight industry on trade lanes between the United States and Puerto Rico.

## IV.   EVIDENCE ESTABLISHING PROBABLE CAUSE

14.   Based on my review of publicly available information as well as information provided by CW-1, I believe that coastal freight shipments between the United States and Puerto Rico is a niche industry dominated primarily by four major carriers. Two carriers, SEA STAR and HORIZON, operate self-propelled ships, and two other carriers, CROWLEY and Trailer Bridge, run tugs and barges. Because self-propelled ships can make the trip between the United States and Puerto Rico considerably faster than tugs and barges, the self-propelled ship service offered by SEA STAR and HORIZON is more desirable and expensive than the tug and barge service offered by CROWLEY and Trailer Bridge. The percentage of shipments between the United States and Puerto Rico that are carried by self-propelled ships is roughly equal to the percentage of shipments carried by tugs and barges.

15.   According to CW-1, a large majority of shipping between the United States and Puerto Rico is handled pursuant to contracts called transportation service agreements, agreements which typically last one year in length and are put out annually for competitive bid. Pursuant to these agreements, the four major shippers transport a large variety of cargo, including produce, consumer goods, and automobiles.

16.   CW-1 has informed me that BACI is responsible for determining the prices that SEA STAR will offer in contract negotiations and in connection with bids

-9-



CROW002747

solicited by customers. When SEA STAR sales personnel wish to bid on or negotiate a contract, they must seek pricing authority from BACI. Based on information provided by CW-1 as well as my review of documents and email communications, discussed below, I believe that GLOVA has similar pricing authority at HORIZON. Based on information provided by CW-1 as well as a review of publicly available information, I believe that FARMER holds a similar position of pricing authority at CROWLEY.

### A. Market Share Communications Between SEA STAR and HORIZON

17.     Based on information and documents provided to me by CW-1 during *between about February 4, 2008 and April 15, 2008* ~~multiple interviews~~ as well as emails between BACI of SEA STAR and GLOVA of HORIZON that I have reviewed, I believe that BACI and GLOVA have been engaged in communications regarding the allocation of market share and customers on an equal basis between SEA STAR and HORIZON. Based on *a telephone call* ~~emails~~ between *(see paragraph 28)* BACI and GLOVA that I have reviewed, I believe these communications have been ongoing since as early as 2002. *CW-1 has told me, as late as April 2008 that the communications between SEA STAR and HORIZON are ongoing.*

18.     In particular, during an interview on February 4, 2008, CW-1 told me that in early 2007 he/she became aware of pricing communications between BACI and GLOVA as a result of statements made by BACI and documents shown to him*/her* by BACI. At various times in 2007 and 2008, CW-1 sought pricing authority from BACI during negotiations with certain customers, and BACI made statements and showed documents to CW-1 indicating that BACI and GLOVA were in communication about the prices SEA STAR and HORIZON would bid on particular contracts. According to CW-1, on at least one occasion, BACI showed CW-1 documents that contained HORIZON pricing information that CW-1 was able to

-10-

ascertain, from the facsimile transmittal information printed as a header on the documents, had been sent to BACI directly from HORIZON. BACI also showed CW-1 emails transmitted between BACI's personal email account, lighthouse123@gmail.com, and a personal email account, southorange@gmail.com, that BACI told CW-1 was maintained by GLOVA.

19. During the February 4, 2008 interview, CW-1 also provided me with copies of documents and emails that BACI had shown him/her. Based on information provided to me by CW-1 and the documents and email communications that CW-1 gave me, which are more fully detailed in the paragraphs to follow, I believe the GMAIL account lighthouse123@gmail.com is used by BACI to communicate with GLOVA at the GMAIL account southorange@gmail.com to: (a) allocate market share and customers between SEA STAR and HORIZON; (b) fix, set, raise, lower, maintain, stabilize, or otherwise affect prices; and (b) rig bids in violation of 15 U.S.C. § 1. On that basis, in February 2008, I applied for, received, and executed a search warrant for the contents of those accounts on the Internet Service Provider Google Inc., which hosts email accounts branded as "GMAIL" accounts. The search warrant resulted in the production of more than 700 emails and documents, the vast majority of which were communications between BACI and GLOVA regarding HORIZON and SEA STAR pricing, customers, and market shares.

20. Based on my review of the emails obtained from the GMAIL accounts, I believe that BACI and GLOVA communicated on an almost daily basis from approximately April, 2007, through at least February, 2008, for the purpose of ensuring that each company maintains a similar market share and specific

-11-

CROW002749

customers for shipments between the United States and Puerto Rico and also to coordinate the prices that SEA STAR and HORIZON will offer in contract negotiations and bids with customers.

21.    I further believe, based on my review of these emails, that these illicit agreements to allocate customers and coordinate prices extend to similar communications and agreements between BACI, GLOVA and FARMER of CROWLEY.

22.    For instance, I reviewed a series of emails exchanged by BACI and GLOVA in November and December 2007 regarding the respective market shares of SEA STAR and HORIZON. In one email dated November 15, 2007, BACI wrote GLOVA: "Here is a look at [southbound] market share between June and August this year versus last. . . . as the weekly loads has been showing us you are improving and we are suffering as a result . . ." In an email response on the same day, GLOVA stated: "[L]et me take a look at it . . . we'll work things out, but I need to compare with my data as well for good order sake."

23.    According to a series of emails I have reviewed, BACI and GLOVA planned to meet in Jacksonville on December 20, 2007, in order to discuss the market shares of SEA STAR and HORIZON. On December 15, 2007, GLOVA wrote BACI, "my flight gets in jax thr 12/20 at 1:09pm . . . . I don't depart until 7:55 PM, so that gives us plenty of time." On December 17, 2007, BACI responded, "okay··i will get us a spot near the airport and will pick you up." In an email response on the same day, GLOVA asked BACI if there was "anything else that you want to discuss besides market share?" Also on December 17, 2007, GLOVA sent BACI a spreadsheet comparing market shares of SEA STAR, HORIZON, CROWLEY and

-12-



CROW002750

Trailer Bridge, attached to an email entitled "jax/pev share analysis to discuss", in which GLOVA told BACI that he would "see [him] at the airport". Using my skills as a computer forensic examiner, I reviewed the properties of the market share spreadsheet computer file attached to the email and learned that the document author was listed as SAM RAYMOND, who, as noted above, is employed by HORIZON..

24. On December 18, 2007, BACI sent an email to GLOVA discussing this spreadsheet, saying: "Greg—the columns to the left are June thru August 2007 and the same time for 2006 and show [SEA STAR's] share dropping [southbound] from 24.0 to 21.2 versus your improvement from 23.9 to 24.8." The email communications I reviewed on this topic continued into January 2008, when BACI wrote GLOVA that "[i]f we just look in terms of [HORIZON's market share gain] coming back to our side of the ledger it would still require an adjustment of about 20 loads [per] week."

25. Based on other emails and documents that I have reviewed, I believe that BACI and GLOVA closely monitor and exchange information regarding the total number of loads that SEA STAR and HORIZON carried between the United States and Puerto Rico. I have reviewed numerous emails for the approximate period, April 2007 through February 2008 in which BACI and GLOVA exchange information regarding the number of loads hauled by each company, northbound and southbound.

26. Based on information provided to me by CW-1 as well as documents I have reviewed, I believe that when a significant customer shifts its business between SEA STAR and HORIZON, BACI and GLOVA communicate for the

-13-



purpose of maintaining the balance of market share and customers between the companies. For example, as discussed in more detail below, SEA STAR lost shipments it was carrying for Walgreens to HORIZON in April 2007. Thereafter, BACI and GLOVA communicated about how to offset the loss of the Walgreens business for SEA STAR. In an April 18, 2007 email, BACI made a proposal for resolving the Walgreens issue, concluding that "if you agree to these two [proposals] we will make up nearly half of the walgreens deficit and it happens relatively quickly." In a reply email dated April 19, 2007 and entitled "Walgreens Recovery," GLOVA responded that he "would prefer to even things out without touching the nvo market. . . . I am committed to working it out with you - just want to discuss options first." In another such email dated April 17, 2007 that referred in the subject line to "Walgreens," BACI states: "As discussed you and I need to agree on the correct path for renormalizing the split and we need to recognize that this may take some weeks to accomplish. For the short term we suggest that you start this week booking 30 loads/week against our [Southbound] sailings [from Port Elizabeth, New Jersey] and [Jacksonville, Florida] which at leas[t] gives us the time to make the transition smoothly. [FRANK PEAKE of SEA STAR] is raising this issue with [GABRIEL SERRA of HORIZON] as we speak. Longer term I think your accounts that we could work together on include Eagle, X-press Freight, Kimberly Clark, Ace Hardware[,] Pueblo, C+F, and Kraft. Let's discuss." In response, GLOVA sent an email to BACI on April 17, 2007, in which he stated that "[w]e will work to square things away with each other as discussed. The most important thing is to not panic. we will work it out as discussed. we just need to figure out

-14-



which accounts make sense. Some accounts you are suggesting make sense, while a few do not. we'll work it out. Let's just do it the right way."

27.     Based on the information provided by CW-1 and emails and other documents that I have reviewed, it appears that BACI and GLOVA were allocating customers and the market to ensure that both companies would maintain a nearly identical percentage of the freight carried by self-propelled ships between the United States and Puerto Rico. In addition to information provided by CW-1, I have reviewed emails evidencing that BACI and GLOVA attempted to allocate the market evenly between SEA STAR and HORIZON by exchanging pricing information regarding contract negotiations with individual customers, adopting coordinated strategies for the purpose of obtaining higher rates in annual contract negotiations with customers, and reaching agreements regarding which company would take the lead in contract negotiations with particular customers and how much each company would offer in negotiations.

28.     On February 19, 2008, CW-1, at my direction, made a consensual audio recording of a conference call he had with BACI, FOX, and LAGOY. I have reviewed this audio recording in its entirety. At one point during the conference call, BACI says that if HORIZON is the "lead" on a particular account, the first set of prices that BACI authorizes will always be higher than HORIZON's first set of prices and vice versa for accounts where SEA STAR is the "lead." BACI told the others that "[w]e've been playing this game for six years now. We know how it's played." After LAGOY stated that it was necessary for BACI to provide initial pricing that was not so high as to offend the customer, BACI explained that the initial pricing differential between the lead and non-lead company would be 5-10%.

-15-



CROW002753

FOX responded that he thought the approach was reasonable because it meant that there would be "no surprises."

**B. Communications Between SEA STAR and HORIZON Regarding Specific Contracts**

29. During interviews, CW-1 has related a number of specific examples of contracts that were the subject of manipulation by BACI and GLOVA and has provided emails and other documents supporting that manipulation and the resulting effect. Additionally, email communications between BACI and GLOVA that were obtained by search warrant and that I have reviewed reflect similar manipulation of numerous other contracts and accounts. A few examples of such contracts that CW-1 told me about or that were reflected in the emails obtained by search warrant include the following:

**1. Walgreens**

30. On February 4, 2008, CW-1 told me that in or about April 2007, Walgreens held an online reverse auction for a contract for its United States to Puerto Rico shipping. I know from public sources and my experience that in a typical reverse online auction, the buyer advertises a need for a service. Sellers then place bids for the amount they expect to be paid in order to perform the service. Generally, the seller who places the lowest bid is awarded the job. The bidding of an online reverse auction is generally monitored by the buyer as it takes place. This "real time" bidding feature and the fact that the sellers do not know the bid amounts of competing sellers is intended to make the bidding more competitive, as sellers attempt to outbid each other in order to win the contract.

-16-



31.     CW-1 told me that he/she witnessed BACI and his assistant, CHISHOLM, participating in the reverse auction and bidding on the Walgreens contract. During the reverse auction, CW-1 watched BACI use his cellular telephone while directing CHISHOLM, who was seated at a computer in BACI's office, to enter the price to bid for SEA STAR in the reverse auction. CW-1 told me that SEA STAR ultimately lost the reverse auction to GLOVA's company, HORIZON.

32.     CW-1 told me that after the reverse auction, he/she had a conversation with BACI about the online auction. BACI told him/her that the person he was on the phone with during the auction was GLOVA. BACI told CW-1 that although SEA STAR had lost the reverse auction, BACI and GLOVA had worked things out so that HORIZON would make up for the business SEA STAR lost on the Walgreens contract with other business. As discussed above, I have reviewed emails between BACI and GLOVA in April 2007 in which they were exchanging proposals regarding how "to even things out" for SEA STAR's loss of Walgreens business in which GLOVA stated that he was "committed to working it out with [BACI] . . . ."

### 2.     Office Max

33.     During our interviews, CW-1 also told me that after losing the business with Walgreens, CW-1 wanted SEA STAR to go after business with Office Max, which CW-1 knew to be a long-time client of HORIZON. He/she proposed the idea to BACI and BACI said he would consider it.

34.     CW-1 told me that BACI later came back to CW-1 and directed him/her not to compete for business from Office Max because BACI had agreed with GLOVA

-17-



CROW002755

that Office Max would remain HORIZON's client. BACI also reassured CW-1 that GLOVA and HORIZON would make up for SEA STAR's lost Walgreens business with some other contract opportunity.

35.    CW-1 told me that BACI offered further reassurance to CW-1 that the loss would be recovered by giving him/her an April 18, 2007 email BACI had received from GLOVA. CW-1 presented this email to me and I have personally reviewed the information depicted on the email. CW-1 told me that BACI said GLOVA's email was sent as a response to BACI, who was looking for an opportunity to make up for the business lost to HORIZON in the Walgreens reverse auction. In the April 18, 2007 email, which I reviewed with CW-1, GLOVA explained that the Office Max contract was not the right contract to restore SEA STAR for giving up Walgreens. GLOVA also asks that BACI have SEA STAR submit an artificially high bid to Office Max. GLOVA's email states, "we seem close to closing, so it might be too late in the game to use this one.. they already asked us to send the amendment for them to sign, would ask that initially you go in high (say 100+ higher than us) until we decide whether this one is the right one to square things away or if there would even be enough time." I believe from these statements and the information provided by CW-1 that GLOVA acknowledges that contract business is owed to SEA STAR by HORIZON because of the phrase, "square things away." I also believe GLOVA has asked BACI to submit the high bid in order to keep the controlling, winning bid price in HORIZON's favor and that the phrase, "higher than us," acknowledges BACI knows GLOVA's shipping rate bid.

-18-

CROW002756

### 3. Magic Transport

36. During our interviews, CW-1 also told me that in May 2007, SEA STAR's contract with Magic Transport came up for renewal. CW-1 advised that SEA STAR had begun negotiations with Magic Transport concerning an increase in SEA STAR's rates. SEA STAR normally gave a prime rate to Magic Transport because they would do most of their shipping with SEA STAR.

37. CW-1 told me that notwithstanding this long-standing rate practice, BACI instructed CW-1 not to offer lower rates to Magic Transport because he (BACI) already knew the rates HORIZON was planning to offer Magic Transport. According to CW-1, BACI also told CW-1 that he had agreed with HORIZON that SEA STAR would offer Magic Transport similar to, but slightly higher than, those offered by HORIZON.

38. According to CW-1, BACI gave CW-1 an email BACI had received from GLOVA regarding the Magic Transport contract. I have personally reviewed the email and printed attachment documents and discussed their content with CW-1. In the email and attachment documents, dated June 1, 2007, GLOVA communicates to BACI information regarding the latest rate negotiations HORIZON had with Magic Transport. GLOVA told BACI to stand firm on the rate increases to Magic Transport because "Magic is squeezing you, so don't give in." I believe this quote from the email references information told to me by CW-1 during the interview that BACI had previously asked GLOVA whether a discount had been offered by HORIZON, as claimed by the Magic Transport representative.

39. I have reviewed other emails between BACI and GLOVA in which they discuss a plan to increase Magic Transport to a different pricing tier. Specifically,

-19-



CROW002757

in early April 2007, BACI sent an email to GLOVA from his SEA STAR email address, stating: "Greg, before I can determine whether your idea of approaching Magic with the program increase ie the increase to the 1000 load TIER I need to understand where your present rates are in relations to ours." GLOVA responded that "[o]ur rates our [sic] the same with the ones I gave you last fall . . . . Since magic is so split now between us, I think that we should go with the plan." BACI wrote back: "greg – I don't have your last set of numbers. I don't hang on to this stuff. It is too dangerous. So please let me have Magic again so I can plot my plan against the combination of your higher starting point and the 1000 TIER increase amount." Later in April, GLOVA sent another email to BACI in which he wrote: "Have you talked with Magic again? I have been holding off sending magic offer all week. They wanted it yesterday, but I haven't sent. You asked for a couple of days on Monday, so I have waited. . . . I am going in with the tier increase, as discussed, so I won't be in your way."

### 4. Carribean Shipping

40. Also during a February 2008 interview, CW-1 told me that in October 2007, SEA STAR was negotiating its contract with Carribean Shipping ("Carribean"). According to CW-1, BACI told CW-1 that he wanted to negotiate higher rates with Carribean. CW-1 advised that during negotiations with Carribean, a Carribean executive told CW-1 that HORIZON's rates were lower than SEA STAR's proposed rates. CW-1 reported this conversation back to BACI and BACI said he would look into the issue.

41. CW-1 told me that BACI later came back to CW-1 to discuss the Carribean contract. BACI told CW-1 that Carribean was bluffing about



CROW002758

HORIZON's rates because he (BACI) had obtained from GLOVA HORIZON's proposed rates to Carribean. BACI then directed CW-1 to hold firm with Carribean on the higher rates for SEA STAR.

42.     CW-1 further told me that BACI gave him/her an email, which CW-1 provided to me. I personally reviewed the contents of the email with CW-1. The email depicted information that indicates BACI received the email at his SEA STAR email address from GLOVA. In the email dated October 17, 2007, GLOVA tells BACI that "they [Carribean] are bluffing and we should let it play out. they told us that if we reduce our rates by $70-$80 in order to give them AG [Aqua Gulf - a separate client of HORIZON] rates, then they would give us more business. we told them absolutely NOT." I reviewed another email dated, November 7, 2007 sent from GLOVA to BACI in which GLOVA transmitted an attached spreadsheet document named, "Reefer Worksheet 2007 - updated 11 4 2007 for PB.xls." I have personally reviewed this document and observed columns of shipping rate and fee charges for various customer accounts which included a column for "Carib Shipping" [Carribean]. I believe, based on my review of this document and information I learned in the February 4, 2008 interview with CW-1, that GLOVA sent this document as a confirmation to BACI of HORIZON's rates for Carribean. In an interview with CW-1 on April 15, 2008, CW-1 told me that although he/she recalled a slight reduction to the proposed SEA STAR rate for Carribean, CW-1 was told by BACI that based on GLOVA's email, SEA STAR would hold firm and not reduce the rate further.

-21-



CROW002759

5.   Walmart

43.    During an interview on February 4, 2008, CW-1 told me that Walmart was then renegotiating its United States to Puerto Rico shipping contracts with coastal water freight carriers, including SEA STAR and HORIZON.

44.    CW-1 told me that in or about January 2008, when the Walmart contract came up for bid, CW-1 went to BACI and told BACI that he/she wanted to bid aggressively to try to grow SEA STAR's share of the Walmart business. According to CW-1, BACI responded by telling him/her that SEA STAR would "follow HORIZON's lead" on the Walmart contract.

45.    CW-1 told me that BACI produced to CW-1 printouts of various spreadsheets reflecting the rates offered by SEA STAR and HORIZON to Walmart in 2007.  CW-1 provided these spreadsheets to me and I reviewed them with CW-1. I observed handwritten notations on one of these spreadsheets that CW-1 told me were written by BACI.  I observed on this spreadsheet handwriting that appears to have been initialed by BACI using the initials, "PAB" and which states, "These Are Actuals."

46.    CW-1 also told me that BACI used these rates as a basis to offer an unusually high rate to Walmart that closely reflected the HORIZON rate because BACI was in agreement with GLOVA to do so.  According to CW-1, BACI told CW-1 that he/she was to continue to hold to this high rate until HORIZON completed its bidding on the Walmart contract and communicated its final rates back to BACI to enable BACI to modify SEA STAR's rate bid.

47.    Thereafter, on February 8, 2008, BACI, who was out of the country, sent CHISHOLM a fax containing handwritten information regarding the SEA

-22-



CROW002760

STAR and HORIZON rates under negotiation with WALMART. BACI told CW-1 to get a copy of the fax from CHISHOLM. CW-1 told me that when he/she spoke to CHISHOLM, CHISHOLM mentioned that he had also received related emails from BACI on his personal Apple I-Phone. In the context of the conversation, CW-1 said it was apparent that CHISHOLM had received additional rate information in those emails from BACI. When CW-1 reviewed the fax from BACI, it included handwritten notations from BACI about HORIZON's old rates to Walmart as well as proposed rate increases by both HORIZON and SEA STAR. According to CW-1, BACI told CW-1 that the fax reflected SEA STAR's new negotiation position with Walmart.

48.    On February 18, 2008, GLOVA sent BACI an email, which I obtained through the warrant discussed above and which I have reviewed. The email stated: "Here are the highlights of where we finished off with Wal*mart. They still have not signed, but we have a verbal agreement. Since we got both base increases and also improved our [bunker fuel] recovery, you will need to either do same or simply get a better % increase on the dry and reefer than we did. Please ensure that you stay at or a slight bit higher on the cost per cube basis. Please send me a copy of the counter-offer [that] you are proposing." The next day, CW-1, at my direction, made a consensual audio recording of a conference call with BACI, FOX, and LAGOY. During the call, *which I listened to,* BACI told the others that Walmart's most recent contract proposal to SEA STAR was significantly less than it had agreed to give HORIZON. BACI explained that he knew the terms of HORIZON's new contract with Walmart and that HORIZON had held firm with Walmart in negotiations. In response to a question from FOX, BACI also stated that the Walmart rates obtained by

-23-



CROW002761

HORIZON and SEA STAR in 2006 had been "spot-on." During the call, it was decided that SEA STAR would submit a proposal to Walmart that reflected a 4.5% price increase over the prior year based on information BACI had provided about HORIZON's agreement with Walmart. Based on my communications with CW-1 and my review of documents, it is my understanding that "bunker fuel" is the fuel used to run self-propelled ships and that the above reference to "bunker fuel recovery" relates to a surcharge imposed by SEA STAR and HORIZON on customers for recovery of increased fuel costs.

49.     CW-1 informed me that after SEA STAR submitted its proposal for a 4.5% price increase, Walmart counter-offered a 3.0% price increase on February 29, 2008. Before SEA STAR had responded to the counter-offer, BACI showed CW-1 an email from GLOVA indicating that HORIZON had negotiated a 2% price increase of the previous year's rate. CW-1 told me that BACI was upset by HORIZON's email because HORIZON's price increase would result in a higher yield for HORIZON than the proposed SEA STAR price increase due to the manner in which it would be applied. BACI told CW-1 that he was going to show the email from GLOVA to PEAKE. When BACI returned from seeing PEAKE, he told CW-1 that SEA STAR would accept Walmart's counter-offer of a 3% price increase.

6.     Quirch

50.     Based on emails between BACI and GLOVA obtained by warrant that I have reviewed, I believe that a company called Quirch asked HORIZON in September 2007 to submit a proposal for a new freight contract, which prompted GLOVA to email BACI and ask for information regarding what rates SEA STAR had offered to Quirch and "where do you plan to finish at?" After BACI provided the

-24-



CROW002762

requested information, GLOVA sent another email to BACI stating that "I thought we were both going in higher on the initial proposals. I need to know if you are planning to do this with others as well, so I don't lose credibility with the customers."

51.     I have reviewed other emails between GLOVA and BACI that reflect continued communications to keep each other apprised about the contract terms being offered to Quirch by both companies in September 2007. On September 18, 2007, GLOVA sent BACI an email informing him that HORIZON had made "a huge spreadsheet formula mistake in its bid to Quirch" and asked BACI to "trust that this was a sincere screw up." Although GLOVA indicates that the "good news" is that rates out of Miami would increase, he said that it "still doesn't excuse taking lead by mistake."

52.     On September 20, 2007, BACI sent GLOVA an email indicating that he "had to bring frank into the numbers" on the Quirch proposal. I believe that "frank" is a reference to BACI's boss, PEAKE. In response, GLOVA sent an email to BACI indicating that he had told "Gabe" about HORIZON's bidding error to Quirch the day that it had happened. I believe that "Gabe" is a reference to SERRA of HORIZON.

### 7.     Government Contracts

53.     During a March 13, 2008 interview, CW-1 told me that he/she met with BYRNES, SEA STAR's Director of Sales Northeast in New Jersey during the previous week. During their meeting, CW-1 asked BYRNES about the status of a SEA STAR contract with the United States military. CW-1 told me that BYRNES



CROW002763

indicated that BYRNES and BACI had negotiated the contract and that BACI had coordinated SEA STAR's negotiations with HORIZON's negotiations.

54. I have also reviewed emails between BACI and GLOVA where the two exchange pricing information and bid proposal information concerning, among other government contracts, contracts for the United States General Services Administration ("GSA") and United States Postal Service ("USPS"). For example, I reviewed an April 26, 2007 email and attachment from GLOVA to BACI that details HORIZON's pricing for a GSA contract and concludes: "Let's discuss the northeast. Please send your proposal as well." I also reviewed a June 4-5, 2007 email exchange between BACI and GLOVA regarding a contract with the USPS. In a June 4 email, BACI wrote: "wanted to make sure their [sic] is no confusion. We also handle the USPS to/from NJ under a different agreement and believe we handle nearly 100% we are going for a $200 increase on this one and would expect you to [remain] out of the picture. Plse confirm." In his June 5 response email, GLOVA wrote: "let's discuss and compare so I continue to stay out of way. we have only handled 12 loads this year through May. Where are your current rates at?"

### C. Other Communications Between SEA STAR and HORIZON About General Pricing and Market Share

55. Based on my review of emails and other information sent between BACI and GLOVA, I believe that SEA STAR and HORIZON also shared other types of pricing information for the purpose of coordinating their pricing to customers.

56. For instance, I have reviewed a May 2007 email exchange between BACI and GLOVA regarding the bunker fuel surcharge that each company imposed on most customers. GLOVA initiated the exchange by writing: "Bunker [fuel] is up

-26-



to about $365 per MT on the east coast. Does this change the dynamics for you? what if you match latest increase and then when fuel goes down eventually, then we'll differentiate the ELZ from the JAX on the way down as a compromise?" In response, BACI wrote: "Franks [sic] and Gabe spoke last night. We are matching you effective the 27th with the proviso that the next time it goes up or down that you will do the differentiation which we feel has to be based upon both fuel consumed by leg and FEUs carried by leg." I believe the reference to "Franks [sic] and Gabe" to mean PEAKE and SERRA. GLOVA responded: "I think this is a fair compromise."

57. I also have reviewed emails sent by CHISHOLM to BACI that attach spreadsheets containing comparisons of SEA STAR and HORIZON contract terms that BACI, in turn, forwarded to GLOVA. For instance, in January 2008, BACI and GLOVA exchanged multiple emails and spreadsheets related to the Walmart contract that was up for renegotiation. I reviewed the properties associated with the computer files for these spreadsheets and observed that the document author information indicated CHISHOLM participated in preparing and/or revising information in the spreadsheets for BACI. I have reviewed other comparisons and spreadsheets and their associated document properties that also indicate the spreadsheets were authored by CHISHOLM and sent to BACI, which BACI then forwarded to GLOVA.

58. During a February 4, 2008 interview, CW-1 provided me a facsimile copy of a spreadsheet, which he/she told me he/she obtained from BACI. CW-1 stated that BACI told him/her that BACI received this spreadsheet from PRETRE. CW-1 further stated he/she recognized the information on the spreadsheet as

-27-



CROW002765

containing a comparison of SEA STAR and HORIZON pricing information for a proposal to Magic Transport for shipping rates. I have reviewed the spreadsheet and observed columns indicating HORIZON shipping rate information and a separate, comparison column of SEA STAR's shipping rates. I also observed that the spreadsheet depicted a facsimile banner on the top of the spreadsheet which read, "05/23/2007 11:42 FAX 17322251544 VESSEL OPS-NPR, INC." During the February 4, 2008 interview, I asked CW-1 about the banner and he/she stated that he/she recognized the banner as the sending facsimile machine in PRETRE's office at Elizabeth, New Jersey.

59. I have reviewed emails obtained by search warrant for the approximate period April 2007 through February 2008 in which BACI and GLOVA, sometimes as frequently as daily, exchanged information regarding the number of northbound and southbound loads that SEA STAR and HORIZON were carrying.

60. I also have reviewed a May 2007 email from BACI to GLOVA attaching what appears to be a table listing each of SEA STAR's Puerto Rico contracts along with information regarding each contract's effective and expiration dates and which customers were being charged various surcharges and fees, such as the bunker fuel surcharge (including the amount) and TAC (total accessorial charge) (including the amount). Based on my communications with CW-1 and my review of documents, I understand TAC to be a charge that SEA STAR and HORIZON impose on customers that combines a number of different fees, such as terminal handling fees, document fees, and a security fee, into a single charge.

61. On February 19, 2008, CW-1, at my direction, made a consensual audio recording of a conference call with BACI, FOX, and LAGOY. I have reviewed

-28-



CROW002766

this audio recording and listened to conversation during the conference call about a previous decision to require a certain delinquent customer to pay cash in advance for future shipments. At one point in the conversation, I heard BACI tell LAGOY to have PERLMUTTER contact HORIZON to obtain assurances that HORIZON would not try to take advantage if SEA STAR put the customer "on cash."

D.     Communications With CROWLEY About Specific Contracts

62.     Based on the information provided by CW-1, as well as emails and other documents that I have reviewed, I believe that CROWLEY was also actively participating with SEA STAR and HORIZON to allocate market share and customers, fix prices, and rig bids for coastal water freight between the United States and Puerto Rico. During my review of email communications between BACI and GLOVA I discovered an additional email account used by GLOVA. On that basis, in March 2008, I applied for, received, and executed another search warrant for the contents of new account for GLOVA, g_glova@yahoo.com on the Internet Service Provider Yahoo! Inc. (Yahoo), hereinafter referred to as the Yahoo Warrant. The Yahoo Warrant resulted in the production of more than 1000 emails and attachment documents for the approximate period April 2007 through March 2008. I have reviewed many of those emails and based on my review, believe this separate email account was used by GLOVA to communicate with FARMER about pricing and market share information in similar fashion as the GMAIL emails between GLOVA and BACI, using GLOVA's southorange@gmail.com account.

63.     During an interview with CW-1, I also learned that GRUNE, Senior Vice President of Pricing for CROWLEY, is in direct contact with PEAKE at SEA STAR, and that FARMER communicates by telephone with BACI at SEA STAR.

-29-



CROW002767

CW-1 told me that on more than one occasion, he/she has overheard FARMER and BACI's conversations emanating from BACI's office on his speaker phone. Furthermore, consensual audio recordings that I have listened to between CW-1 and BACI, as well as email communications I have reviewed that were obtained by search warrant, reflect FARMER's participation with BACI and GLOVA to fix prices and allocate customers between each of the coastal freight carriers, HORIZON, SEA STAR and CROWLEY. A few examples of such contracts that CW-1 told me about or that were reflected in the emails obtained by search warrant that I have reviewed include the following:

    1.    ATEC

64.    Based on my review of emails obtained during this investigation, I believe that HORIZON, SEA STAR and CROWLEY reached agreements determining which company would take the lead in contract negotiations with particular customers and how much each company would offer in negotiations. From my review of these emails, I believe that HORIZON, SEA STAR, and CROWLEY agreed that CROWLEY would take the lead in contract negotiations with ATEC. On August 23, 2007, GLOVA emailed BACI regarding bid proposals on a contract with ATEC. GLOVA asked BACI "when does cmt take increase - believe they are driving this, right?" Based on the emails that I have reviewed as well as my conversations with CW-1, I believe that "cmt" is shorthand used by BACI and GLOVA when referencing CROWLEY.

65.    I reviewed an email dated, October 26, 2007, which GLOVA sent to BACI regarding the ATEC proposal, stating, "Can you please advise on Monday your current rates with ATEC and what lanes/volumes you handle? We need to get

-30-



CROW002768

our proposal together. I realize that cmt drives this, however, we both participate as well and you handle all of the buns that we stayed away from for you. What are your plans for an increase for them?"

66.     In a separate email I reviewed as part of my review of emails from the Yahoo Warrant, GLOVA and FARMER discussed the ATEC client independent of BACI using the Yahoo account. On November 26, 2007, GLOVA re-sent an email to FARMER, he had previously sent on November 20, 2007, requesting CROWLEY's shipping rates for a list of clients. The November 26, 2007 email added to the previous emailed list the client, ATEC. In this email, GLOVA wrote: "The following is a list of info that I need for upcoming contracts. Would like to know your current and proposed rates please." Further, in the same email, GLOVA offers: "Please advise what you need from me." I believe this statement by GLOVA is an offer to provide similar rate information on HORIZON's client customers to FARMER.

2.     Toys R Us

67.     Based on emails between BACI and GLOVA that I have reviewed, I also believe that CROWLEY took the lead in contract negotiations with Toys R Us. In a series of emails, GLOVA and BACI discussed prices for an upcoming contract with Toys R Us. In an email dated May 3, 2007, GLOVA informed BACI that "we [HORIZON] are still higher than cmt on cost per cube formula based on numbers that I saw from [CROWLEY]. we were careful to stay higher than cmt on cost per cube bc I didn't want to hurt them [CROWLEY]. I understand that cmt [CROWLEY] will remain the lead carrier."

68.     In a separate series of emails from the Yahoo Warrant I reviewed, GLOVA and FARMER discussed the Toys R Us client independent of BACI using



CROW002769

the Yahoo account. On May 1, 2007, GLOVA replied to an earlier email from FARMER, "We stayed higher than you on cost per cube basis despite pressure to get more competitive, however, did make an adjustment bc sea star offered big box rate that was equal to us... we had to make adjustment to maintain our share and not lose to them." Within this same email, GLOVA addresses accounts with FARMER for client customers they each serve: Office Max, Pfizer and Colgate Palmolive. In reference to an adjustment HORIZON made for Office Max, GLOVA states, "[the adjustment] Shouldn't impact your share at all."

69. I reviewed another email received by GLOVA from FARMER at the g_glova@yahoo.com account, in which FARMER forwarded an email with attached spreadsheet documents entitled, "Pfizer EZ Tariff 5-1-07_TL.xls," and "CP_Bid Template_07_A.xls." I have reviewed these attachment documents and observed information in them that I believe indicates these are CROWLEY internal documents containing shipping rates and contract bid information of CROWLEY which FARMER transmitted to GLOVA by email. This information included the properties of the spreadsheet computer files attached to the email, which I reviewed using my skills as a computer forensic examiner, in which the document authors are listed as FARMER or another person I believe to be a CROWLEY employee, TONY LUSIS. I also observed that FARMER's forwarded email and attachment documents were first sent to FARMER's internal CROWLEY email address, Tom.Farmer@crowley.com, by LUSIS.

3. **Suarez Beer**

70. Based on emails between BACI and GLOVA that I have reviewed, CROWLEY, SEA STAR and HORIZON shared confidential pricing information

-32-



CROW002770

regarding a contract with Suarez Beer. In an August 20, 2007 email, GLOVA informed BACI that "per our past conversation, we had 6% increase on the table for dry only, which was $97 increase. They were fine with that, but not say it is too much bc [CROWLEY] went in with less of an increase. I thought that [CROWLEY] and you were doing in with 100. [CROWLEY] said that they have settled at +$90 and that you were fine with it. where are you at?"

71. In addition, based on my review of emails and other documentation reviewed in this investigation and my discussions with CW-1, I believe that BACI made an attempt to conceal the fact that he had shared confidential pricing information with his competitors. In a July 19, 2007 email to GLOVA discussing the same Suarez Beer contract, BACI concluded by stating, "okay then all we need to discuss is how we package it so we seem different."

4. **Frito Lay/Pepsi**

72. Emails between BACI and GLOVA that I have reviewed indicate that FARMER communicated confidential information regarding bids to BACI. In a November 28, 2007 email discussing "Frito/pepsi," GLOVA asked BACI "what is the [CROWLEY] position?" BACI informed GLOVA of CROWLEY's position in an email later that day, telling GLOVA "Okay I think we are all holding firm on Frito Lay." BACI indicated that he had spoken to FARMER, stating "Actually Tom as of last night hadn't gotten the bid package." Based on the emails that I have reviewed as well as my conversations with CW-1, it is my understanding "Tom" refers to FARMER.

73. In a separate email I reviewed, GLOVA and FARMER discussed the Frito Lay/Pepsi client independent of BACI using the Yahoo account. On

-33-



November 20, 2007, GLOVA sent an email to FARMER, requesting CROWLEY's shipping rates for a list of clients. Included in the list was the client, Frito Lay/Pepsi. In this email, GLOVA wrote: "The following is a list of info that I need for upcoming contracts. Would like to know your current and proposed rates please."

### 5. Nestle/Walgreens

74. On March 28, 2008, CW-1, at my direction, made a consensual audio recording, which I have reviewed, of a conversation with BACI corroborating that BACI, GLOVA and FARMER communicated confidential pricing information on contracts. During this conversation, BACI told CW-1 about a phone conversation he [BACI] had with FARMER concerning a disagreement FARMER was having with GLOVA. On the audio recording, BACI relates details of the incident to CW-1 and tells CW-1 that the argument between FARMER and GLOVA is because of a misunderstanding over who was to lead in allocating Nestle as a customer. BACI told CW-1 that HORIZON claims CROWLEY "took" 900 loads of Nestle cargo away from HORIZON by underbidding HORIZON. BACI also told CW-1 that GLOVA demanded FARMER return the 900 loads of Nestle. When FARMER would not agree, HORIZON began using a "slap strategy" to take business away from CROWLEY. BACI stated that the first recovery of cargo loads HORIZON was able to take back from CROWLEY was 200 loads of Colgate Palmolive cargo.

75. On the same audio recording, BACI stated that FARMER discussed the Walgreens reverse auction, which was to take place on March 31, 2008. BACI told CW-1 that FARMER threatened to manipulate the auction by bidding lower than HORIZON because of the ongoing argument. CW-1 has informed me that

-34-



CROW002772

since the Walgreens reverse auction was completed, BACI and FARMER have discussed the rates bid in the auction by HORIZON, SEA STAR, and CROWLEY, and that BACI sent an email to several SEA STAR managers identifying the award positions (i.e. first place, second place, etc.) resulting from the auction prior to Walgreens' announcement of the results.

76.    In a separate series of emails I reviewed, GLOVA and FARMER discussed the Nestlè client independent of BACI using the Yahoo account. On November 28, 2007, GLOVA replied to an email from FARMER. FARMER's email to GLOVA included information FARMER received from LUSIS with an attached spreadsheet document named, "Book2.xls." I have reviewed this attachment document and observed it contains columns of information labeled as "CURRENT RATE" and "PROPOSED RATE." Based on the information I have learned during the course of this investigation, I believe the attachment contains CROWLEY internal shipping rates and contract bid information which FARMER received from LUSIS, then transmitted to GLOVA by email. I also observed FARMER's forwarded email and attachment documents were first sent to FARMER's internal CROWLEY email address, Tom.Farmer@crowley.com, by LUSIS.

77.    I reviewed another of GLOVA's emails to FARMER in which he wrote on November 20, 2007, "tom, attached is our nestle proposal." In the same email, GLOVA also addressed another client customer when he wrote: "As info, your Fairburn offer is below ours, so you need to ensure that you don't move at all on that one." This email included an attachment document named, "Nestle 2007 contract 11 15 07 for pb.xls." I have reviewed this attachment document and observed that it lists shipping rates from various points of origin and that the

-35-



CROW002773

spreadsheet depicts the title, "NESTLE 2007 rates through 12/31/07." I also believe, after reviewing many such attachment documents from GLOVA that include the initials, "PB" within the filename that these initials are a reference to BACI. On this basis, I believe GLOVA provided this attachment document, or similar information to both FARMER and BACI.

### 6. Johnson & Johnson

78. Based on other emails I have reviewed, I believe that HORIZON, SEA STAR and CROWLEY shared confidential information regarding negotiations on terms of contracts. In an April 12, 2007 email, GLOVA asked BACI about SEA STAR's plans to bid on a Johnson & Johnson contract. GLOVA informed BACI that "Both [CROWLEY] and we told J&J that we will not give them 18 month contract, however, they still put 18 months in the bid. We are planning to state that the rates are only for 12 months. Are you responding to the bid? How are you handling?"

79. In another email I reviewed, GLOVA forwarded an attached spreadsheet document entitled, "JJ updated 4 23 07 for tf.xls" on April 24, 2007 to FARMER at his personal email address: tg1farmer@bellsouth.net. On the subject line of this email, GLOVA wrote: "j and j offer." I have reviewed this attachment document and observed what I believe are shipping rates of various size shipping containers for HORIZON's client customer, Johnson & Johnson.

## V.   PREMISES TO BE SEARCHED

80. The search will be limited to the offices of CROWLEY; the areas where CROWLEY's management, pricing, and sales personnel, and their respective administrative staff sit and work; and all computer rooms and areas (including the

-36-



CROW002774

contents of any network or e-mail server), document storage areas, filing cabinets, filing containers, and safes on the premises that are large enough to contain business records, files, correspondence, calendars, and other documents. These areas are located within the corporate offices of CROWLEY located at 9487 Regency Square Boulevard, Jacksonville, Florida 32225-8126, as more fully described in Attachment A hereto. During my investigation, I have researched open source information that reports 9487 Regency Square Boulevard, Jacksonville, Florida 32225-8126 as the corporate office for CROWLEY. In addition, I have also conducted surveillance at, and taken photos of the location and observed CROWLEY signs on the building. During surveillance on April 9, 2008, I entered the lobby area and verified with the receptionist that CROWLEY owns and occupies the building except for one suite on the first floor, which is leased to a real estate title company. During an interview on March 15, 2008, CW-1 confirmed this same location as the corporate office of CROWLEY and also told me that he/she knows that both FARMER and GRUNE work at this location.

81.     In order to minimize the prospect of the removal and subsequent destruction of any of the documents and records identified in ~~Exhibit~~ *Attachment* B to the Search Warrant, the search will include the briefcases, laptop computers, hand-held computers, cell phones, and other movable document containers found on the premises described above, and in the possession of, or readily identifiable as belonging to any CROWLEY management, pricing, or sales personnel including, but not limited to, FARMER, GRUNE, KELLEY, and LUSIS who work in the office facilities of CROWLEY. Based on information provided to me by CW-1 and documents that I have reviewed, I believe that employees of coastal water freight

-37-



CROW002775

providers use a variety of portable electronic devices, such as computers, cell phones, and Blackberries, to conduct business and that such individuals are likely to keep their portable electronic devices on their person at all times.

## VI. EVIDENCE TO BE SEIZED

82. Based on the foregoing allegations describing communications and agreements to allocate market share and customers, fix prices, and rig bids submitted to customers for freight shipments on self-propelled ships between the United States and Puerto Rico and the documentary evidence of the use of interstate wires used in furtherance of those agreements, I respectfully submit that there is probable cause to believe that evidence of violations of 15 U.S.C. § 1 will be found at the subject premises.

83. The evidence to be seized constitutes business records of CROWLEY. During the February 4, 2008 interview with CW-1, he/she told me that BACI is solely responsible for determining shipping rates used by SEA STAR sales people in contract negotiations with SEA STAR client customers. Based on my investigation since that interview and my independent review of emails and documents obtained by CW-1; emails and documents obtained by execution of search warrants on Internet Service Providers; and consensual audio and video recordings made by CW-1; I believe FARMER to be of a similar position as BACI, working within CROWLEY's pricing department with similar authority, access and knowledge of CROWLEY's shipping rate and market allocation information. From emails I have reviewed in which I have observed FARMER include attachment documents that were sent to GLOVA at HORIZON, I believe FARMER has authority for CROWLEY's contract offers to customers, and that FARMER communicated by

-38-



CROW002776

email with subordinates, such as LUSIS. Based on information provided to me by CW-1 and documents that I have reviewed, I believe that employees of coastal water freight providers, and specifically, FARMER in his role as senior management, would communicate extensively with his staff by email, as well as keep printed hard copies of emails and other documents he received from GLOVA and provided them with copies.

84. Based on my experience and information I have reviewed throughout this investigation regarding SEA STAR, HORIZON, CROWLEY, and coastal water freight providers generally, I believe documents reflecting communications of pricing and allocation of market share between competitor companies, as well as CROWLEY internal notes, memoranda, email or other documents related to collusion with competitor companies discussed herein would be found in the offices of CROWLEY's management, pricing, and sales personnel in Jacksonville, Florida.

85. Based on information provided by CW-1, and emails that I have reviewed, FARMER worked in the location to be searched and was directly involved in pricing communications with BACI and GLOVA. In addition, based on information provided by CW-1, GRUNE works in the location to be searched and was involved in communications with PEAKE. Accordingly, I believe it is probable that documents and evidence reflecting the conspiratorial agreements describe herein will be found at the location to be searched.

86. Based on my training and experience, I believe that a significant risk exists that if the evidence sought is subpoenaed by a grand jury, at least some relevant evidence may be destroyed or altered by or at the direction of those with criminal culpability. In fact, after CW-1 attended a meeting on February 27, 2008

-39-



CROW002777

with PRETRE at SEA STAR's Port Elizabeth, New Jersey office, CW-1 traveled back to Jacksonville, Florida with CHISHOLM, who had also been at SEA STAR's Port Elizabeth, New Jersey office. CW-1 told me that during the trip CHISHOLM mentioned that PRETRE, who is retiring in June 2008, had retained a considerable amount of documentation that he should not have kept. CHISHOLM told CW-1 that he had instructed PRETRE to begin destroying the documentation. Based on the context of the comments, CW-1 understood CHISHOLM to be referring to documentation reflecting communications and exchanges of pricing information with HORIZON. Similarly, as noted above, BACI sent an email to GLOVA indicating that he does not retain much of the pricing information provided by GLOVA because it is "too dangerous." Based on this information and my experience, I believe it is probable that if the subjects of the investigation found out an investigation was pending, they would destroy critical evidence. The information sought in the warrant is critical to proving the allegations of price fixing and fraud in the coastal water freight transportation industry, and significant evidence of collusion is likely to be found in the location to be searched.

87.     I, therefore, respectfully request that this Court issue a search warrant for the following documents created on or after January 1, 2002. (See Attachment B)

> A.   Notes, memoranda, correspondence, reports, and other records and documentation relating to any agreement, meeting, conversation, or other communication between or among CROWLEY management, pricing, or sales personnel including, but not limited to FARMER, GRUNE, KELLEY and LUSIS, and

-40-

any employee or agent of a CROWLEY competitor in the United States to Puerto Rico shipping trade.

B.  Notes, memoranda, correspondence, reports, price sheets or lists, and other records or documentation relating to the customer allocations or divisions, market shares, and contract negotiations or bid proposals, including, but not limited to the prices, surcharges, and costs offered to any customer.

C.  Final or draft bid files, proposals, purchase orders, contracts, correspondence, estimate work sheets and other documents used to prepare bids or quotes submitted to prospective purchasers of coastal freight transportation services between the United States and Puerto Rico.

D.  All appointment records, diaries, calendars, and other documents used to record schedules, meetings, conversations, or other events by or for CROWLEY management, pricing, or sales personnel including, but not limited to FARMER, GRUNE, KELLEY and LUSIS.

E.  All telephone charge and toll records, including cellular telephone records for CROWLEY management, pricing, or sales personnel including, but not limited to FARMER, GRUNE, KELLEY and LUSIS.

F.  All address books (including electronic address books, such as devices commonly referred to as electronic organizers and Blackberries); message logs; or other indicia of notation of

-41-

CROW002779

messages and telephone numbers and calls of CROWLEY management, pricing, or sales personnel including, but not limited to FARMER, GRUNE, KELLEY and LUSIS.

88.    As used above, the terms records, documents, programs, documentation, applications or materials include but are not limited to records, documents, programs, applications or materials created, modified or stored in any form, including any optical, electrical, electronic or magnetic form (such as any information on an optical, electrical, electronic or magnetic storage device), including floppy disks, hard disks, ZIP disks, CD-ROMs, optical disks, backup tapes, printer buffers or other device memory buffers, smart cards, memory calculators, pagers, personal digital assistants such as Palm Pilot hand-held computers, e-mail servers, as well as opened and unopened e-mail messages and any printouts or readouts from any optical, electrical, electronic or magnetic storage device; any handmade form (such as writing, drawing or painting); any mechanical form (such as printing or typing); any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures or photocopies); or any voice form (including answering machine tapes and opened and unopened voicemail messages).

A.    Computer Data

89.    Based upon my training, experience and information related to me by agents and others involved in the forensic examination of computers, I know that computer data can be stored on a variety of systems and storage devices including hard disk drives, floppy disks, compact disks, magnetic tapes and memory chips.  I also know that during the search of the premises it is not always possible to search

-42-



CROW002780

computer equipment and storage devices for data for a number of reasons, including the following:

A.    Searching computer systems is a highly technical process which requires specific expertise and specialized equipment. There are so many types of computer hardware and software in use today that it is impossible to bring to the search site all of the necessary technical manuals and specialized equipment necessary to conduct a thorough search. In addition, it may also be necessary to consult with computer personnel who have specific expertise in the type of computer, software application or operating system that is being searched.

B.    Searching computer systems requires the use of precise, scientific procedures which are designed to maintain the integrity of the evidence and to recover "hidden," erased, compressed, encrypted or password-protected data. Computer hardware and storage devices may contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. Since computer data is particularly vulnerable to inadvertent or intentional modification or destruction, a controlled environment, such as a law enforcement laboratory, is essential to conducting a complete and accurate analysis of the equipment and storage devices from which the data will be extracted.

-43-

CROW002781

C. The volume of data stored on many computer systems and storage devices will typically be so large that it will be highly impractical to search for data during the execution of the physical search of the premises. A single megabyte of storage space is the equivalent of 500 double-spaced pages of text. A single gigabyte of storage space, or 1,000 megabytes, is the equivalent of 500,000 double-spaced pages of text. Storage devices capable of storing fifteen gigabytes of data are now commonplace in desktop computers. Each non-networked, desktop computer found during a search can easily contain the equivalent of 7.5 million pages of data, which, if printed, would fill a 10' x 12' x 10' room to the ceiling.

D. Computer users can attempt to conceal data within computer equipment and storage devices through a number of methods, including the use of innocuous or misleading filenames and extensions. For example, files with the extension ".jpg" often are image files; however, a user can easily change the extension to ".txt" to conceal the image and make it appear that the file contains text. Computer users can also attempt to conceal data by using encryption, which means that a password or device, such as a "dongle" or "keycard," is necessary to decrypt the data into readable form. In addition, computer users can conceal data within another seemingly unrelated and innocuous file in a process called "steganography." For example, by using

-44-

CROW002782

steganography a computer user can conceal text in an image file which cannot be viewed when the image file is opened. Therefore, a substantial amount of time is necessary to extract and sort through data that is concealed or encrypted to determine whether it is evidence, contraband or instrumentalities of a crime.

90.   In consideration of the foregoing, and in searching for data capable of being read, stored or interpreted by a computer, law enforcement personnel executing this search warrant will employ the following procedure:

A.   Upon securing the premises, law enforcement personnel trained in searching and seizing computer data ("computer personnel") will make an initial review of any computer equipment and storage devices to determine whether these items can be searched on-site in a reasonable amount of time and without jeopardizing the ability to preserve the data.

B.   If the computer equipment and storage devices cannot be searched on-site in a reasonable amount of time, then the computer personnel will determine whether it is practical to copy the data during the execution of the search in a reasonable amount of time without jeopardizing the ability to preserve the data.  To expedite the imaging of multiple computer equipment and storage devices, computer personnel will use transportable storage area networks capable of holding ten terrabytes of data.

-45-



Once the imaging of computer equipment and storage devices is initiated, it should not be interrupted until it is complete.

C.    If the computer personnel determine that the volume of material to be copied is too large to be completed during reasonable work hours, the locations where the data is stored may be seized, and quarantined overnight to prevent any tampering, modification or destruction of data, until such time when all of the data has been copied.

D.    If the computer personnel determine it is not practical to perform an on-site search or make an on-site copy of the data within a reasonable amount of time, then the computer equipment and storage devices will be seized and transported to an appropriate law enforcement laboratory for review. The computer equipment and storage devices will be reviewed by appropriately trained personnel in order to extract and seize any data that falls within the list of items to be seized.

E.    In searching the data, the computer personnel may examine all of the data contained in the computer equipment and storage devices to view their precise contents and determine whether the data falls within the items to be seized as set forth herein. In addition, the computer personnel may search for and attempt to recover "deleted," "hidden" or encrypted data to determine whether the data falls within the list of items to be seized as set forth herein.

-46-



CROW002784

91.    In order to search for data that is capable of being read or interpreted by a computer, law enforcement personnel will need to seize and search the following items, subject to the procedures set forth above:

A.    Any computer equipment and storage device capable of being used to commit, further or store evidence of the offense listed above;

B.    Any computer equipment used to facilitate the transmission, creation, display, encoding or storage of data, including word processing equipment, modems, docking stations, monitors, printers, plotters, encryption devices, and optical scanners;

C.    Any magnetic, electronic or optical storage device capable of storing data, such as floppy disks, hard disks, tapes, CD-ROMs, CD-R, CD-RWs, DVDs, optical disks, printer or memory buffers, smart cards, PC cards, memory calculators, electronic dialers, electronic notebooks, and personal digital assistants;

D.    Any documentation, operating logs and reference manuals regarding the operation of the computer equipment, storage devices or software.

E.    Any applications, utility programs, compilers, interpreters, and other software used to facilitate direct or indirect communication with the computer hardware, storage devices or data to be searched;



-47-

CROW002785

F. Any physical keys, encryption devices, dongles and similar physical items that are necessary to gain access to the computer equipment, storage devices or data; and

G. Any passwords, password files, test keys, encryption codes or other information necessary to access the computer equipment, storage devices or data.

## VIII. CONCLUSION

92. Based upon the forgoing, I respectfully submit that there is probable cause to believe that a search of the offices of CROWLEY at 9487 Regency Square Boulevard, Jacksonville, Florida 32225-8126, as described above, will result in the seizure of items described in Attachment B which are evidence of violations of 15 U.S.C. § 1.

93. I request that this application and accompanying affidavit be placed under seal. This is necessary to protect the integrity of the ongoing investigation. Premature disclosure of the contents of this affidavit would frustrate this investigation by alerting the subjects of the investigation to the nature of the probe, the techniques employed, the evidence developed to date, and the identities of those providing information.

FURTHER AFFIANT SAYETH NAUGHT


Byron Thompson
Special Agent
Federal Bureau of Investigation

CROW002786

# Doc. 36-3

# EXHIBIT B

1        UNITED STATES DISTRICT COURT
          MIDDLE DISTRICT OF FLORIDA

2

        CASE NO.:  3:16-cv-l011

3

4  CROWLEY MARITIME CORPORATION,

5        Plaintiff,

6  v.

7  NATIONAL UNION FIRE INSURANCE
   COMPANY OF PITTSBURGH, PA,

8

        Defendant.

9 _____/

10

11        DEPOSITION OF

12        STEVEN FICON
  As Corporate Representative of Crowley Maritime

13        Corporation

14    Taken on Behalf of the Defendant

15

     Thursday, March 16, 2017
16     12:55 p.m. - 4:15 p.m.

17

    U.S. Legal Support - Jacksonville
18    225 Water Street, Suite 1450
    Jacksonville, Florida 32202
19

20

21

22    Stenographically Reported By:
    Mary Hlavac, RPR, RMR, CRR
23    Registered Professional Reporter
    Registered Merit Reporter
24    Certified Realtime Reporter

25

1   APPEARANCES:

2

    On behalf of Plaintiff:

3

        REED SMITH, LLP

4        10 South Wacker Drive
         Chicago, Illinois 60606-7507

5        (312)207-6400
         BY:  Emily E. garrison

6        egarrison@reedsmith.com

7

    On behalf of Defendant:

8

        LYDECKER DIAZ

9        1221 Brickell Avenue
         19th Floor

10       Miami, Florida 33131
         (305)416-3180

11       BY:  Jason Bloom
         jbloom@lydeckerdiaz.com

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              I N D E X

2

3

4  Examination                    Page

5  Direct      By Mr. Bloom          4
   Cross       By Ms. Garrison       91
6
   Certificate of Oath              93
7  Certificate of Reporter          94
   Read and Sign Letter to Witness        95
8  Errata Sheet (forwarded upon execution)      96

9              DEFENSE EXHIBITS

10  No.                      Page

11  1   Notice of Taking Deposition Duces      6
       Tecum
12
    2   Binder                  10
13
    3   Crowley 002320 through Crowley 002325    30
14
    4   Crowley 002295 and 002296          66
15
    5   Crowley 002273 through 002276        69
16
    6   Crowley 001149 through 001168        82
17

18              - - -

19

20

21

22

23

24

25

Steven Ficon
March 16, 2017                                    4

1    Thereupon,

2    the following proceedings began at 12:55 p.m.:

3           THE COURT REPORTER:  Would you please

4        raise your right hand.

5           Do you swear or affirm the testimony you

6        will give in this cause will be the truth, the

7        whole truth, and nothing but the truth?

8           THE WITNESS:  I do.

9    Thereupon,

10              STEVEN FICON,

11   having been first duly sworn or affirmed, was

12   examined and testified as follows:

13              DIRECT EXAMINATION

14   BY MR. BLOOM:

15      Q.   Good morning -- good afternoon.  My name is

16   Jason Bloom, I'm an attorney with Lydecker Diaz.

17   We've been retained on behalf of National Union in

18   regards to an action currently pending in the Middle

19   District of Florida.

20          I know we've been through this, but can you

21   just state your name and spell it for the record.

22      A.   Steven Ficon.  S-t-e-v-e-n, last name

23   F-i-c-o-n.

24      Q.   Thank you, Mr. Ficon.  And who are you

25   currently employed with?

Steven Ficon
March 16, 2017                                              5

1    A.   Crowley Maritime Corporation.

2    Q.   In what capacity?

3    A.   My title is vice president of claims.

4    Q.   And how long have you held that position?

5    A.   Approximately three years.

6    Q.   And how long have you been employed with

7    Crowley in total?

8    A.   Since 1990.

9    Q.   Prior to being vice president of claims,

10   what title or responsibilities did you have?

11   A.   My title was director of claims with similar

12   responsibilities.

13   Q.   And how long did you hold that position?

14   A.   Approximately ten years.

15   Q.   Prior to -- between 1990 and 2004, how many

16   different positions did you hold with Crowley?

17   A.   One.  One other position.

18   Q.   What was that?

19   A.   Manager of claims.

20   Q.   What's your educational background?

21   A.   I'm a graduate of Bucknell University.

22   Q.   What year was that?

23   A.   1982.

24   Q.   And was that a bachelor's degree, a master's

25   degree?

Steven Ficon
March 16, 2017                                44

1    Q.   What efforts did Crowley make in defense of

2  itself between May 2008 and the announcement of those

3  indictments in October of 2008?

4         MS. GARRISON:  Object.

5    A.   They're not indictments.  They were guilty

6  -- I don't believe they were ever indictments.

7  BY MR. BLOOM:

8    Q.   I'm sorry, announcements of those guilty

9  pleas, you're right.

10        MS. GARRISON:  I'm going to object to the

11       extent it's outside the scope of the

12       deposition.

13        You can answer.

14   A.   Since it's outside the scope, I may not be

15  the best person to describe what efforts Crowley was

16  making or what activities it was doing.

17   Q.   Who would be?

18   A.   Our general counsel.

19   Q.   Were you involved in conversations

20  internally at Crowley between May 2008 and October of

21  2008 regarding the ongoing investigation?

22   A.   No.  Or to a very limited degree.

23   Q.   During this time, is the special committee

24  still convened that was created following the

25  execution of the search warrant?

1      A.   Boy, since, again, I wasn't part of the

2  special committee and I don't attend board meetings or

3  meetings involving our senior leadership team, so I

4  don't know.

5      Q.   Did the special committee ever reach out to

6  you directly?

7      A.   No.

8      Q.   Were there any efforts made by Crowley

9  following service and execution of the search warrant

10  to recover the items or possessions that were taken

11  from its premises?

12         MS. GARRISON:  Object to the -- same

13         objection to the extent it's outside the scope

14         of the deposition.

15      A.   I wasn't privy to that.

16      Q.   Plaintiff alleges in its complaint that it

17  was served with a search warrant and it was unable to

18  obtain a copy of the affidavit attached to that search

19  warrant.  Are you aware of those allegations?

20      A.   Yes.

21      Q.   What efforts were taken by Crowley to

22  uncover or unseal the allegations within the affidavit

23  attached to the search warrant?

24      A.   There's really two parts to that answer.

25  Prior to the arbitration, at various points in time we

1  discussed with outside counsel and asked outside

2  counsel if we could obtain a copy of the search

3  warrant affidavit.

4      Q.   Which outside counsel was that?

5      A.   Charles Lembcke and Sam Rosenthal.  And they

6  advised us that the search warrant affidavit was under

7  seal and unavailable.

8      Q.   When was the first time you had asked for

9  discovery of the -- or inquired with counsel as to the

10  discoverability of whether you could obtain the

11  affidavit?

12     A.   Well, I don't know the exact dates.  There

13  were -- at various points in time, probably beginning

14  in 2009.

15     Q.   What's your basis for coming up with that

16  time frame, 2000 -- beginning of 2009?

17     A.   Well, I can recall conversations with

18  general counsel in which he described to me these

19  discussions we were having -- where he had with --

20  with outside counsel to obtain or to determine the

21  availability of the search warrant affidavit.

22     Q.   And when did those conversations occur?

23     A.   I don't know the specific dates, but I'm

24  estimating it would have been in 2009, 2010.

25  Certainly prior to filing our arbitration demand in --

Steven Ficon
March 16, 2017                                    47

1    I believe that was March of 2012.

2        Q.   Were there any written communications

3    between Crowley and outside counsel regarding efforts

4    to uncover or unseal the search warrant affidavit?

5        A.   No.  To continue with the second part of my

6    answer.  Once Farmer was indicted in March of 2013, we

7    understood that the government prosecutors would be

8    required to unseal the search warrant affidavit and

9    provide it to Mr. Farmer and Mr. Farmer's lawyers to

10   assist in the preparation of his defense.

11          So in April or May 2013, our outside

12   counsel, and it may have been either or both of the

13   two individuals I mentioned, Charles Lembcke or Sam

14   Rosenthal, asked Mr. Farmer's lawyers if he had

15   received the search warrant affidavit and if it could

16   be provided to Crowley.  And Mr. Farmer's lawyers

17   advised that he could not give us the search warrant.

18   It had been unsealed for very limited purposes to

19   Farmer and Farmer's lawyers, and Farmer's lawyers were

20   held to a strict confidentiality and could not share

21   the affidavit with anyone else.

22       Q.   So following Mr. Farmer's indictment, I

23   think it was in March of 2013, you indicated that you

24   became aware that Mr. Farmer had obtained a copy of

25   the search warrant affidavit; is that correct?

Steven Ficon
March 16, 2017                                    48

1        MS. GARRISON:  Object to the extent it

2    mischaracterizes the testimony.

3  BY MR. BLOOM:

4      Q.   Okay.  Did Crowley become aware -- when

5  after the March 2013 indictment of Mr. Farmer did

6  Crowley become aware that the affidavit had been made

7  available to Mr. Farmer?

8      A.   Well, I think we found -- I think we learned

9  from our outside counsel, who are kind of the expert

10  criminal lawyers, that once someone is indicted, the

11  government in this case is required to give them a

12  copy of the search warrant affidavit which forms part

13  of the charges against you.  And with that

14  understanding, our counsel contacted Farmer's lawyers

15  to ask them if they had it and if he could share it

16  with us.

17        And I think we've since learned that there

18  was an unsealing order dated the end of April 2013

19  which unsealed the search warrant document to Farmer's

20  lawyers for their use only, for very limited purposes.

21      Q.   Was Mr. Lembcke's communication with counsel

22  for Farmer at the direction of Crowley or was that

23  done independently?

24      A.   No, we asked him to see if he could check

25  with Mr. Farmer's lawyers.

Steven Ficon
March 16, 2017                                              56

1     five-minute break?

2          MR. BLOOM:  For sure.

3          (Brief recess, 2:45 p.m to 3:01 p.m.)

4     BY MR. BLOOM:

5     Q.   I want to turn to the February 3rd, 2009,

6     letter from Maureen Conboy.  It's marked as Exhibit 3F

7     in your binder.  After Crowley received this

8     communication, what efforts were made to further

9     document its belief that a claim had already been made

10    against Crowley?

11         MS. GARRISON:  Object to the form.

12    A.   Well, we believe we had made a claim that

13    shouldn't have been denied.

14    Q.   When by all accounts --

15    A.   At this point the investigation of Crowley

16    and the four individuals mentioned previously was

17    still ongoing.  The employees of other companies had

18    entered guilty pleas.

19    Q.   At this point in February 3rd of 2009, it

20    had already happened?

21    A.   Let's go back.

22    Q.   You said it was October 2008, correct?

23    A.   Yeah, it was October 2008.

24    Q.   When you first became aware that there were

25    other guilty pleas being entered?

1     A.   Yeah.  That's when those pleas had been

2   announced by the Department of Justice.  Wednesday,

3   October 1st, 2008.

4     Q.   This was all represented in your

5   November 26, 2008, correspondence to Maureen Conboy;

6   is that correct?

7     A.   Yes.

8     Q.   And on February 3rd you received the

9   response.  And is there a decision made by Crowley on

10   what to do and how to respond to this latest

11   correspondence from Ms. Conboy?

12     A.   On that day, no.  But as I said earlier, I

13   believe around this time or before we had made efforts

14   through outside counsel to see if we could obtain the

15   search warrant affidavit which we knew based on custom

16   and practice and based on what is said on the face of

17   the search warrant that there was a search warrant

18   affidavit which accompanied the search warrant.

19     Q.   So you weren't even aware that a search

20   warrant affidavit actually existed at this point?  Is

21   that what you just testified to?

22     A.   No, we were absolutely sure what existed.

23     Q.   Based on customary practice?

24     A.   No.  It said it right on the face of the

25   search warrant.

1    Q.   Okay.  That was what was unclear in your

2   answer.

3    A.   The search warrant itself says pursuant to

4   an affidavit issued by Special Agent Byron Thompson of

5   the FBI, the search warrant was issued.  And my custom

6   and practice response goes to the fact that we know

7   that for a search warrant to be issued, there has to

8   be probable cause, and that probable cause is stated

9   in a search warrant affidavit filed by the

10   investigating authority or prosecuting authority.

11    Q.   Your testimony as to when efforts were made

12   to uncover the search warrant affidavit are different

13   now than they were earlier as to the timeline.  Did

14   you remember something subsequent to our discussion of

15   that previously?

16    A.   How does it differ?

17    Q.   I believe that your testimony prior was that

18   it was in April or May of 2013 outside counsel,

19   either, Charles Lembcke, had attempted to obtain the

20   search warrant affidavit from Mr. Farmer's attorney.

21    A.   That was only the second part of my

22   response.  The first part of that response talked

23   about our efforts to -- talked about our discussions

24   with outside counsel prior to the arbitration in 2012

25   at various points in time whether or not the search

Steven Ficon
March 16, 2017                                          59

1   warrant affidavit was available.

2       Q.   It's your testimony that before the response

3   to the February 3rd, 2009, letter from Maureen Conboy,

4   there had already been discussions taking place about

5   obtaining the search warrant affidavit with outside

6   counsel?

7       A.   I think my prior answer was on -- I'm not

8   sure of the exact dates.  It may have been around this

9   time between, you know, 2009, 2010.  Certainly prior

10  to the arbitration filing of March 2012.

11      Q.   When was your response to Maureen Conboy's

12  February 3rd, 2009, letter made?

13      A.   September 30, 2009.

14      Q.   Why the length in time between -- with

15  regards to your response?

16      A.   I don't think there's anything unusual about

17  the length of time considering this case has gone on

18  for how many years now, 2008, you know, almost nine

19  years.

20      Q.   Did anything precipitate your decision to

21  respond to Maureen Conroy's February 3rd, 2009, letter

22  in September 30, 2009?

23      A.   Well, I think we had received some

24  additional articles and press releases which

25  indicate -- indicated that the Department of Justice

# Doc. 36-4

# EXHIBIT C

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

CROWLEY MARITIME
CORPORATION,

        Plaintiff,

v.                              Case No.:  3:16-cv-01011-TJC-JBT

NATIONAL UNION FIRE
INSURANCE COMPANY OF
PITTSBURGH, PA,

        Defendant.

_____/

**EXPERT REPORT OF WILLIAM F. JUNG**

_____

WILLIAM F. JUNG

February 10, 2017

On behalf of plaintiff Crowley Maritime Corporation ("Crowley"), I provide this expert report.

1. **Professional Background:** I attach as Exhibit 1 my curriculum vitae. Since 1983, my practice has had a significant involvement in federal criminal matters, including as a law clerk to the Hon. Gerald Tjoflat, U.S. Court of Appeals, Eleventh Circuit and Hon. William H. Rehnquist, U.S. Supreme Court; as an Assistant United States Attorney in Miami and Tampa; and as a private practitioner. I have been board certified in Criminal Trial Practice by the Florida Bar since 1994, and A.V. rated by Martindale-Hubbell since 1992. Federal criminal matters constitute roughly 60% of my matters at any given time. The remainder of my practice is civil litigation, primarily attorney malpractice defense and some appeals. Presidents George W. Bush and Barack Obama each nominated me to be a U.S. District Judge for the Middle District of Florida. In both nominations, the ABA Standing Committee on the Federal Judiciary gave me their highest rating, unanimously well-qualified. Both nominations came too late in the Presidents' respective terms for me to get a Senate hearing.

Attached as Exhibit 2 is a list of articles I have authored in the previous 10 years on legal topics. In addition, I previously have authored a number of articles on criminal procedure topics, including one article on corporate grand jury practice and an article on federal grand jury subpoena privileges. In the past four years, I have offered expert testimony on several occasions, as set forth in the attached Exhibit 3. One of these matters involved a deposition. Also, attached as part of Exhibit 3 are two orders of the United States District Court for the Middle District of Florida, accepting my expert opinion in federal fee disputes. Further, in a case for the client, Palm Beach County, I testified in a fees dispute in 1995 in the U.S. District Court for the Southern District of Florida. Judge Jose Gonzalez accepted my expert testimony in that matter. Finally, in past decades, I have testified one or more times in state court on fees disputes as an expert, and over the years probably have provided three or more affidavits for submission on the same subject in other state court cases. I also was previously retained by Crowley to provide opinion testimony in the 2012 arbitration between Crowley and defendant National Union, including testimony regarding the reasonableness of Thomas Farmer's attorneys' fees.

2. **Compensation:** My compensation for this case is $600 an hour plus expenses for non-testifying services and for time spent testifying at deposition or in court. My compensation is not dependent on the outcome of this matter.

3. **Materials Consulted:** Attached as Exhibit 4 is a list of documents that contain data or facts that I considered in forming my opinions in this matter.

4. **Case Background:** My understanding of the relevant background is obtained from the materials consulted as set out in Exhibit 4, and generally is as follows: On April 17, 2008, the FBI executed a search warrant at the headquarters of Crowley Liner Services, Inc., a wholly owned subsidiary of Crowley. The search warrant was issued by the United States District Court for the Middle District of Florida – Jacksonville Division, in connection with a United States Department of Justice (DOJ) antitrust investigation involving an alleged price fixing conspiracy. The search warrant, which was issued based upon an affidavit executed by an agent of the FBI, demanded and ordered that certain property be seized from specifically identified individuals,

such as correspondence and communications between Thomas Farmer and employees of other shipping companies, including Horizon Line and Sea Star Line. As discussed further herein, the affidavit submitted in connection with the search warrant was filed under seal, and was not publicly unsealed until April 24, 2015.

At the time the search warrant was executed, Thomas Farmer was a vice president of price and yield management for Crowley. In this role, Mr. Farmer worked on cabotage pricing rates with employees of other shipping lines that were Crowley competitors, including Gregory Glova (Horizon), Gabriel Serra (Horizon), and Peter Baci (Sea Star). The named individuals, and others, pleaded guilty and served prison sentences ranging from 20 months to four years in connection with the alleged price fixing conspiracy. Another individual, Frank Peake (Sea Star), was convicted by a jury of price fixing and was sentenced to five years in prison.

Following the execution of the search warrant, Thomas Farmer hired counsel in connection with the DOJ antitrust investigation. In February 2013, following a years-long investigation, DOJ prosecutors presented Mr. Farmer with a written offer to enter into a plea agreement. On March 21, 2013, Mr. Farmer was indicted for alleged participation in the price fixing conspiracy. Following a month-long trial, Mr. Farmer was acquitted of all charges by a jury in the U.S. District Court in Puerto Rico on May 8, 2015.

I understand that Crowley indemnified Mr. Farmer for his defense costs incurred in connection with the antitrust investigation through February 2013. I also understand that Crowley sought insurance coverage for these defense costs for which it indemnified Mr. Farmer, but that defendant National Union declined to provide coverage for such costs.

5. **Opinions Offered:** My opinions are set forth below and are based on my review of materials identified in Exhibit 4, my experience as set forth in my CV attached as Exhibit 1, and prior expert testimony as discussed above and as identified in Exhibit 3:

A. In my opinion, the time expended and the rates charged for Thomas Farmer's attorney invoices from the law firm Lankford & Reed, PLLC and attorney Mark Rosenblum for the period from May 2008 to March 2013 that are the subject of this dispute are reasonable, and are within "market rates" for this type of case and the lawyers conducting the work.

First, it is important to note that federal "white collar" criminal rates are generally higher than rates charged for routine civil litigation matters. This is a fact of the market. The reasons for this are several. There are barriers to entry to federal criminal practice, generally requiring a tenure at a prosecutor's or public defender's office. Also, the nature and need of the representation is one of an acute crisis. Further, a federal "white collar" client is not a repeat client providing regular work to counsel, whose promise of regular business (like a bank or insurance company needing recurring civil representation) might permit a lower fee. Finally, "white collar" defense is a special skill, and all the more specialized when criminal antitrust is involved.

I am personally familiar with the Lankford Reed firm in Alexandria, VA, having been involved in two criminal cases with the firm's lawyers over the years. They enjoy a strong

reputation.   Terrance Reed, former Editor in Chief of the American Criminal Law Review, and
V. Thomas Lankford are experienced federal criminal practitioners at the highest levels.  Their
firm is in the "top shelf" of Washington, D.C. – area criminal defense law firms.  Likewise with
local counsel Mark Rosenblum in Jacksonville.  I know of his solid reputation as Florida Bar
Board Certified in Criminal Trial, and he now specializes in criminal defense at the Federal
Public Defender's Office in Jacksonville.

My conclusion is buttressed by expenses incurred by the related defendants.  Horizon is
another shipping line involved in the criminal antitrust matter that is the subject of this case.
Horizon stated in its SEC filings that it incurred $2.5 million in legal fees in connection with the
investigation and defense of Charles Raymond, its CEO.  The fees expended by Horizon in
connection with Raymond's defense at the pre-trial stage are roughly the same as those expended
for Mr. Farmer at the same stage.

The time expended by Mr. Farmer's attorneys is reasonable in amount, and for reasonably
necessary tasks.  In this regard, I do note that the time descriptors in the invoices of Mr. Farmer's
counsel are not overly detailed.  This is typical in this type of criminal case.  The reason is that
the billing records often go to third party payers (such as the subject individual's employer) that
may become a cooperating defendant.  For example, as a prosecutor I have reviewed lawyer
billing records of a target individual that were provided by a cooperating third party payer,
pursuant to a waiver of privilege by the payer.  To avoid potential problems in this regard, it is a
commonly understood and accepted practice for criminal defense attorneys to provide less
detailed descriptions in invoices so as to protect work product and attorney client privileges.

I note that National Union's motion to dismiss filed in this matter stated that Mr. Farmer
"panicked" and hired defense counsel after the FBI executed its search warrant.  Mr. Farmer's
reaction in obtaining counsel after the execution of the search warrant was wise, quite
appropriate, and exactly the proper step.  The massive raid into Crowley's office, and the
concurrent searches at other locations, made clear that this case was incredibly serious.  This was
not "panic" on Farmer's part; it was a smart move to seek counsel.  Indeed, the significant prison
sentences meted out to others in this matter show Farmer was prudent to quickly assemble his
defense team.

This serious and wide-reaching case had a pre-indictment phase for Mr. Farmer of nearly five
years after the search (from 2008 to early 2013).  None of this passage of time was within the
control of Farmer or his lawyers.   These large white collar cases are often years in the making,
especially a case that has multiple defendants and facets like this one.  Farmer's defense team
took the case all the way from start to trial success:  from assembling and then reviewing the
initial and ever-growing (massive) database at the outset, to closing before the jury.   As
discussed below, the search warrant affidavit made very clear that Mr. Farmer was at all times a
key target of the DOJ's case.

Farmer's lawyers made wise use of this pre-indictment, investigative phase.  Their time sheets
show that they exhaustively marshaled facts and crafted a defense for the trial that was
inevitable.    The time sheets show preparation on the key issues in the case, as well as
cooperation with other defense counsel in the related cases (which were factually similar to

Farmer's).  This includes attending the related criminal trial of Frank Peake, president of Sea Star Line, in Puerto Rico, and using that event to further prepare cross-examination and strategy for Farmer's own trial.

The touchstone case on attorneys' fees in the Eleventh circuit is *Johnson v. Georgia Highway Express*, 488 F.2d 714 (5th Cir. 1974).  The attorney fees incurred on behalf of Thomas Farmer meet those standards set forth in the *Johnson* case.  I discuss below the *Johnson* factors required for consideration by the case law:

i.  *The time and labor required*:  This was a complex, massive case.  Based on my review of the dockets and case materials in the underlying criminal antitrust matters, the case involved multiple search warrants in multiple jurisdictions.  A large number of defendants from several companies were eventually charged.  The case also involved several "cooperators" and undercover tapes including tapes of conversations involving Farmer.  The case spawned many lawsuits (civil and criminal) related to the alleged price fixing that had to be monitored by counsel for Farmer.  All of these factors and others required an extensive, thorough and time-consuming preparation by Farmer's counsel.  The trial in 2015 encompassed 18 trial days.   This large volume of work can be seen in the timesheets.  And the exhaustive preparation for trial and time invested in trying the case indeed paid off with a jury acquittal for Farmer in 2015.

ii.  *The novelty and difficulty of questions*:  The case presented a novel and very difficult subject matter.  Criminal antitrust cases are rare.  They require not only a skilled federal criminal defender, but one who is skilled in the intricacies of antitrust and price-fixing jurisprudence.  The case also involved mastering a good bit of accounting, as well as understanding the impact a cabotage price-fixing case would have in a jury trial venue that received nearly all its goods by seaborne freight.

iii.  *The skill requisite to perform the legal services properly:*  There are few law firms that have lawyers with the skills necessary to effectively handle this type case.  Mr. Lankford's and Mr. Reed's firm (which does cutting-edge "white collar" criminal cases) is one such firm. The nature of this case, including the volume of the documents, the complexity of the issues, the time span involved, the number of witnesses involved, and the knowledge and skills required to properly analyze the legal issues and to prepare the defense, required a very high level of skill to perform the legal services. The result obtained and the work required to get there is only achieved at the highest skill level of legal practice.

iv.  *The preclusion of employment by the attorney due to acceptance of the case:*  The case was of sufficient magnitude that Mr. Reed, Mr. Lankford and Mr. Rosenblum were occupied extensively with his significant pre-indictment work and preparation.

v.  *The customary fee:*  Based on my understanding of customary fees charged by lawyers of similar skill in this type of litigation, the hourly rates at which defense

counsel billed in this matter are within the customary range of fees for this type of work.

Such rates have been found reasonable. For example, in the Middle District of Florida, courts have approved $500 hourly rates for lawyers in other sophisticated federal court cases during this time frame. *See, e.g., Pierson v. Orlando Regional Health Center*, No. 08-cv-466, Doc. 429 (M.D. Fla. April 4, 2012) (order of Magistrate Judge), affirmed by District Judge at Doc. 433 (M.D. Fla. May 1, 2012). I note that in a contract case Judge Bucklew approved a fee request that included a $520 hourly rate. *PNC Bank v. BBT Company*, No. 08-cv-611, 2010 WL 2821996 (M.D. Fla. July 16, 2010), invoice submitted with fees motion at Doc. 91-5 (March 23, 2010). The Court found that the rates sought were "reasonable and customary for counsel with commensurate experience in the Middle District." *Id*. Moreover, the Eleventh Circuit undertook a *de novo* examination of the fee award on appeal, and affirmed this Order. PNC Bank, No. 08-cv-611, doc. 122 (11th Cir. Feb. 9, 2012). Indeed, National Union itself appears to have agreed to Mr. Lankford's and Mr. Reed's $500/hr rates after National Union accepted coverage in 2013.

vi.   *Whether the fee is fixed or contingent:*  The fee was straight hourly, as contingent fees are not permitted in criminal cases.

vii.  *The amount involved and the results obtained:*  The "amount involved" refers to the stakes.  Here the stakes were massive:  Mr. Farmer's freedom, personal wealth, and status in life.  The result, a jury acquittal on all charges, was the best possible outcome for Mr. Farmer.

viii. *The experience, reputation and ability of the attorneys:*  The experience, reputation and ability of the lawyers in this case are excellent, as discussed above.

ix.   *The "undesirability" of the case*: This case was undesirable.  The complex and technical but grave nature of the allegations, the breadth of time of the claims asserted and the fact that several of the witnesses were located elsewhere made the logistics of defense challenging.   The detailed, fact intensive nature of this case made it a difficult slog for the defense attorneys.

x.    *The nature and length of the professional relationship of the client:*  The lawyers had a lengthy, ongoing, and devoted relationship with this client.

xi.   *Awards in similar cases*: Several of the reported cases approving this type of fee amount are set forth above. Fees have been approved in this range.

It is routine for prime defense counsel to co-counsel with local attorneys, who live and practice in the venue of the investigation, as Mr. Farmer did with local counsel Mark Rosenblum in Jacksonville.  This is standard practice (and is required in many venues like M.D. Fla. by rule), and is a good idea.  At trial, it makes sense to have local counsel.  This is especially true for jury selection, but also for all the many advantages that local lawyers bring to the defense.

This is also true in the investigative stage, when knowledge of the local court, the local agents, their supervisors, and law enforcement practices and customs, may be invaluable. Often times having someone "on the ground" locally can save money. An example of this would be Mr. Rosenblum attending Baci's sentencing. Local insight is invaluable in any defense situation, and is routine.

B. As part of my work on this matter, I also have considered whether the 2008 search warrant affidavit was a writing that identified Mr. Farmer as an individual against whom a criminal proceeding might be commenced, the history of the search warrant's unavailability, and National Union's argument that pre-indictment activity and post-indictment activity by Mr. Farmer's defense counsel somehow arose from two separate proceedings.

I wrote dozens of search warrants as a federal prosecutor, and have handled many in private practice. They, along with the affidavits that support them, are a significant and time consuming event. In this case, the prosecutors sat down with the FBI investigators and drafted out warrants and affidavits for a series of simultaneous, nationwide searches. The search warrant and search warrant affidavit at issue here were reviewed by Magistrate Judge Klindt, whom I know well. The affidavit that accompanied the search warrant provides extensive detail, laying out why probable cause exists to believe that evidence of federal felonies was at Crowley and, specifically, evidence of felonies was attributable to and related to the conduct of Mr. Farmer. A search warrant is not like an SEC Wells notice and it is not like a subpoena or target letter: it is much more involved, much more serious, and much more "forceful" on expressing an intent and direction. Unlike a subpoena or target letter, a search warrant requires detailed probable cause, proven before a neutral and detached magistrate. The grounds for such probable cause are, as in this case, typically laid out in great detail in the affidavit that accompanies the search warrant.

Pursuant to regular practice, and at the request of the DOJ, the search warrant affidavit in this case was placed under seal on April 16, 2008 once it was entered by the Magistrate Judge in Jacksonville. On March 29, 2013, by an Order of Magistrate Judge James R. Klindt in No. 3:08-mj-1092-JRK, the affidavit was unsealed solely for the use of Mr. Farmer's defense team. Magistrate Judge Klindt's Order, which itself was under seal, barred the use or possession of the affidavit by anyone other than Mr. Farmer's own defense team (with very limited exceptions not relevant here). At the specific request of the DOJ, the March 29, 2013 Order specifically provides that the affidavit "shall remain sealed after defense counsel have been provided with copies, so that the defendant's right to a fair trial will be protected and the ongoing investigation will not be frustrated." This is not unusual in a case with an ongoing investigation. The records show that the affidavit was not transmitted to Mr. Reed, counsel for Farmer, until April 30, 2013, but again remained subject to judicial seal preventing its disclosure to or use by, anyone else. In addition to the restraint placed on the affidavit's release by Magistrate Judge Klindt, the District Court presiding over Farmer's indicted case (in the District of Puerto Rico, No. 3:13-cr-00162) also entered a Protective Order prohibiting dissemination or use of the affidavit by anyone outside of Farmer and his defense team.

The search warrant affidavit first became publicly available in 2015 when it was moved into evidence at a suppression hearing on April 24, 2015. Until that time, the affidavit was

unavailable and barred to Crowley.  Because the DOJ investigation and prosecution remained ongoing, there is no reason to believe that the prosecution – or the Court – would have been willing to unseal the search warrant affidavit to Crowley prior to April 24, 2015.

The 2008 search warrant affidavit clearly indicated in writing that Mr. Farmer was an individual who was likely to be charged with a crime. For example, the search warrant affidavit contains the following written statements regarding the investigation against Mr. Farmer (and others), including specific statements regarding Mr. Farmer's involvement in the alleged unlawful price-fixing scheme and accusing Mr. Farmer of having engaged in illegal conduct:

- "[B]ased on my review of these emails, that these **illicit agreements to allocate customers and coordinate prices extend to similar communications and agreements between BACI [Sea Star VP], GLOVA [Horizon VP] and FARMER of CROWLEY**." (Affidavit at ¶ 21.)[1]

- "I have reviewed many of those emails and based on my review, believe this separate email account was used by GLOVA to communicate with FARMER about pricing and market share information." (*Id.* at ¶ 62.)

- "CW-l [Cooperating Witness 1] told me that on more than one occasion, he/she has overheard FARMER and BACI's conversations emanating from BACI's office on his speaker phone. Furthermore, consensual audio recordings that I have listened to between CW-l and BACI, as well as email communications I have reviewed that were obtained by search warrant, **reflect FARMER's participation with BACI and GLOVA to fix prices and allocate customers between each of the coastal freight carriers, HORIZON, SEA STAR and CROWLEY**." (*Id.* at ¶ 63.)

- "Emails between BACI and GLOVA that I have reviewed indicate that **FARMER communicated confidential information** regarding bids to BACI." (*Id.* at ¶ 72.)

- "On March 28, 2008, CW-l, at my direction, made a consensual audio recording, which I have reviewed, of a conversation with BACI corroborating that BACI, GLOVA and **FARMER communicated confidential pricing information on contracts**." (*Id.* at ¶ 74.)

In my opinion, these exemplar statements, and others in the search warrant affidavit, clearly indicate that as of the date of the search warrant affidavit, Mr. Farmer was identified by the Department of Justice as an individual against whom a criminal proceeding may be commenced, including without limitation an individual against whom a criminal indictment would be filed.

Finally, the entire Farmer case, which spanned from the 2008 search warrant (and affidavit) until the 2015 jury acquittal, was a single criminal case.  This is called a "prosecution."  The same agents and attorneys who run the investigation run the trial and sentencing.  The same targets were charged.  Federal investigations are not done for curiosity, or for academic interest.  A federal criminal investigation of an individual is begun, and is carried forward, until the

---

[1] Emphasis in citations to search warrant affidavit is added.

government determines that the individual will not be pursued further or is convicted (intended to be put in the penitentiary) either by plea or trial.  That is the goal and purpose of the prosecution.

   In this case, there were not two proceedings, or two actions separated by some demarcation (such as, for example "pre" and "post" indictment of Mr. Farmer).  Contending otherwise ignores the reality of federal criminal cases.  When the federal agents raided Crowley in 2008, it is entirely certain that they were looking for evidence to put Mr. Farmer and others in prison, pure and simple.  The search warrant affidavit makes this entirely clear.  That it took them several years to do so proves only how complex this case was, not that there are two parts to it. The DOJ eventually "worked up" their investigation and, as part of their plan begun in 2008, took Farmer to the 2015 jury trial that ended in his acquittal.

# EXHIBIT 1

# William F. Jung

**JUNG & SISCO, P.A.**
101 EAST KENNEDY BLVD.
SUITE 3920
TAMPA, FL 33602
(813) 225-1988
FAX (813) 225-1392
wjung@jungandsisco.com



Born in 1958, Bill Jung received his B.A. in economics, magna cum laude, from Vanderbilt University in 1980, where he was Phi Beta Kappa. He received his J.D. Degree in 1983 from the University of Illinois College of Law, where he was class Valedictorian, Order of the Coif, and Editor in Chief of the Illinois Law Review. In 1983, Bill received the 1st DCA award for the highest score on the Florida Bar exam and gave the speech on behalf of newly admitted lawyers at the Florida Supreme Court. From 1983 to 1985 he served as law clerk to the Hon. Gerald Bard Tjoflat, United States Court of Appeals for the Eleventh Circuit, and as law clerk to the Hon. William H. Rehnquist, United States Supreme Court.

A former federal prosecutor, Bill is an experienced civil and criminal trial lawyer. Bill and his law partner have tried over 150 jury trials between them. His practice is primarily commercial litigation and federal 'white collar" criminal defense. He is a Fellow of the American College of Trial Lawyers. He is Board Certified by the Florida Bar as a specialist in criminal trials, and is AV rated by Martindale-Hubbell (their highest rating) since 1992. He practiced civil litigation with a large Tampa Firm, Carlton Fields, prior to becoming an Assistant U.S. Attorney (criminal division) in Tampa and Miami from 1987 to 1993. He has tried numerous trials to verdict, and has handled many appeals of wide variety. He has published over thirty scholarly articles, and was a Circuit editor of the ABA Appellate Practice Journal.

Bill has also been admitted to the U.S. Supreme Court, all U.S. Courts of Florida, as well as the Eleventh and Fourth Circuit Courts of Appeal. He is a member of the Florida, American, and Federal Bar Associations, and the National Association of Criminal Defense Lawyers. Bill previously served on the Florida Bar Attorney Grievance/Discipline Committee for the Thirteenth Judicial Circuit. Bill served on the Board of Directors of the Tampa Division of the Federal Bar Association for the Middle District of Florida, and served as Vice President for the Eleventh Circuit. He served as chair of the Florida Judicial Nominating Commission for the 13th Judicial Circuit. The United States District Court for the Middle District of Florida chose Bill for its Magistrate Judge Selection Committee (2009 – 2013) and he served as Chair in 2012 -2013.

Bill has won awards from the Bar and Court commendations for *pro bono publico* service to indigents. He is founder and chair of First Step of Hillsborough, Inc., a "tough love" support group for parolees. In 2010 Bill won the James Kynes "In the Trenches Award" for tenacious trial advocacy from the Hillsborough County Bar Association Trial Lawyers Section.

Bill has received commendations and citations for excellence in prosecution of narcotics, money laundering, and public corruption cases from:
- Federal Bureau of Investigation, 1993
- Organized Crime, Drug Enforcement Task Force, 1993
- United States Customs Service, 1992
- United States Marshals Service, 1992

Listings/ Recognitions all current:
- Martindale-Hubbell Highest Rating, AV, since 1992
- Florida Super Lawyers
- Florida Trend Magazine Legal Elite – Florida's Legal Leaders
- The Best Lawyers in America
- Tampa Bay Metro Magazine, Best Bay Area Lawyers

Bill was appointed by Sen. Mel Martinez to the regional (2005 – 2006) and statewide 92006) selection panel for the U.S. Naval Academy.  He resides in Tampa with his wife, Gina, and their four children.

# EXHIBIT 2

**WILLIAM F. JUNG**
**Articles Authored in Previous 10 Years**

- <u>Not Dead Yet:  The Enduring Miranda Rule 25 Years After the Supreme Court's October Term</u> 1984, Saint Louis University Public Law Review (Volume XXCIII, Number Two 2009).

# EXHIBIT 3

**WILLIAM F. JUNG**
**Prior Expert Testimony**

- *Awwad v. Largo Medical Center*, Case No. 8:11-cv-01638 (M.D. Fla.) – Affidavit in Support of Defendant's Motion for Attorneys' Fees and Costs, Sept. 27, 2013

- *U.S. v. KForce Government Solutions, Inc.*, Case No. 13-Cv-001517-T-36TBM (M.D. Fla.) – Affidavit in Support of Defendant's Motion for Attorneys' Fees and Costs, Nov. 20, 2014

- *Fitzgibbons, et al. v. Covan World-Wide Moving, et al.*, Case No. 8:15-CV-1275 (M.D. Fla.) – Deposition Testimony, Feb. 4, 2016

- *Everett v. City of St. Petersburg, et al.*, Case No. 8:14-cv-2508 (M.D. Fla.) – Affidavit in Support of Defendant's Motion for Attorneys' Fees and Costs, Aug. 26, 2016

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

TERRI L. STEFFEN,

    Plaintiff,

v.

Case No.  8:04-cv-1693-T-24 MSS

AKERMAN, SENTERFITT & EDISON, P.A. and
MICHAEL I. GOLDBERG,

    Defendants.

_____/

## ORDER

    This cause comes before the Court on Defendants' motion for attorneys' fees. (Doc. 148.)

## BACKGROUND

    Plaintiff filed this suit against Defendants for legal malpractice based on Defendants'

representation in Plaintiff's efforts to unfreeze her assets in the case of *SEC v. Bilzerian*, 127 F.

Supp. 2d 232 (D.D.C. 2000). Defendants twice offered to settle the instant suit, but Plaintiff

refused. Later, summary judgment was granted in favor of Defendants. (Doc. 101.) Plaintiff

appealed the summary judgment order to the Eleventh Circuit, and the Eleventh Circuit affirmed

the district court's judgment ("first appeal"). (Doc. 120.) Pursuant to Florida's offer of

judgment rule, Defendants sought (Doc. 133) and received (Doc. 138) an award for attorneys'

fees associated with the defense of their case for the period after the Plaintiff refused their

settlement offer, including fees associated with the first appeal. The Trustee of Plaintiff's estate

then appealed the attorneys' fee award ("second appeal") (Doc. 139), and the Eleventh Circuit

affirmed, holding that this Court properly applied Florida's offer of judgment rule to the

bankruptcy proceeding, *Menchise v. Akerman Senterfitt,* 532 F.3d 1146, 1150 (11th Cir. 2008).

Defendants now request attorneys' fees associated with the second appeal.

## DISCUSSION

ENTITLEMENT. Defendants move for attorneys' fees and costs pursuant to Florida's offer of judgment statute, § 768.79, which provides: "In any civil action for damages filed in the courts of this state, if a defendant files an offer of judgment which is not accepted by the plaintiff within 30 days, the defendant shall be entitled to recover reasonable costs and attorneys' fees incurred by her or him . . . from the date of filing of the offer if the judgment is one of no liability." Fla. Stat. § 768.79(1). The statute applies to federal bankruptcy proceedings in this state. *Menchise*, 532 F.3d 1146. It applies to appeals as well. *See Motter Roofing, Inc. v. Leibowitz*, 833 So. 2d 788 (Fla. 3d. DCA 2002). The award also extends to fees generated in litigating the entitlement to attorneys' fees. *McMahan v. Toto*, 311 F.3d 1077, 1085 (11th Cir. 2002). However, the statute is inapplicable to fees generated in litigating the amount of attorneys' fees to which one is entitled. *Id.*

Because the appeal that generated the fees being claimed was based on whether Defendants were eligible for any attorneys' fees under Florida's offer of judgment statute in a federal bankruptcy proceeding—rather than the amount of fees to which they were entitled—Defendants are entitled to attorneys' fees associated with the second appeal.

REASONABLENESS. In determining a reasonable attorneys' fee award, the Court utilizes the lodestar method, which considers the number of hours reasonably billed multiplied by a reasonable hourly rate. *Pinchinat v. Graco Children's Prods, Inc.*, 2005 WL 1459409, at *1 (M.D. Fla. June 20, 2005).

Defendants have submitted their attorney billing records, showing that Hill Ward &

2

Henderson partner and legal practitioner of 18 years, Marie A. Borland, spent 117.4 hours working on the second appeal for this case and that she charged an hourly rate of $310 for that work. This totals $36,886 in attorneys' fees. The records also show that J. Scott Slater, an associate at Hill Ward & Henderson and a legal practitioner with four years of private practice experience, worked for 12.3 hours on the case and charged an hourly rate of $205, for a total of $2,523 in attorneys' fees. The total fees generated between both attorneys, therefore, were approximately $39,409. Ms. Borland submitted an affidavit verifying the time stated in the billing records and the billing rates charged. In addition, William F. Jung, a Florida attorney specializing in litigation, reviewed the billing records, the case materials, and the relevant case law as well as interviewed two time keepers in the matter, and has averred that the hours stated were reasonable and that the rates charged were below market rates. Further, he notes that Defendants have not sought compensation for the time of two Hill Ward & Henderson partners who worked on the case.

The Court has reviewed the records and found that the hours stated and the rates charged were reasonable.

## CONCLUSION

Accordingly, it is ORDERED AND ADJUDGED that Defendant's motion for attorneys' fees and costs (Doc. 148) is GRANTED. The cost hereby awards attorneys' fees in the amount of $39, 409.

**DONE AND ORDERED** at Tampa, Florida, this 24th day of April, 2009.

Susan C. Buckley

SUSAN C. BUCKLEW
United States District Judge

3

Copies to: Counsel of Record

4

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

TERRI L. STEFFEN,

          Plaintiff,

v.                                                Case No. 8:04-cv-1693-T-24MSS

AKERMAN SENTERFITT, a Florida
professional association, and MICHAEL I.
GOLDBERG,

          Defendants.

_____/

## ORDER

This cause comes before the Court for consideration of Defendants' Second Amended

Motion for Attorneys' Fees (Doc. No. 133). Plaintiff filed a response in opposition thereto (Doc.

No. 136).[1]

### I.    Background[2]

On December 16, 2003, Plaintiff filed a complaint in the United States Bankruptcy Court

for the Middle District of Florida (Doc. No. 9-1). On May 28, 2004, Plaintiff filed an amended

complaint (Doc. No. 9-13). In the one-count amended complaint, Plaintiff asserted a claim for

legal malpractice against Defendants arising out of the period of time when Defendants

---

[1]Although Plaintiff's response was filed untimely, the Court considered it for purposes of
this Order.

[2]The Court will not state the extensive procedural and factual background of this case
here. Instead, the Court incorporates by reference the background as outlined in this Court's
December 2, 2005 and March 20, 2007 Orders (Doc. Nos. 101 and 130).

1

represented Plaintiff in her efforts to unfreeze certain assets in the case of <u>SEC v. Bilzerian</u>, 127

F. Supp. 2d 232 (D.D.C. 2000).

      On March 15, 2005, Defendants served Plaintiff with an offer of judgment in the amount

of $10,000.00 pursuant to Florida Statute § 768.79 (Doc. No. 121, Exh. A). The March 15, 2005

offer of judgment did not apportion the offer between Defendant Akerman, Senterfitt & Edison,

P.A. ("Akerman") and Defendant Michael I. Goldberg. On July 7, 2005, Defendants served

Plaintiff with a second offer of judgment under Florida's Offer of Judgment Statute, Florida

Statute § 768.79. Specifically, the July 7, 2005 offer of judgment was apportioned with

$9,990.00 offered by Defendant Michael I. Goldberg and $10.00 offered by Defendant Akerman.

Plaintiff did not accept the offer of judgment. Defendants filed a motion for summary judgment.

On December 2, 2005, this Court granted Defendants' motion for summary judgment (Doc. No.

101) and the Clerk of the Court entered judgment in favor of Defendants (Doc. No. 102). On

December 23, 2005, Plaintiff filed a Notice of Appeal as to the Court's Order granting summary

for Defendants (Doc. No. 108). On June 27, 2006, the Eleventh Circuit affirmed this Court's

Order granting summary judgment (Doc. No. 120).

      Thereafter, Defendants sought their attorneys fees, including appellate fees (and fees

incurred in litigating their entitlement to fees), pursuant to Florida Statute § 768.79 (Doc. No.

121). The Court granted Defendants' Amended Motion for Attorneys' Fees to the extent that the

Court found that Defendants were entitled to reasonable attorneys' fees under § 768.79 from the

date of the July 7, 2005 offer of judgment. The Court denied the motion without prejudice as to

the amount of attorneys' fees to be awarded and directed Defendants to file a second amended

motion for attorneys' fees that contained a detailed billing statement and documentation

2

regarding the reasonableness of the requested hours and billing rates (Doc. No. 130). In response, Defendants filed the instant motion with detailed billing records attached.

## II.     Motion for Attorneys' Fees

Defendants seek attorneys' fees in the amount of $310,878.50 pursuant to Florida's Offer of Judgment Statute, Florida Statute § 768.79, for work done between July 7, 2005 and August 21, 2006[3] plus interest accrued from March 20, 2007.[4]   Defendants request attorneys' fees consisting of (1) $209,784.90 in fees for defense of this case before this Court; (2) $56,678.00 in fees relating to the litigation of entitlement to attorneys' fees; and (3) $44,415.60 in fees for the defense of this case before the Eleventh Circuit Court of Appeals (Doc. No. 133). Defendants acknowledge that fees incurred in litigating the amount of attorneys' fees are not recoverable. See McMahan v. Toto, 311 F.3d 1077, 1085-86 (11th Cir. 2002)(citing State Farm Fire & Cas. Co. v. Palma, 629 So. 2d 830, 833 (Fla. 1993)).

Defendants submitted over 120 pages of single spaced detailed billing statements in support of their motion. Defendants' requested fees are summarized in the following table (Doc. No. 135, Exh. A):

| Attorney/Paralegal | Total Hours | Billing Rate | Total Fees |
|---|---|---|---|
| B. Hill, III | 33.7 | $425.00/$450.00 | $14,417.00 |

---

[3]In its Second Amended Motion for Attorneys' Fees, Defendants state "[t]o allow the Court to more easily determine when [Defendants'] fees incurred for litigating entitlement to fees stopped, and when its fees incurred for litigating the amount of fees began, [Defendants have] calculated [their] recoverable attorneys' fees by including the fees incurred from July 7, 2005 to August 21, 2006, the date on which [Defendants] filed [their] Amended Motion for Attorneys' Fees" (Doc. No. 133, p. 4, n. 2).

[4]The date Defendants' entitlement to fees was determined (Doc. No. 130).

3

| E. Matheney | 594 | $235.00/$260.00 | $142,035.00 |
| M. Criser | 208.6 | $205.00/$225.00 | $43,307.00 |
| S. Slater | 316.7 | $150.00/$180.00 | $51,753.00 |
| P. Greenlee | 26.9 | $175.00/$190.00 | $4,155.00 |
| M. Borland | 82.7 | $295.00 | $24,396.50 |
| D. Luikart | 82.3 | $100.00/$160.00 | $11,290.00 |
| S. Harris | 46.6 | $150.00 | $6,990.00 |
| L. Tibbals | .5 | $220.00 | $110.00 |
| C. Garcia | 1.6 | $100.00 | $100.00 |
| J. Maddox | 18.5 | $95.00 | $1,757.50 |
| J. Murman | .4 | $105.00 | $42.00 |
| L. Harrod | 16.6 | $105.00 | $1,596.00 |
| M. Luke | 5.3 | $105.00 | $556.50 |
| J. Varner | 58 | $125.00 | $7,250.00 |
| J. Roberts | 7.5 | $75.00 | $562.50 |
| **TOTAL** | **1,499.90** | | **$310,878.50** |

Defendants argue that the amount of fees are reasonable in light of the complexity of the case, the amount of damages sought by Plaintiff, and the "extremely favorable" results obtained. In support of their Second Motion for Attorneys' Fees, and the reasonableness of those fees, Defendants submit the affidavits of attorneys Raymond T. Elligett, Jr. ("Elligett")(Doc. No. 131), William F. Jung ("Jung")(Doc. No. 132), and Erik R. Matheney ("Matheney")(Doc. No. 135). Plaintiff responds that Defendants fail to provide an adequate explanation of and necessary documentation to establish the hours expended were reasonable[5], and request a significant

---

[5]The Court notes that Plaintiff limits its response to the 1,042 hours Defendants' requested from the date of the July 7, 2005 offer of judgment through the date of final judgment

4

reduction in the fees to be awarded. Plaintiff submits the Affidavit of attorney H. Stratton Smith, III ("Smith") in support of her opposition to Defendants' Second Motion for Attorneys' Fees (Doc. No. 137).

### A. Reasonableness of Defendants' Requested Attorneys' Fees

In determining a reasonable fee, the Court starts with the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate. See Hensley v. Eckerhart, 461 U.S. 424, 433 (1983)[6]; see also Loranger v. Stierheim, 10 F.3d 776, 781 (11th Cir. 1994). This may be referred to as the lodestar. See ACLU v. Barnes, 168 F.3d 423, 427 (11th Cir. 1999); see also Florida Patient's Com. Fund v. Rowe, 472 So. 2d 1145, 1150 (Fla. 1985)(finding the federal lodestar approach a suitable foundation for computing reasonable attorneys' fees). "The fee applicant bears the burden of establishing entitlement and documenting the appropriate hours and hourly rates." Norman v. Hous. Auth. of the City of Montgomery, 836 F.2d 1292, 1303 (11th Cir. 1988)(citations omitted). The Court will first determine whether the hourly rates requested by

_____

as originally summarized in the Affidavit of Benjamin H. Hill, Jr. (Doc. No. 105) and not the 1,499.90 requested in Defendants' Second Motion for Attorneys' Fees (Doc. Nos. 133 and 135, Exh. A).

[6]In Johnson v. Georgia Highway Express, Inc., 488 F.2d 714 (5th Cir. 1974), the court set out twelve factors to be considered in determining the reasonableness of fees: (1) the time and labor required; (2) the novelty and difficulty of the questions involved; (3) the skill required to perform the legal services properly; (4) the preclusion of other employment due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) the time limitations imposed by the client or circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the undesirability of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases. The lodestar as calculated in Hensley presumptively includes the Johnson factors, but they may be utilized in establishing a reasonable hourly rate. See Norman v. Hous. Auth. of Montogomery, 836 F.2d 1292, 1299 (11th Cir. 1988). The manner in which the Johnson factors influence an award of fees must be elucidated by the court. See In re Celotex Corp., 227 F.3d 1336, 1341 (11th Cir. 2000). Elligett addressed the Johnson factors in his affidavit and they were considered here by the Court.

5

Defendants are reasonable.

### i.    **Reasonable Hourly Rate**

In this case, Defendants seek compensation for services calculated pursuant to the

following hourly rate ranges: (1) $220.00 - $450.00 for shareholders B. Hill, III, E. Matheney, M.

Borland, and L. Tibbals; (2) $150.00 - $225.00 for associate attorneys M. Criser, S. Slater, P.

Greenlee, D. Luikart, and S. Harris; and (3) $75.00 - $125.00 for paralegals and law clerks D.

Luikart, C. Garcia, J. Maddox, J. Murman, L. Harrod, M. Luke, J. Varner, and J. Roberts (Doc.

Nos. 134 and 135, Exh. A).  Plaintiff only specifically challenges B. Hill's rate of

$425.00/$450.00 per hour (Doc. No. 137, Smith Aff., ¶6).  Smith's affidavit states in relevant

part:

> The current billing rates charged by the Defendants' attorneys for services rendered in this
> case, [sic] range from $425 per hour to $150 per hour.  In addition, para-legal and law
> clerks were billed at fees ranging from $85 to $130 per hour.  Within my personal
> knowledge and experience in the central Florida legal community, the present rates
> charged by other attorneys located in the Tampa, Florida [sic] for legal malpractice
> defense have not exceeded $300 per hour. $425/$450 per hour is excessive in a
> litigation matter and is not reasonable.

Defendants are "entitled to have their lawyers compensated at a reasonable hourly rate,

which is 'the prevailing market rate in the relevant legal community for similar services by

lawyers of reasonably comparable skills, experience, and reputation." Dillard v. City of

Greensboro, 213 F.3d 1347, 1353 (11th Cir. 2000)(quoting Barnes, 168 F.3d at 436).  A party

seeking attorneys' fees bears the burden of producing satisfactory evidence that the requested rate

is in line with the prevailing market rate for similar services.  See Loranger, 10 F.3d at 781 (citing

Norman, 836 F.2d at 1299).  Here Defendants submitted the affidavits of Elligett and Jung as to

the reasonableness of the hourly rates charged (Doc. Nos. 131 and 132).  Both state that the rates

6

at which defense counsel and the paralegals were billed in this matter were at, or below, the customary rates of fees that would be charged for similar work in the Middle District and in Tampa.

The Court may use its discretion and expertise to determine the appropriate hourly rate. See Scelta v. Delicatessen Support Services, 203 F. Supp. 2d 1328, 1331 (M.D. Fla. 2002). Accordingly, the Court finds that the hourly rates charged by Defendants' counsel were reasonable, based on the prevailing market rates for attorneys and paralegals of similar experience in the greater Tampa Bay area and based on the complexity of the case.

## ii.    Reasonable Hours

This complex legal malpractice lawsuit involved the claim by Plaintiff that Defendants' negligence caused her to turn over to the Securities and Exchange Commission more than one-half of her assets, which she later valued at $115 million (Doc. No. 9-13). Defendants contend that the number of hours counsel expended in defending this claim was reasonable since the time period at issue for purposes of their motion-- July 7, 2005 through August 21, 2006 - represents the climax of the litigation and covers the substantial bulk of work performed on behalf of Defendants. "Specifically, this thirteen-month period included the last few months of contentious discovery; the summary judgment stage; [Defendants'] opposition to a critical motion for leave to amend to join additional plaintiffs; preparations for an imminent, full-blown trial; an appeal before the Eleventh Circuit Court of Appeals; a battle over entitlement to attorneys' fees; and other miscellaneous matters; including a mediation."[7]  Plaintiff responds that the billing

---

[7]According to the Affidavit of E. Matheney, the breakdown of hours is as follows: (1) approximately 423.1 on discovery matters; (2) approximately 247.5 hours on summary judgment; (3) approximately 111.70 hours defending against Plaintiff's motion to amend; (4) approximately 217.7 hours in trial preparation; (5) approximately 173.1 hours litigating the

7

statements filed in support of Defendants' Second Amended Motion for Attorneys' Fees

impermissibly lump together several tasks in one billing entry.  Plaintiff generally lists over

seventy five examples of billing entries which she contends are improper but does not discuss any

of the purported improper billing entries in detail (Doc. No. 136, pp. 2-3).  Plaintiff also cites to

an itemized list of billing entries that Smith determined were "unreasonable" (Doc. No. 137,

Smith Aff., ¶8).  Smith states in relevant part:

> I have reviewed the Defendant's detailed billing statement on a task by task basis
> and have attached an itemized list of entries that are unreasonable.  Specifically,
> hours billed for the following: travel to depositions; excessive Westlaw/Lexis charges;
> clerical work; or vague entries as it cannot be determined what service was performed
> are not reasonable.

The Eleventh Circuit has stated that "the general subject matter of the time expenditures

ought to be set out with sufficient particularity so that the district court can assess the time

claimed for each activity . . . [a] well-prepared fee petition also would include a summary,

grouping the time entries by the nature of the activity or stage of the case."  Norman, 836 F.2d at

1303.  Furthermore, "[f]ee applicants must exercise . . . 'billing judgment'," which means that

"they must exclude from their fee applications 'excessive, redundant, or otherwise unnecessary

[hours].'"  Barnes, 168 F.3d at 428 (citations omitted).  Thus, fee applicants must exclude hours

"that would be unreasonable to bill to a client and therefore to one's adversary *irrespective of the*

*skill or reputation or experience of counsel*."  Norman, 836 F.2d at 1301 (emphasis in original).

This means that "the measure of reasonable hours is determined by the profession's judgment of

the time that may be conscionably billed and not the least time in which it might theoretically be

done."  Id. at 1306.  Exclusions for unnecessary or excessive time expended is left to the

---

appeal; (6) 273.80 hours litigating entitlement to attorneys' fees; and (7) approximately 50.90
hours on other miscellaneous matters (Doc. No. 135, ¶¶7-8).

8

discretion of the court. <u>See</u> <u>id.</u> at 1301.

### Plaintiff's Objections

Plaintiff specifically objects to Defendants' seeking 273.8 hours in attorneys' fees for litigating their entitlement to attorneys' fees. Smith states that a reasonable number of hours for litigating this issue would be in the range of 50 to 75 hours (Doc. No. 136, Smith Aff., ¶9). Plaintiff also contends that the 20 hours Defense counsel spent preparing for the deposition of Paul Bilzerian, the husband of Plaintiff, was unreasonable. Additionally, Plaintiff challenges the reasonableness of 111.7 hours for "resisting" a motion for leave to amend. Smith states that the number of hours reasonably needed to address this issue would be in the range of 50 hours (Doc. No. 137, Smith Aff., ¶10). Lastly, Plaintiff challenges the reasonableness of expending 247.50 hours in preparing a motion for summary judgment. Smith states that a reasonable number of hours to address this issue would be in the range of 100 to 150 hours (Doc. No. 137, ¶11).

Smith attaches to his Affidavit an itemized list of billing entries that he believes are unreasonable. The Court notes that these entries total approximately $16,490.00. Of these entries, only $10,684.00[8] are at issue here since Defendants are not seeking costs. Smith's reason for believing that most of these fees should be disallowed is that he contends the listed work of J. Varner and J. Roberts is clerical in nature. Work that is purely clerical in nature is not compensable hours, regardless of who performs them. <u>See</u> <u>Reyes v. Falling Star Enterprises. Inc.</u>, 2006 WL 2927553, *5 (M.D. Fla. October 16, 2006)(citations omitted). Smith lists the following time entries which he contends encompass non-compensable clerical work (Doc. No. 137):[9]

---

[8] $16,490.00-$5,806.00 (Westlaw/Lexis Fees) = $10,684.00.

[9] Some entries group non-compensable clerical work with compensable substantive work.

9

| J. Varner | 11/17/05 | Review and organize Plaintiff's production. | $125.00 | 1.00 | $125.00 |
| J. Varner | 11/19/05 | Review and organize Plaintiff's production; Create index re: same. | $125.00 | 3.00 | $375.00 |
| J. Varner | 11/22/05 | Review and organize Plaintiff's production; Edit index re: same; Prepare memorandum to E. Matheney re: discovery. | $125.00 | 5.00 | $625.00 |
| J. Varner | 11/23/05 | Review and organize Plaintiff's production; Create index re: same; Meeting with E. Matheney re: same. | $125.00 | 2.50 | $312.50 |
| J. Varner | 11/27/05 | Review and organize Plaintiff's production; Create index of the same. | $125.00 | 3.00 | $375.00 |
| J. Varner | 11/28/05 | Receive and review selected pleadings from 1989 case in US DistrictCourt; Meeting with project assistant J. Roberts, to discuss organization of the same; Meeting with E. Matheney to discuss Pre-Trial Statement; Review Plaintiff's production and create index re: same. | $125.00 | 7.00 | $875.00 |
| J. Roberts | 11/29/05 | Prepare Key Pleadings binder with pleadings from SEC case. | $75.00 | 2.00 | $150.00 |
| J. Varner | 11/29/05 | Continued review of Plaintiff's production and create index of same. | $125.00 | 5.00 | $625.00 |
| J. Varner | 11/30/05 | Review organization of selected pleadings; E-mail to D. Fitzgerald re: same; Continued review of Plaintiff's production and create index re: same. | $125.00 | 6.00 | $750.00 |

10

| J.Varner | 12/1/05 | Continued review of Plaintiff's production; Create index re: same; Received additional pleadings from 1989 DC case; Process the same. | $125.00 | 4.50 | $562.50 |
| J. Roberts | 12/1/05 | Prepare labeles [sic] for selected pleadings binders. | $75.00 | .40 | $30.00 |
| J. Roberts | 11/30/05 | Continue to organize binders with selected pleadings. | $75.00 | 2.90 | $217.50 |

In the itemized list, Smith also objects to the billing entries of E. Matheney which pertain to travel to and from Washington D.C. for a deposition and travel to a status hearing in front of Magistrate Judge Mary S. Scriven.

Smith concludes his affidavit by summarily stating that "[a]fter adjusting the number of hours and deducting unreasonable amounts from the billing statement, the fees in this case would be in the range of $102.000 to $117,000"(Doc. No. 137, ¶12). It is impossible for this Court to determine how exactly Smith arrived at this range of fees which represents approximately a 65% reduction in fees.

In reviewing petitions for attorneys' fees, the court exercises its discretion in determining what constitutes reasonable hours. Counsel for Defendants have block-billed in numerous entries. Block-billing makes it very difficult for a court to determine the specific amount of time spent by an attorney or a paralegal on each task. Additionally, Defendants utilized the services of four shareholders, four associates, seven paralegals, and two law clerks[10] in the defense of this matter. This Court has carefully reviewed Defendants' submitted billing statements and concludes that some reductions are in order. The basis for these adjustments is the Court's conclusion that some

---

[10]D. Luikart apparently later became an associate attorney with Defendants' counsel.

11

work was duplicative of that performed by others, unnecessary, unreasonable to be billed in the exercise of good billing judgment, or otherwise was inadequately documented to permit the Court to consider the appropriateness of the work. This Court is aware that a firm may be compensated for work performed by separate attorneys on the case so long as the attorneys' efforts are not unreasonably duplicative. See Schafler v. Fairway Park Condo. Ass'n., 324 F. Supp. 2d 1302, 1314 (S.D. Fla. 2004). However, given the voluminous nature of the submitted billing entries, and the number of attorneys and paralegals who worked on the case, this Court cannot determine whether the records reflect collaborative effort on research and drafting or duplicative work and billing. In drawing these conclusions, the Court in no way denigrates the legal representation provided by Defendants' counsel. Defendants were well-served by this firm. Furthermore, the majority of counsels' time appears to be properly claimed.

While the Court has not found binding precedent supporting an across-the-board approach to reducing fees to a reasonable level in a legal malpractice context, such across-the-board reductions have been found appropriate in other cases.[11]   Given the unique nature of this case, and the circumstances surrounding its litigation, it is the finding of this Court that Defendants' fee request should be reduced by 25%. This reduction assuages any concerns regarding excessive hours expended due to overstaffing and/or Plaintiff's cited concerns regarding Defendants' billing for non-compensable clerical work.

---

[11]See St. Fleur v. City of Fort Lauderdale, 149 Fed. Appx. 849 (11th Cir. 2005)(reduction of total hours by 30% in discrimination case not an abuse of discretion); Scelta, 203 F. Supp. 2d at 1335-36 (elimination of time spent on non-compensable issues could be handled by making percent reduction of total time billed where it could not be determined from time entries which specific hours should be excluded); Gundlach v. Nat'l Ass'n for Advancement of Colored People, Inc., 2005 WL 2012738 (M.D. Fla. August 16, 2005)(breach of contract case where court utilized 30 percentage reduction due to use of block billing); United Food Mart, Inc. v. Motiva Enterprises, LLC, 2006 WL 3068820, *5 (S.D. Fla. February 6, 2006).

12

In considering the reasonableness of the fees requested, the Court has also considered the factors set for in § 768.79(7)(b).[12] After considering these factors, the Court finds that an award of $233,158.97 in attorneys' fees is reasonable and appropriate. This amount reflects Defendants' requested $310,878.50 less $77,719.63.

**B.    Entitlement to Interest From March 20, 2007**

Defendants, citing Quality Engineered Installation, Inc. v. Higley South, Inc., 670 So.2d 939, 930-31 (Fla. 1996), argue they are entitled to recover interest that has accrued since this Court's March 20, 2007 Order which determined they were entitled to attorneys' fees. Plaintiff did not address whether Defendants are entitled to interest. The Supreme Court of Florida has determined that "interest accrues from the date the entitlement to attorney fees is fixed through agreement, arbitration award, or court determination, even though the amount of the award has not yet been determined." See id. As such, this Court finds that Defendants' are entitled to recover interest on $233,158.07 that has accrued since March 20, 2007.

**III.    Conclusion**

Accordingly, it is **ORDERED AND ADJUDGED** that Defendants' Second Amended Motion for Attorneys' Fees (Doc. No. 133) is **GRANTED** to the extent that Defendants are awarded $233,158.97 in attorneys' fees, plus interest that has accrued since March 20, 2007.

---

[12]Florida Statute § 768.79(7)(b) provides the following factors for the court to consider:
1. The then apparent merit or lack of merit in the claim.
2. The number and nature of offers made by the parties.
3. The closeness of questions of fact and law at issue.
4. Whether the person making the offer had unreasonably refused to furnish information necessary to evaluate the reasonableness of such offer.
5. Whether the suit was in the nature of a test case presenting questions of far-reaching importance affecting nonparties.
6. The amount of the additional delay cost and expense that the person making the offer reasonably would be expected to incur if the litigation should be prolonged.

13

**DONE AND ORDERED** at Tampa, Florida, this 1st day of June, 2007.

Susan C. Bucklew

SUSAN C. BUCKLEW
United States District Judge

Copies to: Counsel

14

# EXHIBIT 4

EXHIBIT 4

**EXPERT REPORT**
**William F. Jung**
**2/10/2017**

**Materials Consulted**

I have reviewed the following:

- Crowley's Statement of Claim dated Sept. 4, 2012, and exhibits
- Crowley's Statement of Claim dated June 8, 2012, and exhibits
- National Union's Response to Crowley's Sept. 4, 2012 Statement of Claim
- Attorney invoices for Thomas Farmer from May 2008 through June 2015
- Resume web-site information for the main billing attorney's appearing in these invoices
- June 30, 2008 Letter from Lankford & Reed to Maureen Conboy
- July 18, 2012 Letter from Lankford & Reed to Maureen Conboy
- June 30, 2012 Letter from Lankford & Reed to Maureen Conboy
- September 10, 2008 Letter from Finnuala M. Kellenher, United States Department of Justice Trial Attorney to Thomas Farmer
- August 28, 2012 Letter from Peabody & Arnold to Lankford & Reed
- May 27, 2008 Letter from Maureen Conboy to Steve Ficon
- "Top Firms Ranked by Medium Partner Hourly Rate," American Lawyer, *available at* http://www.americanlawyer.com/PubArticleTAL.jsp?id=1202439511677&Top_Firms_Ranked_by_Medium_Partner_Hourly_Rate&slreturn=20120910163123
- "Bankruptcy Rates Top $1K Mark in 2008-09," AmLawDaily.Com, Dec. 15, 2009 *available at* http://amlawdaily.typepad.com/amlawdaily/2009/12/bankruptcy.html
- Engagement Agreement between Simpson Thacher & Bartlett LLP and the Federal Reserve Bank of New York, *available at* www.newyorkfed.org/aboutthefed/simpson.pdf
- "Lawyers Gear Up Grand New Fees," The Wall Street Journal, Aug. 22, 2007, *available at* http://online.wsj.com/article/SB118775188828405048.html
- Protective Order, Doc. 42 Case No.: 3:11-cr-00512 (D.P.R.)
- Joint Motion, Doc. 21 Case No.:  3:13-cr-162 (D.P.R.)
- Notice of Compliance, Doc. 30 Case No.:  3:13-cr-162 (D.P.R.)
- Order, Doc. 40 Case No.:  3:13-cr-162 (D.P.R.)

EXHIBIT 4

- Hearing transcripts Case No.:  3:13-cr-162 (D.P.R.) (4/23/15; 4/24/15)
- Unsealed Motions and Orders in Case No. 3:08-mj-1092-JRK (M.D. Fla.)
- 3/29/13 Order to Disclose Search Warrant (and attached search warrant affidavit)
- Spreadsheet of Farmer defense costs through 2/1/13 (3 page)
- Pleadings and Docket Sheets in Case No.:  3:16-cv-1011 (M.D.Fla.)
- June 12, 2015 Letter from Lankford & Reed to Michael Duffy
- October 16, 2015 Letter from Michael Duffy to Lankford & Reed


In addition, I have reviewed the following Court files (available online):

- Arrowpac, Inc., et. al. v. Sea Star Line, LLC, et. al. No. 2:12-cv-01008-CWH (D.S.C.)
- In Re. Puerto Rican Cabotage Litigation, No. 3:08-MD-1960 (D.P.R.)
- United States v. Crowley, No. cr-12-590 (D.P.R.)
- United States v. Baci, No. 3:08-cr-3150 (M.D. Fl.)
- United States v. Chisholm, No. 3:08-cr-353 (M.D. Fl.)
- United States v. Gill, No. 3:08-cr-351 (M.D. Fl.)
- United States v. Glova, No. 3:08-cr-352 (M.D. Fl.)
- United States v. Peake, No. 3:11-cr-512 (D.P.R.)
- United States v. Serra, No. 3:08-cr-349 (M.D. Fl.)
- Westar Energy, Inc. v. Lake 493 F. Supp. 2d 1126 (D. Kan. 2009), aff'd in part, rev'd in part, Westar Energy, Inc. v. Lake, 552 F. 3d 1215 (10th Cir. 2009)
- In re AOL Time Warner Shareholder Derivative Litigation, 2010 WL 363113 (S.D.N.Y. Feb. 1, 2010)
- In re Merrill Lynch & Co., Inc. Research Reports Securities Litigation, No. 02 MDL 1484 (JFK), 2007 WL 4526593 (S.D.N.Y. Dec. 20, 2007)
- In re AOL Time Warner, Inc. Securities & "ERISA" Litigation, 2006 WL 3057232 (S.D.N.Y. Oct. 25, 2006)
- Case dockets listed in my affidavit

**Doc. 36-5**

# EXHIBIT D

EXHIBIT

Plaintiff's 2
3/3/17   LM

*Author's Direct Line:*  303-639-4116
*Author's Fax:*          312-381-0715
*Email:*    dan_sweeney@ars.aon.com

**AON**

VIA EMAIL: c-claim@aig.com

April 25, 2008

Attention: Claims Department
AIG Domestic Claims
175 Water Street
New York, NY 10038

RE:   Insured:          Crowley Maritime Corporation
      Coverage:         Director, Officers & Private Company Liability
      Policy Number:    066-57-99
      Policy Period:    11/1/07 to 11/1/08
      *Matter:*         *DOJ / FBI Investigation*

Dear Claims Manager:

On behalf of Crowley Maritime Corporation and all other Insureds (collectively the "Insureds" or "Crowley"), and in accordance with the reporting provisions of the Policy, we hereby provide notice of a claim under this and all other applicable policies. Enclosed please find an email dated April 23, 2008 from insured contact Steve Ficon which provides details of a DOJ / FBI investigation.

Crowley and the individual insureds have retained counsel to represent their interests. Please see the April 23, 2008 email for information on the retained law firms and attorneys. Please provide AIG's consent to the retention of the defense counsel, as well as authorization to incur defense costs. If there are any litigation management guidelines with which you request the Insureds comply, please forward a copy of those guidelines at your earliest convenience.

By copy of this letter, we are also providing the Insureds' excess, runoff, crime and punitive wrap insurers with notice of this matter. Please acknowledge receipt of this Claim at your earliest convenience, and direct all correspondence to Steve Ficon, Crowley Maritime Corporation, PO Box 2110, Jacksonville, FL 32203-2110, Phone: 904-727-2200, Email: steve.ficon@crowley.com. In addition to the undersigned, courtesy copies of all correspondence should be sent to: Andrew Teegarden, Aon Financial Services Group, 3565 Piedmont Rd., NE, Suite 700, Atlanta, GA 30305, Phone: 404-240-7612, Email: andrew_teegarden@ars.aon.com.

On behalf of the Insureds, we reserve all rights under the Policy and at law with respect to this matter. Should you need any additional information, or if we can be of further assistance, please do not hesitate to contact the undersigned.

**CONFIDENTIAL INFORMATION**

April 25, 2008
Crowley Maritime Corporation
Page 2 of 2

Sincerely,

Dan Sweeney
Claims Coordinator

Enclosures

cc:     Steve Ficon, Crowley Maritime, Via Email
        Andrew Teegarden, Aon Financial Services Group, Via Email
        Hartford / Twin City (policy no. 00PE010096707)
                Via Fax: 212-277-0915
        Arch Insurance Co. (policy no. DOX0023698-00)
                Via Email: claims@archinsurance.com
        XL Specialty Insurance (policy no. ELU10117907) (Side A)
                Via Fax: 860-548-9572
        AIG Cat Excess (policy no. 544-23-15) (Punitive Wrap)
                Via Email: c-claim@aig.com
        National Union - AIG Domestic Claims (policy no. 061-36-48) (runoff)
                Via Email: c-claim@aig.com
        National Union - AIG Domestic Claims (policy no. 062-04-56) (crime)
                Via Email: c-claim@aig.com

Aon Financial Services Group | A Division of Aon Risk Insurance Services West, Inc. | Legal and Claims Practice
4100 East Mississippi Avenue, Suite 1300 | Denver, Colorado 80246 | t: 303-639-4100 | f: 303-782-2535

**CONFIDENTIAL INFORMATION**

CROW001170

**Ficon, Steve**

| | |
|---|---|
| From: | Ficon, Steve |
| Sent: | Wednesday, April 23, 2008 5:41 PM |
| To: | 'Dan Sweeney' |
| Cc: | Menard, Dwight; Mead, Art; Andrew Teegarden; John L Peterson |
| Subject: | FW: New Crowley D&O Matter- Notice of Events related to recent DOJ/FBI Activities |
| | |
| Attachments: | subpo001.PDF; searc001.PDF |

Attention: Dan Sweeney/ Aon Financial Services Group-Denver, CO

Insured: Crowley Maritime Corporation, et al
Coverage: Directors, Officers and Private Company Liability Insurance
Policy Period: 11/1/07-11/1/08
Limit of Liability:  Primary D&O  Layer $10M (AIG/Policy #066-57-99 )
         First Excess D&O Layer $10M (Hartford/Twin City/Policy #00PE010096707)
         Second Excess D&O Layer $10M (Arch/Policy DOX0023698-00)

Dan: The purpose of this e-mail is to tender notice of this matter to D&O Insurers on behalf of all Insureds. Please forward this notice to the D&O Underwriters captioned above, as well underwriters providing Crime and Punitive Wrap coverage.

On Thursday, April 17, 2008, Crowley Liner Services, Inc. and four employees of Crowley Liner Services, Inc., were served with a Records Subpoena and/or a Search Warrant by federal attorneys/agents representing the Department of Justice National Criminal Enforcement Section /Antitrust Division and the FBI. The subpoena and warrant (see attached) were issued by the US District Court-Jacksonville on April 17, 2008, apparently as part of an investigation into the pricing practices of ocean carriers serving the Jones Act trade lane between the US Mainland and Puerto Rico. In addition to Crowley Liner Services, other ocean carriers served with similar document requests on the same date included Sea Star Line, based in Jacksonville and Horizon Lines, based in Charlotte, NC. The charges that may have lead to the subpoena and search warrant are sealed at this point in time and no indictments have been filed.

Pursuant to the search warrant, on April 17th and 18th, laptop computers, disc drives, cell phones, PDA's and other digital storage devices, as well as paper files were removed by FBI and DOJ agents. Over the next weeks and months, Crowley Liner Services, Inc., as well as the individual Crowley employees served with document requests, will be responding to the production requests. The deadline to produce is May 28, 2008, however given the volume of documents and time period covered by the Subpoena (1/1/2002 to present) , extensions are likley to be requested and granted.

Crowley Liner Services, Inc has retained local Jacksonville attorney Charles Lembcke and Washington, DC counsel Sam Rosenthal of Curtis, Mallet-Prevost, Colt and Mosle to conduct a parallel investigation into this matter, defend the interests of Crowley Liner Services, and assist in the document production.

The four individual Crowley Liner Services, Inc. employees subject to the subpoena and search warrant have each retained their own counsel to defend and protect their interests against what, at some point in the future, may involve criminal or civil charges. These individuals and their counsel are listed below:

(1) Rob Grune, Director, Sr. Vice President CLS,  represented by Kevin Arquit, Simpson Thacher, New York, NY.
(2) Tom Farmer, Vice President, Pricing, represented by Mark J. Rosenblum, Jacksonville, FL .
(3) Tony Lusis, Manager of Pricing, represented by Matthew Kachergus, Jacksonville, FL.
(4) John Kelley, Manager, Area Sales, represented by Jonathan Feld, Katten, Muchin, Rosenman, Chicago, IL.

Rob Grune is an Officer of Crowley Liner Services, Inc and has a right to indemnification per the corporation's bye-laws with respect to any "threatened,  pending or completed action, suit or proceeding, whether civil, criminal , administrative or investigative ....to the fullest  extent permitted by the General Corporation Law of the State of Delaware". Farmer , Lusis and Kelley are employees of Crowley Liner Services without a similar presumptive right of indemnification. Crowley Liner Services, Inc. has not agreed to indemnify the three employees for any loss, including defense costs, that these individuals will incur . These costs could be significant and on-going depending on the future course of the Department of Justice investigation and the charges that may be filed. Pursuant to the Defense Provision of the policy, we expect AIG to advance the Defense Costs to three employees, subject to the Coverage A nil deductible. We will provide to AIG the monthly fee/cost statements from the lawyers hired by these individuals for direct reimbursement. We expect to be in receipt of the first sets of invoices in the next 20-30 days.

1

**CONFIDENTIAL INFORMATION**

CROW001171

All questions/correspondence should be directed to the undersigned.

Steve Ficon, CPCU
Director, Claims
Crowley Maritime Corporation
9487 Regency Square Blvd.
Jacksonville, FL 32225
<mailto:steve.ficon@crowley.com>
Phone: 904-727-2568
Fax- 904-805-1639
Cell: 904-610-2070

  

subpo001.PDF (2     searc001.PDF (1
MB)                 MB)

2

**CONFIDENTIAL INFORMATION**

CROW001172

M. Conboy

1
2  Q.  And which CCD is assigned to this
3  case?
4  A.  I've been handling it.
5  Q.  And are you familiar with an
6  individual, Michelle Graffeo?
7  A.  Michelle Graffeo.
8  Q.  What is Michelle's position?
9  A.  When I left the D&O group, she took
10 over the handling of this file.  She's a senior
11 CCD -- I think she's a senior CCD, either
12 senior CCD or CCD.
13 Q.  She still working on the file?
14 A.  She's -- the claim file is still
15 assigned to her.
16 Q.  Did you review any of the expert
17 reports submitted by Crowley in this case in
18 connection with your deposition?
19 A.  No.
20 Q.  Have you seen those reports?
21 A.  They are in my e-mail inbox, but I
22 haven't read them yet.
23 Q.  Did you bring any documents with you
24 today?
25 A.  No.

M. Conboy

1
2  MS. GARRISON:  We'll have the court
3  reporter mark Exhibit 2.
4  (Plaintiff's Exhibit 2, Crowley's
5  notice under the policy dated April 25,
6  2008, Bates stamped CROW001169 through
7  CROW001171, marked for identification, as
8  of this date.)
9  BY MS. GARRISON:
10 Q.  Ms. Conboy, do you recognize the
11 document that has been marked as Exhibit 2?
12 A.  Yes.
13 Q.  And what do you recognize it to be?
14 A.  It's Crowley's notice under the
15 policy.
16 Q.  Do you recall when you first saw
17 this correspondence?
18 A.  I see that it is dated April 25,
19 2008, but I don't recall specifically when I
20 first saw it.
21 Q.  And the correspondence is addressed
22 to AIG Domestic Claims, 175 Water Street,
23 correct?
24 A.  Yes.
25 Q.  And is 175 Water Street, AIG's main

M. Conboy

1
2  office in New York?
3  A.  Yes.
4  Q.  Taking a step back just to clarify
5  something, this notice is to AIG, the policy in
6  this case is written by -- or the defendant in
7  this case is National Union; is that correct?
8  A.  Yes, yes.
9  Q.  National Union Fire Insurance
10 Company of Pittsburgh, PA, correct?
11 A.  Yes.
12 Q.  Can you explain the relationship
13 between AIG and National Union?
14 A.  AIG Domestic Claims, which is now
15 called AIG Claims Inc., is the authorized
16 representative of National Union and handles
17 claims for National Union.
18 Q.  So you're an employee of AIG,
19 correct?  Not National Union?
20 A.  Correct.
21 Q.  Unless we specifically clarify, is
22 it fair to use, for purposes of this deposition
23 only, AIG and National Union interchangeably?
24 A.  Yes.
25 Q.  Now, after a notice letter like this

M. Conboy

1
2  is received at the main office of AIG, are you
3  familiar with the process of what happens to
4  it?
5  A.  I don't recall the process by which
6  it would make its way from the mail room to my
7  desk back in 2008.
8  Q.  Do you know how it works now when
9  the AIG Claims Inc. receives the first notice?
10 A.  No, not really.
11 Q.  Do you recall if this particular
12 claim was immediately assigned to you or if
13 there was anyone else assigned in between?
14 A.  I don't remember.
15 Q.  And this notice is from Dan Sweeny
16 at AON, correct?
17 A.  Yes.
18 Q.  Do you know who Dan Sweeny is?
19 A.  Well, the letters says he's the
20 claim coordinator at AON.
21 Q.  Is it common for AIG to receive
22 notice letters from a claims coordinator or
23 broker?
24 A.  Yes.
25 Q.  And the April 25, 2008, letter from

**Doc. 36-6**

# EXHIBIT E



**EXHIBIT**
Plaintiff's 6
3|3|17  L.M.



AIG Domestic Claims, Inc.
**Directors & Officers**

175 Water Street
New York, NY 10038
212-458-6038
866-871-0322 (Fax)

**Maureen Conboy**
Complex Claims Director
maureen.conboy@aig.com

May 27, 2008

<u>Via Email & Regular Mail</u>

Steve Ficon
Crowley Maritime Corporation
P.O. Box 2110
Jacksonville, FL 32203-2110

      Re: Insured:  Crowley Maritime Corporation
         Matters:  1) DOJ/FBI Investigation
               2) BacPlas, Inc.; CC1 Limited Partnership; Century Packing Corp.
         Policy:  061-36-48
         Claim:   367-4291

Dear Mr. Ficon:

As you know, AIG Domestic Claims ("AIGDC") has been retained by National Union Fire Insurance Company of Pittsburg, Pa. ("National Union") to represent its interests in connection with the above referenced matters as they concern National Union Executive and Organization Liability Insurance Policy # 061-36-48 (the "Policy"), as issued to Crowley Maritime Corporation.

We are in receipt of an April 25, 2008 letter from Aon Financial Services ("AON") providing notice of a DOJ/FBI investigation (the "Investigation"). Attached to Aon's letter was your email of April 23, 2008, an April 17, 2008 grand jury document subpoena served upon Crowley Liner Services, Inc. (a wholly owned subsidiary of Crowley, and together with Crowley Maritime Corporation hereinafter referred to as "Crowley"), and a copy of an April 16, 2008 search warrant authorizing the FBI to search Crowley's premises in Jacksonville, Florida.

We are also in receipt of a May 1, 2008 letter from AON providing notice of three anti-trust complaints filed on April 22, 2008 in United States District Court, Southern District of Florida, captioned: <u>BacPlas, Inc. v. Horizon Lines, LLC, Sea Star Line, LLC, Trailer Bridge, Inc. and Crowley Liner Services, Inc.</u>, Case #: 08-21131; <u>CC1 Limited Partnership v. Horizon Lines, LLC</u>, et al., Case #: 08-21125; and <u>Century Packing Corp. v. Horizon Lines, LLC, et al.</u>, Case #: 08-1467 (collectively "the Complaints").

**CONFIDENTIAL INFORMATION**

The Investigation and Complaints were submitted to National Union as Claims[1] under the Policy. Upon completion of our review of the Investigation and Complaints, along with the provisions of the Policy, we have concluded for the reasons set forth below that the Policy does not provide coverage for this matter. Please note that our analysis is preliminary, as it is based solely upon the documentation currently available.

As you stated in your April 23, 2008 email, the Investigation appears to concern pricing practices of Crowley and other ocean carriers serving the trade lane between the US mainland and Puerto Rico. The document subpoena seeks from Crowley corporate and employee information, products and pricing information, and communications with competitors and other persons. The search warrant authorized the FBI to search certain areas of Crowley's premises at 9487 Regency Square Boulevard in Jacksonville, Florida. Attachment B to the subpoena describes the property to be seized to include documents relating to any agreement, meeting, conversation, or other communication between or among management "Crowley Liner Services, Inc., including, Rob Grune ("Grune"), Tom Farmer ("Farmer"), John Kelley ("Kelley"), Tony Lusis ("Lusis") and any employee or agent of Sea Star Line, LLC and Horizon Lines, LLC". It also seeks diaries, calendars, telephone records, address books, etc. for "Crowley management, pricing, or sales personnel including, Grune, Farmer, Kelley and Lusis".

The Complaints each allege that beginning April 21, 2004 or earlier the "defendants conspired to allocate markets or engage in other anticompetitive conduct concerning Domestic Noncontiguous Off Shore Trades Services sold in the United States and its territories and possessions. Because of defendants' unlawful conduct, plaintiff and other class members paid artificially inflated prices for Domestic Noncontiguous Off Shore Trade Services in the Puerto Rico trade routes". The Complaints each state one cause of action, unlawful price fixing in violation of the Sherman Act. The plaintiffs each seek a declaration that the defendants violated the Sherman Act, treble damages, a permanent injunction, and such other relief as the court deems proper.

The Policy provides both Executive Liability Insurance and Organization Insurance. Coverage A provides Executive Liability Insurance for "the Loss of any Insured Person arising from a Claim made against such Insured Person for any Wrongful Act of such Insured Person, except when and to the extent that an Organization has indemnified such Insured Person." An Insured Person is defined as "(1) Executive of an Organization; (2) Employee of an Organization; or (3) Outside Entity Executive". Your April 23, 2008 email indicates that Grune is a Director of Crowley, and that Farmer, Kelley and Lusis are employees of Crowley.

Coverage B provides Organization Insurance for (i) "the Loss of any Organization arising from a Securities Claim made against such Organization for any Wrongful Act of such Organization", and (ii) Loss of an Organization "arising from a Claim made against an Insured Person ... for any Wrongful Act of such Insured Person, but only to the extent that such Organization has indemnified such Insured Person."

---

[1] All capitalized terms in this letter shall follow the definitions set forth in the Policy unless otherwise defined herein

**CONFIDENTIAL INFORMATION**

CROW001174

5/27/2008 Ficon
3 of 4

The Policy defines Claim to mean:

(1) a written demand for monetary, non-monetary or injunctive relief ;
(2) a civil, criminal, administrative, regulatory or arbitration proceeding for
monetary, non-monetary or injunctive relief which is commenced by:
    (i) service of a complaint or similar proceeding; or
    (ii) return of an indictment, information or similar document (in the case of a
       criminal proceeding); or
    (iii) receipt or filing of a notice of charges, or
(3) a civil, criminal, administrative or regulatory **investigation of an Insured
Person:**
    (i) once such Insured Person is **identified in writing** by such investigating
       authority **as a person against whom a proceeding** described in Definition
       (b)(2) **may be commenced;** or
    (ii) in the case of an investigation by the SEC or a similar state or foreign
       government authority, **after the service of a subpoena** upon such Insured
       Person. (emphasis added)

### The Complaints

In that the allegations set forth in the Complaint against Crowley do not arise
from a Securities Claim, there is no coverage for the Complaints under Coverage B(i).
And, as no Insured Person has been named in the Complaints, Coverage A and/or
Coverage B(ii) have not been implicated. Thus, the Policy does not provide coverage for
the Complaints.

### The Investigation

The Policy does not provide coverage to Crowley in connection with the
subpoena and/or search warrant, as the Investigation of Crowley is not a Securities Claim
as defined by the Policy.

The April 17, 2008 subpoena was served on Crowley. The search warrant was
served on Crowley. Grune, Farmer, Kelley and/or Lusis (the "Individuals") have not
received subpoenas. Nor have they been identified in writing as a target of any
investigation. In fact, the Judicial Officer who signed the search warrant deleted
language stating "involving which there is an offense under investigation". Thus, a
Claim (as defined by the Policy) has not been made under the Policy. Additionally, no
Wrongful Act has been alleged against any Insured Person. The Policy therefore does
not provide coverage for the Investigation.

For the reasons set forth above, there is no coverage for the Investigation and/or
Complaints. However, based upon the materials submitted to date, National Union will
accept this matter as a notice of circumstances that may give rise to a Claim being made
against an Insured, pursuant to Clause 7(c) of the Policy. In the event that a Claim
arising from the circumstances at issue in the Investigation and/or Complaints is asserted
against an Insured, we will review the new materials, together with the Policy, and advise
you of specific coverage issues that may then exist.

**CONFIDENTIAL INFORMATION**

5/27/2008 Ficon
4 of 4

Should you wish to submit further information or documentation that you feel would be relevant to a determination as to coverage for this matter, please feel free to forward such information to my attention. In the meantime, National Union reserves any and all rights and defenses available under the Policy and applicable law, whether or not specifically referenced herein. If you wish to discuss this matter further, please contact me at 212-458-6038.

Sincerely,

*Maureen Conboy*

Maureen Conboy

Cc:

Dan Sweeney
Aon Financial Services Group
4100 E. Mississippi Ave #1300
Denver, CO 80246

Andrew Teegarden
Aon Financial Services Group
3565 Piedmont Rd, NE, Suite 700
Atlanta, GA 30305

**CONFIDENTIAL INFORMATION**

CROW001176

M. Conboy

1  M. Conboy
2  litigation management to me dated May 16, 2008.
3      Q.   And there's some handwritten notes
4  on the document; is that your handwriting?
5      A.   Yes.
6      Q.   Are these notes that you recall
7  taking?
8      A.   I don't recall taking them, but I --
9  it's my handwriting.
10     Q.   Do you recall whether these notes
11 were taken in connection with a phone call with
12 someone from Crowley?
13     A.   I don't remember the phone call with
14 Steve Ficon, but these are clearly notes that I
15 took from a phone call with Steve Ficon.
16     Q.   On the right-hand side of the page
17 there's some sort of bullet points, the first
18 one being a handwritten note, "No indictment;"
19 do you see that?
20     A.   Yeah.
21     Q.   And the one below it says,
22 "Indication specific targets;" do you see that?
23     A.   Right.
24     Q.   Do you recall having a telephone
25 conversation with Steve Ficon about certain

1  M. Conboy
2  individuals being specific targets?
3      A.   Again, I don't remember talking to
4  him, but clearly it appears that he told me
5  these things.
6          MS. GARRISON:  We'll have the court
7      reporter mark Exhibit 5.
8          (Plaintiff's Exhibit 5, a May 22,
9      2008, e-mail from Steve Ficon to Ms.
10     Conboy, Bates stamped CROW002473 through
11     CROW002476, marked for identification, as
12     of this date.)
13 BY MS. GARRISON:
14     Q.   Ms. Conboy, do you recognize the
15 document that has been marked as Exhibit 5?
16     A.   It's a May 28 -- or I'm sorry,
17 May 22, 2008, e-mail from Steve Ficon to me.
18     Q.   And in his e-mail to you Steve Ficon
19 states, "Maureen, thanks for taking the time to
20 discuss this matter."
21         Do you recall whether this statement
22 is referring to a phone call you had with
23 Mr. Ficon?
24     A.   I think it's referring to the phone
25 call that we just talked about that's reflected

1  M. Conboy
2  in my handwritten notes on the May 16th e-mail.
3      Q.   And in Mr. Ficon's e-mail he states,
4  "Attached find indemnity clause from Crowley
5  Maritime Corporations By-Laws.  And I also
6  scanned an article from Lloyd's list."
7          Do you see that?
8      A.   Yes.
9      Q.   Do you recall whether you asked
10 Mr. Ficon to provide the indemnity clause from
11 Crowley's By-Laws?
12     A.   Again, I don't recall the specifics
13 of the conversation, but my notes from the
14 conversation earlier shows that he told me that
15 they were not going to indemnify -- I believe
16 it says that.  Yea, that there was several
17 people that they were not going to indemnify.
18 So it appears I asked him for documentation on
19 that.
20     Q.   Mr. Ficon also attached an article
21 dated May 7, 2008, do you recall receiving this
22 article from Mr. Ficon?
23     A.   I don't remember getting it, but it
24 appears to have come from the claim file.
25         MS. GARRISON:  We'll have the court

1  M. Conboy
2  reporter mark Exhibit 6.
3          (Plaintiff's Exhibit 6, a coverage
4      letter that Ms. Conboy wrote to Steve Ficon
5      at Crowley on May 27th, 2008, Bates stamped
6      CROW001173 through CROWW001176, marked for
7      identification, as of this date.)
8  BY MS. GARRISON:
9      Q.   Ms. Conboy, do you recognize the
10 document marked as Exhibit 6?
11     A.   Yes, it's a coverage letter that I
12 wrote to Steve Ficon at Crowley on May 27th,
13 2008.
14     Q.   Do you recall writing this letter at
15 or around the time of the date on this letter
16 May 27th, 2008?
17     A.   Yes.
18     Q.   Is sending coverage letters like
19 this May 27th, 2008, letter to your insureds a
20 regular practice -- was it a regular practice
21 of yours as a claims director at AIG?
22     A.   Yes.
23     Q.   And are coverage letters like this
24 kept by AIG in their claims files in the
25 regular course of their business?

M. Conboy

1
2    A.   Yes.
3    Q.   And you stated that you wrote this
4  letter, correct?
5    A.   Yes.
6    Q.   Do you recall whether you consulted
7  with anyone when you wrote this letter?
8    A.   I did not.
9    Q.   At the time you wrote this letter,
10  was Tom McCormack your manager?
11    A.   Yes.
12    Q.   Do you recall whether Tom McCormack
13  reviewed this letter before it was sent?
14    A.   I don't recall, but I tend to doubt
15  it.
16    Q.   And why would you doubt it?
17    A.   Because this -- I don't know, it
18  wasn't really an unusual matter or particularly
19  complicated -- just normally this wasn't the
20  type of thing he would review.
21    Q.   Was there a type of letter that he
22  would review before it went out?
23    A.   No, he really didn't review my
24  letters.  The only time he would review them
25  was if it was something particularly

M. Conboy

1
2  complicated or that I asked him to review.
3    Q.   Do you recall if anyone else
4  reviewed this letter before it went out?
5    A.   No one else did.
6    Q.   On page two of four of this letter,
7  in the very top paragraph, you state, "We have
8  concluded for the reasons set forth below that
9  the policy does not provide coverage for this
10  matter;" do you see that?
11    A.   Yes.
12    Q.   Do you recall the basis for your
13  position at the time that the policy did not
14  provide coverage for this matter?
15    A.   Yes.
16    Q.   And what was that?
17    A.   As to -- actually can I just read
18  this for one second?
19    Q.   Sure.
20       (Witness complies.)
21    A.   So as to the entity Crowley, the
22  matter was not a securities claim so there was
23  no coverage for Crowley and as to the
24  individuals, no claim had been made against
25  them.

M. Conboy

1
2    Q.   Do you recall why AIG took the
3  position that no claim had been made against
4  the individuals?
5    A.   Well, for the reasons that I set
6  forth in the letter including -- so I state on
7  page three of four of the letter that the
8  search warrant was served on Crowley, the four
9  individuals had not received subpoenas, and
10  they hadn't been identified in writing as a
11  target of any investigation and then the letter
12  goes on from there, but that's basically it.
13    Q.   Just as a sort of clean-up matter,
14  do you know now that one of those individuals
15  had received a subpoena?
16    A.   Well, I thought -- I thought more
17  than one person got a subpoena, but I can't
18  remember exactly; but I know eventually Farmer
19  was indicted so...
20    Q.   In the last paragraph of the page
21  that we are on, three of four, you state,
22  "National Union will accept this matter as a
23  notice of circumstances that may give rise to a
24  claim being made against an insurer."  Can you
25  just explain to me your understanding of a

M. Conboy

1
2  notice of circumstances?
3    A.   Well, it's basically an insured
4  sending us notice of facts or circumstances
5  that they believe may lead to a claim as
6  defined by the policy.
7    Q.   And in this letter you invited
8  Crowley to send new materials regarding the
9  claim, correct?
10    A.   Yes.
11    Q.   Do you recall if Crowley did in fact
12  ever send new materials regarding the claim?
13    A.   After I was off the file, I believe
14  they did.
15    Q.   Do you have any knowledge of what
16  materials Crowley did send after this May 27th,
17  2008, letter?
18    A.   Again, I'm not a hundred percent
19  sure when I saw the subpoena against Farmer.
20  I'm not sure if it was sent in April with
21  everything else or whether I got it from his
22  counsel in June.  So at some point I did get
23  the subpoena.  Other than that I can't
24  remember.  I know when Michelle was handling
25  the file, eventually, you know, she accepted

# Doc. 36-7

# EXHIBIT F

## AMERICAN ARBITRATION ASSOCIATION
Commercial Arbitration Tribunal

In the matter of the Arbitration between

CROWLEY MARITIME CORPORATION,

      Claimant,

vs.

                               Case No.  33-195 Y 00084 12

NATIONAL UNION FIRE INSURANCE
COMPANY OF PITTSBURGH, P.A.,

      Respondent.

## Arbitration Decision and Award

WE THE UNDERSIGNED ARBITRATORS, having been designated in accordance with the parties' arbitration agreement and having duly heard the allegations and proofs of the parties, make the following decision and award.

### The Arbitration Hearing

An arbitration hearing was held December 10-12, 2012 at the law offices of CARLTON FIELDS, 450 South Orange Avenue, in Orlando, Florida.

The parties and their representatives were present as follows:

    Claimant:
        Crowley Maritime Corporation, was present through its representatives Steve Ficon, Art Mead, and Porter Seson; and with its counsel, John D. Shugrue and Emily Smith (REED SMITH, LLP), and Charles Trippe (MOSELEY PRICHARD PARRISH KNIGHT & JONES).

    Respondent:
        National Union Fire Insurance Company of Pittsburgh, P.A., was present through its representative Tiffany Ngeo; and with its counsel Michael Duffy.

    Arbitrators:
        Steve Brodie, Esq.
        Terrence M. White, Esq.
        Kenneth B. Bell, Esq.

Testimony was given by Steven Ficon, Geoffrey Fallon, Esq., William Jung, Esq., in Crowley's case and Thomas R. Newman, and Richard A. Sharpstein, Esq. in National Union's case.

CROW002612

Exhibits were introduced and counsel presented closing arguments. The hearing record was declared closed on December 31, 2012.

### Factual and Procedural Background

**A.      The Department of Justice Investigation.**

Crowley Liner Services, Inc. ("Crowley Liner"), is a wholly owned subsidiary of Crowley Maritime Corporation ("Crowley"). On April 16, 2008, the United States District Court for the Middle District of Florida issued a search warrant commanding the search of the area of Crowley Liner's corporate offices in Jacksonville, Florida, where it's management, pricing and sales personnel, and their respective administrative staff sit and work, including all computer rooms, document storage areas, etc. This search warrant was based on an FBI Special Agent's affidavit. The affidavit has remained sealed; therefore, its specific allegations have never been made known to Crowley or its employees. However, as testified to at the arbitration hearing, its essence can be inferred from the substance of the search warrant.

The search warrant commanded the seizure of a host of documents and records relating to any agreement, meeting, conversation, or other communication regarding coastal freight transportation services between the United States and Puerto Rico between or among Crowley's management, pricing or sales personnel, "including ROB GRUNE ("GRUNE"), TOM FARMER ("FARMER"), JOHN KELLEY ("KELLEY"), and TONY LUSIS ("LUSIS") and any employee or agent of SEA STAR LINE, LLC, and HORIZON LINES, LLC."

The search warrant was executed on April 17, 2008. Upon execution, Tom Farmer was served with a subpoena to testify on May 28, 2008 before the federal grand jury. Mr. Farmer apparently never appeared before the grand jury. A month later, Crowley Liner was similarly subpoenaed to testify on May 26, 2008 before the same grand jury. This subpoena included a demand that Crowley Liner bring records related to Tom Farmer's business telephone numbers, his compensation, as well as its water freight shipment records, and financial statements.[1]

On September 1, 2011, the United States Department of Justice ("DOJ") prepared a "Sentencing Guidelines Calculation" or Term Sheet. This document "carves-out" Robert Grune and Tom Farmer.[2]

On June 5, 2012, Crowley Liner executed a plea agreement with the DOJ. Crowley Liner agreed to plead guilty to an information charging one-count of antitrust conspiracy in violation of 15 U.S.C. § 1. Paragraphs 4(a)-(d) of the plea agreement specify the factual basis for the offense. Paragraphs 11-12 specify the government's agreement not to bring further criminal

---

[1] This subpoena to Crowley Liner was not submitted to National Union for coverage. National Union says it was unaware of this subpoena until September 4, 2012, when Crowley's Statement of Claim was filed. Crowley did not dispute this assertion at the hearing.

[2] National Union asserts it did not receive this document until July 19, 2012. Crowley has not disputed this assertion.

CROW002613

charges against Crowley Liner, Crowley, or its related entities.  However, the agreement did not expressly preclude further civil, regulatory, or administrative actions.

This plea agreement was supplemented the same date with a sealed agreement that Crowley Liner, Crowley, and its related entities would fully cooperate with the United States in the investigation and prosecution of the antitrust conspiracy case, as well as any litigation or other proceedings that may arise from that investigation.  This cooperation included an agreement to use its best efforts to secure the full cooperation of current directors, officers and employees, not including Robert Grune and Tom Farmer.  In exchange the Government agreed that it would "not bring criminal charges against any current director, officer, or employee of [Crowley Liner] or its related entities for any act or offense" in furtherance of the antitrust conspiracy.  Robert Grune and Tom Farmer were again carved-out of this exclusion from prosecution.

On July 31, 2012, Crowley Liner pled guilty to the information filed that date.  Included for sentencing purposes was a Joint Sentencing Memorandum.  The information alleged that "[v]arious corporations and individuals, not made defendants in this Information, participated as co-conspirators in the offense charged in this Information and performed acts and made statements in furtherance of it."  Neither the information nor the joint sentencing memorandum named any individual co-conspirators.

## B.    The Notices of Claims and National Union's Responses.

Crowley purchased an Executive and Organization Liability Insurance Policy[3] (the "Policy") from National Union Fire Insurance Company of Pittsburgh, PA ("National Union").  On April 23, 2008, Crowley filed its first notice of claim notifying National Union that Crowley and the four individuals named in the search warrant had retained counsel regarding the DOJ's and FBI's antitrust conspiracy investigation.  It sought National Union's consent to this retention and authorization to incur Defense Costs.

On May 27, 2008, National Union (through AIG Domestic Claims, "AIG") responded.  "[B]ased solely upon the documentation" Crowley had provided, National Union concluded that a claim, as defined by the Policy had not been made.  It determined that:  (1) the search warrant was served on Crowley, not the four named individuals; (2) no individuals had received subpoenas[4]; and, (3) the individuals had not "been identified as "a target" of any investigation."

Crowley supplemented its April 23, 2008 notice of claim on November 26, 2008.  It informed National Union that no additional subpoenas, search warrants, or similar court documents had been issued.  However, it notified National Union that the DOJ had announced that executives employed by the other two co-conspiring shipping companies had agreed to

---

[3] Policy Number 061-36-48 with an initial policy period from November 1, 2007 to November 1, 2008 and an aggregate liability limit of $10 million.

[4] As it later admitted, National Union did receive a copy of Farmer's grand jury subpoena with the April 23, 2008 notice of claim.

CROW002614

plead guilty to antitrust and obstruction of justice charges. It also notified National Union that the investigation of Crowley Liner was ongoing and that it was advancing defense and investigation costs to "Insured Person officer/employees Grune, Farmer, Lusis, and Kelly (sic) and may continue to advance such costs until it has been determined that any officer/employee has not acted in accordance with the law or the best interest of the company."

In this supplementation, Crowley also informed National Union that Tom Farmer was issued a subpoena on April 17, 2008 and noted that this subpoena had been included in the April 23, 2008 notice of claim. Crowley also asserted that the documents revealed that the four individuals are "persons against whom a civil, criminal, administrative regulatory or arbitration proceeding seeking monetary, non-monetary or injunctive relief may be commenced."

National Union responded by letter dated February 3, 2009. It agreed that the Farmer subpoena had been included in the April 23 notice of claim; however, its coverage position remained unchanged. Quoting subparagraph (3) of the "Claim" definition, National Union stated that:

> [t]o date nothing has been submitted to show that there is any civil, criminal, administrative or regulatory investigation of an Insured Person. Additionally, no Insured Person has been identified in writing as a person against whom a proceeding may be commenced. Nor has any Insured Person been served with a subpoena from the SEC or similar state or foreign government authority.

National Union further noted that:

> [t]he grand jury subpoena received by Tom Farmer does not appear to have been issued in connection with an investigation of Mr. Farmer. It does not identify Mr. Farmer as a person against whom a proceeding may be commenced. And, it was not issued in connection with an investigation by the SEC or similar state or foreign government authority. Thus, a Claim (as defined by the Policy) has not been made against any Insured Person and coverage is unavailable.

On June 30, 2008, Tom Farmer's retained counsel also wrote National Union asserting that Mr. Farmer "qualifies for any coverage under the Policy." He re-asserted Crowley's position that the grand jury subpoena and the search warrant were sufficient to constitute a "Claim" as defined under the Policy. National Union responded on August 11, 2008. It reiterated its position that the search warrant and the grand jury subpoena do not satisfy the Policy's definition of Claim.

4

CROW002615

**ISSUE PRESENTED**

As Crowley presents in its Detailed Statement of Claim, the decisive issue is whether or not the "DOJ Investigation" (as evidenced by the search warrant, the Farmer subpoena, the Crowley subpoena, the Term Sheet, the Plea Agreement, the Plea Agreement Supplement, and the Investigation related thereto), is sufficient to constitute a "Claim" as that term is defined under the Insurance Policy. Crowley's primary argument is that the DOJ Investigation is a Claim under subpart (3)(i) of that Definition. Its secondary argument is that the DOJ Investigation is a Claim under subpart (1).

**DECISION**

A.   **The Policy Provisions.**

1.   The following coverage provisions in the Policy have been argued. The capitalized and bolded words are separately defined in the Policy:

**COVERAGE A:  EXECUTIVE LIABILITY INSURANCE**
This policy shall pay the **Loss** of any **Insured Person** arising from a **Claim** made against such **Insured Person** for any **Wrongful Act** of such **Insured Person**, except when and to the extent that an **Organization** has indemnified such **Insured Person**. . .

**COVERAGE B:  ORGANIZATOIN INSURANCE**
(ii)    *Indemnification of an **Insured Person***:  This policy shall pay the **Loss** of an **Organization** arising from a **Claim** made against an **Insured Person** (including and **Outside Entity Executive**) for any **Wrongful Act** of such **Insured Person**, but only to the extent that such **Organization** has indemnified such **Insured Person**.

Section 2 provides the following definitions:

(b)    "**Claim**" means:

(1)    a written demand for monetary, non-monetary or injunctive relief;

(2)    a civil, criminal, administrative, regulatory or arbitration proceeding for monetary, non-monetary or injunctive relief which is commenced by:  (i) service of a complaint or similar pleading; (ii) return of an indictment, information or similar document (in the case of a criminal proceeding); or (iii) receipt of a notice of filing of charges; or

5

(3)    a civil, criminal, administrative or regulatory investigation of an Insured Person:

    (i)    once such Insured Person is identified in writing by such investigating authority as a person against whom a proceeding described in Definition (b)(2) may be commenced; or

    (ii)    in the case of an investigation by the SEC . . . after the service of a subpoena upon such Insured Person.

**(aa)**    "**Wrongful Act**" means:

    (1)    any actual or alleged breach of duty, neglect, error, misstatement, misleading statement, omission or act or any actual or alleged **Employment Practices Violation**.

* * *

## B.    The Rules of Construction for Insurance Contracts.

Delaware law must be applied.  The Delaware Supreme Court recently re-stated the rules of construction to be applied when construing an insurance contract.  As that court wrote on January 9, 2013:

> Clear and unambiguous language in an insurance policy should be given its ordinary and usual meaning.  When the language of an insurance contract is clear and unequivocal, a party will be bound by its plain meaning because creating an ambiguity where none exists could, in effect, create a new contract with rights, liabilities, and duties to which the parties had not assented.

*National Grange Mut. Ins. Co. v. Elegant Sluming, Inc.*, 2013 WL 119676 (Del. S.Ct. Jan. 9, 2013).

In December 2012, that same Court wrote:

> Ambiguity exists in insurance contracts where the language is reasonably susceptible to at least two different meanings.  When ambiguity exists, language is typically construed against the drafter and in accordance with the reasonable expectations of the insured.  However, where the language in insurance contracts is unambiguous, the language is given its plain and ordinary meaning.

*Bermel v. Liberty Mut. Fire Ins. Co.,* 2012 WL 6204771, *8 (Del. S.Ct. Dec. 12, 2012).

## C.    Application.

Applying these rules of construction, the Policy's definition of Claim is clear and unambiguous.  As such, its terms must be given their ordinary and usual meaning.

CROW002617

Given the facts in this case, the triggering event for a Claim by the Insured Persons under subparagraph 2(b)(3) for the DOJ's criminal investigation is when the DOJ identifies in writing an Insured Person as one against whom a criminal proceeding may be commenced. This specified, objective triggering event has yet to occur.

Facially, none of the writings presented identifies an Insured Person "as a person against whom a (criminal) . . . may be commenced." For example, the search warrant is a judicial writing devoid of any identification by the DOJ (or FBI) of any individual as a person against whom a covered proceeding may be commenced. The potential of such a proceeding commencing against any of the named individuals whose work areas and records with Crowley Liner were to be searched is only by inference derived from context beyond the four corners of the search warrant.

Crowley's own argument makes this fact clear. Crowley does not argue that any of the DOJ investigation documents is a writing that, on its face or within its four corners, actually identifies an individual as a person against whom a criminal proceeding may be commenced. Instead, Crowley argues that these individuals are "identified by name" in some of these documents. It then argues that these writings should be read "in context"; and, if read "in context" in which they were written, it is clear that these named individuals are persons against whom a covered proceeding may be commenced.[5] In other words, Crowley argues that, if the Policy language is read broadly and the DOJ investigation documents are read in context of the criminal antitrust conspiracy investigation, the documents "effectively" identify the individuals as persons against whom criminal proceedings may be commenced.

Reading the otherwise plain and unambiguous Policy language as Crowley suggests would not be proper. Doing so would violate the Delaware Supreme Court's acknowledgment that an ambiguity should not be created where none exists, because doing so creates a new contract with rights, liabilities, and duties to which the parties had not assented.[6] *National Grange Mut. Ins. Co., supra.*[7] Reading the Policy language as plainly written, the Insured Person must be indentified in writing by the investigating authority by more than mere name.

---

[5] Crowley's evidence and argument about the realities of antitrust conspiracy cases is similar to Office Depot's argument 'based mostly on the practical realities of securities litigation' that the Eleventh Circuit rejected. *Office Depot, Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 453 Fed.Appx. 871, 877 (11th Cir. October 11, 2009).

[6] For example, Tab 7 to Geoffrey D. Fallon's expert report is a 12/09 exemplar from a Zurich Executive Asset Protection Policy. In addition to a clause similar to the one at issue here, paragraph 5 from the Zurich Policy adds to its definition of a Claim 'any request, demand or subpoena by a regulatory, administrative, governmental or similar authority to interview or depose an Insured Person, or for the production of documents by an Insured Person, in his or her capacity as such.' This policy would clearly provide coverage for persons such as Tom Farmer who are subpoenaed to testify before a grand jury. That coverage is not in the National Union policy.

[7] Though persuasive only, the Eleventh Circuit rejected this same argument applying Florida law. *See Office Depot, Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 453 Fed.Appx. 871, 2011 WL 4840951 at *4 (11th Cir., October 11, 2009).

CROW002618

The Insured Person must be identified in writing as one against whom a covered proceeding may be commenced. This identification (i.e, an Insured Person's name with the requisite descriptive), must be evident in the writing itself. Identification in writing by name alone is insufficient. In other words, reading the writing in context in order to provide the requisite descriptive is improper given the plain and unambiguous triggering event specified in the Policy. *See Office Depot, Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, at \*4; *Diamond Glass Companies, Inc. v. Twin City Fire Ins. Co.*, 2008 WL 4613170 at \*5 (S.D.N.Y. Aug. 18, 2008).

Alternatively, Crowley argues that the DOJ Investigation (e.g. the subpoenas to testify and the search warrant) constitutes a written demand for non-monetary relief covered under subpart (1) of the definition of "Claim." This subpart defines Claim as meaning "a written demand for monetary, non-monetary or injunctive relief." Crowley's case support is: *Agilis Benefit Services, LLC v. Travelers Casualty & Surety Co.*, 2010 WL 8573372 at \*7 (E.D. Tex. April 30, 2010); *Minuteman Int'l, Inc. v. Great American Ins. Co.*, No. 03 C6067, 2004 WL 603482 \*7 (N.D. Ill Mar. 22, 2004); and, *Onvoy, Inc. v. Carolina Cas. Ins. Co.*, Civil No. 06-165, 2006 US Dist. LEXIS 47198 (D. Minn. July 11, 2006).[8]

National Union's reply is that Mr. Farmer is the only individual who received a subpoena. The search warrant and the subpoena *duces tecum* were to Crowley Liner only. No individual response was required or demand made by that search warrant. For case support, it relies on *Diamond Glass Companies, Inc. v. Twin City Fire Ins. Co.*, at \*5 (S.D.N.Y 2008).

The reasoning and holdings in *Agilis Benefit Services* and *Diamond Glass Companies* (the two most applicable cases) cannot be reconciled. And, if Delaware law must be applied, the ordinary and usual meaning of the word "relief" and the *Diamond Glass* case appear most consistent with the Delaware Supreme Court's declaration that "[clear and unambiguous language in insurance policy should be given its ordinary and usual meaning." *National Grange Mut. Ins. Co,* at \*4. The *Webster's Third New International Dictionary* 1918 (3d ed., unabridged) (defining relief, in part as "5 a : a legal remedy or redress"). This is consistent with what the court determined in *Diamond Glass*:

> [B]ased on the ordinary and accepted meaning of the word "relief" and the context in which it is used in the Policy it is clear that investigative subpoenas and search warrants are not "demands" for non-monetary relief.
>
> \* \* \*
>
> Black's Law Dictionary defines "relief" as "[t]he redress or benefit, esp. equitable in nature (such as injunction or specific performance), that a party asks of a court. Also termed, remedy." *Black's Law Dictionary*, 1317 (8th ed. 2004); *see also, Foster v. Summit Medical Systems, Inc.*, 610 N.W.2d 350, 354 (Minn. Ct. App. 2000) . . .
>
> \* \* \*

---

[8] As the District Court noted in *Office Depot, Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.,* the cases Crowley relies upon are distinguishable because the term 'claim' was either not defined or differently defined in those cases. 734 F.Supp. 2d 1304, 1317 n. 4 (S.D. Fla. 2010).

CROW002619

Grand Jury Subpoenas and search warrants do not fit within this meaning of the term "relief" or fall within the reasonable reading of the use of the term in the context of the Policy.

*Diamond Glass*, at *4 (S.D.N.Y 2008). And, given that the language in the National Union Policy is not ambiguous, the distinctions the court made in *Agilis Benefit Services* are inapplicable.

## E.   Conclusion.

Given the above decision, the majority of the panel finds that Crowley failed to prove a covered Claim under the Policy as that term is defined therein. The relevant Policy language is plain and unambiguous. The materials Crowley submitted to National Union did not constitute a Claim for Insured Persons as the term "Claim" is defined in the Policy. The triggering event specified in the Policy has not yet been presented to National Union. As such, Crowley is not entitled to any recovery in this arbitration. The arbitration award is in favor of National Union and against Crowley.

The Alternative Dispute Resolution Process in Paragraph 17 of the Policy provides that the arbitrators award shall not include attorneys' fees or other costs. In light of this provision and the fact that neither party has made a request to the contrary, no award of fees or costs is made. Therefore, the administrative filing and case service fees of the AAA, totaling $11,450.00, shall be borne as incurred. The fees and expenses of the Chair, totaling $21,476.53, shall be borne as incurred.

This Award may be executed in any number of counterparts, each of which shall be deemed an original, and all of which shall constitute together one and the same instrument.

CROW002620

I, Kenneth B. Bell, do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument which is my Award.

Date: January 29, 2013          /s/Kenneth B. Bell
                                Kenneth B. Bell, Chair

I, Steve Brodie, do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument which is my Award.

                                Arbitrator

Dated: January ____, 2013       _____
                                Steve Brodie, Arbitrator

I, Terrence M. White, do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument which is my Award.

Dated: January ____, 2013       _____
                                Terrence M. White, Arbitrator

CROW002621

I, Kenneth B. Bell, do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument which is my Award.

Date: January _____, 2013          **/s/Kenneth B. Bell**
                                    Kenneth B. Bell, Chair

I, Steve Brodie, do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument which is my Award.

                                    Arbitrator

Dated: January 29, 2013            **/s/DRAFT**
                                    Steve Brodie, Arbitrator

I, Terrence M. White, do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument which is my Award.

Dated: January _____, 2013          **/s/DRAFT**
                                    Terrence M. White, Arbitrator

10

CROW002622

# Doc. 36-8

# EXHIBIT G

AMERICAN ARBITRATION ASSOCIATION

No. 33 195 Y 00084 12

CROWLEY MARITIME CORPORATION,
Claimant

v.

NATIONAL UNION FIRE INSURANCE
COMPANY OF PITTSBURGH, PA.,
Respondent

## MEMORANDUM OF NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA. IN SUPPORT OF ITS MOTION FOR SUMMARY DISPOSITION

The Respondent, National Union Fire Insurance Company of Pittsburgh, Pa. ("National Union"), respectfully submits this memorandum in support of its motion for summary disposition. Based on the undisputed facts as set forth in the Affidavit of Maureen Conboy, the panel should return an award finding that Crowley Maritime Corporation is entitled to recover nothing from National Union. As set forth herein, National Union is entitled to prevail as a matter of law because (1) the materials submitted to National Union for coverage do not constitute a Claim as defined in the Policy and (2) even if they did, Crowley's guilty plea to criminal charges arising out of the investigation which is the subject of this proceeding is a complete bar to coverage for Crowley. The issue presented is a question of law which can be decided by the panel without the necessity of a full evidentiary hearing.

### I.  Introduction

This arbitration arises out of the fact that for a period of at least several years prior to April 2008 Crowley Maritime Corporation and/or its subsidiary, Crowley Liner Services, Inc.

(collectively, "Crowley") engaged in a criminal conspiracy with other large shipping companies to fix prices charged for freight transportation between the United States and Puerto Rico. Numerous parties, including Crowley, have pleaded guilty to criminal charges. Despite admitting to criminal conduct, however, Crowley now seeks to recover from National Union approximately $3.5 million that it claims to have spent to provide legal counsel to four of its employees: Thomas Farmer, Robert Grune, John Kelley and Tony Lusis.[1]  Crowley also claims to have spent $600,000 on its own counsel. As set forth herein, Crowley's claim is contrary to the plain language of the National Union policy and it is unsupported by any legal authority.[2]

## II.   **Undisputed Facts**

The following undisputed facts establish that National Union is entitled to prevail as a matter of law:

National Union issued Policy No. 061-36-48 (the "Policy") to Crowley Maritime Corporation, with a Policy Period of November 1, 2007 to November 1, 2008. Loss under the Policy is subject to a self-insured Retention of $500,000. A copy of the Policy is attached to the Affidavit of Maureen Conboy as Ex. A.

By letter dated April 25, 2008, Dan Sweeney of Aon submitted to National Union an April 23, 2008 email from Steve Ficon at Crowley Maritime Corporation. Mr. Ficon's email had

---

[1]  A review of the bills indicates that certain of the attorneys involved also represented other Crowley employees.

[2]  Commencing in April 2008, Crowley also was named as a defendant in numerous civil antitrust actions filed in the United States District Court for the District of Puerto Rico, later consolidated as, *In re Puerto Rican Cabotage Antitrust Litigation*, MDL Docket No. 3:08-md-1960 (DRD). Those actions are not the subject of this arbitration. On January 15, 2010, Crowley entered into a class action settlement of the Puerto Rico antitrust litigation, pursuant to which Crowley agreed to pay a total of $13,750,000. On or about May 17, 2012, several additional antitrust actions were filed against Crowley and others in the United States District Court for the District of South Carolina. See, e.g., *Arrowpac Inc., et al. v. Sea Star Line, LLC, et al.*, Case No. 2:12-cv-01008. On July 26, 2012, the South Carolina plaintiffs filed a voluntary notice of dismissal as to Crowley, apparently pursuant to an undisclosed settlement agreement.

attached to it a Search Warrant dated April 16, 2008 and a document Subpoena addressed to Crowley Liner Services, Inc., dated April 17, 2008.

The Search Warrant sought extensive business records from Crowley, including price sheets, bids, proposals and contracts for shipping the United States and Puerto Rico. The Search Warrant also sought documents relating to communications among Crowley management, pricing or sales personnel, *including* Robert Grune, Thomas Farmer, John Kelley and Tony Lusis. The Subpoena to Crowley sought extensive additional materials regarding shipping between the United States and Puerto Rico. It did not mention any Crowley employees by name. Copies of the Search Warrant and Subpoena addressed to Crowley are attached to the Affidavit of Maureen Conboy as Ex. C and Ex. D.

By letter dated June 30, 2008, Terrance Reed submitted to National Union a testamentary Subpoena addressed to Thomas Farmer, dated April 17, 2008. The Subpoena to Mr. Farmer required him to appear and testify on May 28, 2008. It did not require production of any additional documents. A copy of the Subpoena to Mr. Farmer is attached to the Affidavit of Maureen Conboy as Ex. F.

Mr. Farmer is the only Individual Insured who was served with a Subpoena. Mr. Grune, Mr. Kelley and Mr. Lusis were mentioned only in the Search Warrant served on Crowley.

By correspondence dated May 27, 2008, August 11, 2008 and February 3, 2009, National Union denied coverage under the Policy for the materials submitted. Copies of National Union's coverage correspondence are attached to the Affidavit of Maureen Conboy as Ex. E, Ex. G and Ex. I.

On July 31, 2012, Crowley Liner Services, Inc. pleaded guilty in the United States District Court for the District of Puerto Rico to one count of conspiracy to restrain interstate

trade and commerce in violation of Section 1 of the Sherman Act (15 U.S.C. §1) and agreed to

pay a $17 million fine. *United States of America v. Crowley Liner Services, Inc.*, United States

District Court for the District of Puerto Rico, Case No. 3:12-cr-00590-DRD. Attached hereto as

Exhibits 1-3 are copies of the Information, Joint Sentencing Memorandum and Judgment in a

Criminal Case, all of which were filed in court on July 31, 2012. [3]

### III.   **Argument**

Based on the foregoing facts, none of which are subject to any good faith dispute,

National Union is entitled to prevail as a matter of law. The coverage issue presented is one of

policy interpretation, which is a question of law that can be decided by the panel on motion.

Under the terms of the Policy, Defense Costs are subject to potential coverage *only* where they

result solely from a Claim against an Insured for a Wrongful Act. National Union is entitled to

prevail, because the 2008 Search Warrant and the two Subpoenas submitted for coverage do not

constitute a Claim against an Insured for a Wrongful Act as those terms are defined in the Policy.

In addition, Crowley's claim independently is barred by the fact that it has already pleaded guilty

to a crime.

The standard to be applied in the interpretation of insurance policies in Florida is well

established. "Under Florida law, insurance contracts are construed according to their plain

meaning." *Taurus Holdings, Inc. v. United States Fidelity and Guaranty Co.*, 913 So.2d 528,

532 (Fla. 2005). Where the language of the policy is unambiguous, extrinsic evidence is

---

[3] Although not directly relevant to this motion, the panel should be aware that other participants in the conspiracy also have admitted their guilt. On or about February 24, 2011, Horizon Lines, LLC pleaded guilty to criminal charges arising out of the conspiracy. *United States v. Horizon Lines, LLC*, United States District Court for the District of Puerto Rico, Case No. 3:11-cr-0071. On or about November 17, 2011, Sea Star Line, LLC also pleaded guilty to criminal charges arising out of the conspiracy. *United States v. Sea Star Line, LLC*, United States District Court for the District of Puerto Rico, Case No. 3:11-cr-00511. In addition, at least five individuals employed by either Horizon Lines, LLC or Sea Star Line, LLC have pleaded guilty to criminal charges.

inadmissible. *Philadelphia American Life Ins. Co. v. Buckles*, 2009 WL 3403281 at *4 (11th

Cir.); *Diamond State Ins. Co. v. His House, Inc.*, 2011 WL 146837 (S.D.Fla.) (under Florida law,

an unambiguous insurance contract must be construed according to its terms, without resorting to

extrinsic evidence). "[C]ourts are not free to rewrite the terms of an insurance contract and

where a policy provision is clear and unambiguous, it should be enforced according to its terms."

*Buckley Towers Condominium, Inc. v. QBE Insurance Corp.*, 2010 WL 1609 at *3 (11th Cir.

(Fla.)), citing *Acosta, Inc. v. National Union Fire Insurance Co.*, 39 So.3d 565, 573 (Fla.App.

2010). Policy language is construed against the insurer only where the policy is found to be

ambiguous. *Allstate Insurance Co. v. Morgan*, 870 So.2d 2, 4 (Fla.App. 2003).

It is also settled that "[u]nder Florida law, interpretation of an insurance policy falls

within a court's province because it is a question of law." *Maryland Casualty Co. v. Smartcop,*

*Inc.*, 2012 WL 4344571 at *2 (S.D.Fla.). Therefore, insurance coverage issues such as those

presented here routinely are decided on motions for summary judgment. *United States Life Ins.*

*Co. v. Logus Manufacturing Corp.*, 845 F.Supp.2d 1303, 1310 (S.D.Fla. 2012) ("Under Florida

law, the interpretation of provisions of an insurance policy is a question of law properly decided

on summary judgment"); *Nationwide Mutual Fire Ins. Co. v. Royall*, 588 F.Supp.2d 1306, 1313

(M.D.Fla. 2008) (summary judgment is generally appropriate, inasmuch as construction and

effect of policy are matters of law to be determined by the Court); *Northland Casualty Co. v.*

*HBE Corp.*, 160 F.Supp.2d 1348, 1357-58 (M.D.Fla. 2001) (summary judgment is appropriate in

declaratory judgment actions seeking a declaration of coverage when the insurer's duty, if any,

rests solely upon the applicability of the insurance policy, the construction and effect of which is

a matter of law). Because interpretation of the policy is a question of law, expert testimony on

the meaning of policy language is inadmissible. *Montgomery v. Aetna Casualty & Surety Co.*, 898 F.2d 1537, 1541 (11th Cir. 1990). [4]

Based on the undisputed facts and the plain language of the National Union Policy, the panel should now enter an award in favor of National Union.

> A.   **National Union is Entitled to Prevail, Because the Materials Submitted to National Union for Coverage Under the Policy Do Not Constitute A Claim Against An Insured Person For A Wrongful Act.**

Under the terms of the Policy, the fees incurred by Crowley in providing legal counsel to its employees are not subject to any potential coverage, because such fees do not arise out of a Claim made against an Insured Person for a Wrongful Act. The relevant Insuring Agreement[5] is the Coverage B(ii) Insuring Agreement, which provides as follows:

> *Indemnification of an **Insured Person**:* This policy shall pay the **Loss** of an **Organization** arising from a **Claim** made against an **Insured Person** (including an **Outside Entity Executive**) for any **Wrongful Act** of such **Insured Person**, but only to the extent that such **Organization** has indemnified such **Insured Person**.

[Conboy Affidavit, Ex. A, Section 1.B(ii) ]. Therefore, the existence of a Claim against an Insured Person for a Wrongful Act is a necessary prerequisite to coverage. The definition of Defense Costs reiterates that Defense Costs are potentially payable only after a Claim has been

---

[4] Crowley has produced an expert report from an attorney who purports to state that, in his opinion, the fact that four individuals were named in the search warrant identifies them as persons against whom charges may be brought. However, this is exactly the kind of expert testimony which the Eleventh Circuit has held to be inadmissible under Florida law. *Montgomery v. Aetna Casualty & Surety Co., supra,* 898 F.2d at 1541. Where the documents are undisputed, the construction and effect of the Policy is a pure matter of law for the panel. *Northland Casualty Co. v. HBE Corp., supra,* 160 F.Supp.2d at1357-58. The search warrant which was served on Crowley speaks for itself. It is fundamentally unlike a target letter, in that it does not say whether or not the individuals whose records are sought are persons against whom criminal charges may be brought.

[5] Coverage A clearly is inapplicable, because Coverage A: Executive Liability Insurance applies only in circumstances where the Organization (i.e., Crowley) has failed to indemnify its Insured Persons. Therefore, Crowley itself can never have a claim under Coverage A. Coverage B(i) provides Organization Liability Coverage, but only in the case of a Securities Claim. Therefore, there is no potential coverage for the approximately $600,000 in fees that Crowley claims to have paid its own attorneys in connection with the antitrust investigation.

made against an Insured.  The definition of Defense Costs expressly includes only those costs "resulting solely from the investigation, adjustment, defense and/or appeal of a Claim against an Insured."  [Id., Section 2(f) ].

As indicated in the above statement of Undisputed Facts, the materials submitted to National Union as a basis for coverage consisted of (1) the April 16, 2008 search warrant served on Crowley, (2) the April 17, 2008 subpoena addressed to Crowley and (3) the April 17, 2008 subpoena to Mr. Farmer.  None of these is sufficient to implicate coverage under the Policy, because none of the materials submitted to National Union for coverage in 2008 constituted a Claim against an Insured Person for a Wrongful Act. [6]

The Policy's definition of Claim includes pre-indictment investigation of an Insured Person, but *only* after such person (except with respect to an investigation by the SEC or similar government authority) has been identified in writing by the investigating authority as a person against whom civil or criminal proceedings may be commenced.  Section 2(b) of the Policy defines a "Claim" as follows:

> (1)  a written demand for monetary, non-monetary or injunctive relief;
>
> (2)  a civil, criminal, administrative, regulatory or arbitration proceeding for monetary, non-monetary or injunctive relief which is commenced by: (i) service of a complaint or similar pleading; (ii) <u>return of an indictment, information or similar document (in the case of a criminal proceeding)</u>; or (iii) return or filing of a notice of charges; or

---

[6] Crowley's Statement of Claim also attaches a Subpoena apparently served on Crowley on May 17, 2011. However, that Subpoena was never submitted to National Union for coverage, and National Union had no knowledge of the Subpoena until September 4, 2012, when it received Crowley's Statement of Claim.  Crowley also attached to the Statement of Claim a Sentencing Guidelines Calculation which Crowley apparently received from the government on or about September 1, 2011.  However, Crowley did not disclose this document to National Union until July 19, 2012, just 12 days before it pleaded guilty to participation in the criminal conspiracy on July 31, 2012.

  (3)  a civil, criminal, administrative or regulatory investigation of an **Insured Person**:

    (i)  <u>once such **Insured Person** is identified in writing by such investigating authority as a person against whom a proceeding described in Definition (b)(2) may be commenced</u>; or

    (ii)  in the case of an investigation by the SEC or a similar state or foreign government authority, after the service of a subpoena upon such **Insured Person**.

[Id., Section 2(b) ] (emphasis added).  Section 2(b)(1) is inapplicable, because no Insured Person has received a written demand for monetary, non-monetary or injunctive relief .  No Crowley officers or employees have been indicted, so there can be no claim of coverage under Section 2(b)(2).  Section 2(b)(3)(ii) is inapplicable, because there has been no subpoena served by the SEC of similar authority.  Therefore, in order to establish that a Claim has been made against an Insured, Crowley can only proceed under Section 2(b)(3)(i).  Pursuant to that section, written identification of an individual by the investigating authority as a person against whom further proceedings may be commenced is a necessary triggering event prior to any coverage for costs incurred on account of an investigation of an Insured Person.

   National Union is entitled to prevail because, to date, National Union has been provided with nothing showing that Mr. Farmer or any other individual Insured Person has been identified in writing as a person against whom charges may be brought.  In contrast, it appears that the DOJ *has* so identified employees of other shipping companies which participated in the conspiracy.  According to pleadings filed in the civil antitrust case:

    14.  In fact, <u>Shapiro has been informed that he is a target of the aforementioned criminal investigation</u>, which arises from the same factual scenario as the Plaintiff's Second Consolidated Amended Class Action Complaint, and to which the Plaintiffs make numerous references therein.

*In re: Puerto Rican Cabotage Antitrust Litigation*, MDL Docket No. 3:08-md-1960 (DRD),

*Motion By Leonard Shapiro For Stay of Proceedings and Memorandum of Law in Support*

*Thereof*, June 22, 2009 (emphasis added). If any officer or employee of Crowley has ever

received written notice advising them that they are a person against whom criminal charges may

be brought, they have not so informed National Union. Crowley is entitled to recover nothing in

this proceeding, because the materials that have been submitted to National Union therefore do

not constitute a Claim under the Policy.

Nevertheless, Crowley argues that that the 2008 Search Warrant and Subpoenas

*effectively* identified Mr. Farmer and others as persons against whom further proceedings may be

commenced. Crowley ignores the fact that its argument is contrary to a recent decision by the

Eleventh Circuit Court of Appeals in a case decided under Florida law. Applying the same

policy language at issue here, the court affirmed a decision of the District Court finding no

coverage under Section 2(b)(3)(i) of the definition of Claim for legal fees incurred in connection

with an investigation prior to the date on which the individual insureds received a Wells Notice

advising them in writing of the fact that they were persons against whom future proceedings

might be commenced. *Office Depot, Inc. v. National Union Fire Insurance Company of*

*Pittsburgh, Pa.*, 453 Fed.Appx. 871, 2011 WL 4840951 (C.A.11 (Fla.)).

In the *Office Depot* case, the government had made prior written requests for testimony

from certain employees of the company. Just like Crowley, Office Depot argued that that these

requests effectively identified the employees in question as persons against whom charges could

be brought. The Eleventh Circuit expressly rejected this argument as follows:

> Office Depot seems to contend that the SEC letters it received
> starting in 2007 were sufficient to trigger a Claim as defined by the
> policy. Generally, in these letters, the SEC asked Office Depot to
> preserve certain documents and requested that several individuals

provide testimony.  Office Depot argues that those letters are sufficient to constitute notice that Insured Persons could have proceedings commenced against them.

The letters, however, only broadly request information to assist the SEC in determining whether Office Depot committed securities violations.  They do not allege that violations have occurred or identify specific individuals that could be charged in future proceedings.  In contrast, the Wells Notices, which the carriers concede trigger a Claim, state that the SEC staff "intends to recommend that the Commission bring a civil injunction against [named individual], alleging" that he or she violated specific securities law.  The Wells Notices create a Claim because an "Insured Person is identified in writing by [the SEC] as a person against whom "a civil … proceeding for … injunctive relief" may be commenced by "service of a complaint or similar proceeding" or by the "filing of a notice of charges."  After review of the policy and the correspondence at issue, we conclude that correspondence to which Office Depot referred does not trigger a Claim under the relevant policy definition.

*Id.,* at *4.  In exactly the same way, the 2008 Search Warrant and Subpoenas at issue here do not identify any particular individuals as persons against whom criminal charges may be brought.

The issue is not whether Mr. Farmer or anyone else in fact *is* a person against whom future charges may be brought; the issue is whether the Search Warrant served on Crowley or the 2008 Subpoenas addressed to Crowley and to Mr. Farmer *identify* them as persons against whom such charges may be brought.  Under the holding in *Office Depot*, the answer to that question unambiguously is, "No."  There is nothing on the face of the documents which identifies the individuals named as the parties being investigated or identifies them as persons against whom charges may be brought, rather than mere witnesses in an investigation of Crowley or of the other large shipping companies involved in the conspiracy.  Therefore, the Search Warrant and Subpoenas fail to implicate coverage under the Policy.

In response, Crowley relies on the fact that, in order for a search warrant to have been issued, the government must have filed an affidavit establishing the existence of probable cause.

However, the government was only required to set forth facts sufficient to justify a conclusion that evidence would probably be found at the premises to be searched. *United States v. Robinson*, 2006 WL 304411 (11th Cir. 2006). The government therefore can use a search warrant to obtain materials from persons who are mere witnesses; there is no requirement that the persons whose records were seized must necessarily have been the persons who engaged in the criminal conduct. In addition, Crowley ignores that fact that, in issuing the 2008 search warrant, the judge specifically crossed out the words, "involving which there is an offense under investigation" from the form warrant. [Conboy Affidavit, Ex. C, p. 1]. Therefore, the fact that a person is identified in that portion of the Search Warrant in defining the scope of items to be seized from Crowley does not constitute a written identification of that person by the government as a person against whom charges may be brought.

Other courts interpreting substantially identical policy language have come to the same conclusion. In a recent decision from the Southern District of New York, the court held that a search warrant served on the company and a grand jury subpoena to a named individual did not constitute written notice that the individual in question was a target person against whom charges may be brought:

> The Policy clearly and expressly limits coverage to individuals who have received "written notice" that they are "a target individual against whom formal charges may be commenced." . . . Thus, even if the Complaint sufficiently alleged that any Insured Person was actually a target (which it does not), there would still be no Claim because the Policy clearly and explicitly requires "written notice" specifically identifying an Insured Person as "a target individual against whom formal charges may be commenced." The Complaint fails to allege that any Insured Person has received such "written notice."

*Diamond Glass Companies, Inc. v. Twin City Fire Insurance Company*, 2008 WL 4613170 at *5 (S.D.N.Y.). Crowley has not cited any case from any jurisdiction which has ever held in

interpreting similar policy language that either a search warrant or a subpoena constitutes written identification of a particular individual as a person against whom criminal proceedings may be commenced.

Finally, Crowley also argues in its Detailed Statement of Claim that the 2008 Search Warrant and Subpoenas could constitute Claims because they could be characterized as demands for non-monetary relief under Section 2(b)(1) of the above definition of "Claim." However, the only individual who ever received a Subpoena was Mr. Farmer. The Search Warrant and the document Subpoena were addressed only to Crowley, and they did not demand anything from any individual in response. The 2008 Search Warrant and Subpoenas also do not seek "relief" based on the ordinary meaning of the term or as used in the context of the National Union Policy. Crowley's exact argument was rejected by the court in *Diamond Glass* as follows:

> [B]ased on the ordinary and accepted meaning of the word "relief" and the context in which it is used in the Policy it is clear that investigative subpoenas and search warrants are not "demands for non-monetary relief."
>
> * * *
>
> Black's Law Dictionary defines "relief" as "[t]he redress or benefit, esp. equitable in nature (such as injunction or specific performance), that a party asks of a court. Also termed, *remedy*." Black's Law Dictionary at 1317 (8[th] ed. 2004); see also *Foster v. Summit Medical Systems, Inc.*, 610 N.W.2d 350, 354 (Minn.Ct.App. 2000) . . .
>
> * * *
>
> Grand jury subpoenas and search warrants do not fit within this meaning of the term "relief" or fall within a reasonable reading of the use of the term in the context of the Policy.

*Diamond Glass Companies, Inc. v. Twin City Fire Insurance Company*, 2008 WL 4613170 at *4 (S.D.N.Y.). The 2008 Search Warrant and the Subpoenas also cannot constitute a Claim for a

Wrongful Act as required under the Coverage B(ii) Insuring Agreement, because they fail to allege a Wrongful Act by any individual Insured Person.

The cases cited by Crowley are distinguishable, because they either arise under policies in which the word "Claim" is not defined at all, e.g., *Polychron v. Crum & Forster Ins. Cos.*, 916 F.2d 461, 463 (8th Cir. 1990), or in which the word "Claim" is defined in a way which is fundamentally unlike the definition used in the National Union Policy, e.g., *Minuteman Int'l, Inc. v. Great American Ins. Co.*, 2004 WL 603482 at*3 (N.D.Ill.) (definition of Claim has no reference to coverage for investigations after defined triggering events). Unlike the policies at issue in the cases relied upon by Crowley, the National Union Policy at issue here specifically defines in Section 2(b)(3)(i) the circumstances under which an investigation of an Insured Person can become a Claim for purposes of coverage. It is a well-settled principle of contract law that a contract provision specifically dealing with a particular subject matter controls over a more general provision. *Crastvell Trading Limited v. Marengere*, 90 So.3d 349, 353 (Fla.App. 2012).[7]

## B.  Even If Crowley's Position Were Correct, Crowley's Guilty Plea Precludes Coverage for Crowley.

In the alternative, even if Crowley's argument were entirely correct, the fact that Crowley has now pleaded guilty to criminal participation in the price fixing conspiracy is a complete bar to coverage for Crowley under the Policy. The Information filed with Crowley's guilty plea on July 31, 2012 states in pertinent part as follows:

---

[7] In addition, there is no evidence that any Crowley employees incurred significant legal fees in responding to the search warrant or subpoenas. The Search Warrant was executed at Crowley's offices in a single day; no Crowley employees were required to do anything further in responding to the search warrant. The document subpoena to Crowley was responded to by Crowley, not the individuals. The testamentary subpoena was addressed only to Mr. Farmer, and he never testified.

6.     From at least as early as January 2006 and continuing until at least April 2008, the exact dates being unknown to the United States, Defendant and its co-conspirators entered into and engaged in a combination and conspiracy to suppress and eliminate competition by agreeing to fix base rates for certain Puerto Rico freight services. The combination and conspiracy engaged in by Defend and its co-conspirators was in unreasonable restraint of interstate trade and commerce in violation of Section 1 of the Sherman Act (15 U.S.C. §1).

7.     The charged combination and conspiracy consisted of a continuing agreement, understanding, and concert of action among Defendant and its co-conspirators, the substantial terms of which were to suppress and eliminate competition by fixing base rates for certain Puerto Rico freight services.

Crowley's guilty plea is a binding admission of all factual elements of the charge. *CUMIS Insurance Society, Inc. v. Dominic*, 1997 WL 151120 at *3 (S.D.N.Y.); *McCarthy v. United States*, 394 U.S. 459 (1969). Under Florida law, party who pleads guilty to a crime therefore is precluded from introducing or arguing facts inconsistent with his guilty plea. *Brown v. City of Hialeah*, 30 F.3d 1433, 1437 (11th Cir. 1994).   For this reason, coverage for Crowley now is precluded by Exclusions 4(a) and 4(c) of the National Union Policy.[8]

Exclusion 4(a) of the Policy, as modified by Endorsement No. 9, provides that National Union shall not be liable to make any payment for Loss in connection with any Claim made against an Insured:

(a)     arising out of, based upon or attributable to the gaining of any profit or advantage to which a judgment or final adjudication or an alternative dispute resolution proceeding adverse to the Insured establishes the Insured was not legally entitled;

---

[8] The same result follows as a matter of public policy.  Under Florida law, it is illegal for a criminal to obtain insurance coverage against the consequences of his crime. *State Farm Fire and Casualty Co. v. Tippett*, 864 So.2d 31, 36 (Fla.App. 2004) (public policy dictates against insuring for losses from intentional or criminal acts).

[Conboy Affidavit, Ex. A, Endorsement No. 9]. As indicated above, Crowley's guilty plea is a final adjudication that for at least 2006 through 2008 it illegally overcharged customers shipping freight between the United States and Puerto Rico. This unquestionably constitutes an unlawful profit or advantage received by Crowley for purposes of Exclusion 4(a). *Jarvis Christian College v. National Union Fire Insurance Co. of Pittsburgh, Pa.*, 197 F.3d 742, 748-749 (5th Cir. 2000) (the term "advantage" is broader than "profit" and encompasses any gain or benefit). The profit or advantage from overcharging customers was received directly by Crowley. Exclusion 4(a) is therefore a complete bar to coverage for Crowley. *Serio v. National Union Fire Insurance Co. of Pittsburgh, Pa.*, 795 N.Y.S.2d 529 (App.Div. 2005) (insured's criminal conviction implicates exclusion for unlawful profit or advantage).

Exclusion 4(c) of the Policy, also as modified by Endorsement No. 9, similarly provides that National Union shall not be liable to make any payment for Loss in connection with any Claim made against an Insured:

> (c)     arising out of, based upon or attributable to the committing of any deliberate criminal or deliberate fraudulent act by the Insured if a judgment or final adjudication or an alternative dispute resolution proceeding adverse to the Insured(s) establishes that such deliberate criminal or deliberate fraudulent act was committed;

[Id.]. The crime to which Crowley pleaded guilty cannot have been anything other than "deliberate," because intent is an element of a criminal antitrust offense. *United States v. United States Gypsum Co.*, 438 U.S. 422 (1987). Exclusion 4(c) now precludes all coverage for Crowley, because Crowley's guilty plea is a final adjudication that Crowley engaged in deliberate criminal acts.[9] *Herley Industries, Inc. v. Federal Insurance Cos., Inc.*, 2009 WL

---

[9] No individual Insured Persons have yet pleaded guilty to criminal conduct. However, that is irrelevant to the present disputed. Crowley is the party seeking coverage under Insuring Agreement B(ii). Crowley *has* pleaded

2596072 at *10 (E.D.Pa.) (coverage precluded, because insured's guilty plea is conclusive evidence that insured engaged in criminal acts).

Numerous cases hold that the insured's guilty plea to criminal charges acts as a "final adjudication" for purposes of similar exclusions. *Continental Casualty Co. v. Kriz*, 2011 WL 1213978 (D.Conn.) (insured's guilty plea implicates dishonesty exclusion in policy); *First National Bank Holding Co. v. Fidelity and Deposit Company of Maryland*, 885 F.Supp. 1533 (N.D.Fla. 1995) (argument that guilty plea is not a "final adjudication" for insurance coverage purposes is frivolous). The Policy further provides in Section 8 as follows:

> Such advance payments by the Insurer shall be repaid to the
> Insurer by each and every Insured or Organization, severally
> according to their respective interests, in the event and to the extent
> that any such Insured or Organization shall not be entitled under
> this policy to payment of such Loss.

Accordingly, even if National Union had advanced Defense Costs in 2008, it would now be entitled to get the money back. *Farkas v. National Union Fire Insurance Company of Pittsburgh, Pa.*, 2012 WL 966577 (E.D.Va.).

## IV.    Conclusion

For the reasons stated herein, the panel should enter an award determining that Crowley is entitled to recover nothing in this arbitration. The Policy language is clear and unambiguous and the facts are undisputed. The materials which Crowley submitted to National Union did not constitute a Claim as defined in the Policy and, in any event, Crowley has admitted that it engaged in intentional criminal acts in violation of the antitrust laws. In these circumstances, there is no basis on which Crowley can prevail in this proceeding.

---

guilty to a crime. It is Crowley's own guilty plea, establishing that *Crowley* was guilty of a crime, which precludes coverage for Crowley.

NATIONAL UNION FIRE INSURANCE
COMPANY OF PITTSBURGH, PA.,

By its attorneys,

Michael P. Duffy
PEABODY & ARNOLD LLP
600 Atlantic Avenue
Boston, MA 02210
617-951-2100

775805_2

# Doc. 36-9

# EXHIBIT H

Case 3:16-cv-01011-TJC-JBT   Document 36-9   Filed 04/17/17   Page 2 of 37 PageID 509

HEARING Vol. 2 Confidential                    December 10, 2012
CROWLEY vs. NATIONAL FIRE INSURANCE

Page 180

CONFIDENTIAL

AMERICAN ARBITRATION ASSOCIATION

CASE TYPE:  33 195 Y 00084 12


CROWLEY MARITIME CORPORATION                    VOLUME 2

and

NATIONAL FIRE INSURANCE COMPANY OF PITTSBURGH, P.A.


-----------------------------------------------------------


HEARING (CONTINUING) BEFORE

THE HONORABLE KENNETH BELL,

(Pages 180 - 309)

Monday, December 10, 2012

8:35 a.m. - 4:48 p.m.


at


Carlton Fields, P.A.

450 South Orange Avenue

Suite 500

Orlando, Florida  32801


Reported By:

Richard Castillo

Certified LiveNote Reporter

Notary Public, State of Florida

Esquire Deposition Solutions

Orlando Office Job No. 337330

Phone - (407)426-7676

Page 181

1                        APPEARANCES

2    ARBITRATOR STEVE BRODIE

3    ARBITRATOR TERRY WHITE

4    CHARLES M. TRIPPE, ESQUIRE
     Moseley Prichard Parrish Knight & Jones
5    501 West Bay Street
     Jacksonville, Florida  32202
6
     JOHN D. SHUGRUE, ESQUIRE
7    EMILY E. GARRISON, ESQUIRE
     Reed Smith, LLP
8    10 South Wacker Drive
     Chicago, IL  60606-7507
9
     MICHAEL P. DUFFY, ESQUIRE
10   TIFFANY NGEO, ESQUIRE
     Peabody & Arnold, LLP
11   600 Atlantic Avenue
     Federal Reserve Plaza
12   Boston, MA  02210-2261

13   ALSO PRESENT:

14   ART MEAD, ESQUIRE
     STEVE FICON
15   THOMAS NEWMAN
     PORTER SESNON
16   GEOFFREY FALLON

17

18

19

20

21

22

23

24

25

Page 182

1            PROCEEDINGS HELD ON DECEMBER 10, 2012

2                        I N D E X

3    TESTIMONY OF STEVEN FICON

4        Cross-Examination by Mr. Duffy                    183

         Redirect Examination by Mr. Trippe               225

5

6    TESTIMONY OF GEOFFREY FALLON, ESQUIRE

7        Direct Examination by Mr. Shugrue                229

         Cross-Examination by Mr. Duffy                    302

8        Redirect Examination by Mr. Shugrue              308

9    Court Reporter's Certificate                          *

10

11                    - - - - -

12   NOTE 1:  Ellipses (...) used to reflect pauses between
              words.

13

     NOTE 2:  "(Nods)" can mean either yes or no.

14

15

16

17

18

19

20

21

22

23

24

25

Page 197

1    proceedings may be commenced?

2         A    I don't think you're going to find those

3    exact words in the search warrant.

4         Q    And it doesn't say that anybody else is a

5    person against whom proceedings may be commenced,

6    either, does it?

7         A    Again, I don't think you're going to find

8    those exacts words, but those individuals have been

9    identified in writing ... and ... it's clear -- I

10   think it's clear to any reasonable person, that they

11   are the focus of a criminal investigation, and there

12   is a possibility, sometime in the future, that

13   proceedings may be commenced against them.

14        ARBITRATOR BELL:  May I ask a question to

15        counsel for a second?

16        MR. DUFFY:  Sure.

17        ARBITRATOR BELL:  Having been a judge

18        before the -- search warrants are based on

19        affidavits presented by law enforcement.

20        Has anybody received or gotten a copy?  I

21        would assume Crowley would have gotten it.

22        MR. DUFFY:  My understanding is that the

23        affidavit is still under seal.

24        MR. SHUGRUE:  The affidavit remains under

25        seal.

Page 198

1          ARBITRATOR BELL:  The affidavit is?  You

2     mentioned charges.

3          MR. SHUGRUE:  Until a document is issued,

4     it remains under seal.  So ....

5          ARBITRATOR BELL:  Yeah, but there was an

6     indictment.  And Crowley's pled, right.

7          MR. SHUGRUE:  No indictment of the -- no

8     indictment of -- actually, no indictment of

9     anyone or anything.  No indictment of these

10    individuals.

11         ARBITRATOR BELL:  But as to Crowley --

12         MR. SHUGRUE:  Crowley was not --

13         ARBITRATOR BELL:  Was not indicted?

14         MR. DUFFY:  Crowley pleaded guilty based

15    on an information, and it was never an

16    indictment issued after grand jury, is my

17    understanding.

18         ARBITRATOR BELL:  So nobody's seen the

19    affidavit?

20         MR. TRIPPE:  Well, no one associated with

21    Crowley has seen it.

22         ARBITRATOR BELL:  That's what I meant.

23         MR. DUFFY:  And no one associated with --

24         ARBITRATOR WHITE:  It's both sides'

25    understanding that they do remain sealed.  You

Case 3:16-cv-01011-TJC-JBT Document 36-9 Filed 04/17/17 Page 7 of 37 PageID 514

HEARING VOLUME 3 CONFIDENTIAL                    December 11, 2012
CROWLEY MARITIME CORP vs. NATL FIRE INS CO

CONFIDENTIAL

AMERICAN ARBITRATION ASSOCIATION
CASE TYPE:  33 195 Y 00084 12


CROWLEY MARITIME CORPORATION                    VOLUME 3

and

NATIONAL FIRE INSURANCE COMPANY OF PITTSBURGH, P.A.


-------------------------------------------------------------


HEARING BEFORE

TERRENCE M. WHITE, STEVEN BRODIE, HONORABLE KENNETH BELL,

(Pages 310 - 493)

Tuesday, December 11, 2012
8:32 a.m. - 5:09 p.m.

at

Carlton Fields, P.A.
450 South Orange Avenue
Suite 500
Orlando, Florida  32801


Reported By:
Richard Castillo
Certified LiveNote Reporter
Notary Public, State of Florida
Esquire Deposition Solutions
Orlando Office Job No. 337338
Phone - (407)426-7676

HEARING VOLUME 3 CONFIDENTIAL
CROWLEY MARITIME CORP vs. NATL FIRE INS CO

December 11, 2012

Page 311

```
 1                    APPEARANCES

 2   CHARLES M. TRIPPE, ESQUIRE
     Moseley Prichard Parrish Knight & Jones
 3   501 West Bay Street
     Jacksonville, Florida  32202
 4
     JOHN D. SHUGRUE, ESQUIRE
 5   EMILY E. GARRISON, ESQUIRE
     Reed Smith, LLP
 6   10 South Wacker Drive
     Chicago, IL  60606-7507
 7
     MICHAEL P. DUFFY, ESQUIRE
 8   TIFFANY NGEO, ESQUIRE
     Peabody & Arnold, LLP
 9   600 Atlantic Avenue
     Federal Reserve Plaza
10   Boston, MA  02210-2261

11   ALSO PRESENT:

12   ART MEAD, ESQUIRE
     STEVE FICON
13   THOMAS NEWMAN
     PORTER SESNON
14   GEOFFREY FALLON

15

16

17

18

19

20

21

22

23

24

25
```

HEARING VOLUME 3 CONFIDENTIAL
CROWLEY MARITIME CORP vs. NATL FIRE INS CO

December 11, 2012

Page 312

1          PROCEEDINGS HELD ON DECEMBER 11, 2012

2                    I N D E X

3    TESTIMONY OF WILLIAM JUNG, ESQUIRE

4        Direct Examination by Mr. Shugrue          314
         Cross-Examination by Mr. Duffy            439
5        Redirect Examination by Mr. Shugrue       463
         Recross Examination by Mr. Duffy          487
6        Further Redirect Examination by Mr. Shugrue   490

7

     Court Reporter's Certificate                 493
8

9                    - - - - -

10   NOTE 1:  Ellipses (...) used to reflect pauses between
              words.
11
     NOTE 2:  "(Nods)" can mean either yes or no.
12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 362

1   conspiracy, especially one of these Sherman Act,

2   you're fixing prices, you're not going to clue in

3   non-participants.

4           So, what they wanted was just to prove a

5   tacit agreement.  We don't need a contract signed

6   with a client.  The agreement alone is the crime.

7   So what they're saying here --

8           MR. DUFFY:  No, I object.  There's a lot

9       of speculation here about what might have been

10      going on, and the document speaks for itself.

11      (Pause.)

12      (Arbitrators confer.)

13          MR. SHUGRUE:  The document is a search

14      warrant.  Mr. Jung is an expert who has

15      experience with search warrants.  The search

16      warrant --

17          ARBITRATOR BELL:  That's my question.

18      Having not seen the affidavit, I mean, I think

19      there's some implications, given your

20      background and experience that I may not

21      necessarily disagree with, having signed a

22      bunch of these things.  But without the

23      absence -- I mean, without the affidavit and

24      without, you know, the understanding, aren't

25      you -- and the subsequent knowledge of what it

Page 363

1      may have been charged by Crowley and other

2      defendants ... you don't really know what was

3      being charged.  There's nothing in this

4      document that says, "conspiracy."

5              THE WITNESS:  Oh, no.

6              ARBITRATOR BELL:  This is simply a search

7      warrant.

8              THE WITNESS:  Yes, sir.  But we know what

9      they're looking at.

10             ARBITRATOR BELL:  Right.

11             THE WITNESS:  I think from -- I think we

12     absolutely know that they're looking at pricing

13     in the Puerto Rican trade, because the

14     magistrate edited this and limits it to pricing

15     documents in the Puerto Rican trade regarding

16     coastal freight transportation services between

17     the U.S. and Puerto Rico.

18             ARBITRATOR BELL:  Right.

19             THE WITNESS:   So we know exactly what

20     they're looking for, is the Puerto Rican trade.

21     Okay.  So we know they're looking for that.

22     And we know that the four people at Crowley

23     that are involved in pricing the Puerto Rican

24     trade are Grune, Farmer, Kelly, and Lusis.  So

25     we know pretty much what they're looking at.

Page 488

1    probable cause that he might have a price list in

2    his possession, correct?

3         A    They could.  I'm not going to agree with

4    your facts, but that's possible.

5         Q    Okay.  And they do not have to show

6    probable cause that Mr. Kelly is guilty of a crime,

7    do they?

8         A    No.  Only that he --

9         Q    Yeah.

10        A    Let me finish.

11             No.  Only that he possessed

12   communications ... I'll just leave it at no.

13        Q    Does he have to have communications in his

14   possession, or does he have to have some other

15   Crowley business records?

16        A    Right.  The answer is no to your question.

17        Q    All right.  So, in order to get a search

18   warrant from Mr. Kelly's records, they would have to

19   show probable cause that he has, in his possession,

20   documents related to Crowley's pricing practices?

21        A    That could be a grounds for a search

22   warrant if those were evidence of a felony.

23        Q    Okay.  And you don't know exactly what it

24   says in the affidavit Mr. Kelly had in his

25   possession, do you?

Page 489

1          A      You don't know that.

2          Q      And there is no legal requirement that in

3      order to get a search warrant for documents in

4      Mr. Kelly's possession, they have to show any

5      evidence that Mr. Kelly was personally guilty of a

6      crime?

7          A      Only that he possessed evidence of

8      felonies.

9          Q      Right.  And there might be evidence of

10     felonies committed by somebody else?

11         A      It might be.  "Might" and "may" are the

12     verbs, and it may be that, yes.

13         Q      And that's equally true for all four

14     people named in the search warrant, correct?

15         A      Again, if I look at this page, I can come

16     close to agreeing with that.  If we look at the true

17     facts of what happened that day, the answer is, no.

18         Q      Okay.  Well, let's look at the body of the

19     search warrant.

20         A      Okay.  To answer your question, it could

21     be.  It could be.  It may be that they established

22     in the affidavit that Grune possessed records

23     innocently.  That is possible.  And they were

24     evidence of the conspiracy.  That is extraordinarily

25     unlikely, even based on the face of this warrant.

Case 3:16-cv-01011-TJC-JBT   Document 36-9   Filed 04/17/17   Page 14 of 37 PageID 521

HEARING VOLUME 4 CONFIDENTIAL                    December 11, 2012
CROWLEY MARITIME CORP vs. NATL FIRE INS CO

Page 494

CONFIDENTIAL

AMERICAN ARBITRATION ASSOCIATION
CASE TYPE:  33 195 Y 00084 12

CROWLEY MARITIME CORPORATION                    VOLUME 4

and

NATIONAL FIRE INSURANCE COMPANY OF PITTSBURGH, P.A.

-------------------------------------------------------------

HEARING BEFORE

THE HONORABLE KENNETH BELL,

(Pages 494 - 667)

Tuesday, December 11, 2012
8:32 a.m. - 5:09 p.m.

at

Carlton Fields, P.A.
450 South Orange Avenue
Suite 500
Orlando, Florida  32801

Reported By:
Richard Castillo
Certified LiveNote Reporter
Notary Public, State of Florida
Esquire Deposition Solutions
Orlando Office Job No. 337338
Phone - (407)426-7676

Case 3:16-cv-01011-TJC-JBT  Document 36-9  Filed 04/17/17  Page 15 of 37 PageID 522

HEARING VOLUME 4 CONFIDENTIAL                    December 11, 2012
CROWLEY MARITIME CORP vs. NATL FIRE INS CO

Page 495

1                        APPEARANCES

2       ARBITRATOR STEVE BRODIE

3       ARBITRATOR TERRY WHITE

4       CHARLES M. TRIPPE, ESQUIRE
        Moseley Prichard Parrish Knight & Jones
5       501 West Bay Street
        Jacksonville, Florida  32202
6
        JOHN D. SHUGRUE, ESQUIRE
7       EMILY E. GARRISON, ESQUIRE
        Reed Smith, LLP
8       10 South Wacker Drive
        Chicago, IL  60606-7507
9
        MICHAEL P. DUFFY, ESQUIRE
10      TIFFANY NGEO, ESQUIRE
        Peabody & Arnold, LLP
11      600 Atlantic Avenue
        Federal Reserve Plaza
12      Boston, MA  02210-2261

13      ALSO PRESENT:

14      ART MEAD, ESQUIRE
        STEVE FICON
15      THOMAS NEWMAN
        PORTER SESNON
16      GEOFFREY FALLON

17

18

19

20

21

22

23

24

25

HEARING VOLUME 4 CONFIDENTIAL

CROWLEY MARITIME CORP vs. NATL FIRE INS CO

December 11, 2012

Page 496

1        PROCEEDINGS HELD ON DECEMBER 11, 2012

2              I N D E X

3   TESTIMONY OF THOMAS R. NEWMAN, ESQUIRE

4        Direct Examination by Mr. Duffy            497
         Cross-Examination by Mr. Shugrue           513
5        Redirect Examination by Mr. Duffy          524
         Recross Examination by Mr. Shugrue         525
6        Further Redirect Examination by Mr. Duffy  527
         Further Recross Examination by Mr. Shugrue 528

7

8   TESTIMONY OF RICHARD SHARPSTEIN, ESQUIRE

9        Direct Examination by Mr. Duffy            531
         Cross-Examination by Mr. Trippe            541

10

11  CLOSING ARGUMENT by Mr. Shugrue                 573

12  CLOSING ARGUMENT by Mr. Duffy                   622

13  CLOSING ARGUMENT IN REBUTTAL by Mr. Shugrue     647

14

15  Court Reporter's Certificate                    667

16

17                  - - - - -

18  NOTE 1:  Ellipses (...) used to reflect pauses between
             words.

19
    NOTE 2:  "(Nods)" can mean either yes or no.

20

21

22

23

24

25

Page 536

1    who may have engaged in a crime?

2        A    Absolutely not.  Evidence is gathered, and

3    particularly in white-collar criminal cases, in a

4    very vast manner, meaning that corporations who are

5    the subject of a search, or their locations that are

6    subject to a search, are open to, depending on the

7    judge's limitations, the warrant's limitation, but

8    nevertheless, a broad range of information is sought

9    and gathered.

10            This is the beginning of an investigation.

11   There may be some ... some idea that the prosecutor

12   or the agents have as to what criminal activity they

13   believe is afoot, but they are gathering evidence

14   from any number of people.

15            A lot of individuals at corporations

16   maintain information that might be relevant to an

17   investigation, but by no means identifies them as

18   either a person who may be charged, a subject, a

19   target, but may just merely possess evidence that

20   they are interested in.

21       Q    By the way, have you ever seen the

22   affidavit in this case?

23       A    Never seen the affidavit, and from what I

24   understand from Mr. Jung's report, neither did he,

25   which would be -- which would give information that

Page 537

1   the -- privy to the -- that the magistrate was privy

2   to before he signed the warrant, and would give a

3   lot more information as to what the government had

4   in mind when they drafted the affidavit, and what

5   they were seeking.  But I haven't seen it, and I

6   understand it doesn't -- it is not available.

7       Q    Now, did you hear Mr. Young testify

8   earlier that, in his experience, official target

9   letters are issued less than half of the time?

10      A    Well, I think -- I did hear that

11  testimony, yes.

12      Q    And would you agree with that?

13      A    In my experience, official target letters,

14  I would say, and I think I estimated, when I gave my

15  deposition, about 25 to 50 percent of the time, in

16  my cases.

17           However, a target letter ... a formal

18  target letter is used by some U.S. Attorney's

19  Offices more than others.  However, there's often

20  communication between a target and a lawyer in some

21  other form other than a target letter.

22      Q    Are you familiar with what we referred to

23  as the U.S. Attorney Manual?

24      A    Yes, I am.

25      Q    Can you tell us generally what that is?

HEARING VOLUME 4 CONFIDENTIAL
CROWLEY MARITIME CORP vs. NATL FIRE INS CO

December 11, 2012

Page 538

1      A    Well, we, as defense lawyers possess it to

2  review the practices and procedures and to

3  challenge, from time to time, whether or not the

4  United States attorneys followed their own

5  guidelines.

6           As Mr. Jung said, it's a set of guidelines

7  that sets out practices and procedures that are

8  recommended to be followed by the U.S. Attorney's

9  Office, and generally are.

10           And, from time to time, that's brought up

11  in the course of writing a brief or trying to inform

12  a court as to a violation of ... either ethical or

13  practical guidelines, or some challenge that we

14  might make to a U.S. Attorney in some form of action

15  or inaction taken by them.

16      Q    And is there anything in the U.S. Attorney

17  Manual which was relevant to your opinion?

18      A    Well, I think, as to the search warrant,

19  not in particular, but I was also asked to opine

20  about a subpoena that was issued to Mr. Farmer

21  contemporaneous -- maybe not on the same day, but in

22  and around the same time as the search warrant.

23           And it was my opinion that the service of

24  the subpoena certainly was not a letter or a

25  document from an authority ... in writing, that a

HEARING VOLUME 4 CONFIDENTIAL

December 11, 2012

CROWLEY MARITIME CORP vs. NATL FIRE INS CO

Page 539

1   person may be charged with a crime.  In fact, my

2   opinion was the opposite.  Because, first of all,

3   practically, in my own experience, generally, I

4   would say, if ever.  I've never myself seen it,

5   where someone who they anticipate charging a target,

6   is given a bald grand-jury subpoena on the day of a

7   search warrant.  And that's my practice.

8          It's confirmed by the U.S. Attorney's

9   Manual, where they inform the U.S. Attorneys that,

10  on a regular basis, they are not to subpoena a

11  target, because of the confusion and the ... the

12  misapprehension that might occur, plus they don't

13  like to ... and they're told in their own manual to

14  identify targets early, to identify individuals they

15  may charge early, to reveal their strategy.  There's

16  absolutely no reason for it, because it -- as

17  Mr. Jung said, but it's my opinion, that someone

18  that you serve a subpoena with, and he's a target,

19  is just going to get a lawyer and take the Fifth

20  Amendment, anyway.

21          But -- so there must have been some other

22  reason here, although I'm not privy to it, why a

23  subpoena was issued to Mr. Farmer.  And that would

24  be to gather evidence or information from him.

25          And all of the sections dealing with

HEARING VOLUME 4 CONFIDENTIAL

December 11, 2012

CROWLEY MARITIME CORP vs. NATL FIRE INS CO

Page 540

1   subpoenaing a target and recommending that when you

2   do subpoena a target, that an Advise of Rights form

3   is attached and/or they prefer their -- their

4   recommended procedure is that a target letter be

5   written, and that a voluntary -- and attempting to

6   get the individual to come voluntarily, because that

7   person would have to waive his rights to immunity,

8   or waive his -- waive immunity and testify against

9   his own Fifth Amendment rights.

10      Q    Add, in your practice, had you had

11  experience in cases where that, in fact, happens?

12  In other words, the U.S. Attorney will contact you

13  in order to seek your client's voluntary

14  testimony --

15      A    Yes.

16      Q    -- rather than issuing a subpoena?

17      A    That is the regular procedure that occurs

18  on -- in my practice that I have for three -- 30

19  years now.

20      Q    And that is with respect to people who are

21  targets of the investigation?

22      A    Yes, targets.  Subjects or targets as

23  opposed to witnesses.  Witnesses are subpoenaed.

24  Targets are either invited, or a lawyer is called.

25      Q    And Mr. Sharpstein, if you have -- I may

Page 541

1   interrupted you.  Did you finish your explanation of

2   the basis for your opinion, or is there anything

3   else you wanted to add?

4        A     Well, the search warrant -- without having

5   an affidavit, the search warrant is a very ... broad

6   investigative tool.  And in no way, on the face of

7   this warrant, does it identify the crimes, the

8   philosophy, the charge, the strategy, of the U.S.

9   attorney in this matter.  They're looking to gather

10  evidence, and without speculating or without having

11  any privy review of the affidavit, I would have no

12  ability to comment further than what the face of the

13  affidavit is, what the face of the warrant is to

14  search Crowley Marine and gather certain documents.

15          MR. DUFFY:  I have nothing further.  Thank

16      you.

17                   CROSS-EXAMINATION

18  BY MR. TRIPPE:

19       Q    Mr. Sharpstein, would you agree with me

20  that the -- the key language here, the language that

21  you focused on in the insurance -- and you were

22  provided the insurance policy, right?

23       A    Yes, I was, the relevant portions that --

24       Q    Okay.

25       A    -- to my opinion.

HEARING VOLUME 4 CONFIDENTIAL
CROWLEY MARITIME CORP vs. NATL FIRE INS CO

December 11, 2012

Page 622

1    and materials that have been submitted with

2    respect to him.  So we would ask the panel to

3    grant the relief that Crowley has requested.

4    We thank the panel for your time, appreciate

5    your efforts, and would, as I said, reserve

6    perhaps a smidgen of time for rebuttal if the

7    panel would permit.

8        ARBITRATOR BELL:   Agreed.  Thank you.

9        Mr. Duffy.

10               CLOSING STATEMENT

11       MR. DUFFY:  I will be brief.  I think

12   we've already argued this case extensively.  We

13   gave long openings.  We filed extensive briefs.

14   I'm not going to try to repeat everything that

15   we've said in the briefs.  I don't think that

16   would be productive, but I just want to sum up

17   the main points to focus the panel's attention

18   on what I think are really the key issues after

19   we've heard all of testimony over the course of

20   two days.

21       And the key issue here, the most important

22   issue here, is the fact that the search warrant

23   and the subpoenas submitted to National Union

24   in 2008, do not constitute a claim as defined

25   in the policy.  And that is because, in order

Page 623

1    to be a claim, there has to be something in

2    writing from the government which identifies

3    specific individuals as persons who may be

4    charged, or as persons against whom a

5    proceeding may be commenced.  And the search

6    warrant and the subpoenas do not do that.

7    Their writings, they speak for themselves.

8    They don't say anywhere in either document,

9    these are people who may be charged.

10         I asked Mr. Ficon and Mr. Jung both, is

11   there anything in the search warrant which says

12   that these people may be charged?  The answer

13   is, well, no, it doesn't actually say that.

14         We asked the same question about the

15   subpoenas.  Is there anything in the subpoena

16   which says that these people may be charged and

17   the answer was, well, no, it doesn't actually

18   say that.

19         It's undisputed that it doesn't say it,

20   because it speaks for itself and it says what

21   it says.  And the language just is not there.

22         Crowley actually is the one who is trying

23   to rewrite the policy, because Crowley is

24   trying to make the policy cover an

25   investigation whenever they think somebody

Page 624

1   might be indicted.  But that's not the

2   standard.  The standard is, there has to be a

3   document from the government which identifies

4   him as a person who may be indicted.  And that

5   could be a target letter, it could be something

6   else, but it's not what we have here.  It's not

7   a subpoena, and it's not a search warrant.

8        The search warrant and the subpoena

9   identified them as people who may have relevant

10   information, but on the face of the document,

11   that is all it says, and that's all -- that is

12   all that it does.

13        Now, we know that there must have been an

14   affidavit of some sort issued in order to get

15   the search warrant issued, but we don't have

16   the affidavit.  Nobody here knows what it says.

17   To the extent Mr. Jung is testifying about what

18   he thinks the document, the affidavit says,

19   he's speculating.  He's never seen the

20   affidavit, and he doesn't know what it says.

21   And he made a couple of very important

22   admissions in his testimony.

23        In order to get the affidavit, you have to

24   establish probable cause to believe that

25   evidence of a crime will be found at a

Page 625

1    particular place.  You do not have to show, in

2    order to get a search warrant, that the person

3    whose records are being seized is the one who

4    committed the crime.  Mr. Jung admits that.

5        Mr. Jung also admits, well, maybe some of

6    these people just innocently hold records.

7    Yes, it's not a secretary.  It's not our keeper

8    of the records.  But there's nothing in the

9    document which says, who is the person that

10   they think committed the crime.  That would

11   only be in the affidavit.  And we don't have

12   the affidavit.  If the evidence of a crime

13   exists in their pricing documents and so forth,

14   they could subpoena those records from any

15   corporate official who is likely to have

16   pricing documents in his possession, because

17   those documents are the evidence of a crime, if

18   there is evidence of a crime.

19       The fact that they have those documents in

20   their possession has nothing to do with who is

21   guilty of the crime.  In fact, they easily

22   could subpoena people that they think are

23   completely innocent because they're the ones

24   that are most likely to keep all the records.

25   I mean, nobody knows what the thought process

Page 626

1    is.  I'm not trying to say that's what

2    happened.  What I'm saying is that nobody knows

3    what the government's thought process is,

4    because nobody has seen the evidence.  And it

5    does not say in the search warrant what the

6    government's thought process is.

7         We know that the Government is authorized

8    to obtain records from these four people.  We

9    don't know why.

10        We know maybe that the Government thought

11   these records might have evidence of a crime,

12   but we don't know whose crime we're talking

13   about, because the document doesn't say.

14        And that is really the fatal problem here

15   in arguing that the search warrant is a claim.

16   The search warrant does not say -- and there's

17   no way to know, without seeing the affidavit,

18   whether the government viewed any of these

19   people as individuals who might be the subject

20   of future criminal proceedings.

21        And that's the issue.  The issue is, what

22   do these documents in 2008 say?  Whether or

23   not, three years later, the government is

24   thinking of indicting Mr. Farmer, is

25   interesting, but it has nothing to do with

Page 627

1         whether or not the document, in 2008,

2         identified him as a person who might be

3         charged.

4              The document, in 2008, simply does not do

5         that.  We're not saying that, under the policy,

6         there has to be some sort of magic word.  We're

7         not saying that.  We're not saying that only a

8         target letter can qualify.

9              In fact, I've heard that, for two days

10        now -- and we've looked at the letter from

11        Mr. O'Neal, and it says in the letter, if any

12        of you people receive a target letter or

13        otherwise are identified as persons against

14        whom charges may be brought, please let us

15        know.

16             What it says in the letter or otherwise,

17        it's perfectly clear that National Union is not

18        taking the position that only a target letter

19        from the DOJ, designated as a target letter, is

20        sufficient to implicate coverage.

21             Crowley has invested a lot of energy in

22        trying to disprove an argument that we're not

23        even making.  The point, as I said in the

24        opening, is not that only a target letter will

25        suffice.  Clearly, a target letter will

Page 628

1    suffice.

2         And so it's legitimate to ask, did anybody

3    get a target letter?  And the answer is no.

4         But that is not to say that nothing else

5    could possibly do it.  You could hypothetize

6    various writings which might qualify.  That's

7    irrelevant.  The issue is whether these

8    specific documents that were submitted to

9    National Union in 2008 qualified.  And the

10   answer to that, consistently from National

11   Union, has always been that they do not,

12   because they don't identify as a person who may

13   be charged.

14        We've heard Mr. Jung admit -- we heard

15   Mr. Sharpstein say very clearly that, in their

16   experience, these documents do not identify

17   anybody as a person who may charged, because

18   it's common to use the search warrant as an

19   investigative device to find out who you want

20   to charge.

21        And the fact that you're named in the

22   search warrant doesn't mean that you're the

23   person they're thinking about charging.  You

24   may have evidence in your files, you may have

25   not.  It doesn't have to be about you.  It's an

Page 653

1      which the charges are being initiated.  They

2      have to submit an affidavit.  An affidavit is a

3      writing.

4           The regrettable thing, in part, about this

5      case is, the damn thing is under seal.  If that

6      thing were not under seal, we would be having a

7      very interesting discussion about what it

8      shows, or doesn't show.

9           But we know that any search warrant

10     requires an affidavit.  And the affidavit

11     provides those facts which then are included in

12     the search warrant to the extent the court

13     deems them appropriate.  Is that correct?

14          MR. SHUGRUE:  Yes.  Yes.  All correct.

15          So we know that there is this other

16     writing that, unfortunately, we don't have, we

17     can't --

18          ARBITRATOR WHITE:  But there's not a

19     requirement that that writing be delivered to

20     the insured, nor is there a requirement that

21     that writing be delivered to the insurance

22     company.  It's not a notification.  It's not a

23     letter.  It's not a Well's letter; doesn't have

24     to be delivered.  It must exist.  And we

25     cannot -- we cannot have a search warrant

Page 654

1    without a writing.

2            ARBITRATOR BRODIE:  That makes no sense.

3            ARBITRATOR WHITE:  Well, everybody -- I

4    can bring some people back that will tell you

5    you'll get a search warrant without a writing.

6            ARBITRATOR BRODIE:  No, I agree, but you

7    need to -- there needs to be a writing by an

8    investigative authority as a person against

9    whom a proceeding described in definition B-2,

10   may be commenced.  Okay.  So, the fact that you

11   said there's a writing but no one knows what it

12   says or --

13           ARBITRATOR WHITE:  You know, we -- culled

14   from that are these very specific items that

15   then are placed inside of it, and were drafted

16   by -- the typed versions were drafted by that

17   same agency that submitted the affidavits to

18   ostensibly support it.

19           MR. SHUGRUE:  Right.  And, as Mr. Jung

20   said again, we don't -- we do not know -- we

21   don't have the affidavit itself, but the

22   information that is actually set forth in the

23   search warrant, the results of the showing of

24   probable cause, that which the Court said, yes,

25   you may go forward with the search and look for

HEARING VOLUME 4 CONFIDENTIAL
CROWLEY MARITIME CORP vs. NATL FIRE INS CO

December 11, 2012

Page 655

1    these documents in the possession of these

2    people, we can certainly draw reasonable

3    conclusions about what the contents of the

4    affidavit had to be in order to support the

5    issuance of the search.

6         And it's not at all a stretch, for

7    example, to say, well, the affidavit must have

8    said something about these four individuals.

9    It must have identified Farmer, Grune, Kelly,

10   and Lusis.

11        ARBITRATOR BRODIE:  Wouldn't anyone in a

12   search warrant that has their name have to be

13   based upon an affidavit?

14        MR. SHUGRUE:  Any search warrant has to be

15   issued based on a showing of probable cause.

16        ARBITRATOR BRODIE:  But if you're going to

17   indemnify someone whose documents you're

18   searching, according to what you said, Terry --

19        ARBITRATOR WHITE:  No.  I'd do the same

20   thing that the witness said.  Not always, but

21   sometimes you have to look at the specific

22   document.  And in this particular case, if it's

23   Susie Jones who happens to be, you know, not a

24   management, not a whatever, not a whatever, and

25   there's no other name but two other companies

Page 656

1       that are sitting in here, they're dealing with

2       twice this one, I think could be worthless.

3       Doesn't tell me a damn thing.  I couldn't infer

4       anything beyond it.  She may be the custodian.

5       But when this thing talks about four people by

6       name, talks about another business, talks about

7       price fixing, talks about A, B, and C, that's a

8       horse of a different color.  That stuff didn't

9       just drop out of the sky.  The magistrate

10      couldn't make it up.  He's not allowed to.  It

11      had to come from an affidavit.  And an

12      affidavit is a writing, and the writing comes

13      from the charging agency.

14          MR. DUFFY:  I think the problem is simply

15      this.

16          ARBITRATOR BELL:  Hold on.  Let me ask a

17      question.

18          MR. DUFFY:  I'm sorry.

19          ARBITRATOR BELL:  Burden of proof.  We

20      talked about interpretation, but the question

21      is whether the inference is sufficient from the

22      search warrant that the affidavit identified

23      these four people as persons upon whom a

24      proceeding described in definition B-2 may be

25      commenced, who bears the burden to prove that

Page 657

1          that's what -- 'cause we have conflicting

2          expert opinion.

3               MR. SHUGRUE:  Well, Crowley has to prove,

4          by a preponderance of the evidence, that

5          there's coverage.  In deciding that question,

6          you apply these various rules of policy

7          interpretation and construction of the claim

8          documents.

9               So, Crowley has to prove that it has

10         coverage, but the standard that it has to

11         satisfy in doing so is subject to those rules.

12         So, for example, when looking at the claim

13         documents, the search warrant, and the

14         affidavit that established probable cause for

15         issuance of the search warrant, if there are

16         any doubts about whether those documents are

17         sufficient to satisfy for coverage purposes,

18         the doubts get resolved in favor of Crowley,

19         because this is a defense coverage situation.

20         If there are doubts about whether the -- well,

21         and the definition of claim has to be construed

22         broadly, so when Crowley is proving that there

23         is a claim that is covered by the policy, the

24         definition of "claim" per the -- the settled

25         rules of construction, that definition of claim

Page 658

1   has to be construed broadly and in favor of

2   coverage.  It's not supposed to be construed

3   narrowly to say, for example, well, unless the

4   document uses precisely these exact words, it

5   doesn't count.  That would be a narrow

6   construction of the definition applied.

7        ARBITRATOR BELL:  Well, I think, in my

8   reading of it, what this clause is, is

9   determined when the claim began.  And that's

10  when there's an investigation of the insured

11  persons, and it's again, once that person is

12  identified --

13       MR. SHUGRUE:  Correct.

14       ARBITRATOR BELL:  -- by the investigating

15  authority.

16       MR. SHUGRUE:  Correct.  Once an insured

17  person is identified by the investigating

18  authority in writing as a person against whom a

19  claim may be commenced, then there is a claim

20  and there is coverage.

21       ARBITRATOR BELL:  So I guess that's my

22  question:  Who bears the burden to prove when

23  that happens, that event occurred, timing-wise?

24       MR. SHUGRUE:  Well, again --

25       ARBITRATOR BELL:  Not interpreting policy.

Page 659

1          MR. SHUGRUE:  Crowley has to establish

2     that there's coverage.  Here, the claim that

3     was submitted to National Union, and the claim

4     that we contend is covered that satisfies the

5     definition here, is the search warrant document

6     in combination with the affidavit and the

7     subpoena to Mr. Grune and the seizure of

8     property from the various individuals who were

9     identified in the search warrant.  So there

10    is -- that constitutes the claim.

11         ARBITRATOR WHITE:  The inventory also is

12    an item generated by the investigating agency.

13         MR. SHUGRUE:  Correct.

14         ARBITRATOR WHITE:  That is completed,

15    physically completed by the U.S. Attorney's

16    office or whomever it was that did that.

17         MR. SHUGRUE:  Correct.

18         ARBITRATOR WHITE:  That didn't have a

19    judge intervention.  That's a document created

20    by the investigating agency that indicates the

21    existence of what was taken and what its

22    general nature is.

23         MR. SHUGRUE:  Correct.  And Mr. Ficon

24    advised National Union, at the time he provided

25    the initial notice, that the search warrant had

Page 660

1       been executed and that various computers,

2       files, documents, et cetera, of the four

3       specifically named individuals, in fact had

4       been seized as part of the search warrant and

5       the execution of the search warrant.

6           MR. DUFFY:  I have a couple of things to

7       add.  First of all, the specific answer to your

8       last question, Judge Bell, is this:  Crowley

9       has the burden of proof in establishing

10      coverage.

11          If we're talking about an exclusion, it

12      may be different, but if we're talking about

13      bringing it within the coverage grants, the

14      burden of proof in coverage is on the insured.

15          The problem here is that nobody has seen

16      the affidavit, and nobody knows what it says.

17      And everybody is guessing what they think it

18      says, but nobody knows what it says.  That's

19      the big problem here.

20          ARBITRATOR WHITE:  Do you not believe that

21      the search warrant bears some resemblance to

22      what the written information is, given the fact

23      that there is a typed section that highlights

24      names, dates, places, attachment B.  Attachment

25      B has names, places, et cetera.

**Doc. 36-10**

# EXHIBIT I



UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

IN THE MATTER OF
SEARCH WARRANT FOR:                    CASE NO. 3:08-mj-1092-JRK

CROWLEY LINER SERVICES, INC.           FILED UNDER SEAL
9487 Regency Square Boulevard
Jacksonville, Florida 32225-8126

[PROPOSED] *IN CAMERA*
ORDER TO DISCLOSE SEARCH WARRANT, SEARCH WARRANT
APPLICATION AND AFFIDAVIT, AND RELATED DOCUMENTS

Upon consideration of the United States's Motion to Disclose the Search

Warrant, Search Warrant Application and Affidavit, and Related Documents

("Search Warrant Materials") in the above-captioned matter, it is hereby

ORDERED that:

The United States may provide a copy of the search warrant, search warrant

application and affidavit and inventory or return as applicable for the following:

IN THE MATTER OF SEARCH WARRANT FOR:
CROWLEY LINER SERVICES, INC.
9487 Regency Square Boulevard
Jacksonville, Florida 32225-8126

to counsel for the defendant in *United States v. Thomas Farmer*, Criminal No.

13-162 (JAF) (D.P.R.), (the "Indicted Case") for the sole purpose of preparing a

defense in trying that case.

1

IT IS FURTHER ORDERED that the disclosure of these Search Warrant Materials shall not be discussed, disseminated or disclosed by the defendant or his counsel in the Indicted Case to anyone other than:

(i)  the defendant in the Indicted Case; (ii) the defendant's counsel and staff of the defendant's counsel (such as full time secretaries and attorneys formally associated with the law firm and support services in connection with the maintenance, storage, and copying of the Search Warrant Materials and/or the preparation of summaries, computer databases and other exhibits); and (iii) potential witnesses and individuals who may be retained to provide expert assistance, except upon the express authorization of this Court.  Any individual shown Search Warrant Materials by the United States or defense counsel shall also be shown a copy of this Order and informed that the material is confidential and is to be treated as such. Nothing contained herein shall restrict or prevent any party from offering any materials into evidence or citing any materials in court papers filed in this case.

IT IS FURTHER ORDERED that all Search Warrant Materials, and any copies thereof, disclosed to the defendant or, as permissible hereunder, to third parties by the defendant shall be destroyed or returned to the United States at the end of the litigation of the Indicted Case and all appeals.  If defense counsel elects to destroy any Search Warrant Material rather than return it to the United States, counsel shall certify in writing to the United States that such material has been destroyed.

CROW002724

IT IS FURTHER ORDERED that these materials shall remain sealed after defense counsel have been provided with copies, so that the defendant's right to a fair trial will be protected and the ongoing investigation will not be frustrated.

IT IS FURTHER ORDERED that a copy of this Order will be provided to the United States to use in obtaining copies of the Search Warrant Materials for production to the defendant.

DONE AND ORDERED at Jacksonville, Florida this **29th** day of March, 2013.

_____
The Honorable James R. Klindt
United States Magistrate Judge

Copy to: 3/29/13 mdc
Trial Attorney Jon Jacobs
Assistant United States Attorney (Corsmeier)

3

CROW002725



FILED

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA 2013 MAR 29  AM 9: 45
JACKSONVILLE DIVISION

CLERK, US DISTRICT COURT
MIDDLE DISTRICT OF FL
JACKSONVILLE FLORIDA

IN THE MATTER OF
SEARCH WARRANT FOR:                      CASE NO. 3:08-mj-1092-JRK

FILED UNDER SEAL

CROWLEY LINER SERVICES, INC.
9487 Regency Square Boulevard
Jacksonville, Florida 32225-8126

### UNITED STATES' *IN CAMERA* MOTION TO DISCLOSE SEARCH WARRANT, SEARCH WARRANT APPLICATION AND AFFIDAVIT, AND RELATED DOCUMENTS

The United States of America, by and through the undersigned Trial

Attorneys for the United States Department of Justice, respectfully moves this

Court for an Order allowing the disclosure of the search warrant, application and

affidavit for search warrant, and inventory or return ("Search Warrant Materials")

filed under seal in this matter to the defendant and his counsel in *United States v.*

*Thomas Farmer*, Criminal No. 13-162 (JAF) (D.P.R.) (the "Indicted Case") solely for

use in the preparation of his defense.  The United States seeks to disclose these

documents pursuant to its discovery obligations in the Indicted Case.  The Search

Warrant Materials for CROWLEY LINER SERVICES, INC. were sealed on April

16, 2008.

The United States does not seek broader disclosure of the Search Warrant

Materials and requests that they otherwise remain under seal.  If these documents

are disclosed to the press or general public, the defendant's right to a fair trial, as

well as the rights of other unindicted persons and companies, may well be affected.

CROW002715

Moreover, the investigation that resulted in the Indicted Case is ongoing. Premature disclosure of the Search Warrant Materials to others would frustrate the ongoing investigation.

Accordingly, the United States requests an Order that (i) the persons permitted disclosure of the Search Warrant Materials be limited to the defendant in the Indicted Case; the defendant's counsel; staff of the defendant's counsel, such as full-time secretaries and attorneys formally associated with the law firm and support services in connection with the maintenance, storage, and copying of Search Warrant Materials and/or the preparation of summaries, computer databases and other exhibits; and potential witnesses and individuals who may be retained to provide expert assistance, and (ii) the defendant and his counsel are not to disclose the Search Warrant Materials to any other parties and are required to destroy or return to the United States the Search Warrant Materials at the end of litigation and all appeals in the Indicted Case.

2

Respectfully submitted,

By: _Jon B. Jacobs_

Brent Snyder
Trial Attorney
U.S. Department of Justice
Antitrust Division
San Francisco Field Office
450 Golden Gate Ave, Rm 10-0101
San Francisco, CA 94102

Craig Y. Lee
Jon B. Jacobs
Trial Attorneys
U.S. Department of Justice
Antitrust Division
National Criminal Enforcement Section
450 5th St., NW Suite 11300
Washington, DC 20530
Tel: (202) 307-6694
Fax: (202) 514-6525
Email: jon.jacobs@usdoj.gov

3

CROW002717

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY service by UPS, postage prepaid of two (2) paper copies of the foregoing Appendix of Appellant (Volume II) upon the following clerk of court, this 30th day of May, 2018:

Clerk of Court
U.S. Court of Appeals for the 11th Circuit
56 Forsyth St., N.W.
Atlanta, Georgia 30303

I HERBY CERTIFY that a true and correct copy of the foregoing Appendix of Appellant (Volume II) was filed with the Clerk of Court using the CM/ECF system which will serve a Notice of Docket Activity on this 30th day of May, 2018 to the following:

Michael P. Duffy
Scarlett M. Rajbanshi
Peabody & Arnold, LLP, 6th Floor
600 Atlantic Ave.
Boston, MA 02210-2261
Email: mduffy@peabodyarnold.com
        srajbanshi@peabodyarnold.com

Stephen Hunter Johnson
Jason Benjamin Bloom
Lydecker Diaz
1221 Brickell Ave 19th Flr
Miami, FL 33131-3240
Email: shj@lydeckerdiaz.com
        jbloom@lydeckerdiaz.com

*/s/ Emily E. Garrison*
**Counsel for Appellant**