No. 18-10953-A

## In The United States Court Of Appeals
## For The Eleventh Circuit

## CROWLEY MARITIME CORPORATION

*Plaintiff-Appellant,*

v.

## NATIONAL UNION FIRE INSURANCE
## COMPANY OF PITTSBURGH, PA.,

*Defendant-Appellee.*

On Appeal From The Judgment Of The
United States District Court For The Middle District Of Florida
At Civil Action No. 3:16-cv-01011-TJC-JBT

## APPENDIX OF APPELLANT

## VOLUME III of IV

John D. Shugrue
Thomas A. Marrinson
Emily E. Garrison
REED SMITH LLP
10 South Wacker Drive, 40th Floor
Chicago, IL 60606-7507
Telephone: (312) 207-1000
Facsimile: (312) 207-6400
jshugrue@reedsmith.com
tmarrinson@reedsmith.com
egarrison@reedsmith.com

*Counsel for Plaintiff-Appellant*

# INDEX TO APPELLANT'S APPENDIX

**Document Description**                                    **Docket/ Tab #**

## VOLUME I

Civil Docket Sheet for Case No. 3:16-cv-01011 ..............................     A

Crowley's Complaint .......................................................................     1

Executive and Organization Liability Insurance Policy Number
061-36-48 ........................................................................................     1-1

National Union's Memorandum in Support of its Motion to
Dismiss............................................................................................     16

Crowley's Opposition to National Union's Motion to Dismiss ........     20

Declaration of Steven Ficon in Support of Crowley's Opposition
to National Union's Motion to Dismiss.............................................     20-1

July 22, 2015 Letter from Crowley to National Union (Ex. A to
Doc. 20-1) ........................................................................................     20-2

August 3, 2015 Letter from National Union to Crowley (Ex. B to
Doc. 20-1) ........................................................................................     20-3

Declaration of Emily Garrison in Support of Crowley's
Opposition to National Union's Motion to Dismiss ..........................     20-4

April 24, 2015 Order Denying Thomas Farmer's Motion to
Suppress (Ex. A to Doc. 20-4).........................................................     20-5

Excerpts from the April 24, 2015 Transcript in the Trial of
Thomas Farmer  (Ex. B to Doc. 20-4) ..............................................     20-6

December 6, 2012 Email from E. Garrison to M. Duffy (Ex. I to
Doc. 20-4) ........................................................................................     20-13

Reply of National Union In Support of Its Motion to Dismiss ......... 25

National Union's Answer and Affirmative Defenses ....................... 35

Certificate of Service (Volume I)

## VOLUME II

Crowley's Supplemental Memorandum in Opposition to National
Union's Motion to Dismiss / For Summary Judgment ..................... 36

Declaration of Emily Garrison in Support of Crowley's
Supplemental Memorandum .............................................. 36-1

Search Warrant Affidavit (Ex. A to Doc. 36-1) ................................ 36-2

Excerpts from the March 16, 2017 Deposition of S. Ficon (Ex. B
to Doc. 36-1) ...................................................... 36-3

Expert Witness Report of William F. Jung (Ex. C to Doc. 36-1) ...... 36-4

April 25, 2008 Notice Letter (Ex. D to Doc. 36-1) ........................... 36-5

May 27, 2008 Letter from M. Conboy to S. Ficon (Ex. E to Doc.
36-1) ............................................................. 36-6

Arbitration Decision and Award (Ex. F to Doc. 36-1) ..................... 36-7

National Union's Motion for Summary Disposition in the
Arbitration (Ex. G to Doc. 36-1) ...................................... 36-8

Excerpts from the Transcript of Proceedings in the Arbitration
(Ex. H to Doc. 36-1) .................................................. 36-9

March 29, 2013 Order in *In the Matter of Search Warrant for
Crowley Liner Services Inc.* (Ex. I to Doc. 36-1) .............................. 36-10

Certificate of Service (Volume II)

# VOLUME III

March 5, 2013 Letter from M. Duffy to T. Reed (Ex. J to Doc. 36-1) ..................................................................................... 36-11

December 9, 2011 Order in *In the Matter of Search Warrant for Crowley Liner Services Inc.* (Ex. K to Doc. 36-1)............................. 36-12

National Union's Responses to Crowley's First Set of Requests for Admission (Ex. L to Doc. 36-1).................................................... 36-13

Expert Witness Report of Ty Sagalow (Ex. M to Doc. 36-1)............ 36-14

Expert Witness Report of Thomas R. Newman (Ex. N to Doc. 36-1) ..................................................................................... 36-15

April 16, 2008 Order in *In the Matter of Search Warrant for Crowley Liner Services Inc.* (Ex. P to Doc. 36-1) ............................. 36-17

June 30, 2008 Letter from T. Reed to M. Conboy (Ex. Q to Doc. 36-1) ................................................................................. 36-18

Nov. 26, 2008 Letter from S. Ficon to D. Sweeney (Ex. R to Doc. 36-1) ................................................................................. 36-19

Feb. 2, 2009 Letter from M. Conboy to S. Ficon (Ex. S to Doc. 36-1) ................................................................................. 36-20

Sept. 30, 2009 Letter from S. Ficon to M. Conboy, including attachments (Ex. T to Doc. 36-1)......................................................... 36-21

July 18, 2012 Letter from T. Reed to M. Conboy (Ex. U to Doc. 36-1) ................................................................................. 36-22

May 7, 2008 Email from S. Ficon to E. Conlon (Ex. V to Doc. 36-1) ................................................................................. 36-23

June 30, 2008 Letter from T. Reed to M. Conboy (Ex. W to Doc. 36-1) ................................................................................. 36-24

May 22, 2008 email from E. Conlon to M. Conboy (Ex. X to Doc. 36-1) ........................................ 36-25

June 9, 2010 Letter from E. Joseph O'Neil to C. Dolan (Ex. Y to Doc. 36-1) ........................................ 36-26

Aug. 12, 2010 Letter from E. Joseph O'Neil to S. Ficon (Ex. Z to Doc. 36-1) ........................................ 36-27

Aug. 28, 2012 Letter from M. Duffy to R. Reed (Ex. AA to Doc. 36-1) ........................................ 36-28

Excerpts from the March 3, 2017 Deposition of M. Conboy (Ex. BB to Doc. 36-1) ........................................ 36-29

Excerpts from the March 17, 2017 Deposition of M. Graffeo (Ex. CC to Doc. 36-1) ........................................ 36-30

Oct. 16, 2015 Letter from M. Duffy to T. Reed (Ex. DD to Doc. 36-1) ........................................ 36-31

Certificate of Service (Volume III)

## VOLUME IV

July 22, 2015 Letter from S. Ficon to M. Graffeo (Ex. EE to Doc. 36-1) ........................................ 36-32

Aug. 3, 2015 Letter from M. Graffeo to S. Ficon (Ex. FF to Doc. 36-1) ........................................ 36-33

Aug. 12, 2013 Order from *United States of America v. Thomas Farmer* (Ex. GG to Doc. 36-1) ........................................ 36-34

Excerpts from the March 8, 2017 Deposition of W. Jung (Ex. HH to Doc. 36-1) ........................................ 36-35

National Union's Supplemental Memorandum in Support of its Converted Motion for Summary Judgment ........................................ 37

Crowley's Response to National Union's Supplemental
Memorandum ...................................................................................... 40

Declaration of Emily Garrison in Support of Crowley's Response
to National Union's Supplemental Memorandum ............................. 40-1

Excerpts from the March 14, 2017 Deposition of Ty Sagalow (Ex.
A to Doc. 40-1) ................................................................................... 40-2

National Union's Response to Crowley's Supplemental
Memorandum in Opposition to National Union's Motion for
Summary Judgment............................................................................. 43

Transcript of June 20, 2017 Motion Hearing..................................... 49

February 8, 2018 Order....................................................................... 53

February 9, 2018 Judgment................................................................ 54

Certificate of Service (Volume IV)

# Doc. 36-11

# EXHIBIT J

**PEABODY & ARNOLD** LLP
COUNSELLORS AT LAW

FEDERAL RESERVE PLAZA
600 ATLANTIC AVENUE, BOSTON, MA 02210-2261
(617) 951-2100  FAX (617) 951-2125

BOSTON, MA   PROVIDENCE, RI
MICHAEL P. DUFFY
[617] 951.2002
mduffy@peabodyarnold.com

March 5, 2013

*Via E-Mail and Certified Mail*

Terrance G. Reed
Lankford & Reed, P.L.L.C.
120 N. St. Asaph Street
Alexandria, VA 22314

> Re:  **Insured:**    ***Crowley Maritime Corporation***
>     **Matter:**     ***DOJ/FBI Investigation***
>     **Policy No.:**  ***061-36-48 ("Policy")***
>     **Claim No.:**   ***367-004291***

Dear Mr. Reed:

As you are aware, we represent Chartis Claims, Inc. ("Chartis") and National Union Fire Insurance Company of Pittsburgh, Pa. ("National Union") regarding the above matter. This letter responds to your letter dated February 15, 2013, which we received by facsimile on February 18, 2013. Based on the materials submitted, National Union will treat the Department of Justice Antitrust Division investigation of your client as a Claim under the above Policy as of February 18, 2013, subject to a full and complete reservation of rights. This letter supplements and incorporates by reference all of National Union's prior coverage correspondence.

The above Policy was issued by National Union to Crowley Maritime Corporation with an initial Policy Period of November 1, 2007 to November 1, 2008. Pursuant to Endorsement No. 14, the Named Entity under the Policy was granted a six year Discovery Period in which to report Claims first made during the Discovery Period for Wrongful Acts on or prior to November 1, 2007. Coverage under the Policy is subject to an aggregate Limit of Liability in the amount of $10,000,000 and a self-insured Retention of $500,000 for Loss other than Non-Indemnifiable Loss. Please refer to the Policy for its full terms and conditions.

Your letter of February 15, 2013 encloses a copy of a letter dated February 11, 2013, from Brent Snyder of the Department of Justice Antitrust Division to you and to Mark Rosenblum in your capacities as counsel for Thomas Farmer. In that letter, Mr. Snyder states

NU003891

**PEABODY & ARNOLD** LLP
Terrance G. Reed
March 5, 2013
Page 2

that the government is willing to enter into a plea agreement with Mr. Farmer on specified terms and conditions, including a recommended application of the applicable sentencing guidelines. Mr. Snyder further states that the estimated sentencing guidelines will be reanalyzed with all available evidence in connection with a post-indictment plea or post-conviction sentencing.

It is our understanding that Mr. Farmer qualifies as an Insured Person under the Policy in his capacity as a present or former officer, director or employee of Crowley Maritime Corporation or one of its Subsidiaries as defined in the Policy. Your letter of February 15, 2013 is within the six year Discovery Period granted by Endorsement No. 14. In addition, your letter of February 15, 2013 appears to be related to prior correspondence which was acknowledged by Maureen Conboy as a notice of circumstances under Section 7(c) of the Policy in her May 27, 2008 letter to Steven Ficon at Crowley Maritime Corporation. It is our understanding that the ongoing investigation of Mr. Farmer involves certain conduct prior to November1, 2007. If our understanding as set forth in this paragraph is not correct, please let me know.

Although National Union acknowledges potential coverage for the DOJ investigation of Mr. Farmer, please note that as indicated in my letter of August 28, 2012, Insured Persons such as Mr. Farmer have direct rights under the Policy only pursuant to Insuring Agreement I.A. Coverage is afforded under Insuring Agreement I.A. only in certain circumstances in which the insured Organization fails to indemnify the Insured Person. Please advise as to whether or not Mr. Farmer's legal fees are still being paid by Crowley Maritime Corporation or one of its related entities. To the extent Mr. Farmer's legal fees are paid by Crowley or a related entity, Mr. Farmer would appear to have no Loss and no present right to pursue coverage under the Policy in his own behalf.

National Union reserves all other rights or defenses under the Policy or otherwise. In particular, but without limitation, National Union reserves its rights as to potential application of Exclusion 4(c), which provides that National Union shall not be liable to make any payment for Loss in connection with a Claim against an Insured arising out of, based upon or attributable to the committing of any deliberate criminal act by the Insured if a judgment or final adjudication or an alternative dispute resolution proceeding adverse to the Insured establishes that such deliberate criminal act was committed. Nothing herein is a waiver of any additional rights or defenses available to National Union, including but not limited to potential application of the Definition of Claim, the Definition of Loss, the Definition of Insured, Exclusion 4(a) [profit or advantage], Endorsement No. 24 [Tie-In Limits] and the terms of the applicable Insuring Agreements.

**PEABODY** & **ARNOLD** LLP
Terrance G. Reed
March 5, 2013
Page 3

    I look forward to hearing from you.  If you wish to discuss these issues further or if there are any other materials that you believe National Union should consider in its coverage analysis, please do not hesitate to contact me.

Very truly yours,

Michael P. Duffy

783441 1

NU003893

**Doc. 36-12**

# EXHIBIT K



UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

IN THE MATTER OF
SEARCH WARRANT FOR:

Case No. 3:08-mj-1092-JRK

CROWLEY LINER SERVICES, INC.
9487 Regency Square Boulevard
Jacksonville, Florida 32225-8126

### *IN CAMERA*
### ORDER TO DISCLOSE SEARCH WARRANT, SEARCH WARRANT APPLICATION AND AFFIDAVIT, AND RELATED DOCUMENTS

Before the Court is the United States' *In Camera* Motion to Disclose the Search Warrant, Search Warrant Application and Affidavit, and Related Documents ("Search Warrant Materials") filed in this matter.  Upon consideration, it is hereby:

ORDERED that the United States may provide a copy of the search warrant, search warrant application and affidavit, and inventory or return to counsel for the defendant in <u>United States v. Frank Peake</u>, Criminal No. 11-00512 (D.P.R.) (the "Indicted Case"), for the sole purpose of preparing a defense in that case.

IT IS FURTHER ORDERED that the disclosure of these Search Warrant Materials shall not be discussed, disseminated, or disclosed by the defendant or his counsel in the Indicted Case to anyone other than: (i)  the defendant in the Indicted Case; (ii) the defendant's counsel and staff of the defendant's counsel (such as full time secretaries and attorneys formally associated with the law firm and support services in connection with the maintenance, storage, and copying of the Search Warrant Materials and/or the preparation of summaries, computer databases and other exhibits); and (iii) potential witnesses and individuals who may be retained to provide expert assistance,

except upon the express authorization of this Court.  Any individual shown Search

Warrant Materials by the United States or defense counsel shall also be shown a copy

of this Order and informed that the material is confidential and is to be treated as such.

Nothing contained herein shall restrict or prevent any party from offering any materials

into evidence or citing any materials in court papers filed in this case.

IT IS FURTHER ORDERED that all Search Warrant Materials, and any copies

thereof, disclosed to the defendant or, as permissible hereunder, to third parties by the

defendant shall be destroyed or returned to the United States at the end of the litigation

of the Indicted Case and all appeals.  If defense counsel elects to destroy any Search

Warrant Materials rather than return them to the United States, counsel shall certify in

writing to the United States that such material has been destroyed.

IT IS FURTHER ORDERED that these materials shall remain sealed after

defense counsel has been provided with copies, so that the defendant's right to a fair

trial will be protected and the ongoing investigation will not be compromised.

IT IS FURTHER ORDERED that a copy of this Order shall be provided to the

United States to use in obtaining copies of the Search Warrant Materials for production

to the defendant.

DONE AND ORDERED at Jacksonville, Florida, this _____9th_____ day of December,

2011.


JAMES R. KLINDT
United States Magistrate Judge


2

Copies to:

**Department of Justice (Snyder)**
**U.S. Attorney (Corsmeier)**

CROW002728



# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### JACKSONVILLE DIVISION

IN THE MATTER OF
SEARCH WARRANT FOR:                          CASE NO. 3:08-mj-1092-JRK

                                             FILED UNDER SEAL

CROWLEY LINER SERVICES, INC.
9487 Regency Square Boulevard
Jacksonville, Florida 32225-8126

### UNITED STATES' *IN CAMERA* MOTION
### TO DISCLOSE SEARCH WARRANT, SEARCH WARRANT APPLICATION AND
### AFFIDAVIT, AND RELATED DOCUMENTS

The United States of America, by and through the undersigned Trial Attorneys for the United States Department of Justice, respectfully moves this Court for an Order allowing the disclosure of the search warrant, application and affidavit for search warrant, and inventory or return ("Search Warrant Materials") filed under seal in this matter to the defendant and his counsel in *United States v. Frank Peake*, Criminal No. 11-00512 (D.P.R.) (the "Indicted Case") solely for use in the preparation of his defense. The United States seeks to disclose these documents pursuant to its discovery obligations in the Indicted Case. The Search Warrant Materials for CROWLEY LINER SERVICES, INC. were sealed on April 16, 2008.

The United States does not seek broader disclosure of the Search Warrant Materials and requests that they otherwise remain under seal. If these documents are disclosed to the press or general public, the defendant's right to a fair trial, as well as the rights of other unindicted persons and companies, may well be affected. Moreover, the investigation that resulted in the Indicted Case is ongoing.

Premature disclosure of the Search Warrant Materials to others would frustrate the ongoing investigation.

Accordingly, the United States requests an Order that (i) the persons permitted disclosure of the Search Warrant Materials be limited to the defendant in the Indicted Case; the defendant's counsel; staff of the defendant's counsel, such as full-time secretaries and attorneys formally associated with the law firm and support services in connection with the maintenance, storage, and copying of Search Warrant Materials and/or the preparation of summaries, computer databases and other exhibits; and potential witnesses and individuals who may be retained to provide expert assistance, and (ii) the defendant and his counsel are not to disclose the Search Warrant Materials to any other parties and are required to destroy or return to the United States the Search Warrant Materials at the end of litigation and all appeals in the Indicted Case.

CROW002719

Respectfully submitted,

By:

Brent Snyder
Trial Attorney
U.S. Department of Justice
Antitrust Division
San Francisco Field Office
450 Golden Gate Ave, Rm 10-0101
San Francisco, CA 94102

Craig Y. Lee
Michael L. Whitlock
Trial Attorneys
U.S. Department of Justice
Antitrust Division
National Criminal Enforcement Section
450 5th St., NW Suite 11300
Washington, DC 20530
Tel: (202) 307-6694
Fax: (202) 514-6525
Email: michael.whitlock@usdoj.gov

3

CROW002720

**Doc. 36-13**

# EXHIBIT L

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA

CROWLEY MARITIME CORPORATION,

Plaintiff

v.

NATIONAL UNION FIRE INSURANCE
COMPANY OF PITTSBURGH, PA.,

Defendant

C.A. NO.  3:16-cv-1011-TJC-JBT

**NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA.'S
RESPONSES TO CROWLEY MARITIME CORPORATION'S
FIRST SET OF REQUESTS FOR ADMISSION**

Pursuant to Rule 36 of the Federal Rules of Civil Procedure, the defendant, National

Union Fire Insurance Company of Pittsburgh, PA ("National Union"), hereby responds to the

First Set of Requests for Admission propounded by the plaintiff, Crowley Maritime Corporation

("Crowley").

**REQUEST NO. 1**

Admit that Thomas Farmer is an "Insured Person" under the Policy.

**RESPONSE NO. 1**

Admitted.

**REQUEST NO. 2**

Admit that the Search Warrant Affidavit is a "Claim" (as that term is defined in the Policy)
against Thomas Farmer.

**RESPONSE NO. 2**

Denied.

**REQUEST NO. 3**

Admit that the Search Warrant Affidavit alleges a "Wrongful Act" (as that term is defined in the Policy) by Thomas Farmer.

**RESPONSE NO. 3**

National Union admits that the person who signed the Affidavit stated therein that he believed that Mr. Farmer entered into certain agreements in violation of the United States Antitrust Laws. National Union says that the Affidavit speaks for itself and otherwise denies this request.

**REQUEST NO. 4**

Admit that the Defense Costs incurred by Thomas Farmer in connection with his defense of the Department of Justice Investigation and sought in this action were reasonable and necessary.

**RESPONSE NO. 4**

Denied.

**REQUEST NO. 5**

Admit that the hourly rates charged by Thomas Farmer's lawyers, paralegals, experts and consultants in connection with his defense of the Department of Justice Investigation were reasonable.

**RESPONSE NO. 5**

Admitted.

**REQUEST NO. 6**

Admit that the number of hours billed by Thomas Farmer's lawyers for each task in connection with his defense of the Department of Justice Investigation was reasonable and necessary.

**RESPONSE NO. 6**

Denied.

**REQUEST NO. 7**

Admit that Crowley indemnified Thomas Farmer for Defense Costs incurred in defense of the Department of Justice Investigation.

**RESPONSE NO. 7**

National Union has insufficient information to admit or deny the allegations contained in this Request. National Union was not a party to and lacks personal knowledge of whatever arrangements were made between Crowley and Mr. Farmer regarding his Defense Costs.

**REQUEST NO. 8**

Admit that you were not deprived of the opportunity to review or control Thomas Farmer's Defense Costs as they were being incurred in connection with his defense of the Department of Justice Investigation.

**RESPONSE NO. 8**

Denied. National Union was under no obligation to review or consent to the attorney's fees incurred by Mr. Farmer because Defense Costs as that term is defined by the Policy are limited to fees and expenses resulting solely from the defense of a "Claim against an Insured." Here, the matters submitted prior to February 18, 2013 did not establish the existence of a Claim against Mr. Farmer as defined in the Policy.

**REQUEST NO. 9**

Admit that Crowley offered to provide You copies of invoices for Defense Costs incurred on behalf of Thomas Farmer on November 26, 2008.

**RESPONSE NO. 9**

Admitted.

**REQUEST NO. 10**

Admit that Crowley provided You copies of invoices for Defense Costs incurred on behalf of Thomas Farmer on September 30, 2009.

**RESPONSE NO. 10**

Admitted.

**REQUEST NO. 11**

Admit that You never objected to the hourly rates charged by Thomas Farmer's lawyers prior to February 18, 2013 in connection with his defense of the Department of Justice Investigation.

**RESPONSE NO. 11**

Admitted.

**REQUEST NO. 12**

Admit that You never objected to the reasonableness of the Defense Costs incurred by Thomas Farmer prior to February 18, 2013 in connection with his defense of the Department of Justice Investigation.

**RESPONSE NO. 12**

National Union admits that prior to issuance of its coverage correspondence dated March 5, 2013 it did not object to the reasonableness of the Defense Costs incurred by Mr. Farmer prior to February 18, 2013. National Union otherwise denies this request.

**REQUEST NO. 13**

Admit that You never objected to the law firms or attorneys hired to defend Thomas Farmer (including Lankford & Reed, PLLC (formerly Lankford, Coffield & Reed PLLC) and Mark Rosenblum P.C.) prior to February 18, 2013 in connection with the Department of Justice Investigation.

**RESPONSE NO. 13**

Admitted.

**REQUEST NO. 14**

Admit that You were informed on April 25, 2008 that Mark Rosenblum P.C. had been retained on Thomas Farmer's behalf in connection with the Department of Justice Investigation.

**RESPONSE NO. 14**

Admitted.

**REQUEST NO. 15**

Admit that You were informed on June 30, 2008 that Lankford & Reed, PLLC (formerly Lankford, Coffield & Reed PLLC) had been retained on Thomas Farmer's behalf in connection with the Department of Justice Investigation.

**RESPONSE NO. 15**

Admitted.

**REQUEST NO. 16**

Admit that You never informed Crowley that You did not consent to Thomas Farmer incurring Defense Costs in connection with his defense of the Department of Justice Investigation.

**RESPONSE NO. 16**

Admitted.  In further response, National Union was under no obligation to review or consent to the attorney's fees incurred by Mr. Farmer because Defense Costs as that term is defined by the Policy are limited to fees and expenses resulting solely from the defense of a "Claim against an Insured."  Here, the matters submitted prior to February 18, 2013 did not establish the existence of a Claim against Mr. Farmer as defined in the Policy.

**REQUEST NO. 17**

Admit that the Search Warrant Affidavit was not available to Crowley or to National Union prior to April 24, 2015.

**RESPONSE NO. 17**

National Union objects to this Request to the extent that the term "available" in this context is vague, undefined and ambiguous.

Notwithstanding this objection and without waiving same, National Union states that it has insufficient information to admit or deny the allegations contained in this Request.  National Union does not deny that the Search Warrant Affidavit was under seal, but it has no knowledge as to whether Mr. Farmer had access to a copy or as to whether Crowley ever made any attempts to obtain a copy of the Affidavit in connection with the defense of criminal charges against it or otherwise prior to April 24, 2015.

**REQUEST NO. 18**

Admit that You did not pursue unsealing the Search Warrant Affidavit at any time prior to April 24, 2015.

**RESPONSE NO. 18**

Admitted.

**REQUEST NO. 19**

Admit that You did not ask Crowley or Thomas Farmer to pursue unsealing of the Search Warrant Affidavit at any time prior to April 24, 2015.

**RESPONSE NO. 19**

Admitted.

**REQUEST NO. 20**

Admit that prior to March 5, 2013 you denied that the materials submitted to You by Crowley in connection with the Department of Justice Investigation prior to February 18, 2013 constituted a "Claim" (as that term is defined in the Policy) against Thomas Farmer.

**RESPONSE NO. 20**

National Union admits that by correspondence dated March 5, 2013 it acknowledged the existence of a Claim (as that term is defined in the Policy) against Thomas Farmer as of February 18, 2013. National Union further admits that its prior correspondence denied coverage for previously submitted materials. National Union says that its correspondence speaks for itself and otherwise denies this request.

**REQUEST NO. 21**

Admit that You treated the Department of Justice Investigation as a "Claim" against Thomas Farmer as of February 18, 2013.

**RESPONSE NO. 21**

National Union admits that by correspondence dated March 5, 2013 it acknowledged the existence of a Claim (as that term is defined in the Policy) against Thomas Farmer as of February 18, 2013. National Union says that its correspondence speaks for itself and otherwise denies this request.

**REQUEST NO. 22**

Admit that You never issued a reservation of rights letter regarding the Department of Justice Investigation prior to March 5, 2013.

**RESPONSE NO. 22**

Denied. National Union's coverage correspondence prior to March 5, 2013 reserved all rights and defenses under the Policy or applicable law.

Objections by:

Michael P. Duffy, Esq.
Peabody & Arnold LLP
Federal Reserve Plaza
600 Atlantic Avenue
Boston, MA 02210-2261
(617) 951-2004
mduffy@peabodyarnold.com

Stephen Hunter Johnson, Esq.
Jason Bloom, Esq.
Lydecker Diaz
1221 Brickell Avenue
19th Floor
Miami, FL 33131
(305) 416-3180
shj@lydeckerdiaz.com
jbloom@lydeckerdiaz.com

Dated:  March _6_, 2017

<u>VERIFICATION</u>

I, Maureen Conboy, being duly sworn, depose and say as follows:

I have read the attached NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA'S ANSWERS TO CROWLEY MARITIME CORPORATION FIRST SET OF REQUESTS FOR ADMISSION; that while I do not have personal knowledge of all the facts recited in these responses, the responses were prepared based on my review of records available to National Union; that the facts stated, subject to the limitations set forth herein, are true to the best of my knowledge, information and belief.

**SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY THIS** 3rd **DAY OF MARCH, 2017.**

Maureen Conboy, of AIG Claims, Inc. as authorized
representative for National Union Fire Insurance
Company of Pittsburgh, Pa. and not individually.

## CERTIFICATE OF SERVICE

I, Michael P. Duffy, hereby certify that this ⟍6⟍ day of March, 2017, I served a copy of the foregoing document upon all counsel of record, by mailing a copy of same, to:

Charles B. Lembcke, Esquire
Law Offices of Charles B. Lembcke, P.A.
1300 Riverplace Boulevard, Suite 605
Jacksonville, FL  32207

John D. Shugrue, Esquire
Thomas A. Marrinson, Esquire
Emily E. Garrison, Esquire
Reed Smith LLP
10 South Wacker Drive, 40th Floor
Chicago, IL  60606-7507

_____
Michael P. Duffy

1171597_1

**Doc. 36-14**

# EXHIBIT M



**EXPERT WITNESS REPORT OF TY R. SAGALOW**


**Crowley Maritime Corporation**

**v.**

**National Union Fire Insurance Company of Pittsburgh, PA.,**


**February 10, 2017**

## PRELIMINARY MATTERS

### I

### WITNESS QUALIFICATIONS

1.  My CV is attached as Exhibit A.  In summary, I have been an insurance executive for over 34 years.  I have been affirmatively held to be an insurance expert under rule 702 by the United States District Court for the Southern District of California.

2.  From 1987 to 2009, I held various senior positions in AIG, including Chief Underwriting Officer and General Counsel of National Union Fire Insurance Company of Pittsburgh, Pa. ("National Union"), Chief Operating Officer for AIG eBusiness Risk Solutions and President of AIG Product Development (General Insurance, Global).  National Union is among the largest providers of directors and officers (D&O) and professional liability insurance (E&O) policies.

3.  Following my time at AIG until 2012, I was at Zurich North America and The Tower Group, initially in each job as the company's Chief Innovation Officer where I led teams that developed and drafted various insurance policies and products (including D&O and E&O), among other activities.

4.  Since February 2012, I have been CEO and Founder of Innovation Insurance Group, LLC, a consulting firm to the insurance industry, with offices in New York, New York and Millburn, New Jersey.  The company provides expert witness services as well as advice and counsel to both policyholders and insurers as well as insurance brokers in the areas of various types of liability insurance.  I have personally reviewed and been consulted on many policy language changes in directors and officers insurance policies and regularly advise insurance companies and policyholders on issues of word choice, grammar, sentence construction, clarity and placement of provisions in the policy in order to make the insurance policy readable and understandable by the purchaser.  While I have expertise in many kinds of insurance products, my specialty developed over my three decades in the industry is in directors and officers and professional liability insurance products.

5.  In August 2015, I became Chief Executive Officer of Lemonade Insurance Company and Chief Insurance Officer of Lemonade, Inc., in addition to my position at

Innovation Insurance Group, LLC.  I also have been a licensed P&C insurance broker in several states since 2012.

6.  As a chief underwriting officer at AIG's National Union subsidiary, I was responsible for major underwriting decisions for one of the world's largest directors and officers and professional liability (including insurance agent professional liability) insurance carriers.  As Assistant General Counsel and then General Counsel, I personally wrote, or led a team that wrote, all of the insurance policies that National Union produced from 1988 to 2000.  In these capacities, my work and knowledge included policy forms which contain the same, or substantially the same, language on which I have been asked to comment in this case.

7.  As Chief Underwriting Officer of National Union, I had frequent contact with senior members of the claims department.  As a matter of process, both senior underwriters and senior claims personnel worked hand in hand in the creation of any new insurance policy. This occurred for every major new policy.  It was the practice of AIG to locate claims physically next to underwriting due to the frequent interaction of the two departments.  I frequently participated in major claim meetings. These meetings occurred several times a year for major claims.  It also was commonplace for me and the head of claims to discuss coverage positions on claims and potential claims submitted to the company.  It would not be uncommon for this type of conversation to occur at least once a week.

8.  I have taught seminars on proper claims-handling processes for the Claims Litigation Management Alliance's "Claims College".  I have taught in the following subject areas, which have included teaching the approaches to interpreting policy language and claims handling issues:

- The Proper Role of the Claims Examiner.
- Stakeholders to Consider in the Claims Process.
- Best Practices in Communication and Coordination in Claims.

9.  I graduated *summa cum laude* from Long Island University, *cum laude* from Georgetown University Law Center, and I have an L.L.M. from New York University Law School.

10.  Since June of 2012, part of my consulting practice has been to be an expert witness in insurance coverage (including policy rescission) and underwriting and claims matters

2

and I have been so retained over 50 times.   I have been deposed as an insurance expert approximately 12 times and have testified at trial as an insurance expert once where, as mentioned earlier, I was affirmatively held to be an insurance expert in federal court. These engagements are listed on my CV.

11.   I am the author or co-author of several works in the field of D&O insurance and new product development.  Details of these publications are included in my CV.


## II

## COMPENSATION

12.   My compensation for this matter is at a rate of $725 per hour. Days at trial and depositions have a minimum of eight hours.  My compensation is not dependent upon my findings or the outcome in this matter.


## III

## FACTS AND DATA CONSIDERED

13.   The facts and data that I considered in forming my opinions are cited in the body of this report or are part of the documents that are listed in Exhibit B.  In reaching the opinions expressed herein, in addition to the materials cited in the body of this report and listed in Exhibit B, I relied upon my education and my knowledge of insurance industry custom and practice as it relates to the subjects discussed, gained from my thirty plus years of experience as a chief underwriting officer, general counsel and chief innovation officer of large insurance companies and extensive experience in well over 50 cases representing both policyholders and insurance carriers in insurance disputes.

14.   I am aware that discovery is continuing in this matter and that additional documents may be provided to me to review in the future.  I reserve my rights to modify, amend, restrict or otherwise revise this opinion if I become aware of facts or considerations that require such a revision, including without limitation, opinions offered by me or opinions or statements offered by others (including other expert witnesses), whether prior to or in deposition or at trial.  This is especially true given that fact discovery has not been completed in this case.

3

IV

**SUMMARY OF FACTS**[1]

15.     This case concerns insurance coverage issues arising from a Department of Justice, Antitrust Division Investigation involving shipping (the "DOJ Investigation").

16.     Crowley Liner Services, Inc. is a wholly owned subsidiary of, and a corporate Insured under the National Union Policy issued to, its parent Crowley Maritime Corporation (this report refers to both as "Crowley" unless the context requires otherwise).

17.     Crowley operates tugs and barges for commercial transportation between the United States and Puerto Rico.[2]

18.     During the relevant time period, Crowley's competitors included Trailer Bridge, which also operates tugs and barges, as well as Sea Star Line, LLC ("Sea Star") and Horizon Lines, LLC ("Horizon"), which operate self-propelled ships.[3]

19.     According to the FBI, these four companies dominated the coastal freight transportation US to Puerto Rico shipping market during the relevant time period.[4]

20.     At the relevant times, Thomas Farmer ("Farmer") was an officer of Crowley and determined pricing and "yield management" at the company.[5]

21.     Mr. Farmer's equivalent at Sea Star was Mr. Peter A. Baci ("Baci").[6]  According to the FBI, Mr. Farmer and Mr. Baci, who previously had worked for Crowley for five years, knew each other for several years[7].

22.     From February 2008, the FBI had reason to believe that these companies, including Mr. Farmer and Mr. Baci, had entered into a conspiracy to "allocate market share and customers, fix prices and rig bids in violation of 15 U.S.C. §1 (Sherman Act)."[8]

23.     Pursuant to that belief, as part of the DOJ Investigation, the FBI executed a search warrant at Crowley's corporate offices on April 17, 2008, where Mr. Farmer worked. The warrant specifically commanded the seizure of "Notes, memoranda, correspondence, reports, and other records and documentation relating to any

---

[1] To the best of my knowledge, the parties are not in disagreement as to the essential underlying facts.
[2] FBI Search Warrant Affidavit ("FBI Affidavit") at paragraph 14.
[3] Ibid.
[4] Ibid.
[5] Ibid at para. 12(c)(ii).
[6] Ibid at para. 16.
[7] Ibid at para. 10.
[8] Ibid at para. 4.

agreement, meaning, conversation, or other communication between or among management, pricing, or sales personnel [sic] CROWLEY LINER SERVICES, INC., including, but not limited to… Tom Farmer… And any employee or agent of SEA STAR LINE, LLC. and HORIZON LINES, LLC."[9]

24. The Search Warrant also specifically asked for all "Notes, memoranda, correspondence, reports, price sheets or lists, and other records or documentation relating to customer allocations or divisions, market shares, and contract negotiations or bid proposals, including, but not limited to the prices, surcharges, and costs offered to any customer."[10]

25. The Search Warrant also asked for all telephone records and address books for specified Crowley personnel, including Farmer (in addition to three others).[11]

26. The "facts to support a finding of Probable Cause" to justify the issuance of the Search Warrant were contained in an affidavit signed by FBI Special Agent Byron Thompson (the "FBI Affidavit").  Pursuant to court order, the FBI Affidavit was sealed and unavailable to Crowley for viewing.

27. On April 25, 2008, Crowley gave notice to National Union of the DOJ Investigation.

28. On May 27, 2008, National Union, through its claims handler AIG Domestic Claims ("AIG"),[12] denied coverage for the DOJ Investigation on the grounds that the Investigation did not involve a "Claim" as that term is defined in the Policy and that no "Wrongful Act" had been alleged against any insured person.  The denial letter informed Crowley that National Union would accept the matter as a notice of circumstances that may give rise to a Claim pursuant to Clause 7(c) of its policy and invited Crowley to submit further information or documentation that might be relevant to a determination as to coverage.

29. Thereafter, at various times between May 27, 2008 and February 18, 2013, Crowley corresponded with National Union in an unsuccessful attempt to get National Union to reverse its position.

---

[9] Search Warrant at "Attachment B", paragraph A.
[10] Ibid at paragraph B.
[11] Ibid at paragraphs E and F.
[12] For ease of reference, AIG and National Union are both referred to herein as "National Union."

5

30.   On February 18, 2013, Mr. Farmer's counsel advised National Union of a DOJ Plea Agreement Offer to Mr. Farmer (which Farmer rejected).

31.   On March 5, 2013, National Union agreed that the DOJ Plea Agreement Offer was a Claim under the Policy and accepted the DOJ Investigation as a Claim effective February 18, 2013.

32.   National Union has maintained its refusal to reimburse any defense costs incurred in connection with the DOJ Investigation prior to February 2013.

33.   In July 2015, Crowley advised National Union that Mr. Farmer was acquitted of all criminal charges, that the FBI Affidavit had been unsealed, and that the FBI Affidavit identified Mr. Farmer as a person against whom criminal charges might be brought. Crowley, once again, requested coverage for the pre-Plea Agreement Offer defense costs.

34.   On August 3, 2015, National Union again refused to reverse its prior position that defense costs incurred before the Plea Agreement Offer were not covered because, according to National Union, they were not incurred in connection with a Claim as defined under the Policy.

## V

## OPINIONS

35.   I have been asked by counsel for the policyholder to provide an expert opinion with respect to the custom and practice in the insurance industry and the common understanding of certain provisions in a directors and officers (D&O) insurance policy.

36.   I have been asked to offer opinions relating to several positions taken by National Union:

   a.   Whether it would be industry custom and practice to treat the FBI Affidavit as a "Claim" first made against Thomas Farmer on April 16, 2008, even though the FBI Affidavit was not unsealed and made available to Crowley until around May 2015, particularly where National Union never sought to have the affidavit unsealed or counseled its insured to do so?

6

b.   Whether it would be industry custom and practice to apply the Run-Off endorsement in such a way as to bar coverage for Mr. Farmer's pre-indictment defense costs?

c.   Whether it would be industry custom and practice to apply the "criminal act" or "improper personal profit" exclusions of the Policy to bar coverage for defense costs incurred on behalf of Mr. Farmer in light of the guilty plea by a different insured, Crowley?

d.   Whether National Union's position that Crowley failed to fulfill its obligations under the Policy with respect to submitting defense costs comports with industry custom and practice?

37.   Outside of offering an expert opinion relating to the coverage positions taken by National Union, I have also been asked to provide an expert opinion relating to whether National Union fulfilled its obligations to conduct a prompt and through investigation of Crowley's request for coverage respecting in particular any request (or lack thereof) by National Union to have the FBI Affidavit unsealed.

38.   My opinions on these questions are guided by my experience and insurance industry custom and practice.

39.   In reaching my opinions, there are a number of industry customs and practices, both dealing with policy coverage and language as well as claims handling, which are important to keep in mind.

40.   Respecting policy language and interpretation, these include:

a.   Exclusions and restrictions on coverage are to be interpreted narrowly and if there are two reasonable interpretations of a restrictive provision, the one favoring coverage controls;

b.   Insurance policies are to be viewed "as a whole" and provisions in a policy should be examined in connection with other related provisions; and

c.   Coverage grants are to be construed broadly and if there are two reasonable interpretations of a coverage grant, the one favoring coverage controls.

41.   Custom and practice in the insurance industry has also resulted in a number of standards applicable to claims handling.  Claim adjusters are trained in such standards, at least they should be. These standards and procedures have been developed so that an adjuster does not act in an arbitrary or capricious manner.

7

Industry custom and practice dictates that the insurer must act in good faith and deal fairly with the insured in connection with a claim.  A failure to adhere to claims handling standards results in a breach of that obligation.  In many cases, claims manuals have been written so that an adjuster may refer to written guidelines to assist his or her decision- making. Claims-handling customs and practices include:

a.   After a carrier is notified of a claim or potential claim, the insurer must then promptly evaluate whether the claim or incident involves a risk potentially covered by the policy.

b.   The insurance carrier must then conduct a full, fair and prompt investigation, after which the insurance carrier must advise the insured as to whether the carrier has concluded whether there is coverage for the submitted claim or not and the reasons for its determination.  If no determination can be made, the carrier may choose to cover the claim under a "reservation of rights" letter indicating, in essence, that there are insufficient facts to make a final determination so the carrier will be providing coverage (usually manifested by providing a defense) as an initial matter.

c.   If a reservation of rights letter is issued, the insurer must promptly and fully investigate the claim to determine, if at all possible, whether the reasons for the reservation are valid, and so inform the insured.

d.   Further, if after making an adverse coverage determination, the insurer becomes aware of facts that should lead it to make a conclusion different than the one the carrier previously advised, the carrier has a duty to "update" the insured with the new conclusions and take steps consistent with them.

e.   In managing a claim, the insurance company must treat its policyholder's interests with equal regard as its own interests.

f.   The insurance company should assist the policyholder with the claim;

g.   The insurance company must disclose to its policyholder all benefits, coverages and limitations that may apply to the claim.

h.   The insurance company cannot shift the burden of investigation onto the insured.

i.   The insurance company cannot off load the burden of investigation to outside counsel.

8

j.     In its function to fully, fairly and promptly evaluate and adjust the claim:

      i.   The insurance company must not misrepresent facts or policy provisions or fail to bring to the policyholder's attention facts or policy provisions on which it is relying to deny or limit coverage; and

      ii.  The duty of good faith and fair dealing continues into litigation with the insured.

### A.

**Whether It Would Be Industry Custom and Practice to Treat the FBI Affidavit as a "Claim" First Made Against Thomas Farmer on April 16, 2008, Even Though the Affidavit Was Not Unsealed Until 2015**

42.    Unlike occurrence format policies – the kind most people are familiar with in their personal life – "claims made" format policies only provide coverage for claims which are made against an insured during the policy period (or extended reporting period) of the policy.

43.    For this reason, what is a "claim" and when that claim was "made" are not uncommon issues in claims made coverage disputes.

44.    Given its importance, one might assume that the term "claim" was always a defined term in claims made policies such as directors and officers (D&O) insurance. However, this was not always the case.

45.    Indeed, in 1988 when AIG announced its new D&O policy, it continued the practice of its earlier 1980 form of not defining the word "claim."  As one might imagine, this led to disagreements, from time to time, between the insured and the insurance carrier as to what exactly a "claim" was.

46.    Not defining such an important term changed, at least for AIG, several years later when in 1995, it published a revised D&O policy form.  In that form, "Claim" was defined less expansively than in later policy forms as:

    (1) a written demand for monetary or non-monetary relief; or

    (2) a civil, criminal, or administrative proceeding for monetary or non-monetary relief which is commenced by:

      (i)  service of a complaint or similar pleading; or

      (ii) return of an indictment (in the case of a criminal proceeding); or

9

(iii) receipt or filing of a notice of charges.[13]

47.    One can immediately notice two aspects of this definition.  First, it does not explicitly include any type of regulatory investigation.  Second, the definition also indicates (at least with respect to "proceedings") when a claim is deemed "made" (or "commenced," using the same language that the definition uses).  For example, in the case of a criminal proceeding, a claim is made (or "commenced") upon return of an indictment.  Note that neither the insured nor the insurer will necessarily know that an indictment has been returned.  This lack of knowledge does not preclude the policy from indicating that the claim is deemed "made" at that time.

48.    Five years later, in 2000, AIG once again came out with a new base D&O form for publicly traded companies, called in the market, simply, the "2/2000" form.  This form, which was the one provided to Crowley by National Union in the policy at issue here, added a third element to the definition of "Claim" to deal with regulatory investigations:

> (3) a civil, criminal, administrative or regulatory investigation of an Insured Person:
>
> (i)    once such Insured Person is identified in writing by such investigating authority as a person against whom a proceeding described in Definition (b)(2) [dealing with civil, criminal, administrative, or regulatory or arbitration proceedings] may be commenced; or
>
> (ii)    in the case of an investigation by the SEC…. after the service of a subpoena upon such Insured Person.

49.    In addition to the obvious fact that this additional subparagraph explicitly broadens the definition of Claim to include regulatory investigations, we see that like the two prongs included in the prior version of the definition, this new prong of the definition also essentially indicates when an investigation type Claim is "made", *i.e.*, at such time as the investigating authority has "identified in writing … a person against whom a proceeding described in Definition (b)(2) may be commenced."

50.    There is good reason for an insurance carrier to both define what a "Claim" is, as well as to define, whenever possible, when that "Claim" is deemed to be "made" because these elements are central to the "claims made" format of the policy.

---

[13] Directors, Officers and Corporate Liability Insurance Policy, form 62335 (5/95), definition (a). [The text cited excludes the definition's reference to Securities Claims not relevant in this case.]

51.    The decision by the insurance industry to explicitly add regulatory investigations to the definition of Claim and provide a different "trigger point" for when such a Claim is "made" was thought-out, purposeful, and carefully made.  Unlike with other types of proceedings included in the definition of Claim, there is no requirement that a regulatory investigation involve formal legal service or receipt of a specific type of document. The insurance industry chose to provide insurance coverage for a wide range of regulatory investigations, and chose broad language to describe how such a Claim would commence.  The broad language reflects the industry's intent to provide coverage under a variety of factual circumstances.

52.    One aspect of the broad wording in the investigation-related provisions of the definition of Claim, is the use of the word "may" in the phrase "*may* be commenced." From an industry custom and practice point of view, the word "may" is understood to have implications in policy drafting and coverage impact.  National Union's definition of "Claim" does not say "will be" commenced or is "reasonably likely to" be commenced, (phrases that are used elsewhere in the policy for different "triggers"[14]); it simply says "*may* be commenced."  This low threshold of probability is consistent with industry custom and practice, and proper underwriting, as it seeks to avoid disputes between the insured and the insurer as to the subjective intent of the regulator and the likelihood of the regulator bringing a claim against an Individual Insured.  The insured and insurer need not engage in a dispute as to whether it is "probable" or "likely" that the regulator will bring a more formal proceeding.  The chance that the regulator "may" do so is enough.

53.    Similarly, the phrase "identified in writing" does *not* require and should not be equated with the phrase "identified in writing *to the insured*" (*i.e.* served on the insured).  The insurance industry knows how to draft language that requires notice to the insured (the Policy here reflects application of that know-how in other provisions), but National Union chose not to include language with such a requirement here, likely in view of its favoring broad coverage that would apply in a wide variety of circumstances, potentially including a situation where, as here, there is a document known by the Insured and the insurer to be in existence, which

---

[14] See, for example, Appendix B, definition (a)(2) ("reasonably likely").

document has "identified in writing" an Individual Insured but has not yet been served on the Insured.

54. Bearing in mind these aspects of the insurance industry custom and practice with regard to word choice and policy drafting in mind, when examining the FBI Affidavit against the words of National Union's expanded definition of Claim in the Policy, there appears no doubt that the FBI Affidavit fulfills the requirement of the definition. Indeed, I do not believe there to be any dispute between the parties as to whether the FBI Affidavit is a "Claim."

55. However, for sake of completeness and providing background relevant to other aspects of this report, I will go through the analysis anyway.  Again, the issue is whether the FBI Affidavit is:

    a.    part of a civil, criminal, administrative or regulatory investigation,

    b.    of an Insured Person that

    c.    identifies in writing the Insured Person as a person against whom a proceeding described in Definition (b)(2) [dealing with civil, criminal, administrative, regulatory or arbitration proceedings] may be commenced;

56. One needs to go no further than Section III of the FBI Affidavit, which is aptly named "SUBJECTS OF THIS INVESTIGATION," to find the affirmative answer to this question.  Specifically, that section states in its opening paragraph that "The subjects of this investigation include companies that sell coastal water freight services, as well as certain *officers and employees* of those companies"[15] (emphasis added).

57. Paragraph 12 of the FBI Affidavit names Crowley and then continues to name as subjects of the DOJ Investigation certain officers and employees of Crowley, and most importantly at subparagraph (ii) it identifies:

> TOM FARMER ("FARMER").  During the relevant period, FARMER was employed as Vice President of Pricing & Yield Management of CROWLEY and worked in CROWLEY's Jacksonville, Florida office.

---

[15] FBI Affidavit at paragraph 12.

12

58.     Elsewhere in the FBI Affidavit, specific activities of Farmer are discussed including
        alleged various conversations with his old friend and equivalent officer at Sea Star,
        Peter A. Baci.  For example:

   a.     Paragraph 21 of the Affidavit states: "I further believe, based on my review of
          these emails, that these illicit agreements to allocate customers and coordinate
          prices extend to similar communications between BACI, GLOVA and
          ***FARMER*** of CROWLEY" (emphasis added);

   b.     Paragraph 62 of the Affidavit states, in part: "I have reviewed many of those
          [Yahoo Warrant] emails and based on my review, believe this separate email
          account was used by GLOVA to communicate with ***FARMER*** about pricing
          and market share information in similar fashion as the GMAIL emails between
          GLOVA and BACI, using GLOVA's southorange@gmail.com account"
          (emphasis added).

   c.     Paragraph 63 of the Affidavit states explicitly that "audio recordings that I have
          listened to between CW-1 and BACI, as well as email communications I have
          reviewed that were obtained by search warrant, ***reflect FARMER's***
          ***participation with BACI and GLOVA to fix prices and allocate customers***
          between each of the coastal freight carriers, HORIZON, SEA STAR and
          CROWLEY" (emphasis added).

   d.     Paragraph 72 of the Affidavit states that "FARMER communicated confidential
          information regarding bids to BACI" and cites an email discussing the
          allocation of the "Frito/pepsi" account which stated "Okay I think we are all
          holding firm on Frito Lay." Paragraph 72 further states: "BACI indicated that he
          had spoken to ***FARMER***, stating 'Actually ***Tom*** as of last night hadn't gotten
          the bid package'" (emphasis added); and

   e.     Paragraph 74 of the Affidavit states that "BACI, GLOVA and FARMER
          communicated confidential pricing information on contracts," and details the
          recording of a conversation between the FBI's confidential informant, "CW-1"
          and BACI in which BACI told CW-1 of an earlier disagreement with ***FARMER***
          on who was supposed to be allocated the Nestle/Walgreens account stating that
          "When ***FARMER*** would not agree (to the corrected allocation), HORIZON

13

began using a 'slap strategy' to take business away from CROWLEY"
(emphasis added).

59.     Once it is determined that the FBI Affidavit is a Claim as defined in the National
Union Policy (and here it certainly is), we must examine the question of *when* was
the Claim "made"?

60.     For coverage to apply, the Claim must be "made" against an Insured during the
Policy Period or the Extended Reporting Period (sometimes called the Discovery
Period).

61.     National Union has taken the position that the FBI Affidavit could not possibly have
been "made" on April 16, 2008 since its contents were sealed and unavailable to
Crowley or National Union until 2015.

62.     National Union's position does not comport with industry custom and practice.
Where, as here, a policy sets forth when a "Claim" is deemed made, it is my
experience that the policy will be applied as written, as opposed to adding terms that
do not appear in the policy as additional requirements for the policyholder to obtain
coverage.

63.     More specifically, the definition of Claim in the Policy incorporates the timing aspect
of when a Claim is "made" against an Insured both with respect to Claims as defined
in paragraph (2) of the definition, as well as paragraph (3) of the definition, which
applies here.

64.     In paragraph (2), the definition states, in effect, that a proceeding will be deemed to
have been "made" against an Insured when:

        (i)     the complaint or a similar pleading is served (in case of civil
                proceedings),

        (ii)    an indictment is returned (by a Grand Jury),

        (iii)   an Information (criminal, non-Grand Jury jurisdictions) or similar
                document is returned, or

        (iv)    when a notice of charges is received or filed.

14

65.   Similarly, paragraph (3), the one applicable to this case, states, in effect[16], that a regulatory investigation will be deemed to have been made "once such Insured Person is identified in writing by such investigating authority as a person against whom a proceeding described in Definition (b)(2) may be commenced."

66.   National Union could have written paragraph (3) (i) of the definition to be like paragraph 3 (ii) of the definition, which requires "service … upon such Insured Person," or to be like certain parts of paragraph 2 of the definition, which require that the document identifying the insured as a potential target be "served" or "received," but it did not.  It is not consistent with industry custom and practice to attempt to put those requirements in now by effectively inserting language and restrictions into paragraph (3) of the definition language that are not there.

67.   Along the same lines, National Union could have included, but chose not to include, a separate provision in its Policy that stated when a "Claim" would be deemed made.

68.   National Union was well familiar with the availability of policy language that would dictate that a "Claim" is made *only* when it is received.  Indeed, on August 3, 2015, National Union wrote to Crowley, stating that the FBI Affidavit could not be a "Claim" while it remained sealed, citing such a policy provision (although it did not actually exist in the policy at issue):

> A Claim shall be considered to have been first made against an Insured when written notice of such Claim is received by any Insured, by the Company on behalf of any Insured or by the Insurer, whichever comes first.

69.   There is no such provision in the Policy at issue here.  It seems that this language appears *in another* policy issued by National Union to Crowley (policy 066-57-99) which was on *another* policy form, 68461 (8/79).  National Union's reliance in this letter on policy language that does not even appear in the policy at issue is significant for two reasons.  First, to be generous, it shows some "sloppiness" in claims handling very late in the game.[17]  Second, and perhaps more importantly, it shows that

---

[16] I use the phrase "in effect" because AIG's definition does not use the language  "made against an insured" but the effect of the language used in both paragraph (2) and (3) of the definition has an identical effect in terms of defining when a claim is deemed to be made.

[17] While I hope that this was just sloppiness, I note that the theory of a "notification to the insured" requirement was presaged in a letter sent by National Union's counsel  to the Insured's broker 5 years earlier on June 9, 2010. (AIG Third Denial Letter).  There is no "notification to the insured" requirement in the relevant policy provisions here.

National Union had language that may have accomplished what National Union now says they intended to accomplish, and indeed used that language in another policy issued to the same Insured during the same policy period.  Accordingly, if National Union had wanted to define when a Claim was made based on receipt of the Claim by its Insured, it could have inserted such language into paragraph 3 of the Claim definition or included a general provision like that cited in its August 3, 2015 letter. By not doing so, they created a reasonable expectation of the Insured that they would not interpret the two policies in the same way (at least for investigations coverage) in terms of requiring that the insured be served with the triggering document.

70.    Even if it is not accurate to say that the FBI Affidavit Claim was first made on April 16, 2008 based on the above analysis, there is a second and independent reason to reach a similar conclusion.

71.    In their First Denial Letter, National Union states that even though they do not regard the DOJ Investigation as a Claim, they will nevertheless regard the April 25, 2008 letter as a "notice of circumstances that may give rise to a Claim being made against an Insured, pursuant to Clause 7(c) of the Policy."[18]

72.    Clause 7(c) of the Policy states:

> If during the Policy Period or during the Discovery Period (if applicable) an Organization or an Insured shall become aware of any circumstances which may reasonably be expected to give rise to a claim being made against an insured and shall give written notice to the Insurer of the circumstances, the Wrongful Act allegations anticipated and the reasons for anticipating such a Claim, with full particulars as to date, persons and entities involved, then a Claim which is subsequently made against such insured, and reported to the Insurer alleging arising out of, based upon or attributable to such circumstances or alleging any Wrongful Act at which is the same as related to any Wrongful Act alleged alleged or contained in such circumstances**, *shall be considered made at the time such notice of such circumstances was given*.** (emphasis added)

73.    Even by National Union's version of the facts, Clause 7(c) of the Policy applies here. To break it down:

a.    In its May 2008 letter, National Union told Crowley that it accepted the 4/25/08 notice of a DOJ Investigation to be a notice of circumstances under clause 7(c).

---

[18] First Denial Letter, May 27, 2008, at page 3.

16

b. National Union acknowledges the Plea Agreement Offer made to Mr. Farmer on February 18, 2013 to be a "Claim" under the Policy.[19]

c. Nowhere in National Union's letter of August 3, 2015, do they contest that the FBI Affidavit meets the definition of Claim (nor based on the context on the FBI Affidavit, could they contest that it isn't a Claim as defined in the Policy).

d. Both the FBI Affidavit Claim and the Plea Agreement Offer Claim arise out of the same circumstances and same alleged Wrongful Acts as that described in the May 2008 letter/notice of circumstances.

e. Therefore, under Clause 7(c), once a Claim was made that arose from the same circumstances as those that were the subject of a prior notice of circumstances then the Claim *shall be considered made at the time such notice of such circumstances was given*, *i.e.* in the case at hand, April 25, 2008.

74. Accordingly, even under National Union's interpretation of the facts, by operation of 7(c), the Claim (whether it is the FBI Affidavit or Plea Agreement Offer) is "considered made" on April 25, 2008 and therefore all defense costs incurred in connection with the Claim on or after April 25, 2008 should be covered.

75. The closest National Union gets to explaining *why* they think there was not a Claim made against the Insured in April 2008 is in their letter of August 3, 2015.

76. In that letter, National Union attempts to explain why the FBI Affidavit's unavailability for inspection in 2008 by either the Insured or the Insurer meant, in essence, that it did not exist.  In its explanation, National Union cites a "fact," a "policy provision" and a "theoretical" basis for denying coverage.

77. The "fact" cited is that "At that [April 2008] time, the DOJ investigation was not a Claim against Mr. Farmer because neither Crowley nor Mr. Farmer was aware of any documents identifying Mr. Farmer as person who might be charged with a crime *because* no such documents were submitted to National Union." (emphasis added)

78. There are a number of problems with this "fact."

79. First, "awareness" of an identifying document is not dependent upon whether such document was submitted to the insurance carrier.  There is nothing in the Policy that requires submission of a document to National Union for there to be a Claim.  Likewise, there is nothing in the Policy that requires submission of a document to Crowley or Mr. Farmer before they can be deemed "aware" of the document.  It is self-evident that someone can be aware of a document and not submit the document

---

[19] *See* National Union letter of March 5, 2013.

17

to their insurance carrier or be aware of its precise contents.   Moreover, in my experience, it is not uncommon that a policyholder first gives notice of a claim without sending the actual litigation document (*e.g.*, a complaint) until later.  No carrier that I am aware of takes the position that such "trailing" provision of a complaint or similar pleading precludes coverage as long as the first notice was timely given.

80.   Second, in fact by all appearances both Crowley ***and*** National Union ***were very much aware*** that the FBI Affidavit existed (the Search Warrant said so), and given Mr. Farmer's role at Crowley and the very nature of the DOJ Investigation (also evident from the Search Warrant), it would defy logic NOT to believe that Mr. Farmer was identified as a target or subject of the investigation (as we now know he was). Indeed, in its original notice of claim email dated April 23, 2008 to Aon, which was attached to Aon's official notice of claim to National Union, Crowley states that Mr. Farmer and the other three individuals who were subject to the subpoena and search warrant each "retained their own counsel to defend and protect their interests against what, at some point in the future, may involve criminal or civil charges." and also indicated that "[t]hese costs could be significant and on-going depending upon the future course of the Department of Justice investigation and the charges that may be filed."  Given these sets of facts, it would be impossible for National Union to argue that it was  not aware that both Crowley and Farmer believed that Farmer was a possible target of the FBI Investigation.

81.   The "policy provision" cited in the August 3, 2015 letter is perhaps most puzzling. As discussed above, National Union cites a policy provision that does not, in fact, appear in the policy but apparently came from another policy issued by National Union to Crowley for the same period of time.

82.   Finally, National Union also cites a "theoretical" basis for denying coverage that relies on considerations of "fairness."

83.   National Union states that "basic considerations of fairness dictate that written notice to the Insured is essential to the existence of a Claim… and therefore there could have been no Claim against Mr. Farmer until such time as Mr. Farmer had written notice of the facts constituting the Claim."  There are a number of problems with this "theory."

84.     Initially, it is worth noting that National Union seems to be referring to fairness to the Insured.  In the case at hand, there is no unfairness to the Insured in considering the FBI Affidavit (or Plea Agreement Offer) to be a Claim made in April 2008.

85.     Next, there has never been a custom and practice in the D&O insurance industry of requiring that the insured have notice of the "facts constituting" a Claim in order for a matter to be considered a "Claim," and the policy language certainly does not impose such a requirement.  This is not an uncommon scenario.  For example, if a plaintiff makes a written demand seeking monetary relief against a corporate director and officer and simply alleges, without providing any supporting facts, that the director breached his fiduciary duty in operating the company, that's a Claim.  Perhaps a poorly fleshed-out one, but a Claim nevertheless.

86.     Further, the considerations of "fairness" that National Union cites cannot be applied in a vacuum, as National Union seeks to do here, but instead should be applied based on the particular facts and circumstances presented here.  It is not custom and practice in the insurance industry to investigate claims without reference to the facts or policy language.  Moreover, claims handling standards require, among other things, that:

   a.   The insurance company should assist the policyholder with the claim;

   b.   The insurance company must disclose to its policyholder all benefits, coverages and limitations that may apply to the claim;

   c.   The insurance company cannot shift the burden of investigation onto the insured; and

   d.   The insurance company must not misrepresent facts or policy provisions or fail to bring to the policyholder's attention facts or policy provisions which it is relying upon in denying or limiting coverage.

87.     Of course, there is nothing "unfair" in holding National Union to the language of the policy it drafted, especially since the facts of the claim at issue are very different than the hypothetical situation envisioned in National Union's letter, where the insured was unaware of the "Claim" against it, reported the claim late, and the insurer then sought to turn around and use this fact against the insured to make out a late notice defense.

88.     Here, the particular, some might say unique, facts of this case fall far from the late-notice hypothetical raised by National Union, in at least the following respects:

19

a.  *Everyone* knew there was a document that the insured believed was a Claim (*i.e.*, the FBI Affidavit).

b.  The insured **told** the Insurer about the document that it believed was a Claim and asked for coverage.

c.  *Everyone* had facts sufficient to show that the insured's belief that there was a Claim was not unreasonable (or at least not without some good faith basis given the other facts of which everyone was aware).

d.  It thus would have been entirely "fair" to the insured for the insurer to treat the FBI Affidavit as a Claim, even though it was unavailable for review.

e.  It also would not have been "unfair" to National Union to treat the FBI Affidavit as a Claim because National Union had the option of advancing defense costs subject to a reservation of rights and undertaking by Crowley to repay any amounts that National Union advanced if, when the details of the Claim were revealed (*i.e* the FBI Affidavit was unsealed), it was determined that in fact there was not a "Claim."   Specifically, the Section of the Policy titled "DEFENSE COSTS, SETTLEMENTS, JUDGMENTS (INCLUDING THE ADVANCEMENT OF DEFENSE COSTS)" contains the following mechanism for National Union to recoup any advanced defense costs:

> Such advance payments by the Insurer shall be repaid to the Insurer by each and every Insured or Organization, severally according to their respective interests, in the event and to the extent that any such Insured or Organization shall not be entitled under this policy to payment of such Loss.  (Policy, § 8.)

89.   In conclusion, to the extent that considerations of "fairness" apply, National Union's approach to fairness would leave the Insured entirely unprotected against what everyone presumably now acknowledges was a document that met the definition of "Claim," even though National Union would have been fully protected had it agreed to advance defense costs subject to an appropriate reservation of rights and undertaking.   This case involves somewhat unique facts.   Even if, as National Union seems to assume in its August 2015 letter, this circumstance "falls through the cracks" of the Policy language, it would be industry custom and practice to give the policyholder the benefit of the doubt by providing conditional advancement of defense costs subject to an undertaking that the insured repay such defense costs in

the unlikely event that the FBI Affidavit, once unsealed, did not meet the definition of a Claim under the policy.

90. My opinions on this issue are further buttressed by the fact that National Union never sought to unseal the FBI Affidavit itself or counseled the insured that it should seek to do so. An insurer has a duty to its insured to conduct a full, fair and thorough investigation of any request for insurance coverage. National Union did not conduct such an investigation here. Instead, it chose to ignore the likely contents of the FBI Affidavit (burying its head in the sand), insisted that it could not determine whether there was a Claim without access to the affidavit, but never sought to obtain the affidavit itself or advised the insured to seek to obtain the affidavit. I make no assumption that either National Union or Crowley could have succeeded in unsealing the affidavit, but National Union's failure in this regard nevertheless is troublesome from an industry standards point of view.

91. National Union knew that the FBI Affidavit existed since the Search Warrant said so. Instead of offering to help to unseal the Affidavit, they used the fact that it was sealed (and thus unavailable to both the insured and the insurer) as the reason why they could not provide coverage. In essence, they told the Insured "If only we could *see* the actual affidavit, then we would be in a position to *know* whether it is a Claim under the Policy." Although I disagree with National Union that they actually did need to see the FBI Affidavit to at least *conditionally* regard it as a Claim, once National Union decided to take the position that they did, claims handling industry standards compelled them to attempt to get the FBI Affidavit unsealed or *at least* offer to the Insured to do that.

92. More specifically, by failing to discuss with the Insured the unsealing of the FBI Affidavit (whether or not such unsealing would be successful), National Union failed to meet industry custom and practice, which should have caused National Union to:

  a. treat its policyholder's interests with equal regard to its own interests;

  b. assist the policyholder with the claim;

  c. disclose to its policyholder all benefits, coverages and limitations that may apply to the claim;

  d. conduct a full, fair, thorough, and prompt investigation of the claim at its own expense;

21

e.   conduct such an investigation without shifting the burden of investigation onto the insured.

### B.

### Whether it would be Industry Custom and Practice to Apply the Run-Off Endorsement[20] in Such a Way as to Bar Coverage for Mr. Farmer's Pre-Indictment Defense Costs.

93.   The Claim in the form of the FBI Affidavit was provided to Crowley sometime between May 8, 2015, the day Mr. Farmer was acquitted, and July 22, 2015, the date of Crowley's letter to National Union advising them of the acquittal and the unsealing of the affidavit.

94.   National Union takes the position that the FBI Affidavit cannot be considered to be a covered Claim as it was made against the Insured and reported to the insurer after November 2013, the expiration date of the Discovery Period.

95.   This positon is inconsistent with industry custom and practice for two reasons.

96.   First, as discussed at length in the earlier sections of this report, even under National Union's version of the facts, the Claim in the form of the FBI Affidavit was deemed made and reported no later than on April 25, 2008 when National Union accepted the Insured's notice of claim of the DOJ Investigation as a notice of circumstance pursuant to condition 7(c) of the Policy.[21]  This is a straightforward application of this condition consistent with its purpose, which is to allow reporting of claims made long after the expiration date of the policy or discovery period (if applicable), so long as notice of circumstances was provided during the policy period.

97.   National Union's position seems to turn the purpose of the Run-Off endorsement on its head.  It goes without saying that the existence of a run-off or discovery endorsement is intended to expand coverage beyond what would exist in the absence

---

[20] The Run-Off endorsement in the Policy provides: "The Named Entity shall have the right to a period of SIX of [sic] 6 years following the Effective Date (herein referred to as the Discovery Period) in which to give written notice to the Insurer of any Claim first made against any Insured during said 6 year period for any Wrongful Act occurring on or prior to the Effective Date and otherwise covered by this policy."

[21] In this paragraph, I have assumed National Union's position that the April 25, 2008 notice of a "claim" was in fact not a notice of a "claim" but a notice of "circumstances that might give rise to a claim" and thus use the date April 25, 2008 for both claims made and claims reporting purposes.  In fact, I am in agreement with the policyholder that a Claim was in fact made (without regard to operation of Clause 7(c)) on April 16, 2008 (the day the FBI Affidavit was executed) and that this Claim was properly reported to National Union as a Claim on April 25, 2008.

of such an endorsement.  With this purpose in mind, it is inconsistent with industry custom and practice, and the very purpose of the run-off endorsement, for National Union to attempt to use the Run-Off endorsement as a way of *eliminating* coverage that would otherwise exist under condition 7(c) had the run-off endorsement coverage not been granted.

98.     <u>Second</u>, as discussed earlier in this report, given the facts known to National Union on April 25, 2008, custom and practice would have been for National Union to advance defense costs subject to an analysis of the FBI Affidavit fulfilling the definition of Claim once the affidavit was unsealed, *whenever* that occurred, which would have made consideration of how the Run-Off endorsement applies wholly unnecessary.

## C.

**Whether it Would be Industry Custom and Practice to Apply the "Criminal Acts" and "Improper Personal Profit" Exclusions of the Policy to Bar Coverage for Defense Costs Incurred on Behalf of Mr. Farmer in Light of the Guilty Plea by a Different insured, Crowley**

99.     Like almost all D&O policies, the National Union Policy contains what are known as the criminal acts and improper personal profit exclusions.  The criminal acts exclusion 4(c) and improper profit exclusion (4)(a) (both as amended by Endorsement No. 9), provide as follows:

> The Insurer shall not be liable to make any payment for Loss in connection with any Claim made against an Insured:
>
> (a)     arising out of, based upon or attributable to the gaining of any profit or advantage to which a judgment or final adjudication or an alternative dispute resolution proceeding adverse to the Insured establishes the Insured was not legally entitled;
>
> (c)     arising out of, based upon or attributable to the committing of any deliberate criminal or deliberate fraudulent act by the Insured if a Judgment or final adjudication or an alternative dispute resolution proceeding adverse to the Insured(s) establishes that such deliberate criminal or deliberate fraudulent act was committed.

100.    Because *allegations* of the types of conduct addressed by these exclusions are not uncommon, the D&O insurance industry has for some time provided two safeguards to insureds that prevent insurers from denying coverage for such allegations against

23

an insured. One immediately notes that the National Union Policy contains both of the above mentioned safeguards.

101.   The first safeguard is that the exclusions will not apply absent a "final adjudication" that the criminal conduct or improper personal profit actually occurred.  Industry language specifics on this point differ, but in the case here, there was neither a "final adjudication" or an "alternate dispute resolution proceeding" finding that Mr. Farmer committed any criminal act or improperly made any profit needed to trigger the exclusions[22].  Indeed, as we know, the opposite happened.  Mr. Farmer was acquitted. Accordingly, these exclusions do not apply.

102.   The second safeguard also applies in our case.  That safeguard, known as "Severability", essentially states that the "final adjudication" of criminal conduct against one insured shall not be imputed to another insured.[23]  In this case, this means that the criminal guilty plea by Crowley Liner Services is not imputed to Tom Farmer for the purposes of applying the criminal acts exclusion.

103.   The policy actually accomplishes this severability in two different ways and appears in two places in the Policy.

104.   First, the exclusion requires a final adjudication adverse to *"the insured,"* not one adverse to "***any insured.***"  (Exclusion 4(a), as modified by Endorsement 9).  Thus, a final adjudication against one insured does not get imputed to other insureds.  Second, even if the Policy was not otherwise structured to require application of exclusions on an insured-by-insured basis, the severability provision of the Policy forbids National Union from imputing the effect of Crowley's guilty plea to other insureds.

105.   Put another way, the exclusions are applied claim-by-claim and insured-by-insured. As the introductory language to the exclusions make clear, the exclusion is evaluated by looking at "a" claim against "an insured."  Thus, under industry custom and practice, in determining whether there is insurance coverage for a Claim against Mr. Farmer, we look at whether there was a final adjudication in ***that claim*** against ***that insured***, not to whether there was an adjudication adverse to another insured in another claim.

---

[22] See Policy at endorsement 9
[23] See Policy at endorsement 23

106. Also, perhaps to state the obvious, the fact that the payment amounts might be due to the corporate policyholder (arising from the fact that the corporate policyholder previously indemnified the defense costs incurred by the individual insured and is therefore out the money) is irrelevant.  The key to the exclusion is and has always been which Insured the Claim was against and on which Insured's behalf the defense costs were incurred, not to whom the carrier happens to be writing out the check. To apply the exclusion differently would destroy the essence of the final adjudication and severability provisions of the contract and the essence of the policy covering claims made against a "director or officer."

107. To flesh this out a bit more, the "Severability of Exclusions" provision of the National Union Policy, contained in Endorsement 23,  states, in pertinent part that:

> For the purpose of determining the applicability of the . . . Exclusions, . . . the facts pertaining to. . . any Insured shall not be imputed to any other Insured Person. . .

108. Under this provision, the facts pertaining to Crowley (*i.e.*, its guilty plea), shall not be imputed to an Individual Insured like Mr. Farmer.  Rather, this provision requires that the application of the exclusions be determined separately as to each individual insured.

109. I also note that in this case, no Claim (as defined) was actually ***ever*** made against the corporate insured, Crowley, with the result being that there is no guilty plea as to any Claim to which the Policy can be applied here.

110. In summary, the industry custom and practice with respect to application of these provisions is straightforward and completely at odds with National Union's position here.  Applying the guilty plea of one insured to bar coverage for costs incurred on behalf of another insured, particularly where that other insured has been acquitted of all criminal wrongdoing, would violate a basic precept under which D&O policies containing such language have been sold for many years.  Indeed, I find it hard to believe that National Union ever took a contrary position.

**D.**

**Whether National Union's Position that Crowley Failed to Fulfill its Obligations Under the Policy with Respect to Submitting Defense Costs Comports with Industry Custom and Practice**

111.   Despite National Union's denial of coverage, Crowley (and Mr. Farmer's counsel) did submit some defense costs invoices to National Union for pre-indictment defense costs and offered to submit others.  I noted the following examples in the correspondence provided to me: a November 26, 2008 letter from Crowley to National Union (through Aon) which states "[a] schedule summarizing defense costs paid through 10/30/08 is attached…If underwriters require copies of fee statements, please advise and we will provide."; a September 30, 2009 letter enclosing copies of invoices and a "schedule summarizing defense costs paid through 8/10/09"; and a July 30, 2010 letter enclosing "documentation which substantiates the additional defense costs that have been incurred."

112.   National Union chose not to pay these invoices, not to offer any objections to the hourly rates they reflected, or provide any input regarding them whatsoever.  National Union chose not to provide coverage for Crowley's Claim and did not take Crowley up on invitations to review invoices or consent to defense costs.  Under such circumstances, it is not industry custom and practice for an insurer to require an insured to go through the empty exercise of further submitting defense cost invoices to its insurer.

113.   From a custom and practice point of view, once the carrier denies the claim, they are in essence indicating that they will not look at any defense costs bill submitted to it in any event.  National Union's conduct here is consistent with that custom and practice in that it never sought to review defense cost invoices.

114.   National Union has argued that it is "unfair" to ask them to pay for defense costs bills due to the fact that they have had no opportunity to control the defense.  But National Union did have the opportunity to associate in Mr. Farmer's defense, and instead chose to give up that opportunity.   As discussed earlier, National Union could have chosen to advance defense costs from the beginning subject to an undertaking for reimbursement should the FBI Affidavit not end up meeting the definition of a Claim.  Had they elected to do so, they would have had the opportunity to both associate in

26

the defense as well as review defense costs billed on a contemporaneous basis.  But National Union chose not to take that course. National Union has not been subjected to any "unfairness" in this regard.


Sincerely,


Ty R. Sagalow

# EXHIBIT A – CURRICULUM VITAE

## TY R. SAGALOW

2 World Financial Center, 30th Floor, N.Y. N.Y. 10281• (917) 620-2174 •

tysagalow@innovationinsurancegroup.com

### SUMMARY

**CEO & Founder, Innovation Insurance Group, LLC**, a premier consulting firm to the insurance industry specializing in expert witness services focused in management and professional liability, and product development. (www.innovationinsurancegroup.com).  Former senior executive for large global insurance companies with proven track record of management success. Expertise in new product development, management/professional liability products, cyber-risk and reputational risk products.  Customer Focused, Results-oriented, entrepreneurial, visionary, inventive.

### KEY POSITIONS

- CEO & Founder of insurance consulting firm specializing in new product development and expert witness services.
- Chief Insurance Officer of Lemonade Inc, a Sequoia backed "P2P" Insurance company
- Former Chief Innovation Officer of AIG, Zurich North America and Tower Group.
- Former Chief Underwriting Officer for National Union (world's largest D&O/E&O underwriter)
- Former General Counsel for National Union (world's largest D&O/E&O underwriter)
- Former Chief Operating Officer for AIG eBusiness Risk Solutions (largest US based cyber-risk insurance company)
- Licensed P&C Insurance Broker

### KEY ACHIEVEMENTS

- Over 45 successful client engagements in its first 48 months (Innovation Insurance Group, LLC) including major insurance companies, insurance brokers, law firms (representing both carrier and policyholder) and entrepreneurs.
- Exclusive "*Ask the Expert*" senior advisor for Advisen (D&O, E&O and Cyber)
- Host of "*Innovations in Insurance with Ty Sagalow*", "*What's New in Insurance*" - World Risk and Insurance News
- No 1 "New Product Innovator of the Year " for 2011 for first time in company 180 year history (Zurich)
- Produced $1.5B+ GWP from products enhanced from 2009 to 2011; (Zurich)
- 28   Improved development to launch cycle time by 33% (Zurich)
- 29   Chief designer of cyber-insurance, a $1B industry premium business in 2012 (AIG)
- 30   Chief designer of reputational risk insurance for Zurich and AIG
- 31   Chief designer of Y2k Insurance (AIG)
- 32   Chief designer of Coverage C (Entity Coverage) in Directors and Officers liability insurance

(AIG)
• Authored several published works

• Frequent Speaker before industry forums, FOX; testified before Congress and Chaired Congressional committees


**PROFESSIONAL EXPERIENCE**

**Innovation Insurance Group, LLC  *CEO & Founder* (3/12 to Present) (4/11-8/11)**

Founded first known consulting company designed to provide broad array of product development services to the insurance industry. In 2013, firm created a second major practice group providing expert witness services specialized in management and professional liability.  For more information, www.innovationinsurancegroup.com; a list of clients and partners in expert witness field, go to http://innovationinsurancegroup.com/our-services/expert-witness-services/

**Lemonade, Inc, *Chief Insurance Officer* (8/16 - present)**
**Lemonade Insurance Company, *Chief Executive Officer* (8/16- present)**

Responsible for insurance operations at first "Peer-to-Peer" insurance carrier.

**Tower Group, *Chief Innovation Officer (8/11 - 3/12)***

Responsible for shepherding #40 P&C company to its next evolution of organic growth thru the development of new products.


**Zurich North America, *Chief Innovation Officer (1/09 - 4/11)***

Responsible for department charged with creating or enhancing products and launching them into marketplace for U.S.

• $1.5B in premium generated from products created new or enhanced from January 2009 (over $250M in new business)
• Launched 66 products in 2010 presenting 22.7% of all current products generating 17% of all GWP in Dec 2010
• Launched 12 "national Sales campaigns" in various industry verticals with minimum annual GWP of $50M each.

**AIG, *President, Product Development - Worldwide* (2004-2009)**

Responsible for department charged with creating new products for all member companies of AIG in General Insurance

Launched new insurance product every 15 days. Both foreign and US product launches. Called "a unit without peer in the insurance industry"

**AIG,** ***Chief Operating Officer, AIG e-Business Risk Solutions*** (2000-2003)

Found and created cyber-risk insurance, a new market niche producing $20M (Y1) climbing to $100M (Y4)

**AIG,** ***Chief Underwriting Officer and General Counsel, National Union*** (1988-1994) (1994-1999) Responsible for all major underwriting decisions for largest management liability insurance carrier producing approximately $4 billion in sales annually. Responsible for managing in-house attorneys.

**AIG,** ***Staff Counsel*** (1983-1988) Responsible for cases under portfolio as staff litigation counsel.

**PUBLIC POLICY EXPERIENCE**

***Public Policy Advocacy*** (2000 -Present) Experienced in public policy, lobbying and legislative process in cyber-risk security.

**EDUCATION**

**New York University Law School**, New York, NY (L.L.M, 1987)
**Georgetown University Law Center**, Washington, DC (J.D. *cum laude,* 1983)
**Long Island University**, Brookville, NY (B.A. *summa cum laude,* 1980)

**BAR and LICENSES**

New York Bar (1983)
U.S. Supreme Court Bar (2003)
P&C Insurance Broker (multiple states)

**BOARDS AND CHAIRS**

Chairman, Internet Security Alliance (2007-2011); Board Member, Financial Services Information, Sharing and Analysis Center (FS/ISAC) (2004-2009); Chaired various congressional committee and private sector task forces

**SELECTIVE MAJOR PUBLICATIONS**

Directors and Officers Liability and Insurance Handbook, National Association of Corporate Directors, 1999; Director and Officer Liability: Indemnification and Insurance (with Josiah Hatch and John Olson), Clark Boardman Callaghan, 1990, 1994; @ Risk, The definitive guide to legal issues of insurance and reinsurance of internet, e-commerce, cyber

**APPEARANCES**

Have appeared on FOX, CNBC, Bloomberg Radio, World Business Review and National Press Club. Have appeared at the White House, Departments of Treasury, Defense, Homeland Security, and Congress in addition to regular industry forums.

**ADDITIONAL INFORMATION**

http://innovationinsurancegroup.com/about/ty-r-sagalow-ceo/
www.linkedin.com/in/tysagalow

<u>All List of Publications (2006-2016)</u>

1. Accounting Irregularities and Financial Fraud (with Michael Young) (*Harcourt Brace & Co, 2000-2006)*

2. *The Role of Cyber Insurance in Fighting the War on Terror*, Cutter IT Journal, May 2006.

3. Top Ten Steps When Faced with a D&O Denial Letter (Financier Worldwide, August 2014)

<u>Testimony at Deposition or Trial (2012-2016)</u>

1. First Horizon v Certain Underwriters at Lloyds, et al (Deposition) (District Court, Tennessee, 2013)

2. JP Morgan Chase v Indian Harbor (Deposition) (Supreme Court, State of New York, 2014)

3. FDIC v Rafael Arrillaga-Torrens, Jr. et al [Eurobank] (Deposition) (District Court, Puerto Rico, 2014)

4. Millennium v Darwin Insurance Company (Deposition, Trial)  (District Court, San Diego) (2014, 2015)

5. Sandburg vs National Union  (fact witness) (Deposition) (District Court, Texas) (2014)

6. Millennium vs. Allied World Insurance Company (Deposition) (District Court, San Diego) (2014)

7. Repid vs. Philadelphia Insurance et al (Deposition) (Circuit Court, Maryland) (2015)

8. Imperium vs. Shelton & Associates (Deposition)(District Court, Mississippi) (2015)

9. Beazley vs. ACE (Deposition)(District Court, New York)(2015)

10. Illinois National Insurance vs. AlixPartners (Circuit Court, Michigan) (2016)

11. Baldwin vs. Aon Risk Services (Superior Court, Frenso (CA) (2016)

12. Patriarch Partners vs. Axis Insurance Company (District Court, NY) (2016)

13. Fidelity and Deposit Company of Maryland (Zurich) vs First National Community Bankcorp (District Court, PA)(2016)

## EXHIBIT B – FACTS AND DATA CONSIDERED

1.     The following **insurance policies, binders, applications, application warranty letters and quote letters**:

     a.   Executive and Organization Liability Insurance Policy No. 061-36-48 issued by National Union Fire Insurance Company of Pittsburgh, Pa. ("NUFIC" or "AIG") to Crowley Maritime Corporation for the policy period of November 1, 2007 to November 1, 2008 providing a limit of liability of $10,000,000 ("Policy");

     b.   Directors, Officers and Private Company Liability Insurance Policy No. 066-57-99 issued by National Union Fire Insurance Company of Pittsburgh, Pa. to Crowley Maritime Corporation for the policy period of November 1, 2007 to November 1, 2008.

2.     The following **Coverage Dispute pleadings** and other related documents:

     a.   Plaintiff's Complaint dated August 8, 2016

     b.   Defendant's Motion to Dismiss dated October 14, 2016

     c.   Plaintiff's Opposition to Defendant's Motion to Dismiss dated November 7, 2016

     d.   Defendant's Reply to Plaintiff's Opposition dated December 9, 2016

     e.   Arbitration Decision and Award dated January 29, 2013

3.     The following **Underlying Claim** and other Underlying Claim related Documents

     a.   DOJ Application and Affidavit for Search Warrant dated April 16, 2008 with Attachment A (Description of Premises to be Searched) and Attachment B (Description of Property to be Seized) ("FBI Search Warrant")

     b.   DOJ Affidavit in Support of Search Warranted of April 16, 2008 ("FBI Affidavit") ("FBI Search Warrant" and "FBI Affidavit" (sealed or unsealed) "DOJ Investigation")

4.  The following **claims** documents and correspondence

    a.    Various correspondence to and from the parties, or their representatives, dated:

        i.    4/25/08        Notice of Claim- 'DOJ Investigation'

        ii.    5/7/08        Insured to AIG re defense costs request

        iii.    5/22/08        Insured to AIG re corporate indemnification

        iv.    5/27/08        AIG to Insured – "First Denial Letter"

        v.    6/30/08        Insured to AIG re: Grand Jury coverage

        vi.    11/26/08        Insured to AIG re: underlying claim status update

        vii.    2/3/09        AIG to Insured – "Second Denial Letter"

        viii.    9/30/09        Insured to AIG re: Second Denial Letter

        ix.    6/9/10        AIG to Insured – "Third Denial Letter"

        x.    7/3/10        Insured to AIG re: underlying claim status update

        xi.    8/18/10        AIG to Insured

        xii.    7/18/12        Insured to AIG re: Farmer as a DOJ Target

        xiii.    8/28/12        AIG to Insured re: 7/18/12 Insured letter

        xiv.    2/18/13        Second Notice of Claim – 'DOJ Plea Offer'

        xv.    3/5/13        AIG to Insured – DOJ Plea Offer Coverage Acceptance

        xvi.    7/22/15        Insured to AIG re: Tom Farmer's acquittal

        xvii.    8/3/15        AIG to Insured – "Fourth Denial Letter" re: DOJ Investigation

        xviii.    9/14/15        Insured to AIG re: coverage

        xix.    12/1/15        AIG to Insured – "Fifth Denial Letter" re: DOJ Investigation

5.  The following **other documents**:

    a.    Section 145 of the Delaware Corporation Law (respecting indemnification)

33

# Doc. 36-15

# EXHIBIT N

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

CROWLEY MARITIME CORPORATION          :
                                       :
                  Plaintiff,           :        Case No. 3:16-CV-1101-J-32JBT
       v.                              :
                                       :
NATIONAL UNION FIRE INSURANCE          :
COMPANY OF PITTSBURGH, PA.,            :
                                       :
                  Defendant.           :

---

### EXPERT REPORT OF THOMAS R. NEWMAN

I am Thomas R. Newman, an attorney and counsel to the law firm of Duane Morris LLP, 1540 Broadway, New York, N.Y. 10036.

### MY QUALIFICATIONS

1.     I was admitted to the Bar of the State of New York in January 1961 after receiving my Bachelor of Laws Degree from New York University School of Law in 1960. I am co-author of Ostrager & Newman, *Handbook on Insurance Coverage Disputes,* now in its 18th edition, which has been cited as an authority almost 350 times by state and federal courts throughout the country, including by the Florida Supreme Court, the Eleventh Circuit Court of Appeals and the United States District Court for the Southern and Middle Districts of Florida. Section 4.02[b][*5*] of our *Handbook* is devoted to claims-made policies and notice of claims thereunder and Chapter 20 deals with Current Issues Relating to D&O Coverage. Attached hereto as **Exhibit A** is a copy of my current *curriculum vitae*, which sets out in full my qualifications, including a list of all publications authored by me within the preceding ten years and a listing of other cases in which I have appeared as an expert witness at trial or by deposition

within the preceding four years.

2.    I have had extensive dealing with both primary and excess insurers and their underwriters and claims handlers for the last forty years, although I have never been employed "in-house" by an insurance company.

3.    During my long career as an attorney advising insurance company claims' departments, I have reviewed literally thousands of underwriting and claim files. I have met with hundreds of individual claims' handlers from numerous companies that do business throughout the United States to discuss questions of coverage and other issues presented by their claims files. I would advise them how to deal with such issues and make suggestions as to how the claim should be handled according to insurance industry custom and practice as I have come to know it, as well as from a legal standpoint.

4.    Insurers develop and implement their standards and practices in the context of a highly regulated industry and frequent litigation over their policies and practices. Accordingly, insurers must keep abreast of how courts interpret their own and similar policy wording in order to determine their policy rights and obligations. A discussion of liability insurance industry standards and practices, therefore, may involve consideration of judicial decisions in insurance cases. However, any such discussion is not intended to express a legal opinion but merely to provide context for the claims-handling issues and my opinions thereon.

5.    I have personally reviewed and analyzed over 3,500 claim files and prepared, reviewed and edited coverage opinions, reservations of rights, nonwaiver agreements, disclaimer and denial of coverage letters and other communications between claims handlers and policyholders, brokers, counsel and claimants. I have monitored claims for both primary and excess insurers, negotiated settlements of underlying claims, and participated in the mediation,

2

arbitration and litigation of claims.  In addition, I have often been invited to lecture to claims handlers and underwriters on various subjects relevant to their daily tasks.

6.     I also have been retained as an expert on insurance matters by counsel for policyholders in coverage disputes, and I have prepared reports and given testimony against insurers in a number of cases.

## SCOPE OF THIS REPORT

7.     I have been asked by counsel for National Union Fire Insurance Company of Pittsburgh, Pa. ("National Union"), the defendant in the above captioned action, to provide them with my opinions and comments on the Expert Report of Ty R. Sagalow, dated February 10, 2017 2012 (hereinafter "Sagalow"), insofar as it pertains to the question of coverage under National Union's Executive and Organization Liability Insurance Policy No. 061-36-48, issued to Crowley Maritime Corporation ("Crowley") for the Policy Period from November 1, 2007 to November 1, 2008 (the "National Union Policy" or "Policy"), for Claims first made against an Insured during the Policy Period and reported to National Union pursuant to the terms of the Policy.

## COMPENSATION

8.     Duane Morris LLP expects to be compensated for the time I devote to this assignment, and any other work I may be asked to do herein, including giving evidence at a deposition or trial, at its billing rate for my services herein of $725 per hour. My compensation is not contingent upon the outcome of this case.

## MY OPINIONS

9.    Although I am a lawyer, all the opinions I express herein are to a reasonable degree of certainty as an expert in the field of liability insurance coverage and claims handling when dealing with a claim reported to an insurer under a claims-made and reported policy such as National Union's Policy.

10.    In **Section I,** I set forth the relevant terms of National Union's Policy. In **Section II,** I discuss (a) the structure of National Union's policy, (b) claims-made coverage generally, and (c) applicable principles of construction.  In **Section III,** I set out the relevant facts, as I understand them, taken from the documents I have reviewed. In **Section IV,** I apply the general principles governing claims handling under a claims-made and reported policy to the facts and express my opinions and observations on Mr. Sagalow's Expert Report. In **Section V,** I list all the documents that counsel for National Union provided to me and which I reviewed before arriving at the opinions expressed herein. In **Section VI,** I list an additional basis for my opinions.

11.    **I.    National Union's Policy No. 061-36-48**

National Union's Policy contains the following relevant terms and conditions:

**EXECUTIVE AND ORGANIZATION LIABILITY INSURANCE POLICY**[1]

> **NOTICE: COVERAGES A, B AND C ARE CLAIMS MADE. THE COVERAGE OF THIS POLICY IS GENERALLY LIMITED TO LIABILITY FOR CLAIMS THAT ARE FIRST MADE AGAINST THE INSUREDS AND CRISIS FIRST OCCURRING DURING THE POLICY PERIOD AND REPORTED IN WRITING TO THE INSURER PURSUANT TO THE TERMS HEREIN. PLEASE READ THE POLICY CAREFULLY AND REVIEW ITS COVERAGE WITH YOUR INSURANCE AGENT OR BROKER.**
>
>         .   .   .

---

[1]    From Form 75010 (2/00).

4

## DECLARATIONS

. . .

1.    NAMED ENTITY:   CROWLEY MARITIME CORPORATION

2.    POLICY PERIOD:   From November 1, 2007 to November 1, 2008.

. . .

**1.    INSURING AGREEMENTS[2]**

With respect to coverages A, B and C, solely with respect to **Claims** first made against an **Insured** during the **Policy Period** . . . and subject to the other terms, conditions and limitations of this policy, this policy affords the following coverage:
**COVERAGE A:  EXECUTIVE LIABILITY INSURANCE**

This policy shall pay the **Loss** of any **Insured Person** arising from a **Claim** made against such **Insured Person** for any **Wrongful Act** of such **Insured Person**, except when and to the extent that an **Organization** has indemnified such **Insured Person**. . . .

**COVERAGE B:  ORGANIZATION INSURANCE**

(i)    *Organization Liability:* This policy shall pay the **Loss** of any **Organization** arising from a **Securities Claim** made against such **Organization** for any **Wrongful Act** of such **Organization**.

(ii)    *Indemnification of an Insured Person:* This policy shall pay the **Loss** of an **Organization** arising from a **Claim** made against an **Insured Person** . . . for any **Wrongful Act** of such **Insured Person,** but only to the extent that such **Organization** has indemnified such **Insured Person**.

. . .

**2.    DEFINITIONS**

(b)    Claim means:

    (1)    a written demand for monetary relief, non-monetary or injunctive relief;

    (2)    a civil, criminal, administrative, regulatory or arbitration proceeding for  . . . proceeding for monetary, non-monetary or injunctive relief which is commenced by: (i) service of a complaint or similar pleading; (ii) return of an indictment, information or similar document (in the case of a criminal proceeding); or (iii) receipt or filing of a notice of charges; or

    (3)    a civil, criminal, administrative or regulatory investigation of an **Insured Person**:

        (i)    once such **Insured Person** is identified in writing by such investigating authority as a person against whom a proceeding described in Definition

---

[2]    The following policy provisions are from Form 75011 (2/00).

(b)(2) may be commenced; or

(ii)     in the case of an investigation by the SEC ... after service of a subpoena upon such **Insured Person.**

. . .

(f)     "**Defense Costs**" means reasonable and necessary fees, costs and expenses consented to by the **Insurer** . . . resulting solely from the investigation, . . . defense . . . of a **Claim** against an **Insured** . . .

(g)     "**Employee**" means any past, present or future employee, other than an **Executive** of an **Organization** . . . .

(j)     "**Executive**" means any:

(1)     past, present and future duly elected or appointed . . . officer . . . of a corporation . . . .

(n)     "**Insured**" means any:

(1)     **Insured Person**; or
(2)     **Organization**, but only with respect to a **Securities Claim**

(o)     "**Insured Person**" means any:

(1)     **Executive** of an **Organization**;
(2)     **Employee** of an **Organization**; . . .

(p)     "**Loss**" means damages, . . . **Defense Costs** . . .

(t)     "**Organization**" means:

(1) the **Named Entity;**
(2) each **Subsidiary**; . . .

(w)     "**Policy Period**" means the period of time from the inception date shown in Item 2 of the declarations to the earlier of the expiration date shown in such Item 2 . . .

(aa)     "**Wrongful Act**" means:

(1)     any actual or alleged breach of duty, neglect, error, misstatement, misleading statement, omission or act . . .

(i)     with respect to any **Executive** of an **Organization**, by such **Executive** in his or her capacity as such or any matter claimed against such **Executive** solely by reason of his or her status as such; . . .

DM1\7601512.1

(2)     with respect to an **Organization,** any actual or alleged breach of duty, neglect, error, misstatement, misleading statement, omission or act by such **Organization** but solely in regard to a **Securities Claim**.

## 4.    EXCLUSIONS

The **Insurer** shall not be liable to make any payment of **Loss** in connection with any **Claim** made against an **Insured**:

. . .

(a)     arising out of, based upon or attributable to the gaining of any profit or advantage to which a judgment or final adjudication or an alternative dispute resolution proceeding adverse to the **Insured** establishes the **Insured** was not legally entitled;

. . .

(c)     arising out of, based upon or attributable to the committing of any deliberate criminal or deliberate fraudulent act by the **Insured** if a judgment or final adjudication or an alternative dispute resolution proceeding adverse to the **Insured(s)** establishes that such deliberate criminal or fraudulent act was committed. [3]

## 7.    NOTICE/CLAIM REPORTING PROVISIONS

Notice hereunder shall be given in writing to the Insurer named in Item 8 of the Declarations at the address indicated in Item 8 of the Declarations. . . .

(a)     An **Organization** or an **Insured** shall, as a condition precedent to the obligations of the **Insurer** under this policy, give written notice to the **Insurer** of a **Claim** made against an **Insured** . . . as soon as practicable: (i) after the **Named Entity's** Risk Manager or General Counsel (or equivalent position) first becomes aware of the **Claim** . . ., but in all vents no later than either:

    (1)     the end of the **Policy Period** or the **Discovery Period** (if applicable); . . .

(c)     If during the **Policy Period** . . . an **Organization** or an **Insured** shall become aware of any circumstances which may reasonably be expected to give rise to a **Claim** being made against an Insured and shall give written notice to the **Insurer** of the circumstances, the **Wrongful Act** allegations anticipated and the reasons for anticipating such a **Claim**, with full particulars as to dates, persons and entities involved, then a Claim which is subsequently made against such **Insured** and reported to the **Insurer** alleging, arising out of, based upon or attributable to such circumstances or alleging any **Wrongful Act** which is the same as or related to any **Wrongful Act** alleged or contained in such circumstances, shall be considered made at the time such notice of such circumstances was given.

---

[3]     Endorsement #9 Form 90497 (2/06).

8.    **DEFENSE COSTS,** . . .

Under Coverages A, B and C of this policy, except as hereinafter stated, the **Insurer** shall advance, excess of any applicable retention amount, covered **Defense Costs** no later than ninety (90) days after the receipt by the **Insurer** of such defense bills. . . .

*The **Insurer** does not, however, under this policy, assume any duty to defend. The **Insureds** shall defend and contest any **Claim** made against them.* . . .

. . .

18.   **ACTION AGAINST INSURER**

. . . no action shall lie against the **Insurer** unless, as a condition precedent thereto, there shall have been full compliance with all of the terms of this policy, . . .

**ENDORSEMENT # 14**
**RUN-OFF ENDORSEMENT**

10.   **RUN-OFF COVERAGE CLAUSE**

The **Named Entity** shall have the right for a period of *SIX* of *6 years* following the **Effective Date** [November 1, 2007](herein referred to as the **Discovery Period**) in which to give written notice to the **Insurer** of any **Claim** first made against any **Insured** during said *6 year* period for any **Wrongful Act** occurring on or prior to the **Effective Date** and otherwise covered by this policy.

II.    **CLAIMS-MADE COVERAGE**

A.    **The structure of the policy**

12.    The National Union Policy, like liability insurance policies generally, begins with the "INSURING AGREEMENTS." This clause affirmatively indicates the coverage which is provided by the policy and it is the only place in the policy where one looks to see what coverage is included. The National Union Policy provides four different types of coverage,[4] only two of which, **Coverage A**: Executive Liability Insurance, and **Coverage B**: Organization Insurance, are involved in this case.

---

[4]    **Coverage A**: Executive Liability Insurance; **Coverage B**: Organization Insurance; **Coverage C**: Outside Entity Executive Liability Insurance; **Coverage D**: CrisisFund Insurance.

8

13.    The Executive Liability Insurance provides coverage to Insured Persons (i.e., Executives or Employees of an Organization) for Loss for which they have not been indemnified by an Organization. The Organization Insurance provides coverage for (i) *Organization Liability* and (ii) *Indemnification of an Insured Person.*

14.    The policy contains "DEFINITIONS" which state the meaning to be given to key terms used throughout the policy (in bold). As a matter of industry custom and practice, undefined terms will be given their plain English meaning.

15.    The policy also has "EXCLUSIONS" which expressly state what will not be covered by the policy. As a matter of industry custom and practice, a claims handler's analysis of coverage begins by looking first at what is found under the heading "INSURING AGREEMENTS" to see what is covered. If it is clear that the policy was not intended to cover the Claim asserted, the analysis ends there. If the Claim triggers an initial grant of coverage in the Insuring Agreements, the various exclusions are examined, individually, to see whether any of them precludes coverage of the Claim. If no exclusion applies, the claims handler will review the other terms and conditions of the policy to see whether the insured has met all of the conditions precedent to the insurer's obligation to indemnify it for a covered Loss.

16.    The typical liability policy includes such other terms and conditions as "6. RETENTION CLAUSE," "7. NOTICE/CLAIM REPORTING PROVISIONS," "8. DEFENSE COSTS, SETTLEMENTS, JUDGMENTS (INCLUDING THE ADVANCEMENT OF DEFENSE COSTS)," "17 ALTERNATIVE DISPUTE RESOLUTION PROCESS" and "18. ACTION AGAINST INSURER." Those terms and conditions, however, are not part of the coverage grant, which is found only in the express statements of COVERAGES A, B, C & D, in the INSURING AGREEMENTS.

9

**B.**   **Claims-made coverage generally**

17.   To trigger coverage under a claims-made policy (assuming no exclusions apply or any other reason for denying coverage), a notice of claim must comply strictly with the policy terms governing notice. These, generally, will state that notice of claims is to be reported to the insurer's claims department or, as in the case of National Union's policies, to a specific mailing address (*e.g.*, 175 Water Street, New York, N.Y. 10038, which is AIG's claims department).

18.   Unlike an occurrence-based policy that covers injury or damage that takes place during the policy period regardless of whether the loss is reported during that period, a claims-made policy provides coverage only if a claim is asserted during the policy period. A more restrictive type of claims-made policy (e.g., the National Union Policy) requires not only that the claim must first be made during the policy period, but that the insured also reports the claim (gives notice) to the insurer during the policy period or any extended reporting period (ERP). It is the timely notice of claim that triggers coverage under these policies. Often, as in National Union's Policy, notice is expressly stated to be "a condition precedent to the obligations of the Insurer under this policy . . ."

19.   The notice requirement in a claims-made policy allows the insurer to close its books on a policy at its expiration and thus to attain a level of predictability unattainable under standard occurrence policies which may have to respond to claims arising from occurrences that took place decades earlier.

20.   The knowledge that after a certain date the insurer is no longer liable for newly reported claims under a claims-made policy enables the insurer to fix its reserves more accurately for future liabilities and to compute premiums with greater certainty. By limiting its maximum ''tail'' exposure period, the insurer avoids the increased risks associated with future

inflation, the prospect of increasing jury awards, and unanticipated changes in the substantive law. This allows the underwriter to set premiums on claims-made and reported policies at lower rates than for comparable coverage under an occurrence form.

21.    A claims-made policy covers acts and omissions occurring either before or during the policy period; for prior acts, the policy may provide full retroactive coverage or it may only cover claims arising out of acts and omissions after the "retroactive date" or "continuity date" specified in the Declarations. Insurers protect themselves against liability for old occurrences by including a date specifying the earliest occurrence to be covered, no matter when the claim is made. Herein, a "continuity date" of August 22, 1985, is used for Coverages A and B.

**C.    Applicable principles of construction**

22.    As a matter of insurance industry custom and practice (dictated by the law in all jurisdictions), a claims handler will apply the following principles when reviewing a policy and making a coverage determination: The determination of the parties' intent, as an initial matter, is to be made solely from the language employed by the parties without reference to extrinsic evidence of any kind.   Where the provisions of the policy are clear and unambiguous, they must be given their plain and ordinary meaning.   Full force and effect should be given to all of the words in the policy. An insurance policy should not be read so that some provisions are rendered meaningless. Every clause or word in an insurance contract is deemed to have some meaning. All parts and clauses of the policy must be considered together so that it may be seen if and how far one clause is explained, modified, limited or controlled by the others. Coverage grants are to be construed broadly while exclusions are construed narrowly.

## III.   THE RELEVANT FACTS

    23.   The following is a chronology of the relevant events:

Nov. 1, 2007      National Union policy incepts.

Apr. 17, 2008      Crowley Liner Services, Inc., a wholly owned subsidiary of Crowley, served with [1] a search warrant which had crossed out "involving which there is an offense under investigation," and [2] a Grand Jury subpoena for documents in connection with a United States DOJ antitrust investigation.

     The property to be seized included, "A. Notes, memoranda, correspondence, reports, and other records and documentation relating to any agreement, meeting or conversation, or other communications . . . between or among management, pricing, or sales personnel CROWLEY LINER SERVICES, INC., including ROB GRUNE ("GRUNE"), TOM FARMER ("FARMER"), JOHN KELLEY ("KELLEY") and TONY LUSIS ("LUSIS") and any employee or agent of a SEA STAR LINE, LLC, and HORIZON LINES, LLC. . . .

     E.   All telephone charge and toll records, including cellular telephone records for CROWLEY management, pricing or sales personnel, including GRUNE, FARMER, KELLEY and LUSIS, and any employee or agent of a SEA STAR LINE, LLC, and HORIZON LINES, LLC.

Apr. 17, 2008      Grand Jury subpoena for testimony served on FARMER.

Apr. 25, 2008      AON, on behalf of Crowley and all other Insureds gave notice to National Union of the DOJ/FBI investigation and advised that Crowley and the individual insureds had retained counsel to represent their interests.

May 27, 2008      AIGDC (Maureen Conboy), on behalf of National Union, acknowledges receipt of the notice and denies coverage as [1] the investigation of Crowley is not a Securities Claim, [2] no Insured Person has been named in the complaints or identified in writing as a target of any investigation, and [3] no Wrongful Act has been alleged against any Insured Person.

Jun. 30, 2008      FARMER's counsel gives notice to AIGDC of grand jury subpoena to testify served  on FARMER and requests coverage for him.

Aug. 11, 2008      AIGDC (Maureen Conboy) acknowledges receipt and reiterates denial of coverage. The subpoena is not an investigation of an Insured Person and the search warrant does not identify FARMER as the target of an investigation.

12

| | |
|---|---|
| Nov. 26, 2008 | Crowley gives National Union additional information and advises it has "advanced defense and investigation costs to Insured Person officer/employees Grune, FARMER, Lusis and Kelly and may continue to advance such costs . . ." |
| Feb. 3, 2009 | AIGDC (Maureen Conboy) acknowledges receipt and reiterates denial of coverage. "Our coverage position . . . remains unchanged. . . . To date nothing has been submitted to show that there is any civil, criminal, administrative or regulatory investigation of an Insured Person. Additionally, no Insured Person has been identified in writing as a person against whom a proceeding may be commenced. . . . The grand jury subpoena received by FARMER does not appear to have been issued in connection with an investigation of FARMER. It does not identify FARMER as a person against whom a proceeding may be commenced... Thus, a Claim (as defined by the Policy) has not been made against any Insured Person and coverage is unavailable." |
| May 17, 2011 | Grand jury subpoena served on Crowley Liner to produce telephone records for numbers used by FARMER. Maureen Conboy's Affidavit, ¶ 10, says this was not submitted to National Union until Crowley filed its Detailed Statement of Claim on September 4, 2012. |
| Sep. 11, 2011 | DOJ sent Settlement Term Sheet to Crowley with FARMER and Grune, "carved out." Maureen Conboy's Affidavit, ¶ 11, says this was not submitted to National Union until June 19, 2012. |
| Jul. 31, 2012 | Crowley pleaded guilty in the U.S.D.C, District of Puerto Rico, to one count of conspiracy to restrain trade and commerce in violation of the Sherman Act, §1 (15 USC § 1), and agreed to pay a $17 million fine. |
| Jan. 2013 | Award made in arbitration proceeding between Crowley and National Union finding National Union not obligated to reimburse Crowley for FARMER's legal fees. |
| Feb. 8, 2013 | FARMER's counsel advised National Union of the DOJ Plea Agreement Offer to FARMER (which FARMER rejected). |
| Mar. 5, 2013 | National Union agreed that the DOJ Plea Agreement Offer was a Claim under its Policy and accepted the DOJ Investigation as a Claim effective February 18, 2013. |
| Jul. 22, 2015 | Crowley advised National Union that FARMER was acquitted of all criminal charges, that the FBI Affidavit had been unsealed, ad that the FBI Affidavit identified FARMER as a person against whom criminal charges might be brought. Crowley sought reimbursement of all legal fees paid on behalf of FARMER. |

| Aug. 3, 2015 | National Union adhered to its position that Defense Costs incurred prior to February 18, 2013, are not covered. |
| Sep. 14, 2015 | Crowley notes its disagreement with National Union's position that the January 2013 arbitration award is entitled to res judicata effect. |
| Dec. 1, 2015 | National Union reiterates its position that there is no coverage for Defense Costs incurred prior to February 18, 2013. |

## IV.    MY OPINIONS AND COMMENTS

### A.

24.    Paragraphs 42-92 of Mr. Sagalow's Expert Report address the following question:

Whether it would be industry custom and practice to treat the FBI Affidavit as a Claim first made against Thomas Farmer on April 16, 2008, even though the Affidavit was not unsealed until 2015?

25.    For the reasons explained below, I do not believe that the answer to the question formulated by Mr. Sagalow answers the broader and dispositive question in this action:

Did National Union's claims handlers act in accordance with good and accepted insurance industry custom and practice when they concluded that there was no coverage under the Policy for Crowley or Mr. Farmer for reimbursement of his Defense Costs prior to February 18, 2013?

26.    While Mr. Sagalow professes not to "believe there to be any dispute between the parties as to whether the FBI Affidavit is a 'Claim'" (Sagalow ¶ 54), it is my understanding that National Union does dispute whether a Claim was made against Mr. Farmer as of the date of the Affidavit. In any case, even assuming that the FBI Affidavit identifies FARMER "as a person against whom a proceeding described in Definition (b)(2) may be commenced," based on custom and practice in the industry it is not a Claim "made against an Insured Person" as is required by the Insuring Agreements.

27.    A Claim cannot be said to be "made against" a person or entity that is unaware such a Claim has been made.  Assume that the FBI Affidavit was made on October 30, 2007 — two days before inception of the National Union Policy on November 1, 2007 — but not disclosed to the Insured until November 2, 2007, after which it was promptly reported to the Insurer. If the FBI Affidavit is treated as a Claim  on the day it was made, there would be no coverage for that Claim under National Union's Policy because the Claim was not "first made against the Insureds . . . during the policy period . . .", as is required by the first paragraph of the Insuring Agreements.

28.    Mr. Sagalow states "there is nothing in the Policy that requires submission of a document to Crowley or Mr. Farmer before they can be deemed 'aware' of the document." Sagalow ¶ 79.   However, he focuses only on the definition of "Claim" and ignores the fact that in order for coverage to be implicated under the Policy the "Claim" must also be "made" against an Insured Person.  It is the insurance industry custom and practice (as well as settled law) to interpret contracts of insurance in a reasonable manner to effectuate the mutual intent of the parties at the time the contract was formed.  A reasonable insured would not have intended to lose coverage because he did not promptly report a claim that he was unaware of

29.    I also do not agree with Mr. Sagalow that, consistent with insurance industry custom and practice, submission of the Affidavit to National Union in 2015 should have led National Union to find coverage under its Policy for Crowley's claim to be reimbursed for the defense costs it paid on behalf of FARMER for his individual defense against the DOJ investigation prior to February 18, 2013.

30.    Mr. Sagalow, mistakenly, relies on Condition 7(c) of National Union's Policy and concludes that "by operation of 7(c), the Claim (whether it is the FBI Affidavit or Plea

Agreement Offer), is 'considered made' on April 25, 2008 and thereafter all defense costs incurred in connection with the Claim on or after April 25, 2008 should be covered." Sagalow ¶¶ 73-74.

31.     Mr. Sagalow overlooks the fact that under the clear wording of Condition 7(c) only a Claim that is made **subsequent** to the written notice of circumstances "shall be considered made at the time such notice of such circumstances was given." Thus, if its component parts are stated separately, Condition 7(c) provides:

i.      If during the Policy Period . . .

ii.     an Organization or an Insured shall become aware of any circumstances which may reasonably be expected to give rise to a Claim being made against an Insured

iii.    and shall give written notice to the Insurer of the circumstances . . . with full particulars as to dates, persons and entities involved,

iv.     then a Claim which is **subsequently made** against such Insured

v.      and reported to the Insurer . . . based upon or attributable to such circumstances or alleging any Wrongful Act which is the same as or related to any Wrongful Act alleged or contained in such circumstances,

vi.     shall be considered made at the time such notice of circumstances was given.

32.     The FBI Affidavit was signed on April 16, 2008.

33.     AON's letter on behalf of Crowley, accepted by National Union "as a notice of circumstances pursuant to Clause 7(c) of the Policy," was made on April 25, 2008.

34.     The FBI Affidavit was dated **prior to** the notice of circumstances, so even if it were considered to be a Claim made against FARMER (which it is not), it clearly is not a Claim **subsequently made** against the insured and, therefore, it does <u>not</u> relate back to April 25, 2008 based on the notice of circumstances.

35.     As for the Plea Agreement Offer made to FARMER on February 18, 2013, this fails to implicate coverage for costs incurred prior to that date because Defense Costs as defined in the Policy[5] are limited to costs incurred in response to an actual Claim.  In addition, the law in the Eleventh Circuit — which is what claims handlers faced with a claim in that Circuit will look to for guidance in determining their obligations — is clear that reimbursable "Defense Costs" under a policy such as National Union's, are limited to only "those costs incurred after a Claim has been made. Investigation of a Claim necessitates that a Claim exists to investigate." *Office Depot, Inc. v. National Union Fire Ins. Co. of Pittsburgh, Pa.,* 453 Fed. Appx. 871, 877 (11th Cir. 2011).

36.     National Union correctly determined that there was no covered Claim prior to February 18, 2013, and it agreed to advance FARMER's Defense Costs incurred after that date. Complaint, ¶ 25.

37.     Mr. Sagalow states National Union should have conducted a thorough investigation of the claim for coverage and counseled its insured to seek to unseal the FBI Affidavit and that claims handling standards require that it "assist the policyholder with its claim." Sagalow ¶¶ 86, 90-92.  I disagree.

38.     While an insurer may have a duty to investigate a *first-party* property damage claim to determine the cause and amount of the loss, insurance industry custom and practice imposes no such duty upon a *third-party* liability insurer, especially not when the insured is counseled and represented by one of the world's largest insurance brokers, AON.[6]  And neither

---

[5]     "**Defense Costs**" means reasonable and necessary fees, costs and expenses consented to by the **Insurer** . . . resulting solely from the investigation, . . . defense . . . of a **Claim** against an **Insured** . . ."  See ¶ 11 at p. 5, *supra*.

[6]     Aon "is the leading global provider of risk management, insurance and reinsurance brokerage,   .   .   .   Through its more than 72,000 colleagues

does the law to which claims handlers would look to determine their obligations. *See, e.g., Fitzpatrick v. American Honda Motor Co.*, 78 N.Y.2d 61, 68 n. 2, 571 N.Y.S.2d 672, 675 n. 2 (1991) ("the duty we recognize here, i.e., the duty to defend when the facts *known* to the insurer indicate coverage, does not depend upon, or even imply, a corollary duty to investigate"); *City of Salina v. Maryland Cas. Co.*, 856 F. Supp. 1467, 1480 n. 9 (D. Kan. 1994)(" There is no requirement that an insurer conduct an independent investigation before rejecting an insured's demand for defense").

**B.**

39.    Paragraphs 93-98 of Mr. Sagalow's Expert Report address the following question:

> Whether it would be industry custom and practice to apply the Run-Off Endorsement[7] in such a way as to bar coverage for Mr. FARMER's pre-indictment defense costs?

40.    Mr. Sagalow states that "The Claim in the form of the FBI Affidavit was provided to Crowley sometime between May 8, 2015, the day Mr. FARMER was acquitted, and July 22, 2015, the date of Crowley's letter to National Union advising them of the acquittal and the unsealing of the affidavit." Sagalow ¶ 93.

41.    Crowley's letter of July 22, 2015 is 20 months too late -- notice of a Claim under the Run-Off Endorsement must have been given before November 1, 2013.

---

worldwide, Aon unites to empower results for clients in over 120 countries . . . Aon has been named repeatedly as the world's best broker, . .. by multiple industry sources." http://www.aon.com/about-aon/about-aon.jsp [last accessed February 16, 2017].

[7]    "The **Named Entity** shall have the right for a period of *SIX* of *6 years* following the **Effective Date** [November 1, 2007](herein referred to as the **Discovery Period**) in which to give written notice to the **Insurer** of any **Claim** first made against any **Insured** during said *6 year* period for any **Wrongful Act** occurring on or prior to the **Effective Date** and otherwise covered by this policy."

42.   By letter dated August 3, 2015, National Union denied the claim on the ground, *inter alia*, that "an affidavit unsealed and submitted for the first time in 2015 is insufficient on the merits to establish coverage for fees that were incurred starting in 2008."

43.   Mr. Sagalow states that National Union's "position is inconsistent with industry custom and practice . . ." Sagalow ¶ 95.  I disagree.

44.   There is no insurance industry custom and practice of which I am aware that permits one to ignore a clear and unambiguous endorsement that extends for six years — but not a day longer — the time for an insured to "give written notice to the Insurer of any Claim first made against any Insured during said 6 year period for any Wrongful Act occurring on or prior to the Effective Date [November 1, 2007] and otherwise covered by this policy."

45.   Mr. Sagalow states that "the Claim in the form of the FBI Affidavit was deemed made and reported no later than on April 25, 2008 when National Union accepted the Insured's notice of claim of the DOJ Investigation as a notice of circumstance pursuant to Condition 7(c) of the Policy." Sagalow ¶ 96.  As indicated above, however, relation back under Condition 7(c) applies only to Claims made subsequent to the notice of circumstances.

46.   As shown in ¶ 34 hereof, reimbursable "Defense Costs" under National Union's Policy are limited to only "those costs incurred after a Claim has been made," and not costs incurred during the period between the notice of circumstances and the Claim. *Office Depot, Inc. v. National Union Fire Ins. Co. of Pittsburgh, Pa.,* 453 Fed. Appx. 871, 877 (11th Cir. 2011).

47.   Insurance industry custom and practice is to follow the language of the Policy and applicable law.

**C.**

48.     Paragraphs 99-110 of Mr. Sagalow's Expert Report address the following question:

> Whether it would be industry custom and practice to apply the "Criminal Acts" and "Improper Personal Profit" exclusions of the Policy to bar coverage for Defense Costs incurred on behalf of Mr. FARMER in light of the guilty plea by a different insured, Crowley.

49.     In view of my opinion that National Union's claims handlers properly found that there is no coverage for Crowley's and FARMER'S claim for reimbursement of his Defense Costs incurred prior to February 18, 2013, I see no need to address this question.

50.     Because of the modular construction of insurance policies,[8] the starting point for any coverage determination — whether made by a court or an insurance company claims handler — is with the insuring agreement to determine whether there is coverage for the claim. "If coverage does not exist under the insuring agreement, the inquiry is at an end. There is no need to look to the exclusions because they cannot expand the basic coverage granted in the insuring agreement." *Stanford Ranch v. Maryland Cas. Co.*, 89 F.3d 618, 627 (9th Cir. 1996).[9]

51.     Based on custom and practice in the insurance industry, the Affidavit signed in 2008 and submitted to National Union in 2015 does not establish that a Claim was first made

---

[8]     Insurance policies such as National Union's generally consist of the following parts: Declarations, Insuring Agreements, Definitions, Exclusions, Conditions

[9]     *See also, American Family Mut. Ins. Co. v. American Girl, Inc.*, 268 Wis.2d 16, 32-33, 673 N.W.2d 65, 73 (2004)("First, we examine the facts of the insured's claim to determine whether the policy's insuring agreement makes an initial grant of coverage. If it is clear that the policy was not intended to cover the claim asserted, the analysis ends there. If the claim triggers the initial grant of coverage in the insuring agreement, we next examine the various exclusions to see whether any of them preclude coverage of the present claim.").

against the Insured and timely reported during the Policy Period and Condition 7(c) does not apply to so as to consider the claim as having been made on April 25, 2008, when the notice of circumstances was given.

**D.**

52.    Paragraphs 111-114 of Mr. Sagalow's Expert Report address the following question:

> Whether National Union's position that Crowley failed to fulfill its obligations under the policy with respect to submitting Defense Costs comports with industry custom and practice.

53.    In view of my opinion that National Union's claims handlers properly found that there is no coverage for Crowley's and FARMER's claim for reimbursement of his Defense Costs incurred prior to February 18, 2013, I see no need to address this question.

## V.    **INFORMATION CONSIDERED**

54.    Counsel for National Union provided me with, and I have reviewed, the following documents:

National Union's Executive and Organization Liability Insurance Policy No. 061-36-48, issued to Crowley Maritime Corporation for the Policy Period Nov. 1, 2007 to Nov. 1, 2008

Expert Report of Ty R. Sagalow, dated February 10, 2017.

Aon's letter to AIG Claims dated April 25, 2008, with attached email of April 23, 2008

AIG Claims' letter to Crowley dated May 23, 2008

Crowley's letter to Lankford & Reed, dated March 27, 2013

Crowley's letter to National Union dated July 22, 2015

AIG Claims' letter to Crowley dated August 3, 2015

Crowley's letter to AIG Claims dated September 14, 2015

AIG Claims' letter to Crowley dated December 1, 2015

## VI.   ADDITIONAL BASIS FOR MY OPINIONS

In reaching the opinions expressed herein, in addition to the materials described above, I relied on my general knowledge of insurance industry custom and practice as it relates to the subjects discussed, gained from my experience in representing insurance companies and my extensive dealing with both primary and excess liability insurers, underwriters and claims handlers for more than forty years.  I also relied on the books and articles I have authored on the subject of liability insurance, the many continuing legal education programs dealing with D&O and other forms of liability insurance that I attended, co-chaired and participated in, as well as my continuing reading of the law and professional journals and publications dealing with the subject of liability insurance and claims handling.

Dated: New York, N.Y.
       March 1, 2017.

Thomas R. Newman

# EXHIBIT A

# THOMAS R. NEWMAN
## Duane Morris LLP
### 1540 Broadway
### New York, New York 10036-4086
Direct: (212) 692-1028
Fax:    (212) 208-0902
E-mail Address:trnewman@duanemorris.com

Admitted to Bar, 1961, New York; 1963, U.S. Dist. Ct., SDNY; 1964, U.S. Sup. Ct.; 1965, U.S. Ct. of Appeals, 2d Circuit.

**Education**: Hofstra University (B.A., *cum laude*, 1957); New York University School of Law (LL.B., 1960). Article and Survey Editor, NYU Law Review, 1959-60.

Law Clerk to Judge Charles W. Froessel, New York Court of Appeals, 1960-62.

**1963 -1970 -**    Sabin, Bermant & Blau (and predecessor firm), represented Newhouse Newspapers in securities litigation, antitrust and libel defense.

**January 1, 1971 - June 30, 1987**  founder, Siff & Newman, P.C., general appellate practice, insurance and reinsurance litigation/arbitration.

**July 1, 1987 - April 30, 1991**  partner, Bower & Gardner, appellate practice, insurance and reinsurance litigation/arbitration.

**May 1, 1991 - April 30, 1999**  founder Newman & Company, P.C.

**May 1, 1999 - May 31, 2003** of counsel, Luce, Forward, Hamilton & Scripps LLP (NY office).

**June 1, 2003** – of counsel, Duane Morris LLP (NY office).

**CHAMBERS USA, America's Leading Lawyers for Business (2005, 2006, 2007, 2008, 2009, 2010, 2011, 2012, 2013, 2014, 2015, 2016)**: "Thomas Newman '*knows the business inside and out.*'" **CHAMBERS USA,** 135  **(2013)**; "Thomas Newman is a widely respected member of the insurance Bar. He brings a wealth of experience in court litigation and arbitrations arising out of the reinsurance sector." **CHAMBERS USA,** 1381 **(2006)** "Tom Newman is rated as '*top of the heap*' when it comes to his performance on reinsurance arbitrations. He is frequently called upon as an expert witness in insurance cases in the USA and the UK." **CHAMBERS USA,** 1215 **(2005)**: "Tom Newman at Duane Morris is an established name whose practice encompasses insurance coverage analysis, and insurance and reinsurance arbitrations." "Senior statesman Thomas Newman continues to enjoy a fine reputation for his skill at handling key disputes and arbitrations for reinsurance clients" **CHAMBERS USA,** 154 **(2016)**.

**"THE BEST LAWYERS IN AMERICA (2007, 2008),** listed in two categories: Appellate Law and Insurance Law; **NEW YORK'S SUPER LAWYERS, 2007, 2008, 2009, 2010, 2011, 2013, 2014, 2015, 2016** Insurance Coverage. **NEW YORK AREA'S BEST LAWYERS, 2009, 2010, 2011, 2012, 2013, 2014, 2015, 2016** Appellate Law and

Insurance Law. **NEW YORK AREA'S BEST LAWYER OF THE YEAR, 2013** Appellate Practice.

"One of the Top Appellate Lawyers in New York," **Corporate Counsel, July 2009**.

For 45 years, consistently AV peer-review rated by Martindale-Hubbell for the highest level of ethical standards and professional competence.

**Author**: Ostrager & Newman, **Handbook on Insurance Coverage Disputes** (Wolters Kluwer, 18th ed., 2017)(Winner, 2007 Burton Awards for Legal Achievement); Newman, **New York Appellate Practice** (Matthew Bender, 1985, Supp. 1989), now Buzzard & Newman, **New York Appellate Practice**; Columnist, Appellate Practice, *New York Law Journal*, 1975 — .

Co-editor and co-chairman: **Insurance, Excess and Reinsurance Coverage Disputes**, PLI (Annually, 1983-1997).

Author of numerous articles in professional journals (see attached list).

**Insurance/Reinsurance Arbitrations:** Served as lead trial counsel in more than 60 insurance/reinsurance arbitrations in U.S. and Canada, representing cedents as well as reinsurers. Participated as an expert witness or co-counsel in more than 25 international arbitrations in London and Bermuda. Served as Arbitrator in insurance arbitrations in London, Bermuda and U.S. Listed in Who's Who Legal: Insurance and Reinsurance 2015.

**Appellate Practice:** Briefed and argued over 80 appeals in N.Y. Court of Appeals, 30 in U.S. Court of Appeals, Second Circuit, over 500 appeals in all four Departments of the N.Y. Appellate Division, as well as in other States and Circuits, including the highest courts in California and Connecticut. Prepared and filed numerous certiorari petitions in the Supreme Court of the United States.

**Expert Witness:** Qualified and testified as an expert in U.S. and U.K. cases involving such matters as primary and excess carrier issues, insurance coverage disputes, D&O and umbrella insurance, bad faith claims, and New York law on contract and insurance issues.

**Member:** American Law Institute, 1976 — (Life Member, 2001); Fellow, Chartered Institute of Arbitrators; London Court of International Arbitration; International Arbitration Club of New York; ARIAS•US; American Academy of Appellate Lawyers 1993 — ; Federation of Defense and Corporate Counsel, 1985 — ; American College of Coverage and Extracontractual Counsel 2013— ; Defense Research Institute, 1976-2017 ; New York State Office of Court Administration, Advisory Committee on Civil Practice, 1987— ; New York State Bar Association (Chairman, Committee on Courts of Appellate Jurisdiction, 1981-1985); ABA, Tort & Insurance Practice Section; New York City Bar Assn.

## ARTICLES BY THOMAS R. NEWMAN

"Frivolous Conduct: Ethical Considerations in Appellate Practice," NYSBA Journal, vol. 87, No. 6 (July/August 2015), p. 39.

"Satisfying a Self-Insured Retention or Deductible in a Third-Party Claim, FDCC Quarterly vol. 64, No.3 (Spring 2015)

"Waiver of Arbitration", ARIAS-U.S. Quarterly (Fourth Quarter 2014), p. 8

"Attorneys' Fees as Covered Costs, Damages or Loss," For The Defense (DRI March 2014)

Co-author, Davis, Moore, Page, Moriarty and Newman, "An American Abroad: The Divergent Worlds of U.S. and U.K. Insurance Arbitrations," Mealey's International Arbitration Report, vol. 29, #1 (January 2014).

"What Happened To The Sanctity Of Contracts?" Real Estate Weekly, Nov. 1, 2013

"Claims-Made Coverage: What Is A Claim?" FDCC Quarterly vol. 63, No. 1, Fall 2012 Recipient, FICC's Andrew Hecker Award for Best Quarterly Article for 2012-2013 year.

"Ending Duty to Defend," For The Defense (DRI March 2013)

"Incorporating Arbitration Agreements by Reference," ARIAS-U.S. Quarterly (Fourth Quarter 2012), p.15

"Restrictions on the Insured's Right to Settle," FDCC Quarterly, vol. 61, no. 4, pp. 390-404 (Summer 2011)

"Arbitrability and Arbitrating With a Non-Signatory," ARIAS-U.S. Quarterly, vol. 18, No. 3 (2011)

"Expert Evidence in Insurance Coverage Cases," paper presented at 13th Annual Europe Pacific Legal Conference, Pocol, Cortina D'Ampezzo, Italy, January 11, 2009.

"The Steps in a Typical U.S. Reinsurance Arbitration and How it Differs From a U.K. Insurance Arbitration," paper presented at Lorman Seminar, Update of Insurance Issues in New York, Feb. 13, 2008.

"Overview of the Law of Informed Consent," paper presented at 12th Annual Europe Pacific Legal Conference, Pocol, Cortina D'Ampezzo, Italy, January 2008.

"Is there an expert in the House? Expert evidence in insurance coverage cases," *Defense Counsel Journal,* October 2007.

Contributor of biography of Associate Judge Charles W. Froessel, in Rosenblatt, *The Judges of the New York Court of Appeals: A Biographical History* (2007)

"The Drug Approval Process in the United States and Post-Marketing Surveillance," paper presented at 10th Annual Europe Pacific Legal Conference, Pocol, Cortina D'Ampezzo, Italy, January 2006.

"The Very Limited Grounds For Vacating an Arbitration Award Under the F.A.A." , paper presented at Glasser Legal Works, Reinsurance Law & Practice: Hot Topics, Oct. 2004.

"An Insurer's Right of Subrogation in New York," Vol. 31 *Torts, Insurance & Compensation Law Section Journal, NYSBA* p. 14 (Spring 2002).

"Discovery in Reinsurance Arbitrations," paper presented at ARIAS•US Meeting in N.Y.C. on November 7, 2002.

"The Saga of Gracie Terrace," Thomas R. Newman & Maro A. Goldstone, 2 *Nevada Law Journal* 502 (Summer 2002).

"Conflict Between Insurer's Duty To Defend And Its Right To Settle," *Mealey's Insurance Litigation Reports*, Jan. 22, 2002.

"Additional Insured and Indemnification Issues Affecting the Insurance Industry, Coverage Counsel and Defense Counsel- Legal Advice and Pointers, Charles E. Spevacek, John F. Ledwith, Thomas R. Newman & John B. Lennes, Jr., FDCC Quarterly, vol. 52, No. 1, p. 3 (Fall 2001)

"Certificates and Other Evidence of Liability Insurance," *Mealey's Insurance Litigation Reports: Insurance*, September 19, 2000, Vol. 14, No. 43

"Triggering Coverage Under An 'Awareness Clause' of a Claims-Made Liability Policy," Thomas R. Newman and Michael L. Gioia, *Federation of Insurance & Corporate Counsel Quarterly*, Vol. 49, No. 2, Winter 1999.

"Challenging an Insured's Settlement," Thomas R. Newman and Aidan M. McCormack, *Federation of Insurance & Corporate Counsel Quarterly*, Vol. 47, No. 2, Winter 1997. Recipient, FICC's Andrew Hecker Award for Best Quarterly Article for 1996-97 year.

"Applying the Owned Property Exclusion to Groundwater Contamination Claims," Thomas R. Newman & Aidan M. McCormack, *For the Defense*, April 1996, Vol. 38, No. 4, pp.33-39.

"Attempts To Avoid Application Of The Owned-Property Exclusions To Groundwater

Contamination Claims: New Jersey Courts Draw The Line," Thomas R. Newman and Aidan M. McCormack, *Mealey's Litig. Reports: Insurance*, Oct. 17, 1995, vol. 9, No. 47.

"The Antisubrogation Rule in Construction Accident Cases," Thomas R. Newman and Patrick J. Dellay, *Torts, Insurance & Compensation Law Journal*, New York State Bar Association, June, 1995, Vol. 24, No. 1, pp. 22-27.

"Excess Liability Insurance Over Self-Insured Retentions," Thomas R. Newman, *Federation of Insurance & Corporate Counsel Quarterly*, Vol. 44, No. 2 (Winter 1994).

"There Is No General Duty To Investigate Before Denying Defense Or Coverage For Third-Party Claims," Thomas R. Newman, *Mealey's Litigation Reports: Insurance*, June 1, 1993, Vol. 7, No. 29, pp. 14 - 20.

"Mega-Coverage Case Cost Sharing Proposals," Thomas R. Newman, *Insurance, Excess, and Reinsurance Coverage Disputes 1989*, Course Handbook Series, No. 369, pp. 587-596.

"Current Problems Involving Excess Insurers," Thomas R. Newman & Barry Ostrager, *Insurance, Excess, and Reinsurance Coverage Disputes 1989*, Course Handbook Series, No. 369, pp. 307-335.

"The Duty Of An Excess Insurer To Provide Coverage When The Primary Becomes Insolvent," Thomas R. Newman, *Second Annual Insurance Litigation Institute*, 1988, pp. 139-147.

"Hazardous Waste Litigation: CGL Insurance Coverage Issues," Sheila L. Birnbaum, Thomas R. Newman, Irene A. Sullivan and William J. Wright, Jr., *Second Annual Insurance Litigation Institute*, 1988, p. 3.

"Damages: A Call For Meaningful Precedents," Thomas R. Newman, *Pace Law Review,* vol. 3 pp. 605-691(Spring 1983).

"Construction Accidents," Thomas R. Newman, *Journal of the Insurance, Negligence and Compensation Law Section*, NYSBA, Spring 1977, pp. 34-39

## CASES IN WHICH I APPEARED AS AN EXPERT
(Excluding confidential arbitrations)

*Stryker Corp. v. TIG Ins. Co.*, USDC WD Mich. Case No. 105-cv-0051 July 2014

*Quincy Mut. Fire. Ins. Co. v. New York Central Mut. Fire Ins. Co.*, USDC, NDNY, Case No. 3:12-CV-1041(NAM/DEP)

*Lexington Ins. Co. v. Horace Mann Ins. Co.*, USDC, ND Ill. 11-cv-02352, Aug. 2013

*Fiserv Solutions, Inc. v. Westchester Fire ins. Co., et al.*
USDC, ED Wisc. Case No. 2:11-cv-00603-CNC,  Apr. 22, 2013

*Charleston Area Medical Center v. National Union Fire*
*Ins. Co. of Pittsburgh, Pa.,* USDC, D. W.Va., Civil Action
No. 2:09-0573, Jan. 17, 2011

*Office Depot, Inc. v. National Union Fire Ins. Co. of*
*Pittsburgh, Pa.,* USDC, SD Fla., Civil Action No. 09-80554, Oct. 7, 2010

*Onex Corp. v. American Home Assurance Co., et al.,*
Ontario (Canada) Superior Court of Justice,
No. CV-08-00365387, Sept. 29, 2010

*Maccari v. Bituminous Casualty Corp.,* Superior Ct, Delaware,
New Castle County, No. 09C-02-249 JEB, June 30, 2010

*Cole v. National Union Fire Ins. Co. of Pittsburgh, Pa.,*
Superior Ct, Los Angeles, CA, No. GIC821682, June 18, 2010

*Maritz, Inc. v. Federal Ins. Co.,* Circuit Ct, St. Louis County, Mo.,
Cause No. 07CC-001163,  April 30, 2010

*Canyon Resources Corp. v. Travelers Indemnity Co. of America,*
U.S.D.C., D. Colo. Case No. 08-cv-02215-REB-MJW Sept. 14, 2009

*Pulse Engineering v. Travelers Indemnity Co.,* U.S.D.C., S.D. Indiana,
Case No. 1:06-cv-1237

*Federal National Mortgage Ass'n v. National Union Fire*
*Ins. Co. of Pittsburgh, Pa.,* U.S.D.C.,  District of Columbia,
Case No. 1:05-cv-02462(RMU), Sept. 28, 2007

*Great American Ins. Co. v. Estate of Deborah Felmly,*
Pinnelas County (Fla.) Circuit Ct., Case No. 04-007409-CI-008
Sept. 10, 2007

*Eberhard v. AISLIC,* AAA Arbitration, Denver, Colo., Apr. 19, 2007

*Brown Group Retail, Inc. v. Allstate Ins. Co., et al.*
District Ct., Denver, Colo.  Case No. 03CV1410, Feb. 1, 2007

*New Jersey Natural Gas Co. v. Kemper Indemnity Ins. Co.*
Super. Ct., Ocean Co., N.J., No. OCN-l-3100-04, Dec. 5, 2006

*Oliver v. Steadfast Ins. Co.,* 15th Jud. Cir., Palm Beach Co., Fla., Case No. 50 2004 CA 008514 AI  November 16, 2006.

*John M. Constantini v. Optimum Choice, Inc.,* USDC, D. Del. CA 05-680GMS, Aug. 28, 2006

*Century Indemnity Co. v. Aqua-Chem, Inc.,* Cir. Ct. Milwaukee Co., Wisc., Case No. 04-CV-002852m  October 10, 2005.

*Santa Fe Gold Corp. v. United Nuclear Corp.,* 11th Jud. Dist. Ct., McKinley Co., New Mexico, Case No. CV-97-139II, June 3, 2005, Nov. 9, 2005.

*Associated Wholesale Grocers, Inc. v. Americold Services* Wyandotte Co., Kansas, Civil Case No. 92-C-4015 July 12, 2005.

*Gregory Young v. Scottsdale Ins. Co.,* Palm Beach Co., Fla. Jan 27, 2005.

*Adam Dwayne Thomas v. Harford Ins. Co.,* Dover County, Delaware February 26, 2004.

*Amerace Corporation and Elastic Stop-Nut Corporation of America v. Aetna Casualty & Surety Company, et al.,* Superior Court of New Jersey Law Division: Bergen County Docket No. BER–L-5039-00 February 19, 2003, October 31, 2003.

*Smithkline Beecham Corporation v. Aetna Casualty & Surety Company, et al.,* Superior Court of New Jersey Law Division: Middlesex County Docket No. MID-L-7799-94 October 9, 2003,  December 30, 2003.

*Robert M. Friedland v. The Travelers Indemnity Co.* U.S.D.C., D. Colo., Civil Action No. 02-CV-4435 August 12, 2003.

*Dillards, Inc. v. TIG Insurance Co.* Circuit Ct. Pulaski Co., Arkansas, No. CV-00-8538 July 17, 2002.

*Christopher Alstrin et al. v. St. Paul Mercury Ins. Co., et al.* U.S.D.C., Del. C.A. No. 98-683-RRM July 17, 2001.

*Jillian A. Rowlands v. Phico Ins. Co.* U.S.D.C., Del. C.A. No. 00-477 GMS, March 14, 2001.

*Brosnahan Builders, Inc. v. Harleysville Mut. Ins. Co.*
U.S.D.C., Del. C.A. No. 00-339 SLR   Feb. 5, 2001.

*Royal Surplus Lines Ins. Co. v. Sofamor Danek
Group, Inc., et al.*, No. 97-2499 GV, U.S.D.C.,
W.D. Tenn., April 11, 2000.

*American Medical Systems, Inc. v. National Union Fire Insurance
Co. of Pittsburgh, PA.*, U.S.D.C., E.D. La., October 14, 1999.

*Tenby, Inc. v. Continental Ins. Co.*, U.S.D.C.,
C.D. Cal., 96-0129 WKD (Mcx), June 1998.

*Henkel Corp. v. Lloyd's of London, et al.*
U.S.D.C., C.D. Cal., CV 96-5972 ABC (ANx) April 1998.

*Federal Ins. Co. v. Hawaiian Electric Industries*,
U.S.D.C., D. Hawaii, Civ. No. 94-00125 HG, 3/27/98, 5/27/98

*United States v. Brennan*, U.S.D.C., EDNY,
CR-95-00420 (CPS), May 19, 1997.

*Arkwright-Boston Mfg. Mut. Ins. Co., et al. v.
Truck Ins. Exchange*, U.S.D.C., EDNY No. 94-2585,
February, 1997, April 30, 1997.

*General Reinsurance Corp. v. Reliance Ins. Co.*
U.S.D.C., S.D.N.Y., October 10, 1995.

*Vicorp v. Federal Ins. Co.*,
U.S.D.C., D. Colo., August 10, 1994.

*First State Ins. Co. v. Minnesota Mining
& Mfg. Co.*, Dist. Court, County of Ramsey,
C3-94-12780, November 29, 1995.

*Drummond John Abernethy v. FLP Secretan & Co., et al.*,
Q.B. Commercial Ct. 1994 Folio 2230.

*William Hallam-Eames v. Merrett Syndicates Ltd.*,
Q.B. Commercial Ct., 1993 Folio No. 145.

*Sir Quentin Charles Agnew-Somerville v. Wellington
Underwriting Agencies, Ltd.*, Q.B. Commercial Ct.,
1993 Folio No. 625.

*PakTank Florida, Inc. v. American Home Assurance Co., et al.*,
U.S.D.C. MD Fla., November 16, 1993.

*Interco Inc. v. Federal Ins. Co.*, U.S.D.C., E.D.
Missouri, July 22-23, 1993.

*City of Bakersfield v. Reliance*, Superior Court California.

*Oppenheim v. Reliance*, U.S.D.C., MD Fla., 9/3/91.

*Stockwell v. Outhwaite*, Q.B. Commercial Court,
Q.B. Commercial Ct., 1989 Folio No. 2729.

*Sher v. Policyholder's Protection Board*,
Q.B. Commercial Ct., 1991 Folio No. 2128.

# Doc. 36-17

# EXHIBIT P

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

IN THE MATTER OF
SEARCH WARRANT FOR:

CASE NO. 3:08-mj-1092-JRK

CROWLEY LINER SERVICES, INC.     FILED UNDER SEAL
9487 Regency Square Boulevard
Jacksonville, Florida 32225-8126

*IN CAMERA*
ORDER

Upon the written motion of the United States of America to seal (1) the

Application and Affidavit for Search Warrant in this matter, and (2) the Motion to

Seal, the Court finds that the interests of justice require that the Application and

Affidavit for Search Warrant and the Motion to Seal be sealed; therefore

IT IS ORDERED that the Motion To Seal is GRANTED;

IT IS FURTHER ORDERED that the Application and Affidavit for Search

Warrant and the Motion to Seal be sealed by the Clerk of the Court until further

order of the Court;

DONE AND ORDERED at Jacksonville, Florida this 16th day of April,

2008.

JAMES R. KLINDT
United States Magistrate Judge

Copy to:
Trial Attorney John Terzaken
Assistant United States Attorney (Duva)



UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

IN THE MATTER OF
SEARCH WARRANT FOR:                    CASE NO. 3:08-mj-1092 JRK

CROWLEY LINER SERVICES, INC.           <u>FILED UNDER SEAL</u>
9487 Regency Square Boulevard
Jacksonville, Florida 32225-8126

*IN CAMERA*
<u>MOTION TO SEAL SEARCH WARRANT APPLICATION AND AFFIDAVIT</u>

The United States of America, by and through the undersigned Trial

Attorney for the United States Department of Justice, respectfully moves this Court

to seal (1) the Application and Affidavit for Search Warrant in this matter, and

(2) this Motion to Seal, and in support thereof states that disclosure of the contents

of the affidavit would make public facts which could jeopardize an ongoing criminal

investigation and related investigations.

WHEREFORE, the United States respectfully moves the Court to seal the

Application and Affidavit for Search Warrant and this Motion to Seal until further

order of the Court.

Respectfully submitted,

JOHN TERZAKEN
Trial Attorney
United States Department of Justice
Antitrust Division
Tel: (202) 307-0719
Fax: (202) 514-6525
john.terzaken@usdoj.gov

**Doc. 36-18**

# EXHIBIT Q



# FAX TRANSMISSION

## LANKFORD, COFFIELD & REED PLLC
120 North Saint Asaph Street
Alexandria, Virginia 22314

Telephone (703) 299-5000    Facsimile (703) 299-8876

V. Thomas Lankford, Jr.    William F. Coffield    Terrance G. Reed    Robert K. Moir

**DATE:**              June 30, 2008

**TO:**                Maureen Conboy

**FAX NUMBER:**        866/871-0322

**FROM:**              Terrance G. Reed

**NUMBER OF PAGES:**   -6-    (Including Cover)

**SUBJECT:**
Your Insured, Crowley Maritime Corporation
Policy No. 061-36-48

### NOTICE OF CONFIDENTIALITY
The information contained in and transmitted with this facsimile is:

1.  SUBJECT TO THE ATTORNEY-CLIENT PRIVILEGE;
2.  ATTORNEY WORK PRODUCT; OR
3.  CONFIDENTIAL

**LANKFORD, COFFIELD & REED, P.L.L.C.**

120 North Saint Asaph Street
Alexandria, Virginia 22314

Telephone: (703) 299-5000     Facsimile: (703) 299-8876

V. Thomas Lankford, Jr.
Terrance G. Reed
William F. Coffield
Robert K. Moir

601 Pennsylvania Avenue, N.W.
Suite 900, South Building
Washington, D.C. 20004

June 30, 2008

VIA FACSIMILE
866-871-0322
Maureen Conboy
Complex Claims Director
AIG Domestic Claims, Inc.
175 Water Street
New York, NY 10038

Re: Your Insured, Crowley Maritime Corporation,
    Policy No. 061-36-48

Dear Ms. Conboy:

I am writing as counsel to Thomas Farmer, an employee of your insured Crowley Maritime Corporation ("Crowley"), to request that AIG confirm that it will cover his payments to my firm, and that of Mr. Mark Rosenblum for legal services in connection with an ongoing government investigation. In your letter of May 27, 2008 to Mr. Ficon of Crowley, you indicated that your "preliminary analysis" was that the Policy at issue (No. 061-36-48) does not provide coverage. I am writing to provide additional information that, I submit, yields the opposite conclusion as to Mr. Farmer.

In your May 27, 2008 letter, you have confirmed that an "Insured Person" under the Policy includes an employee of Crowley, and you further confirmed that Mr. Farmer is a Crowley employee and therefore is an "Insured Person." Accordingly, Mr. Farmer qualifies for any coverage provided under the Policy.

In your letter of May 27th, you indicate that a "Claim" against an Insured Person includes a criminal investigation in which an investigating authority has identified in writing the Insured

NU002741

Person as someone against whom a proceeding may be commenced.    Please be advised that Mr. Farmer has been so identified by means of service of a grand jury subpoena.   A copy of this subpoena has been attached.   I respectfully submit that this constitutes a "Claim" under the Policy, and request confirmation of coverage for Mr. Farmer.  Further written identification of Mr. Farmer by the investigating authority can be found in the search warrant for the Crowley offices which also identifies Mr. Farmer by name.

I have enclosed a copy of my bills in connection with representation of Mr. Farmer in this investigation, and I believe you are already in receipt of a bill from Mr. Rosenblum.  These are being submitted not only for purposes of payment, but also to establish that a Claim has accrued. I have additional descriptions for each entry which are available if you need them to make a coverage decision.  Please forward to me your current requirements as to billing in order to be paid under the policy.

As you can appreciate, effective representation during a grand jury investigation can make the difference between having a short investigation, or incurring the far greater costs and burdens associated with a protracted investigation.  With that in mind, I respectfully ask you to make a determination that the costs of representing Mr. Farmer are covered under the Policy.

Yours truly,

Terrance G. Reed

cc: Mark Rosenblum, Esq.

AO110 (Rev. 12/89) Subpoena to Testify Before Grand Jury

# UNITED STATES DISTRICT COURT

MIDDLE _____ DISTRICT OF _____ FLORIDA

TO:

Tom Farmer

**SUBPOENA TO TESTIFY
BEFORE GRAND JURY**

SUBPOENA FOR:
☒ PERSON ☐ DOCUMENT(S) OR OBJECT(S)

**YOU ARE HEREBY COMMANDED** to appear and testify before the Grand Jury of the United States District Court at the place, date, and time specified below.

| PLACE | COURTROOM |
|---|---|
| United States Courthouse<br>300 North Hogan Street<br>Jacksonville, Florida 32202 | Grand Jury Room |
| | DATE AND TIME |
| | May 28, 2008 at 9:30am |

**YOU ARE ALSO COMMANDED** to bring with you the following document(s) or object(s):*

☐ *Please see additional information on reverse.*

This subpoena shall remain in effect until you are granted leave to depart by the court or by an officer acting on behalf of the court.

| CLERK | DATE |
|---|---|
| SHERYL L. LOESCH | |
| (By) Deputy Clerk<br>*Lenore R. Bennet* | April 17, 2008 |
| This subpoena is issued on application<br>of the United States of America | NAME, ADDRESS AND PHONE NUMBER OF ASSISTANT U.S. ATTORNEY<br><br>John Terzaken (202) 307-0719<br>U.S. Department of Justice, Antitrust Division<br>450 5th Street, NW, 11th Floor, Washington, D.C. 20001 |

* If not applicable, enter "none".

NU002743

June 30, 2008

**PERSONAL AND CONFIDENTIAL**
Maureen Conboy
Complex Claims Director
AIG Policy No. 061-36-48
175 Water Street
New York, NY 10038

**For Professional Services Rendered:** May 1, 2008 thru May 31, 2008

Re: Thomas Farmer

| Attorney/Staff | Hours | Hourly Rate | Total |
|---|---|---|---|
| Terrance G. Reed | 16.1 | $500.00 | $8,050.00 |
| Robert K. Moir | 0.0 | $300.00 | $0.00 |
| **Total:** | | | **$8,050.00** |
| Disbursements/Expenses  (telecopier, postage, telephone, copier, courier, process server, transcripts, consultant): | | | $0.00 |
| Westlaw | | | $0.00 |
| Expert and/or consultant charges: | | | $0.00 |
| Travel-related expenses: | | | $1,201.56 |
| **Total new charges:** | | | **$9,251.56** |

Please make check payable to: **Lankford, Coffield & Reed, PLLC**

Amounts thirty days past due from billing date
will incur a late payment charge of 1 percent per month
on the unpaid balance.

NU002744

June 30, 2008

**PERSONAL AND CONFIDENTIAL**
Maureen Conboy
Complex Claims Director
AIG Policy No. 061-36-48
175 Water Street
New York, NY 10038

**For Professional Services Rendered:** June 1, 2008 thru June 30, 2008

Re: Thomas Farmer

| Attorney/Staff | Hours | Hourly Rate | Total |
|---|---|---|---|
| Terrance G. Reed | 18.6 | $500.00 | $9,300.00 |
| Robert K. Moir | 0.0 | $300.00 | $0.00 |
| **Total:** | | | **$9,300.00** |
| Disbursements/Expenses (telecopier, postage, telephone, copier, courier, process server, transcripts, consultant): | | | $0.00 |
| Westlaw | | | $0.00 |
| Expert and/or consultant charges: | | | $0.00 |
| Travel-related expenses: | | | $0.00 |
| **Total new charges:** | | | **$9,300.00** |

Please make check payable to: **Lankford, Coffield & Reed, PLLC**

Amounts thirty days past due from billing date
will incur a late payment charge of 1 percent per month
on the unpaid balance.

M. Conboy

1   any such insured or organization shall not be
2   entitled under this policy to payment of such
3   loss."
4   What do you understand that sentence
5   I just read to mean?
6   MR. DUFFY:  Objection.
7   A.   It means that advanced payments by
8   the insurer shall be repaid to the insurer by
9   each and every insured organization severally
10  according to the respective interests, et
11  cetera.  I mean, it means what it says.
12  Q.   So is it your understanding that if
13  National Union had agreed to advance defense
14  costs to any of the individual insureds, it
15  could have later sought to recoup those defense
16  costs?
17  MR. DUFFY:  Objection.
18  A.   I'm not sure what you are asking.
19  We don't -- I don't -- I'm not aware of us
20  having -- Michelle Graffeo was the claims
21  handler on this and I don't know what, if any,
22  position she's taken with respect to
23  recoupment.  I didn't take -- I don't recall
24  taking a position when I was handling the

M. Conboy

1   claim.
2   Q.   In your time as a complex claims
3   director or senior complex claims director, do
4   you recall ever taking a position that National
5   Union was entitled to recoup advanced defense
6   costs?
7   A.   I don't know.  I -- I can't recall a
8   specific instance, but it may have happened.  I
9   don't remember.
10  Q.   But you don't recall taking -- you,
11  as supposed to Michelle or anyone else, you
12  don't recall taking a specific position in this
13  case?
14  A.   Oh, in this particular case?
15  Q.   Yes.
16  A.   No, I issued -- the letters I issued
17  were denials of coverage.  I don't think that
18  my letters talked about paying defense costs,
19  let alone recouping them.
20  Q.   When you issued your coverage denial
21  letters, were you aware of this provision in
22  the policy?
23  A.   The -- I mean, yes.
24  MS. GARRISON:  I'll have the court

M. Conboy

1   reporter mark Exhibit 9.
2   (Plaintiff's Exhibit 9, an e-mail
3   from Edward Conlon to Ms. Conboy dated
4   May 22nd, 2008, Bates stamped NU002747
5   through NU002750, marked for
6   identification, as of this date.)
7   BY MS. GARRISON:
8   Q.   Ms. Conboy, do you recognize the
9   document that's been marked as Exhibit 9?
10  A.   It's an e-mail from Edward Conlon to
11  me dated May 22nd.
12  Q.   And the e-mail attached is a May 13,
13  2008, letter from Mark Rosenblum; is that
14  correct?
15  A.   Yes.
16  Q.   Do you recall receiving this letter
17  from Mark Rosenblum?
18  A.   I don't remember receiving it, but I
19  recognize it as being part of the file.
20  Q.   And who do you understand Mark
21  Rosenblum is?
22  A.   He was one of Mr. Farmer's
23  attorneys.
24  Q.   And in his -- in this letter that's

M. Conboy

1   attached to the May 22, 2008, e-mail
2   Mr. Rosenblum explains that -- in the second
3   paragraph of the letter he explains that, "You
4   will notice that my time sheet is, at times,
5   nonspecific regarding names and tasks."
6   Do you see that?
7   A.   Yes.
8   Q.   He says, "This is done deliberately
9   to avoid a situation where the government
10  obtains my time sheets through a discovery
11  request."
12  Do you see that?
13  A.   Yes.
14  Q.   Do you recall ever asking
15  Mr. Rosenblum to provide more specific time
16  entries on his time sheets?
17  A.   No, I denied coverage.
18  MS. GARRISON:  I'll have the court
19  reporter mark Exhibit 10.
20  (Plaintiff's Exhibit 10, a fax
21  transmission and letter from Lankford,
22  Cofield & Reed dated June 30, 2008, Bates
23  stamped NU002740 through NU002745, marked
24  for identification, as of this date.)

1        M. Conboy
2  BY MS. GARRISON:
3        Q.   Ms. Conboy, do you recognize the
4  document marked as Exhibit 10?
5        A.   Yes.
6        Q.   What do you recognize it to be?
7        A.   It's a fax transmission and letter
8  from Lankford, Cofield & Reed dated June 30,
9  2008.
10       Q.   And is this a letter you received in
11 your role as a claims handler at AIG?
12       A.   Yes.
13       Q.   And is it your understanding that it
14 was received at or near the date of the letter
15 June 30, 2008?
16       A.   I assume so.
17       Q.   As a claims adjuster at AIG, was it
18 regular practice for you to receive letters
19 from insureds or is it common for you to
20 receive letters from insured?
21       A.   Of course.
22       Q.   Is it your regular practice to keep
23 those letters in the file?
24       A.   Yes.
25       Q.   Do you understand who Lankford,

1        M. Conboy
2  Cofield & Reed is?
3        A.   They are one of Mr. -- or were one
4  of Mr. Farmer's attorneys.
5        Q.   On the second page of Mr. Reed's
6  letter, in the second paragraph, he states, "I
7  have enclosed a copy of my bills in connection
8  with representation of Mr. Farmer."
9        Do you see that?
10       A.   Yes.
11       Q.   Do you recall receiving bills from
12 Mr. Reed in connection with his representation
13 of Mr. Farmer?
14       A.   I don't recall exactly who I got
15 bills from, but I do recall receiving bills
16 from attorneys on behalf of Mr. Farmer.
17       Q.   Do you recall receiving invoices or
18 bills from Crowley that were invoices from
19 Mr. Farmer's attorneys?
20       A.   I don't remember who I got them from
21 or which firms they were from, but I recall
22 that I did receive some invoices, yes.
23       MS. GARRISON:  I'll have the court
24 reporter mark Exhibit 11.
25       (Plaintiff's Exhibit 11, an e-mail

1        M. Conboy
2  that Ms. Conboy sent to Terry Reed, Bates
3  stamped NU002737 through NU002739, marked
4  for identification, as of this date.)
5  BY MS. GARRISON:
6        Q.   Ms. Conboy, do you recognize the
7  document that's been marked as Exhibit 11?
8        A.   It's an e-mail that I sent to Terry
9  Reed, one of Mr. Farmer's attorney, on Monday
10 August 11th of 2008 where it appears I sent him
11 a copy of my August 11, 2008, coverage letter.
12       Q.   That's a letter you wrote in your
13 role as the claims handler for this case?
14       A.   Yes.
15       Q.   And that letter was written at or
16 around the date stated on the letter August 11,
17 2008?
18       A.   Yes.
19       Q.   And as a claim adjuster at AIG, was
20 it regular practice for you to write letters
21 like this to your insureds?
22       A.   Yes.
23       Q.   Was it your regular practice to keep
24 it in the claims file as well?
25       A.   Yes.

1        M. Conboy
2        Q.   Your August 11, 2008, letter to
3  Mr. Reed, doesn't mention the under sealed
4  documents referred to in Mr. Ficon's April 23rd
5  e-mail, does it?
6        MR. DUFFY:  Objection.
7        A.   Correct.
8        MS. GARRISON:  I'll have the court
9  reporter mark Exhibit 12.
10       (Plaintiff's Exhibit 12, a letter
11 from Crowley to AON dated November 26th,
12 2008, Bates stamped CROW002481 through
13 CROW002502, marked for identification, as
14 of this date.)
15 BY MS. GARRISON:
16       Q.   Ms. Conboy, do you recognize the
17 document marked as Exhibit 12?
18       A.   Yes, it's a letter from Crowley to
19 AON dated November 26th, 2008.
20       Q.   And the letter, as you mentioned, is
21 to AON, do you recall whether AON forwarded
22 this letter to yourself at AIG?
23       A.   I think -- you know what, I don't
24 know.
25       MS. GARRISON:  I'll have the court

**Doc. 36-19**

# EXHIBIT R



# CROWLEY®

November 26, 2008

VIA UPS

Mr. Dan Sweeney
Aon Financial Services Group
Suite 1300
4100 East Mississippi Avenue
Denver, CO 80246

| | | |
|---|---|---|
| RE: | Insured: | Crowley Maritime Corporation |
| | Matter: | DOJ/FBI Investigation and interrelated *BacPlas, Inc., CC1 Limited Partnership, Century Packing Corp.,* et al, Civil Antitrust Complaints |
| | D/Claim: | 4/17/08 |
| | Policy Period: | 11/1/2007-2008 |
| | Primary Policies: | (1) National Union Directors, Officers and Private Company Liability Insurance – Policy #066-57-99 AIG Claim #313-34345 |
| | | (2) National Union Executive and Organization Liability Insurance – Policy #061-36-44 (D&O) AIG Claim #367-4291 |
| | Crowley Ref. No.: | 08DO001 |

---

Dear Dan:

This is to update the status of the matter first reported with our correspondence dated April 23, 2008. Please forward this letter and enclosures to interested underwriters.

<u>DOJ/FBI Investigation</u>

So far as Crowley is presently aware, the Department of Justice (DOJ) has not caused to be issued, through the U.S. District Court for the Middle District of Florida or any other court, any additional subpoenas, search warrants or similar court documents, beyond those subpoenas and search warrants issued to Crowley Liner Services and/or individual officers/employees on April 17, 2008.

Significantly, on October 1, 2008, the DOJ announced that four shipping executives employed by Horizon Lines, Inc. and Sea Star Lines, LLC had agreed to plead guilty to felony antitrust crimes. Another executive of Sea Star Lines, LLC agreed to plead guilty to a felony obstruction of justice charge. The DOJ's press release dated October 1, 2008, is enclosed as Exhibit "A".

CROWLEY MARITIME CORPORATION • POST OFFICE BOX 2110 • JACKSONVILLE, FLORIDA  32203-2110 • PHONE 904.727.2200
www.crowley.com

Mr. Dan Sweeney
November 26, 2008
Page 2

Crowley and it officers/employees have cooperated with the DOJ and have complied with the DOJ's document production requests. The investigation of Crowley Liner Services, Inc. and its officers/employees remains ongoing.

Civil Litigation

Crowley previously provided underwriters with the initial three civil complaints - *BacPlas, Inc., CC1Limited Partnership* and *Century Packing Corp.* filed on April 22, 2008 in the U.S. District Court for the Southern District of Florida and in the District of Puerto Rico. These putative class action civil complaints generally alleged that the defendant ocean shipping carriers, including Crowley Liner Services, Inc. engaged in anticompetitive conduct in the Puerto Rico trade routes in violation of the Clayton Act and Sherman Act. Since April 2008, a total of 34[1] related civil complaints have been filed in various federal and state court jurisdictions. Crowley's Civil Case Tracker (updated 11/18/08) identifying each case filed, is attached at Exhibit "B".  On August 13, 2008, the United States Judicial Panel on Multidistrict Litigation issued a transfer order centralizing the Puerto Rican Cabotage antitrust litigation in the US District Court, District of Puerto Rico.
A copy of the transfer order creating MDL No. 1960 is attached at Exhibit "C".
The MDL cases are currently inactive. A pre-trial order issued on October 28, 2008 granted the plaintiffs until December 5, 2008 to file their Consolidated Amended Class Action Complaint.  A Status/Scheduling Conference is set for January 20, 2009.

A copy of each complaint listed on the Crowley Civil Case tracker is enclosed.

Defense Costs

Crowley has advanced defense and investigation costs to Insured Person officer/employees Grune, Farmer, Lusis and Kelly and may continue to advance such costs until it has been determined that any officer/employee has not acted in accordance with the law or in the best interests of the company. Aggregate defense costs advanced to the attorneys representing the individual officer/employees totaled $406,033.73 as of 10/30/08. A schedule summarizing defense costs paid thru 10/30/08 is attached at Exhibit "D". If underwriters require copies of the fee statements, please advise and we will provide.

Reservation of Rights Letters

Excess Underwriters have requested copies of the reservation of rights letters issued by primary D&O Underwriter National Union. National Union's letters dated May 23, 2008 and May 27, 2008 are attached at Exhibit "E". We intend to respond to several inaccurate statements, conclusions and coverage positions made/taken in these letters in due course. For example, on page 3 of the May 27, 2008 letter, National Union states 'the April 17, 2008 subpoena was served on Crowley" and "the Individuals (Grune, Farmer, Kelly and/or Lusis) have not received subpoenas". In fact, a subpoena was

---

[1] Although 35 cases appear on the Crowley Civil Case Tracker, 33 federal cases are currently pending consolidation in MDL 1960. Crowley was dismissed from *Alpha Freight* as this matter involves trade practices by ocean carriers in the Hawaii /Guam trade routes. Crowley is not a participant in this trade. *Caribbean Shipping Services* is pending in Florida State Court. A motion to dismiss was filed on October 27, 2008.

Mr. Dan Sweeney
November 26, 2008
Page 3

issued to Tom Farmer on April 17, 2008. This subpoena was included in our original notification. Furthermore, the subpoena requiring Mr. Farmer to testify before the Grand Jury and the search warrant and document subpoena requiring the seizure of records maintained by Messrs. Grune, Farmer, Kelley and Lusis demonstrates that those four individuals are -- and have been since at least as early as April 17, 2008 -- persons against whom a civil, criminal, administrative regulatory or arbitration proceeding seeking monetary, non-monetary or injunctive relief may be commenced.

Please let us know if you or Interested Underwriters have any questions/comments.

Very truly yours,

Steven Ficon, CPCU
Director, Claims
CROWLEY MARITIME CORPORATIION

cc:     Art Mead, Sr. VP & General Counsel, Crowley Maritime Corporation
        Dwight Menard, VP, Risk Management, Crowley Maritime Corporation
        Mike Roberts s, Sr. VP & General Counsel, Crowley Maritime Corporation
        Andrew Teegarden, Asst. VP, Aon Financial Services Group



# Department of Justice

---

**FOR IMMEDIATE RELEASE**                                                    **AT**
Wednesday, October 1, 2008                                        **(202) 514-2007**
WWW.USDOJ.GOV                                              **TDD (202) 514-1888**

## Four Shipping Executives Agree to Plead Guilty to Conspiracy to Eliminate Competition and Raise Prices for Moving Freight to and from the Continental U.S. and Puerto Rico

### *Fifth Executive Agrees to Plead Guilty to Destroying Evidence*

WASHINGTON — Four U.S. shipping company executives have agreed to plead guilty and serve jail sentences for their roles in a wide-ranging conspiracy to rig bids, fix prices and allocate market shares for customers transporting goods between the continental United States and Puerto Rico by ocean vessel, the Department of Justice announced today. The Department also announced that a fifth shipping executive has agreed to plead guilty to destroying evidence of the shipping conspiracy. These are the first charges in the Antitrust Division's ongoing investigation into collusion in the coastal shipping industry.

A one-count felony antitrust charge was filed today in U.S. District Court in Jacksonville, Fla., against each of the four shipping executives: Peter Baci of Jacksonville; Kevin Gill and Gregory Glova of Charlotte, N.C.; and Gabriel Serra of San Juan, Puerto Rico. Under the terms of their plea agreements, each of the four executives has agreed to serve a jail term that will be determined by the court, pay a $20,000 criminal fine and cooperate fully in the Department's ongoing antitrust investigation. The pleas, fines and jail sentences are subject to court approval.

A one-count felony obstruction of justice charge also was filed against a fifth shipping executive, Alexander Chisholm, of Jacksonville, who has agreed to plead guilty and serve jail time, subject to court approval.

"We are committed to prosecuting executives who violate U.S. antitrust laws and harm consumers and competition in the United States," said Thomas O. Barnett, Assistant Attorney General in charge of the Department's Antitrust Division. "Acts of obstruction of justice threaten the ability of the Department to fully uncover and prosecute antitrust crimes, and we will pursue individuals who engage in obstruction with the same vigor as we pursue those who engage in the underlying criminal violations."

The five executives charged today work for large U.S. companies that provide freight shipping services to customers transporting goods between the continental U.S. and Puerto Rico. These companies transport a variety of cargo shipments, such as heavy equipment, medicines and consumer goods, on scheduled ocean voyages between the continental U.S. and Puerto Rico. The U.S. to Puerto Rico shipping lane is governed by the Jones Act, a portion of the Merchant Marine Act of 1920. The Jones Act dictates that any cargo being sent between two U.S. ports (including U.S. possessions and territories like Puerto Rico) must be on ships that were built in the U.S., owned by U.S. citizens, and fly the American flag. Sales of freight services in the U.S. to Puerto Rico shipping lane total hundreds of millions of dollars every year, as ocean shipping is a primary way for customers to move goods to and from the island of Puerto Rico.

The four individuals charged with violating the federal antitrust laws have agreed to plead guilty for their

CONFIDENTIAL INFORMATION                                         CROW 002484

roles in a conspiracy that began at least as early as May 2002 and continued until as late as April 2008, the object of which was to eliminate competition and raise prices for the movement of goods in the U.S. to Puerto Rico shipping lane. The Department charged that the executives sought to eliminate competition and raise prices by agreeing not to compete for one another's customers; agreeing to rig bids submitted to government and commercial buyers; and agreeing to fix the prices of rates, surcharges and other fees charged to customers.

Baci, Gill, Glova and Serra are each charged with violating the Sherman Act, which carries a maximum sentence of 10 years imprisonment and fines of $1 million for individuals. The maximum fine may be increased to twice the gain derived from the crime or twice the loss suffered by the victims of the crime, if either of those amounts is greater than the statutory maximum fine.

Chisholm has agreed to plead guilty for his conduct in obstructing the Department of Justice's investigation of the shipping conspiracy. The charge alleges he destroyed documents on a computer server that were material to the coastal shipping grand jury investigation and responsive to a grand jury subpoena. He faces a maximum sentence of 20 years imprisonment and a fine of $250,000.

The investigation is being conducted by the National Criminal Enforcement Section of the Antitrust Division and the Jacksonville Field Office of the Federal Bureau of Investigation (FBI). Anyone with information concerning bid rigging or other anticompetitive conduct in the shipping industry is urged to call the Antitrust Division's National Criminal Enforcement Section at 202-307-6694, or the FBI's Jacksonville Field Office at 904-721-1211.

###

08-876

CONFIDENTIAL INFORMATION                                      CROW 002485

## Crowley Civil Case Tracker – Updated 11/18/08

### FEDERAL CASES

| # | Case Name & Number | United States District Court | Transferred/Consolidated to DPR (Y/N) | Date Complaint Filed | Date Complaint Served on Crowley |
|---|---|---|---|---|---|
| 1 | *Alaska Air & Sound Center, Inc. v. Horizon Lines, Inc., et al*, Case No. 3:08-cv-01569-DRD | District of Puerto Rico | Previously Consolidated | 05/20/2008 | 06/04/2008 (Executed) |
| 2 | *Alpha Freight & Transport Int'l, Inc. v. Horizon Lines, Inc., et al*, Case No. 3:08-cv-449-TJC-TEM | Middle District of Florida | N (MDL Panel transferred case to W.D. Was. case number: C08-1455TSZ. MDL case number: MDL 1972 - Hawaiian & Guamanian Cabotage Antitrust Litigation) | 05/01/2008 | 05/16/2008 (Executed) |
| 3 | *BacPlus, Inc. v. Horizon Lines, LLC, et al*, Case No. 1:08-CV-21131-JEM | Southern District of Florida | Y (3:08-cv-01902-DRD) | 04/22/2008 | 04/25/2008 (Issued) |
| 4 | *CCI Ltd. Partnership v. Horizon Lines, LLC, et al*, Case No. 1:08-cv-21125-JEM | Southern District of Florida | Y (3:08-cv-01901-DRD) | 04/22/2008 | 04/25/2008 (Executed) |
| 5 | *Century Packing Corp. v. Horizon Lines, LLC, et al*, Case No. 3:08-cv-01467-DRD | District of Puerto Rico | Main Case | 04/22/2008 | 05/27/2008 (Executed) |
| 6 | *Cliffstar Corp. v. Horizon Lines, et al*, Case No. 1:08-cv-22127-PAS | Southern District of Florida | Y (3:08-cv-02123-DRD) | 07/28/2008 | 09/12/2008 (Executed) |
| 7 | *Combe Products, Inc. v. Horizon Lines, et al*, Case No. 3:08-cv-02003-JAG | District of Puerto Rico | Y (3:08-cv-02003-DRD) | 09/04/2008 | No Summons Information |
| 8 | *CV Joints Specialties, Inc. v. Horizon Lines, Inc., et al*, Case No. 3:08-cv-01618-DRD | District of Puerto Rico | Previously Consolidated | 06/03/2008 | 06/06/2008 (Issued) |
| 9 | *Econocaribe, Inc. v. Horizon Lines, Inc., et al*, Case No. 08-23174-CIV-LENARD/GARBER | Southern District of Florida | N | 11/14/2008 | 11/14/2008 (Issued) |
| 10 | *Fermax, Inc, et. al. v. Horizon Lines, et. al*, Case No. 3:08-cv-02260-ADC | District of Puerto Rico | Y (3:08-cv-02260-ADC) | 11/03/2008 | 11/05/2008 (Issued) |
| 11 | *Flexible Packaging Group v. Horizon Lines, Inc., et al*, Case No. 3:08-cv-01553-DRD | District of Puerto Rico | Previously Consolidated | 05/16/2008 | 05/19/2008 (Issued) |
| 12 | *Foam Pack, Inc. v. Horizon Lines, et al*, Case No. . 3:08-cv-01925-FAB | District of Puerto Rico | Y (3:08-cv-01925-DRD) | 08/20/2008 | No Summons Information |
| 13 | *Horizon International Shipping, Inc. v. Horizon Lines, et al*, | District of Puerto Rico | Previously Consolidated | 08/15/2008 | 08/18/2008 |

Last updated 10/2/08

1

4981936

CROW 002486

| # | Case Name & Number | United States District Court | Transferred/Consolidated to DPR (Y/N) | Date Complaint Filed | Date Complaint Served on Crowley |
|---|---|---|---|---|---|
|  | Case No. 3:08-CV-01908-DRD |  |  |  |  |
| 14 | Isaac Industries, Inc. v. Horizon Lines, Inc., et al., Case No. 1:08-cv-21151-JEM | Southern District of Florida | Y (3:08-cv-01903-DRD) | 04/23/2008 | 04/25/2008 (Issued) |
| 15 | Kamino International Transport v. Horizon Lines, Inc., et al., Case No. 1:08-cv-21856-JLK | Southern District of Florida | Y (3:08-cv-02031-DRD) | 06/27/2008 | No Summons Information |
| 16 | La Esperanza Bus Line v. Horizon Lines, Inc., et al., Case No. 3:08-cv-01525-DRD | District of Puerto Rico | Previously Consolidated | 05/06/2008 | 05/08/2008 (Issued) |
| 17 | La Rosa del Monte Express, Inc. v. Horizon Lines, Inc., et al., Case No. 3:08-cv-01617-DRD | District of Puerto Rico | Previously Consolidated | 06/03/2008 | 06/05/2008 (Issued) |
| 18 | Linde Gas Puerto Rico, Inc. v. Horizon Lines, Inc., et al., Case No. 3:08-cv-01665-DRD | District of Puerto Rico | Previously Consolidated | 06/18/2008 | 06/20/2008 (Issued) |
| 19 | Luis Freire, Dir of KMA Associates of Puerto Rico, Inc. v. Horizon Lines, et al., Case No. 3:08-cv-01926-GAG | District of Puerto Rico | Y (3:08-cv-01926-DRD) | 08/20/2008 | No Summons Information |
| 20 | Magazine Auto, Inc. v. Horizon Lines, Inc., et al., Case No. 3:08-cv-00463-HLA-JRK | Middle District of Florida | Y (3:08-cv-02026-DRD) | 05/07/2008 | 05/07/2008 (Issued) |
| 21 | Magic Transport, Inc. v. Horizon Lines, Case No. 3:08-cv-02244-JAF | District of Puerto Rico | Y (3:08-cv-02244-JAF) | 10/30/2008 | 10/31/2008 (Issued) |
| 22 | Mark Francis Kent v. Horizon Lines, Inc., et al., Case No. 1:08-cv-21689-FAM | Southern District of Florida | Y (3:08-cv-02030-DRD) | 06/13/2008 | No Summons Information |
| 23 | Marina Electric Inc. v. Horizon Lines, Inc., et al., Case No. 3:08-cv-01555-DRD | District of Puerto Rico | Previously Consolidated | 05/19/2008 | 05/20/2008 (Issued) |
| 24 | Mayda Rodriguez v. Horizon Lines, Inc., et al., Case No. 3:08-cv-00536-JHM-TEM | Middle District of Florida | Y (3:08-cv-02028-DRD) | 05/27/2008 | No Summons Information |
| 25 | Mayshorn International Trading, Co. v. Horizon Lines, et al., Case No. - 3:08-cv-01936-JP | District of Puerto Rico | Y (3:08-cv-01936-DRD) | 08/21/2008 | 08/25/2008 (Issued) |
| 26 | Metro Plumbing, Inc. v. Horizon Lines, Inc., et al., Case No. 3:08-cv-01626-DRD | District of Puerto Rico | Previously Consolidated | 06/05/2008 | 06/09/2008 (Issued) |
| 27 | Pedro Luciano v. Horizon Lines, Inc., et al., Case No. 3:08-cv-01795-RLA | District of Puerto Rico | Y (3:08-cv-01795-DRD) | 07/21/2008 | 07/23/2008 (Issued) |
| 28 | Rona Distributors, Inc. v. Horizon Lines, Inc., et al., Case No. 3:08-cv-01531-DRD | District of Puerto Rico | Previously Consolidated | 05/07/2008 | 06/17/2008 (Executed) |
| 29 | Sedeco Servicios de Descuentos en Compra, Inc. v. Horizon Lines, Inc. et al., | District of Puerto Rico | Y (3:08-cv-02001-DRD) | 09/04/2008 | 09/26/2008 |

Last updated: 10/2/08

2

4981936

| # | Case Name & Number | United States District Court | Transferred/Consolidated to DPR (Y/N) | Date Complaint Filed | Date Complaint Served on Crowley |
|---|---|---|---|---|---|
|  | Case No. 3:08-cv-02001-GAG |  |  |  | (Executed) |
| 30 | SGS Logistic Services, Inc. v. Horizon Lines, Inc., et al, Case No. 1:08-cv-21565-JEM | Southern District of Florida | N (transferred to W.D. Was., Case No. C08-1456-TSZ), CASE CLOSED | 06/02/2008 | Crowley Liner Services, Inc. – 06/11/2008 (Executed) ************ Crowley Maritime Corp. – 06/05/2008 (Issued) |
| 31 | The Aaron Group v Horizon Lines, Inc. et al, Case No. 3:08-cv-01904-GAG | District of Puerto Rico | Y (3:08-cv-01904-DRD) | 08/14/2008 | 08/19/2008 (Issued) |
| 32 | Vineland Fireworks Company v. Sea Star Line, LLC, et al., Case No. 1:08-cv-21275-JEM | Southern District of Florida | Y (3:08-cv-02029-DRD) | 05/01/2008 | 05/01/2008 (Issued) |
| 33 | X-Press Freight Forwarders, Inc. v. Horizon Lines, et al, Case No. 3:08-cv-00501-TJC-JRK | Middle District of Florida | Y (3:08-cv-02027-DRD) | 05/15/2008 | 05/15/2008 (Issued) |
| 34 | Yoly Industrial Supply, Inc. v. Horizon Lines, Inc., et al, Case No. 3:08-cv-00434-TJC-HTS | Middle District of Florida | Y (3:08-cv-01900-DRD) | 04/30/2008 | 5/8/2008 (Executed) |

**Pending Motions in Cases Not Yet Transferred to Consolidated Matter (*Century Packing*)\*:**
- *Century Packing:* Joint Motion for Entry of Agreed Pretrial Order No. 1 filed on 10/20/08.
  Initial Scheduling Conference previously set for November 5, 2008, now set for January 20, 2009 at 9:00 a.m., in Court Room Num. 3, before Judge Daniel R. Dominguez.
- *Econocaribe* Complaint filed on 11/14/08. Summons issued on 11/14/08.
- *Ferrmax*: Summons issued on 11/5/08, service due by 3/8/09.
  Motion for Consolidation filed 11/5/08.
- *Magic Transport*: Complaint filed on 10/30/08. Summons issued on 10/31/08, service due by 3/3/09.
- *SGS Logistics*: Notice of Voluntary Dismissal filed 11/10/08. Case closed.

**Status of Consolidated Matter (*Century Packing*):** On September 24, 2008, the Court set an Initial Scheduling Conference ("ISC") for November 5, 2008 in San Juan. By Order dated October 28, 2008 granting the parties' joint motion to amend the Court's initial scheduling order, the Court reset the ISC for January 20, 2009 in San Juan, and also ordered Plaintiffs submit their consolidated amended complaint by December 5, 2008. Defendants' response will be due on January 19, 2008, 45 days after the amended pleading is filed. Defendants intend to respond with a *Twombly* motion to dismiss.

3

Last updated: 10/2/08

4981936

CONFIDENTIAL INFORMATION

\*Motions pending in other cases relate to transfer and consolidation issues specifically.

## STATE CASE(S)

| # | Case Name & Number | Circuit Court | Transferred/Consolidated to DPR (Y/N) | Date Complaint Filed | Date Complaint Served on Crowley | Date Answer Due |
|---|---|---|---|---|---|---|
| 1 | *Caribbean Shipping Services v. Horizon Lines, Inc., et al,* Case No. 16-2008-CA-008795 (Judge Lance Day) | Duval County Circuit Court | N/A | 07/09/2008 | 07/09/2008 (Issued) | 10/27/08 |

Pending Motions:

-Motion to Dismiss filed on 10/27/08.

Last updated: 10/2/08

4

4981936

CROW 002489

UNITED STATES
JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

UNITED STATES JUDICIAL PANEL
on
MULTIDISTRICT LITIGATION

**Aug 13, 2008**

FILED
CLERK'S OFFICE

IN RE: PUERTO RICAN CABOTAGE
ANTITRUST LITIGATION

MDL No. 1960

### TRANSFER ORDER

**Before the entire Panel:** Plaintiff in one Southern District of Florida action has moved, pursuant to 28 U.S.C. § 1407, for coordinated or consolidated pretrial proceedings of this litigation in the Southern District of Florida. All responding parties agree that centralization is appropriate and variously support one or more of the following suggested transferee districts: the Southern District of Florida, the Middle District of Florida, the Eastern District of Louisiana, or the District of Puerto Rico.

This litigation currently consists of five actions listed on Schedule A and pending in three districts as follows: three actions in the Southern District of Florida and one action each in the Middle District of Florida and the District of Puerto Rico.[1]

On the basis of the papers filed and hearing session held, we find that these actions involve common questions of fact, and that centralization under Section 1407 in the District of Puerto Rico will serve the convenience of the parties and witnesses and promote the just and efficient conduct of this litigation. These actions share factual questions relating to allegations that defendants conspired to fix prices of cabotage services to and from Puerto Rico in violation of the Sherman Antitrust Act. Centralization under Section 1407 will eliminate duplicative discovery; prevent inconsistent pretrial rulings, especially with respect to class certification; and conserve the resources of the parties, their counsel and the judiciary.

The question of the best transferee court presents us with several good options. The Middle District of Florida, the Southern District of Florida, and the District of Puerto Rico would each be an appropriate transferee district. We conclude that the actions are best centralized in the District of Puerto Rico. Eleven actions are already pending there, ten of which are before Judge Daniel R. Dominguez, who has MDL experience. Moreover, docket conditions in this district are favorable for the assignment of an MDL. Therefore, centralization in the District of Puerto Rico can achieve

---

[1] The Panel has been notified that eighteen other related actions have been filed as follows: ten actions in the District of Puerto Rico, and four actions each in the Middle District of Florida and the Southern District of Florida. These actions will be treated as potential tag-along actions. *See* Rules 7.4 and 7.5, R.P.J.P.M.L., 199 F.R.D. 425, 435-36 (2001).

CROW 002490

-2-

the dual benefits of convenience and of spreading the workload of multidistrict litigation cases.

IT IS THEREFORE ORDERED that, pursuant to 28 U.S.C. § 1407, the actions listed on Schedule A and pending outside the District of Puerto Rico are transferred to the District of Puerto Rico and, with the consent of that court, assigned to the Honorable Daniel R. Dominguez for coordinated or consolidated pretrial proceedings with the action pending there and listed on Schedule A.

PANEL ON MULTIDISTRICT LITIGATION

John G. Heyburn II
Chairman

J. Frederick Motz          Robert L. Miller, Jr.
Kathryn H. Vratil          David R. Hansen

IN RE: PUERTO RICAN CABOTAGE
ANTITRUST LITIGATION                           MDL No. 1960

## SCHEDULE A

Middle District of Florida

Yoly Industrial Supply, Inc. v. Horizon Lines, Inc., et al., C.A. No. 3:08-434

Southern District of Florida

C C 1, LP v. Horizon Lines, Inc., et al., C.A. No. 1:08-21125
BacPlas, Inc. v. Horizon Lines, LLC, et al., C.A. No. 1:08-21131
Issac Industries, Inc. v. Horizon Lines, Inc., et al., C.A. No. 1:08-21151

District of Puerto Rico

Century Packing Corp. v. Horizon Lines, Inc., et al., C.A. No. 3:08-1467

CONFIDENTIAL INFORMATION

Case 3:08-cv-01467-DRD  Document 101  Filed 08/13/2008  Page 1 of 8

UNITED STATES JUDICIAL PANEL
on
MULTIDISTRICT LITIGATION

| CHAIRMAN: | MEMBERS: | | DIRECT REPLY TO: |
|---|---|---|---|
| Judge John G. Heyburn II<br>United States District Court<br>Western District of Kentucky | Judge J. Frederick Motz<br>United States District Court<br>District of Maryland | Judge Kathryn H. Vratil<br>United States District Court<br>District of Kansas | Jeffery N. Lüthi<br>Clerk of the Panel<br>One Columbus Circle, NE<br>Thurgood Marshall Federal<br>Judiciary Building |
| | Judge Robert L. Miller, Jr.<br>United States District Court<br>Northern District of Indiana | Judge David R. Hansen<br>United States Court of Appeals<br>Eighth Circuit | Room G-255, North Lobby<br>Washington, D.C. 20002<br><br>Telephone: [202] 502-2800<br>Fax: [202] 502-2888<br>http://www.jpml.uscourts.gov |

August 13, 2008

Frances Rios De Moran, Clerk
150 Federico Degetau Federal Building
150 Carlos Chardon Avenue
Hato Rey, PR 00918-1767

Re: MDL No. 1960 -- IN RE: Puerto Rican Cabotage Antitrust Litigation

Dear Ms. Rios De Moran:

Attached as a separate document is a certified copy of a transfer order issued today by the Judicial Panel on Multidistrict Litigation in the above-captioned matter. The order is directed to you for filing. Rule 1.5 of the Rules of Procedure of the Judicial Panel on Multidistrict Litigation, 199 F.R.D. 425, 428 (2001), states "A transfer or remand pursuant to 28 U.S. C. § 1407 shall be effective when the transfer or remand order is filed in the office of the clerk of the district court of the transferee district."

Today we are also serving an information copy of the order on the transferor court(s). The Panel's governing statute, 28 U.S.C. §1407, requires that the transferee clerk "transmit a certified copy of the Panel's order to transfer to the clerk of the district court from which the action is being transferred [transferor court]."

Rule 1.6(a), pertaining to transfer of files, states "the clerk of the transferor district court shall forward to the clerk of the transferee district court the complete original file and a certified copy of the docket sheet for each transferred action." With the advent of electronic filing, many transferee courts have found that it is not necessary to request the original file. Some transferee courts will send their certified copy of the Panel order with notification of the newly assigned transferee court case number and inform the transferor courts that they will copy the docket sheet via PACER. Others may request a certified copy of the docket sheet and a copy of the complaint (especially if it was removed from state court). You should be specific as to the files you would like to receive from the transferor courts and if no files will be necessary, you should make that clear. Therefore, Rule 1.6(a) will be satisfied once a transferor court has complied with your request.

You may find Chapter 7 of Volume 4 of the Clerks Manual, United States District Courts helpful in managing the your MDL docket.

The Panel Clerk's Office maintains the only statistical accounting of multidistrict litigation traffic in the federal courts. These statistics are used by the Administrative Office of the United States Courts and the Judicial Conference. Therefore, your cooperation in keeping the Panel advised of the progress of this litigation would be appreciated. We are particularly interested in receiving the docket numbers assigned to each transferred action by your court; the caption and docket numbers of all actions originally filed in your district; and copies of orders regarding appointment of liaison counsel, settlements, dismissals, state court remands, and reassignments to other judges in your district.

CONFIDENTIAL INFORMATION  CROW 002493

Case 3:08-cv-01467-DRD   Document 101   Filed 08/12/2008   Page 2 of 6

- 2 -

     Your attention is also directed to Panel Rule 7.6, regarding termination and remand of transferred actions. Upon notification from your court of a finding by the transferee judge suggesting to the Panel that Section 1407 remand of a transferred action is appropriate, this office will promptly file a conditional remand order.

     Attached to this letter, for your information, is a copy of the Panel Attorney Service List and a listing of the transferor court clerks with respect to this order.

     Very truly,

     Jeffery N. Lüthi
     Clerk of the Panel

     By
     Mecca S. Thompson
     Docket Specialist

Attachments (Transfer Order is a Separate Document)

cc:    Transferee Judge: Judge Daniel R. Dominguez
     Chief Judge Transferee District: Judge Jose Antonio Fuste

     JPML Form 33

## Judicial Panel on Multidistrict Litigation - Panel Attorney Service List
### for
## MDL 1960 - IN RE: Puerto Rican Cabotage Antitrust Litigation

*** Report Key and Title Page ***

Please Note: This report is in alphabetical order by the last name of the attorney. A party may not be represented by more then one attorney. See Panel rule 5.2(c).

**Party Representation Key**
 * Signifies that an appearance was made on behalf of the party by the representing attorney.
 # Specified party was dismissed in some, but not all, of the actions in which it was named as a party.
 All counsel and parties no longer active in this litigation have been suppressed.

**This Report is Based on the Following Data Filters**
 Docket: 1960 - Puerto Rican Cabotage AT
 For Open Cases

CONFIDENTIAL INFORMATION                              CROW 002495

Case 3:08-cv-01467-DRD    Document 101    Filed 08/__/2008    Page 4 of 6

**Judicial Panel on Multidistrict Litigation – Panel Attorney Service List**                    Page 1

Docket: 1960 - IN RE: Puerto Rican Cabotage Antitrust Litigation
Status:   Transferred on 08/13/2008
Transferee District:  PR       Judge: Dominguez, Daniel R.                    Printed on 08/13/2008

| ATTORNEY - FIRM | REPRESENTED PARTY(S) |
|---|---|
| Dabonavich, Keith S.<br>GARVEY SCHUBERT & BARER<br>121 S.W. Morrison Street<br>11th Floor<br>Portland, OR 57204-3141 | =>Phone: (503) 228-3939  Fax: (503) 226-0259  Email: kdabonavich@gsblaw.com<br>Sea Star Line, LLC* |
| Gordon, Ruthanne<br>BERGER & MONTAGUE PC<br>1622 Locust Street<br>Philadelphia, PA 19103-6365 | =>Phone: (215) 875-3000  Fax: (215) 875-4604  Email: rgordon@bm.net<br>Century Packing Corp.* |
| Hanzman, Michael A.<br>MICHAEL A HANZMAN PA<br>2525 Ponce de Leon Boulevard<br>Suite 700<br>Coral Gables, FL 33134 | =>Phone: (305) 529-9108  Fax: (305) 529-1612  Email: mhanzman@hanzmangilbert.com<br>C. C. 1 Ltd. Partnership* |
| Kaplan, Robert N.<br>KAPLAN FOX & KILSHEIMER LLP<br>850 Third Avenue<br>14th Floor<br>New York, NY 10022 | =>Phone: (212) 687-1980  Fax: (212) 687-7714  Email: rkaplan@kapfanfox.com<br>BasPisa, Inc.* |
| Rappaport, Richard I.<br>MCGUIREWOODS LLP<br>77 West Wacker Drive<br>Suite 4100<br>Chicago, IL 60601-7567 | =>Phone: (312) 750-8618  Fax: (312) 920-3696  Email: rrappaport@mcguirewoods.com<br>Horizon Lines, Inc.*; Horizon Lines, LLC*; Horizon Logistics, LLC* |
| Richburg, Scott D.<br>FOLEY & LARDNER LLP<br>One Independent Drive<br>Suite 1300<br>Jacksonville, FL 32202-5017 | =>Phone: (904) 359-2080  Fax: (904) 359-8700  Email: srichburg@foley.com<br>Trailer Bridge, Inc.* |
| Rosenthal, Samuel<br>PATTON BOGGS LLP<br>2550 M Street, N.W.<br>Washington, DC 20037 | =>Phone: (202) 457-6000  Fax: (202) 457-6315  Email: srosenthal@pattonboggs.com<br>Crowley Liner Services, Inc.*; Crowley Maritime Corp.* |
| Sakrans, Hollis L.<br>LABATON SUCHAROW LLP<br>140 Broadway, 33rd Floor<br>New York, NY 10005 | =>Phone: (212) 907-0700  Fax: (212) 818-0477  Email: hsakrans@labaton.com<br>Yoly Industrial Supply, Inc.* |
| Simon, Bruce L.<br>PEARSON SIMON SOTER WARSHAW & PENNY LLP<br>44 Montgomery Street<br>Suite 1430 | =>Phone: (415) 433-9000  Fax: (415) 433-9008  Email: bsimon@pswplaw.com<br>Isew Industries, Inc.* |

Note: Please refer to the report title page for complete report scope and key.

CONFIDENTIAL INFORMATION                    CROW 002496

Case 3:08-cv-01467-DRD   Document 101   Filed 08/19/2008   Page 5 of 6

*(Panel Attorney Service List for MDL 1,960 Continued)*                                    Page 2

**ATTORNEY - FIRM**                     **REPRESENTED PARTY(S)**

San Francisco, CA 94104

Note: Please refer to the report title page for complete report scope and key.

CONFIDENTIAL INFORMATION                              CROW 002497

NOV.25.2008   4:42PM    JIMENEZ GRAFFAM&LAUSELL(7514068)          NO.596    P.20/23

Case 3:08-cv-01467 DRD    Document 101    Filed 08/??/2008    Page 6 of 6

IN RE: PUERTO RICAN CABOTAGE
ANTITRUST LITIGATION                                      MDL No. 1960

### INVOLVED CLERKS LIST

Sheryl L. Loesch, Clerk
U.S. District Court
300 North Hogan Street
Suite 9-150
Jacksonville, FL 32202-4271
Flmd-MDL Litigation/FLMD/11/USCOURTS

Steven Larimore, Clerk
Federal Courthouse Square
301 North Miami Avenue
Miami, FL 33128-7788
CMECF CaseTransfers FLSD/FLSD/11/USCOURTS

A CERTIFIED TRUE COPY
ATTEST

By Mecca Thompson on Aug 13, 2008

FOR THE UNITED STATES
JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

UNITED STATES JUDICIAL PANEL
on
MULTIDISTRICT LITIGATION

UNITED STATES
JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

Aug 13, 2008

FILED
CLERK'S OFFICE

IN RE: PUERTO RICAN CABOTAGE
ANTITRUST LITIGATION

MDL No. 1960

TRANSFER ORDER

**Before the entire Panel:** Plaintiff in one Southern District of Florida action has moved, pursuant to 28 U.S.C. § 1407, for coordinated or consolidated pretrial proceedings of this litigation in the Southern District of Florida. All responding parties agree that centralization is appropriate and variously support one or more of the following suggested transferee districts: the Southern District of Florida, the Middle District of Florida, the Eastern District of Louisiana, or the District of Puerto Rico.

This litigation currently consists of five actions listed on Schedule A and pending in three districts as follows: three actions in the Southern District of Florida and one action each in the Middle District of Florida and the District of Puerto Rico.[1]

On the basis of the papers filed and hearing session held, we find that these actions involve common questions of fact, and that centralization under Section 1407 in the District of Puerto Rico will serve the convenience of the parties and witnesses and promote the just and efficient conduct of this litigation. These actions share factual questions relating to allegations that defendants conspired to fix prices of cabotage services to and from Puerto Rico in violation of the Sherman Antitrust Act. Centralization under Section 1407 will eliminate duplicative discovery; prevent inconsistent pretrial rulings, especially with respect to class certification; and conserve the resources of the parties, their counsel and the judiciary.

The question of the best transferee court presents us with several good options. The Middle District of Florida, the Southern District of Florida, and the District of Puerto Rico would each be an appropriate transferee district. We conclude that the actions are best centralized in the District of Puerto Rico. Eleven actions are already pending there, ten of which are before Judge Daniel R. Dominguez, who has MDL experience. Moreover, docket conditions in this district are favorable for the assignment of an MDL. Therefore, centralization in the District of Puerto Rico can achieve

---

[1] The Panel has been notified that eighteen other related actions have been filed as follows: ten actions in the District of Puerto Rico, and four actions each in the Middle District of Florida and the Southern District of Florida. These actions will be treated as potential tag-along actions. *See* Rules 7.4 and 7.5, R.P.J.P.M.L., 199 F.R.D. 425, 435-36 (2001).

-2-

the dual benefits of convenience and of spreading the workload of multidistrict litigation cases.

IT IS THEREFORE ORDERED that, pursuant to 28 U.S.C. § 1407, the actions listed on Schedule A and pending outside the District of Puerto Rico are transferred to the District of Puerto Rico and, with the consent of that court, assigned to the Honorable Daniel R. Dominguez for coordinated or consolidated pretrial proceedings with the action pending there and listed on Schedule A.

PANEL ON MULTIDISTRICT LITIGATION

John G. Heyburn II
Chairman

J. Frederick Motz            Robert L. Miller, Jr.
Kathryn H. Vratil            David R. Hansen

CONFIDENTIAL INFORMATION                                    CROW 002500

IN RE: PUERTO RICAN CABOTAGE
ANTITRUST LITIGATION                              MDL No. 1960


SCHEDULE A


Middle District of Florida

Yoly Industrial Supply, Inc. v. Horizon Lines, Inc., et al., C.A. No. 3:08-434

Southern District of Florida

C C 1, LP v. Horizon Lines, Inc., et al., C.A. No. 1:08-21125
BacPlas, Inc. v. Horizon Lines, LLC, et al., C.A. No. 1:08-21131
Issac Industries, Inc. v. Horizon Lines, Inc., et al., C.A. No. 1:08-21151

District of Puerto Rico

Century Packing Corp. v. Horizon Lines, Inc., et al., C.A. No. 3:08-1467

CONFIDENTIAL INFORMATION                                    CROW 002501

DOJ/FBI/CIVIL ANTI-TRUST
DEFENSE COST
THRU OCT. 31, 2008

| VENDOR | TOTAL |
|---|---|
| Charles B. Lembcke, P.A. (CLS) | $ 166,057.36 |
| Computer Evidence Specialists | $ 46,209.94 |
| Curtis, Mallet-Prevost, Colt & Mosle LLP (CLS) | $ 56,575.70 |
| Daniel A. Smith (Farmer) | $ 4,200.00 |
| Data Resources (IT) | $ 26,229.88 |
| IKON Office Solutions (subpoena copies) | $ 45,686.84 |
| Impact Forensics LLC | $ 4,650.00 |
| Jimenez, Graffam & Lausell (CLS Class Action) | $ 43,308.36 |
| Katten Muchin Rosenman LLP (Kelley) | $ 26,261.97 |
| Lankford, Coffield & Reed, PLLC (Farmer) | $ 92,831.64 |
| Mark Rosenblum, P.A. (Farmer) | $ 14,690.00 |
| Moseley Prichard Parrish Knight & Jones (CLS) | $ 6,323.00 |
| Net Tech Consultants | $ 1,760.00 |
| Patton Boggs LLP (CLS Class Action) | $ 466,680.48 |
| Patton Boggs LLP (CLS DOJ) | $ 677,160.90 |
| Seipp & Flick (Class Action) | $ 5,305.59 |
| Sheppard White Thomas & Kachergus, P.A. (Lusis) | $ 21,455.52 |
| Simpson Thacher Bartlett LLP (Grune) | $ 246,594.60 |
| Venable LLP (CLS) | $ 47,109.02 |
| Access Data | $ 6,330.00 |
| Lex Business Solutions | $ 35,160.17 |
| Patton Boggs LLP (CLS Issues/Analysis) | $ 82,960.14 |
| Compass Lexecon (economist) | $ 40,136.27 |
| Dibner Maritiime Associates (economist) | $ 33,370.00 |
| Patton Boggs LLP (CLS General) | $ 2,737.56 |
| Insight (IT) | $ 13,121.26 |
| FedEx | $ 703.84 |
| CDW | $ 3,045.01 |
| PC Mall | $ 2,345.26 |
| **Grand Total** | **$ 2,219,000.31** |

CONFIDENTIAL INFORMATION

Page 62

M. Conboy

1
2  BY MS. GARRISON:
3      Q.   Ms. Conboy, do you recognize the
4  document marked as Exhibit 10?
5      A.   Yes.
6      Q.   What do you recognize it to be?
7      A.   It's a fax transmission and letter
8  from Lankford, Cofield & Reed dated June 30,
9  2008.
10      Q.   And is this a letter you received in
11  your role as a claims handler at AIG?
12      A.   Yes.
13      Q.   And is it your understanding that it
14  was received at or near the date of the letter
15  June 30, 2008?
16      A.   I assume so.
17      Q.   As a claims adjuster at AIG, was it
18  regular practice for you to receive letters
19  from insureds or is it common for you to
20  receive letters from insured?
21      A.   Of course.
22      Q.   Is it your regular practice to keep
23  those letters in the file?
24      A.   Yes.
25      Q.   Do you understand who Lankford,

Page 63

M. Conboy

1
2  Cofield & Reed is?
3      A.   They are one of Mr. -- or were one
4  of Mr. Farmer's attorneys.
5      Q.   On the second page of Mr. Reed's
6  letter, in the second paragraph, he states, "I
7  have enclosed a copy of my bills in connection
8  with representation of Mr. Farmer."
9          Do you see that?
10      A.   Yes.
11      Q.   Do you recall receiving bills from
12  Mr. Reed in connection with his representation
13  of Mr. Farmer?
14      A.   I don't recall exactly who I got
15  bills from, but I do recall receiving bills
16  from attorneys on behalf of Mr. Farmer.
17      Q.   Do you recall receiving invoices or
18  bills from Crowley that were invoices from
19  Mr. Farmer's attorneys?
20      A.   I don't remember who I got them from
21  or which firms they were from, but I recall
22  that I did receive some invoices, yes.
23          MS. GARRISON:  I'll have the court
24  reporter mark Exhibit 11.
25          (Plaintiff's Exhibit 11, an e-mail

Page 64

M. Conboy

1
2  that Ms. Conboy sent to Terry Reed, Bates
3  stamped NU002737 through NU002739, marked
4  for identification, as of this date.)
5  BY MS. GARRISON:
6      Q.   Ms. Conboy, do you recognize the
7  document that's been marked as Exhibit 11?
8      A.   It's an e-mail that I sent to Terry
9  Reed, one of Mr. Farmer's attorney, on Monday
10  August 11th of 2008 where it appears I sent him
11  a copy of my August 11, 2008, coverage letter.
12      Q.   That's a letter you wrote in your
13  role as the claims handler for this case?
14      A.   Yes.
15      Q.   And that letter was written at or
16  around the date stated on the letter August 11,
17  2008?
18      A.   Yes.
19      Q.   And as a claim adjuster at AIG, was
20  it regular practice for you to write letters
21  like this to your insureds?
22      A.   Yes.
23      Q.   Was it your regular practice to keep
24  it in the claims file as well?
25      A.   Yes.

Page 65

M. Conboy

1
2      Q.   Your August 11, 2008, letter to
3  Mr. Reed, doesn't mention the under sealed
4  documents referred to in Mr. Ficon's April 23rd
5  e-mail, does it?
6          MR. DUFFY:  Objection.
7      A.   Correct.
8          MS. GARRISON:  I'll have the court
9  reporter mark Exhibit 12.
10          (Plaintiff's Exhibit 12, a letter
11  from Crowley to AON dated November 26th,
12  2008, Bates stamped CROW002481 through
13  CROW002502, marked for identification, as
14  of this date.)
15  BY MS. GARRISON:
16      Q.   Ms. Conboy, do you recognize the
17  document marked as Exhibit 12?
18      A.   Yes, it's a letter from Crowley to
19  AON dated November 26th, 2008.
20      Q.   And the letter, as you mentioned, is
21  to AON, do you recall whether AON forwarded
22  this letter to yourself at AIG?
23      A.   I think -- you know what, I don't
24  know.
25          MS. GARRISON:  I'll have the court

M. Conboy

1  
2  reporter mark this as Exhibit 13.  
3      (Plaintiff's Exhibit 13, a  
4  February 3rd, 2009 letter from Ms. Conboy  
5  to Steve Ficon, Bates stamped CROW001180  
6  through CROW001182, marked for  
7  identification, as of this date.)  
8  BY MS. GARRISON:  
9      Q.   Ms. Conboy, do you recognize  
10  Exhibit 13?  
11      A.   Yes, it's a February 3rd letter from  
12  me to Steve Ficon.  
13      Q.   And is this a letter you wrote in  
14  your role as a claims handler for Crowley's  
15  claim?  
16      A.   Yes.  
17      Q.   And did you write the letter at or  
18  near the date that it's dated, February 3rd,  
19  2009?  
20      A.   Yes.  
21      Q.   As a claims handler at AIG, was it  
22  regular practice for you to write letters like  
23  this to your insureds?  
24      A.   Yes.  
25      Q.   Is it regular practice for you to  

M. Conboy

1  
2  keep letters like this in your claims file?  
3      A.   Yes.  
4      Q.   The bottom of this letter you state,  
5  "We are now in receipt of your November 26th,  
6  2008, letter to Dan Sweeny."  
7      Do you see that?  
8      A.   Yes.  
9      Q.   Does this refresh your recollection  
10  as to whether you received the November 26th,  
11  2008, letter?  
12      A.   Yes.  
13      Q.   And is it your understanding that  
14  you did receive that letter?  
15      A.   Yes.  
16      Q.   Now, if we could turn back to the  
17  November 26, 2008, letter, on the second page  
18  of that letter.  Under the heading "Defense  
19  Costs," there's a statement at the end of that  
20  section that states, "A schedule summarizing  
21  defense costs paid thru 10/30/08 is an attached  
22  at Exhibit "D".  If underwriters require copies  
23  of the fee statements, please advise and we  
24  will provide."  
25      Do you see that?  

M. Conboy

1  
2      A.   Yes.  
3      Q.   Do you recall whether you ever asked  
4  for copies of the fee statements that are  
5  referenced in this letter?  
6      A.   Given that we denied coverage, I  
7  wouldn't have done that.  Although I don't  
8  specifically recall.  
9      Q.   Going back to Exhibit 13, which is  
10  your February 3rd, 2009, letter, at the very  
11  end of that letter you state, "Should you wish  
12  to submit further information or documentation  
13  that you feel would be relevant to a  
14  determination as to coverage in this matter,  
15  please feel free to forward such information to  
16  my attention."  
17      Do you see that?  
18      A.   Yes.  
19      Q.   Do you know whether Crowley provided  
20  additional information and support of its claim  
21  after February 3rd, 2009?  
22      A.   I know that after Michelle Graffeo  
23  took the file over that they submitted a plea  
24  agreement and an indictment.  I don't recall  
25  whether I got anything else -- whether I  

M. Conboy

1  
2  personally got anything else after  
3  February 3rd.  
4      Q.   And we also talked earlier that  
5  you're also aware that a search warrant  
6  affidavit has now been submitted by Crowley as  
7  well, correct?  
8      A.   Yeah, I believe to Michelle sometime  
9  in 2015 or so.  
10      Q.   During the time frame between the  
11  February 3rd, 2009, letter marked as Exhibit 9  
12  and your coverage denial letter dated May 27th,  
13  2008, marked as Exhibit 6, do you recall doing  
14  any additional investigation into Crowley's  
15  claim for coverage?  
16      A.   No.  
17      Q.   And, sorry, to clarify, do you not  
18  recall or was there no additional investigation  
19  done?  
20      A.   Whatever I considered in coming to  
21  my coverage determination is reflected in my  
22  letters.  So I considered what they  
23  submitted -- what Crowley submitted -- Crowley  
24  and Mr. Farmer submitted to me.  
25      Q.   And to clarify, we talked about this

**Doc. 36-20**

# EXHIBIT S



 **AIG** | AIG Domestic Claims, Inc.
**Directors & Officers**

175 Water Street
New York, NY 10038
212-458-6038
866-871-0322 (Fax)

Maureen Conboy
Complex Claims Director
maureen.conboy@aig.com

February 3, 2009

RECEIVED
FEB 09 2009
RISK MGMT. DEPT
JACKSONVILLE FLORIDA

Via Email & Regular Mail

Steve Ficon
Crowley Maritime Corporation
P.O. Box 2110
Jacksonville, FL 32203-2110

          Re: Insured:  Crowley Maritime Corporation
              Matters:  1) DOJ/FBI Investigation
                        2) BacPlas, Inc.; CC1 Limited Partnership; Century Packing Corp.
              Policy:   061-36-48
              Claim:    367-4291

Dear Mr. Ficon:

        As you know, AIG Domestic Claims ("AIGDC") has been retained by National Union
Fire Insurance Company of Pittsburg, Pa. ("National Union") to represent its interests in
connection with the above referenced matters as they concern National Union Executive and
Organization Liability Insurance Policy # 061-36-48 (the "Policy"), as issued to Crowley
Maritime Corporation ("Crowley").

        Aon Financial Services ("Aon") provided notice of the DOJ/FBI investigation
("Investigation") by letter dated April 25, 2008, and notice of three anti-trust complaints
(BacPlas, Inc. v. Horizon Lines, LLC, Sea Star Line, LLC, Trailer Bridge, Inc. and Crowley
Liner Services, Inc., Case #: 08-21131; CC1 Limited Partnership v. Horizon Lines, LLC, et al.,
Case #: 08-21125; and Century Packing Corp. v. Horizon Lines, LLC, et al., Case #: 08-1467)
filed in United States District Court, Southern District of Florida on April 22, 2008 by letter
dated May 1, 2008. On May 27, 2008 we issued a coverage letter with reference to the matters
noticed by Aon.

        We are now in receipt of your November 26, 2008 letter to Dan Sweeney at Aon, a copy
of which was forwarded to us by Mr. Sweeney. This letter is intended to respond to your
November 26th letter and further supplement our May 27, 2008 coverage letter.

**CONFIDENTIAL INFORMATION**

CROW001180

2/3/2009 Ficon
2 of 3

<u>Civil Litigation</u>

Thirty-two (32) new complaints were enclosed with your November 26, 2008 letter. The 32 new complaints, along with the three complaints noticed to us on May 1, 2008, are listed on the Crowley Civil Case Tracker that was also attached to your November 26th letter (collectively "the Complaints"). None of the Complaints name any individuals as defendants. The 32 new complaints contain the same allegations as the complaints submitted to us on May 1, 2008. As you note in your November 26th letter, the Complaints all "generally allege that the defendant ocean shipping carriers, including Crowley Liners Services, Inc., engaged in anticompetitive conduct in the Puerto Rico trade routes in violation of the Clayton Act and Sherman Act."

As stated in my letter of May 27, 2008, in that the allegations set forth in the Complaints against Crowley do not arise from a Securities Claim, there is no coverage for the Complaints under Coverage B(i). And, as no Insured Person has been named in the Complaints, Coverage A and/or Coverage B(ii) have not been implicated. Thus, the Policy does not provide coverage for the Complaints.

<u>Investigation</u>

You state in your November 26th letter that no additional subpoenas have been received by Crowley or any individual officers/employees beyond those received April 17, 2008. You further advise that, contrary to what I stated in my May 27th letter, one individual, Tom Farmer, did in fact receive a subpoena. I have re-reviewed the materials Aon submitted to us on April 25, 2008 and discovered that you are correct. I overlooked the April 17, 2008 subpoena for Tom Farmer to appear before the Grand Jury of the United States District Court on May 28, 2008. Our coverage position, however, remains unchanged.

As stated in my May 27, 2008 letter, the Policy does not provide coverage for the subpoena and search warrant received by Crowley as the investigation of Crowley is not a Securities Claim as defined by the Policy. As to coverage for Rob Grune, John Kelley, Tom Farmer and Tony Lusis, the Policy defines a Claim to include:

a civil, criminal, administrative or regulatory investigation of an Insured Person:
(i) once such Insured Person is identified in writing by such investigating authority as a person against whom a proceeding described in Definition (b)(2) may be commenced; or
(ii) in the case of an investigation by the SEC or similar state or foreign government authority, after the service of a subpoena upon such Insured Person.

To date nothing has been submitted to show that there is any civil, criminal, administrative or regulatory investigation of an Insured Person. Additionally, no Insured Person has been identified in writing as a person against whom a proceeding may be commenced. Nor has any Insured Person been served with a subpoena from the "SEC or similar state or foreign government authority". The grand jury subpoena received by Tom Farmer does not appear to have been issued in connection with an investigation of Mr. Farmer. It does not identify Mr. Farmer as a person against whom a proceeding may be commenced. And, it was not issued in connection with "an investigation by the SEC or similar state or foreign government authority". Thus, a Claim (as defined by the Policy) has not been made against any Insured Person and coverage is unavailable.

**CONFIDENTIAL INFORMATION**

CROW001181

2/3/2009 Ficon
3 of 3

For the reasons set forth above, and in my prior letter, there is no coverage for the Investigation and/or Complaints. However, based upon the materials submitted to date, National Union will continue to accept this matter as a notice of circumstances that may give rise to a Claim being made against an Insured, pursuant to Clause 7(c) of the Policy. In the event that a Claim arising from the circumstances at issue in the Investigation and/or Complaints is asserted against an Insured, we will review the new materials, together with the Policy, and advise you of specific coverage issues that may then exist.

Should you wish to submit further information or documentation that you feel would be relevant to a determination as to coverage for this matter, please feel free to forward such information to my attention. In the meantime, National Union reserves any and all rights and defenses available under the Policy and applicable law, whether or not specifically referenced herein. If you wish to discuss this matter further, please contact me at 212-458-6038.

Sincerely,

Maureen Conboy

Cc:

Dan Sweeney
Aon Financial Services Group
4100 E. Mississippi Ave #1300
Denver, CO 80246

Andrew Teegarden
Aon Financial Services Group
3565 Piedmont Rd, NE, Suite 700
Atlanta, GA 30305

**CONFIDENTIAL INFORMATION**                    CROW001182

Page 66

M. Conboy

1   reporter mark this as Exhibit 13.
2          (Plaintiff's Exhibit 13, a
3   February 3rd, 2009 letter from Ms. Conboy
4   to Steve Ficon, Bates stamped CROW001180
5   through CROW001182, marked for
6   identification, as of this date.)
7   BY MS. GARRISON:
8       Q.   Ms. Conboy, do you recognize
9   Exhibit 13?
10      A.   Yes, it's a February 3rd letter from
11  me to Steve Ficon.
12      Q.   And is this a letter you wrote in
13  your role as a claims handler for Crowley's
14  claim?
15      A.   Yes.
16      Q.   And did you write the letter at or
17  near the date that it's dated, February 3rd,
18  2009?
19      A.   Yes.
20      Q.   As a claims handler at AIG, was it
21  regular practice for you to write letters like
22  this to your insureds?
23      A.   Yes.
24      Q.   Is it regular practice for you to

Page 67

M. Conboy

1   keep letters like this in your claims file?
2       A.   Yes.
3       Q.   The bottom of this letter you state,
4   "We are now in receipt of your November 26th,
5   2008, letter to Dan Sweeny."
6          Do you see that?
7       A.   Yes.
8       Q.   Does that refresh your recollection
9   as to whether you received the November 26th,
10  2008, letter?
11      A.   Yes.
12      Q.   And is it your understanding that
13  you did receive that letter?
14      A.   Yes.
15      Q.   Now, if we could turn back to the
16  November 26, 2008, letter, on the second page
17  of that letter.  Under the heading "Defense
18  Costs," there's a statement at the end of that
19  section that states, "A schedule summarizing
20  defense costs paid thru 10/30/08 is an attached
21  at Exhibit "D".  If underwriters require copies
22  of the fee statements, please advise and we
23  will provide."
24          Do you see that?

Page 68

M. Conboy

1       A.   Yes.
2       Q.   Do you recall whether you ever asked
3   for copies of the fee statements that are
4   referenced in this letter?
5       A.   Given that we denied coverage, I
6   wouldn't have done that.  Although I don't
7   specifically recall.
8       Q.   Going back to Exhibit 13, which is
9   your February 3rd, 2009, letter, at the very
10  end of that letter you state, "Should you wish
11  to submit further information or documentation
12  that you feel would be relevant to a
13  determination as to coverage for this matter,
14  please feel free to forward such information to
15  my attention."
16          Do you see that?
17      A.   Yes.
18      Q.   Do you know whether Crowley provided
19  additional information and support of its claim
20  after February 3rd, 2009?
21      A.   I know that after Michelle Graffeo
22  took the file over that they submitted a plea
23  agreement and an indictment.  I don't recall
24  whether I got anything else -- whether I

Page 69

M. Conboy

1   personally got anything else after
2   February 3rd.
3       Q.   And we also talked earlier that
4   you're also aware that a search warrant
5   affidavit has now been submitted by Crowley as
6   well, correct?
7       A.   Yeah, I believe to Michelle sometime
8   in 2015 or so.
9       Q.   During the time frame between the
10  February 3rd, 2009, letter marked as Exhibit 9
11  and your coverage denial letter dated May 27th,
12  2008, marked as Exhibit 6, do you recall doing
13  any additional investigation into Crowley's
14  claim for coverage?
15      A.   No.
16      Q.   And, sorry, to clarify, do you not
17  recall or was there no additional investigation
18  done?
19      A.   Whatever I considered in coming to
20  my coverage determination is reflected in my
21  letters.  So I considered what they
22  submitted -- what Crowley submitted -- Crowley
23  and Mr. Farmer submitted to me.
24      Q.   And to clarify, we talked about this

**Doc. 36-21**

# EXHIBIT T

# CROWLEY®



EXHIBIT
Plaintiff's 14
3/3/17   LM

September 30, 2009

*VIA UPS*

Ms. Maureen Conboy
Complex Claims Director
AIG Domestic Claims, Inc.
Directors & Officers
175 Water Street
New York, NY 10038

| | | |
|---|---|---|
| RE: | Insured: | Crowley Maritime Corporation; Tom Farmer; Rob Grune; John Kelley; and Tony Lusis |
| | Matter: | DOJ/FBI Antitrust Investigation of Anticompetitive Conduct in Shipping Industry |
| | D/Claim: | 4/17/08 |
| | Policy Period: | 11/1/2007-2008 |
| | Primary Policies: | (1) National Union Directors, Officers and Private Company Liability Insurance – Policy #066-57-99 |
| | | (2) National Union Executive and Organization Liability Insurance – Policy #061-36-44 |
| | AIG Claim No.: | 313-34335 / 367-4291 |
| | Crowley Ref. No.: | 08DO001 |

Dear Ms. Conboy:

I am responding to your letter of February 3, 2009 in which you conclude that "a Claim (as defined by the Policy) has not been made against any Insured Person and coverage is [thus] unavailable." That conclusion was based on the following four premises, each of which is incorrect:

   (1) That "nothing has been submitted to show that there is any civil, criminal, administrative or regulatory investigation of an Insured Person";

   (2) That "no Insured Person has been identified in writing as a person against whom a proceeding may be commenced";

   (3) That "[t]he grand jury subpoena received by Tom Farmer does not appear to have been issued in connection with an investigation of Mr. Farmer"; and

   (4) That the grand jury subpoena "does not identify Mr. Farmer as a person against whom a proceeding may be commenced."

You apparently believe that no one can ever be "identified in writing as a person against whom a proceeding may be commenced" unless the government issues a written statement which

CROW002863

Ms. Maureen Conboy
Complex Claims Director
AIG Domestic Claims, Inc.
September 30, 2009
Page 2

uses those exact words. (*e.g.*, "You are hereby notified that the FBI has identified you as a person against whom a civil, criminal or administrative procedure may be commenced"). That is a completely unrealistic interpretation of the policy language, since the government simply does not operate in that fashion.

The Policy defines a "Claim" as being, among other things, "a civil, criminal, administrative or regulatory investigation of an Insured Person[,] once such Insured Person is identified in writing by such investigating authority as a person against whom a proceeding . . . may be commenced . . . ." A reasonable interpretation of this language is that, in order to establish that there has been a "Claim," an Insured Person must show (1) that he is a subject of a government investigation; (2) that he has been identified in writing by the government in a way that supports an inference that he is a subject of an investigation; and (3) that the government's writings support an inference that -- depending on the outcome of the investigation -- a civil, criminal, administrative or regulatory proceeding may be commenced against him.

The evidence in this case is sufficient to establish those three elements as to each of the four Insured Persons identified above in the caption of this letter, as the following summary demonstrates.

First, the Search Warrant obtained by the FBI (issued on April 16, 2008 upon the application of Special Agent Byron Thompson) reflects that the FBI informed the United States Magistrate Judge, *in writing*, that "there is an offense under investigation" involving not only the Jacksonville, Florida premises of Crowley but also "the briefcases, laptop computers, hand-held computers, cell phones [and] Blackberries . . . in the possession of, or readily identifiable as belonging to . . . ROB GRUNE, TOM FARMER, JOHN KELLEY, and TONY LUSIS." (See Search Warrant attached as Exhibit A.)

It is true, as you observed in your letter of May 27, 2008, that "the Judicial Officer who signed the search warrant deleted language stating 'involving which there is an offense under investigation.'" However, that misses the point. The point is that the FBI told the federal Magistrate Judge that the government was investigating an offense that involved information stored in the briefcases of, or on electronic devices belonging to, four Insured Persons -- Grune, Farmer, Kelley and Lusis. Whatever reasons the Magistrate Judge may have had for striking the language you cited does not change or detract from the fact that the FBI explicitly told the judge that it was investigating an offense that involved the Insured Persons.

The "Description Of Property To Be Seized" attached to the search warrant could not make it more clear that the Insured Persons are not only a subject of the government's investigation but, indeed, a focus of that investigation. Items to be seized included "documentation relating to any agreement, meeting, conversation, or other communication between . . . ROB GRUNE ("GRUNE"), TOM FARMER ("FARMER"), JOHN KELLEY ("KELLEY"), and TONY LUSIS ("LUSIS") and any employee or agent of SEA STAR LINE, LLC, and HORIZON LINES, LLC." Also to be seized were "[a]ll. appointment records, diaries, calendars, and other documents used to record schedules, meetings, conversations, or other events by or for . . . . GRUNE, FARMER, KELLEY and LUSIS." The search warrant also commanded the seizure of "[a]ll

CROW002864

Ms. Maureen Conboy
Complex Claims Director
AIG Domestic Claims, Inc.
September 30, 2009
Page 3

address books . . . [and] message logs . . . [of] GRUNE, FARMER, KELLEY and LUSIS."
Although Crowley has thousands of employees, the search warrant only identified in writing four
persons -- the Insured Persons referenced above -- and no others. It is apparent that, in April
2008, the FBI believed that the Insured Persons may have had meetings or communications
with business competitors during which anticompetitive agreements were reached.

On October 1, 2008 the Department of Justice ("DOJ") issued a press release which reported
that four shipping company executives -- all officials of either Sea Star Line or Horizon Lines --
had "agreed to plead guilty and serve jail sentences for their role in a wide-ranging conspiracy to
rig bids, fix prices and allocate market shares for customers transporting goods between the
continental United States and Puerto Rico by ocean vessel." The press release (attached as
Exhibit B) noted that "[t]hese are the first charges in the Antitrust Division's ongoing
investigation into collusion in the coastal shipping industry." This press release confirmed -- in
writing -- that the government's investigation into the "wide-ranging conspiracy" was still ongoing
in October 2008, and that there was a reasonable possibility that further criminal proceedings
would be initiated later against other shipping company executives -- since the charges brought
against the four officials that had pleaded guilty were only "the *first* charges" in an "ongoing"
investigation. (Emphasis added.)

The DOJ issued another press release on January 30, 2009 (attached as Exhibit C) to
announce that one of the four officials who had pleaded guilty was sentenced to four years in jail
-- the "Longest Jail Term Ever Imposed for a Single Antitrust Violation." This press release also
confirmed -- in writing -- that the federal antitrust investigation was still "ongoing" at the end of
January 2009.

On February 2, 2009 it was reported, in The Journal of Commerce Online, that "Federal
prosecutors have said their investigation of carrier pricing activities in the Jones Act domestic
offshore trades is continuing." (The article is attached as Exhibit D.) It also was reported in the
same article that "Prosecutors have not released specifics of their investigation or the price-
fixing conspiracy to which Baci and others pleaded guilty."  DOJ attorney John Terzaken was
quoted in the article as saying that "the information provided by [the] defendant has been useful
in building cases against co-conspirators who remain to be charged for their roles in the
charged conspiracy and other offenses."

This article demonstrates first that the government will not announce to the world in advance --
in writing -- that specific individuals are persons against whom proceedings may later be
brought. Investigations don't work that way. Government prosecutors do "not release specifics
of their investigation" until they are ready to pounce. The article also shows that, since April
2008, the government has been busy "building cases" against as yet unnamed co-conspirators
"who remain to be charged," and that this effort is being aided by information provided by the
shipping officials who pleaded guilty.  Under these circumstances, it is a fair inference that the
four Insured Persons were singled out, in the search warrant the FBI served on Crowley, as a
result of their having been identified (by the executives who pleaded guilty) as alleged co-
conspirators. It also is a fair inference -- from all the government has said in writing -- that the

CROW002865

Ms. Maureen Conboy
Complex Claims Director
AIG Domestic Claims, Inc.
September 30, 2009
Page 4

Insured Persons continue to be subjects of the ongoing investigation, and that they are therefore "persons against whom a proceeding may hereafter be commenced."

For the Policy's definition of a "Claim" to be satisfied in the present circumstances, all that is required is a showing that a proceeding "may" be commenced against the Insured Persons. The word *may* is critical -- there is no need to show that it is certain, or even more likely than not, that a proceeding will be commenced, just that there is a reasonable *possibility* that such might occur.[1] Crowley and the four Insured Persons have demonstrated their sincere, and prudent, belief that there is at least a reasonable possibility that proceedings may be commenced -- by going out and retaining well-qualified defense counsel to protect their interests in connection with the government's ongoing investigation. In the face of AIG's ongoing unreasonable conduct in refusing to acknowledge that a "Claim" has arisen, Crowley and the Insured Persons have expended their own funds to make sure that the insureds' rights and interests are not left unprotected by AIG's refusal to get involved.

## Defense Costs

Crowley has advanced defense and investigation costs to Insured Person officer/employees Grune, Farmer, Lusis and Kelley and may continue to advance such costs unless and until it is determined that any officer/employee did not act in accordance with the law or in the best interests of the company. Aggregate defense costs advanced to the attorneys representing the individual officer/employees totaled $1,005,649.22 as of 8/10/09. A schedule summarizing defense costs paid through 8/10/09 is attached as Exhibit E. Supporting copies of the fee statements are enclosed.

## Conclusion

We expect AIG to honor its policy with Crowley, particularly in light of the facts of the government investigation that have been provided. Please confirm promptly that this claim will be paid. The amount presently due from AIG, after deducting the $500,000 retention, is $505,649.22. By copy of this letter to Mr. Dan Sweeney at Aon Financial Services Group, we ask that he provide a copy of this letter and all exhibits and enclosures to excess layer D&O Underwriters - Hartford/Twin City, Arch and XL.

Sincerely,

Steven Ficon, CPCU
Director, Claims
CROWLEY MARITIME CORPORATIION

---

[1] Webster's dictionary defines the word "may" to include "a possibility."

Ms. Maureen Conboy
Complex Claims Director
AIG Domestic Claims, Inc.
September 30, 2009
Page 5

cc:     Art Mead, Sr. VP & General Counsel, Crowley Maritime Corporation
        Dwight Menard, VP, Risk Management, Crowley Maritime Corporation
        Mike Roberts , Sr. VP & General Counsel, Crowley Maritime Corporation
        Andrew Teegarden, Asst. VP, Aon Financial Services Group
        Mr. Dan Sweeney, Claims Coordinator, Aon Financial Services

AO 93 (Rev. 8/98) Search Warrant

# UNITED STATES DISTRICT COURT

## MIDDLE DISTRICT OF FLORIDA

In the Matter of the Search of
(Name, address or brief description of person, property or premises to be searched)

CROWLEY LINER SERVICES, INC.
9487 Regency Square Boulevard
Jacksonville, Florida 32225-8126

**SEARCH WARRANT**

CASE NUMBER: 3:08-MJ-1092-JRK

TO:   Any United States Marshal and any Authorized Officer of the United States

Affidavit(s) having been made before me by Byron Thompson, Special Agent, Federal Bureau of Investigation, who has reason to believe

that ☐ on the person of or ☒ on the premises known as (name, description and/or location)

   See Attachment A

~~involving which there is an offense under investigation~~ in the Middle District of Florida, there is now concealed a certain person or property, namely (describe the person or property)

   See Attachment B

I am satisfied that the affidavit(s) and any record testimony establish probable cause to believe that ~~the person~~ ~~or~~ property so described is now concealed on the person or premises above-described and establish grounds for the issuance of this warrant.

YOU ARE HEREBY COMMANDED to search on or before April ~~18~~, 2008 (not to exceed 10 days) the ~~person or~~ place named above for the ~~person or~~ property specified, serving this warrant and making the search in the daytime---6:00 A.M. to 10:00 P.M.—and if the ~~person or~~ property be found there to seize same, leaving a copy of this warrant and receipt for the ~~person or~~ property taken, and prepare a written inventory of the ~~person or~~ property seized and promptly return this warrant to the Honorable James R. Klindt, United States Magistrate Judge as required by law. In the event that computer equipment and other electronic storage devices must be transported to an appropriate laboratory, rather than searched on the premises, the search of computer equipment and other electronic devices must be completed within 30 days of seizure.*

April 16, 2008    at    6:22 p.m.                at    Jacksonville, Florida
Date and Time Issued                                    City and State

The Honorable James R. Klindt
United States Magistrate Judge
Name & Title of Judicial Officer

James R. Klindt
Signature of Judicial Officer

* If no evidence is found in the computer equipment and electronic storage devices by the end of the 30-day period, or if any electronically stored information is outside of the scope of the warrant, such shall be returned promptly.

CROW002868

ATTACHMENT A
DESCRIPTION OF PREMISES TO BE SEARCHED

The office area to be searched is more particularly described as the corporate office of CROWLEY LINER SERVICES, INC., located within their building identified as 9487 Regency Square Boulevard, Jacksonville, Florida 32225-8126. The search will be limited to the areas where CROWLEY's management, pricing, and sales personnel, and their respective administrative staff sit and work; and all computer rooms and areas (including the contents of any network or e-mail server), document storage areas, filing cabinets, filing containers, and safes on the premises that are large enough to contain business records, files, correspondence, calendars, and other documents.

The CROWLEY office building is located within the North Regency Executive Park. The office park complex is bordered on three sides by Regency Square Boulevard, Gilmore Heights Road and Regency Square Boulevard North. CROWLEY's office building is one of two similarly designed structures on the office park property. The building is a 5-story structure with a glass and concrete exterior. The building's exterior appearance consists of glass panels that wrap around the building on each floor level without separation. At each floor level, there is a concrete exterior layer separating floors beneath from the floors above. The concrete surface is a light tan, or off-white color. The second floor level overhangs the first floor in several areas and is supported by columns.

CROWLEY's main entrance is on the north side of the building. The entrance exterior is all glass and has glass doors on either side of a reception station. Access to the facility through these locked doors is effected through the receptionist or by

an employee's electronic card-key.  There are additional secured doors at the rear, courtyard area.

In order to minimize the prospect of the removal and subsequent destruction of any of the documents and records identified in Attachment B to the Search Warrant, the search will include the briefcases, laptop computers, hand-held computers, cell phones, Blackberries, and other movable document containers found on the premises described above, and in the possession of, or readily identifiable as belonging to CROWLEY management, pricing, or sales personnel including, but not limited to ROB GRUNE, TOM FARMER, JOHN KELLEY, and TONY LUSIS. Photographs of the premises are incorporated below.

-2-

CROW002870



Figure 1 – CROWLEY Office, Front of building with sign and CROWLEY emblem



Figure 2 – CROWLEY Office, southeast side, rear of building

CROW002871



Figure 3 – CROWLEY main entrance, northwest side

CROW002872

## ATTACHMENT B
## DESCRIPTION OF PROPERTY TO BE SEIZED

The following documents created on or after January 1, 2002:

A.    Notes, memoranda, correspondence, reports, and other records and documentation relating to any agreement, meeting, conversation, or other communication between or among management, pricing, or sales personnel CROWLEY LINER SERVICES, INC., including, ~~but not limited to~~ ROB GRUNE ("GRUNE"), TOM FARMER ("FARMER"), JOHN KELLEY ("KELLEY"), and TONY LUSIS ("LUSIS") and any employee or agent of a SEA STAR LINE, LLC, and HORIZON LINES, LLC.

B.    Notes, memoranda, correspondence, reports, price sheets or lists, and other records or documentation relating to the customer allocations or divisions, market shares, and contract negotiations or bid proposals, including, ~~but not limited to~~ the prices, surcharges, and costs offered to any customer.

C.    Final or draft bid files, proposals, purchase orders, contracts, correspondence, estimate work sheets and other documents used to prepare bids or quotes submitted to prospective purchasers of coastal freight transportation services between the United States and Puerto Rico.

D.    All appointment records, diaries, calendars, and other documents used to record schedules, meetings, conversations, or other events by or for CROWLEY management, pricing, or sales

CROW002873

personnel including, ~~but not limited to~~ GRUNE, FARMER, KELLEY and LUSIS.

E.   All telephone charge and toll records, including cellular telephone records for CROWLEY management, pricing, or sales personnel including, ~~but not limited to~~ GRUNE, FARMER, KELLEY and LUSIS.

F.   All address books (including electronic address books, such as devices commonly referred to as electronic organizers and Blackberries); message logs; ~~or other indicia of notation of messages and telephone numbers and calls~~ of CROWLEY management, pricing, or sales personnel including, ~~but not limited to~~ GRUNE, FARMER, KELLEY and LUSIS.

As used above, the terms records, documents, programs, documentation, applications or materials include but are not limited to records, documents, programs, applications or materials created, modified or stored in any form, including any optical, electrical, electronic or magnetic form (such as any information on an optical, electrical, electronic or magnetic storage device), including floppy disks, hard disks, ZIP disks, CD-ROMs, optical disks, backup tapes, printer buffers or other device memory buffers, smart cards, ~~memory calculators, pagers,~~ personal digital assistants such as Palm Pilot hand-held ~~computers,~~ e-mail servers, as well as opened and unopened e-mail messages and any printouts or readouts from any optical, electrical, electronic or magnetic storage device; any handmade form (such as writing, drawing or painting); any mechanical form (such as printing or typing); any photographic form (such as microfilm,

-2-

microfiche, prints, slides, negatives, videotapes, motion pictures or photocopies); or any voice form (including answering machine tapes and opened and unopened voicemail messages).

-3-

CROW002875

AO 93 (Rev. 8/98) Search Warrant (Reverse)

| RETURN | | CASE NUMBER: |
|---|---|---|
| DATE WARRANT RECEIVED | DATE AND TIME EXECUTED | COPY OF WARRANT AND RECEIPT FOR ITEMS LEFT WITH |

INVENTORY MADE IN PRESENCE OF

INVENTORY OF PERSON OR PROPERTY TAKEN PURSUANT TO THE WARRANT

## CERTIFICATION

I swear that this inventory is a true and detailed account of the person or property taken by me on the warrant.

_____

Subscribed, sworn to, and returned before me this date.

_____        _____
United States Magistrate Judge            Date

CROW002876

# ☉ Department of Justice

**FOR IMMEDIATE RELEASE**
Wednesday, October 1, 2008
WWW.USDOJ.GOV

AT
**(202) 514-2007**
TDD (202) 514-1888

## Four Shipping Executives Agree to Plead Guilty to Conspiracy to Eliminate Competition and Raise Prices for Moving Freight to and from the Continental U.S. and Puerto Rico

### *Fifth Executive Agrees to Plead Guilty to Destroying Evidence*

WASHINGTON — Four U.S. shipping company executives have agreed to plead guilty and serve jail sentences for their roles in a wide-ranging conspiracy to rig bids, fix prices and allocate market shares for customers transporting goods between the continental United States and Puerto Rico by ocean vessel, the Department of Justice announced today. The Department also announced that a fifth shipping executive has agreed to plead guilty to destroying evidence of the shipping conspiracy. These are the first charges in the Antitrust Division's ongoing investigation into collusion in the coastal shipping industry.

A one-count felony antitrust charge was filed today in U.S. District Court in Jacksonville, Fla., against each of the four shipping executives: Peter Baci of Jacksonville; Kevin Gill and Gregory Glova of Charlotte, N.C.; and Gabriel Serra of San Juan, Puerto Rico. Under the terms of their plea agreements, each of the four executives has agreed to serve a jail term that will be determined by the court, pay a $20,000 criminal fine and cooperate fully in the Department's ongoing antitrust investigation. The pleas, fines and jail sentences are subject to court approval.

A one-count felony obstruction of justice charge also was filed against a fifth shipping executive, Alexander Chisholm, of Jacksonville, who has agreed to plead guilty and serve jail time, subject to court approval.

"We are committed to prosecuting executives who violate U.S. antitrust laws and harm consumers and competition in the United States," said Thomas O. Barnett, Assistant Attorney General in charge of the Department's Antitrust Division. "Acts of obstruction of justice threaten the ability of the Department to fully uncover and prosecute antitrust crimes, and we will pursue individuals who engage in obstruction with the same vigor as we pursue those who engage in the underlying criminal violations."

The five executives charged today work for large U.S. companies that provide freight shipping services to customers transporting goods between the continental U.S. and Puerto Rico. These companies transport a variety of cargo shipments, such as heavy equipment, medicines and consumer goods, on scheduled ocean voyages between the continental U.S. and Puerto Rico. The U.S. to Puerto Rico shipping lane is governed by the Jones Act, a portion of the Merchant Marine Act of 1920. The Jones Act dictates that any cargo being sent between two U.S. ports (including U.S. possessions and territories like Puerto Rico) must be on ships that were built in the U.S., owned by U.S. citizens, and fly the American flag. Sales of freight services in the U.S. to Puerto Rico shipping lane total hundreds of millions of dollars every year, as ocean shipping is a primary way for customers to move goods to and from the island of Puerto Rico.

The four individuals charged with violating the federal antitrust laws have agreed to plead guilty for their roles in a conspiracy that began at least as early as May 2002 and continued until as late as April 2008, the object of which was to eliminate competition and raise prices for the movement of goods in the U.S. to Puerto Rico shipping lane. The Department charged that the executives sought to eliminate competition and raise prices by agreeing not to compete for one another's customers; agreeing to rig bids submitted to government and commercial buyers; and agreeing to fix the prices of rates, surcharges and other fees charged to customers.

http://www.usdoj.gov/opa/pr/2008/October/08-at-876.html

8/24/2009

CROW002877

Baci, Gill, Glova and Serra are each charged with violating the Sherman Act, which carries a maximum sentence of 10 years imprisonment and fines of $1 million for individuals. The maximum fine may be increased to twice the gain derived from the crime or twice the loss suffered by the victims of the crime, if either of those amounts is greater than the statutory maximum fine.

Chisholm has agreed to plead guilty for his conduct in obstructing the Department of Justice's investigation of the shipping conspiracy. The charge alleges he destroyed documents on a computer server that were material to the coastal shipping grand jury investigation and responsive to a grand jury subpoena. He faces a maximum sentence of 20 years imprisonment and a fine of $250,000.

The investigation is being conducted by the National Criminal Enforcement Section of the Antitrust Division and the Jacksonville Field Office of the Federal Bureau of Investigation (FBI). Anyone with information concerning bid rigging or other anticompetitive conduct in the shipping industry is urged to call the Antitrust Division's National Criminal Enforcement Section at 202-307-6694, or the FBI's Jacksonville Field Office at 904-721-1211.

### 

08-876

8/24/2009

CROW002878

# FEDERAL BUREAU OF INVESTIGATION
## JACKSONVILLE

## Department of Justice Press Release

For Immediate Release                    United States Attorney's Office
January 30, 2009                         Northern District of Florida
                                         Contact: (850) 942-8430

**Former Shipping Executive Sentenced to 48 Months in Jail for His Role in Antitrust Conspiracy**
*Sentence Is Longest Jail Term Ever Imposed for a Single Antitrust Violation*

WASHINGTON —A former high-level shipping executive was sentenced today to serve 48 months in jail and to pay a $20,000 criminal fine for his role in an antitrust conspiracy involving the transportation of goods to and from the continental United States and Puerto Rico by ocean vessel, the Department of Justice announced today. This is the longest jail sentence ever imposed for a single antitrust charge.

Peter Baci of Jacksonville, Florida, pleaded guilty on Oct. 20, 2008, in the U.S. District Court in Jacksonville for his role in the conspiracy, which began at least as early as May 2002 and continued until as late as April 2008. Baci was charged with engaging in a conspiracy to suppress and eliminate competition in the coastal water freight transportation services between the continental United States and Puerto Rico by agreeing to allocate customers, agreeing to rig bids submitted to government and commercial buyers, and agreeing to fix the prices of rates, surcharges, and other fees charged to customers.

Related antitrust charges remain pending in the U.S. District Court in Jacksonville against three other shipping executives: R. Kevin Gill and Gregory Glova, of Charlotte, North Carolina; and Gabriel Serra, of San Juan, Puerto Rico. A related obstruction of justice charge is also pending against a fifth shipping executive, Alexander Chisholm, of Jacksonville.

"Today's sentencing should make clear that individuals who violate the antitrust laws will be prosecuted to the fullest extent of the law," said Scott D. Hammond, Acting Assistant Attorney General in charge of the Department's Antitrust Division. "Significant jail time will be a consequence of harming consumers and competition in both the continental United States and Puerto Rico."

Baci worked for a large U.S. company that provides freight shipping services to customers transporting goods between the continental United States and Puerto Rico. These companies transport a variety of cargo shipments, such as heavy equipment, medicine, food and consumer goods. Sales of freight services in the United States to Puerto Rico shipping lane total hundreds of millions of dollars every year, as ocean shipping is a primary way for people in Puerto Rico to receive essential goods.

In June 2004, Congress raised the maximum sentence for antitrust crimes from three years imprisonment to 10 years imprisonment. While longer jail sentences have been imposed against individuals who violated the antitrust laws together with other crimes, this case represents the first time that an individual was sentenced to more than three years for a single antitrust charge.

The current prosecution and pending charges arose from an ongoing federal antitrust investigation into bid rigging and other anticompetitive conduct in the shipping industry, which is being conducted by the National Criminal Enforcement Section of the Antitrust Division and the Jacksonville Field Office of the Federal Bureau of Investigation (FBI). Anyone with information concerning the focus of this investigation is urged to call the Antitrust Division's National Criminal Enforcement Section at 202-307-6694, or the FBI's Jacksonville Field Office at 904-721-1211.

Press Releases | Jacksonville Home

Accessibility | eRulemaking | Freedom of Information Act | Legal Notices | Legal Policies and Disclaimers | Links
Privacy Policy | USA.gov | White House
FBI.gov is an official site of the U.S. Federal Government, U.S. Department of Justice.

CROW002879

# ꙮepartment of Justice

FOR IMMEDIATE RELEASE
Friday, January 30, 2009
WWW.USDOJ.GOV

AT
(202) 514-2007
TDD (202) 514-1888

## Former Shipping Executive Sentenced to 48 Months in Jail for His Role in Antitrust Conspiracy

### *Sentence is Longest Jail Term Ever Imposed for a Single Antitrust Violation*

WASHINGTON — A former high-level shipping executive was sentenced today to serve 48 months in jail and to pay a $20,000 criminal fine for his role in an antitrust conspiracy involving the transportation of goods to and from the continental United States and Puerto Rico by ocean vessel, the Department of Justice announced today. This is the longest jail sentence ever imposed for a single antitrust charge.

Peter Baci of Jacksonville, Fla., pleaded guilty on Oct. 20, 2008, in the U.S. District Court in Jacksonville for his role in the conspiracy, which began at least as early as May 2002 and continued until as late as April 2008. Baci was charged with engaging in a conspiracy to suppress and eliminate competition in the coastal water freight transportation services between the continental United States and Puerto Rico by agreeing to allocate customers, agreeing to rig bids submitted to government and commercial buyers, and agreeing to fix the prices of rates, surcharges, and other fees charged to customers.

Related antitrust charges remain pending in the U.S. District Court in Jacksonville against three other shipping executives: R. Kevin Gill and Gregory Glova, of Charlotte, N.C. and Gabriel Serra, of San Juan, Puerto Rico. A related obstruction of justice charge is also pending against a fifth shipping executive, Alexander Chisholm, of Jacksonville.

"Today's sentencing should make clear that individuals who violate the antitrust laws will be prosecuted to the fullest extent of the law," said Scott D. Hammond, Acting Assistant Attorney General in charge of the Department's Antitrust Division. "Significant jail time will be a consequence of harming consumers and competition in both the continental United States and Puerto Rico."

Baci worked for a large U.S. company that provides freight shipping services to customers transporting goods between the continental United States and Puerto Rico. These companies transport a variety of cargo shipments, such as heavy equipment, medicine, food and consumer goods. Sales of freight services in the United States to Puerto Rico shipping lane total hundreds of millions of dollars every year, as ocean shipping is a primary way for people in Puerto Rico to receive essential goods.

In June 2004, Congress raised the maximum sentence for antitrust crimes from three years imprisonment to 10 years imprisonment. While longer jail sentences have been imposed against individuals who violated the antitrust laws together with other crimes, this case represents the first time that an individual was sentenced to more than three years for a single antitrust charge.

The current prosecution and pending charges arose from an ongoing federal antitrust investigation into bid rigging and other anticompetitive conduct in the shipping industry, which is being conducted by the National Criminal Enforcement Section of the Antitrust Division and the Jacksonville Field Office of the Federal Bureau of Investigation (FBI). Anyone with information concerning the focus of this investigation is urged to call the Antitrust Division's National Criminal Enforcement Section at 202-307-6694, or the FBI's Jacksonville Field Office at 904-721-1211.

###

09-075

CROW002880



## Ex-Sea Star executive claims he acted under orders
January 30, 2009
By Joseph Bonney / The JOURNAL of COMMERCE ONLINE

Former Sea Star Line executive Peter Baci, the first person sentenced in a federal antitrust investigation of Puerto Rico carriers, claims that he participated in a price-fixing scheme under orders from an official at Saltchuk Resources, a part-owner of Sea Star.

Baci was senior vice president, yield management, at Sea Star until he was fired last year after the federal investigation became public. He was sentenced today to four years in prison, a $20,000 fine and two years of supervised release after pleading guilty to antitrust conspiracy.

Four other former carrier officials – Gabriel Serra, R. Kevin Gill and Gregory Glova of Horizon Lines and Alexander Chisholm of Sea Star – are scheduled to be sentenced April 27 in Jacksonville, Fla. Serra, Glova and Gill pleaded guilty to antitrust conspiracy. Chisholm pleaded guilty to obstructing justice.

Federal prosecutors have said their investigation of carrier pricing activities in the Jones Act domestic offshore trades is continuing, and that it is not limited to the Puerto Rico trade.

The investigation became public last April when federal agents seized documents, computers and other materials in raids of offices of Horizon, Sea Star and Crowley Maritime, and subpoenaed information from Jones Act carriers Trailer Bridge and Matson.

Prosecutors have not released specifics of their investigation or the price-fixing conspiracy to which Baci and others pleaded guilty.

In a pre-sentencing memorandum filed with the court, Baci's attorney claimed that Baci participated in the price-fixing conspiracy under orders from Leonard Shapiro, vice president of pricing at Totem Ocean Trailer Express. Shapiro also is a partner in Saltchuk, which owns TOTE, a Pacific Northwest-Alaska carrier, as well as part of Sea Star.

"Mr. Shapiro was powerful; he threatened and directed the termination of employment at others at Sea Star and he significantly intimidated Mr. Baci," the memo said. "Mr. Baci believes Mr. Shapiro hatched the idea of collusion with the other carriers. Later, Shapiro ordered him to collude with his counterpart at Horizon..."

Attorney Gerald Houlihan said in the memo that Baci believes that Shapiro conceived the scheme and worked it out with Serra, who was Horizon's senior vice president and general manager for Puerto Rico services. Houlihan said the plan then was implemented by Baci at Sea Star and Gill and Glova at Horizon.

"Peter Baci did not originate the idea, create the concept or hatch the plan," Houlihan wrote.

Shapiro could not be reached immediately for a response to the allegations.

CROW002881

Houlihan's memo, which sought leniency in Baci's sentencing, said Baci did not profit from the price-fixing scheme, but participated only to keep his job.

"To the extent there was any financial gain, it would have been realized by corporations who are likely to be charged in subsequent indictments," the memo stated.

In documents filed before Baci's sentencing, Justice Department attorney John Terzaken said Baci has cooperated with prosecutors by sharing his "detailed insight regarding the illegal activity of his co-conspirators. In particular, the information provided by [the] defendant has been useful in building cases against co-conspirators who remain to be charged for their roles in the charged conspiracy and other offenses."

In addition to the government's criminal investigation, about three dozen private civil antitrust lawsuits have been filed against Jones Act carriers on behalf of customers. Those lawsuits have been consolidated at San Juan and Seattle.

At least four shareholder lawsuits also have been filed against Horizon, which is involved in all of the main Jones Act trade lanes between the continental U.S. and Puerto Rico, Alaska, Hawaii and Guam.

© Copyright 2009 UBM Global Trade All rights reserved.

CROW002882

**ANTI-TRUST COSTS**

| Vendor | Date | Invoice # | Amount |
|---|---|---|---|
| CROWLEY MARITIME CORPOTATION | | | |
| ANTI - TRUST COST | | | |
| | | | |
| | | | |
| Daniel A. Smith (Farmer) | 4/28/2008 | Grune042808 | $4,200.00 |
| | | | $4,200.00 |
| | | | |
| | | | |
| Lankford & Reed, PLLC (Farmer) | 2/5/2009 | Farmer013109 | $20,549.95 |
| Lankford & Reed, PLLC (Farmer) | 3/9/2009 | Farmer030909 | $21,099.01 |
| Lankford & Reed, PLLC (Farmer) | 3/31/2009 | Farmer033109 | $39,705.83 |
| Lankford & Reed, PLLC (Farmer) | 6/5/2009 | Farmer053109 | $25,150.00 |
| Lankford & Reed, PLLC (Farmer) | 8/10/2009 | Farmer081009 | $36,401.68 |
| Lankford, Coffield & Reed, PLLC (Farmer) | 8/14/2008 | Farmer081408 | $9,251.56 |
| Lankford, Coffield & Reed, PLLC (Farmer) | 8/14/2008 | Farmer081408B | $12,557.00 |
| Lankford, Coffield & Reed, PLLC (Farmer) | 8/14/2008 | Farmer081408C | $17,349.62 |
| Lankford, Coffield & Reed, PLLC (Farmer) | 8/14/2008 | Farmer091508 | $32,520.21 |
| Lankford, Coffield & Reed, PLLC (Farmer) | 10/23/2008 | Farmer1008 | $21,153.25 |
| Lankford, Coffield & Reed, PLLC (Farmer) | 11/12/2008 | Farmer1108 | $15,482.26 |
| Lankford, Coffield & Reed, PLLC (Farmer) | 12/4/2008 | Farmer1208 | $15,290.77 |
| Lankford, Coffield & Reed, PLLC (Farmer) | 12/18/2008 | Farmer121808 | $11,049.40 |
| Lankford, Coffield & Reed, PLLC (Farmer) | 5/70/09 | Farmer043009 | $32,398.62 |
| Lankford, Coffield & Reed, PLLC (Farmer) | 7/17/2009 | Farmer071709 | $32,398.62 |
| | | | $342,357.78 |
| | | | |
| | | | |
| Mark Rosenblum, P.A. (Farmer) | 5/13/2008 | Farmer043008 | $6,890.00 |
| Mark Rosenblum, P.A. (Farmer) | 7/4/2008 | Farmer053108 | $7,800.00 |
| Mark Rosenblum, P.A. (Farmer) | 11/18/2008 | Farmer111808 | $6,654.68 |
| Mark Rosenblum, P.A. (Farmer) | 11/19/2008 | Farmer111908A | $9,385.36 |
| Mark Rosenblum, P.A. (Farmer) | 11/19/2008 | Farmer111908B | $11,588.75 |
| Mark Rosenblum, P.A. (Farmer) | 11/20/2008 | Farmer112008 | $12,915.82 |
| Mark Rosenblum, P.A. (Farmer) | 11/21/2008 | Farmer112108 | $10,179.05 |
| Mark Rosenblum, P.A. (Farmer) | 12/22/2008 | Farmer122208 | $2,080.00 |
| Mark Rosenblum, P.A. (Farmer) | 2/2/2009 | Farmer20209 | $5,495.00 |
| Mark Rosenblum, P.A. (Farmer) | 3/19/2009 | Farmer31909 | $1,202.50 |
| Mark Rosenblum, P.A. (Farmer) | 4/6/2009 | Farmer40609 | $1,397.50 |
| Mark Rosenblum, P.A. (Farmer) | 7/1/2009 | Farmer070109 | $10,155.60 |
| Mark Rosenblum, P.A. (Farmer) | 4/30/2009 | Farmer4309 | $8,568.48 |
| Mark Rosenblum, P.A. (Farmer) | 2/3/2009 | Farmer20309 | $9,578.33 |
| | | | $103,891.07 |
| | | | |
| | | | |
| **Total Farmer** | | | **$450,448.85** |
| | | | |
| | | | |
| Katten Muchin Rosenman LLP (Kelley) | 5/5/2008 | | $7,318.50 |
| Katten Muchin Rosenman LLP (Kelley) | 6/17/2008 | | $4,476.10 |

CROW002883

**ANTI-TRUST COSTS**

| CROWLEY MARITIME CORPOTATION ANTI - TRUST COST | | | |
|---|---|---|---|
| Vendor | Date | Invoice # | Amount |
| | | | |
| Katten Muchin Rosenman LLP (Kelley) | 7/11/2008 | 1300554544 | $3,600.00 |
| Katten Muchin Rosenman LLP (Kelley) | 8/15/2008 | 1300566302 | $9,806.20 |
| Katten Muchin Rosenman LLP (Kelley) | 9/11/2008 | 1300572552 | $63.67 |
| Katten Muchin Rosenman LLP (Kelley) | 10/14/2008 | 1300582252 | $997.50 |
| Katten Muchin Rosenman LLP (Kelley) | 11/14/2008 | 1300591784 | $9,016.11 |
| Katten Muchin Rosenman LLP (Kelley) | 12/10/2008 | 1300599439 | $1,131.89 |
| Katten Muchin Rosenman LLP (Kelley) | 1/10/2009 | 1300609082 | $125.15 |
| Katten Muchin Rosenman LLP (Kelley) | 2/13/2009 | 1300617811 | $244.00 |
| Katten Muchin Rosenman LLP (Kelley) | 7/16/2009 | 1300660684 | $183.00 |
| **Total Kelley** | | | **$36,962.12** |
| | | | |
| Katten Muchin Rosenman LLP (Klenck) | 12/10/2008 | 1300599453 | $348.00 |
| Katten Muchin Rosenman LLP (Klenck) | 1/10/2009 | 1300609083 | $6,918.36 |
| Katten Muchin Rosenman LLP (Klenck) | 2/13/2009 | 1300617814 | $302.17 |
| **Total Klenck** | | | **$7,568.53** |
| | | | |
| Sheppard White Thomas & Kachergus, P.A. (Lusis) | 8/4/2008 | SWTK01 | $16,478.04 |
| Sheppard White Thomas & Kachergus, P.A. (Lusis) | 10/13/2008 | SWTK02 | $4,977.48 |
| Sheppard White Thomas & Kachergus, P.A. (Lusis) | 11/3/2008 | SWTK03 | $11,115.35 |
| Sheppard White Thomas & Kachergus, P.A. (Lusis) | 12/22/2008 | SWTK04 | $5,751.31 |
| Sheppard White Thomas & Kachergus, P.A. (Lusis) | 3/13/2009 | SWTK05 | $2,612.76 |
| Sheppard White Thomas & Kachergus, P.A. (Lusis) | 5/29/2009 | SWTK06 | $3,512.50 |
| Sheppard White Thomas & Kachergus, P.A. (Lusis) | 6/15/2009 | SWTK07 | $4,481.25 |
| Sheppard White Thomas & Kachergus, P.A. (Lusis) | 7/29/2009 | SWTK08 | $343.75 |
| **Total Lusis** | | | **$49,272.44** |
| | | | |
| Simpson Thacher Bartlett LLP (Grune) | 6/16/2008 | 245974 | $246,594.60 |
| Simpson Thacher Bartlett LLP (Grune) | 11/12/2008 | 247883 | $135,866.55 |
| Simpson Thacher Bartlett LLP (Grune) | 1/20/2009 | 250021 | $17,550.36 |
| Simpson Thacher Bartlett LLP (Grune) | 11/12/2008 | 247883A | $325.30 |
| Simpson Thacher Bartlett LLP (Grune) | 4/16/2009 | 252224 | $55,868.50 |
| Simpson Thacher Bartlett LLP (Grune) | 6/8/2009 | 253893 | $5,191.57 |
| **Total Grune** | | | **$461,396.88** |
| | | | |
| **Grand Total** | | | **$ 1,005,648.82** |

Page 2 of 2

CROW002884

Page 70

```
 1              M. Conboy
 2   before, you never asked Crowley affirmatively
 3   to attempt to unseal any sealed documents, did
 4   you?
 5       A.   No, when I was handling the file I
 6   don't recall really any discussion of sealed
 7   documents.  Crowley's focus was on the fact
 8   that, in their opinion, the search warrant by
 9   itself was a claim.  And that's what I recall
10   the focus being.  I don't recall discussions
11   about anything that was sealed.
12       Q.   Now, as we saw earlier, there was a
13   mention of sealed documents in Steve Ficon's
14   April 23rd, 208, notice letter?
15       A.   Sealed charges.
16          MS. GARRISON:  I'll have the court
17       reporter mark Exhibit 14.
18          (Plaintiff's Exhibit 14, a letter
19       from Crowley dated September 30, 2009,
20       addressed to Ms. Conboy, Bates stamped
21       CROW002863 through CROW002884, marked for
22       identification, as of this date.)
23   BY MS. GARRISON:
24       Q.   Ms. Conboy, do you recognize the
25   document marked as Exhibit 14?
```

Page 71

```
 1              M. Conboy
 2       A.   Yes, it's a letter from Crowley
 3   dated September 30, 2009, addressed to me.
 4       Q.   Do you recall receiving this letter
 5   at or around September 30, 2009?
 6       A.   I don't have a specific recollection
 7   of receiving it, but I have seen this document
 8   before.
 9       Q.   On page two of the letter, do you
10   see the third full paragraph down that starts,
11   "First, the search warrant obtained"?
12       A.   Yeah.
13       Q.   And in that sentence Mr. Ficon
14   stated, "First, the search warrant obtained by
15   the FBI, (issued on April 16, 2008, upon the
16   application of Special Agent Byron Thompson)
17   reflects that the FBI informed the United
18   States Magistrate Judge, in writing, that there
19   is an offense under investigation."
20          Do you see that?
21       A.   Yes.
22       Q.   Do you understand what Mr. Ficon was
23   referring to when he states that there was an
24   application by Special Agent Byron Thompson?
25       A.   Are you asking if I understand now
```

Page 72

```
 1              M. Conboy
 2   or if I understood back then?
 3       Q.   Did you understand back then?
 4       A.   I don't know that I -- I don't know
 5   what, if anything, I did when I got this
 6   letter.  I don't even know whether I read it.
 7   This was the time period when I was changing
 8   jobs.  I moved into the coverage group in
 9   October of 2009; I don't recall the exact date.
10   So I believe that Michelle Graffeo may have
11   been the one who responded to this letter.
12       Q.   So right around this time, as you
13   just stated, to clarify, that's when you moved
14   from your position as senior complex claims
15   director to the coverage group, correct?
16       A.   Yes.
17       Q.   And, at that time, the file was then
18   transferred to Michelle Graffeo?
19       A.   Yes.
20       Q.   And what was the process for
21   transferring the file from yourself to
22   Michelle?
23       A.   I wouldn't have done that.  My boss
24   or someone at his direction would have done it.
25       Q.   Do you recall speaking to Michelle
```

Page 73

```
 1              M. Conboy
 2   Graffeo about this claim at the time in
 3   October 2009?
 4       A.   No.
 5       Q.   Or September 2009?
 6       A.   I don't recall talking to her.
 7       Q.   Do you recall talking to her about
 8   the claim at any time after October 2009?
 9       A.   I do -- yes, I have -- I did talk to
10   her about the claim after 2009.
11       Q.   Do you recall when the first time
12   you talked to her about the claim after 2009
13   was?
14       A.   No.
15       Q.   Do you recall whether it was in
16   2010?
17       A.   I don't remember.
18       Q.   Do you remember if it was in 2011?
19       A.   I don't remember.  I -- I'm -- I
20   don't remember.
21       Q.   Do you remember the circumstances
22   that caused you to talk to her about the claim
23   again after the file was transferred?
24       A.   I think it would have happened -- it
25   would have occurred when Crowley filed
```

**Doc. 36-22**

# EXHIBIT U

# LANKFORD & REED, P.L.L.C.

V. Thomas Lankford, Jr. | Terrance G. Reed | Robert K. Moir

www.LRfirm.net

CONFIDENTIAL AND SUBJECT TO ATTORNEY CLIENT PRIVILEGE
AND WORK PRODUCT IMMUNITY

July 18, 2012

VIA FACSIMILE
866-871-0322
Maureen Conboy
Complex Claims Director
175 Water Street
New York, New York 10038

Re: Your Insured, Crowley Maritime Corporation Policy No. 061-36-48

Dear Ms. Conboy:

I am writing as counsel for Thomas Farmer, an employee of your insured Crowley
Maritime Corporation ("Crowley"), to request that AIG confirm that it will cover his defense
costs, including payments to my law firm, and that of Mark Rosenblum for legal services in
connection with ongoing civil litigation, and the indictment that the Justice Department's
Antitrust Division has indicated it will seek against Mr. Farmer. I previously submitted claim
letters to you in 2008 in connection with the grand jury investigation commenced by the Justice
Department's Antitrust Division into the conduct of Mr. Farmer's employer, Crowley. At that
time, you confirmed that Mr. Farmer was an "Insured Person" under Policy No. 061-36-48, but
you otherwise declined to provide coverage. I believe that the prior Claim was assigned No.
367-4291.

In the intervening years, Justice Department attorneys have contacted me several times to
discuss their intentions of prosecuting Mr. Farmer, based largely upon the plea bargains entered
by employees of Horizon Lines and Sea Star in 2008. In November 2011, the Justice
Department secured the first indictment in the investigation, an antitrust indictment against the
former Chief Executive Officer of another company, Sea Star Lines, by the name of Frank
Peake, in the United States District Court for the District of Puerto Rico (Case No. 11-CR-
512(DRD). In that proceeding, a protective order has been obtained by the Justice Department
restricting other targets of its investigation from having access to pretrial discovery. Pursuant to
that order, the Justice Department has confirmed in writing to Peake's counsel (David Markus:
305-379-6667) that Thomas Farmer is a target of the same government investigation. I have
also been told this directly by the senior Antitrust Division attorneys who are responsible for that
criminal prosecution. Specifically, they have indicated that have secured all necessary internal
Department approvals to seek the return of an indictment against Mr. Farmer.

1

The ongoing civil litigation includes individual actions by corporate customers of Crowley who have opted out of the class action settlement approved by the district court last year.   Several such suits were filed in mid-April 2012 in the United States District Court for the District of South Carolina.   While Mr. Farmer was not named as a defendant in these suits, the civil complaints contain several allegations about Mr. Farmer's alleged participation in antitrust violations, all of which he denies.   As these civil suits proceed, it is highly likely that Mr. Farmer will need representation for purposes of responding to discovery requests.

I would appreciate hearing back from you about coverage of Mr. Farmer's claim at your earliest convenience.

Yours truly,

Terrance G. Reed

CONFIDENTIAL INFORMATION

CROW001871

TX Result Report

P  1
07/19/2012 02:02
Serial No.  A1UE011013002
TC:    19244

| Addressee | Start Time | Time | Prints | Result | Note |
|-----------|-----------|------|--------|--------|------|
| 18668710322 | 07-19 02:01 | 00:00:46 | 003/003 | OK | |

Note    TMB:Timer TX, POL:Polling, ORG:Original Size Setting, FME:Frame Erase TX,
        ORG:Page Separation, MX: Mix:Mixed Original TX, CALL:Manual TX, ECM:ECM,
        FWD:Forward, PC:PC-FAX, BND:Double-Sided Binding Direction, SP:Special Original,
        FCODE:F-code, RLY:RLY:Relay, MBX:Confidential, BUL:Bulletin, SIP:SIP Fax,
        IPADR:IP Address Fax, I-Fax:Internet Fax

Result  OK: Communication OK, S-OK: Stop Communication, PW-OFF: Power Switch OFF,
        TEL: RX from TEL, NG: Other Error, Cont: Continue, No Ans: No Answer,
        Refuse: Receipt Refused, Busy: Busy, M-Full:Memory Full,
        LOVR:Receiving length Over, POVR:Receiving page Over, FIL:File Error,
        DC:Decode Error, MDN:MDN Response Error, DSN:DSN Response Error.

120 North Saint Asaph Street
Alexandria, Virginia 22314
Telephone: 703-299-5000
Facsimile:  703-299-8876
www.lrfirm.net

**Lankford & Reed,
PLLC**

# Fax

To: MAUREEN Conboy          From: Terry Reed

Fax: 866 871 0322           Pages: 3

Phone:                       Date: 7/18/11

Re: Crowley Maritime

**Urgent**    ☐ For Review    ☐ Please Comment    **Please Reply**    ☐ Please Recycle

◆ Comments:

NOTICE OF CONFIDENTIALITY: The information contained in and transmitted with this facsimile is subject to the attorney-client privilege, attorney work product or confidential. It is intended only for the individual or entity designated above. You are hereby notified that any dissemination, distribution, copying or use of or reliance upon the information contained in and transmitted with this facsimile by or to anyone other than the recipient designated by the sender is unauthorized and strictly prohibited. If you have received this facsimile in error, please notify Lankford & Reed by telephone (703)299-5000 immediately. Any facsimile erroneously transmitted to you should be immediately returned to sender by U.S. Mail, or if authorization is granted by sender, destroyed.

**Doc. 36-23**

# EXHIBIT V



**From:** Ficon, Steve
**Sent:** Wednesday, May 07, 2008 3:22 PM
**To:** 'edward.conlon@aig.com'
**Cc:** 'Dan Sweeney'; Andrew Teegarden; Menard, Dwight
**Subject:** Crowley Maritime Corp./ DOJ/FBI Investigation, Sub Poena and Search Warrants D/Claim: 4/17/08 AIG Ref: #313035345

Ed: I understand from Dan Sweeney at Aon that you are the assigned adjuster on this new D&O matter noticed on 4/25/08. I further understand that it may take 30-60 days for AIG to issue the usual reservation of rights letter. A more pressing issue is the payment of non-indemnified employees' defense costs under Coverage A. We have instructed counsel hired by Crowley employees (and Insureds) Tony Lusis, Tom Farmer and John Kelley to submit monthly fee and cost invoices directly to your attention. The first bill from Lusis' attorney Sheppard, White, Thomas and Kachergus for the period 4/17/08 -5/1/08 was inadvertently sent to Crowley, so I am forwarding this invoice to you as an attachment for payment. If there are any AIG litigation management guidelines or billing formats that should be followed, I would suggest sending them directly to counsel. If for any reason these invoices will not be promptly paid, I would appreciate a phone call at the direct phone # listed below.

Steve Ficon, CPCU
Director, Claims
Crowley Maritime Corporation
9487 Regency Square Blvd.
Jacksonville, FL 32225
<mailto:steve.ficon@crowley.com>
Phone: 904-727-2568
Fax- 904-805-1639
Cell: 904-610-2070

1

Sheppard, White, Thomas & Kachergus, P.A.
215 Washington Street
Jacksonville, Florida 32202
Telephone: (904) 356-9661
Facsimile: (904) 356-9667

Page: 1
05/01/2008

Tony Lusis
c/o Crowley Marine- Attn: Art Meade
9487 Regency Square Blvd.
Jacksonville FL 32225

ACCOUNT NO:     65226-00
STATEMENT NO:         1



INTERIM STATEMENT

### Fees

| | | HOURS |
|---|---|---|
| **04/17/2008** | | |
| MRK | Conferences With co-counsel. | 8.50 |
| WJS | Conference with MRK. | 0.50 |
| | | |
| **04/18/2008** | | |
| MRK | Conference With WJS. | 0.30 |
| WJS | Conference with MRK. | 0.50 |
| WJS | Conference With MRK. | 0.25 |
| MRK | Conferences With co-counsel. | 2.50 |
| ELW | Conference With MRK and WJS re: Lusis. | 0.80 |
| WJS | Conference With MRK and ELW re: Lusis. | 0.80 |
| MRK | Conference With WJS & ELW re: Lusis. | 0.80 |
| | | |
| **04/19/2008** | | |
| WJS | Review Documents. | 0.80 |
| | | |
| **04/21/2008** | | |
| WJS | Conference. | 0.30 |
| | | |
| **04/22/2008** | | |
| MRK | Telephone Conference With co-counsel.  Telephone conference with client. | 0.30 |
| MRK | Conference With co-counsel. | 1.00 |
| WJS | Conference With RP. | 0.50 |
| | | |
| **04/23/2008** | | |
| WJS | Conferences. | 1.00 |
| GT | Conference With WJS and MRK.  Research.  Review documents. | 0.50 |
| MRK | Conference With WJS. | 0.30 |
| MRK | Conference With client. | 1.50 |
| MRK | Research. | 0.30 |
| WJS | Conference. | 0.30 |
| | | |
| **04/24/2008** | | |
| CLK | Research. | 0.50 |

CONFIDENTIAL INFORMATION

Tony Lusis

Page: 2
05/01/2008
ACCOUNT NO:      65226-00
STATEMENT NO:            1

|      |                                              | HOURS  |           |
|------|----------------------------------------------|--------|-----------|
| MRK  | Conference and draft papers.                 | 0.30   |           |
| WJS  | Conference.                                  | 0.30   |           |
| WJS  | Conferences.                                 | 0.30   |           |
| WJS  | Conference and research.                     | 2.00   |           |
| MRK  | Conference.                                  | 1.50   |           |
| GT   | Conference and research.                     | 0.30   |           |

04/25/2008
| WJS | Research. | 0.50 |

04/28/2008
| MRK | Telephone Conference With co-counsel.        | 0.50 |
| WJS | Conference With DOJ and review documents.    | 0.30 |

05/01/2008
| WJS | Review Documents.                    | 0.75      |
| WJS | Conference and review documents.     | 3.00      |
|     | FOR PROFESSIONAL SERVICES RENDERED   | 32.00     | 10,627.50 |

RECAPITULATION

| TIMEKEEPER          | HOURS |
|---------------------|-------|
| Wm. J. Sheppard     | 12.10 |
| Elizabeth L. White  | 0.80  |
| Clerk               | 0.50  |
| D. Gray Thomas      | 0.80  |
| Matthew R. Kachergus| 17.80 |

TOTAL CURRENT WORK                                      10,627.50

BALANCE DUE                                            $10,627.50

CONFIDENTIAL INFORMATION                         CROW 002472

Page 34

M. Graffeo

1
2    A.   Well, I did speak with him in
3  November of -- I did -- I had a face-to-face
4  meeting Mr. Ficon in 2000, I believe it was
5  2015.  I did have conversations with Mr. Ficon
6  prior to that.
7    Q.   Do you recall ever having a
8  conversations with Mr. Ficon prior to Crowley
9  filing the arbitration demand in 2012?
10    A.   I don't recall.  I know there was
11  correspondence that I had with him.
12    Q.   Turning to the April 25th letter
13  from AON, this letter comes from a Dan Sweeny
14  at AON.
15         Do you know who Dan Sweeny is?
16    A.   I see that he signed the letter.  I
17  don't know who he is personally.
18    Q.   And the second paragraph of the
19  first page of the letter on the last sentence,
20  Mr. Sweeny states, "If there are any litigation
21  management guidelines with which you request
22  the insured's comply, please forward a copy of
23  those guidelines at your earliest convenience."
24         Prior to Mr. Farmer's indictment in
25  2013, do you know if AIG ever forwarded

Page 35

M. Graffeo

1
2  litigation management guidelines to Crowley or
3  any of --
4    A.   I do not think that we would have
5  sent guidelines before 2013 because this matter
6  wasn't a claim and we had denied coverage.
7    Q.   Do you recall whether litigation
8  guidelines were sent to Mr. Farmer's counsel
9  after the indictment or after the March 2013
10  letter?
11    A.   I believe that they were.
12         MS. GARRISON:  I will have the court
13    reporter mark Exhibit 4.
14         (Plaintiff's Exhibit 4, a letter
15    from Mr. Ficon to Edward Conlon dated May
16    7th, 2008, Bates stamped CROW002470 through
17    CROW002472, marked for identification, as
18    of this date.)
19  BY MS. GARRISON:
20    Q.   Actually, I apologize, before we get
21  to Exhibit 4 if you could go back to Exhibit 3
22  for a second.
23         Do you recall if this letter and the
24  attached e-mail was something that you would
25  have reviewed when you took over the handling

Page 36

M. Graffeo

1
2  of Crowley's claim in November of 2009?
3    A.   Yes, I would have reviewed it and I
4  did.
5    Q.   Okay.  Sorry, you can go back to
6  Exhibit 4 now.  We will go back to Exhibit 3 if
7  you want to put it somewhere.
8         Have you seen the document marked as
9  Exhibit 4 before?
10    A.   Yes, I have.
11    Q.   Was this one of the correspondence
12  that you would have reviewed when you took over
13  the file in November 2009?
14    A.   Yes, that's correct.
15    Q.   In this correspondence, similar to
16  AON's letter, Mr. Ficon asks if there are any
17  AIG litigation management guidelines or billing
18  formats which should be filed; do you see that?
19    A.   Yes, I do.
20    Q.   Prior to March 2013, it's your
21  understanding that National Union didn't -- or
22  AIG didn't provide any litigation management
23  guidelines to Crowley or the individual
24  lawyers?
25    A.   In the light of the fact that there

Page 37

M. Graffeo

1
2  was a denial, I don't believe that any
3  guidelines were forwarded to Mr. Ficon.
4         MS. GARRISON:  Can we take a
5    two-minute break?
6         (Recess is taken.)
7  BY MS. GARRISON:
8         MS. GARRISON:  I'm going to have the
9    court reporter mark Exhibit 5.
10         (Plaintiff's Exhibit 5, a letter to
11    Mr. Ficon from Maureen Conboy dated May
12    27th, 2008, Bates stamped CROW001173
13    through CROW001176, marked for
14    identification, as of this date.)
15  BY MS. GARRISON:
16    Q.   Ms. Graffeo, do you recognize the
17  document marked Exhibit 5?
18    A.   Yes, I do.
19    Q.   What do you recognize it to be?
20    A.   I recognize it as a letter that was
21  written.  It was dated May 7th of 2008 -- I
22  mean, May 27th, 2008, signed by Maureen Conboy
23  to Crowley Maritime Corporation in reference to
24  the DOJ/FBI investigation and addressed to
25  Steve Ficon at Crowley Maritime Corporation.

10 (Pages 34 to 37)

M. Graffeo

1
2     Q.   At this time, May 2008, you weren't
3   at AIG, correct -- no, you were back at AIG?
4     A.   I was back at AIG.
5     Q.   You wouldn't have any involvement in
6   drafting this letter, right?
7     A.   Right, right.
8     Q.   You took the file over in
9   November 2009?
10    A.   Yes, I did.
11    Q.   Do you know what steps National
12  Union took to investigate between the coverage
13  of the first notice April 25, 2008, and this
14  May 27th, 2008, letter?
15    A.   Well, I would assume Maureen would
16  have looked at the -- would have looked at the
17  four corners of the information that she had
18  received, and also would have looked within the
19  four corners of the policy and made a
20  determination that there was no coverage under
21  the circumstances and the materials that had
22  been provided.  And would be issued a denial
23  letter and therefore no further investigation
24  would be necessary.
25    Q.   If you could turn back to the

M. Graffeo

1
2   document that has marked been Exhibit 3.
3     Turn to the April 23rd e-mail from
4   Steve Ficon, attached to letter in the second
5   paragraph it starts on Thursday April 17, 2008,
6   the last sentence of the paragraph, "The
7   charges may have led to the subpoena and search
8   warrants are sealed at this point in time and
9   no indictments have been filed."
10        Have you seen that?
11    A.   Yes, I do.
12    Q.   Do you recall reviewing this
13  statement when you took the file over in
14  November 2009?
15    A.   Yes, I did see it.
16    Q.   Did you ever ask Mr. Ficon what he
17  meant by this statement?
18    A.   No, I didn't.
19    Q.   Did you ever talk to any criminal
20  lawyers or lawyers specializing in criminal law
21  about this statement?
22    A.   No, I did not.
23    Q.   It's your understanding that this
24  matter involves an ongoing, or now over,
25  investigation into alleged price fixing,

M. Graffeo

1
2   correct?
3     A.   Yes, I understood that.
4     Q.   Are you aware that it's regular
5   practice for the Department of Justice to
6   request an affidavit supporting a search
7   warrant is filed under a seal during an ongoing
8   investigation?
9     A.   I know it's necessary, in order for
10  a search warrant to be issued, to have an
11  affidavit to support the facts for the issuance
12  of a search warrant.
13    Q.   Are you aware that it's typical for
14  the government to -- for the government to ask
15  that an affidavit be filed under seal?
16    A.   Yes.
17    Q.   And that's what happened in this
18  case, correct?
19    A.   That's correct.
20    Q.   Did AIG ever ask Mr. Ficon for a
21  copy of the under-seal affidavit that's
22  mentioned in this e-mail, or under-seal charges
23  mentioned in this e-mail?
24    A.   I cannot say as to 2008, but I don't
25  believe that they did.  Because based on the

M. Graffeo

1
2   information that we had received to date, there
3   was a denial.
4     Q.   As of 2009 when you took over the
5   claim, you did not ask for a copy of the
6   affidavit, did you?
7     A.   No, I did not.
8     Q.   Did National Union investigate if it
9   was possible to obtain a copy of affidavit?
10    A.   We did not have a duty to
11  investigate whether there was a copy because we
12  had denied coverage at that time.
13    Q.   Is it your understanding that
14  National Union did not do an investigation?
15    A.   We did not -- well, I did not from
16  the point that I handled the claim I did not do
17  a further investigation because it wasn't
18  necessary because the claim was denied.
19    Q.   You didn't see any investigation
20  done in the file that you reviewed when you
21  took over the claim?
22    A.   No -- just repeat the question
23  again.
24    Q.   You didn't see any investigation
25  into the possibility of obtaining the copy of

11 (Pages 38 to 41)

**Doc. 36-24**

# EXHIBIT W



# FAX TRANSMISSION

## LANKFORD, COFFIELD & REED PLLC
120 North Saint Asaph Street
Alexandria, Virginia 22314

Telephone (703) 299-5000   Facsimile (703) 299-8876

V. Thomas Lankford, Jr.        William F. Coffield        Terrance G. Reed        Robert K. Moir

**DATE:**           June 30, 2008

**TO:**             Maureen Conboy

**FAX NUMBER:**     866/871-0322

**FROM:**           Terrance G. Reed

**NUMBER OF PAGES:**   -6-      (Including Cover)

**SUBJECT:**
Your Insured, Crowley Maritime Corporation
Policy No. 061-36-48

NOTICE OF CONFIDENTIALITY

The information contained in and transmitted with this facsimile is:

1.     SUBJECT TO THE ATTORNEY-CLIENT PRIVILEGE;

2.     ATTORNEY WORK PRODUCT; OR

3.     CONFIDENTIAL

# LANKFORD, COFFIELD & REED, p.l.l.c.

120 North Saint Asaph Street
Alexandria, Virginia 22314

Telephone: (703) 299-5000     Facsimile: (703) 299-8876

V. Thomas Lankford, Jr.
Terrance G. Reed
William F. Coffield
Robert K. Moir

601 Pennsylvania Avenue, N.W.
Suite 900, South Building
Washington, D.C. 20004

June 30, 2008

VIA FACSIMILE
866-871-0322
Maureen Conboy
Complex Claims Director
AIG Domestic Claims, Inc.
175 Water Street
New York, NY 10038

Re: Your Insured, Crowley Maritime Corporation,
    Policy No. 061-36-48

Dear Ms. Conboy:

I am writing as counsel to Thomas Farmer, an employee of your insured Crowley Maritime Corporation ("Crowley"), to request that AIG confirm that it will cover his payments to my firm, and that of Mr. Mark Rosenblum for legal services in connection with an ongoing government investigation. In your letter of May 27, 2008 to Mr. Ficon of Crowley, you indicated that your "preliminary analysis" was that the Policy at issue (No. 061-36-48) does not provide coverage. I am writing to provide additional information that, I submit, yields the opposite conclusion as to Mr. Farmer.

In your May 27, 2008 letter, you have confirmed that an "Insured Person" under the Policy includes an employee of Crowley, and you further confirmed that Mr. Farmer is a Crowley employee and therefore is an "Insured Person." Accordingly, Mr. Farmer qualifies for any coverage provided under the Policy.

In your letter of May 27th, you indicate that a "Claim" against an Insured Person includes a criminal investigation in which an investigating authority has identified in writing the Insured

NU002741

Person as someone against whom a proceeding may be commenced.   Please be advised that Mr. Farmer has been so identified by means of service of a grand jury subpoena.   A copy of this subpoena has been attached.   I respectfully submit that this constitutes a "Claim" under the Policy, and request confirmation of coverage for Mr. Farmer.   Further written identification of Mr. Farmer by the investigating authority can be found in the search warrant for the Crowley offices which also identifies Mr. Farmer by name.

I have enclosed a copy of my bills in connection with representation of Mr. Farmer in this investigation, and I believe you are already in receipt of a bill from Mr. Rosenblum.   These are being submitted not only for purposes of payment, but also to establish that a Claim has accrued. I have additional descriptions for each entry which are available if you need them to make a coverage decision.   Please forward to me your current requirements as to billing in order to be paid under the policy.

As you can appreciate, effective representation during a grand jury investigation can make the difference between having a short investigation, or incurring the far greater costs and burdens associated with a protracted investigation.   With that in mind, I respectfully ask you to make a determination that the costs of representing Mr. Farmer are covered under the Policy.

Yours truly,

Terrance G. Reed

cc: Mark Rosenblum, Esq.

AO110 (Rev. 12/89) Subpoena to Testify Before Grand Jury

# UNITED STATES DISTRICT COURT

MIDDLE _____ DISTRICT OF _____ FLORIDA

TO:

Tom Farmer

**SUBPOENA TO TESTIFY
BEFORE GRAND JURY**

SUBPOENA FOR:
☒ PERSON          ☐ DOCUMENT(S) OR OBJECT(S)

**YOU ARE HEREBY COMMANDED** to appear and testify before the Grand Jury of the United States District Court at the place, date, and time specified below.

| PLACE | COURTROOM |
|---|---|
| United States Courthouse<br>300 North Hogan Street<br>Jacksonville, Florida 32202 | Grand Jury Room<br>DATE AND TIME<br>May 28, 2008 at 9:30am |

YOU ARE ALSO COMMANDED to bring with you the following document(s) or object(s):*

☐ *Please see additional information on reverse.*

This subpoena shall remain in effect until you are granted leave to depart by the court or by an officer acting on behalf of the court.

| CLERK | DATE |
|---|---|
| SHERYL L. LOESCH | |
| (By) Deputy Clerk<br>*Lenore R. Bennet* | April 17, 2008 |
| This subpoena is issued on application<br>of the United States of America | NAME, ADDRESS AND PHONE NUMBER OF ASSISTANT U.S. ATTORNEY<br><br>John Terzaken (202) 307-0719<br>U.S. Department of Justice, Antitrust Division<br>450 5th Street, NW, 11th Floor, Washington, D.C. 20001 |

* If not applicable, enter "none".

NU002743

June 30, 2008

**PERSONAL AND CONFIDENTIAL**
Maureen Conboy
Complex Claims Director
AIG Policy No. 061-36-48
175 Water Street
New York, NY 10038

**For Professional Services Rendered:** May 1, 2008 thru May 31, 2008

Re: Thomas Farmer

| Attorney/Staff | Hours | Hourly Rate | Total |
|---|---|---|---|
| Terrance G. Reed | 16.1 | $500.00 | $8,050.00 |
| Robert K. Moir | 0.0 | $300.00 | $0.00 |
| **Total:** | | | **$8,050.00** |
| Disbursements/Expenses (telecopier, postage, telephone, copier, courier, process server, transcripts, consultant): | | | $0.00 |
| Westlaw | | | $0.00 |
| Expert and/or consultant charges: | | | $0.00 |
| Travel-related expenses: | | | $1,201.56 |
| **Total new charges:** | | | **$9,251.56** |

Please make check payable to: **Lankford, Coffield & Reed, PLLC**

Amounts thirty days past due from billing date
will incur a late payment charge of 1 percent per month
on the unpaid balance.

NU002744

June 30, 2008

**PERSONAL AND CONFIDENTIAL**
Maureen Conboy
Complex Claims Director
AIG Policy No. 061-36-48
175 Water Street
New York, NY 10038

**For Professional Services Rendered:** June 1, 2008 thru June 30, 2008

Re: Thomas Farmer

| Attorney/Staff | Hours | Hourly Rate | Total |
|---|---|---|---|
| Terrance G. Reed | 18.6 | $500.00 | $9,300.00 |
| Robert K. Moir | 0.0 | $300.00 | $0.00 |
| **Total:** | | | **$9,300.00** |
| Disbursements/Expenses  (telecopier, postage, telephone, copier, courier, process server, transcripts, consultant): | | | $0.00 |
| Westlaw | | | $0.00 |
| Expert and/or consultant charges: | | | $0.00 |
| Travel-related expenses: | | | $0.00 |
| **Total new charges:** | | | **$9,300.00** |

Please make check payable to: **Lankford, Coffield & Reed, PLLC**

Amounts thirty days past due from billing date
will incur a late payment charge of 1 percent per month
on the unpaid balance.

NU002745

Page 62

M. Conboy

1   BY MS. GARRISON:
2       Q.   Ms. Conboy, do you recognize the
3   document marked as Exhibit 10?
4       A.   Yes.
5       Q.   What do you recognize it to be?
6       A.   It's a fax transmission and letter
7   from Lankford, Cofield & Reed dated June 30,
8   2008.
9       Q.   And is this a letter you received in
10  your role as a claims handler at AIG?
11      A.   Yes.
12      Q.   And is it your understanding that it
13  was received at or near the date of the letter
14  June 30, 2008?
15      A.   I assume so.
16      Q.   As a claims adjuster at AIG, was it
17  regular practice for you to receive letters
18  from insureds or is it common for you to
19  receive letters from insured?
20      A.   Of course.
21      Q.   Is it your regular practice to keep
22  those letters in the file?
23      A.   Yes.
24      Q.   Do you understand who Lankford,
25

Page 63

M. Conboy

1   Cofield & Reed is?
2       A.   They are one of Mr. -- or were one
3   of Mr. Farmer's attorneys.
4       Q.   On the second page of Mr. Reed's
5   letter, in the second paragraph, he states, "I
6   have enclosed a copy of my bills in connection
7   with representation of Mr. Farmer."
8            Do you see that?
9       A.   Yes.
10      Q.   Do you recall receiving bills from
11  Mr. Reed in connection with his representation
12  of Mr. Farmer?
13      A.   I don't recall exactly who I got
14  bills from, but I do recall receiving bills
15  from attorneys on behalf of Mr. Farmer.
16      Q.   Do you recall receiving invoices or
17  bills from Crowley that were invoices from
18  Mr. Farmer's attorneys?
19      A.   I don't remember who I got them from
20  or which firms they were from, but I recall
21  that I did receive some invoices, yes.
22           MS. GARRISON:  I'll have the court
23  reporter mark Exhibit 11.
24           (Plaintiff's Exhibit 11, an e-mail
25

Page 64

M. Conboy

1   that Ms. Conboy sent to Terry Reed, Bates
2   stamped NU002737 through NU002739, marked
3   for identification, as of this date.)
4   BY MS. GARRISON:
5       Q.   Ms. Conboy, do you recognize the
6   document that's been marked as Exhibit 11?
7       A.   It's an e-mail that I sent to Terry
8   Reed, one of Mr. Farmer's attorney, on Monday
9   August 11th of 2008 where it appears I sent him
10  a copy of my August 11, 2008, coverage letter.
11      Q.   That's a letter you wrote in your
12  role as the claims handler for this case?
13      A.   Yes.
14      Q.   And that letter was written at or
15  around the date stated on the letter August 11,
16  2008?
17      A.   Yes.
18      Q.   And as a claim adjuster at AIG, was
19  it regular practice for you to write letters
20  like this to your insureds?
21      A.   Yes.
22      Q.   Was it your regular practice to keep
23  it in the claims file as well?
24      A.   Yes.
25

Page 65

M. Conboy

1       Q.   Your August 11, 2008, letter to
2   Mr. Reed, doesn't mention the under sealed
3   documents referred to in Mr. Ficon's April 23rd
4   e-mail, does it?
5            MR. DUFFY:  Objection.
6       A.   Correct.
7            MS. GARRISON:  I'll have the court
8   reporter mark Exhibit 12.
9            (Plaintiff's Exhibit 12, a letter
10  from Crowley to AON dated November 26th,
11  2008, Bates stamped CROW002481 through
12  CROW002502, marked for identification, as
13  of this date.)
14  BY MS. GARRISON:
15      Q.   Ms. Conboy, do you recognize the
16  document marked as Exhibit 12?
17      A.   Yes, it's a letter from Crowley to
18  AON dated November 26th, 2008.
19      Q.   And the letter, as you mentioned, is
20  to AON, do you recall whether AON forwarded
21  this letter to yourself at AIG?
22      A.   I think -- you know what, I don't
23  know.
24           MS. GARRISON:  I'll have the court
25

**Doc. 36-25**

# EXHIBIT X



**Conboy, Maureen**

**From:**     Conlon, Edward
**Sent:**     Thursday, May 22, 2008 5:57 PM
**To:**       Conboy, Maureen
**Subject:**  313-34345 (Crowley Maritime - DOJ/FBI Investigation

DOC080522.pdf
(53 KB)

        Dear Maureen,

Attached, please find correspondence from Defense Counsel for the above-referenced claim,
which has now been transferred to you.  I left a voicemail message for Defense Counsel
advising that the matter had been transferred to you.

Best,
Ed

Edward M. Conlon
Claims Analyst III
Financial Lines Claims
Directors & Officers Liability
AIG Domestic Claims, Inc.
175 Water Street
5th Floor
New York, NY 10038
Tel: (212) 458-1066
Fax: (866) 958-0262
edward.conlon@aig.com


-----Original Message-----
From: aig_scanner [mailto:aig_scanner@aig.com]
Sent: Thursday, May 22, 2008 5:46 PM
To: Conlon, Edward
Subject: Scanned from MFP-00E35223 05/22/2008 17:46

Scanned from MFP-00E35223.
Date: 05/22/2008 17:46
Pages:3
Resolution:200x200 DPI
----------------------------------------

1



# MARK ROSENBLUM, P.A.

Mark Rosenblum, P.A.
500 North Ocean Street
Jacksonville, Florida 32202
www.markrosenblum.com

Office 904.354.6002
Direct 904.354.7228
Facsimile 904.354.6637
markrosenblumlaw@bellsouth.net

May 13, 2008

Edward Conlon, Esq.
Directors & Officers Liability
AIG Domestic Claims
175 Water Street, 5th Floor
New York, NY 10038

      **Re:**    **Thomas Farmer**
               **Crowley Liner Services, FBI Investigation**
               **AIG Claim # 313034345**

Dear Mr. Conlon:

I represent Thomas Farmer, an employee of Crowley Liner Services, in the matter under investigation by the FBI. At the direction of Arthur Mead, Crowley's in-house counsel, I am submitting my bill for legal fees to AIG for payment. I will submit a monthly statement as the case progresses. The enclosed statement is for April, 2008.

One word of explanation. You will notice that my time sheet is, at times, non-specific regarding names and tasks. (For example, instead of "telephone call with 'John Jones'" it says "telephone call with 'counsel'".) This is done deliberately to avoid a situation where the government obtains my time sheets through a discovery request or at the court's direction, and as a result is able to discern matters relating to trial strategy.

Should you have questions or concerns, feel free to contact me any time.

Yours very truly,

Mark Rosenblum

NU002748

# MARK ROSENBLUM, P.A.

**Mark Rosenblum, P.A.**
**500 North Ocean Street**
**Jacksonville, Florida 32202**
**www.markrosenblum.com**

Office 904.354.6002
Direct 904.354.7228
Facsimile 904.354.6637
markrosenblumlaw@bellsouth.net

May 13, 2008

Edward Conlon, Esq.
Director's & Officer's Liability
AIG Domestic Claims
175 Water Street, 5th Floor
New York, NY 10038

    **Re:**   **Thomas Farmer**
          **Crowley Liner Services, FBI Inverstigation**
          **AIG Claim #313034345**

## <u>STATEMENT – APRIL 2008</u>

| | |
|---|---|
| Hourly Rate | $325.00 per hour |
| Time expended during billing period | 21.2 Hours |
| Fee for time expended | $6,890.00 |
| **Balance Due** | **$6,890.00** |

Please make check payable to Mark Rosenblum, P.A.

THOMAS L. FARMER/CROWLEY LINER SERVICES – TIME RECORD
APRIL, 2008

| <u>Date</u> | <u>Task</u> | <u>Time</u> |
|---|---|---|
| 4/17/08 | Conferences with counsel; conference with client | 6.0 |
| 4/21/08 | Reviewed search warrant, items removed from premises, legal hold, subpoenas | 1.0 |
| | Exchanged emails with client | .1 |
| | Telephone call with counsel | .1 |
| | Telephone call with counsel | .1 |
| | Telephone call with client | .1 |
| 4/22/08 | Telephone call with client | .1 |
| | Conference with counsel | 1.0 |
| | Conference with client; reviewed documents | 4.1 |
| | Conference with counsel | 1.6 |
| 4/23/08 | Conference with client; reviewed documents | 2.0 |
| | Conference with counsel | 1.5 |
| 4/24/08 | Conference with client | 3.0 |
| 4/25/08 | Reviewed client's email and responded | .1 |
| 4/28/08 | Telephone call with counsel | .1 |
| | Telephone call with counsel | .1 |
| | Exchanged emails with client | .1 |
| 4/29/08 | Telephone call with client | .1 |
| | **TOTAL TIME** | **21.2** |

NU002750

Page 46

M. Graffeo
1
2   Union had that right under this policy?
3       MR. DUFFY:  Objection.
4       A.   The policy speaks for itself.
5       Q.   And in your role as a senior complex
6   claims director, you did -- did you work on
7   cases where National Union was advancing
8   defense costs on an as-incurred basis?
9       A.   Yes, I have and I worked on those
10  when there was a claim that was made and
11  noticed.
12      Q.   How does National Union determine
13  whether to advance defense costs?
14      MR. DUFFY:  Objection.
15      A.   Again, as a general rule, you would
16  review the policy and you would review the
17  material that has been provided by the -- by
18  the insurer and review the eight corners and
19  determine if there was coverage under the
20  policy.
21      Q.   Does National Union advance defense
22  costs when there's a potential coverage for the
23  policy?
24      A.   No.
25      Q.   Does National Union advance defense

Page 47

M. Graffeo
1
2   costs based on the ultimate outcome of the
3   litigation?
4       A.   No.
5       Q.   Now, this policy, if you turn to
6   page -- probably the easiest way to found it is
7   the pages are numbered along the top.  I'm
8   looking at page 59 of 82.
9            And page 59 of 82 endorsement 14,
10  "Run-off Endorsement;" is that correct?
11      A.   That's correct.
12      Q.   Do you understand what the purpose
13  of a run-off endorsement is?
14      A.   Yes, I do.
15      Q.   What's your understanding of a
16  run-off endorsement?
17      MR. DUFFY:  Objection.
18      A.   The policy speaks for itself.
19      MR. DUFFY:  Object on the grounds
20  of -- I think this is outside the scope of
21  the 30(b)(6) topics, but to the extent she
22  has a personal understanding, I'm not going
23  to instruct her not to give it.
24  BY MS. GARRISON:
25      Q.   You gave your answer, correct?

Page 48

M. Graffeo
1
2       A.   Yes.
3       Q.   Is it your understanding that the
4   run-off endorsements restrict or limit on the
5   coverage otherwise provided by the policy?
6       MR. DUFFY:  Objection.
7       A.   The policy speaks for itself.
8       Q.   Would you consider this run-off
9   endorsement to be a limitation on the coverage
10  provided to Crowley?
11      MR. DUFFY:  Objection.
12      A.   Again, the policy speaks for itself.
13      MR. DUFFY:  Can we take a short
14  break?
15      MS. GARRISON:  Sure.
16      (Recess is taken.)
17      MS. GARRISON:  Can you repeat the
18  last question and answer?
19      (Question was read back as follows:
20      "QUESTION:  Would you consider this
21      run-off endorsement to be a
22      limitation on the coverage provided
23      to Crowley?")
24      (Answer was read back as follows:
25      "ANSWER:  Again, the policy speaks

Page 49

M. Graffeo
1
2   for itself.")
3   BY MS. GARRISON:
4       Q.   After the break, Ms. Graffeo, do you
5   have any changes to the answers that you gave?
6       A.   No, I don't.  I would expand that it
7   actually broadens the coverage for Crowley and
8   gives it another six years to report.
9       Q.   What's your understanding of what
10  happens after that six years?
11      A.   After those six years, the policy --
12  this is the claims reported and it would have
13  to be remade or reported within the six
14  years -- within the policy period which does
15  include the run-off coverage clause.
16      MS. GARRISON:  I am going to have
17  the court reporter mark Exhibit 7.
18      (Plaintiff's Exhibit 7, an e-mail
19  from Edward Conlon to Maureen Conboy and
20  also letters from Mark Rosenblum, Bates
21  stamped NU002747 through NU002750, marked
22  for identification, as of this date.)
23  BY MS. GARRISON:
24      Q.   Ms. Graffeo, do you recognize the
25  document marked as Exhibit 7?

13 (Pages 46 to 49)

1          M. Graffeo
2      A.   Yes, I do.
3      Q.   What do you recognize it to be?
4      A.   I recognize it to be an e-mail from
5  Edward Conlon to Maureen Conboy and also
6  letters from Mark Rosenblum.
7      Q.   Who is Edward Conlon?
8      A.   I believe he's a claims analyst at
9  AIG.
10     Q.   Is he one of the individuals that
11 would determine -- at this time in May 2008, do
12 you know if he was one of the individuals who
13 would have determined if a claim went to the
14 complex claims department?
15     A.   If he was handling the claim, which
16 I am not sure that he was, but if he was
17 handling the claim he would have some
18 responsibility obviously to look at the claim
19 and review and determine if there was coverage.
20     Q.   Was he in the complex claims
21 department?
22     A.   No.
23     Q.   Would he refer the claim then to
24 complex claims; do you recall?
25     A.   I don't recall.  I would, as a

1          M. Graffeo
2  general rule, if it went into mainstream and it
3  was later determined it was complex claim, it
4  would then be transferred up to a complex
5  claims director.
6      Q.   So can you tell, from his e-mail
7  block here, was he a mainstream?
8      A.   He was claims analyst 3.
9      Q.   Do you recall reviewing the May 13,
10 2008, letter from Mark Rosenblum, it's attached
11 to this document when you took over the file?
12     A.   Yes, I did.
13     Q.   When you took over the file, did you
14 understand that Mark Rosenblum was acting as a
15 local counsel for Mr. Farmer in Jacksonville?
16     A.   I'm not sure exactly when I found
17 out.  I knew -- I did have a conversation with
18 Terry Reed as to the role of Mr. Mark
19 Rosenblum, and it was my understanding that he
20 would be acting as local counsel in
21 Jacksonville.
22     Q.   Prior to March 2013, did National
23 Union ever object to Mr. Rosenblum acting as
24 local counsel for Mr. Farmer?
25     A.   Well, we had denied the claim before

1          M. Graffeo
2  March of 2013.  And we did not object because
3  the claim was in denial, and we would not be
4  paying the cost.
5      Q.   And --
6      A.   I would like to correct myself.  I
7  said the claim was in denial.  The matter had
8  been denied, it was not the claim.
9      Q.   Did National Union, after March
10 2013, object to Mr. Rosenblum's role as local
11 counsel?
12     A.   We -- I understood that he would
13 only be serving in the role as local counsel
14 and would not be serving as co-counsel for
15 Mr. Reed.  So I did not object to him acting as
16 local counsel in Jacksonville.
17     Q.   Did you object to him acting as
18 co-counsel or you understood he was --
19     A.   It was understanding initially, from
20 the conversations that I had with Mr. Reed,
21 that Mr. Rosenblum would be acting just as
22 local counsel.  Upon reviewing his invoices, it
23 appeared to me that he was taking a much more
24 active role than that of local counsel and
25 appeared to be acting in a role as co-counsel.

1          M. Graffeo
2      Q.   When you said review the invoice,
3  are you referring to the invoices after
4  March 2013?
5      A.   That's correct.  Since the matter
6  became a claim, I started to review the
7  invoices.
8      Q.   Do you recall reviewing any of
9  Mr. Rosenblum's invoices prior to March 2013?
10     A.   No.
11     Q.   Prior to March 2013, did National
12 Union object to Mr. Rosenblum acting as
13 co-counsel?
14     A.   No, but again, the matter had been
15 denied and we were not paying for any pre-claim
16 cost.
17     Q.   And sorry, just to clarify, did
18 National Union object to Mr. Rosenblum acting
19 as co-counsel as opposed to local counsel after
20 March 2013?
21     A.   It was my understanding that he was
22 acting as local counsel.  Upon review of the
23 invoices, it appeared from the invoices and the
24 entries that were made, that he was taking a
25 much more -- he was taking a role as co-counsel

# Doc. 36-26

# EXHIBIT Y



EXHIBIT
Plaintiff's 12
3|17|17

**PEABODY & ARNOLD** LLP
COUNSELLORS AT LAW

FEDERAL RESERVE PLAZA
600 ATLANTIC AVENUE, BOSTON, MA 02210-2261
(617) 951-2100 FAX (617) 951-2125

BOSTON, MA   PROVIDENCE, RI

E. Joseph O'Neil
[617] 951.4705
eoneil@peabodyarnold.com

*Via Federal Express*

June 9, 2010

Catherine J. Dolan
Aon Risk Insurance Services West, Inc.
Vice President
Legal and Claims Practice
4100 East Mississippi Avenue, Suite 1300
Denver, CO 80246

|     |            |                                                              |
|-----|------------|--------------------------------------------------------------|
| Re: | Insured:   | *Crowley Maritime Corporation*                               |
|     | Matter:    | *DOJ/FBI Investigation and Puerto Rico Antitrust Litigation* |
|     | Policy Nos.: | *066-57-99*                                                |
|     |            | *061-36-44*                                                  |
|     | Claim Nos.: | *367-004291*                                                |
|     |            | *313-34345*                                                  |

Dear Mr. Ficon:

       We represent Chartis Claims, Inc. ("Chartis") and National Union Fire Insurance
Company of Pittsburgh, Pa ("National Union") regarding the above matter. This is in response
to your letter of September 30, 2009 addressed to Maureen Conboy at Chartis. This letter
supplements National Union's prior coverage correspondence, all of which correspondence is
incorporated herein. For the reasons stated herein, National Union maintains its denial of
coverage for the legal fees incurred by Robert Grune, Thomas Farmer, John Kelley and Tony
Lusis in connection with the above investigation.

       When we spoke in December of 2009, you stated that you would be submitting additional
information relevant to the coverage issues discussed below. Since our call, we have not
received any additional material. Accordingly, we are issuing our supplemental coverage letter
at this time. We remain willing to reevaluate coverage based on any additional information you
would like to submit. If you or the Insured have additional information you would like to
provide, we continue to welcome you to do so at any time.

       The materials submitted for coverage are (1) a search warrant dated April 16, 2008
allowing a search of the Crowley Liner Services, Inc. offices in Jacksonville, Florida (2) a
document subpoena dated April 17, 2008 addressed to Crowley Liner Services, Inc., requiring

PEABODY & ARNOLD LLP
Catherine Dolan
June 9, 2010
Page 2

production of certain documents to a federal grand jury, and (3) a subpoena dated April 17, 2008 requiring Mr. Farmer to testify before the federal grand jury. No coverage is afforded, because none of the materials submitted constitute Claims for Wrongful Acts as defined in the above policies. In addition, the search warrant and the subpoena addressed to Crowley Liner Services, Inc. are not directed to an individual Insured Person. Our understanding is that no subpoenas have ever been served on Mr. Grune, Mr. Kelley or Mr. Lusis.

As stated in National Union's prior correspondence, Policy No. 061-36-48 provides specified coverage for reasonable Defense Costs incurred in connection with certain investigations of an Insured Person, pursuant to the following language in the definition of Claim:

"Claim" means:

\* \* \*

(3)     a civil, criminal, administrative or regulatory investigation of an **Insured Person**:

    (i)     once such **Insured Person** is identified in writing by such investigating authority as a person against whom a proceeding describe in Definition (b)(2) may be commenced; or

    (ii)    in the case of an investigation by the SEC or a similar state or foreign government authority, after the service of a subpoena upon such **Insured Person**.

No such coverage is available in this case, because (i) none of the individual Insured Persons have been identified in writing by the investigating authorities that they are persons against whom a civil or criminal proceeding may be commenced, and (ii) there no investigation by the SEC or similar state or foreign government authority.

The search warrant and subpoena served on Crowley Liner Services, Inc., do not specify the individuals or entities against whom criminal charges may be brought. It is impossible to determine from these documents whether Mr. Farmer, Mr. Grune, Mr. Kelley and Mr. Lusis are witnesses or potential defendants. The subpoena to Mr. Farmer also does not specify any individuals or entities against whom criminal charges may be brought. The three Department of Justice press releases referenced in your letter do not identify the potential targets of the ongoing investigation. It is our understanding that neither Mr. Farmer, Mr. Grune, Mr. Kelley nor Mr.

PEABODY & ARNOLD ᴸᴸᴾ
Catherine Dolan
June 9, 2010
Page 3

Lusis have ever received any notification from the Department of Justice identifying them as a target of the investigation.

In your letter, you state that "the government will not announce to the world in advance – in writing – that specific individuals are persons against whom proceedings may later be brought." However, it is the express policy of the Department of Justice to provide advance written notification to a "target" or "subject" of a grand jury investigation. The United States Attorneys' Manual, available on line at the Department of Justice website, states the government's policy in this regard as follows:

> It is the policy of the Department of Justice to advise a grand jury witness of his or her rights if such witness is a "target" or "subject" of a grand jury investigation. See the Criminal Resource Manual at 160 for a sample target letter.

> \* \* \*

> Notwithstanding the lack of a clear constitutional imperative, it is the policy of the Department that an "Advice of Rights" form be appended to all grand jury subpoenas to be served on any "target" or "subject" of an investigation.

> \* \* \*

> [T]he Department of Justice continues its longstanding policy to advise witnesses who are known "targets" of the investigation that their conduct is being investigated for possible violation of Federal criminal law.

USAM 9-11.151.

> When a target is not called to testify pursuant to USAM 9-11.150, and does not request to testify on his or her own motion (see USAM 9-11.152), the prosecutor, in appropriate cases, is encouraged to notify such person a reasonable time before seeking an indictment in order to afford him or her an opportunity to testify before the grand jury, subject to the conditions set forth in USAM 9-11.152.

USAM 9-11.153. It does not appear from the materials submitted that Mr. Farmer, Mr. Grune, Mr. Kelley or Mr. Lusis ever received either a target letter or an "Advice of Rights" form from the Department of Justice. If this is not correct, please let me know.

PEABODY & ARNOLD LLP
Catherine Dolan
June 9, 2010
Page 4

It is not correct, as you state in your letter, that "all that is required is a showing that a proceeding 'may' be commenced against the Insured Persons." Under the terms of the Policy, coverage for an investigation by the SEC or similar agency commences upon the service of a subpoena on an Insured Person. For all other criminal or civil investigations, coverage for investigations commences only after written notification that the Insured Person is a person against whom criminal or civil proceedings may be commenced. The absence of any such written notification in this case precludes coverage for the legal fees incurred by Mr. Farmer, Mr. Grune, Mr. Kelley and Mr. Lusis. If Mr. Farmer, Mr. Grune, Mr. Kelley or Mr. Lusis is notified in writing that they are a target or subject of the ongoing investigation or otherwise that they are a person against whom civil or criminal proceedings may be commenced, please forward such notification for our review.

If there is any additional information that you believe National Union should consider in making its coverage determination, please let me know. Please note that nothing herein is a waiver of any additional rights or defenses available to National Union under the terms of the above Policies, at law or in equity.

Very truly yours,

E. Joseph O'Neil

PABOS2:711950_1
9501-80811

711950_1

Page 62

```
 1            M. Graffeo
 2  information to my attention."
 3       Do you see that?
 4       A.   Yes, I do.
 5       Q.   And in the paragraph prior to that,
 6  Ms. Conboy states that, "National Union will
 7  continue to accept this matter as a notice of
 8  circumstances."
 9       Do you see that?
10       A.   That's correct.
11       Q.   Do you understand what is meant by
12  the phrase "Notice of circumstances"?
13       A.   Yes, I do.
14       Q.   What is your understanding of that
15  phrase?
16       A.   It's my understanding that at the
17  point it's information that is submitted and we
18  accept it.  It is not -- it does not constitute
19  a claim at the time, but it provides us with an
20  enough information to actually put a bookmark
21  in the policy if the claim should arise at a
22  later date.
23       MS. GARRISON:  I'm going to have the
24  court reporter mark Exhibit 11.
25       (Plaintiff's Exhibit 11, a letter
```

Page 63

```
 1            M. Graffeo
 2  from Mr. Ficon, Crowley to Maureen Conboy
 3  dated September 30th, 2009, Bates stamped
 4  CROW002863 through CROW002867, marked for
 5  identification, as of this date.)
 6       (Witness complies.)
 7  BY MS. GARRISON:
 8       Q.   Ms. Graffeo, do you recognize the
 9  document marked Exhibit 11?
10       A.   Yes, I do.
11       Q.   What do you recognize it to be?
12       A.   It's a letter from Mr. Ficon,
13  Crowley to Maureen Conboy dated September 30th,
14  2009.
15       Q.   Do you recall reviewing this letter
16  when you took over the file in 2009?
17       A.   Yes, I did.
18       Q.   And page 4 of the letter, under the
19  heading Defense Costs, the last sentence of
20  that paragraph under the heading Defense Costs
21  supports copies of fee statements that are
22  enclosed --
23       A.   Yes, I see that.
24       Q.   I did not actually attach any fee
25  statements to this exhibit, but do you recall
```

Page 64

```
 1            M. Graffeo
 2  when you reviewed the file that there were
 3  copies of invoices from Crowley or the
 4  individual defense counsel in the file?
 5       A.   I believe there were.
 6       Q.   At the time you took over the file,
 7  did you ever review those invoices to determine
 8  if the amounts charged were reasonable and
 9  necessary?
10       A.   Again, the matter was denied we were
11  not providing coverage for the matter, and I
12  don't recall reviewing the invoices.
13       Q.   Did National Union ever inform
14  Crowley that it was objecting to the amounts
15  charged in those invoices as not reasonable or
16  necessary?
17       MR. DUFFY:  Objection.
18  BY MS. GARRISON:
19       Q.   Prior to March 2013.
20       A.   I did not from the time I took over
21  the claim.
22       Q.   Do you recall seeing anything in the
23  file that would suggest it had been done prior
24  to you?
25       A.   No.
```

Page 65

```
 1            M. Graffeo
 2       Q.   No --
 3       A.   No, I did not see anything in the
 4  file.
 5       MS. GARRISON:  I'm going to have the
 6  court reporter mark Exhibit 12.
 7       (Plaintiff's Exhibit 12, a letter
 8  dated June 9, 2010, signed by Mr. O'Neil
 9  from Peabody & Arnold LLP and it's
10  addressed to Catherine Dolan, Bates stamped
11  CROW002273 through CROW002276, marked for
12  identification, as of this date.)
13  BY MS. GARRISON:
14       Q.   Ms. Graffeo, have you ever seen the
15  document marked as Exhibit 12?
16       A.   Yes.
17       Q.   What do you recognize it to be?
18       A.   It is a letter dated June 9, 2010,
19  signed by Mr. O'Neil from Peabody & Arnold LLP
20  and it's addressed to Catherine Dolan.
21       Q.   And who is Mr. O'Neil at Peabody &
22  Arnold?
23       A.   Mr. O'Neil is a partner at Peabody &
24  Arnold.
25       Q.   At the time he wrote this letter on
```

17 (Pages 62 to 65)

```
 1            M. Graffeo
 2  June 9, 2010, you had taken over the handling
 3  of claim by then; is that correct?
 4      A.   That's correct.
 5      Q.   And Peabody & Arnold is coverage
 6  counsel for AIG in connection with this claim;
 7  is that correct?
 8      A.   That's correct.
 9      Q.   Did you make the decision to hire
10  coverage counsel or was that Ms. Conboy who
11  made that decision?
12      A.   I believe it was Ms. Conboy, it was
13  not me.
14      Q.   So that would have happened?
15      A.   That would have happened prior to
16  2009.
17      Q.   Do you know who Catherine Dolan is?
18      A.   Yes.
19      Q.   Who is she?
20      A.   She is a broker at AON.
21      Q.   Do you know why Mr. O'Neil addressed
22  this letter to Ms. Dolan instead of Mr. Ficon
23  who has been on the prior letters?
24      A.   Well, we had previous conversations
25  with Ms. Dolan.  We had been prepared, I
```

```
 1            M. Graffeo
 2  believe, it was in December of 2009, to send
 3  out a letter in response to Mr. Ficon's letter
 4  and Ms. Dolan had requested a conference call.
 5  And she asked us to hold back on sending our
 6  response to Mr. Ficon, but she expressed that
 7  she would be providing additional information
 8  to us for us to make a determination whether
 9  this was a claim.
10      Q.   And when that conference was held
11  with Ms. Dolan, was that after you had taken
12  over the claim or was that when Ms. Conboy was
13  handling it?
14      A.   I was handling it in December of
15  2009.
16      Q.   Did you participate in that
17  conference call?
18      A.   Yes, I did.
19      Q.   And did Peabody & Arnold also
20  participate in that conference call?
21      A.   Yes, they did.  Mr. Duffy was on the
22  call.
23      Q.   Do you recall if anyone from Crowley
24  was on that call?
25      A.   I don't believe anyone from Crowley
```

```
 1            M. Graffeo
 2  was on that call.
 3      Q.   Prior to the date of this letter,
 4  this June 9, 2010, letter, from Mr. O'Neil, do
 5  you recall discussing with -- discussing the
 6  conference call with AON with anyone at
 7  Crowley?
 8      A.   Can you please repeat the question?
 9      Q.   Sure.  Prior to the date of this
10  letter, June 9, 2010 --
11      A.   Right.
12      Q.   -- did you discuss the conference
13  call that you had had with AON, with anyone at
14  Crowley?
15      A.   No, it was my understanding, just
16  from the conversations that I had with
17  Ms. Dolan, that she was in contact with Crowley
18  because she continued to say she was going to
19  provide us with -- the insured had additional
20  information, and she was going to provide us
21  with that information.  So I had assumed that
22  she was in contact with Crowley.
23      Q.   Did you review a copy of this letter
24  before it was sent to Crowley?
25      A.   Yes, I did.
```

```
 1            M. Graffeo
 2      Q.   In the second paragraph on the first
 3  page, the last two sentences, Mr. O'Neil
 4  states, "We remain willing to reevaluate
 5  coverage based on any additional information
 6  you would like to submit.  If you or the
 7  insured have additional information you would
 8  like to provide, we continue to welcome you to
 9  do so at any time."
10           Do you see that?
11      A.   The last?
12      Q.   The second paragraph of the first
13  page.
14      A.   Yes, I recall reviewing this and
15  that paragraph.
16      Q.   In this letter and one of the prior
17  exhibits we looked at, National Union invited
18  Crowley to submit additional documentation; is
19  that correct?
20      A.   That's correct.
21      Q.   Did National Union ever withdraw its
22  offer to consider additional information from
23  Crowley?
24           MR. DUFFY: Objection.
25      A.   That we had invited them to provide
```

# Doc. 36-27

# EXHIBIT Z

**PEABODY & ARNOLD** LLP
COUNSELLORS AT LAW

FEDERAL RESERVE PLAZA
600 ATLANTIC AVENUE, BOSTON, MA 02210-2261
(617) 951-2100  FAX (617) 951-2125

BOSTON, MA   PROVIDENCE, RI

E. JOSEPH O'NEIL
[617] 951.4705
eoneil@peabodyarnold.com

August 12, 2010

*Via Certified Mail*

Steven Ficon
Director, Claims
Crowley Maritime Corporation
Post Office Box 2110
Jacksonville, FL 32203

|       |              |                                          |
|-------|--------------|------------------------------------------|
| Re:   | *Insured:*   | *Crowley Maritime Corporation*           |
|       | *Matter:*    | *DOJ/FBI Investigation*                  |
|       | *Policy Nos.:* | *066-57-99*                            |
|       |              | *061-36-44*                              |
|       | *Claim Nos.:* | *367-004291*                            |
|       |              | *313-34345*                              |

Dear Mr. Ficon:

We represent Chartis Claims, Inc. ("Chartis") and National Union Fire Insurance Company of Pittsburgh, Pa ("National Union") regarding the above matter. This letter is in response to your letter of July 30, 2010 addressed to Maureen Conboy at Chartis. Please note for your file that Michele Graffeo is now the analyst responsible for the handling of the above matter at Chartis.

National Union has endeavored at all times to maintain a constructive dialogue with its insured and to respond promptly to all inquiries regarding coverage. On December 7, 2009, we participated in a conference call with Catherine Dolan and John Peterson of Aon. The purpose of the call was to discuss outstanding coverage issues as described in your September 30, 2009 letter. We told Aon at that time that we had a response letter ready to issue. However, Aon advised us in the call that there may be additional documents which had not yet been submitted to National Union which would meet the Policy definition of a Claim. On that basis, Aon asked us to defer a written response to your September 30, 2009 letter until such time as we had a chance to review the additional documents. We agreed to defer a response at Aon's request. Aon advised us that they would be submitting such additional documents for our review shortly.

By email dated January 11, 2010, we followed up with Mr. Peterson and Ms. Dolan regarding the promised materials. Ms. Dolan advised us by return email that Aon was still

NU003811

**PEABODY & ARNOLD** LLP
Steven Ficon
August 12, 2010
Page 2

working with Crowley to review relevant documents for privilege issues. We followed up again via emails dated March 30, 2010 and April 15, 2010. By response email dated April 15, 2010, Ms. Dolan advised us that Crowley was still working with its attorneys to obtain copies of the relevant documents, but that the process was being slowed by numerous privilege issues. She stated that Crowley was getting close to producing the additional materials. We followed up again by email dated May 7, 2010. By email dated May 26, 2010, we advised Aon that if we did not have any additional materials by June 7, we would be issuing a response to your September 2009 letter based on the materials in our possession. On June 9, 2010, we sent a written response to your September 2009 letter to Ms. Dolan at Aon. As it appears you have not seen our response, a copy of our June 9, 2010 letter is enclosed.

It is still our position that we are willing to consider any materials that you may wish to submit in order to establish the existence of a Claim as defined in the Policy. If there are any additional materials relevant to this issue as stated in the December 2009 phone call, I invite you to submit such materials for our review at this time. We will consider such additional materials and respond further as to the existence of coverage.

Once you have had a chance to review our June 9, 2010 letter and submit any additional materials, please contact this office to discuss how you would like to proceed. We would welcome informal discussions with Crowley regarding the issues raised in your September 30, 2009 letter and our June 9, 2010 response. On behalf of National Union, I look forward to working with you.

Sincerely,

Joe O'Neil/KAP

E. Joseph O'Neil

cc: Catherine Dolan (Aon)

728074_2

**Doc. 36-28**

# EXHIBIT AA

**PEABODY & ARNOLD** LLP
COUNSELLORS AT LAW

FEDERAL RESERVE PLAZA
600 ATLANTIC AVENUE, BOSTON, MA 02210-2261
(617) 951-2100  FAX (617) 951-2125

BOSTON, MA   PROVIDENCE, RI

MICHAEL P. DUFFY
[617] 951.2002
mduffy@peabodyarnold.com

August 28, 2012

*Via Certified Mail*

Terrance G. Reed
Lankford & Reed, P.L.L.C.
120 N. St. Asaph Street
Alexandria, VA 22314

Re:   Insured:      ***Crowley Maritime Corporation***
      Matter:       ***DOJ/FBI Investigation***
      Policy No.:   ***061-36-48***
      Claim No.:    ***367-004291***

Dear Mr. Reed:

We represent Chartis Claims, Inc. ("Chartis") and National Union Fire Insurance
Company of Pittsburgh, Pa. ("National Union") regarding the above matter. This letter
supplements National Union's prior coverage correspondence in response to your July 18, 2012
letter to Maureen Conboy at Chartis. All of National Union's prior coverage correspondence is
incorporated herein by reference.

As an initial matter, please note that Insured Persons such as Mr. Farmer have direct
rights under the Policy only pursuant to Insuring Agreement I.A. Coverage is afforded under
Insuring Agreement I.A. only in certain circumstances in which the insured Organization fails to
indemnify the Insured Person. It is our understanding that Mr. Farmer's legal fees are being paid
by Crowley Maritime Corporation or one of its related entities ("Crowley"). If this is not correct,
please let me know. To the extent Mr. Farmer's legal fees are being paid by Crowley, Mr.
Farmer has no present right to pursue coverage under the Policy in his own behalf.

In addition, National Union requires further information in light of your July 18, 2012
letter in order to verify whether or not a Claim as defined in the Policy has been asserted against
Mr. Farmer and, if so, the date of the Claim. In this regard, please forward a copy of the
protective order referenced in your letter. Please also forward a copy of the document by which
the Justice Department reportedly confirmed in writing that Mr. Farmer is a target of the
investigation. Also, please confirm whether or not Mr. Farmer has received a target letter or
other correspondence from the Justice Department identifying him as a person against whom
criminal charges may be brought. Please note that the Policy's definition of Claim includes a

**PEABODY & ARNOLD** LLP
Terrance G. Reed
August 28, 2012
Page 2

criminal investigation of an Insured Person only once such Insured Person is identified in writing by the investigating authority as a person against whom proceedings may be commenced. National Union reserves all rights in this regard.

   With respect to the antitrust litigation pending in South Carolina, it appears from your letter that Mr. Farmer has not been named as a defendant.  As a result, such litigation does not constitute a Claim against Mr. Farmer for purposes of coverage under the Policy.  Coverage under the Policy is only for Loss arising from a Claim.  No coverage is afforded for the cost of responding to discovery requests in a case in which the Insured Person is not a party.  If Mr. Farmer is added as a party in the South Carolina litigation, please let us know immediately and forward copies of the relevant pleadings.

   Please note that nothing herein is a waiver of any other rights or defenses available to National Union under the Policy or otherwise.  National Union continues to reserve the right to rely on any applicable exclusions or other Policy terms or conditions, including but not limited to Exclusion 4(c), which provides that National Union shall not be liable to make any payment for Loss in connection with a Claim against an Insured arising out of, based upon or attributable to the committing of any deliberate criminal act by the Insured if a judgment or final adjudication or an alternative dispute resolution proceeding adverse to the Insured establishes that such deliberate criminal act was committed.

   If you wish to discuss these issues further or if there are any other materials that you believe National Union should consider in its coverage analysis, please do not hesitate to contact me.

                                         Very truly yours,

                                         Michael P. Duffy

772592_1

**Doc. 36-29**

# EXHIBIT BB

Page 1

1

2          IN THE UNITED STATES DISTRICT COURT
           FOR THE MIDDLE DISTRICT OF FLORIDA
3               JACKSONVILLE DIVISION

4

   CROWLEY MARITIME CORPORATION,)
5                               )
                   Plaintiff    ) Case No.:
6                               ) 3:16-cv-01011-TJC-JBT
                                )
7              v.               )
                                )
8  NATIONAL UNION FIRE INSURANCE)
   COMPANY OF PITTSBURGH, PA.,  )
9                               )
                   Defendant.   )
10 ----------------------------

11

12

13

14         DEPOSITION OF MAUREEN CONBOY
15              New York, New York
16            Friday, March 3, 2017

17

18

19

20

21

22

23 Reported by:
   Lisa M. Muraco
24 JOB NO.:  120417

25

Page 2

```
 1
 2
 3                   March 3rd, 2017
 4                   9:26 a.m.
 5
 6
 7         Deposition of MAUREEN CONBOY, held
 8   at the offices of REED SMITH LLP, 599
 9   Lexington Avenue, New York, New York,
10   before Lisa M. Muraco, a Notary Public of
11   the State of New York.
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1
 2             A P P E A R A N C E S :
 3
 4
 5   REED SMITH
 6   Attorneys for Plaintiff
 7        10 South Wacker Drive
 8        Chicago, Illinois 60606
 9   BY:   EMILY GARRISON, ESQ.
10
11
12   PEABODY & ARNOLD
13   Attorneys for Defendant
14        600 Atlantic Avenue
15        Boston, Massachusetts 02210
16   BY:   MICHAEL DUFFY, ESQ.
17
18
19
20
21
22
23
24
25
```

Page 4

```
 1
 2        IT IS HEREBY STIPULATED AND AGREED
 3   by and between the attorneys for the
 4   respective parties herein, that filing and
 5   sealing be and the same are hereby waived.
 6        IT IS FURTHER STIPULATED AND AGREED
 7   that all objections, except as to the form
 8   of the question, shall be reserved to the
 9   time of the trial.
10        IT IS FURTHER STIPULATED AND AGREED
11   that the within deposition may be sworn to
12   and signed before any officer authorized
13   to administer an oath, with the same
14   force and effect as if signed and sworn to
15   before the Court.
16
17
18
19              - oOo -
20
21
22
23
24
25
```

Page 5

```
 1                M. Conboy
 2   M A U R E E N   C O N B O Y ,
 3        called as a witness, having been duly sworn
 4        by a Notary Public, was examined and
 5        testified as follows:
 6   EXAMINATION BY
 7   MS. GARRISON:
 8        Q.   State your name for the record,
 9   please.
10        A.   Maureen Conboy.
11        Q.   State your address for the record,
12   please.
13        A.   239 East 79th Street, Apartment 14H,
14   New York, New York 10075.
15        Q.   Good morning, Ms. Conboy.
16        A.   Good morning.
17        Q.   We met briefly earlier.  My name is
18   Emily Garrison, I am one of the attorneys
19   representing the plaintiff, Crowley Maritime
20   Corporation, in this case.
21             Thank you for being available today.
22             MS. GARRISON:  I am going to have
23   the court reporter mark Exhibit 1.
24             (Plaintiff's Exhibit 1, a Deposition
25   Notice, marked for identification, as of
```

Page 6

M. Conboy

1    this date.)
2    BY MS. GARRISON:
3        Q.   Ms. Conboy, do you recognize the
4    document that has been marked as Exhibit 1?
5        A.   Yes.
6        Q.   Have you seen this document before?
7        A.   I believe so, yes.
8        Q.   What do you recognize it to be?
9        A.   It's a deposition notice.
10       Q.   And you're appearing today pursuant
11   to this notice, correct?
12       A.   Yes.
13       Q.   And you are represented by counsel
14   today?
15       A.   Yes.
16       Q.   Have you been deposed before?
17       A.   Twice.
18       Q.   And how recently were those
19   depositions?
20       A.   One was about two years ago, and the
21   other one was probably about three years ago,
22   maybe four.
23       Q.   The one that was two years ago, what
24   kind of case was that?

Page 7

M. Conboy

1        A.   It was a bad faith case.  A coverage
2    in bad faith case that's venued in Nebraska.
3        Q.   What type of insurance policy was
4    involved in that case?
5        A.   It was an E&O policy.
6        Q.   And were you deposed in your
7    capacity as an employee of AIG in that case?
8        A.   I was the 30(b)(6) witness, so yes.
9        Q.   And the other case that you were
10   deposed in three years ago, what kind of case
11   was that?
12       A.   Actually, now that I think about it,
13   that was probably more than that.  That was
14   more like 2010 or '11.  That was also a
15   coverage case.  I was also a 30(b)(6) witness
16   and yeah.
17       Q.   What type of policy was involved in
18   that case?
19       A.   I don't remember.  I don't remember.
20       Q.   Have you ever testified at trial?
21       A.   Once.
22       Q.   When was that?
23       A.   That was about a year-and-a-half or
24   two years ago in Maryland.  Yeah.

Page 8

M. Conboy

1        Q.   What kind of case was that?
2        A.   That was -- it was either a D&O or
3    an E&O policy.  I can't remember.
4        Q.   Was that a case where the
5    policyholder was suing AIG?
6        A.   Yes.
7        Q.   Do you recall the outcome of that
8    case?
9        A.   We won at trial and -- well, we won
10   at trial.
11       Q.   Do you recall the caption or the
12   name?
13       A.   The plaintiff is The Fund for
14   Animals.
15       Q.   So sounds like you have done this
16   before a couple of times, but just some quick
17   ground rules.
18           First, the court reporter can't
19   record your answers if we are both talking at
20   the same time.  So if you wait until I finish
21   my question, I will try to wait until you
22   finish your answer.
23           If you can make all your answers
24   verbal as well.  The court reporter can't take

Page 9

M. Conboy

1    down head nods.  If anything I say is unclear,
2    please don't hesitate to ask me to clarify the
3    question.  If you answer, I'll assume that you
4    understood.
5            And finally, we can take a break at
6    any time.  I just ask that if a question is
7    pending that you answer the question before we
8    take the break.  I also plan to take breaks
9    about every hour or so for the court reporter
10   and for all of us, but if there's any time you
11   want to, please let me know.
12           Is there any reason that you cannot
13   testify truthfully and accurately today?
14       A.   No.
15       Q.   Let's start with talking a little
16   bit about your educational background.  Did you
17   attend college?
18       A.   Yes.
19       Q.   And what school?
20       A.   St. Bonaventure.
21       Q.   What year did you graduate?
22       A.   '82.
23       Q.   What was your --
24       A.   I was a business major.

Page 34

M. Conboy

1   M. Conboy
2   Dan Sweeny attaches an April 23rd, 2008, e-mail
3   from Steve Ficon, correct?
4        A.   Yes.
5        Q.   Do you know who Steve Ficon is?
6        A.   I know he's at Crowley or was at
7   Crowley, at least this time.
8        Q.   When you received the April 25th
9   notice letter, do you recall also receiving the
10  April 23rd e-mail?
11       A.   I don't have a recollection of this
12  April 23rd e-mail, but it's mentioned in the
13  April 25 letter.
14       Q.   And the April 23rd e-mail mentions
15  an attached subpoena and warrant, do you recall
16  receiving those when you received this notice?
17       A.   I recall seeing the search warrants.
18  I don't recall exactly when I saw the subpoena,
19  but I do recall the search warrant.
20       MS. GARRISON:   We'll have the court
21  reporter mark Exhibit 3.
22       (Plaintiff's Exhibit 3, an e-mail
23       from Edward Conlon dated May 12, 2008,
24       Bates stamped NU002780 through NU002782,
25       marked for identification, as of this

Page 35

M. Conboy

1   M. Conboy
2   date.)
3   BY MS. GARRISON:
4        Q.   Ms. Conboy, do you recognize the
5   document that has been marked as Exhibit 3?
6        A.   It's an e-mail that I received from
7   Edward Conlon on May 12, 2008.
8        Q.   And who is Edward Conlon?
9        A.   I don't know.  I don't remember him.
10  Well, his -- the e-mail says he was a claims
11  analyst in the D&O group, but...
12       Q.   And he says in the e-mail that, "The
13  Claim No. 313-34345 has been transferred to you
14  for handling," is that correct?
15       A.   I see that.
16       Q.   Does that refresh your recollection
17  on approximately when you first received the
18  claim?
19       A.   No, because I think there were two
20  claim files.  Each on a different policy, so I
21  don't recall which is which.  Whichever one
22  this one was, it looks like it was assigned to
23  him first, but I don't know which file this is.
24       Q.   And do you know why it would have
25  been transferred to you?

Page 36

M. Conboy

1   M. Conboy
2        A.   I'm guessing because I had the other
3   one that came in.  That's -- it's a guess.
4        Q.   Okay.  And is it your recollection
5   that there were two claim numbers because there
6   were two different policies potentially
7   involved?
8        A.   There were two policies.
9        Q.   And this May 12th, 2008, e-mail
10  forwards a May 7, 2008, e-mail from Steve Ficon
11  to Edward Conlon; do you see that?
12       A.   Yeah.
13       Q.   In the second to the last line of
14  Mr. Ficon's e-mail he states, "If there are
15  ever any AIG litigation management guidelines
16  or billing formats that should allowed, I would
17  suggest sending them directly to counsel."
18       Do you see that?
19       A.   No.
20       Q.   Sorry, it's starting in the third to
21  last line of Mr. Ficon's e-mail.
22       A.   Oh, I see it.  Okay.
23       Q.   Do you recall whether AIG ever sent
24  any litigation management guidelines or billing
25  formats to any of the counsel representing the

Page 37

M. Conboy

1   M. Conboy
2   insurance in this case?
3        A.   I don't believe any were sent
4   because the coverage was denied.
5        Q.   And is it AIG's practice that when
6   coverage is denied they don't send litigation
7   management guidelines or billing formats?
8        A.   Yes.
9        Q.   When AIG denies coverage, do they
10  expect their insurance to continue to send them
11  billing invoices from the underlying case?
12       A.   No.
13       MS. GARRISON:   Mark this number
14  four, please.
15       (Plaintiff's Exhibit 4, an e-mail
16       from William Nagy and litigation management
17       to Ms. Conboy dated May 16, 2008, Bates
18       stamped NU002774, marked for
19       identification, as of this date.)
20  BY MS. GARRISON:
21       Q.   Ms. Conboy, do you recognize the
22  document that's been marked as Exhibit 4?
23       A.   Yes.
24       Q.   What do you recognize it to be?
25       A.   It's an e-mail from William Nagy and

M. Conboy

1  litigation management to me dated May 16, 2008.
2  
3      Q.   And there's some handwritten notes
4  on the document; is that your handwriting?
5      A.   Yes.
6      Q.   Are these notes that you recall
7  taking?
8      A.   I don't recall taking them, but I --
9  it's my handwriting.
10     Q.   Do you recall whether these notes
11 were taken in connection with a phone call with
12 someone from Crowley?
13     A.   I don't remember the phone call with
14 Steve Ficon, but these are clearly notes that I
15 took from a phone call with Steve Ficon.
16     Q.   On the right-hand side of the page
17 there's some sort of bullet points, the first
18 one being a handwritten note, "No indictment;"
19 do you see that?
20     A.   Yeah.
21     Q.   And the one below it says,
22 "Indication specific targets;" do you see that?
23     A.   Right.
24     Q.   Do you recall having a telephone
25 conversation with Steve Ficon about certain

M. Conboy

1  individuals being specific targets?
2      A.   Again, I don't remember talking to
3  him, but clearly it appears that he told me
4  these things.
5          MS. GARRISON:  We'll have the court
6      reporter mark Exhibit 5.
7          (Plaintiff's Exhibit 5, a May 22,
8      2008, e-mail from Steve Ficon to Ms.
9      Conboy, Bates stamped CROW002473 through
10     CROW002476, marked for identification, as
11     of this date.)
12 BY MS. GARRISON:
13     Q.   Ms. Conboy, do you recognize the
14 document that has been marked as Exhibit 5?
15     A.   It's a May 28 -- or I'm sorry,
16 May 22, 2008, e-mail from Steve Ficon to me.
17     Q.   And in his e-mail to you Steve Ficon
18 states, "Maureen, thanks for taking the time to
19 discuss this matter."
20         Do you recall whether this statement
21 is referring to a phone call you had with
22 Mr. Ficon?
23     A.   I think it's referring to the phone
24 call that we just talked about that's reflected

M. Conboy

1  in my handwritten notes on the May 16th e-mail.
2      Q.   And in Mr. Ficon's e-mail he states,
3  "Attached find indemnity clause from Crowley
4  Maritime Corporations By-Laws.  And I also
5  scanned an article from Lloyd's list."
6          Do you see that?
7      A.   Yes.
8      Q.   Do you recall whether you asked
9  Mr. Ficon to provide the indemnity clause from
10 Crowley's By-Laws?
11     A.   Again, I don't recall the specifics
12 of the conversation, but my notes from the
13 conversation earlier shows that he told me that
14 they were not going to indemnify -- I believe
15 it says that.  Yea, that there was several
16 people that they were not going to indemnify.
17 So it appears I asked him for documentation on
18 that.
19     Q.   Mr. Ficon also attached an article
20 dated May 7, 2008, do you recall receiving this
21 article from Mr. Ficon?
22     A.   I don't remember getting it, but it
23 appears to have come from the claim file.
24         MS. GARRISON:  We'll have the court

M. Conboy

1  reporter mark Exhibit 6.
2          (Plaintiff's Exhibit 6, a coverage
3      letter that Ms. Conboy wrote to Steve Ficon
4      at Crowley on May 27th, 2008, Bates stamped
5      CROW001173 through CROWW001176, marked for
6      identification, as of this date.)
7  BY MS. GARRISON:
8      Q.   Ms. Conboy, do you recognize the
9  document marked as Exhibit 6?
10     A.   Yes, it's a coverage letter that I
11 wrote to Steve Ficon at Crowley on May 27th,
12 2008.
13     Q.   Do you recall writing this letter at
14 or around the time of the date on this letter
15 May 27th, 2008?
16     A.   Yes.
17     Q.   Is sending coverage letters like
18 this May 27th, 2008, letter to your insureds a
19 regular practice -- was it a regular practice
20 of yours as a claims director at AIG?
21     A.   Yes.
22     Q.   And are coverage letters like this
23 kept by AIG in their claims files in the
24 regular course of their business?

**Doc. 36-30**

# EXHIBIT CC

1

2          IN THE UNITED STATES DISTRICT COURT
         FOR THE MIDDLE DISTRICT OF FLORIDA
3              JACKSONVILLE DIVISION

4
    CROWLEY MARITIME CORPORATION,)
5                                )
                 Plaintiff       ) Case No.:
6                                ) 3:16-cv-010110TJC-JBT
                                 )
7              v.                )
                                 )
8   NATIONAL UNION FIRE INSURANCE)
    COMPANY OF PITTSBURGH, PA.,   )
9                                )
                 Defendant.      )
10  -----------------------------

11

12

13

14         DEPOSITION OF MICHELE GRAFFEO

15              New York, New York

16            Friday, March 17, 2017

17

18

19

20

21

22

23

24  Reported by: Lisa M. Muraco

25  Job No: 121003

Page 2

```
 1
 2
 3                    March 17, 2017
 4                    9:45 a.m.
 5
 6
 7          Deposition of MICHELE GRAFFEO, held
 8   at the offices of REED SMITH, 599
 9   Lexington Avenue, New York, New York,
10   before Lisa M. Muraco, a Notary Public of
11   the State of New York.
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
 1
 2          IT IS HEREBY STIPULATED AND AGREED
 3   by and between the attorneys for the
 4   respective parties herein, that filing and
 5   sealing be and the same are hereby waived.
 6          IT IS FURTHER STIPULATED AND AGREED
 7   that all objections, except as to the form
 8   of the question, shall be reserved to the
 9   time of the trial.
10          IT IS FURTHER STIPULATED AND AGREED
11   that the within deposition may be sworn to
12   and signed before any officer authorized
13   to administer an oath, with the same
14   force and effect as if signed and sworn to
15   before the Court.
16
17
18
19                    - oOo -
20
21
22
23
24
25
```

Page 3

```
 1
 2   A P P E A R A N C E S :
 3
 4
 5      REED SMITH
 6      Attorneys for Plaintiff
 7         10 South Wacker Drive
 8         Chicago, IL 60606
 9      BY:  EMILY GARRISON, ESQ.
10
11
12      PEABODY & ARNOLD
13      Attorneys for Defendant
14         600 Atlantic Avenue
15         Boston, MA 02210
16      BY:  MICHAEL DUFFY, ESQ.
17
18
19
20
21
22
23
24
25
```

Page 5

```
 1               M. Graffeo
 2   M I C H E L E  G R A F F E O,
 3      called as a witness, having been duly sworn
 4      by a Notary Public, was examined and
 5      testified as follows:
 6   EXAMINATION BY
 7   MS. GARRISON:
 8      Q.   State your name for the record,
 9   please.
10      A.   Michele Graffeo.
11      Q.   Good morning, Ms. Graffeo.  For the
12   record, my name is Emily Garrison and I am one
13   of the attorneys representing the plaintiff,
14   Crowley Maritime Corporation, in this case.
15   Thank you for being available today.
16          Can you state your current
17   residential address for the record?
18      A.   It's 34 Ritchie, R-i-t-c-h-i-e,
19   Drive, Yonkers, New York.
20          MS. GARRISON:  I am going to have
21   the court reporter mark Exhibit 1 and 2.
22          (Plaintiff's Exhibit 1, Michelle
23   Graffeo's Notice of Deposition, marked for
24   identification, as of this date.)
25          (Plaintiff's Exhibit 2, Crowley's
```

M. Graffeo
1
2     Q.    Did you speak with Mr. Rosenblum
3  about the strategy of the case?
4     A.    We discussed his role in the case, I
5  discussed his role in the case.
6     Q.    With Mr. Rosenblum?
7     A.    Excuse me?
8     Q.    Sorry, I didn't mean to -- go ahead.
9     A.    I am fine.
10     Q.    You discussed Mr. Rosenblum's role
11  with Mr. Rosenblum?
12     A.    Yes, I had previously discussed
13  Mr. Rosenblum's role in the case with Terry
14  Reed.
15     Q.    Were Mr. Farmer's attorneys directed
16  to submit their invoices directly to you?
17     A.    That's correct.
18     Q.    Were you the person responsible for
19  approving payment of those invoices?
20     A.    Yes, that's correct.
21     Q.    Mr. Farmer hired local counsel in
22  Puerto Rico, also Joseph Laws, were you
23  responsible for approving his invoices?
24     A.    Yes, I was.
25     Q.    Did you ever speak to Mr. Laws?

M. Graffeo
1
2     A.    I don't believe I did.
3         MR. DUFFY:  Off the record.
4         (Discussion held off the record.)
5  BY MS. GARRISON:
6     Q.    Did National Union independently
7  hire any attorneys to oversee the defense of
8  Mr. Farmer in the DOJ lawsuit?
9     A.    No.
10     Q.    Do you recall about how often you
11  spoke to Mr. Reed?
12     A.    I would say maybe half a dozen
13  times.
14     Q.    Did National Union appoint anyone to
15  attend Mr. Farmer's trial in Puerto Rico?
16     A.    No.
17     Q.    Did National Union have anyone
18  reviewing the transcripts from the trial in
19  Puerto Rico?
20     A.    No.
21     Q.    After the trial was over, do you
22  recall receiving a letter from Steve Ficon with
23  a search warrant affidavit or -- sorry, strike
24  that -- informing you that the search warrant
25  affidavit had been unsealed?

M. Graffeo
1
2     A.    Yes, I did.  I believe I received
3  that letter some time in the summer of 2015.
4     Q.    Were you still the claims handler
5  assigned to the case at that time?
6     A.    Yes.
7     Q.    Are you still the claims handler
8  assigned to the case?
9     A.    Yes -- well, at this point it's up
10  in coverage.
11     Q.    So did it go back to coverage when
12  the lawsuit in this case was filed?
13     A.    Yes, that's correct.
14     Q.    Just generally, once a claim goes to
15  the coverage group, do you have any further
16  involvement?
17     A.    No, unless I am deposed.
18         MS. GARRISON:  I am going to have
19  the court reporter mark Exhibit 3.
20         (Plaintiff's Exhibit 3, a letter
21  from AON to AIG dated April 25th, 2008,
22  Bates stamped CROW001169 through
23  CROW001172, marked for identification, as
24  of this date.)
25  BY MS. GARRISON:

M. Graffeo
1
2     Q.    Ms. Graffeo, do you recognize the
3  document that has been marked as Exhibit 3?
4     A.    Yes, I do.
5     Q.    What do you recognize it as?
6     A.    I recognize this as a letter from
7  AON dated April 25, 2008, to a claims manager,
8  the insured is Crowley Maritime Corporation and
9  the policy number is 0665799 and it pertains to
10  DOJ FBI investigation.
11     Q.    And the AON letter attached is a
12  April 23, 2008, e-mail from Steve Ficon; is
13  that correct?
14     A.    Yes, that's correct.
15     Q.    Do you know who Steve Ficon is?
16     A.    Yes, I do.
17     Q.    Who do you understand Steve Ficon to
18  be?
19     A.    I believe he's a VP at Crowley.
20     Q.    Prior to Crowley's letter in 2015
21  informing you that the search warrant affidavit
22  was unsealed, did you ever speak with
23  Mr. Ficon?
24     A.    Yes, I did.
25     Q.    When was that?

Page 34

M. Graffeo

1             M. Graffeo
2    A.  Well, I did speak with him in
3 November of -- I did -- I had a face-to-face
4 meeting Mr. Ficon in 2000, I believe it was
5 2015. I did have conversations with Mr. Ficon
6 prior to that.
7    Q.  Do you recall ever having a
8 conversations with Mr. Ficon prior to Crowley
9 filing the arbitration demand in 2012?
10    A.  I don't recall. I know there was
11 correspondence that I had with him.
12    Q.  Turning to the April 25th letter
13 from AON, this letter comes from a Dan Sweeny
14 at AON.
15        Do you know who Dan Sweeny is?
16    A.  I see that he signed the letter. I
17 don't know who he is personally.
18    Q.  And the second paragraph of the
19 first page of the letter on the last sentence,
20 Mr. Sweeny states, "If there are any litigation
21 management guidelines with which you request
22 the insured's comply, please forward a copy of
23 those guidelines at your earliest convenience."
24        Prior to Mr. Farmer's indictment in
25 2013, do you know if AIG ever forwarded

Page 35

M. Graffeo

1             M. Graffeo
2 litigation management guidelines to Crowley or
3 any of --
4    A.  I do not think that we would have
5 sent guidelines before 2013 because this matter
6 wasn't a claim and we had denied coverage.
7    Q.  Do you recall whether litigation
8 guidelines were sent to Mr. Farmer's counsel
9 after the indictment or after the March 2013
10 letter?
11    A.  I believe that they were.
12    MS. GARRISON: I will have the court
13    reporter mark Exhibit 4.
14    (Plaintiff's Exhibit 4, a letter
15    from Mr. Ficon to Edward Conlon dated May
16    7th, 2008, Bates stamped CROW002470 through
17    CROW002472, marked for identification, as
18    of this date.)
19 BY MS. GARRISON:
20    Q.  Actually, I apologize, before we get
21 to Exhibit 4 if you could go back to Exhibit 3
22 for a second.
23    Do you recall if this letter and the
24 attached e-mail was something that you would
25 have reviewed when you took over the handling

Page 36

M. Graffeo

1             M. Graffeo
2 of Crowley's claim in November of 2009?
3    A.  Yes, I would have reviewed it and I
4 did.
5    Q.  Okay. Sorry, you can go back to
6 Exhibit 4 now. We will go back to Exhibit 3 if
7 you want to put it somewhere.
8    Have you seen the document marked as
9 Exhibit 4 before?
10    A.  Yes, I have.
11    Q.  Was this one of the correspondence
12 that you would have reviewed when you took over
13 the file in November 2009?
14    A.  Yes, that's correct.
15    Q.  In this correspondence, similar to
16 AON's letter, Mr. Ficon asks if there are any
17 AIG litigation management guidelines or billing
18 formats which should be filed; do you see that?
19    A.  Yes, I do.
20    Q.  Prior to March 2013, it's your
21 understanding that National Union didn't -- or
22 AIG didn't provide any litigation management
23 guidelines to Crowley or the individual
24 lawyers?
25    A.  In the light of the fact that there

Page 37

M. Graffeo

1             M. Graffeo
2 was a denial, I don't believe that any
3 guidelines were forwarded to Mr. Ficon.
4    MS. GARRISON: Can we take a
5    two-minute break?
6    (Recess is taken.)
7 BY MS. GARRISON:
8    MS. GARRISON: I'm going to have the
9    court reporter mark Exhibit 5.
10    (Plaintiff's Exhibit 5, a letter to
11    Mr. Ficon from Maureen Conboy dated May
12    27th, 2008, Bates stamped CROW001173
13    through CROW001176, marked for
14    identification, as of this date.)
15 BY MS. GARRISON:
16    Q.  Ms. Graffeo, do you recognize the
17 document marked Exhibit 5?
18    A.  Yes, I do.
19    Q.  What do you recognize it to be?
20    A.  I recognize it as a letter that was
21 written. It was dated May 7th of 2008 -- I
22 mean, May 27th, 2008, signed by Maureen Conboy
23 to Crowley Maritime Corporation in reference to
24 the DOJ/FBI investigation and addressed to
25 Steve Ficon at Crowley Maritime Corporation.

```
 1              M. Graffeo
 2      Q.   At this time, May 2008, you weren't
 3  at AIG, correct -- no, you were back at AIG?
 4      A.   I was back at AIG.
 5      Q.   You wouldn't have any involvement in
 6  drafting this letter, right?
 7      A.   Right, right.
 8      Q.   You took the file over in
 9  November 2009?
10      A.   Yes, I did.
11      Q.   Do you know what steps National
12  Union took to investigate between the coverage
13  of the first notice April 25, 2008, and this
14  May 27th, 2008, letter?
15      A.   Well, I would assume Maureen would
16  have looked at the -- would have looked at the
17  four corners of the information that she had
18  received, and also would have looked within the
19  four corners of the policy and made a
20  determination that there was no coverage under
21  the circumstances and the materials that had
22  been provided.  And would be issued a denial
23  letter and therefore no further investigation
24  would be necessary.
25      Q.   If you could turn back to the
```

```
 1              M. Graffeo
 2  document that has marked been Exhibit 3.
 3          Turn to the April 23rd e-mail from
 4  Steve Ficon, attached to letter in the second
 5  paragraph it starts on Thursday April 17, 2008,
 6  the last sentence of the paragraph, "The
 7  charges may have led to the subpoena and search
 8  warrants are sealed at this point in time and
 9  no indictments have been filed."
10          Have you seen that?
11      A.   Yes, I do.
12      Q.   Do you recall reviewing this
13  statement when you took the file over in
14  November 2009?
15      A.   Yes, I did see it.
16      Q.   Did you ever ask Mr. Ficon what he
17  meant by this statement?
18      A.   No, I didn't.
19      Q.   Did you ever talk to any criminal
20  lawyers or lawyers specializing in criminal law
21  about this statement?
22      A.   No, I did not.
23      Q.   It's your understanding that this
24  matter involves an ongoing, or now over,
25  investigation into alleged price fixing,
```

```
 1              M. Graffeo
 2  correct?
 3      A.   Yes, I understood that.
 4      Q.   Are you aware that it's regular
 5  practice for the Department of Justice to
 6  request an affidavit supporting a search
 7  warrant is filed under a seal during an ongoing
 8  investigation?
 9      A.   I know it's necessary, in order for
10  a search warrant to be issued, to have an
11  affidavit to support the facts for the issuance
12  of a search warrant.
13      Q.   Are you aware that it's typical for
14  the government to -- for the government to ask
15  that an affidavit be filed under seal?
16      A.   Yes.
17      Q.   And that's what happened in this
18  case, correct?
19      A.   That's correct.
20      Q.   Did AIG ever ask Mr. Ficon for a
21  copy of the under-seal affidavit that's
22  mentioned in this e-mail, or under-seal charges
23  mentioned in this e-mail?
24      A.   I cannot say as to 2008, but I don't
25  believe that they did.  Because based on the
```

```
 1              M. Graffeo
 2  information that we had received to date, there
 3  was a denial.
 4      Q.   As of 2009 when you took over the
 5  claim, you did not ask for a copy of the
 6  affidavit, did you?
 7      A.   No, I did not.
 8      Q.   Did National Union investigate if it
 9  was possible to obtain a copy of affidavit?
10      A.   We did not have a duty to
11  investigate whether there was a copy because we
12  had denied coverage at that time.
13      Q.   Is it your understanding that
14  National Union did not do an investigation?
15      A.   We did not -- well, I did not from
16  the point that I handled the claim I did not do
17  a further investigation because it wasn't
18  necessary because the claim was denied.
19      Q.   You didn't see any investigation
20  done in the file that you reviewed when you
21  took over the claim?
22      A.   No -- just repeat the question
23  again.
24      Q.   You didn't see any investigation
25  into the possibility of obtaining the copy of
```

Page 70

```
 1              M. Graffeo
 2    additional information for our review.
 3        Q.   Did National Union ever withdraw the
 4    position that it was treating Crowley in 2008
 5    in the notice of circumstances?
 6        A.   We never withdrew that it was a
 7    notice of circumstance until March 2013. We
 8    received the plea agreement and upon that we
 9    made a determination that it was a claim. At
10    no time before that was this matter a claim,
11    and we continued to obtain there was a notice
12    of circumstance.
13           MS. GARRISON: I will have the court
14    reporter mark Exhibit 13.
15           (Plaintiff's Exhibit 13, a letter
16    signed by Mr. Ficon from Crowley to Maureen
17    Conboy dated July 30th, 2010, Bates stamped
18    CROW002277 through CROW 002278, marked for
19    identification, as of this date.)
20           (Witness complies.)
21    BY MS. GARRISON:
22        Q.   Ms. Graffeo, do you recognize the
23    document that has been marked as Exhibit 13?
24        A.   Yes, I do.
25        Q.   What do you recognize it to be?
```

Page 71

```
 1              M. Graffeo
 2        A.   It's a letter signed by Mr. Ficon
 3    from Crowley to Maureen Conboy dated July 30th,
 4    2010.
 5        Q.   And as of this date, it was actually
 6    you who was handling the claim, correct?
 7        A.   That's correct.
 8        Q.   You hired coverage counsel?
 9        A.   Correct.
10        Q.   Would this letter, even though it
11    was addressed to Maureen Conboy, eventually
12    have found its way to you?
13        A.   Yes, it did.
14        Q.   Do you recall reviewing it around
15    July 30, 2010?
16        A.   Yes, I did.
17        Q.   I don't have all of the attachments
18    here, but the last sentence of the first page
19    states, "I am enclosing herewith documentation
20    which substantiates the additional defense
21    costs that have been incurred since my most
22    recent submission of defense counsels'
23    invoices."
24           Do you see that?
25        A.   Yes.
```

Page 72

```
 1              M. Graffeo
 2        Q.   Do you recall receiving invoices
 3    from Crowley around July 30, 2010?
 4        A.   Yes, I did.
 5        Q.   Did you review any of those invoices
 6    at that time?
 7        A.   No, I did not. Since this matter
 8    was not a claim, and we had denied coverage,
 9    and we were not paying any of its costs.
10        Q.   As we have discussed previously, at
11    some point National Union did begin advancing
12    defense costs?
13        A.   Yes, that's correct.
14        Q.   And that was in about March 2013?
15        A.   March. I believe it was March, or
16    February. I know that he was indicted in March
17    and the plea agreement was either in the
18    beginning of March or sometime in February, but
19    I'm -- it was around -- as I said, it was
20    triggered once the -- we received the plea
21    agreement that indicated that Mr. Farmer was a
22    person who was being charged by the Department
23    of Justice.
24        Q.   Prior to that time, did National
25    Union ever ask to participate in the defense of
```

Page 73

```
 1              M. Graffeo
 2    the Department of Justice's investigation of
 3    Mr. Farmer or any other individual?
 4        A.   No, since it was not a claim.
 5        Q.   Prior to that time, March or
 6    February 2013, did National Union ask to be
 7    advised of defense efforts by Mr. Farmer's
 8    attorneys?
 9        A.   I'm not quite sure what you mean.
10        Q.   Let me rephrase that. Prior to
11    March 20, 2013, did National Union ever ask to
12    be advised of defense counsel strategies for
13    Mr. Farmer?
14        A.   No, we had not since we were not
15    covering the matters since it was not a claim
16    at that point, but we continued to ask for any
17    information -- for additional information that
18    they had.
19        Q.   In your time working at AIG, have
20    you dealt with any other scenarios like this
21    one where the insured asserted a claim was
22    made, but a document related to that claim was
23    filed under seal?
24           MR. DUFFY: Objection.
25        A.   I don't recall having -- I think
```

19 (Pages 70 to 73)

# Doc. 36-31

# EXHIBIT DD

**EXHIBIT**
Plaintiff's 19
3|17|17   L.M.

**PEABODY & ARNOLD** LLP
COUNSELLORS AT LAW

FEDERAL RESERVE PLAZA
600 ATLANTIC AVENUE, BOSTON, MA 02210-2261
(617) 951-2100  FAX (617) 951-2125

BOSTON, MA   PROVIDENCE, RI

MICHAEL P. DUFFY
(617) 951-2002
mduffy@peabodyarnold.com

October 16, 2015

***VIA FIRST CLASS MAIL***

Terrance G. Reed, Esq.
Lankford & Reed, P.L.L.C
120 N. St. Asaph Street
Alexandria, VA 22314

> ***Re:*** ***United States v. Thomas L. Farmer***
> **District of Puerto Rico Case No.: 3:13-cr-162-DRD**
> **Crowley Liner Services Claim No. 367-004291**

Dear Mr. Reed:

As you know, we represent National Union Fire Insurance Company of Pittsburgh, Pa. ("National Union") and AIG Domestic Claims, Inc. ("AIG") in connection with the above matter. We are in receipt of the following invoices from your firm:

- Invoice for work completed through November 30, 2015;

- Invoice for work completed through December 31, 2015;

- Invoice for work completed through January 31, 2015;

- Invoice for work completed through February 28, 2015;

- Invoice for work completed through March 31, 2015;

- Invoice for work completed through April 30, 2015; and

- Invoice for work completed through May 10, 2015.

National Union has issued payment in the amount of $722,516.61. You should be receiving the payment shortly. Below are charts of time entries that have been deducted by AIG, and the reasons for the deductions.

PEABODY & ARNOLD LLP
Terrance G. Reed, Esq.
October 16, 2015
Page 2

**Invoice through February 28, 2015**

| Date | Description | Reason for Deduction | Amount Deducted |
|---|---|---|---|
| 2/16/15 | Maritime Expert | Vague | $550.00 |
| 2/16/15 | Preparation and conference call with trial team on 142 jury panel | Excessive/double coverage | $4,100.00 |
| 2/18/15 | Maritime expert work | Vague | $1,050.00 |
| 2/24/15 | Trial postponement issues | Vague | $350.00 |
| 2/9/15 | General analysis of jurors spreadsheet (by paralegal) | Vague | $800.00 |
| 2/10/15 | General analysis of jurors spreadsheet (by paralegal) | Vague | $800.00 |
| 2/11/15 | General analysis of jurors spreadsheet (by paralegal | Vague | $600.00 |
| 2/19/15 | Peter Baci witness binder review (by paralegal) | Vague | $200.00 |
| 2/20/15 | Greg Glova witness binder review (by paralegal) | Vague | $200.00 |
| **TOTAL:** | | | **$8,650.00** |

**Invoice through March 31, 2015**

| Date | Description | Reason for Deduction | Amount Deducted |
|---|---|---|---|
| 3/28/15 | Prepare list of charts | Clerical work | $250.00 |
| 3/2/15 | Lists of lists (by paralegal) | Vague | $130.00 |
| **TOTAL:** | | | **$380.00** |

**Invoice through May 10, 2015**

| Date | Description | Reason for Deduction | Amount Deducted |
|---|---|---|---|
| 5/9/15 | Collect and shred documents | Clerical Work | $1,500.00 |
| 4/9/15 | Motions | Vague | $500.00 |
| 4/10/15 | Monitor trial issues | Excessive/duplicative | $500.00 |
| 4/28/15 | Suspended proceedings and defense case | Vague | $1,550.00 |
| 5/8/15 | Jury monitoring | Excessive/duplicative | $1,450.00 |
| **TOTAL:** | | | **$5,500.00** |

The above deductions represent approximately 2% of the total amount billed through the invoices listed above.

PEABODY & ARNOLD LLP
Terrance G. Reed, Esq.
October 16, 2015
Page 3

Please note that nothing herein is a waiver of any terms, conditions, exclusions, or other provisions of the Policy or any other policies of insurance issued by National Union or any of its affiliated companies.  National Union expressly reserves all of its rights under the Policy, as well as at law and in equity, including the right to assert additional defenses to coverage as warranted by the circumstances.

If there is any additional information or argument that you believe National Union and AIG should consider, please let me know.  National Union and AIG will consider any such additional information or argument and respond accordingly.

Very truly yours,

Michael P. Duffy

MPD/

852818_1
9500-94066

M. Graffeo

1
2    Q.   Do you recall how much that
3  retention is?
4    A.   I believe it's 500,000.
5    Q.   Do you recall whether Crowley
6  submitted invoices that it had paid to support
7  amounts going towards erosion of that
8  retention?
9    A.   Yes, they did.
10   Q.   Did you review the invoices that
11 Crowley submitted?
12   A.   Yes, I did.
13   Q.   Do you recall whether National Union
14 took any deductions from those invoices?  And
15 I'm talking now just about the invoices.
16   A.   The part of the retention?
17   Q.   Yeah.
18   A.   I can't recall.
19   Q.   Do you recall whether National Union
20 objected to the format of the invoices that
21 Crowley submitted for purposes of eroding the
22 retention?
23   A.   I don't recall if we did it at that
24 time, but I do know that we did have
25 conversations with Mr. Reed regarding the

M. Graffeo

1
2  format of the invoices.
3    Q.   Do you recall when National Union
4  started actually paying invoices after the
5  retention had been eroded?
6    A.   I believe I had received a letter
7  from Mr. Ficon and said that he had sent
8  559,000 and that's -- which was providing
9  evidence that the retention had been satisfied.
10 And once we received -- we had received
11 invoices, which is proof that he, you know,
12 there were invoices and that once he had told
13 us that he had paid that 500, we started to pay
14 and reimbursed Mr. Crowley for the additional
15 59,000 that he had paid over the retention.
16   Q.   Do you recall approximately when
17 that was?
18   A.   It was either the latter part -- I
19 think it was in 2014, not latter part, the
20 latter part of 2013 or sometime in the
21 beginning of 2014.
22   Q.   Do you recall whether Crowley
23 submitted invoices for work done by Mark
24 Rosenblum in order to erode the $500,000
25 retention?

M. Graffeo

1
2    A.   Yes, they did.  In fact, they had
3  provided me with invoices previously that were
4  attached to the letters.
5    Q.   And National Union continued paying
6  invoices through Mr. Farmer's acquittal in
7  2015; is that correct?
8    A.   That's correct.
9    Q.   Do you recall how much --
10 approximately, how much total National Union
11 paid for Mr. Farmer's lawyers?
12   A.   Approximately, $3 million.  Which is
13 shy of 50,000 under three, so.
14   Q.   Do you recall how much of that
15 amount went to the three different firms
16 Lankford and Reed, Mark Rosenblum and Joseph?
17   A.   The bulk of it went to Mr. Reed.
18 And in addition to paying for the lawyers, we
19 were also paying for any experts or any other
20 witnesses.  So there were additional costs that
21 were not only incurred by the firms.
22   Q.   Would those expert and witness cost
23 be included in that 3 million?
24   A.   Yes, that would be considered
25 defense cost.

M. Graffeo

1
2    Q.   And just to clarify, is the
3  $3 million figure you gave, over --
4    A.   I think it's 2.965.
5    Q.   Okay.  2.965.  That's over the
6  retention?
7    A.   That's over the retention.  That's
8  2.965 million.
9        MS. GARRISON:  I will have the court
10   reporter mark Exhibit 19.
11       (Plaintiff's Exhibit 19, a letter to
12   Mr. Reed from Mr. Duffy dated October 16th,
13   2015, Bates stamped CROW002623 through
14   CROW002625, marked for identification, as
15   of this date.)
16       (Witness complies.)
17 BY MS. GARRISON:
18   Q.   Ms. Graffeo, do you recognize the
19 document marked as Exhibit 19?
20   A.   Yes, I do.
21   Q.   What do you recognize it to be?
22   A.   It's a letter from Mr. Duffy of
23 Peabody & Arnold to Mr. Reed, dated October 16,
24 2015.
25   Q.   And you testified earlier that you

1           M. Graffeo
2   were the claims handler involved during the
3   trial of Mr. Farmer and, you know, after his
4   indictment was Peabody & Arnold also involved
5   during that time?
6       A.   They were my coverage counsel.
7       Q.   Were you -- just to clarify, were
8   you the one that was reviewing the invoices
9   provided by Mr. Farmer's counsel?
10      A.   Yes, that's correct.
11      Q.   This letter contains a payment for
12  700 -- or refers to a payment being made of
13  $722,516.61 for work through May 10, 2015,
14  correct?
15      A.   Right.
16      Q.   And the letter is dated
17  October 2015, correct?
18      A.   That's correct.
19      Q.   Do you recall whether National Union
20  made any additional payments to Terry Reed
21  after October 16th, 2015?
22      A.   I don't recall if this was the last
23  payment we made.
24      Q.   According to this letter there was a
25  payment made at or around October 16, 2015?

1           M. Graffeo
2       A.   Yes, the letter speaks for itself.
3   It indicates we would be issuing a payment.
4       Q.   And is it your understanding that
5   this document is true copy of the letter from
6   Peabody & Arnold to Terry Reed?
7       A.   Yes, it is my understanding that it
8   is.
9       Q.   Would this have been kept in
10  National Union's -- is this kept in the claim
11  file of National Union?
12      A.   Yes, it would be.
13      Q.   The second page of the letter, the
14  bottom states the above -- there's some charts
15  with the deductions and then the very bottom
16  states, "The above deductions represent
17  approximately two percent of the total amount
18  billed through the invoices lists above."  Do
19  you see that?
20      A.   Yes, I do.
21      Q.   Did National Union make deductions
22  to Mr. Reed's invoices other than what is
23  contained in this letter?
24      A.   Based on the invoices that were
25  submitted and that were noted on this list,

1           M. Graffeo
2   those would be the only -- those would be the
3   only reductions that pertained to this the
4   invoice.
5       Q.   Okay.  For invoices submitted prior
6   to the ones included in this letter, do you
7   recall if National Union made deductions on
8   those invoices too?
9       A.   Yes, we did.
10      Q.   And would this statement that the
11  deductions were approximately two percent of
12  total amount billed, is that generally your
13  understanding of the amounts deducted from
14  Mr. Reed's invoices?
15          MR. DUFFY:  Objection.
16      A.   No, I can't say there was always two
17  percent.  Again, it would be reviewing each
18  invoice individually and making a determination
19  as to what was reasonable.
20      Q.   Do you recall whether Mr. Reed ever
21  submitted invoices where National Union
22  deducted more than two percent?
23      A.   I don't recall.
24          MS. GARRISON:  I will have the court
25  reporter mark Exhibit 20.

1           M. Graffeo
2       (Plaintiff's Exhibit 20, a letter to
3   Mr. Rosenblum from Mr. Duffy, Bates stamped
4   NU003040 through NU003044, marked for
5   identification, as of this date.)
6       (Witness complies.)
7       Q.   Ms. Graffeo, do you recognize the
8   document marked as Exhibit 20?
9       A.   Yes, I do.  I recognize it as a
10  letter to Mr. Rosenblum, signed by Mr. Duffy,
11  and dated October 16th, 2015.
12      Q.   The fourth page of this letter
13  there's -- after the tables, at the end of it
14  states, "As of the date of this letter,
15  National Union has paid your firm $187,989.36."
16  Do you see that?
17      A.   Yes.
18      Q.   Is it your understanding that that
19  is approximately -- in addition to the $1,690
20  paid in connection with this letter, is it your
21  understanding that's approximately the amount
22  paid in total to Mr. Rosenblum?
23      A.   I don't know.
24      Q.   Do you recall the amount of invoices
25  that Mr. Rosenblum submitted for payment by

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY service by UPS, postage prepaid of two (2) paper copies of the foregoing Appendix of Appellant (Volume III) upon the following clerk of court, this 30th day of May, 2018:

Clerk of Court
U.S. Court of Appeals for the 11th Circuit
56 Forsyth St., N.W.
Atlanta, Georgia 30303

I HERBY CERTIFY that a true and correct copy of the foregoing Appendix of Appellant (Volume III) was filed with the Clerk of Court using the CM/ECF system which will serve a Notice of Docket Activity on this 30th day of May, 2018 to the following:

Michael P. Duffy
Scarlett M. Rajbanshi
Peabody & Arnold, LLP, 6th Floor
600 Atlantic Ave.
Boston, MA 02210-2261
Email: mduffy@peabodyarnold.com
       srajbanshi@peabodyarnold.com

Stephen Hunter Johnson
Jason Benjamin Bloom
Lydecker Diaz
1221 Brickell Ave 19th Flr
Miami, FL 33131-3240
Email: shj@lydeckerdiaz.com
       jbloom@lydeckerdiaz.com

*/s/ Emily E. Garrison*
**Counsel for Appellant**