No. 18-10953-A

**In The United States Court Of Appeals
For The Eleventh Circuit**

**CROWLEY MARITIME CORPORATION**

*Plaintiff-Appellant,*

v.

**NATIONAL UNION FIRE INSURANCE
COMPANY OF PITTSBURGH, PA.,**

*Defendant-Appellee.*

On Appeal From The Judgment Of The
United States District Court For The Middle District Of Florida
At Civil Action No. 3:16-cv-01011-TJC-JBT

**APPENDIX OF APPELLANT**

**VOLUME IV of IV**

John D. Shugrue
Thomas A. Marrinson
Emily E. Garrison
REED SMITH LLP
10 South Wacker Drive, 40th Floor
Chicago, IL 60606-7507
Telephone: (312) 207-1000
Facsimile: (312) 207-6400
jshugrue@reedsmith.com
tmarrinson@reedsmith.com
egarrison@reedsmith.com

*Counsel for Plaintiff-Appellant*

# INDEX TO APPELLANT'S APPENDIX

**Document Description**                                    **Docket/ Tab #**

## VOLUME I

Civil Docket Sheet for Case No. 3:16-cv-01011 ..............................    A

Crowley's Complaint ........................................................    1

Executive and Organization Liability Insurance Policy Number
061-36-48 .........................................................................    1-1

National Union's Memorandum in Support of its Motion to
Dismiss ............................................................................    16

Crowley's Opposition to National Union's Motion to Dismiss ........    20

Declaration of Steven Ficon in Support of Crowley's Opposition
to National Union's Motion to Dismiss ............................................    20-1

July 22, 2015 Letter from Crowley to National Union (Ex. A to
Doc. 20-1) .........................................................................    20-2

August 3, 2015 Letter from National Union to Crowley (Ex. B to
Doc. 20-1) .........................................................................    20-3

Declaration of Emily Garrison in Support of Crowley's
Opposition to National Union's Motion to Dismiss ..........................    20-4

April 24, 2015 Order Denying Thomas Farmer's Motion to
Suppress (Ex. A to Doc. 20-4) ............................................    20-5

Excerpts from the April 24, 2015 Transcript in the Trial of
Thomas Farmer  (Ex. B to Doc. 20-4) ............................................    20-6

December 6, 2012 Email from E. Garrison to M. Duffy (Ex. I to
Doc. 20-4) .........................................................................    20-13

Reply of National Union In Support of Its Motion to Dismiss ......... 25

National Union's Answer and Affirmative Defenses ....................... 35

Certificate of Service (Volume I)

## **VOLUME II**

Crowley's Supplemental Memorandum in Opposition to National
Union's Motion to Dismiss / For Summary Judgment ..................... 36

Declaration of Emily Garrison in Support of Crowley's
Supplemental Memorandum .............................................. 36-1

Search Warrant Affidavit (Ex. A to Doc. 36-1) ................................ 36-2

Excerpts from the March 16, 2017 Deposition of S. Ficon (Ex. B
to Doc. 36-1) ..................................................... 36-3

Expert Witness Report of William F. Jung (Ex. C to Doc. 36-1) ...... 36-4

April 25, 2008 Notice Letter (Ex. D to Doc. 36-1) ........................... 36-5

May 27, 2008 Letter from M. Conboy to S. Ficon (Ex. E to Doc.
36-1) ............................................................. 36-6

Arbitration Decision and Award (Ex. F to Doc. 36-1) ..................... 36-7

National Union's Motion for Summary Disposition in the
Arbitration (Ex. G to Doc. 36-1) ........................................ 36-8

Excerpts from the Transcript of Proceedings in the Arbitration
(Ex. H to Doc. 36-1) ........................................... 36-9

March 29, 2013 Order in *In the Matter of Search Warrant for
Crowley Liner Services Inc.* (Ex. I to Doc. 36-1) ............................. 36-10

Certificate of Service (Volume II)

# VOLUME III

March 5, 2013 Letter from M. Duffy to T. Reed (Ex. J to Doc. 36-1) ...................................................................................... 36-11

December 9, 2011 Order in *In the Matter of Search Warrant for Crowley Liner Services Inc.* (Ex. K to Doc. 36-1) ............................ 36-12

National Union's Responses to Crowley's First Set of Requests for Admission (Ex. L to Doc. 36-1) .................................................... 36-13

Expert Witness Report of Ty Sagalow (Ex. M to Doc. 36-1) ............ 36-14

Expert Witness Report of Thomas R. Newman (Ex. N to Doc. 36-1) ...................................................................................... 36-15

April 16, 2008 Order in *In the Matter of Search Warrant for Crowley Liner Services Inc.* (Ex. P to Doc. 36-1) ............................ 36-17

June 30, 2008 Letter from T. Reed to M. Conboy (Ex. Q to Doc. 36-1) ...................................................................................... 36-18

Nov. 26, 2008 Letter from S. Ficon to D. Sweeney (Ex. R to Doc. 36-1) ...................................................................................... 36-19

Feb. 2, 2009 Letter from M. Conboy to S. Ficon (Ex. S to Doc. 36-1) ...................................................................................... 36-20

Sept. 30, 2009 Letter from S. Ficon to M. Conboy, including attachments (Ex. T to Doc. 36-1) ...................................................... 36-21

July 18, 2012 Letter from T. Reed to M. Conboy (Ex. U to Doc. 36-1) ...................................................................................... 36-22

May 7, 2008 Email from S. Ficon to E. Conlon (Ex. V to Doc. 36-1) ...................................................................................... 36-23

June 30, 2008 Letter from T. Reed to M. Conboy (Ex. W to Doc. 36-1) ...................................................................................... 36-24

May 22, 2008 email from E. Conlon to M. Conboy (Ex. X to Doc. 36-1) .......................................................... 36-25

June 9, 2010 Letter from E. Joseph O'Neil to C. Dolan (Ex. Y to Doc. 36-1) .......................................................... 36-26

Aug. 12, 2010 Letter from E. Joseph O'Neil to S. Ficon (Ex. Z to Doc. 36-1) .......................................................... 36-27

Aug. 28, 2012 Letter from M. Duffy to R. Reed (Ex. AA to Doc. 36-1) .......................................................... 36-28

Excerpts from the March 3, 2017 Deposition of M. Conboy (Ex. BB to Doc. 36-1).......................................................... 36-29

Excerpts from the March 17, 2017 Deposition of M. Graffeo (Ex. CC to Doc. 36-1).......................................................... 36-30

Oct. 16, 2015 Letter from M. Duffy to T. Reed (Ex. DD to Doc. 36-1) .......................................................... 36-31

Certificate of Service (Volume III)

## VOLUME IV

July 22, 2015 Letter from S. Ficon to M. Graffeo (Ex. EE to Doc. 36-1) .......................................................... 36-32

Aug. 3, 2015 Letter from M. Graffeo to S. Ficon (Ex. FF to Doc. 36-1) .......................................................... 36-33

Aug. 12, 2013 Order from *United States of America v. Thomas Farmer* (Ex. GG to Doc. 36-1) .......................................................... 36-34

Excerpts from the March 8, 2017 Deposition of W. Jung (Ex. HH to Doc. 36-1) .......................................................... 36-35

National Union's Supplemental Memorandum in Support of its Converted Motion for Summary Judgment ...................................... 37

Crowley's Response to National Union's Supplemental
Memorandum ....................................................................................... 40

Declaration of Emily Garrison in Support of Crowley's Response
to National Union's Supplemental Memorandum ............................ 40-1

Excerpts from the March 14, 2017 Deposition of Ty Sagalow (Ex.
A to Doc. 40-1) ................................................................................... 40-2

National Union's Response to Crowley's Supplemental
Memorandum in Opposition to National Union's Motion for
Summary Judgment............................................................................. 43

Transcript of June 20, 2017 Motion Hearing..................................... 49

February 8, 2018 Order....................................................................... 53

February 9, 2018 Judgment................................................................. 54

Certificate of Service (Volume IV)

**Doc. 36-32**

# EXHIBIT EE





July 22, 2015

Michele Graffeo
National Union Fire Insurance Company of Pittsburgh, PA
175 Water Street
New York, New York 10038

RE:   *United States v. Thomas L. Farmer*, Claim No. 367-004291, Policy No. 061-36-48

Dear Ms. Graffeo:

I am writing with regard to recent developments in the above-referenced matter. On May 8, 2015, Tom Farmer was acquitted by a federal jury on charges brought against him by the United States Department of Justice in *United States v. Farmer*, No. 13-0162 (D.P.R.). Following Mr. Farmer's acquittal and dismissal of those charges, Crowley was provided with a copy of the FBI affidavit that was submitted prior to the issuance of the April 16, 2008 search warrant previously provided to National Union. This search warrant affidavit was submitted under seal and until Mr. Farmer's recent acquittal was unavailable to Crowley and National Union.

We have reviewed the search warrant affidavit, and it is clear from its contents that there was in fact a "Claim," as that term is defined in Policy No. 061-36-48 (the "Policy"), asserted with respect to Mr. Farmer as of the date of filing of the search warrant affidavit in April 2008. Because the search warrant affidavit makes clear there was a Claim against Mr. Farmer as of April 2008, Crowley should be reimbursed for all legal fees paid on behalf of Mr. Farmer – totaling $2,541,346.34 (net of the Policy deductible) – prior to National Union's acceptance of coverage in February 2013.

Crowley will be able to provide a copy of the search warrant affidavit to National Union when an appropriate confidentiality agreement is in place. The parties' existing confidentiality agreement is limited in scope to the parties' prior mediation and arbitration. Crowley suggests that rather than starting over with a new agreement, the parties execute an addendum to the existing agreement that covers the search warrant affidavit and our renewed discussions in connection with the search warrant affidavit. I have attached for your review a proposed addendum and a copy of the fully executed confidentiality agreement.

Please indicate National Union's acceptance of the confidentiality addendum by signing where indicated and returning at your earliest convenience.



9487 Regency Square Blvd.
Jacksonville, FL 32225
P: 904.727.2200
crowley.com

CROW002004

One last point, Crowley has received inquiries from two of the law firms representing Tom Farmer (Lankford & Reed, Mark Rosenblum, PA) asking when they can expect payment of outstanding invoices related to their trial and pre-trial work. Some of these invoices are over 90 days past due. Expert and trial witness fees, which National Union instructed be sent directly to National Union, are also outstanding. Your prompt payment of these charges would be appreciated.

Please contact me if you have any questions or would like to discuss this matter. Crowley continues to reserve all of its rights under the Policy and applicable law. Thank you for your anticipated cooperation.

Very truly yours,

*Steve Ficon*

Steven  Ficon
VP, Claims
Enc.                                                                                 Crowley Maritime Corporation

CROW002602

Page 74

1           M. Graffeo
2    this case is unique.  I have worked with cases
3    where there was false -- under the False Claims
4    Act where their complaint was under seal and
5    until it was unsealed that was at the time we
6    would accept coverage.
7        Q.   Like a qui tam case?
8        A.   Qui tam.
9        Q.   And in those circumstances, AIG
10   would accept coverage when the complaint was
11   unsealed?
12       A.   That's correct.  But if we -- once
13   we receive notice that the claim was unsealed.
14       Q.   So if you also receive notice?
15       A.   Right.  So the claim would be
16   determined to be made and noticed at the time
17   it was unsealed.
18       Q.   In any of those qui tam cases that
19   you worked on were there circumstances where
20   the insured knew of the complaint, or was aware
21   that it might exist out there somewhere, but
22   didn't have a copy because it was under seal?
23       A.   Generally we might have been.  Well,
24   I withdraw that.  There were cases where we
25   might have received a letter that they thought

Page 75

1           M. Graffeo
2    there might be an investigation and accepted
3    those as a notice of circumstance.
4        MS. GARRISON:  I will have the court
5    reporter mark Exhibit 14.
6        (Plaintiff's Exhibit 14, a letter
7    from Mr. Ficon, Crowley to Ms. Graffeo
8    dated July 22, 2015, Bates stamped
9    CROW002001 through CROW002602, marked for
10   identification, as of this date.)
11       (Witness complies.)
12   BY MS. GARRISON:
13       Q.   Ms. Graffeo, do you recognize the
14   document that has been marked as Exhibit 14?
15       A.   Yes, it's a letter from Mr. Ficon,
16   Crowley to me, dated July 22, 2015.
17       Q.   In the first paragraph of this
18   letter Mr. Ficon states, "Following
19   Mr. Farmer's acquittal and dismissal of those
20   charges, Crowley would provide a copy of
21   the FBI affidavit that was submitted prior to
22   the issuance of the April 16th, 2008, search
23   warrant previously provided to National Union."
24       Do you see that?
25       A.   Yes.

Page 76

1           M. Graffeo
2        Q.   Prior to receiving Mr. Ficon's
3    letter on the July 22nd, 2015, was National
4    Union aware that the search warrant affidavit
5    that was submitted in connection with the
6    search warrant was unsealed during Mr. Farmer's
7    trial?
8        A.   No, I was not aware of it.
9        Q.   Mr. Ficon does not provide a copy of
10   the search warrant affidavit in this letter,
11   does he?
12       A.   No, he did not.
13       Q.   Did you respond to Mr. Ficon's
14   July 22, 2015, letter?
15       A.   I believe I wrote a letter back to
16   him in the beginning of August 2015.
17       Q.   Do you recall whether you asked
18   Mr. Ficon for a copy of this the search warrant
19   affidavit in that August 2015 letter?
20       MR. DUFFY:  Objection.
21       A.   I don't recall.
22       MS. GARRISON:  I will have the court
23   reporter mark Exhibit 15.
24       (Plaintiff Exhibit 15, a letter that
25   Ms. Graffeo wrote in response to

Page 77

1           M. Graffeo
2    Mr. Ficon's letter in July, this letter is
3    dated August 3rd, 2015, Bates stamped
4    CROW002603 through CROW002605, marked for
5    identification, as of this date.)
6        (Witness complies.)
7    BY MS. GARRISON:
8        Q.   Ms. Graffeo, do you recognize the
9    document marked as Exhibit 15?
10       A.   Yes, I do.  This is the letter that
11   I wrote in response to Mr. Ficon's letter in
12   July and this letter is dated August 3rd, 2015.
13       Q.   Now that you have the letter in
14   front of you, does this refresh your
15   recollection as to whether you asked Mr. Ficon
16   for a copy of the search warrant affidavit in
17   response to this July 22, 2015, letter?
18       A.   I did indicate if there's any
19   additional information or argument that you
20   believe National Union should consider in its
21   coverage analysis, please let me know.
22       Q.   Okay.  Is it fair that you didn't
23   specifically ask?
24       A.   The letter speaks for itself.  I did
25   not specifically ask him for the affidavit, but

# Doc. 36-33

# EXHIBIT FF





AIG Claims, Inc.
32 Old Slip, 21st Floor
New York, NY 10005
www.aig.com

Michele Graffeo
Sr. Complex Claims Director
Directors & Officers
Financial Lines Claims

T  646 857 2169
F  866 878 7228
Michele.Graffeo@aig.com

Correspondence Address:
AIG Property Casualty
Financial Lines Claims
P.O. Box 25947
Shawnee Mission, KS 66225

Email new notices to
c-Claim@aig.com

Fax new notices to
866 227 1750

August 3, 2015

**Via Email at steve.ficon@crowley.com**

Mr. Steven Ficon
Vice President - Claims
Crowley Maritime Corporation
9487 Regency Square Blvd.
Jacksonville, FL 32225

| Re: | Insured: | **Crowley Maritime Corporation ("Crowley")** |
|---|---|---|
| | Matter: | **DOJ/FBI Investigation** |
| | Policy No.: | **061-36-48** |
| | Claim No.: | **367-004291** |

Dear Mr. Ficon:

As you know, AIG Claims, Inc. ("AIG") is the claims administrator handling Claims arising under Policy No. 061-36-48 (the "Policy") issued to Crowley Maritime Corporation ("Crowley") by National Union Fire Insurance Company of Pittsburgh, Pa. ("National Union"). We are writing to respond to your letter of July 22, 2015, in which you advise that Crowley has recently obtained a copy of an FBI Affidavit that was submitted to the court prior to the issuance of the April 16, 2008 search warrant previously provided to National Union. Based on this affidavit, you request that National Union reimburse Crowley for legal fees of $2,541,346.34 which it paid on behalf of Thomas Farmer prior to National Union's acknowledgement of potential coverage in or about February 2013.

National Union has carefully considered the issues raised in your letter. For the reasons stated below, however, we do not believe that National Union is obligated under the terms of the Policy to reimburse Crowley for the fees requested in your letter.

First, National Union and Crowley previously submitted to binding arbitration the question of whether National Union was obligated to reimburse Crowley for the same fees sought in your July 22, 2015 letter. The hearings took place in December 2012. In January 2013, a final award was rendered in favor of National Union, determining that National Union was not obligated to pay such fees. The January 2013 arbitration award has full *res judicata* effect and it precludes any further attempts by Crowley to recover such fees under the Policy.

In addition, an affidavit unsealed and submitted for the first time in 2015 is insufficient on the merits to establish coverage for fees that were incurred starting in 2008. National Union's determination of coverage in 2008 necessarily was based on the materials submitted at that time. Based on the materials submitted, National Union correctly denied coverage for the requested fees. At that time, the DOJ investigation was not a Claim against Mr. Farmer because neither Crowley nor Mr. Farmer was aware of any documents identifying Mr. Farmer as a person who might be charged with a crime and because no such documents were submitted to National Union.



Allowing subsequently revealed documents to retroactively convert a non-Claim into a Claim could potentially wreak havoc for insureds. For example, in the case of a search warrant served before the policy period that was not reported because it did not identify any individuals as persons who could be charged, the rule that you appear to advocate would allow an insurer to argue that the investigation was a Claim all along, *even though nobody knew it*, in which case the insurer could deny coverage on the grounds that the Claim was first made before the start of the policy period. We know of no legal support for such a result.

Basic considerations of fairness dictate that written notice to the Insured is essential to the existence of a Claim. Section 7 of the Policy, entitled Notice/Claim Reporting Provisions, further provides as follows:

> A Claim shall be considered to have been first made against an Insured when written notice of such Claim is received by any Insured, by the Company on the behalf of any Insured or by the Insurer, whichever comes first.

Therefore, there could have been no Claim against Mr. Farmer until such time as Mr. Farmer had written notice of the facts constituting the Claim. Based on our understanding of the evidence, this first occurred at or about the time of his indictment in 2013. Even assuming for present purposes that the affidavit says what you say it says, Mr. Farmer had no knowledge that such was the case until after his acquittal.

Please note that nothing herein is a waiver of any terms, conditions, exclusions, or other provisions of the Policy or any other policies of insurance issued by National Union or any of its affiliated companies. National Union expressly reserves all of its rights under the Policy, as well as at law and in equity, including the right to assert additional defenses to coverage as warranted by the circumstances. With respect to any outstanding bills from Mr. Farmer's defense counsel, those bills are under review and we expect any outstanding issues to be resolved shortly.

If you have any questions or concerns regarding the contents of this letter, please feel free to contact me. If there is any additional information or argument that you believe National Union should consider in its coverage analysis, please let me know. National Union will consider any such additional information or argument and respond accordingly.

Sincerely,

CROW002604



*Michele Graffeo*

Michele Graffeo

CROW002605

Page 78

M. Graffeo

1            M. Graffeo
2   I did invite him to provide information.
3      Q.   Page two of three of your letter,
4 the second paragraph, it states, "Basic
5 considerations of fairness dictate that written
6 notice to the insured is essential to the
7 existence of a claim"; is that correct?
8      A.   Right.
9      Q.   And in that section you have a
10 quoted paragraph from Section 7 of the policy
11 stating, "The claim shall be considered to have
12 been first made against insured when written
13 notice of such claim is received by the
14 insured."
15      Do you see that?
16      A.   Yes, I do.
17      Q.   Have you since learned that this
18 language contained in this letter was not
19 actually contained in the policy at issuance in
20 this case?
21      A.   Yes, I have. It was -- I mistakenly
22 put the incorrect language in here.
23      Q.   And is this language, do you know,
24 contained in the other policy that was issued
25 to Crowley for the approximately same period?

Page 79

1            M. Graffeo
2      A.   That's correct.
3      Q.   And is it your understanding that
4 the policy at issue in this case, which we
5 marked as an exhibit previously, does not
6 contain language similar to that?
7      MR. DUFFY: Objection.
8      A.   The policy speaks for itself, but it
9 is a different definition. This is not
10 included in the policy that you referenced.
11      Q.   Do you know whether the policy at
12 issue in this case requires a written notice of
13 a claim must be received by an insured?
14      MR. DUFFY: Objection.
15      A.   Again, the policy speaks for itself.
16      Q.   Are you able to point to any of
17 language in the policy requiring that the
18 insured received written notice of a claim for
19 coverage to apply?
20      The policy is marked as Exhibit 6 if
21 you want to look at that.
22      A.   The insuring agreement would have
23 required, that in order for a claim to be made
24 against an individual, that the insured would
25 have to know about who would have to have

Page 80

1            M. Graffeo
2 knowledge of that matter.
3      Q.   Okay. Which insuring agreement are
4 you looking at?
5      A.   I am looking at the insuring
6 agreement that's on page 7 of 82.
7      Q.   Are you looking at a specific
8 section; coverage A, or coverage B, or coverage
9 C?
10      A.   I'm looking at the language on the
11 insuring agreement number one.
12      Q.   Okay.
13      A.   And it's actually contained in the
14 other -- it's person shall pay the loss of
15 insured arising from a claim made against such
16 insured person, so that's coverage A. And
17 there's also in this case because we are
18 talking about individual, it's the
19 indemnification of the insured person.
20      Q.   Those insuring provisions that you
21 just pointed to don't use the words -- don't
22 use the word "received", do they?
23      MR. DUFFY: Objection.
24      A.   They don't. The plain and ordinary
25 language of the policy is that in order to have

Page 81

1            M. Graffeo
2 a claim made against an individual they would
3 have to have knowledge of it.
4      Q.   And the word "knowledge" is not
5 actually contained in the policy. I mean, in
6 the insuring provisions you just pointed to,
7 correct?
8      A.   No, it's not contained there, but as
9 I said, the interpretation of this insuring
10 agreement would mean that in order for an
11 individual to have a claim made against them,
12 they would have to knowledge that such claim
13 was made against them.
14      Q.   What is the basis for your statement
15 that the interpretation of the insuring
16 agreement requires knowledge?
17      A.   Well, again, I think it's plain and
18 ordinary language of the reading of the policy.
19      Q.   Is there anything outside of the
20 policy language that informs that position?
21      A.   I think the policy is not ambiguous,
22 it is unambiguous, and I don't -- you can just
23 go within the four corners of the policy
24 requires that a claim be made and, you know, if
25 you would not have knowledge, you would have an

21 (Pages 78 to 81)

Page 82

M. Graffeo

1    issue if you would not require knowledge, you
2    would have an issue of requiring your insureds
3    to provide notice of claims that they didn't
4    even know about. So you would have to have,
5    you know, it would be common sense that would
6    have to have knowledge of the claim, before the
7    claim, you know, in order to make a claim.
8         Q. In this case, is it AIG's
9    understanding that Crowley knew of a Department
10   of Justice investigation as of April 17, 2008,
11   when the search warrant was executed?
12        MR. DUFFY: Objection. That Crowley
13   knew of an investigation?
14        MS. GARRISON: Correct.
15        MR. DUFFY: As of what date?
16        MS. GARRISON: Well, as of
17   April 17th, 2008, which is the date the
18   search warrant was executed.
19        A. I think it's indicated in their
20   letters there was a DOJ investigation.
21        Q. And Mr. Farmer's attorney also sent
22   letters to AIG prior to March 2013, correct?
23        A. Yes, they did.
24        Q. They also indicated that they were

Page 83

M. Graffeo

1    aware of the DOJ investigation?
2         A. They were aware of the DOJ
3    investigation, that's correct.
4         Q. Crowley and Mr. Farmer were aware of
5    the search warrant as of the date that was
6    executed, correct?
7         MR. DUFFY: Objection.
8         A. They were aware that there was an
9    investigation.
10        Q. Going back to the initial notice
11   letter from Crowley, which I think we have
12   marked as Exhibit 3, Crowley also stated in
13   that letter that the charges that may have lead
14   to the subpoena and search warrant.
15        Based on Mr. Ficon's e-mail of
16   April 23, 2008, Crowley was aware at the time
17   that the charges that may have lead to the
18   subpoena and search warrant are sealed at this
19   time; is that fair?
20        MR. DUFFY: Objection.
21        A. The letter speaks for itself.
22        (Recess is taken.)
23        (Question was read back as follows:
24   "QUESTION: Going back to the

Page 84

M. Graffeo

1    initial notice letter from Crowley,
2    which I think we have marked as
3    Exhibit 3, Crowley also stated in
4    that letter that the charges that
5    may have lead to the subpoena and
6    search warrant.
7         Based on Mr. Ficon's e-mail
8    of April 23, 2008, Crowley was aware
9    at the time that the charges that
10   may have lead to the subpoena and
11   search warrant are sealed at this
12   time; is that fair?.")
13   (Answer was read back as follows:
14   "ANSWER: The letter speaks for
15   itself.")
16        MS. GARRISON: I will have the court
17   reporter mark Exhibit 16.
18        (Plaintiff's Exhibit 16, a letter to
19   Ms. Graffeo from Steve Ficon dated
20   September 14th, 2015, Bates stamped
21   CROW002006 through CROW002609, marked for
22   identification, as of this date.)
23        (Witness complies.)
24   BY MS. GARRISON:

Page 85

M. Graffeo

1         Q. Ms. Graffeo, do you recognize the
2    document that's been marked as Exhibit 16?
3         A. Yes, I do. It's letter sent by
4    Mr. Ficon from Crowley to me dated
5    September 14, 2015.
6         Q. Following the Mr. Ficon
7    September 14, 2015, letter, National Union and
8    Crowley participated in an in-person meeting,
9    correct?
10        A. That's correct, in November.
11        Q. At that time Mr. Ficon or Crowley --
12   someone at Crowley provided a copy of the
13   search warrant affidavit, correct?
14        A. I had the opportunity to review it
15   in November. I don't know if I actually
16   received actual copy of it then, but I did have
17   the opportunity to review.
18        Q. And you...
19        A. I did review it at the meeting.
20        Q. And did you ever actually receive a
21   copy of it?
22        A. Wait, I'm sorry, you're talking
23   about the search warrant --
24        Q. The affidavit.

# Doc. 36-34

# EXHIBIT GG

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF PUERTO RICO**

UNITED STATES OF AMERICA,

Plaintiff,

v.

THOMAS FARMER,

Defendant

Criminal No.:13-162 (DRD)

<u>ORDER GRANTING JOINT MOTION FOR AN ORDER PROVIDING</u>
<u>FOR DISCLOSURE AND PROTECTION OF GRAND JURY</u>
<u>AND INVESTIGATIVE MATERIALS</u>

This matter having come before the Court on a Joint Motion for an Order Providing Disclosure and Protection of Grand Jury and Investigative Materials (the "Motion") and good cause appearing therefore, the Motion is hereby **GRANTED** as follows:

1. Attorneys for the United States may disclose to defendant grand jury materials including grand jury transcripts, exhibits, and documents and other materials obtained via grand jury subpoenas that (a) must be disclosed pursuant to the Jencks Act, 18 U.S.C. § 3500; Rules 16 and 26.2 of the Federal Rules of Criminal Procedure; *Brady v. Maryland*, 373 U.S. 83 (1963) and its progeny; *Giglio v. United States*, 405 U.S. 150 (1972) and its progeny; and any discovery order issued by this Court or (b) should be disclosed in the interest of justice and fairness to enable defendant to prepare for trial;

2. Attorneys for the United States may disclose to defendant confidential materials, including investigatory materials from the files of the Department of Justice and Federal Bureau of Investigation, transcripts and audio recordings of consensually monitored telephone

conversations, copies of FBI 302, Defense Criminal Investigative Service (DCIS) Form 1, and other interview memoranda prepared by federal agents and the Department of Justice;

3. Attorneys for the United States may disclose to defendant confidential business information from companies doing business in coastal freight water transportation obtained through search warrants or produced to grand jury subpoenas or cooperation agreements;

4. Except as permitted by Federal Rule of Criminal Procedure 6(e), this Order, or other court order, defendant and his counsel shall not disclose any transcripts or documents (or the contents thereof) described in Paragraphs 1, 2 and 3 above to any third party, provided that, for the sole purpose of preparing for trial:

a. defense counsel may use his knowledge of the transcripts or documents to interview prospective witnesses;

b. defense counsel may show transcripts and documents to defendant, and to all other agents of the defense;

c. defense counsel may show counsel for an individual or company that is a prospective witness documents, other than confidential business records as designated by companies that do business in coastal water freight transportation, a transcript of the prospective witness's sworn testimony, and the portion of a 302, Form 1 or interview memoranda that relates directly to the prospective witness provided that defense counsel shows a copy of the protective order to the prospective witness and his or her own counsel and receives written acknowledgment of receipt of this protective order by the prospective

witness and his or her own counsel;

d. defense counsel may furnish copies of documents described in Subparagraph (c) to counsel for the prospective witness thirty days in advance of a scheduled meeting, provided that defense counsel provides counsel a copy of this protective order and requires return of all documents and copies following the meeting with the prospective witness, and receives written acknowledgment from counsel for the prospective witness of both receipt of this protective order and agreement to return the documents and copies immediately following the meeting;

e. defense counsel may allow secretaries, clerical workers, paralegals and experts retained to assist in the preparation of this case for trial to view the transcripts and documents solely for the purpose of assisting counsel to prepare for the trial of this case; and

f. defense counsel is authorized to disclose produced documents to counsel for Frank Peake, and to review documents subject to the protective order in *United States v. Frank Peake*, No. 11-512, under the terms of this protective order.

5. The parties may apply to the Court for a modification of this Order at any time; and defense counsel may apply ex parte for Court permission to use documents subject to this Order;

6. Each witness or prospective witness to whom transcripts or documents have been shown or their contents disclosed pursuant to Paragraphs 4 and 5 of this Order, shall not discuss with or disclose the contents thereof to anyone other than counsel for the defendant or

his or her counsel, and they shall not be permitted to further disclose such material;

7. Any notes or recorded notations of any kind that defense counsel, his secretaries, clerical workers, paralegals, or experts may make relating to the contents of the transcripts or documents shall not be shown to anyone except his own client or an agent for the defense, and then only for the sole purpose of the defense of this indictment, and defense counsel shall maintain the confidentiality of these materials pursuant to the terms of this Order after this case is disposed of by trial, appeal, if any, or other resolution of the charges against defendant;

8. All transcripts and documents disclosed pursuant to Paragraphs 1, 2 and 3 of this Order and all copies thereof shall either be promptly destroyed or returned to the United States and defense counsel shall maintain the confidentiality of these materials pursuant to the terms of this Order after this case is disposed of by trial, appeal, if any, or other resolution of the charges against defendant;

9. Nothing contained herein shall restrict or prevent any party from offering any materials into evidence or citing any materials in court papers filed in this case; and

10. The government's discovery shall be produced no later than seven days after entry of this Order.

**IT IS SO ORDERED.**

In San Juan, Puerto Rico, this 12th day of August, 2013.

/s/ DANIEL R. DOMÍNGUEZ

DANIEL R. DOMÍNGUEZ
U.S. District Judge

-4-

**Doc. 36-35**

# EXHIBIT HH

1                    UNITED STATES DISTRICT COURT
                       MIDDLE DISTRICT OF FLORIDA
2

3

4     CROWLEY MARITIME CORPORATION,

5              Plaintiff,

6     vs.                          Case No.:  3:16-CV-1011

7

      NATIONAL UNION FIRE INSURANCE
8     COMPANY OF PITTSBURGH, P.A.

9              Defendants.
      - - - - - - - - - - - - - - - - - - - - - - - -\
10

11

                        DEPOSITION OF WILLIAM R. JUNG
12                          Volume I of I
                            (Pages 1-122)
13

14

                            March 8, 2017
15                    12:30 p.m. -- 3:08 p.m.
                      U.S. Legal Support, Inc.
16          4350 West Cypress Street, Suite 701
                      Tampa, Florida 33607
17

18

19

20

21

                      Stenographically Reported by:
22                      BALINDA J. WALKER, FPR
                      Florida Professional Reporter
23

24

25

Page 2

```
 1   APPEARANCES:
 2   On Behalf of Plaintiff:
 3   REED SMITH, LLP
     10 South Wacker Drive
 4   Chicago, Illinois  60606-7507
     (312) 207-3917
 5   BY:  EMILY E. GARRISON, ESQUIRE
     egarrison@reedsmith.com
 6
 7
 8
 9   On Behalf of Defendant:
10   LYDECKER DIAZ, P.A.
     1221 Brickell Avenue   19th Floor
11   Miami, Florida  33131
     (305) 416-3180
12   BY:  JASON BLOOM, ESQUIRE
     jbloom@lydeckerdiaz.com
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1              INDEX OF PROCEEDINGS
 2                                          PAGE
 3   Direct Examination by Mr. Bloom           4
 4   Cross-Examination by Ms. Garrison       114
 5   Stipulations                            118
 6   Certificate of Oath                     119
 7   Reporter's Certificate                  120
 8   Signature of Witness                    122
 9
10
11
12                   EXHIBITS
13   EXHIBIT NO.:                            PAGE
14   For the Plaintiff:
15        (No exhibits marked by the plaintiff)
16
17   For the Defendant:
18        (No exhibits marked by the defendant)
19
20
21
22
23
24
25
```

Page 4

```
 1          Deposition taken before, Balinda J.
 2   Walker, Florida Professional Reporter and Notary
 3   Public in and for the State of Florida at Large
 4   in the above cause.
 5              * * * * * * * * * *
 6          THE COURT REPORTER:  Do you swear the
 7   testimony you are about to give will be the
 8   truth, the whole truth, and nothing but the
 9   truth?
10          THE DEPONENT:  Yes, I do.
11          THE COURT REPORTER:  Thank you.
12      THEREUPON,
13             WILLIAM R. JUNG,
14   having been first duly sworn, was examined and
15   testified as follows:
16             DIRECT EXAMINATION
17   BY MR. BLOOM:
18      Q    Mr. Jung, my name is Jason Bloom.  I'm an
19           attorney for National Union from Lydecker Diaz
20           in Miami.  We're local counsel on a case that
21           you've provided an expert opinion on.  Is it
22           Jung or Young?
23      A    It's Jung.
24      Q    Okay.  Just making sure I say that
25           correctly.  I'm assuming that you've given a
```

Page 5

```
 1   deposition before.
 2   A    This is my third.  I was thinking I'm in
 3   my third deposition.  I do understand the
 4   guidelines and rules.
 5   Q    So we'll skip over the formalities and
 6   instructions, given your previous experience.
 7   And I know that I have read through your
 8   report, as well as the exhibits, but if we can
 9   just kind of get a rundown of your prior
10   experience.
11   A    Of course.
12   Q    So where did you go to law school?
13   A    University of Illinois.
14   Q    And what did year did you graduate?
15   A    1983.
16   Q    What have you done in the capacity as a
17   lawyer since 1983?
18   A    Well, I was -- when I graduated, I was a
19   law clerk for Gerald Bard Tjoflat,
20   T-J-O-F-L-A-T, in Jacksonville, Florida.  And
21   then I was a law clerk for William Rehnquist on
22   the U.S. Supreme Court.  And then I -- from
23   1985 to 1987, I was an associate at Carlton
24   Fields in Tampa.  And from '87 to '93 I was an
25   assistant United States attorney in the
```

Page 106

1 made, which is one of the issues in this
2 federal case.
3 A    Go right ahead.  I think I made that in
4 the first report, didn't I?
5 Q    There's also a whole section in this
6 report.  Do you want to look at it?
7 A    No, no, I'm fine.
8 Q    I'm delving into an area of law in which
9 you have much more familiarity and expertise
10 than I, so excuse the ignorance if it comes
11 across as such.  What's the difference between
12 a target and a subject?
13 A    Well, first of all, those terms aren't
14 used that much.  I know your side was kind of
15 seizing on those in the arbitration.  A target
16 -- and this is defined in the United States
17 Attorney's Manual, Department of Justice Manual
18 -- I think a subject is someone, some person --
19 and of course to get it I would know go to the
20 -- precisely I would go to the US Attorney's
21 Manual, Department of Justice Manual.
22 Q    Is it a public record?
23 A    Yeah.  It's pretty nice.  They have --
24 although it's not really that detailed.  A
25 subject is someone about whose conduct is

Page 107

1 involved that the area about which the grand
2 jury is making inquiry.  And a target is
3 someone against whom the grand jury is
4 considering indictment.  And, again, you know,
5 it's kind of like the tax code, you better go
6 get it from the horse's mouth and the book but
7 that's basically it.
8 Q    Okay.  What happened here is that an
9 affidavit was -- a sealed affidavit was used to
10 substantiate a search warrant that was served
11 on Crowley.  Is that a fair characterization of
12 what happened?
13 A    Yes.
14 Q    Okay.  Wouldn't Crowley have a due
15 process right to identify the allegations in
16 that search warrant affidavit considering that
17 the materials were being taken?
18      MS. GARRISON:  Object to the form.
19 Q    Do you understand the question?
20 A    The answer is no, until they were
21 indicted and then they would get a copy of
22 that.
23 Q    Okay.  So pre-indictment, Crowley has --
24 there's no mechanism available for Crowley to
25 try to unseal or obtain that affidavit?

Page 108

1 A    That is right.
2 Q    Okay.
3 A    You know, they could always try, but
4 there's no mechanism and it would be denied.
5 Q    Do you know what factors the court would
6 consider in determining whether or not to
7 unseal the affidavit for Crowley?
8 A    Pre-indictment?
9 Q    Pre-indictment.
10 A    Well, I've never heard of such a thing.
11 I suppose there's some exigent factors that --
12 and I've been doing this a long time.  You just
13 don't get the search warrant unless you're
14 indicted -- the affidavit unless you're
15 indicted.
16      Now, if I were Crowley and I wanted to do
17 that and get stuff figured out, you could file a
18 Motion for Return of Property but that's not
19 going to get you the affidavit.  I don't think
20 they would ever get the affidavit.
21 Q    You're not familiar with any case law
22 which discuss --
23 A    There might be, I'm not familiar with it,
24 and I don't -- in my experience, it's never
25 happened to my purview.

Page 109

1 Q    Okay.  Once the indictment was returned,
2 was there any compelling exigency or state
3 federal interest in keeping the affidavit
4 sealed?
5 A    Oh, absolutely.  They keep them sealed.
6 Q    But we've discussed the difference pre-
7 and post-indictment on the affidavit being
8 sealed?
9 A    Um-hum.
10 Q    So would Crowley have been entitled to
11 obtain that affidavit post-indictment?
12 A    Post Crowley's indictment?
13 Q    Post Farmer's indictment.
14 A    No.  The answer is no.  And Farmer
15 couldn't get it post Peake's indictment.
16 There's expressed orders in this record
17 precluding that, two of them, one from
18 Jacksonville and one from Puerto Rico.
19 Q    Are you --
20 A    Now, the -- excuse me -- the Puerto Rico
21 order says that implicitly because the motion
22 discusses it.  No.  There's a magistrative
23 order that says you can't give this to anybody,
24 Mr. Peake.
25 Q    What if Mr. Peake wanted to give this to

**Page 110**

1  -- why did Mr. Peake want to give this to --
2  A     Well, I don't know that he did, but he
3  wanted it and he was precluded.  They were
4  precluded, barred, specifically -- I mean, it's
5  in this mass of stuff that involves our case.
6  There's an order from Jim Klindt, Magistrate
7  Jim Klindt -- oh, boy, times all run together,
8  don't they -- that said we're going to unseal
9  this for criminal purposes, but only the
10 defendant and his client.  You know, if you
11 don't have it, she can get it to you.
12 Q     And that was Peake?
13 A     It was signed by -- there were two orders
14 that precluded the access to the affidavit, one
15 of which was -- my recollection, it was
16 Magistrate Judge Klindt in the Peake case; and
17 the other was the similar order in our case,
18 meaning Farmer, by the District Court in Puerto
19 Rico, that doesn't expressly say it, but the
20 application for it says it and --
21 Q     The application for what says what?
22 A     For the application to permit discovery
23 to the defendant, Farmer, says, You know, we'll
24 keep this.  We understand, something like that,
25 okay, and that would be -- that order was

**Page 111**

1  issued by the district judge, I believe, the
2  District of Puerto Rico.
3        Now, the thing became available when it
4  was filed in open court about halfway through
5  Farmer's trial.  I mean, publicly, you know,
6  unsealed.
7  Q     Sure.  Are you aware of any efforts by
8  Crowley to attempt to obtain the affidavit at
9  anytime prior to -- I believe it was
10 Ms. Garrison obtaining it from the docket?
11 A     I'm not.  I'm not aware of that ever
12 happening in any case, and I don't think it --
13 Q     But specifically not in this case?
14 A     Right.  And I don't think it would be
15 successful, but, you know.
16 Q     What's the basis for the court being able
17 to obtain property from a nonparty without a
18 remedy available to that party to obtain that,
19 for them to see the basis?
20 A     You mean the authority for the search
21 warrant?
22 Q     What's the basis for --
23 A     Fourth Amendment of the United States
24 Constitution.
25 Q     As far as keeping from them the

**Page 112**

1  information that forms the basis for the
2  reasonableness.
3  A     Well, I don't know what permits, other
4  than the court's ability to police its own
5  docket, you know, the All Writs Act, all of
6  that, I don't know that there's a rule that
7  expressly says, Search warrant affidavit shall
8  be sealed, period, you know, or until further
9  review of Court, but that's how it's done and
10 it's always been done that way.
11 Q     As matter or courts they are sealed,
12 search warrant affidavits?
13 A     Oh, yeah.  Yeah, you can't get them.
14 Q     Is the application to be made by the
15 prosecutor that you're saying?
16 A     Yes, or the defendant, and typically what
17 happens is the defense -- the guy's indicted.
18 His lawyer says, You know, you tossed my guy's
19 desk -- I'm sorry.  I'm talking with vernacular
20 -- give me the search warrant affidavit.  And
21 they hem and ha, and then if they don't give it
22 to you, you have to move for it.  But, you
23 know, oftentimes if there's a search and
24 they're going to use the evidence against your
25 client at trial, then they turn it over, and

**Page 113**

1  it's not always the case.  In the old days
2  where the thing is like embargoed by a court
3  order but this one wasn't embargoed.
4  Q     There was additional protection placed on
5  this particular search warrant affidavit?
6  A     An order, yeah, because the case was
7  ongoing, you know.  They were trying to ladder
8  up to everybody.
9  Q     In your experience as a former AUSA, what
10 kind of concerns would you have about the
11 public disclosure of the information within a
12 search warrant affidavit?
13 A     Well, they don't ever want to give
14 anything that's under oath or that would be
15 helpful to the defense, you know.  I mean,
16 obviously, they are going to follow the rules
17 of the law, but there's very little -- there's,
18 in fact, no gratuitous discovery in criminal
19 matters so --
20 Q     In the federal context?
21 A     Yeah.  So the argument would be, We're
22 not going to not use this evidence; the search
23 is irrelevant to our case, and you wouldn't get
24 it; they wouldn't give it to you and you
25 couldn't get it, unless this search yielded

Page 114

1      fruit.
2      Q     Or if my substantive due process runs --
3      A     Right.
4      Q     No big deal?  Really?
5      A     What, that they came and tossed your
6      house?
7      Q     Well, or in this particular case, my
8      insurance company says that they need to see
9      the search warrant affidavit for them to pay
10     me.
11     A     Well, look, if there are cases on point,
12     and I'm not saying there aren't, I haven't seen
13     any such thing in my experience or in the
14     Middle District of Florida.
15           MR. BLOOM:  Fair enough.  Okay.  I'm
16     done.
17           MS. GARRISON:  Can we take like a
18     five-minute break?
19           MR. BLOOM:  Sure.
20     (A break was taken off of the record at 2:50 p.m.)
21           (Back on the record at 3:00 p.m.)
22                 CROSS-EXAMINATION
23     BY MS. GARRISON:
24     Q     Good afternoon, Mr. Jung.  For the
25     record, this is Emily Garrison on behalf of the

Page 115

1      plaintiff in this case, Crowley Maritime
2      Corporation.  I just have a couple of quick
3      questions.
4      A     Yes, ma'am.
5      Q     Your opinions in this case about the
6      reasonableness and necessity of the fees
7      incurred, those opinions are with respect to
8      the particular facts and circumstances of this
9      case, correct?
10     A     Yes.  You know, very big criminal,
11     longtime complex case.
12     Q     Your opinions are not intended to be in
13     the abstract about general billing practices,
14     correct?
15     A     Absolutely not.
16     Q     You gave a similar opinion that you
17     testified to that the defense costs incurred on
18     behalf of Mr. Farmer were reasonable and
19     necessary, and that opinion was in 2012,
20     correct?
21     A     That's correct.
22     Q     And that opinion was before Mr. Farmer
23     was indicted?
24     A     That's right.
25     Q     Knowing what we do now, that he was

Page 116

1      eventually indicted and acquitted, would you
2      change anything about that 2012 opinion?
3      A     No.  The results bear it out, I suggest.
4      Q     And we talked -- Counsel asked you some
5      questions just now about the under seal search
6      warrant affidavit, correct?
7      A     That's right.
8      Q     And you mentioned the government's
9      interest in keeping the search warrant
10     affidavit under seal, would one of those
11     interests be that there was an ongoing criminal
12     investigation?
13     A     I think that that's their paramount
14     interest, and they also -- they've always, you
15     know, almost certainly correctly so, if they
16     can, they want to protect their sources.
17           MS. GARRISON:  That is all I have.
18           MR. BLOOM:  I don't think I can even
19     redirect on that.
20           THE WITNESS:  So we'll read, if he
21     orders.
22           MR. BLOOM:  Thank you for your time.  We
23     will order, and we want it expedited, though, in
24     two days.
25           COURT REPORTER:  Okay.

Page 117

1            MS. GARRISON:  Can we get a rough like
2      within the next four days or three days?
3            COURT REPORTER:  Well, he's ordering the
4      transcript expedited in two days, so would you
5      like to order a copy?
6            MS. GARRISON:  Yes.
7
8            (The deposition concluded at 3:08 p.m.)
9      (Reading and signing of the deposition was not waived
10          by the witness and all parties.)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25



**Page 118**

1                    S T I P U L A T I O N S

2

3        It was stipulated by and between counsel for the

4   respective parties herein that:

5        1.  Reading and signing of the deposition by

6   the deponent before filing ARE NOT waived.

**Page 119**

1                    CERTIFICATE OF OATH

2   STATE OF FLORIDA

3   COUNTY OF HILLSBOROUGH

4        I, the undersigned authority, certify that

5   WILLIAM R. JUNG personally appeared before me and was

6   duly sworn,

7        WITNESS my hand and official seal this 10th day

8   of March, 2017.

17

18        BALINDA WALKER, FPR

          Florida Professional Reporter

19        Notary Public, State of Florida

          Commission No.:  FF925098

20        Expires:  October 6, 2019

**Page 120**

1                REPORTER'S DEPOSITION CERTIFICATE

2   STATE OF FLORIDA

3   COUNTY OF HILLSBOROUGH

4        I, BALINDA WALKER, certify that I was

5   authorized to and did stenographically report the

6   foregoing deposition of WILLIAM R. JUNG; that a review

7   of the transcript was requested; and that the

8   transcript is a true and complete record of my

9   stenographic notes.

10       I further certify that I am not a

11  relative, employee, attorney, or counsel of any of the

12  parties, nor am I a relative or employee of any of the

13  parties' attorney or counsel connected with the action,

14  nor am I financially interested in the action.

15       DATED this 10th day of March, 2017.

20

21        BALINDA WALKER, FPR

          FLORIDA PROFESSIONAL REPORTER

**Page 121**

1                WITNESS NOTIFICATION LETTER

2   March 10, 2017

3   Mr. William R. Jung

    C\O Emily E. Garrison, Esquire

4   Reed Smith, LLP

    10 South Wacker Drive

5   Chicago, Illinois 60606-7507

6   In Re: CROWLEY MARITIME CORPORATION VS. NATIONAL UNION

         FIRE INSURANCE OF PITTSBURGH

7        Deposition taken on March 8, 2017

         U.S. Legal Support Job No. 1543096

8

    The transcript of the above-referenced proceeding is

9   now available for your review.

10  Please call to schedule an appointment between the

    hours of 9:00 a.m. and 4:00 p.m., Monday through

11  Friday, at a U.S. Legal Support Office located nearest

    you.

12

    Please complete your review within 30 days.

13

    Sincerely,

14

15

    Balinda J. WALKER, FPR

16  Florida Professional Reporter

    U.S. Legal Support, Inc.

17  4350 West Cypress Street, Suite 701

    Tampa, Florida 33607

18  (813) 876-4722

19

    CC via transcript

20  Jason Bloom, Esquire

    Emily E. Garrison, Esquire

**Doc. 37**

UNITED STATES DISTRICT COURT
for the
MIDDLE DISTRICT OF FLORIDA

CROWLEY MARITIME CORPORATION,

               Plaintiff

v.

NATIONAL UNION FIRE INSURANCE
COMPANY OF PITTSBURGH, PA.,

               Defendant

C.A. NO.  3:16-cv-1011-J-32JBT

## SUPPLEMENTAL MEMORANDUM OF
## NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA.
## IN SUPPORT OF ITS CONVERTED MOTION FOR SUMMARY JUDGMENT

Michael P. Duffy, Esq.
Peabody & Arnold LLP
Federal Reserve Plaza
600 Atlantic Avenue
Boston, MA 02210-2261
(617) 951-2100
mduffy@peabodyarnold.com

Stephen Hunter Johnson, Esq.
Jason Bloom, Esq.
Lydecker Diaz
1221 Brickell Avenue
19th Floor
Miami, FL 33131
(305) 416-3180
shj@lydeckerdiaz.com
jbloom@lydeckerdiaz.com

On December 21, 2016, the defendant National Union Fire Insurance Company of Pittsburgh, Pa. ("National Union")'s motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6) was converted by the Court into a motion for summary judgment. Thereafter, the parties engaged in extensive discovery; thousands of documents were exchanged, expert witnesses were disclosed and seven depositions were taken.  Despite all of this activity, however, nothing was revealed that changes in any way the undeniable fact, as set forth in National Union's motion to dismiss, that all claims asserted by Crowley Maritime Corporation ("Crowley") are barred as a matter of law by the doctrine of *res judicata* and by the applicable statute of limitations.  In the alternative, to the extent Crowley now seeks to avoid the statute of limitations by arguing that its cause of action did not accrue until November 2015, when it submitted the March 2008 Affidavit to National Union, Crowley's complaint should be dismissed because the six year Discovery Period allowed under the Policy for the reporting of Claims expired in November 2013.  Because the pertinent facts are undisputed, National Union now submits this supplemental memorandum in support of its motion to dismiss all claims against it pursuant to Fed.R.Civ.P. 56.

Nothing learned through discovery changes the fact that an arbitration panel in January 2013 issued a final award in favor of National Union and against Crowley, determining that (1) no Claim had been reported to National Union as of January 2013, and (2) National Union had no obligation to reimburse Crowley for attorney's fees Crowley advanced up to that point to four of its employees, including Thomas Farmer.  The Award speaks for itself.  Under Florida law, Crowley's alleged subsequent discovery of additional evidence in the form of a March 2008 Affidavit does not allow Crowley to re-litigate exactly the same cause of action.  In the same way, nothing learned through discovery changes the fact that any claims seeking to challenge National Union's 2008 denial of coverage are untimely on their face under the five year statute

1

of limitations applicable to breach of contract actions under Florida law.  In addition, nothing learned through discovery changes the fact that the March 2008 Affidavit was not submitted to National Union until November 2015, when it was far too late to report Claims under the Policy. Because none of these facts are disputed by Crowley, National Union is entitled to prevail as a matter of law.

National Union is not asking to be "absolved of its clear coverage obligations," as Crowley puts it.  *Crowley's Supplemental Memorandum*, p. 1.  Rather, as the arbitration panel correctly recognized in 2013, National Union can have no coverage obligations under the Policy until a Claim as defined in the Policy is made against an Insured and timely reported to National Union.  That did not occur until February 2013.  National Union properly accepted coverage when Mr. Farmer was offered a plea deal in February 2013 but, as the arbitration panel decided, it has no obligation to pay fees incurred prior to that date.  Claims made and reported policies are enforced in Florida according to their terms.  *Jennings Construction Services Corp. v. ACE American Ins. Co.*, 783 F.Supp.2d 1209, 1212-1213 (M.D.Fla. 2011).

WHEREFORE, National Union respectfully requests that its converted motion for summary judgment be ALLOWED.[1]

---

[1] In addition to the specific legal arguments raised by National Union's motion to dismiss, the fundamental premise of Crowley's case is flawed.  Crowley's entire case is based on its contention that a Claim was made against Mr. Farmer when the Affidavit was signed on April 16, 2008, even though he was completely unaware at the time.  See, *Crowley's Supplemental Memorandum* at footnote 4.  This plainly is not a reasonable construction of the Policy, because it would place on the Insured the impossible burden of reporting things of which he had no knowledge. See, Expert Report of Thomas Newman, at ¶¶ 27-28, attached as Exhibit N to the Garrison Declaration.  Crowley's purported custom and practice expert conceded at his deposition that he was not aware of any case in which any insurer had ever taken such a position (See, *Sagalow Deposition*, p. 105, attached as Exhibit 2 to the Duffy Declaration), which is inconsistent with his claim that there is an established custom and practice on the issue. Crowley's expert then agreed, however, that it *is* standard practice in the industry to consider a written demand for relief to be a claim made against the Insured only when it is *received* by the Insured, which is exactly the position National Union takes here with respect to the Affidavit (assuming, of course, that the Affidavit adequately identified Mr. Farmer as a person who might be the subject of future charges).  *See* Exhibit 2 to the Duffy Declaration, pp. 108-109.  The cases cited on page 5 of Crowley's supplemental memorandum on this point are not helpful, because *Medical Depot, Inc. v. RSUI Indem. Co*. 2016 WL 5539879 (Del.Super. Sept. 29, 2016), held only that an unserved complaint could still constitute a written demand for relief, and *Amerisource Bergen Corp. v. ACE American Ins.*

2

## I.   FACTUAL BACKGROUND

The relevant facts are set forth in some detail in National Union's previous filings, all of which are incorporated herein.   National Union issued Executive and Organization Liability Insurance Policy No. 061-36-48 (the "Policy") to Crowley with a Policy Period of November 1, 2007 to November 1, 2008.   *See* Exhibit O to the Declaration of Emily Garrison (Document 36-1 (hereinafter, "Garrison Declaration").   The Policy was issued subject to a "Run-Off Endorsement" effective at inception, which provided that Crowley:

> … shall have the right to a period of [six] years following the Effective Date (herein referred to as the Discovery Period) in which to give written notice to the Insurer of any Claim first made against any Insured during said 6 year period for any Wrongful Act occurring on or prior to the Effective Date and otherwise covered by this policy.

*See id.* at Endorsement 14.   It is undisputed that the six-year Discovery Period commenced on November 1, 2007 and expired on November 1, 2013.

On April 17, 2008, the FBI executed a search warrant at Crowley's headquarters in Jacksonville, Florida.   Complaint, ¶ 15.   On April 25, 2008, Crowley submitted copies of the April 16, 2008 search warrant and an April 17, 2008 grand jury document subpoena served upon Crowley Liner Services, Inc. to National Union for potential coverage under the Policy.   *See* Exhibit D to the Garrison Declaration.

On May 27, 2008, National Union denied coverage on the grounds that a Claim, as that term was defined by the Policy, had not yet been reported to National Union.   *See* Exhibit E to the Garrison Declaration, p. 3.   Of relevance to this proceeding is Section 2(b) of the Policy, which defines Claim to include:

---

*Co.*, 100 A.3d 283 (Pa. Super. 2014), concerned whether a lawsuit was "pending" rather than when a claim was "made."

(1)    a written demand for monetary, non-monetary or injunctive relief;…

(3)    a civil, criminal, administrative or regulatory investigation of an **Insured Person**:

        (i)    once such **Insured Person** is identified in writing by such investigating authority as a person against whom a proceeding described in Definition (b)(2) may be commenced[.]

*See* Exhibit O to the Garrison Declaration.  National Union advised Crowley in its May 27, 2008 letter that it would accept the materials submitted "… as a notice of circumstances that may give rise to a Claim being made against an Insured[.]"  *See* Exhibit E to the Garrison Declaration, p. 3.

On March 7, 2012, Crowley filed a demand for arbitration seeking reimbursement of attorney's fees advanced by Crowley to four of its employees, including Thomas Farmer. Complaint, ¶ 21.  *It is those same attorney's fees paid on behalf of Farmer that Crowley seeks for a second time to recover in this action*.  On January 29, 2013, after a full hearing on the merits, the arbitration panel rejected Crowley's arguments and held that National Union's denial of coverage was correct because, based on the unambiguous terms of the Policy, no Claim as defined by the Policy had been reported to National Union as the date of the Award.  Therefore, the panel determined that National Union had no obligation to reimburse Crowley for the attorney's fees it had paid on behalf of its four employees, including the fees paid on behalf of Mr. Farmer.  *See* Exhibit F to the Garrison Declaration, p. 9.

In February 2013, Crowley advised National Union that Mr. Farmer had been offered a plea deal in writing by the DOJ.  At that point, National Union acknowledged that a Claim had been made against Mr. Farmer and it agreed to provide coverage for Defense Costs incurred thereafter.   In July 2015, two and a half years after the arbitration panel issued its final award in favor of National Union and against Crowley, and nearly two years after the expiration of the

4

six-year Discovery Period for reporting Claims, Crowley advised National Union that it had obtained the previously sealed 2008 search warrant affidavit.  *See* Exhibit EE to the Garrison Declaration.  Crowley ultimately provided National Union with a copy of the Affidavit in or about November, 2015. *See* Exhibit 1 to the Declaration of Michael P. Duffy (hereinafter, "the Duffy Declaration").  On that basis, Crowley now seeks to re-litigate the same coverage issue that was decided in National Union's favor by the arbitration panel back in 2013, and to recover from National Union the same legal fees that it failed to recover at arbitration.

## ARGUMENT

"Summary judgment is appropriate 'if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law.'" *Scottsdale Ins. Co. v. Cutz, LLC,* 543 F. Supp. 2d 1310, 1313 (S.D. Fla. 2007), *quoting* Fed.R.Civ.P. 56(c).  Based upon the facts set forth above, none of which are disputed, National Union is entitled to a judgment in its favor under Florida law.  Crowley has already litigated its alleged right to recover under the Policy for the legal fees incurred by Mr. Farmer beginning in 2008.  The arbitration panel has conclusively determined that as of January 2013 no Claim as that term is defined by the Policy had been reported to National Union.  Crowley is not entitled to a second chance to litigate that same cause of action.  National Union also is entitled to a judgment in its favor as a matter of law because this action is untimely under the five-year statute of limitations and because, in any event, the Affidavit was not submitted to National Union until years after the six-year Discovery Period granted to Crowley by the Policy had expired.

For these reasons, National Union's converted motion for summary judgment should be allowed.

5

## I.   CROWLEY'S CLAIMS ARE BARRED BY *RES JUDICATA.*

The elements of res judicata are clearly established under Florida law and are set forth in National Union's prior memoranda.  A matter is *res judicata* if the following conditions are met:

> (1) identity of the thing sued for; (2) identity of the cause of action;
> (3) identity of the parties and (4) identity in the person for or
> against whom the claim is made.

*AMEC Civil, LLC v. PTG Construction Services Company*, 106 So.3d 455, 456 (Fla. 1st DCA 2013).   As set forth in National Union's prior memoranda on this issue, all four of these "identities" are present here.   Crowley is suing here for the same exact thing it sought in the arbitration: recovery of the legal fees incurred by Mr. Farmer from 2008 through 2013.   Both proceedings assert breach of contract claims against National Union seeking to recover the same fees under the same Policy.   The issue in the arbitration was whether a Claim had been asserted against any Crowley employees and timely reported to National Union.   The issue here is exactly the same.   The arbitration and this action assert the same cause of action because they both "'arise out of the same transaction or series of transactions,'" *i.e.* Crowley's demand for coverage for Mr. Farmer's attorney's fees and National Union's denial of that demand.   *See Trustmark Ins. Co. v. ESLU, Inc.*, 299 F.3d 1265, 1269-1270 (11th Cir. 2002), quoting *In re Piper Aircraft Corp.*, 244 F.3d 1289, 1296 (11th Cir. 2001).

In its supplemental memorandum, Crowley simply repeats its old argument that, because it now has a new piece of evidence, it is no longer asserting the same cause of action as in the arbitration.   The argument is completely unfounded.   As explained previously, *every* case decided as a question of fact necessarily is based on the adequacy of the evidence presented.   The precise question presented to the jury in every case is whether the evidence presented was sufficient to meet the plaintiff's burden of proof.   It simply does not follow from this that the plaintiff has a new cause of action every time it finds a new piece of evidence.   On the contrary,

6

it is clear that a second action arising out of the same transaction is precluded by *res judicata* "even though the plaintiff is prepared in the second action . . . [t]o present evidence or grounds or theories of the case not presented in the first action." *Restatement of the Law of Judgments, Second*, Section 25.   Therefore, the mere fact that the arbitrators' decision was based on the evidence presented adds nothing to Crowley's argument.

Crowley also repeats its argument that its discovery of the affidavit in 2015 is a new fact[2] which precludes application of *res judicata*.   As set forth previously, however, this is just the later discovery of an *old* fact.   The affidavit was executed in 2008.   The present situation therefore is fundamentally unlike the cases on which Crowley relies, in which a second cause of action was allowed to proceed based on new facts *which did not exist* at the time of the first case. See, e.g., *State Street Bank and Trust Co. v. Badra,* 765 So.2d 251 (Fla. Dist. Ct. App. 2000), where the court allowed a second foreclosure action to go forward based on a new notice of acceleration that was issued after the first case was over.   *Id*., at 254.   The only new authority cited is *Millennium Labs., Inc. v. Allied World Assurance Co. (U.S.), Inc.,* 165 F. Supp. 3d 931, 934 (S.D. Cal. 2016), which is completely irrelevant because it involves a motion to reconsider and amend a judgment under F.R.Civ.P. 59 based on newly discovered evidence.   The *Millennium* case has nothing to do with *res judicata*.   Crowley never sought to re-open the arbitration, nor could it have.   *See, e.g., Migdal Plumbing & Heating Corp. v. Dakar Developers, Inc.,* 662 N.Y.S.2d 106, 107-108 (App.Div.1st Dept. 1997) (citing "well-settled rule" that newly discovered evidence does not constitute a ground for challenging an arbitration award.").

---

[2] Although not the basis for National Union's motion, it is not "undisputed" (*Crowley's Supplemental Memorandum*, p. 6) that Crowley could not possibly have obtained the affidavit prior to Mr. Farmer's acquittal.  In fact, Crowley could have filed a motion seeking to unseal the affidavit but it chose not to do so.  See, e.g., *Bennett v. United States*, 2013 WL 3821625 (S.D.Fla. July 23, 2013).  "Although the Eleventh Circuit has not considered whether such a rights exists, decisions from federal courts in other circuits recognize that, rooted in the Fourth Amendment, targets of a search warrant have a pre-indictment right of access to search-warrant  materials." *Id*., at *5.  There is no guarantee that such a motion would have been allowed, of course, but the only thing which is truly "undisputed" here is the fact that Crowley never even tried.

Crowley's final argument is that application of Florida *res judicata* law in this case would result in a "pernicious" injustice. This argument has been answered previously as well. Crowley's argument is based on its assertion that it "seeks only to have NU do what its Policy was intended to do" (*Crowley's Supplemental Memorandum*, p. 7). However, Crowley's assertion on this point is just wrong. The Policy is a claims made *and reported* policy. The Policy thus only covers fees incurred after a Claim made against an Insured has been timely reported to National Union. The arbitration panel determined conclusively that as of January 2013 no Claim had been reported to National Union. Therefore, what Crowley seeks is exactly the opposite of what the Policy was intended to do. Crowley now seeks to make National Union retroactively responsible for Defense Costs incurred over a five-year period, from 2008 to 2013, in which no Claim was ever reported to National Union, nor could it have been because no Claim was made against Mr. Farmer until February of 2013 when he was offered a written plea deal. By the time Mr. Farmer got a copy of the Affidavit, National Union had already agreed to pay his ongoing legal fees.

Crowley also minimizes the significance of its own admitted participation in the antitrust conspiracy. Crowley was the one that chose to inject considerations of "equity" into the equation and Crowley never identifies what is so "inequitable" about the fact that a company that collected millions of dollars in illegal profits from its antitrust activity might have to pay a portion of that money to cover the legal fees of one of its operatives. This is especially so in light of the fact that Crowley chose to file the arbitration in 2012, without waiting to get a copy of the Affidavit. It must have known when it did so that it was taking a chance the absence of the Affidavit would be problematic in the arbitration. At this point, it is simply asking to be relieved of the consequences of its own strategic decision to initiate the arbitration without

waiting to get a copy of the Affidavit.  There is nothing inequitable about the fact that a large commercial enterprise like Crowley should live with the consequences of its consciously chosen litigation strategies.[3]

*Res judicata* is not a mere technicality.  The doctrine of *res judicata* furthers an important societal goal by protecting parties from serial litigation of the same cause of action.  In this case, *res judicata* requires the dismissal of Crowley's claim.  National Union has already tried this case once and won.  It should not have to go through the same process for a second time.

## II.   CROWLEY'S CLAIMS ALSO ARE BARRED BY THE STATUTE OF LIMITATIONS AND/OR THE TERMS OF THE RUN-OFF ENDORSEMENT.

It is undisputed that National Union's denial of coverage for the fees at issue was issued on May 27, 2008.  It is undisputed that this action was filed more than eight years later, on August 8, 2016.  Therefore, the action is barred on its face by the five-year statute of limitations applicable to breach of contract suits.

> In Florida, an insurer is deemed to have entered into a contract with the insured upon the issuance of an insurance policy, *Ocean Acci. & Guarantee Corp. v. Tucker*, 112 Fla. 401, 402 (Fla. 1933), consequently, an insured who alleges breach of contract against an insurer must commence the action within the five-year limitations period set forth in Fla.Stat. §95.11(2)(b) for contract suits.
>
> * * *
>
> In suits alleging a breach of insurance contract for failure to pay benefits under the policy, the statute of limitations begins to run when the insurer has denied the insured's claim. *Lee*, 678 So.2d 818, 821 (Fla. 1996); *Roth v. State Farm Mut. Auto. Ins. Co.*, 581 So.2d 981, 982 (Fla.Dist.Ct.App. 2d Dist. 1991) ("In regard to insurance contracts, a specific refusal to pay a claim is the breach

---

[3] Crowley cites *Empire Fire & Marine Ins. Co. v. J. Transp., Inc*., 880 F.2d 1291 (11th Cur. 1989), for the proposition that *res judicata* is applied differently in a declaratory judgment action.  However, the arbitration was not a mere declaratory judgment action.  In the arbitration, Crowley asserted a breach of contract claim for money damages.  What the panel actually decided was that as of January 2013 National Union had no obligation to pay anything because no Claim as defined in the Policy had been reported to National Union.  There is nothing in the *Empire Fire* case which even remotely suggests that Crowley now gets a second chance to prove the same thing.

which triggers the cause of action and begins the statute of limitations running").

*Community Bank of Florida v Progressive Casualty Ins. Co.*, 2013 WL 12093842 at *4 (S.D.Fla. Feb. 25, 2013).  While Crowley may not have known what the Affidavit said until 2015, there is no discovery rule for breach of contract actions in Florida.  *Beck v. Lazard Freres & Co., LLC*, 175 F.3d 913, 914 (11th Cir. 1999).

In response, Crowley continues to advance multiple arguments, none of which have any merit.  For example, Crowley again cites to cases addressing the special circumstance in which an insurer is in ongoing breach of a duty to pay defense costs.  In those circumstances, the five-year statute of limitations does not begin to run until the underlying case is over.   *See, e.g., Grissom v. Commercial Union Ins. Co.* 610 So.2d 1299 (Fla. 1st DCA 1992).  The problem with this argument, as was pointed out previously, is that this is not such a case.  The arbitration panel determined that as of January 2013 National Union had no duty to pay or advance Defense Costs, and upon receipt of the proposed plea agreement in February 2013 National Union promptly undertook to advance Defense Costs incurred thereafter.   Therefore, there was no ongoing breach by National Union which could have continued until the criminal case was over. Rather, Crowley is seeking in this case to establish coverage retroactively, even though National Union had no duty to pay at the time.  The statute of limitation cases on which Crowley relies are plainly inapplicable.

In addition, Crowley's appeal for equitable tolling of the statute is contrary to Florida law.  While Crowley correctly cites *Carroll v. TheStreet.com, Inc*., 2014 WL 5474061 (S.D.Fla. July 7, 2014), as holding that equitable tolling is allowed in extraordinary circumstances, Crowley neglects to mention that other courts from the District of Florida have reached the opposite conclusion.  See, e.g., *Baez v. Root*, 2014 WL 1414433 at *3 (S.D.Fla. Apr. 11, 2014)

("Under Florida law, equitable tolling is unavailable outside of the administrative context"); *Pierson v. Orlando Regional Healthcare Systems*, 2010 WL 1408391 at *15 (M.D.Fla. April 6, 2010), *aff'd,* 451 Fed.Appx. 862 (11th Cir. 2012) ("Equitable tolling, however, is not available in civil actions in Florida.  Section 95.051(1), Florida Statutes, sets forth a list of events that toll a statute of limitations, and equitable tolling is not among them.")  Significantly, the Eleventh Circuit stated in affirming the decision in the *Pierson* case that "[t]he district court carefully analyzed every claim raised by Pierson and correctly applied the law." 451 Fed.Appx. at 864.[4]

Statutory tolling is equally unavailing.  Tolling of the statute pursuant to Fla. Stat. Ann. §95.051(g) is available only during the pendency of an arbitration proceeding "pertaining to the dispute that is the subject of the action."  Here, Crowley wants to have it both ways.  In response to the *res judicata* argument, Crowley says that the arbitration involved an entirely different cause of action because Crowley can only avoid *res judicata* by showing that the cases involve different disputes.  Thus, there is no basis on which it can also take the complete opposite position and seek tolling of the statute of limitations on the grounds that the cases involve the *same* dispute.  Tolling under §95.051(f) is unavailable because National Union has never made any partial payment of the fees incurred between 2008 and 2013 which are the subject of this action.  In addition, by the time National Union started to pay Mr. Farmer's post-indictment fees, the five-year statute of limitations which commenced on the date of the May 2008 denial of coverage had already expired.  See, *Graffeo Deposition*, p. 99, attached as Exhibit 3 to the Duffy Declaration.

Crowley's primary response to the statute of limitations issue seems to be the argument that its cause of action did not accrue until 2015, because National Union did not breach the

---

[4] Even if equitable tolling were available under the law, for the reasons set forth above and in National Union's previous filings, there are no extraordinary circumstances here which would warrant a failure to enforce the statute of limitations.

Policy until 2015, when it refused to acknowledge Crowley's *post hoc* submittal of the Affidavit as creating retroactive coverage under the Policy.   However, the insured cannot restart the limitations clock simply by resubmitting the same bills.   *Roth v. State Farm Mut. Auto. Ins. Co.*, *supra*, 581 So.2d at 983.   Regardless, to the extent Crowley now maintains that a Claim was made against Mr. Farmer when the Affidavit was signed on April 16, 2008 but that no breach of the Policy occurred at that time because the Affidavit was not reported to National Union until 2015, Crowley just loses for a different reason.   As set forth above, the last date on which Crowley was allowed to report Claims to National Union was November 1, 2013.   The Run-Off Endorsement effective November 1, 2007 provided that Crowley:

> … shall have the right to a period of [six] years following the Effective Date (herein referred to as the Discovery Period) in which to give written notice to the Insurer of any Claim first made against any Insured during said 6 year period for any Wrongful Act occurring on or prior to the Effective Date and otherwise covered by this policy.

*See* Exhibit O to the Garrison Declaration, Endorsement 14.   By the time Crowley submitted the Affidavit to National Union, the time allowed for the reporting of Claims had already expired.[5]

Under Florida law, failure to timely report Claims as required under a claims made policy precludes all possible coverage.   *Jennings Construction Services Corp. v. ACE American Ins. Co. supra*, 783 F.Supp.2d at 1212-1213.   Numerous courts have recognized that an insurer like National Union is entitled to "close its books" for good on a claims-made and reported policy once the policy period or applicable discovery period has expired.   *See, e.g., Sigma Fin. Corp. v. Am. Int'l Specialty Lines Ins. Co.,* 200 F. Supp. 2d 710, 716–17 (E.D. Mich. 2002) ("because

---

[5] There is no basis for Crowley's suggestion that this argument was somehow waived because it was not included in the original memorandum that National Union filed in support of its motion to dismiss.  Under the Federal Rules of Civil Procedure, no waiver results from the failure to include substantive defenses in a motion to dismiss.  *Chilivis v. S.E.C.*, 673 F.2d 1205, 1208-1209 (11th Cir. 1982).  This is especially so in light of the fact that the defense is specifically asserted by National Union in its Answer.  Crowley also ignores the fact that the argument was raised in response to Crowley's argument that the alleged breach of contract did not occur until the Affidavit was submitted to National Union.  Crowley has been aware of the argument for many months and makes no claim of prejudice.

notice during the policy period is a prerequisite for coverage, a claims made policy benefits the insurer by allowing it to 'close its books' on a policy at its expiration date, restricting its liability to a finite period of time, thus permitting 'a level of predictability unattainable under standard occurrence policies'"), *quoting Resolution Trust Corp. v. Ayo*, 31 F.3d 285, 289 (5th Cir.1994); *LaForge v. Am. Cas. Co. of Reading, Pennsylvania*, 37 F.3d 580, 583 (10th Cir. 1994) (same). As of November 1, 2013, therefore, National Union had a right to assume that no further Claims would be reported under the Policy.

In response, and in conflict with its argument that the alleged breach of the Policy by National Union did not occur until 2015, Crowley insists that the Affidavit is a Claim that was actually reported to National Union in 2008, even though neither Crowley nor National Union had a copy or knew what it said until 2015. However, this is directly contrary to the clear ruling of the arbitration panel that as of January 2013 no Claim had been reported to National Union. Based on this ruling, Crowley is foreclosed from arguing that a Claim was reported to National Union prior to the date of the arbitration Award. Crowley's present argument is the same argument that was rejected by the panel. Crowley's argument that the Claim was reported to National Union in 2008 also is inconsistent with its argument that National Union's alleged breach of the Policy did not occur until 2015. If the Claim was reported in 2008, then National Union's breach would have occurred at that time and Crowley would have prevailed in the arbitration. Obviously, that did not occur.

Crowley then argues that the Affidavit submitted to National Union in 2015 relates back to Crowley's original notice of circumstances on April 25, 2008 pursuant to Section 7(c) of the Policy, which reads:

> If during the Policy Period or during the Discovery Period (if applicable) an Organization or an Insured shall become aware of

13

any circumstances which may reasonably be expected to give rise to a Claim being made against an Insured and shall give written notice to the Insurer of the circumstances, the Wrongful Act allegations anticipated and the reasons for anticipating such a Claim, with full particulars as to dates, persons and entities involved, then a Claim *which is subsequently made* against such Insured and reported to the Insurer alleging, arising out of, based upon or attributable to such circumstances or alleging any Wrongful Act which is the same as or related to any Wrongful Act alleged or contained in such circumstances, shall be considered made at the time such notice of such circumstances was given (emphasis added).

*See* Exhibit O to the Garrison Declaration, Section 7(c) (emphasis added).  However, this is inconsistent with Crowley's fundamental argument that the Affidavit is a Claim made against Mr. Farmer on April 16, 2008, when the Affidavit was signed.  Relation back under Section 7(c) only applies to Claims that are *subsequently* made against an Insured.  A notice of circumstances given on April 25, 2008 therefore can have no possible application to a Claim made *previously*, on April 16, 2008.

On the other hand, if the Affidavit is deemed to be a Claim made against Mr. Farmer in March 2013 when he first obtained a copy,[6] then the Claim would relate back to the April 25, 2008 notice of circumstances.  However, such relation back would do Crowley no good here.  By the time Mr. Farmer had a copy of the Affidavit, National Union had already acknowledged an independent obligation to pay his legal fees going forward.  Relation back to the notice of circumstances would not create coverage for fees incurred prior to the date the Claim was made.  This very issue was considered by the Eleventh Circuit in *Office Depot, Inc. v. National Union Fire Insurance Company of Pittsburgh, Pa*., 453 Fed.Appx. 871 (11th Cir. 2011), where the Court stated the following:

---

[6] Crowley's Supplemental Memorandum stipulates that Mr. Farmer's counsel received a copy of the Affidavit in March 2013, even though Crowley itself apparently did not get a copy until 2015.  *See* Exhibit EE to the Garrison Declaration.

14

> After analyzing the policy as a whole, it is clear that Section 7 does not cover the costs incurred between the filing of the initial notice of circumstances and the time a Claim is made against an Insured. . . . Therefore, the policy does not cover the Defense Costs associated with the SEC investigation – which did not constitute a Claim against Office Depot until events such as the issuance of subpoenas and Wells Notices occurred.

453 Fed.Appx. at 878.  Therefore, Section 7(c) of the Policy does not support Crowley's position in any way.

If the Affidavit is deemed to be a Claim made on April 16, 2008, as Crowley argues, then Section 7(c) is by its terms inapplicable because it provides relation back only with respect to Claims made *subsequently* to the April 25, 2008 notice of circumstances.  If the Affidavit is deemed to be a Claim made in 2013, when Mr. Farmer got a copy, then the Claim would relate back to the April 25, 2008 notice of circumstances but *Office Depot* precludes retroactive coverage for fees incurred prior to when the Claim was actually made.  In either case, Section 7(c) provides no basis for the recovery of fees incurred between 2008 and 2013.

## CONCLUSION

For the foregoing reasons, National Union submits that its converted summary judgment motion should be ALLOWED.   The Complaint in this action is barred by *res judicata* and by the statute of limitations and/or by the terms of the Run-Off Endorsement.  The facts are undisputed and National Union is entitled to prevail as a matter of law.

NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA.

By its attorneys,

*/s/Michael P. Duffy*_____
Michael P. Duffy, Esq.
Peabody & Arnold LLP
Federal Reserve Plaza
600 Atlantic Avenue

Boston, MA 02210-2261
(617) 951-2004
mduffy@peabodyarnold.com

Stephen Hunter Johnson, Esq.
Jason Bloom, Esq.
Lydecker Diaz
1221 Brickell Avenue
19th Floor
Miami, FL 33131
(305) 416-3180
shj@lydeckerdiaz.com
jbloom@lydeckerdiaz.com

## <u>CERTIFICATE OF SERVICE</u>

I, Jason Bloom, do hereby certify that I have, this 9th day of May, 2017, served the foregoing document, by causing a copy thereof, to be sent electronically to the registered participants in this case, if any, as identified on the Notice of Electronic Filing (NEF):

*/s/ Jason Bloom*

1205927_2
9500-94066

16

# Doc. 40

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

---

CROWLEY MARITIME CORPORATION,   )
             )
       Plaintiff,   )
             )     Case No. 3:16-cv-01011-TJC-JBT
    v.         )
             )     Judge Timothy J. Corrigan
NATIONAL UNION FIRE INSURANCE   )
COMPANY OF PITTSBURGH, PA.,   )     **DEMAND FOR JURY TRIAL**
             )
       Defendant.   )

---

**CROWLEY'S RESPONSE TO NATIONAL UNION'S SUPPLEMENTAL**
**MEMORANDUM IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

Plaintiff Crowley Maritime submits this response to Defendant National Union's ("NU") Supplemental Memorandum in Support of its Converted Motion for Summary Judgment ("Supplemental Memo").  NU has not justified the inequitable relief that it seeks – barring Crowley's claim for coverage based on *res judicata* or statute of limitations defenses.  The new case authority and arguments raised for the first time in NU's Supplemental Memo are misplaced or distinguishable, and do not support its motion, which should be denied.

**I.       NU Mischaracterizes the Deposition Testimony of Ty Sagalow.**

Ty Sagalow, one of Crowley's expert witnesses in this matter, opined that NU's position that the Search Warrant Affidavit at issue here was not a Claim "made" in April 2008 is inconsistent with industry custom and practice.  (*See* Ex. M to Crowley's Suppl. Mem. [Dkt. 36] at ¶¶ 61-62.)  NU's Supplemental Memo incorrectly claims that Mr. Sagalow's deposition testimony is inconsistent with his expert opinion.  (NU Suppl. Mem. [Dkt. 37] at fn. 1.)  NU's citations to Mr. Sagalow's testimony, however, are improperly taken out of context and are

irrelevant to this dispute for several reasons.

First, Mr. Sagalow's cited testimony concerned the "written demand" portion of Claim definition (b)(1) of the Policy, which is **not** at issue in this case.  Rather, this case involves Claim definition (b)(3)(i), which defines Claim to include a "writing" of an investigating authority identifying an Insured Person as someone against whom a criminal proceeding may be commenced.  Mr. Sagalow's testimony regarding when a "written demand" type of Claim is made is thus irrelevant to this case.

Second, Mr. Sagalow testified – in portions of his deposition selectively excluded from NU's Supplemental Memo – that although NU expressly provided in another policy it sold to Crowley that "receipt" of a Claim by the insured was a trigger for coverage, NU chose not to include such language with respect to the investigative "writing" Claim type involved here in the Policy at issue.  (Exhibit A to Garrison Decl. at 106:7-107:3.)  This testimony was consistent with his opinion that the Search Warrant Affidavit was a Claim as of April 2008 regardless of whether it was "received" by any Insured at that time.

Third, the portions of Mr. Sagalow's deposition cited by NU involved a hypothetical situation where, unlike here, an insured had "no knowledge" of the Claim made against it.  (*Id.* at 103:11-16; 109:4-110:15.)  Unlike that hypothetical, the facts here demonstrate that Crowley, Mr. Farmer and NU all were aware of the Search Warrant Affidavit, which was unavailable because it was filed under seal. (Crowley's Suppl. Mem. at 4.)  Indeed, it is undisputed that Crowley's initial notice letter to NU included a search warrant, which on its face referred to the Affidavit as stating the "facts to support a finding of Probable Cause," and expressly stated that the "charges" (*i.e.,* the allegations and accusations) that may have led to the search warrant were under seal.  (*Id.* at 3.)  As Mr. Sagalow testified, "when [the Affidavit] was unsealed is not

important under my theory.  What was important is that it was in existence **and it was known to be in existence in 2008**." (Exhibit A at 99:9-14) (emphasis added.)

## II.  *Bennett* Supports Crowley's Position that it Could Not Obtain the Affidavit.

NU argues for the first time in its Supplemental Memo that it is not "undisputed" that Crowley could not have obtained a copy of the Search Warrant Affidavit prior to Mr. Farmer's acquittal.  (NU Suppl. Mem. at fn. 2.)  NU's statement at most raises an issue of fact, and is unsupported by applicable law.  *Bennett v. United States*, 2013 WL 3821625 (S.D.Fla. July 23, 2013), which NU cites in support of its new argument, actually supports Crowley's position.  Although *Bennett* states that some courts hold that "targets of a search warrant have a pre-indictment right of access to search-warrant materials," NU ignores that *Bennett* explains that courts finding a Fourth Amendment right of access to search-warrant affidavits "have also held that this right … **is qualified and may be limited or completely denied 'upon a showing of a compelling government interest that cannot be accommodated by some means less restrictive than sealing the court's records'**." *Id.* at *5 (emphasis added).   The court then held that it would **not** unseal the search warrant affidavit in that case because "the Government's interest in protecting the integrity of its ongoing criminal investigation is constitutionally compelling" and the court again concluded that "unsealing the warrant materials at this time would unjustifiably compromise that interest." *Id.* at *6.

Here, the undisputed facts demonstrate that, pursuant to regular practice and an *in camera* request from the prosecuting authority, both this Court and the Puerto Rico District Court sealed the Affidavit and kept it sealed based on the DOJ's assertion that doing so was needed to protect its ongoing investigation.  (Exs. P and GG to Crowley's Suppl. Mem.)  The Affidavit thus was not made publicly available until April 24, 2015, during Mr. Farmer's trial.  (Crowley's Suppl. Mem. at 2-4.)   Neither the facts nor the case law support NU's position that there was any way

for Crowley to unseal the Search Warrant Affidavit prior to its unsealing during Mr. Farmer's trial.

**III.     Equitable Tolling is Available Outside of the Administrative Context.**

NU's Supplemental Memo cites for the first time *Pierson v. Orlando Regional Healthcare Systems*, 2010 WL 1408391 at *15 (M.D.Fla. April 6, 2010), *aff'd*, 451 Fed.Appx. 862 (11th Cir. 2012) in support of its incorrect position that equitable tolling is not available in the civil context. (NU Suppl. Mem. at 11.)  NU, however, failed to cite to decisions that reject *Pierson* or recognize that equitable tolling is available in the civil context.  *See, e.g., Starling v. R.J. Reynolds Tobacco Co.,* 845 F. Supp. 2d 1215, 1233 (M.D. Fla. 2011) (rejecting *Pierson*); *In re Engle Cases,* 45 F. Supp. 3d 1351, 1364 (M.D. Fla. 2014) ("equitable tolling can apply in civil actions"); *Carroll v. TheStreet.com, Inc.*, 2014 WL 5474061, *6 (S.D. Fla. July 07, 2014) (same).  Application of the doctrine of equitable tolling is thus fully appropriate here, based on the extraordinary circumstances of this case.  (Crowley Suppl. Mem. at 12.)

**IV.     *Office Depot, Inc. v. National Union Fire Inc. Co.* is Distinguishable.**

NU's Supplemental Memo cites for the first time the Eleventh Circuit's decision in *Office Depot, Inc. v. National Union Fire Inc. Co.*, 453 Fed.Appx. 871 (11th Cir. 2011) for the proposition that "[r]elation back to the notice of circumstances would not create coverage for fees incurred prior to the date the Claim was made." (NU Suppl. Mem. at 14-15.)  *Office Depot*, however, is distinguishable because here the Claim – in the form of the Search Warrant Affidavit – was made in April 2008.  In *Office Depot*, the insured received letters from the SEC none of which were a "claim" under the policy at issue but that Office Depot reported as a notice of circumstances under the policy.  *Id.* at 876.  Several months later a lawsuit was filed against the insured that was a "claim" under the policy at issue.  The court held that the insured could not collect its defense costs incurred between the notice of circumstances and the later made claim.

*Id.* at 878.   Unlike this case, *Office Depot*: (i) ***did not*** involve a document that constituted a Claim, the existence of which was known but that was unavailable because it was filed under seal; and (ii) ***did not*** involve an initial matter that was noticed to the insurer as a Claim and recognized by the insurer as being asserted to be a Claim.   The circumstances in *Office Depot* are not analogous to the facts here, where the Search Warrant Affidavit was known but unavailable, and where Crowley asserted that a Claim in fact had been made at the time of its initial notice.

**V.      NU's Argument that the Run-Off Endorsement Bars Coverage Must Be Rejected.**

NU's Supplemental Memo raises a new argument that it is entitled to "close its books" for good on a claims-made and reported policy once the policy period or discovery period has expired.   (NU Suppl. Mem. at 12-13.)   This argument has no application here, where it is undisputed that Crowley provided timely notice of the DOJ Investigation, and explained that the "charges" leading to the Search Warrant existed, but were under seal, in April 2008.   (Crowley Suppl. Mem. at 14.)   The Run-Off Endorsement requires only that the insured provide written notice "of a Claim," which requirement was clearly met by Crowley's April 2008 notice.   As Mr. Sagalow opined, under the facts and circumstances of this case, "it is inconsistent with industry custom and practice, and the very purpose of the run-off endorsement, for NU to attempt to use the Run-Off endorsement as a way of eliminating coverage." (Ex. M to Crowley's Suppl. Mem. at ¶ 97.)   Moreover, NU's decision to accept Crowley's notice as a notice of circumstances in 2008 demonstrates that NU itself chose to keep its books "open" on its Policy.   (Ex. E to Crowley's Suppl. Mem. at 3-4.)   Pursuant to the "notice of circumstances" Clause 7(c) of the Policy, any Claim – including the Affidavit – later asserted or unsealed and presented to NU – is "considered made when the notice of circumstances was given," and there is no timeline or deadline for when such later Claim must be made.

Dated: May 23, 2017                        Respectfully Submitted,

/s/ Emily E. Garrison

Charles B. Lembcke
Florida Bar No. 140285
Email: cbl@cbllaw.com
Law Offices of Charles B. Lembcke, P.A.
1300 Riverplace Blvd
Suite 605
Jacksonville, FL 32207
Telephone:  (904) 355-5467
Facsimile:  (904) 633-9328

*Admitted Pro Hac Vice:*
John D. Shugrue
Thomas A. Marrinson
Emily E. Garrison
REED SMITH LLP
10 South Wacker Drive, 40th Floor
Chicago, IL  60606-7507
Telephone:  (312) 207-1000
Facsimile:  (312) 207-6400
**COUNSEL FOR PLAINTIFF**

## CERTIFICATE OF SERVICE

       I hereby certify that this document and all attachments thereto filed through the ECF system will be sent electronically to registered participants and paper copies will be sent to those indicated as non-registered participants on May 23, 2017.

/s/ Emily E. Garrison

Attorney for Plaintiff

# Doc. 40-1

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

CROWLEY MARITIME CORPORATION,  )
                                  )

        Plaintiff,  )

                                 )     Case No. 3:16-cv-01011-TJC-JBT

        v.  )

                                 )     **DEMAND FOR JURY TRIAL**

NATIONAL UNION FIRE INSURANCE  )
COMPANY OF PITTSBURGH, PA.,  )
                                   )

        Defendant.  )

## <u>DECLARATION OF EMILY E. GARRISON</u>

I, Emily E. Garrison, declare as follows:

1.      I have personal knowledge of the facts stated in this declaration.  I am over 18 years of age and could testify competently to the matters set forth herein if called upon to do so.

2.      I am an attorney at law duly licensed to practice before all courts in the State of Illinois, as well as the United States District Court for the Northern District of Illinois.  I am an attorney with the law firm Reed Smith LLP, attorneys of record for Crowley in this lawsuit.

3.      I submit this declaration in support of Crowley Maritime Corporation's ("Crowley") Response to National Union's Supplemental Memorandum in Support of its Motion for Summary Judgment in the above-captioned lawsuit.

4.      Attached hereto as Exhibit A is a true and correct copy of excerpts from the March 14, 2017 deposition of Ty Sagalow in this matter.

I declare the foregoing to be true and accurate to the best of my knowledge under the penalty of perjury.

Executed on May 23, 2017

_____
Emily E. Garrison

# Doc. 40-2

# EXHIBIT A

1

2    UNITED STATES DISTRICT COURT

3    MIDDLE DISTRICT OF FLORIDA

4    Case No. 3:16-cv-01011-TJC-JBT

5    ----------------------------------)

6    CROWLEY MARITIME CORPORATION,

7              Plaintiff,

8         vs.

9    NATIONAL UNION FIRE INSURANCE

10   COMPANY OF PITTSBURGH, P.A.,

11             Defendant.

12   ----------------------------------)

13

14

15        DEPOSITION OF TY SAGALOW

16          New York, New York

17           March 14, 2017

18

19

20

21

22   Reported by:

23   Linda Salzman, RPR

24   Job No. 121099

25

Page 2

1

2                    March 14, 2017

3                    1:00 p.m.

4

5        Deposition of TY SAGALOW, the

6   witness herein, held at the offices

7   of Reed Smith, LLP, 599 Lexington

8   Avenue, New York, New York, pursuant

9   to Notice and Agreement, before

10  Linda Salzman, a Notary Public of

11  the State of New York.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                        T. Sagalow

1    yes.

2         Q.    And in deciding the summary

3    judgment motion on coverage, is it fair to

4    say the judge disallowed your affidavit?

5         A.    I don't think that would be fair

6    to say.  I mean, the judge specifically

7    affirmed my expertise, affirmed me as an

8    expert, denied the Daubert motion, allowed

9    me to testify, and allowed me to testify

10   on the issue at hand, which was bad faith,

11   but also allowed me to testify as to the

12   reasonableness from a bad faith point of

13   view as Darwin's decision to find that

14   there was not coverage.

15        Q.    In the AlixPartners case?

16        A.    Yes.

17        Q.    Did you testify regarding

18   something that you described as a

19   principle of continuity?

20        A.    I seem to recall that.  I like

21   talking about continuity.

22        Q.    What does that mean to you, that

23   principle?

24        A.    So there's a lot of subsets to

1                    T. Sagalow

2   that, but on the highest level, what it

3   means is that an insured that is with,

4   most of the time it's a single carrier,

5   but it could be multiple carriers that are

6   providing a continuous series of policies,

7   that the insured has a reasonable

8   expectation in most circumstances, absent

9   unusual facts, that a claim that is made

10  sometime during those series of policy

11  periods would be covered somewhere.

12      Q.    Is that still your opinion that

13  this is an established custom and practice

14  in the industry?

15      A.    I believe the continuity is an

16  established practice in the industry.

17      Q.    If you say that a claim can be

18  made against the insured, it can be deemed

19  to be made against the insured, even

20  though the insured is completely unaware

21  of it, doesn't that inevitably conflict

22  with the principle of continuity?

23      A.    No, because the principle of

24  continuity says that the insured has a

25  reasonable expectation that it will be

1                    T. Sagalow

2      covered in one of the policies.

3                    Here the reasonable expectation

4      of the insured is that it would be covered

5      under the 2007/2008 policy, because it is

6      my view, as indicated in the report, that

7      the claim was made in April of 2008.

8                    Now, you had mentioned a number

9      of times about when the affidavit was

10     unsealed, and I had indicated that I

11     thought it was unsealed in 2015 and it

12     wouldn't matter, it's still made it 2008,

13     I think that's certainly true.  It is an

14     interesting issue if it was under National

15     Union's theory, which I don't agree with,

16     that when it was unsealed was important.

17                   Under that theory, if it was

18     unsealed and made available to Farmer

19     earlier, I don't want to read into your

20     questions, but to the extent that if it's

21     true, and I don't know, that it was made

22     available to Farmer earlier before 2015,

23     then that under National Union's theory

24     might mean that it was made earlier than

25     2015.

Page 99

1          T. Sagalow

2          And if it was made during the

3   extended reporting period meaning before

4   November 1, 2013, then under National

5   Union's theory that when Farmer became

6   aware of the unsealing or it was unsealed

7   to him, that might be another reason why

8   it was covered under the 2007 policy.

9          But my fundamental belief

10  remains, as I said in the report, that

11  when it was unsealed is not important

12  under my theory.  What was important is

13  that it was in existence and it was known

14  to be in existence in 2008.

15     Q.    Going back to my question, which

16  was more a matter of general custom and

17  practice in the industry rather than the

18  particularized facts of this case --

19     A.    Got it.  Uh-huh.

20     Q.    Is it a custom and practice in

21  the industry to place on the insured the

22  burden of reporting things that he doesn't

23  know about?

24          MR. SHUGRUE:  Object to the form

25      of the question.

1     T. Sagalow

2  A.  So to answer that question, you

3 would look at the notice provisions.  The

4 notice provisions usually say that it has

5 to be reported as soon as practical.

6 Sometimes it says it has to be reported as

7 soon as practical after one or more named

8 individuals are aware of the claim.  As

9 you indicated sometimes, there's a

10 post-policy period reporting allowance,

11 and that's what the policy says.

12    Now, sometimes you can imagine

13 hypothetical situations where the strict

14 application of that rule might result in

15 an unfairness to the insured, in which

16 case one would look at that.

17    But again, that's not the

18 hypothetical we have here.  The

19 hypothetical we have here -- the facts we

20 have here is that Farmer is looking for

21 the straightforward application of the

22 definition of claim.  He is not saying oh

23 I wasn't aware of it and therefore I'm

24 losing coverage unfairly.

25    In fact, it's the opposite.

1                T. Sagalow

2  National Union is trying to take away

3  coverage, I would view unfairly, under

4  this some sort of argument dealing with

5  Farmer's awareness of the content of the

6  FBI affidavit.

7      Q.    Getting back to my question, in

8  general custom and practice in the

9  industry, the policy typically provides

10  that the claim must be reported in no

11  event later than the end of the policy

12  period or the end of the post-policy

13  reporting allowance, correct?

14      A.    Correct.

15      Q.    So in terms of general custom

16  and practice in the industry, if a claim

17  is made in one policy period and it's not

18  discovered until after the end of the

19  post-policy period discovery allowance,

20  which policy would respond?

21          MR. SHUGRUE:  Object to the

22      form.

23      A.    Again, it's an incomplete

24  hypothetical.  If a claim is made during

25  the policy period and it is reported

1                    T. Sagalow

2    during the policy period, obviously

3    everything is fine.

4            If it's reported before the end

5    of the post-policy period reporting

6    allowance, everything is fine.  If there

7    is late reporting, sometimes it's fine,

8    sometimes it isn't fine.  It depends upon

9    the facts and circumstances, and while I'm

10   not a lawyer, sometimes it does depend on

11   the underlying law as that may be

12   manifested by endorsements as to why it

13   was reported late.  So again, not a simple

14   answer.

15       Q.    If you take the position that a

16   claim is deemed made when it's discovered

17   and reported, is that consistent with the

18   principle of continuity as you describe

19   it?

20       A.    The AIG approach to this issue,

21   which is the only one that I'm thinking in

22   my head, I think is very consistent with

23   the issue of continuity because it's

24   looking at the issue of fairness and

25   saying to an insured:  You have been with

1                T. Sagalow

2    me for a continuous period of time and you

3    reported the claim late.  And under these

4    circumstances, that's okay.  And we're

5    going to cover it, even though you

6    reported it late, but subject to these

7    various conditions or restrictions as set

8    forth in the New York and mandatory and

9    versions of the endorsement that are in

10   the industry that do a similar thing.

11       Q.    Are you aware of any cases in

12   which an insurer has denied coverage on

13   the grounds that the claim was made before

14   the policy period even though the insured

15   had no knowledge of the claim until during

16   the policy period?

17       A.    I don't have any specific

18   awareness, but I wouldn't be surprised if

19   that happened.

20       Q.    Why would you not be surprised

21   at that?

22       A.    Because again, it deals with

23   issues of continuity and fairness.  And

24   there are situations where that might be

25   okay.  And there are situations where it

1                T. Sagalow

2    might not be okay.

3            Again, we look at the language

4    of the policy.  The policy says a claim

5    has to be made during the policy period.

6    If the insured doesn't adhere to that

7    rule, if the claim was made prior to the

8    policy period, one's first reaction is not

9    covered.

10           But that's only a first

11   reaction.  You would have to look at the

12   facts and see whether there were other

13   facts that would make that reaction to be

14   unfair.

15   Q.    Is that really the case, in each

16   case you determine whether it's covered by

17   whether it would be fair or unfair?

18   A.    No.  I use fairness in answering

19   your questions because National Union --

20   one of National Union's defenses in this

21   case is that providing coverage to Tom

22   Farmer would be unfair.  I think their

23   argument as to why it would be unfair is

24   extremely puzzling.  But as long as the

25   issue of fairness seems to be on the

1              T. Sagalow

2   table, I answer your questions by using

3   that phrase.

4      Q.   Are you aware of any instances

5   in which National Union or any AIG company

6   ever took the position that a claim was

7   made before the policy period even though

8   the insured didn't know about it?

9         MR. SHUGRUE:  Object to the

10    form.

11      A.   I don't know, but I wouldn't be

12   surprised because again you look at the

13   definition of claim.  And the definition

14   of claim sometimes requires awareness by

15   the insured of the existence of the claim.

16   Sometimes the language does not require

17   awareness of the insured of the existence

18   of the claim.

19      Q.   Are you aware of any cases in

20   which any other insurer ever took the

21   position that a claim was made against the

22   insured before the policy period even

23   though the insured didn't know about it?

24      A.   I answer the same way.

25      Q.   Would you look in Exhibit 3 at

1              T. Sagalow

2    the definition of claim again?

3         A.    Uh-huh.

4         Q.    Is there anything in the

5    definition of claim that talks about when

6    a claim is deemed to be made?

7         A.    Yes.  This definition of claim

8    has a timing aspect to it.  Now, there are

9    many, many ways of inserting a timing

10   aspect into an insurance policy.  A D&O

11   policy.  One of the easier ways was the

12   way AIG chose in another policy form

13   issued to Crowley which had a provision,

14   and I don't have it in front of me which

15   had a provision which essentially said a

16   claim is deemed have been made at the time

17   it is received by the insured or by the

18   insured's agent or by the carrier

19   whichever comes first.

20             Something like that.  That's

21   obviously a very easy and simple way of

22   putting into the "when is a claim made

23   concept" into the insurance policy.

24             Now, AIG didn't do that here.

25   If it was, we would be looking at that

1              T. Sagalow

2    provision.  But they chose not to do that

3    here.

4              Instead, they chose to put the

5    timing issue into the actual definition of

6    claim.  So, for example, (b)(2) says that

7    a civil, criminal, administrative,

8    regulatory or arbitration proceeding is a

9    claim which is commenced by, right.  So

10   "which is commenced by" is a timing

11   phrase.  And it essentially says it is

12   commenced by, meaning it occurs, it

13   becomes a claim, it is made at the time of

14   the service of the complaint or similar

15   proceeding.

16             And in the case of an indictment

17   is when the indictment is returned, by the

18   way, whether or not the insured knows it

19   was returned.  That's the rule.

20             And then (3)(i) is the receipt

21   of a notice of charges.  So there's a

22   timing issue of inherent in (b)(2).

23   Similarly, the definition which is the

24   definition in this case, (b)(3) also has a

25   timing issue.  And one of the issues in

1              T. Sagalow

2    this case is when did that timing issue

3    occur.

4              And my interpretation of (b)(3)

5    is that that timing issue occurred in

6    April of 2008, and I believe Mr. Newman,

7    at least in paragraph 34 of his report,

8    agrees that the DOJ investigation, the FBI

9    affidavit was made in April of 2008, and I

10   certainly agree with him on that point.

11       Q.    There's nothing in the language

12   of the definition of claim which talks

13   about -- which uses the phrase "claim

14   being made"?

15       A.    Correct.   These are alternative

16   phrases that result in the same concept.

17       Q.    In part 1 of the definition, is

18   there any timing aspect there?

19       A.    There is no timing aspect in 1.

20   There is a timing aspect in (2).   There is

21   a timing aspect in (3).   Yes, there is a

22   timing aspect in (2)(i), (2)(ii),

23   (3)(iii), i.e. all of (2), (3)(i) and

24   (3)(ii).

25       Q.    So under part 1 of the

1         T. Sagalow

2    definition, how do you tell when the claim

3    was made?

4        A.    So fascinating question, right.

5    So here the carrier is taking, I think, a

6    practical view, which is when is a written

7    demand made.

8            I think that most carriers would

9    take the point of view that a written

10   demand is made when it's received, but the

11   language doesn't say so.  And it would be

12   an interesting case where there was a

13   written demand that was written out,

14   drafted, kept in a drawer, and then given

15   to the insured until years later.

16           I think if that actually

17   happened a few times, the industry would

18   change (b)(1) to add language to a written

19   demand for monetary or nonmonetary relief

20   when, when it was served, when it was

21   given, when it was written.

22           Right now it does not have an

23   expressed timing issue in (b)(1).

24       Q.    But in this scenario that you

25   just hypothesized, which is a demand

1                      T. Sagalow

2       letter written out, put into a drawer and

3       not shown to the insured until a year

4       later, pretty much every carrier would

5       take the position the claim was made when

6       the insured received it, right?

7                MR. SHUGRUE:   Object to the form

8          of the question.

9          A.    I would say that carriers should

10      take that point of view because of an

11      issue of fairness to the insured.  My

12      guess is also that it happened a lot.

13      Then the definition (b)(1) would be

14      amended to make it clear that a written

15      demand is a claim when it's received.

16         Q.    What about if a written demand

17      is mailed on December 26th and received on

18      January 3rd, based on custom and practice

19      in the industry, when would you say a

20      claim was made?

21               MR. SHUGRUE:   Object to the form

22          of the question.

23         A.    So in the real world, we would

24      need a whole bunch of other facts.  We

25      talked before about continuity.  If it was

1                     T. Sagalow

2    the same carrier in both policy period 1

3    and policy period 2, then with the same

4    terms conditions limits deductible,

5    et cetera, et cetera.  Then it might not

6    matter and everyone might agree to just

7    cover in policy period 2.

8              If there was different carriers,

9    then it is possible that either carrier

10   would point to each other, which would be

11   unfortunate for the insured.

12       Q.    And are you, as an expert, aware

13   of any custom and practice in the industry

14   as to how they would deal with that

15   situation?

16             MR. SHUGRUE:  Object to the

17        form.

18       A.    Yes.  The custom and practice in

19   the industry would be to look at the

20   reasonable expectations of the insured and

21   for the carriers in question to get

22   together and make sure they act in a way

23   that doesn't deprive the insured of his

24   reasonable expectations of coverage.  What

25   that reasonable expectation was is very

# Doc. 43

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA

CROWLEY MARITIME CORPORATION,

                        Plaintiff

v.                                                          C.A. NO.  3:16-cv-1011-J-32JBT

NATIONAL UNION FIRE INSURANCE
COMPANY OF PITTSBURGH, PA.,

                        Defendant

---

**RESPONSE OF NATIONAL UNION FIRE INSURANCE COMPANY OF
PITTSBURGH, PA. TO PLAINTIFF'S SUPPLEMENTAL MEMORANDUM IN
OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Michael P. Duffy, Esq.
Peabody & Arnold LLP
Federal Reserve Plaza
600 Atlantic Avenue
Boston, MA 02210-2261
(617) 951-2100
mduffy@peabodyarnold.com

Stephen Hunter Johnson, Esq.
Jason Bloom, Esq.
Lydecker Diaz
1221 Brickell Avenue
19th Floor
Miami, FL 33131
(305) 416-3180
shj@lydeckerdiaz.com
jbloom@lydeckerdiaz.com

Pursuant to the Court's recent Order, National Union respectfully submits the following response to the supplemental memorandum filed by the plaintiff on May 23, 2017.

## 1.  Proffered Expert Testimony of Ty Sagalow

Crowley's position, as set forth in the Complaint and in all of its prior filings, is that a Claim was made against Mr. Farmer when the Affidavit was signed on April 16, 2008, *even though he was not aware of it at the time*.  See, e.g., *Complaint*, ¶28 ("The Search Warrant Affidavit, which is dated April 16, 2008, plainly establishes that a Claim was made against Mr. Farmer as of April 16, 2008.")  As pointed out previously by National Union, however, this would place the insured in the impossible position of having to report things of which it had no knowledge.  Crowley then offered an expert report from Ty Sagalow to show that its position was supported by industry practice.

At his deposition, however, Mr. Sagalow admitted that he was unaware of any case in which any insurer had ever taken the position advocated by Crowley, i.e., that a Claim can be deemed to have been made against the insured even though the insured is completely unaware of it.  In the absence of an actual industry practice on the issue, Mr. Sagalow's opinion is nothing more than his personal opinion on how the Court should read the policy, which clearly is not a proper subject for expert testimony.  *Devin v. City of Hollywood,* 351 So.2d 1022, 1026 (Fla. 4th DCA 1976).  Other courts have disregarded similar attempts by Mr. Sagalow to opine on questions of policy interpretation.  For example:

> [T]he Court GRANTS AAIC's motion to strike the declaration of Ty R. Sagalow as speculative and consisting of improper legal conclusions.  The Court does not consider the declarations relevant to the legal issues presented in the cross-motions for summary judgment.  Instead, as is within its province, the Court bases its decision on an independent interpretation the contractual language of the applicable insurance policies.

*American Alternative Ins. Corp.,* 2016 WL 801374 at *3 (N.D.Cal.).

1

Crowley's supplemental memorandum does not dispute that this was in fact Mr. Sagalow's deposition testimony. Rather, Crowley says that his testimony was taken out of context because it involved a hypothetical situation in which an insured had no knowledge of the claim. Of course, however, this is the entire theory of Crowley's case. Crowley claims in this case that the Claim was made against Mr. Farmer on April 18, 2008 even though he didn't know it at the time. Therefore, the hypothetical was entirely appropriate.

Furthermore, the only industry custom and practice actually identified by Mr. Sagalow strongly supports National Union's position. He testified that with respect to Part (b)(1) of the definition of Claim ("a written demand for monetary, non-monetary or injunctive relief"), every insurer takes the position a Claim is not deemed to have been made against the insured until the insured receives the demand. Despite what Crowley now says, this is far from irrelevant. This practice is completely inconsistent with Crowley's argument that a Claim was made against Mr. Farmer under Part (b)(3) of the definition of Claim on April 16, 2008 even though he didn't know it at the time.

**2. Prior Availability of the Search Warrant Affidavit**

Crowley's Supplemental Memorandum filed on April 17, 2017 characterized as "undisputed" Crowley's assertion that it could not have obtained a copy of the Search Warrant Affidavit prior to 2015. (*Crowley's Supplemental Memorandum*, p. 6). National Union then noted in its own supplemental filing that prior unavailability of the Affidavit was not in fact "undisputed." Under *Bennett v. United States*, 2013 WL 3821625 (S.D.Fla. July 23, 2013), Crowley could have filed a motion seeking access to the Affidavit. Mr. Farmer also could have filed a motion seeking permission from the Court to share the Affidavit with Crowley for the limited purpose of pursuing insurance coverage. Neither did so. While Crowley now argues that

such motions might not have been allowed and that there is at least an issue of fact on this point, Crowley does not deny that no such motions were filed and it does not contradict National Union's statement that prior unavailability of the Affidavit is not in fact "undisputed."

### 3.  Availability of Equitable Tolling

National Union's prior memorandum cited extensive case law from the District of Florida holding that under Florida law equitable tolling of the statute of limitations is unavailable outside of the administrative law context.  See, e.g., *Baez v. Root*, 2014 WL 1414433 at *3 (S.D.Fla. Apr. 11, 2014); *Lopez v. GEICO Casualty Co.*, 968 F.Supp.2d 1202, 1206-1207 (S.D.Fla. 2013); *Migdalia v. NBTY, Inc.,* 2011 WL 13115434 at *3 (S.D.Fla. Dec. 9, 2011); *Socas v. Northwestern Mut. Life Ins. Co.*.., 829 F.Supp.2d 1262 (S.D.Fla. 2011); *Pierson v. Orlando Regional Healthcare Systems*, 2010 WL 1408391 at *15 (M.D.Fla. April 6, 2010), *aff'd,* 451 Fed.Appx. 862 (11th Cir. 2012).  While Crowley cites to several cases coming out the other way on this point, it never even attempts to deal with the fact that the *Pierson* decision denying equitable tolling was affirmed Eleventh Circuit Court of Appeals in 2012 with a statement that "[t]he district court carefully analyzed every claim raised by Pierson and correctly applied the law."  451 Fed.Appx. at 864.  Unless the Eleventh Circuit reverses itself on this issue, equitable tolling of the statute of limitations is not available in this case.

### 4.  Office Depot as Controlling Precedent

The decision of the Eleventh Circuit in *Office Depot, Inc. v. National Union Fire Insurance Company of Pittsburgh, Pa.*, 453 Fed.Appx. 871 (11th Cir. 2011), also is controlling precedent in this case.  The *Office Depot* case involved the same policy form at issue here.  In *Office Depot*, the court squarely held that even where a Claim relates back to a prior notice of circumstances pursuant to Section 7(c) of the National Union policy, no coverage is afforded for

legal fees incurred prior to date the Claim was made.  This is directly contrary to Crowley's argument that, even if the Claim against Mr. Farmer is deemed to have been made when he received the Affidavit in 2013, relation back to the April 25, 2008 notice of circumstances pursuant to Section 7(c) would entitle Crowley to recover fees incurred in the interim.

In response, Crowley repeats its argument that a Claim was made against Mr. Farmer in 2008.  But this is no response at all.  If, as Crowley says, the Claim was made when the Affidavit was signed on April 16, 2008, then the concept of relation back under Section 7(c) is irrelevant.  By its terms, Section 7(c) only applies to Claims made *subsequent* to the notice.  If the Claim is deemed to have been made after April 25, 2008, then it relates back pursuant to Section 7(c), but under the terms of the policy as construed by the Eleventh Circuit, there is no coverage for fees incurred prior to the date the Claim was made.  Obviously, there are factual differences between *Office Depot* and this case, but those differences have nothing to do with the Eleventh Circuit's clear decision construing the same policy language on which Crowley purports to rely.

## 5.  Application of the Run-Off Endorsement

Finally, National Union argued in its prior memorandum that Crowley's claim for coverage also should be rejected because the Search Warrant Affidavit was not submitted to National Union as a Claim until November of 2015.  Crowley's claim thus was untimely on its face because, pursuant to Endorsement No. 14 of the Policy, the Discovery Period for giving notice of Claims expired on November 1, 2013.  This was not a "new argument," because the same argument was made in National Union's reply memorandum filed on December 9, 2016.  Under Florida law, failure to give timely notice under a claims made policy precludes coverage. *Jennings Construction Services Corp. v. ACE American Ins. Co.,* 783 F.Supp.2d 1209, 1212-1213 (M.D.Fla. 2011).

4

In its supplemental memorandum, Crowley now says that the Claim actually was reported to National Union in 2008.  However, this was Crowley's argument at the arbitration and Crowley lost.  The arbitration panel determined that as of January 2013 no Claim had been reported to National Union.  Crowley cannot prevail here just by repeating the same arguments that were rejected by the arbitrators.

Crowley's other argument is that Mr. Sagalow thinks it would be inconsistent with industry practice to enforce the terms of the policy.  However, it is settled under Florida law that industry practice cannot be used to contradict clear policy language.  *Indian Harbor Citrus, Inc. v. Poppell,* 658 So. 2d 605, 606 (Fla. Dist. Ct. App. 1995) ("custom and usage… 'cannot operate to contravene express instructions or to contradict an express contract to the contrary.'")  Furthermore, Mr. Sagalow never identifies the basis for his assertion regarding so-called industry practice.  As stated by another court in similar circumstances involving the same Mr. Sagalow:

> Although Sagalow claims that his opinions are derived from the insurance industry's custom and practice, nowhere in his affidavit does Sagalow clarify what these customs actually are or identify his sources therefor.  Rather, the paragraphs touch immediately upon the heart of the matter and the issue this court is prevailed upon to answer, *i.e.* whether [the insured] is entitled to coverage under the Policy and, as such, the paragraphs propone a legal conclusion.  A mere generalized statement of "based on the custom and practice of the professional liability insurance and underwriting industry" without any further clarification does not lift these paragraphs from the impermissible realm of legal conclusion into valid expert opinion.

*Bar Plan Mut. Ins. Co. v. Likes Law Office, LLC,* 44 N.E.3d 1279, 1291 (Ct. App. Ind. 2015).  For the same reasons, Mr. Sagalow's assertions regarding so-called industry practice should be given no weight in this case.

NATIONAL UNION FIRE INSURANCE
COMPANY OF PITTSBURGH, PA.

By its attorneys,

*/s/Michael P. Duffy*_____
Michael P. Duffy, Esq.
Peabody & Arnold LLP
Federal Reserve Plaza
600 Atlantic Avenue
Boston, MA 02210-2261
(617) 951-2004
mduffy@peabodyarnold.com

Stephen Hunter Johnson, Esq.
Jason Bloom, Esq.
Lydecker Diaz
1221 Brickell Avenue
19th Floor
Miami, FL 33131
(305) 416-3180
shj@lydeckerdiaz.com
jbloom@lydeckerdiaz.com

## CERTIFICATE OF SERVICE

I, Jason Bloom, do hereby certify that I have, this 7th day of June, 2017, served the foregoing document, by causing a copy thereof, to be sent electronically to the registered participants in this case, if any, as identified on the Notice of Electronic Filing (NEF):

*/s/ Jason Bloom*

1228580_1

# Doc. 49

IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

CROWLEY MARITIME CORPORATION,    Jacksonville, Florida

          Plaintiff,             Case No. 3:16-cv-1011-J-32JBT

  vs.                            June 20, 2017

NATIONAL UNION FIRE INSURANCE    10:04 a.m.
COMPANY OF PITTSBURGH, PA.,
                                 Courtroom No. 10D
          Defendant.
_____


MOTION HEARING
BEFORE THE HONORABLE TIMOTHY J. CORRIGAN
UNITED STATES DISTRICT JUDGE


COURT REPORTER:

     Shannon M. Bishop, RDR, CRR
     221 North Hogan Street, #150
     Jacksonville, Florida  32202
     Telephone:  (904)549-1307
     dsmabishop@yahoo.com


     (Proceedings recorded by mechanical stenography;
transcript produced by computer.)

PLAINTIFF'S COUNSEL:

        **JOHN D. SHUGRUE, ESQ.**
        **EMILY E. GARRISON, ESQ.**
        Reed Smith, LLP
        10 South Wacker Drive, 40th Floor
        Chicago, IL  60606-7507

        **CHARLES B. LEMBCKE, ESQ.**
        Law Office of Charles B. Lembcke, PA
        1300 Riverplace Boulevard, Suite 605
        Jacksonville, FL  32207

DEFENSE COUNSEL:

        **MICHAEL P. DUFFY, ESQ.**
        Peabody & Arnold, LLP
        600 Atlantic Avenue, 6th Floor
        Boston, MA  02210-2261

        **JASON BENJAMIN BLOOM, ESQ.**
        Lydecker Diaz
        19th Floor
        1221 Brickell Avenue
        Miami, FL  33131

1          P R O C E E D I N G S

2    June 20, 2017                           10:04 a.m.

3                       - - -

4          COURT SECURITY OFFICER:  All rise.  The United States

5    District Court in and for the Middle District of Florida is now

6    in session.  The Honorable Timothy J. Corrigan presiding.

7    Please be seated.

8          THE COURT:  Good morning.  As you all can see, we

9    have some interns here.  Some of these folks work for the

10   federal court.  Others work for law firms and others around the

11   city.

12         And we have a program in which we invite them to come

13   in to observe court proceedings.  And they've already observed

14   a criminal sentencing with my colleague, Judge Howard.  And

15   today was their lucky day to observe a civil proceeding.

16         And since this argument seemed to be of the type that

17   was a legal argument that had elements to it that we thought

18   the students might be interested in, we've invited them to join

19   us today.  So what that means to the lawyers is you need to be

20   on your best behavior and show them how it's really done.

21         And for you, we welcome you.

22         I'm going to let counsel for Crowley, when he first

23   gets up, to just give me a brief statement of the case.  I

24   don't normally do that, because I already know what the case is

25   about, but -- but it will help you-all at least to have some

1    understanding.

2            It's essentially an insurance coverage dispute.  And

3    it has issues of potential application of res judicata, statute

4    of limitations, and some other subsidiary issues in it.

5            So I think once you start to hear the arguments,

6    you'll be able to follow along well.  And so hopefully it will

7    be interesting for you.

8            I've read, of course, all the briefing and a pretty

9    extensive record involving, as I said, a prior -- I don't know

10   if I did say, but there was a prior arbitration proceeding,

11   which is the basis for the claim that res judicata bars the

12   case.  And so you'll -- I think as you hear the arguments

13   develop, you'll be able to follow along.

14           And I actually -- I actually misspoke.  The moving

15   party is the insurance company.  Sometimes -- it depends on how

16   the case is set up.

17           But in this case the insurance company is moving for

18   summary judgment to have the court rule as a matter of law that

19   there's no coverage in the case.

20           And so the first attorney to argue will be the

21   attorney for the defendant, National Union Fire Insurance

22   Company of Pittsburgh.  And let me go ahead and announce the

23   case.  *Crowley Maritime Corporation versus National Union Fire*

24   *Insurance Company of Pittsburgh*, Case No. 3:16-cv-1011.

25           And let me see if I can get all the cast here.

1   Mr. Shugrue.

2           Am I saying it right?

3           MR. SHUGRUE:  Yes, Your Honor.

4           THE COURT:  Ms. Garrison.

5           MS. GARRISON:  Yes, Your Honor.

6           THE COURT:  Mr. Lembcke, how are you, sir?

7           MR. LEMBCKE:  Good.  How are you?

8           THE COURT:  And assisted by Ms. Lehmann.

9           And is it Fi-con or Fic-on?

10          MR. FICON:  Fi-con.

11          THE COURT:  Ficon, vice president on the Crowley

12  side.

13          And then over here on -- Mr. Duffy and Mr. Bloom for

14  National Union; is that correct?

15          MR. DUFFY:  Yes, Your Honor.

16          THE COURT:  Okay.  Good.

17          All right.  What confused me slightly is usually I

18  have the plaintiff -- y'all are on the opposite sides of what

19  I'm normally used to, so that's -- that was why I was

20  struggling with who was who.  But I think I got it now.

21          So, Mr. Duffy, are you going to present the argument

22  on behalf of National Union?

23          MR. DUFFY:  Yes, I am, Your Honor.

24          THE COURT:  You may proceed.

25          MR. DUFFY:  Good morning, Your Honor.

1        Michael Duffy from Peabody & Arnold on behalf of the

2   defendant, National Union Fire Insurance Company of Pittsburgh,

3   Pennsylvania.  And with me is Jason Bloom from Lydecker Diaz.

4        Your Honor, as a brief, I guess, statement of the

5   case, for the benefit of our listeners, this is an insurance

6   coverage dispute.  It involves the plaintiff's attempt to

7   recover legal fees which it paid on behalf of one of its

8   employees during the period from 2008 through 2013.

9        The underlying circumstances involve a -- an

10  antitrust conspiracy between Crowley and a number of other

11  shipping companies, in which they were setting prices for

12  shipping in the -- between Jacksonville and San Juan primarily.

13  We know that that's true because Crowley pleaded guilty to

14  criminal charges in 2012.

15       The motion today is a motion for summary judgment

16  that was originally filed as a motion to dismiss.  And it's

17  based primarily -- or not primarily, but at least initially, on

18  the fact that we had a prior arbitration in this case.

19       The underlying facts involve a search warrant served

20  at Crowley's offices in 2008, which was submitted to National

21  Union at that time for coverage under the policy.

22       There was a denial of coverage in 2008.  Crowley then

23  filed a demand for arbitration in 2012 seeking to recover fees

24  that it paid on behalf of four of its employees starting in

25  2008.

1    The arbitration panel issued an award in January of

2 2013 in favor of National Union, finding that National Union

3 did not owe a duty to pay any of those fees under the policy.

4    In 2013, after the arbitration award, Mr. Farmer was

5 indicted.  And at that point National Union did agree to

6 recognize the proceeding against Mr. Farmer.  Actually, it was

7 a month before the indictment.

8    But we agreed to treat that as a claim against

9 Mr. Farmer.  And we recognized fees incurred from 2013 forward

10 as potentially covering -- as covered under the policy.

11    National Union, in fact, paid Mr. Farmer's fees from

12 2013 through 2015.  In 2015, he was acquitted by a jury.  And

13 in 2015, Crowley went back and obtained from the court a copy

14 of the original search warrant affidavit that was filed in

15 2008.

16    And based on that affidavit, they filed this action,

17 claiming that, based on the affidavit, National Union now is

18 retroactively obligated to pay attorneys' fees incurred from

19 2008 through 2013, even though the arbitration panel decided in

20 2013 that National Union was not obligated to pay any of those

21 fees.

22    That's basically what it's about in a nutshell.

23    THE COURT:  And let me just -- and I appreciate that.

24 And let me just say one other thing, and then we'll -- we'll

25 get going here.

1      The operative portion of the policy -- there may be

2  other portions that are relevant.  But the one that people talk

3  about the most in this case is that the policy provides

4  coverage for an insured if there is a civil, criminal,

5  administrative, or regulatory investigation of an insured

6  person.  In this case that's going to be Mr. Farmer, as you'll

7  hear.

8      And here's the key language:  Once such insured

9  person is identified in writing by such investigating authority

10  as a person against whom a proceeding described in definition

11  may be commenced.

12      And so you'll hear probably a lot about that as we go

13  along, but -- and the primary arguments, as you'll start to

14  hear, are res judicata based on the arbitration award and,

15  alternatively, that the statute of limitations has expired on

16  the claim.

17      So, Mr. Duffy, you may now proceed with your

18  argument.

19      MR. DUFFY:  Thank you, Your Honor.

20      Your Honor, as you know, we initially filed this as a

21  motion to dismiss.  It was converted by the court into a motion

22  for summary judgment.

23      We conducted discovery for a period of months.  I

24  don't remember the exact -- how many.  We took multiple

25  depositions.  And now we're back before you as a motion for

1    summary judgment.

2          Our view is that nothing which happened in the course

3    of discovery points to any disputed issue of fact.  Our motion

4    is based on the chronology of events.  And the chronology of

5    events is not disputed, I don't believe, in any respect by

6    Crowley.

7          The base of chronology I alluded to earlier is that

8    we have this conspiracy running up to 2008.  We have a policy

9    issued by National Union, November 1st of 2007.  And there are

10   a couple of provisions of the policy that are pertinent.

11         There's the definition of claim, as Your Honor

12   mentioned earlier, but there's also Endorsement 14 to the

13   policy, which is designated as a run-off endorsement.

14         What that policy says is that the insured was granted

15   a six-year discovery period in which it could report to

16   National Union claims that were first made against an insured

17   during the discovery period.

18         THE COURT:  And I had a question about that as it --

19   as it interrelates with the statute of limitations.  Is the --

20   what is the interrelationship between the statute of

21   limitations and the run-off period?

22         In other words, let's say you have -- you know,

23   Florida -- I guess it was five years.  It ended up being almost

24   coextensive, I guess, but -- and what if you had a state who

25   had a three-year statute of limitation on breach of contract

1   claims, but you have the six-year run-off period?

2          Does the policy, in effect, allow claims beyond where

3   a statute of limitations might otherwise?  I just -- I just was

4   not familiar -- I've done a lot -- a fair amount of insurance

5   coverage work.  I just am not familiar with this run-off period

6   and how it works.

7          MR. DUFFY:  Well, Your Honor, I don't think there's

8   actually any case law on that question, because it just never

9   comes up.

10         And the reason why it never comes up is this.  If you

11  have a later-filed claim which relates back under section 7(c)

12  of the policy --

13         THE COURT:  Right.

14         MR. DUFFY:   -- under the *Office Depot* case, there's

15  no coverage -- even suing relation back, there's no coverage

16  for fees incurred prior to the date the actual claim was made.

17  So relation back wouldn't matter, I think.

18         As far as how it interrelates to the statute of

19  limitations, you know -- I don't think it changes the statute

20  of limitations.  Florida law still says you have a five-year

21  period in which you're allowed to file suit.

22         The six-year run-off period and the statute of

23  limitations have different starting points.  The six-year

24  run-off period starts when the policy is issued.  And you have

25  six years to report a claim.

1           The five-year statute of limitations starts on the

2    date of the breach, which I think is the date of the denial.

3    So the two periods measure different things for different

4    purposes.

5           THE COURT:  Well, they do.  But you could envision a

6    situation where the run-off period was longer than the statute

7    of limitations period.  But I know that's not necessarily what

8    we're talking about.

9           I just didn't -- I just was not -- it was just kind

10   of an interesting thing to me as I was reading it, because -- I

11   guess really the question I had is:  Is the -- does the policy

12   treat relation back the same way that a statute of limitations

13   would?

14          MR. DUFFY:  Let me just make one more point about the

15   run-off endorsement.

16          THE COURT:  Yeah.

17          MR. DUFFY:  Because you have six years to report a

18   claim.

19          THE COURT:  Right.

20          MR. DUFFY:  And then you have five years to file a

21   suit for when the claim is denied.  So you could report a claim

22   in year number six.  If it's denied at that point, then you'd

23   have five more years to file suit.  If you report a claim in

24   year number one and it's denied, then you'd have five years to

25   file suit.  So they just measure different things.

1      The run-off period is when the claim has to be

2  reported.  And as long as it's timely reported, you have five

3  years from the date of breach in order to file the suit.

4      THE COURT:  All right.  Well, we probably could write

5  a law review article on it, but we're not going to.

6      MR. DUFFY:  Okay.

7      THE COURT:  So let's -- can I just ask you a

8  question?

9      MR. DUFFY:  Of course.

10      THE COURT:  So what happened in this case is that the

11  search warrant was issued and Mr. Farmer was named in the

12  search warrant.  He also received a grand jury subpoena.

13      And we now know -- and those were thought by the

14  arbitrators to be insufficient information to meet the policy

15  provisions.

16      We now know that at that same time that the search

17  warrant was issued, this affidavit was actually part of it,

18  which it always is, but that affidavit was kept under seal by

19  the court, which is not unusual in a criminal investigation.

20      In that affidavit Mr. Farmer was specifically named

21  as a subject of the investigation.  So I have two questions for

22  you.

23      First of all, I want to understand your position.  If

24  that affidavit had been available at the same time as the

25  search warrant, so that -- and so that the record included the

1    affidavit as part of the information available, would that have

2    been sufficient under the policy to identify in writing the

3    insured person by such investigating authority as the person

4    against whom a proceeding may be commenced?

5              MR. DUFFY:  Your Honor, our position on that would be

6    no.  But our position on that is that -- we're not relying on

7    that as the basis for our motion.

8              THE COURT:  I understand.  But it -- it is important

9    to me.  Because I want to know are we talking about -- are we

10   talking about something that if it had been known at the time

11   it was actually executed, like the search warrant was, would

12   National Union have denied coverage saying that even that

13   writing was not good enough?

14             Or are we talking about a situation where National

15   Union acknowledges that buried in the backyard, under seal of

16   the court, same thing, that -- that under the seal of the court

17   there was, in fact, a writing which identified the insured

18   person as being investigated?

19             MR. DUFFY:  Well, no, Your Honor, we don't

20   acknowledge that.  And -- but as I said, that's not the grounds

21   for our motion.

22             THE COURT:  Why don't you acknowledge it?  What do

23   you --

24             MR. DUFFY:  Because our view on that would be that

25   there's a difference between being a subject of an

1  investigation and being a target of an investigation.  And

2  those are terms of art with the Department of Justice.  And the

3  affidavit lists a whole -- 20 people as subjects.

4        THE COURT:  Right.

5        MR. DUFFY:  And to be a subject --

6        THE COURT:  Well, but some of them happen to be your

7  insured, right?

8        MR. DUFFY:  Some of them were and some of them

9  weren't.  And there were four or five of our insureds named.

10 But to be a subject is different than being a target.

11       To be a subject just means that the government is

12 going to look at you.  It says nothing about who is going to be

13 indicted or who might be indicted.

14       THE COURT:  And so why -- if that's true, why isn't

15 that your position in this case?  Why are you relying on

16 res judicata?

17       I mean, in other words, why didn't you just come in

18 and say, It doesn't matter; it doesn't matter about this

19 affidavit; we wouldn't have given you coverage even if we had

20 known about it?

21       Why wouldn't you -- why isn't -- why wasn't that one

22 of the positions that were -- that was asserted by you?

23       MR. DUFFY:  Maybe could have been.  But when we filed

24 the motion, it was a motion to dismiss.

25       THE COURT:  And I converted it to a motion for

1  summary judgment.  And I did so -- I don't really remember --

2  because it's been a while.  But I felt like we were trying to

3  rely on too much outside of the four corners of the complaint.

4         Now, I have to say, when I read that y'all took a

5  bunch of depositions and there's experts in the case and all

6  that, I didn't necessarily think that was going to happen.  I

7  didn't -- right now, if you had to ask me, I wouldn't know what

8  either one of these experts said that had anything to do with

9  anything.

10        I mean, in other words, I don't -- I don't -- y'all

11 don't really rely on it in your briefing and they don't really

12 rely on it too much in theirs.  And it just seemed like a

13 couple of other people -- Bill Jones, who I have great respect

14 for, and this other fellow who I don't know -- but it just

15 seemed like they were just telling me what they thought.  And I

16 think I probably have to decide that.

17        So I -- when I converted it to a motion for summary

18 judgment, I did so because -- I think because we were going to

19 be relying on arbitration.  We were going to -- y'all were --

20 it seemed to me that we were trying to rely on things that were

21 outside of the four corners of the complaint and that I would

22 be in a little bit of peril to try to decide this case just

23 on -- on the motion to dismiss.  So I converted it.

24        Then y'all turned it into this big thing with

25 depositions and experts and everything and -- okay.  That's

1   fine.  And now we're kind of back to where we started from.

2           And -- but I guess I -- I guess my question is -- so

3   you don't really care whether the affidavit was out there or

4   not, because you wouldn't -- you wouldn't have paid the claim

5   anyway.

6           MR. DUFFY:  Well, Your Honor, that's kind of a

7   hypothetical question, what they would have done, and it never

8   actually came up.

9           The reason why the argument is not in the initial

10  motion is because it was a motion to dismiss.  And we were

11  concerned about going too far outside the pleadings, that the

12  only document that we referred to in the motion was the

13  arbitration award, which is quoted in the complaint.

14          So we thought we could do that and still do it as a

15  motion to dismiss.  When it was converted to a motion for

16  summary judgment, I guess we could have injected that

17  additional argument into the case.  We didn't --

18          THE COURT:  Well, I guess what it -- I guess by not

19  doing that, what it made me think was that you were

20  acknowledging that if that affidavit had been available at --

21  on a more timely basis, that that would have been a writing

22  that identified the insured person under the provisions of the

23  agreement.

24          And so that -- and I agree with you it doesn't --

25  it -- you could argue it doesn't make any difference to your

1   res judicata or statute of limitations argument.

2          But you could also argue it does if -- because when I

3   read this provision, it says that a claim is defined as a

4   civil, criminal, administrative, or regulatory investigation of

5   an insured person once such person is identified in writing by

6   the investigating authority as a person against whom a

7   proceeding may be commenced.

8          What I said to myself was:  Well, even though it

9   wasn't publicly available, there is such a writing.  There is

10  such a writing.  There's an affidavit that says he's the

11  subject of an investigation.

12          So why is that not -- why is that not important?

13          MR. DUFFY:  I'm not saying it's unimportant.  I mean,

14  it was not in the original motion, because it was a motion to

15  dismiss.

16          We haven't argued it here, because I guess we were

17  concerned that -- how to characterize the affidavit would be

18  seen as a question of fact.  And we were trying to focus on

19  things that were strictly issues of law in the context of a

20  motion for summary judgment.

21          So for purposes of this motion --

22          THE COURT:  But you're telling me that what would

23  have happened if -- if National Union had received this

24  affidavit in the same 2008 time period, it would have written

25  back to Crowley and said, Sorry, still no coverage -- or no

1    coverage, because you're not the target of the -- Mr. Farmer is

2    not the target of the investigation, he's only the subject of

3    the investigation, and, therefore, he has not been identified

4    in writing by such investigating authority as a person against

5    whom a proceeding may be commenced?

6           That's what -- that's what you're telling me National

7    Union's position would have been?

8           MR. DUFFY:  Well, as I said, of course, the question

9    never arose.  But if it did arise, I think our position then

10   would be what it is today, which is there's a difference

11   between being the subject and being a target of an

12   investigation.

13          THE COURT:  Okay.

14          MR. DUFFY:  But our motion states on things which are

15   straight questions of law, which is that -- the res judicata

16   and the statute of limitations.

17          I want to make one more point, though, because I

18   think we're merging two separate issues.  One is the definition

19   of a claim.  And the other is when a claim is deemed to have

20   been made against an individual insured.

21          And our view is that you can't say that a claim has

22   been made against an individual unless he's aware of it.

23   Because under a claims made policy, the question of when a

24   claim is made is what governs when the insured is required to

25   report it.

```
 1              THE COURT:  You don't think Mr. Farmer knew he was
 2    the subject of a criminal investigation?
 3              MR. DUFFY:  I don't think he knew that -- I don't
 4    think he knew what the affidavit said.
 5              THE COURT:  Well, I know he didn't know what the
 6    affidavit said.  But you don't think he knew that he was the
 7    subject of a criminal investigation?  You want to get him under
 8    oath and ask him?
 9              MR. DUFFY:  He may have reasonably believed that,
10    Your Honor.  But that's not the test for coverage.  The test
11    for coverage is you have to be identified in writing.
12              Now, everything --
13              THE COURT:  So you're saying that even though --
14    you're saying even assuming that the affidavit satisfied the
15    writing requirement, because Mr. Farmer didn't know what the
16    affidavit said, he's not able to make a claim -- a claim has
17    not been made against him, and, therefore, he's not able to put
18    you on notice?
19              MR. DUFFY:  Yes.  In fact, that was really the issue
20    at the arbitration.  Because at the arbitration Crowley was
21    arguing that, Well, we have a search warrant; therefore, we
22    must have an affidavit.  And we think that the affidavit
23    probably identifies these four people, but nobody knew.
24              And what the arbitration panel decided is that those
25    circumstances are not sufficient to constitute the claim having
```

1    been reported to National Union on the policy.

2          In order to have the reporting of a --

3          THE COURT:  So you're saying that the affidavit --

4    the fact of the affidavit's existence and its potential

5    significance was discussed during the arbitration?

6          MR. DUFFY:  Yes.

7          THE COURT:  And I -- I agree with you it was.  I only

8    had, like, little bits and pieces of the arbitration.  I'm

9    not -- y'all didn't give me the full transcript.  But I did see

10   it was certainly discussed.  I was interested in what the final

11   decision said, though.

12         It says, The affidavit has remained sealed.

13         This is the arbitrator's decision.

14         Therefore, its specific allegations have never been

15   made known to Crowley or its employees.  And this is the part

16   that I am going to need some help with.

17         However, as testified to at the arbitration hearing,

18   its essence can be inferred from the substance of the search

19   warrant.

20         I don't know what that means.  What's the -- what

21   inference is being drawn, that it identified him, that it

22   didn't identify him?  I didn't understand what that meant.

23         MR. DUFFY:  Well, you know, Your Honor, I didn't

24   write it.  But this is from the panel.  And it's not clear to

25   me exactly what the panel meant by that.

1          But it -- but assume they inferred that, Okay.  It

2   probably talks about the following people.  That's not the same

3   thing as knowing that it talks about the following people.

4   That's not the same thing as knowing that any individual has

5   been identified in writing.

6          If you know that there is an affidavit, you can take

7   an educated guess about what it looks like, just based on what

8   the -- they were looking for when they searched Crowley's

9   offices.  But that's not what the policy requires.

10          What the panel found is that in order for there to be

11   coverage there has to be evidence that he was identified in

12   writing and that -- and that National Union was aware of that,

13   that it was -- the existence of a claim was reported to

14   National Union.

15          And what the panel found is that as of January of

16   2013 no claim under the policy had been reported to National

17   Union, and, therefore, National Union did not have to cover the

18   fees incurred between 2008 and 2013.

19          THE COURT:  So then -- and then, like, two weeks

20   later, in February, I guess Mr. Farmer was given a plea

21   agreement by the government.  So I guess at that point he

22   certainly knew he was --

23          MR. DUFFY:  We did not have long to celebrate our

24   victory.

25          THE COURT:  And so you felt like -- that the plea

1   agreement was enough evidence in writing that he was under

2   investigation, and that's when you started to cover the claim?

3           MR. DUFFY:  Not just -- not evidence that he's under

4   investigation, but evidence that he's a person who is probably

5   going to be charged at that point.  He can either plead -- and

6   the clear implication of the letter is that, If you don't take

7   the deal, we're going to indict you, which is, in fact, what

8   happened within a couple of weeks of the date of the plea

9   agreement.

10          THE COURT:  And then you covered him for two years

11  through his acquittal?

12          MR. DUFFY:  Correct.  Correct.

13          Our view was that when we received these materials,

14  in the spring of 2013, that -- that satisfied all the

15  requirements in the policy.  He was identified in writing.  He

16  received writing and he gave the writing to us.

17          And at that point it was coverage treated under the

18  policy and we paid a significant amount of money to his defense

19  counsel in the two years between 2013 and 2015.

20          What we're talking about now is an attempt to

21  retroactively create coverage for the fees in the first five

22  years that we didn't have to cover at the time of the -- the

23  time of the arbitration.

24          THE COURT:  At the end of the arbitration decision,

25  in the conclusion, the arbitrators wrote -- also, it was

1 interesting -- it said the majority of the panel.  It kind of

2 led me to believe it was like a two-to-one decision, but they

3 don't -- I guess arbitrations don't record dissent.

4       It says, The materials Crowley submitted to National

5 Union did not constitute a claim for insured persons as the

6 term claim is defined in the policy.  The triggering event

7 specified in the policy has not yet been presented to National

8 Union.

9       And are you saying that in February that triggering

10 event occurred, February 13?

11       MR. DUFFY:  Yes.

12       THE COURT:  All right.  But that the uncovering of

13 the affidavit was not a triggering event?

14       MR. DUFFY:  The uncovering of the affidavit two years

15 later, in 2015, was not a triggering event, because it wasn't

16 given to us until 2015, which is after the discovery period.

17 It's after the case is over.  And at that point we're talking

18 about fees that would go back seven years, all the way to 2008.

19       THE COURT:  By the way, you know, everybody always

20 talks about how arbitration is supposed to be this inexpensive,

21 brief, you know, way to get right to it.

22       I'm looking here at the fees and I'm thinking you

23 get -- you file a lawsuit and it costs you 350 bucks, and you

24 get a judge and a jury and everything.  And you file an

25 arbitration and you get -- you pay all this money.  But I guess

1  everybody still likes it.

2        So -- by the way, that actually did raise a point

3  with me.  Why is this suit not in arbitration?  Why are we

4  here?

5        MR. DUFFY:  Well, maybe we should be.  But the

6  parties -- they filed it in court.

7        THE COURT:  Right.  And you didn't ask for -- you

8  didn't move --

9        MR. DUFFY:  No, we didn't ask for arbitration.

10        THE COURT:  You didn't ask for arbitration.  So here

11  we are.

12        MR. DUFFY:  Right.

13        THE COURT:  So, in other words, you waived -- and

14  that's fine.  But you waived the -- because I looked at the

15  policy.

16        I mean, obviously the first time the parties had a

17  dispute under this policy, they went to arbitration, because

18  that's what the -- that's what the policy says.

19        And so I'm reading the policy and I'm looking at

20  this -- the contention that the arbitration is res judicata and

21  all that.  And I'm thinking, Well, why didn't they just go back

22  to arbitration?

23        I've never -- I don't think I've ever been asked to

24  find an arbitration res judicata of subsequently filed federal

25  suit.  It appears that there's some law that says that you -- I

1   wasn't even sure that res judicata applied.

2           I didn't know -- because I've never been asked before

3   to apply an arbitration -- a private arbitration award as

4   res judicata of a federal lawsuit.

5           Have you ever -- have you ever had to do that before?

6           MR. DUFFY:  I've never done that before, but, Your

7   Honor, as we say in our brief, there is quite a bit of case law

8   which says that arbitration awards are given the same

9   res judicata effects as judgments.

10          THE COURT:  Wouldn't you -- wouldn't you -- couldn't

11  you have gone back to the same panel or filed for arbitration

12  and said -- and said -- had the panel rule that it was

13  res judicata?

14          MR. DUFFY:  Well, there is no proceeding -- the

15  procedure in arbitration, to go back to the same panel.

16          THE COURT:  There's not?

17          MR. DUFFY:  Once the panel is discharged, you have --

18  I think it's 60 days for any post-decision proceedings.  And

19  then after that, the panel cannot be brought back together.

20          So there could have been --

21          THE COURT:  Another weakness.  But I digress.

22          MR. DUFFY:  Yes.  There could have been a whole new

23  arbitration with a different panel.  Crowley chose to file the

24  suit here and we chose to let it stay here.

25          THE COURT:  Well, that's fine.  I'm happy to have

1  y'all.  I just -- it seemed kind of unusual.  I don't think

2  I've ever been asked to apply res judicata principles to a

3  private arbitration before.

4           MR. DUFFY:  And, Your Honor, if you -- Your Honor is

5  asking about the reasons.  It's, I think, mainly because of the

6  appellate rights that you have in a court that you don't have

7  in an arbitration.  And if you lose in an arbitration on a

8  point of law, that's the end of it.

9           THE COURT:  Yeah.

10          MR. DUFFY:  If you lose in a court on a point of law,

11  you do have further proceedings available to you, so...

12          THE COURT:  You're making my point.  But everybody

13  loves arbitration, apparently, except the people that lose.

14          MR. DUFFY:  It's not always quicker or faster, Your

15  Honor.  You're right.

16          THE COURT:  Well, I've actually had arbitrations

17  where the Federal Rules of Civil Procedure applied.  I mean, it

18  was everything exactly like the lawsuit was.  People took

19  depositions and had experts and all this stuff.  And the only

20  difference was they had to pay the arbitrators a bunch of

21  money, and -- and you have absolutely no right of review.

22          MR. DUFFY:  And the taxpayers are paying you.

23          THE COURT:  So I get the same no matter what.

24          But, anyway, that's not really the point either.  The

25  only point that I wanted to ask you about is there's -- there's

1    no -- and your opponents haven't really raised this.

2           But there's no doubt in your mind that

3    res judicata -- the same res judicata principles that apply if

4    this had been another lawsuit that had been adjudicated to

5    verdict -- they apply in this case, even though this was a

6    private arbitration award?

7           MR. DUFFY:  Your Honor, there's no doubt in my mind

8    on that.  And we cite a whole -- a long string cite of cases in

9    our first memo.  And there's not been any disagreement from

10   Crowley on that.

11          THE COURT:  The other question I had for you -- and,

12   again, these are just things as I was going through.

13          The arbitration panel applied Delaware law.

14          MR. DUFFY:  Yes, it did.

15          THE COURT:  And nobody is citing me Delaware law.

16   Why not?

17          MR. DUFFY:  Well, that's an interesting question.

18   Because we had a lot of discussion at the arbitration about the

19   choice of law.

20          And the alternative dispute resolution clause in the

21   policy which provides for either mediation or arbitration says

22   that in the event of an arbitration, the panel shall -- I don't

23   have the exact wording in front of me -- shall give due

24   consideration to the law of the jurisdiction in which the

25   plaintiff is incorporated, I think something like that, and it

1    doesn't say what due consideration means.

2         It doesn't say Delaware law shall apply.  It says the

3    court's -- the panel shall give due consideration to Delaware

4    law.

5         We had a long talk about that with the panel.  They

6    eventually decided the case under Delaware law.  I don't think

7    there were any substantive differences, so I don't think that

8    it matters.

9         THE COURT:  Well, I don't know anything about

10   Delaware res judicata law.  But, I mean, the parties seem to be

11   relying on Florida or federal principles.

12        It's not quite --

13        MR. DUFFY:  Well, I think that's right.  That's

14   because the provision in the policy, which the panel thought

15   incorporated Delaware law, is only in the ADR clause.  And that

16   doesn't apply here, because we're not acting under the ADR

17   provision of the policy.

18        So we have the usual law that we have a contract

19   issued to an insured in Florida.  And the usual rules of

20   Florida law would govern that kind of contract.  So that's been

21   our position here.  And I think it's been the position of both

22   parties.

23        THE COURT:  So let me -- because I'm going to need to

24   give your opponent some time here.

25        So the principle of res judicata that -- because

1  res judicata is an equitable doctrine.  And so it's supposed to

2  not only be legal, but it's supposed to be fair.

3          And is the principle of res judicata violated when

4  there is evidence under lock and key that nobody -- none of the

5  parties can get to, and then after the arbitrators rule that

6  evidence becomes available, and it would have been important to

7  have at that time -- why isn't -- why should I apply

8  res judicata in that kind of an unusual situation?

9          MR. DUFFY:  Well, I guess, first of all, because we

10 meet all of the criteria set out under Florida law to have

11 res judicata.

12          And as far as the equity of it -- you know, Crowley

13 says that, Well, we're only asking National Union to do what

14 they should have done at the beginning.

15          But they're not.  We only had to cover fees at the

16 beginning if a claim was made against the insured and timely

17 reported to us.

18          And if that had happened, everything would have been

19 different, because we would have been involved in the selection

20 and the supervision of defense counsel.

21          None of that happened.  The thing went on on its own

22 for five years.  And they were doing this completely on their

23 own.

24          National Union had denied coverage.  The panel said

25 that National Union had correctly denied coverage.

1        So now we're trying to retroactively, seven years

2    later, in 2015, create coverage for fees that weren't covered

3    at the time.

4        That's not what the policy is meant to cover.  This

5    is -- it's a strange argument.  I've never seen it before.

6    That's not what the policy is about.

7        THE COURT:  All right.  Let me ask you one other

8    question.  And then I'm going to have to give your opponents

9    some time here.

10        So there appeared to be two cases that -- that are --

11    that come out to opposite results.  And I just want you to give

12    me a -- just if you have a way to do it.

13        The cases I'm talking about are the *Trustmark* case

14    from the Eleventh Circuit which I think you all like, and the

15    *Badra* case from the Fourth District in Florida that I think

16    the -- your opponents like.

17        Are those cases -- and they both deal with things

18    that occur -- information that comes to light after the

19    proceeding has concluded.

20        Is there a way to reconcile -- is there a rule or a

21    point of law that can reconcile those two decisions?  I know

22    they were different on their facts, but -- or are they just

23    different on their facts?  Or what do you say about that?

24        MR. DUFFY:  I think that -- -- it's not quite right

25    to say that they involve information which comes to light after

1    the decision.  They involve new facts which occur after the

2    decision.

3           So I'm not sure if I have the right case, but there

4    was one Florida case on res judicata where the landlord filed a

5    notice of eviction and he lost, and then he filed a corrected

6    notice of eviction after the arbitration, and that was not

7    res judicata because that was a new notice and a new claim.

8           There is a difference between new events which occur

9    after the decision and discovery of events which existed before

10   the decision.  So they're not about information that comes to

11   light.  They're about new things that happen.

12          THE COURT:  And so you don't -- you don't think that

13   the fact that this affidavit which contained relevant

14   information -- the fact that it was unavailable to anybody

15   doesn't make it the functional equivalent of new information?

16          MR. DUFFY:  It does not make it new events.  And I

17   think the point there is also -- it's also known that in

18   Florida there is no discovery rule on breach of contract

19   actions.

20          And the courts in Florida and up through the Eleventh

21   Circuit say very clearly that there is -- the cause of action

22   for breach of contract accrues at the date of the breach even

23   if the insured -- even if -- even if the plaintiff is unaware

24   of it at the time, even if the insured doesn't know about it on

25   the --

1    THE COURT:  So you're saying that the law

2  contemplates that there can be information which might be

3  valuable, but for whatever reason doesn't come to light, and

4  sometimes that's just too bad?

5    MR. DUFFY:  I think that's right.  And I think that's

6  what -- that's the result of the fact that there is no

7  discovery rule under contract.

8    On a tort case you would have a discovery rule.  But

9  on a contract case in Florida, you do not.  And the courts have

10  said very clearly that it doesn't matter for purposes of

11  determining when the cause of action accrues whether the

12  plaintiff even is aware of the fact that he has a claim.  That

13  does not matter under Florida law.

14    THE COURT:  All right.  Thank you, sir.  I'm sure

15  I'll give you a chance to talk.  I know you didn't get to say

16  everything --

17    MR. DUFFY:  I had a whole lot of other things I

18  wanted to say.

19    THE COURT:  I know you did.  I'll probably give you

20  some time.  I'll tell you what I'll do, go -- because I asked

21  you a bunch of questions.

22    I'll just give you a few minutes to just say whatever

23  you want to say and I'll be quiet, and then I'll -- and then

24  I'll talk to your opponent.

25    MR. DUFFY:  Okay.  I will do this in a very condensed

```
 1   fashion.
 2            THE COURT:  Sure.
 3            MR. DUFFY:  We've already talked --
 4            THE COURT:  And let me just say to you, this is why I
 5   do this.  I can listen to canned presentations all day long,
 6   but I got that in the briefs.
 7            MR. DUFFY:  Right.
 8            THE COURT:  So this is me -- this is me working it
 9   out in my head while I'm asking you questions and getting help
10   from you.
11            So don't feel like because you don't get to say
12   everything you want to say that that means it hadn't been
13   worthwhile, so...
14            MR. DUFFY:  And, Your Honor, this is the -- I don't
15   remember the last time I had a motion where two parties filed
16   seven briefs.  So everything is really in the papers.
17            THE COURT:  Yeah.
18            MR. DUFFY:  So all of it --
19            THE COURT:  Yeah.
20            MR. DUFFY:  -- I think is there.
21            THE COURT:  Go ahead.
22            MR. DUFFY:  We basically have three arguments for
23   summary judgment.  The first we've touched on is the
24   res judicata argument.
25            And I think it is clear that the arbitration award
```

1   gets the same res judicata effect as a court decision.  The

2   res judicata standard requires four identities.  You have to

3   have the same parties, the same things sued for, the same cause

4   of action, and the same person who is the defendant.

5        All of those are undisputed except, to some extent,

6   the same cause of action.  But on the cause of action issue,

7   the Florida case -- and we cite these in our papers, so I'm

8   repeating it, really, I guess.

9        They followed the transaction test.  And they say

10  that claims arising out of the same transaction are

11  res judicata.  Claims are res judicata if the evidence

12  necessary is the same in the two cases.

13       Now, here, this case and the arbitration both are

14  about breach of contract claims for breach of the same contract

15  for the same fees.

16       In this case and in the arbitration, what they had to

17  prove was exactly the same, that there was a contract, that a

18  claim was made, that it was timely reported, and that National

19  Union failed to pay.

20       So the evidence necessary -- it's not just similar,

21  it is exactly the same.  And we don't -- there's no -- nothing

22  has happened since the arbitration which changes that.

23       On the statute of limitations, we have a five-year

24  statute of limitations in Florida for breach of contract.  We

25  have no discovery rule.

1         THE COURT:  Let me ask you this -- and I know I said

2  I'd be quiet.  But this is my key question on the statute of

3  limitations.

4         Is this just a catch-22?  In other words, if they had

5  waited for this affidavit to become available and then tried to

6  get relief, not -- not gone to arbitration in 2012, waited for

7  the affidavit, the day after the affidavit becomes available,

8  then they file their suit, you'd be saying statute of

9  limitations, wouldn't you?

10         MR. DUFFY:  If -- probably if it was more than five

11  years, but -- yeah.  I think you have five years to file suit

12  no matter when you discover the claim.

13         THE COURT:  So it's a little bit of a catch-22, in

14  the sense that if you're saying -- if you're saying that the

15  affidavit is -- is there, but not available to them, then it

16  becomes -- and so you shouldn't have gone and arbitrated -- if

17  you really cared about the affidavit, you shouldn't have gone

18  and arbitrated without it.  Now you have it.  Now it's too late

19  because it's res judicata.

20         But if you'd waited for the affidavit, it would have

21  also been too late because of the statute of limitations, so

22  you are just out of luck.

23         MR. DUFFY:  Well, if they waited more than five

24  years, and they --

25         THE COURT:  Well, I mean, isn't it true that the

1   affidavit only became available after five years?

2        MR. DUFFY:  Well, it became available to the public.

3   I mean, Mr. Farmer got a copy in the spring of 2013.  He did

4   not have permission from the court to share it beyond his

5   defense team, but he -- he could have asked the court for

6   permission to share it with whoever was paying his legal fees,

7   and he didn't.  So we'll never know what would have happened to

8   that motion, because it was never filed.

9        THE COURT:  All right.

10       MR. DUFFY:  I also wanted to -- wanted to address

11  just for a minute the third argument we're making about the

12  compliance with the discovery period in the policy.

13       Six years, from July 1st -- June 1st -- sorry,

14  November 1st, of 2007, the claims were made and reported to

15  National Union.

16       We have to look separately at two different

17  questions:  When was the claim made and when was the claim

18  reported?

19       Crowley's position on the papers is, I think, that

20  the claim was made against Mr. Farmer on April 16th of 2008,

21  even though he didn't know it at the time.

22       Now, we don't think that's right.  Because we don't

23  think it's possible for a claim to be made if you don't know

24  about it, because that would cause all kinds of problems for

25  insurance about when they have to report things.

1          But if we assume it to be true, as Crowley says, that

2     the claim was made on April 16th, then the question is:   When

3     was that claim reported to National Union?  And it wasn't

4     reported until 2015, when they told National Union, Here is the

5     affidavit, this is what it says.

6          Prior to that it was just, This is what we think it

7     says, but we don't really know.  So a claim reported in 2015 on

8     its face is outside the discovery period.

9          They have said, Well, we reported it in 2008 because

10    that's when we gave the search warrant, but that's the argument

11    they made at the arbitration.  And it didn't work.

12         You cannot just say, We told you in 2008 there was a

13    search warrant and, therefore, there was an affidavit, but we

14    didn't know what it said.  That was the -- that is the issue

15    that's already been decided against them by the panel.

16         We have a claim here -- if they're right, it was made

17    on the date of the affidavit, reported to us in '15, and it's

18    untimely.

19         You know, Your Honor, it's as if they're saying, If

20    someone at the DOJ writes down on a yellow legal pad, I think

21    Tom Farmer should be indicted, and they put it in the drawer of

22    their desk and they never tell anybody -- a claim can't be made

23    as of that date because he doesn't tell anybody.  Because when

24    a claim is made it has to be reported.

25         They also argue that, Well, we have relation back

1  under section 7(c) of the policy.  Because when the search
2  warrant was submitted, it was treated by National Union -- not
3  as a claim, but as a notice of circumstances.
4          And section 7(c) says that any claim made
5  subsequently or after those circumstances will be treated as if
6  it was made on the date of the notice.
7          That provision can have no application to a claim
8  that was made before the notice of circumstances.  It only
9  applies to claims made after.
10          So if Crowley is right that the claim was made on
11  April 16th, 7(c) of the policy is of no potential
12  applicability.
13          If, on the other hand, the claim is deemed to have
14  been made against Mr. Crowley -- against Mr. Farmer, when he
15  got the affidavit in 2013, that it might relate back to notice
16  of circumstances -- in fact, it would.
17          But the *Office Depot* case in the Eleventh Circuit is
18  directly on point in that case and that situation.  That also
19  involved National Union.  It involved the same policy forum
20  that we're dealing with here.
21          And what the Eleventh Circuit said is that when you
22  have a notice of circumstances and a claim made subsequently,
23  it does relate back, but there is no coverage under the policy
24  for the fees incurred prior to the date of the actual claim.
25          And by the time Mr. Farmer got the affidavit, we were

1    already paying his legal fees anyway.  So relation back

2    wouldn't help in that situation.

3            THE COURT:  All right.  I'm going to have to stop you

4    right --

5            MR. DUFFY:  Thank you, Your Honor.  I'll rest on the

6    papers.  Thank you.

7            THE COURT:  Appreciate it.

8            MR. SHUGRUE:  Good morning, Your Honor.

9            THE COURT:  Good morning.

10            MR. SHUGRUE:  John Shugrue for Reed Smith on behalf

11    of the plaintiff, Crowley.

12            I'd like to start with the run-off endorsement,

13    because I think there are some critical mischaracterizations

14    and misstatements made by National Union with respect to that

15    provision, and also mischaracterizations of the facts.

16            What National Union now seems to be arguing, which

17    was never actually the basis for their motion, and which they

18    have not actually moved for summary judgment on, but they

19    brought it into the mix here, is taking the position that the

20    DOJ investigation -- which is the claim that is at issue here.

21            The claim is the DOJ investigation of Mr. Farmer,

22    that that was not reported to National Union until the

23    affidavit that supported the issuance of the search warrant was

24    made available to National Union until 2015.  But that

25    factually and legally is not correct.

1        In 2008, Crowley was served with a search warrant.

2   Crowley reported to National Union through its broker, Aon, a

3   claim.  It reported that a claim had been made against Crowley

4   and its individual insureds.

5        That is the language that was used in the notice that

6   Aon provided to National Union in April of 2008.  It was noted

7   and reported and submitted as a claim.

8        Accompanying the Aon letter was an e-mail from

9   Mr. Ficon, who is with us in court today, that attached the

10  search warrant.

11       The search warrant on its face reflected that the

12  search warrant was obtained based on an affidavit filed by an

13  FBI special agent which provided the basis for finding probable

14  cause for issuance of the search warrant.

15       So the affidavit was facially identified on the claim

16  documents that were submitted and reported and noticed by

17  Crowley to National Union in 2008.

18       And Mr. Ficon, in his e-mail that was part of that

19  notice, specifically stated the charges, i.e., the allegations,

20  the accusations, that give rise to this search warrant are

21  contained in these materials that are filed under seal.

22       And critically, National Union, in its May 2008

23  denial letter, specifically stated that what Crowley had

24  provided, and what they understood Crowley had provided, was

25  notice of a claim as that term is defined under the policy.

1        And Mr. Reed -- Mr. Farmer's defense counsel followed

2   up in later correspondence, in June of 2008, and reiterated

3   that what was being noticed and reported and pursued from

4   National Union was coverage for a claim as defined in the

5   policy, a claim being -- arriving -- a DOJ investigation, as to

6   which a writing has been made to identify Mr. Farmer.

7        THE COURT:  But that's what you went to arbitration

8   on and lost.

9        MR. SHUGRUE:  No.  That's not true, Your Honor.  The

10  issue in the arbitration was whether Crowley had been able to

11  establish the existence of the claim.

12       And it was clear that the affidavit was a critical

13  part of that, that the affidavit was sealed, it was unavailable

14  to the parties, it was unavailable to Crowley, had not been

15  made available for purposes of the arbitration, so that the

16  panel ruling in -- the arbitration decision was not that

17  Crowley had notified National Union of a claim in 2008 or

18  reported the DOJ investigation as a claim in 2008.

19       In fact, the panel award in several places

20  specifically indicates that Crowley filed its first notice of

21  client notifying National Union.

22       THE COURT:  And so tell me why -- why is this

23  significant to what we're doing here?  I'm not sure I'm

24  understanding what --

25       MR. SHUGRUE:  It's significant because National Union

1   now takes the position that this run-off endorsement applies.

2   And the run-off endorsement says that Crowley has only six

3   years until November of 2013 to report or notify National Union

4   of a claim.

5           And National Union is now taking the position that --

6   notwithstanding all these communications and the reporting that

7   went back and forth between Crowley and National Union in 2008

8   and 2009, that Crowley never reported or notified National

9   Union of a claim during that time period.

10          THE COURT:  Well, what is -- what is what happened in

11  2015 when you-all got this affidavit and you sent it to

12  National Union?  What were you doing then?

13          MR. SHUGRUE:  We were providing the document, the

14  affidavit, that had previously been available, although well

15  known to everyone, National Union, Crowley and the arbitration

16  panel, and Mr. Farmer and his counsel -- providing the

17  documentation to establish that what Crowley asserted in 2008,

18  in fact, was correct, that as of April 2008 a claim --

19          THE COURT:  But -- but in the meantime --

20          MR. SHUGRUE:   -- was as to Farmer.

21          THE COURT:  But in the meantime, you'd had a complete

22  arbitration that went all over this evidence and you got ruled

23  against.  And so that can't just be an irrelevancy.

24          MR. SHUGRUE:  It's not an irrelevancy.  But what the

25  panel did not rule on, and National Union urged the panel not

1   to make a ruling by speculating or drawing inferences about the

2   contents of the search warrant affidavit -- and he mentioned

3   the panel making the statement that, Well, certain inferences

4   can be drawn.

5           National Union, however, argued to the panel, But you

6   can't do that.  We have to have the affidavit itself.  And

7   without the affidavit itself, Panel, you cannot draw inferences

8   or speculate about the contents of the affidavit.

9           So the panel, at National Union's expressed urging,

10  limited its ruling to whether the documents that were available

11  and had been presented by Crowley to National Union qualified

12  as a client.

13          THE COURT:  And how do I know that?  I mean, all I

14  have -- I mean, maybe I -- I tried to read what I had, but I

15  don't have -- I've got little snippets of the arbitration that

16  I think y'all provided.

17          But I don't have -- what you just said to me as a

18  fact, that Crowley specifically -- I mean, that National Union

19  specifically told the arbitrators not to consider the

20  affidavit, not to -- I mean, I have little snippets of

21  conversation from the arbitrators about what the significance

22  of the affidavit is.  There was some argument in there, maybe

23  by you, if I recall correctly.

24          And -- but, you know, I don't -- if you're trying

25  to -- if you're trying to tell me that somehow the -- the

1   meaning of the affidavit was excluded from the arbitrator's

2   decision, it's not entirely clear to me that that's true.

3          I mean, everybody knew that it was there, and

4   everybody was trying to talk about what it meant and what it

5   didn't mean, and whether it would identify them or it wouldn't

6   identify them, but obviously nobody really knew.

7          So if this was so important -- I guess I'm having a

8   little trouble understanding why this affidavit is so important

9   now but wasn't important enough for somebody to go ask the

10  court to unseal it, or for something to happen, or for the

11  arbitration to be held in abatement to go see if we could get

12  it -- I mean, if everybody really thought this was such an

13  important thing, why didn't things like that happen?

14          MR. SHUGRUE:  Okay.  Well, let me start, Your

15  Honor -- first, the panel did expressly, in its conclusion, in

16  its opinion, limit its ruling to the materials that Crowley

17  submitted to National Union, held that the materials Crowley

18  submitted to National Union, which did not include the

19  affidavit, because it was unavailable, did not constitute a

20  claim for insured persons as the term claim is defined in the

21  policy.

22          That's where the panel then says the triggering event

23  specified has not yet been presented to National Union.  I

24  think -- the panel doesn't say specifically the affidavit may

25  be the triggering event.

1       But I think if you look at the entirety of the award

2   and the arguments that were made, that's what the panel was

3   considering.

4       And National Union argued specifically to the

5   panel -- and this is in the materials, which say you could

6   hypothesize various writings which might qualify as a claim.

7   That's irrelevant.  The issue is whether these specific --

8       THE COURT:  That's a little fast -- that's a little

9   fast to read.  Thank you.

10      MR. SHUGRUE:  Sorry.

11      National Union's counsel argued to the panel, You

12  could hypothesize various writings which might qualify as a

13  claim.  That's irrelevant.  The issue is whether these specific

14  documents that were submitted to National Union in 2008

15  qualified.

16      And one of the arbitrators noted the regrettable

17  thing is that the affidavit is under seal.  If that thing were

18  not under seal, we would be having a very interesting

19  discussion about what it shows or doesn't show.

20      And this ties into the principles of res judicata,

21  which are that if there are different facts and conditions that

22  intervene between the prior action and the subsequent action,

23  then res judicata does not apply.

24      THE COURT:  But everybody -- this is different than

25  that.  Everybody knew that there was this affidavit and it just

1  wasn't available, although it doesn't look like anybody tried

2  to get it, and -- let me back you up.

3          Let's say -- let's say that instead of an arbitration

4  that you had filed this suit in this court and we had gone to

5  trial and a jury had ruled that based on the information

6  available to National Union that -- that no claim had been

7  made, and during the course of the trial this affidavit was

8  referenced and, Yeah, we don't know what it says, and we can't

9  get it, and so forth, and a jury had ruled.  And let's even say

10 it was affirmed on appeal.

11         Would you be able to come back into this court and

12 file another lawsuit once this affidavit came due in 2015?

13         MR. SHUGRUE:  I would say yes, because of the -- the

14 principles that applied to res judicata, for several reasons.

15         First, what happened in the arbitration was more akin

16 to a declaratory judgment ruling than a decision that would be

17 rendered by a jury.

18         The panel interpreted the insurance policy as a

19 matter of law and decided that the definition of claim was not

20 satisfied based on the materials, as to which there was no

21 dispute, Crowley had submitted to National Union.

22         And it is true, and we agree, that principles of

23 res judicata that apply to legal decisions in court applied

24 equally to arbitration decisions.

25         And one of those principles, which we've cited in our

1   materials, is that res judicata does not apply in a declaratory

2   judgment situation.

3           So it's not at all unusual for an insured, as Crowley

4   did in this case, to say, We've submitted certain materials to

5   the insured -- to the insured that we believe trigger coverage,

6   and we'd like a declaration as a matter of law that those do

7   trigger coverage.

8           Here, the panel's ruling -- when you look at what it

9   says in conclusion, the materials submitted to date, which is

10  what National Union urged the panel to limit its ruling to and

11  limit its focus on, do not satisfy the definition of claim,

12  don't substantiate that a claim was made.  The material -- the

13  triggering event has not yet been presented to National Union.

14          Well, when the affidavit was finally unsealed and

15  made available to Crowley in 2015, and was submitted to

16  National Union, at that point the evidence that established

17  that a claim had been made against Mr. Farmer in 2008 was now

18  in front of National Union.

19          In terms of what could Crowley have done or why

20  didn't they try to unseal these materials earlier, as Your

21  Honor stated earlier, it's not at all unusual for a search

22  warrant affidavit to be sealed.

23          Here, there were three separate orders, two by the

24  court in the Middle District of Florida, one by the district

25  court in Puerto Rico, that put strict limitations on the

1   ability of parties to whom the affidavit actually was provided.

2           THE COURT:  So did y'all -- you obviously made a

3   strategic decision.  You knew you didn't have the affidavit.

4   And you didn't know what it said either.  You had a -- I mean,

5   you might have guessed, right?  But you didn't really know, did

6   you?

7           MR. SHUGRUE:  Well, we didn't have the affidavit.

8   And so no one knew exactly what it said.

9           THE COURT:  Sure.  So you made a strategic -- Crowley

10  made a strategic decision to go in front of this arbitration

11  panel, knowing it didn't have the affidavit, knowing it was not

12  going to have it, and to make its case to the arbitration

13  panel, and you lost.

14          And a couple of years later the affidavit becomes

15  available and you say, Gosh, I wish we would have had this when

16  we were in front of that arbitration panel.

17          And then you get to file a new federal lawsuit and

18  say, Never mind what happened before, this is it now?

19          MR. SHUGRUE:  Yes.  Because, Your Honor, the facts

20  and conditions that were present, and the facts that were

21  determined by the panel in the arbitration, and as to which it

22  adjudicated the parties' rights and obligations -- the panel

23  did not have before it the affidavit, so was not able to

24  determine are there facts --

25          THE COURT:  But it knew it didn't have it.  And you

1   knew it didn't have it.

2           MR. SHUGRUE:  Correct.  Correct.

3           THE COURT:  And it's not like this is something

4   that -- this isn't a classic piece of newly discovered evidence

5   or anything.

6           This is actually something that everybody knew was

7   there and knew it was under seal, and it was -- it was kind of

8   baked into the arbitration, wasn't it?  I mean, you-all are all

9   talking freely about this affidavit and what it might say and

10  what it might not say.

11          And so were you thinking at that point:  Well, if we

12  win the arbitration, good for us; if we lose the arbitration,

13  well, we'll get the affidavit later, and then we'll -- then

14  we'll get to try again?

15          Is that -- was that the calculus?

16          MR. SHUGRUE:  Well, no, Your Honor.  At that point in

17  time it wasn't clear whether we would ever get the affidavit.

18  I mean, it was entirely possible -- maybe not likely, but

19  possible, that Mr. Farmer wouldn't be indicted.

20          If Mr. Farmer had never been indicted, then the

21  search warrant might have remained under seal.  There would

22  have been no opportunity or ability or reason to have it

23  unsealed.

24          So Crowley made the decision that having reimbursed

25  Mr. Farmer for several million dollars of legal fees, having

1  uncertainty about whether the affidavit would become available

2  or when it would become available, that it would attempt to

3  establish coverage based on materials that it had.

4        The panel, obviously, indicated that the materials

5  that were presented -- if you look at all of the National Union

6  correspondence, it's very clear there is a denial of coverage

7  in every instance --

8        THE COURT:  Let me ask you this.

9        MR. SHUGRUE:  -- based on the materials submitted.

10        THE COURT:  This may be -- this may be a fanciful

11  question, but let me ask it anyway.

12        Let's say the exact opposite thing occurred; that is,

13  that you went to arbitration and, based on the papers that you

14  put in front of the arbitrators, they found there, in fact, was

15  coverage.

16        2015 comes and the affidavit is unsealed and it says,

17  Mr. Farmer is not the subject of the investigation, and he

18  never was.  We just wanted to get records from him.  We don't

19  care about him.

20        Would Crowley then be able to file an action in court

21  to recover all these legal expenses that they paid you over

22  this time?

23        MR. SHUGRUE:  With National Union?

24        THE COURT:  National Union.  Sorry.

25        MR. SHUGRUE:  Yes, they actually would, because

1   there's a specific -- specific provision in their policy that

2   says that if we advance defense costs and it is later

3   established that the claim for which we advanced the costs was

4   not actually covered, then we have a right of recoupment.

5           THE COURT:  So you would have said, All right.  Yeah,

6   you're right, here's your money.

7           MR. SHUGRUE:  Well, if -- if the affidavit, in fact,

8   indicated that Mr. Farmer was not someone against whom a

9   criminal proceeding might be commenced, then that would have

10  been the outcome.  I think Your Honor hit the nail on the

11  head -- there I go with bad analogies of --

12          THE COURT:  I never heard that one before.

13          MR. SHUGRUE:  But you --

14          THE COURT:  Did you just make that up?

15          MR. SHUGRUE:  But the catch-22 point that you made --

16  so Crowley could have waited, not brought the arbitration.  But

17  by the time it got the affidavit, and even by the time

18  Mr. Farmer got the affidavit, which he couldn't share with

19  Crowley, per the court's order -- I mean, he only actually

20  obtained the affidavit by entering into this protective order

21  that indicated he couldn't share outside the defense team --

22  but if Crowley had made it, we would have been faced with this

23  catch-22.

24          Well, now you've got the affidavit.  You didn't

25  pursue the arbitration.  You waited to get the affidavit.  Now

1  you have it.  Well, you lose because of the statute of

2  limitations.

3          THE COURT:  Well, let me ask you this:  What would

4  have happened if the affidavit had not come unsealed until the

5  year 2030?

6          Would you be able to -- in 2030, would Crowley be

7  able to file a suit against National Union and say, Hey,

8  remember that thing we had 20 years ago, you owe us -- you owe

9  us a bunch of money?

10         MR. SHUGRUE:  Well, I think --

11         THE COURT:  I mean, I guess I don't -- I don't -- I

12 mean, there has to be some -- I mean, the reason we have

13 statute of limitations is not necessarily because people don't

14 have valid claims after they expire.

15         It's just that there's some finality that needs to

16 occur in our legal system.  Otherwise, people will always be at

17 risk.

18         And so if my -- if you want to tell me that my

19 2030 -- well, I don't know about 2030, but I do know about

20 2015, you've got -- you're going to have to explain to me what

21 the -- what the difference is.

22         MR. SHUGRUE:  Well, I think if you -- if you strictly

23 applied the legal principles for statute of limitations, there

24 may not be a bar on your hypothetical.

25         Now, there would be a bar based on other timing

1   issues that we've identified as removing statute of limitations

2   from play in this case that the -- would not be available in

3   that circumstance.

4          For example, we have the principles of law that --

5   when you have defense coverage from an insured, that the

6   statute of limitations does not start running until the

7   underlying matter is resolved, finalized, which did not occur

8   in this case until Mr. Farmer's acquittal in 2015.

9          So under that principle, the statute of limitations

10  for National Union's defense obligation, duty to pay the costs

11  of defending this DOJ investigation, which included the

12  pre-indictment phase, the indictment, the trial, that statute

13  of limitations doesn't even start running until 2015, when

14  Mr. Farmer is acquitted.  We also have the principle of a

15  continuing breach.

16         Now, in this case there were legal fees and invoices

17  submitted to National Union up to December 2012 prior to the

18  arbitration that they failed and refused to pay.

19         That would be a continuing breach.  And the statute

20  of limitations would run five years from December of 2012.  So

21  it still would not have run out.

22         Now, National Union's rejoinder to that is to say,

23  Well, there really was no breach, because the panel said you

24  hadn't given us information to prove your assertion that there

25  was a client, so it couldn't be a continuing breach if there

1   was no breach.  But what Mr. Duffy argued earlier is that the

2   trigger isn't the breach.  It's the denial.

3          So if National Union's denial of coverage in 2008, on

4   the basis that the materials submitted did not prove the

5   existence of a claim -- if that started the statute of

6   limitations running, according to National Union's theory, that

7   each time National Union was provided with invoices or tendered

8   to them for payment, provided to them for payment, and they

9   failed or refused to pay, that would be a continuing denial or

10  a continuing breach, if you will, that would refresh and extend

11  the statute of limitations from that point forward.

12         So those sorts of temporal restrictions on the

13  application of the statute of limitations would not be

14  available in your hypothetical that the affidavit wasn't

15  obtained until 2013.  So there are protections that would

16  apply.

17         THE COURT:  2030, not --

18         MR. SHUGRUE:  2030.  Sorry.

19         THE COURT:  So what is the arbitration decision

20  res judicata of?

21         MR. SHUGRUE:  Whether the search warrant, the grand

22  jury subpoena -- there were a couple of other documents that

23  had been provided by Crowley to National Union.  It's

24  res judicata that those documents do not substantiate the

25  existence of a claim against Mr. Farmer.

1          THE COURT:  Why isn't this just like any other case

2     that, Gosh, I sure wish I had had that piece of evidence before

3     I went to trial?

4          I mean, this is -- this is not a new claim or a

5     new -- this is just -- isn't this just evidence of -- of the

6     claim?

7          MR. SHUGRUE:  Well, I would say it's both.

8          First, it -- and it's unusual.  And it's not just,

9     Oh, I wish we would have had that evidence.  Because this

10    wasn't just something that Crowley could have found out, could

11    have had access to, could have known about, but just didn't,

12    because of bad, you know, lawyering or failure to obtain the

13    information.

14         This is a situation where because of the sealing of

15    the affidavit Crowley was not able to obtain access to it until

16    it was ultimately unsealed.

17         Now, remember -- you know, Mr. Duffy talked about the

18    fact that, you know, Crowley entered into a plea agreement.

19    And Crowley was involved in this antitrust criminal

20    investigation and litigation.

21         So, you know, the hypothesis that a court -- first of

22    all, there's no evidence presented by National Union that there

23    was any possibility or probability or likelihood that this

24    affidavit could have been unsealed and made available to

25    Crowley or to National Union anytime prior to 2015.

1    We presented the opinion testimony of Mr. Jung to the

2  contrary, that it would not have been made available, because

3  the investigation was still ongoing.

4    And the *Bennett* case that National Union cites

5  reflects that the compelling government interest in protecting

6  an ongoing investigation overcomes the right of access to

7  obtaining the search warrant affidavit.  And we certainly have

8  seen no case, and National Union has certainly seen no case --

9    THE COURT:  Where was the -- where was the

10  investigation at the point in time that Crowley initiated the

11  arbitration?  Had Crowley pled by that point?

12    MR. SHUGRUE:  No.  No, Your Honor.

13    THE COURT:  When did Crowley plead?

14    MR. SHUGRUE:  That was in -- I believe it was in the

15  summer of 2012, so after the arbitration was initiated and

16  prior to the hearing and the arbitration.

17    THE COURT:  And so you're saying, in effect, that the

18  burden of not knowing what's in this affidavit falls on

19  Crowley -- I mean, on National Union, not on you?

20    In other words, you didn't try to get it.  And I

21  understand why -- there may be really good reasons not to --

22  not to be poking at the Department of Justice and trying to

23  get -- I mean, I can understand that as a strategic matter.

24    But the fact remains you didn't even try to get it.

25  Whether you would have gotten it or not, I agree with Mr. Jung

1    it's probably more likely than not that you wouldn't have,

2    although I guess Mr. Farmer had it, and his lawyer, but...

3          So you don't have to try to get it.  You don't have

4    to be told no.  But the fact that it isn't there then becomes

5    Crowley's problem when it's unsealed two years later, or eight

6    years later, or whenever it was, eight -- I guess it was in

7    2008 to 2015, so seven years later.

8          So why is that Crowley's problem and not your

9    problem?

10          MR. SHUGRUE:  Why is it National Union's problem?

11          THE COURT:  I can't -- I'm sorry.  Y'all -- I tell

12   you, you messed me up.  You sat on the wrong side.  And I

13   cannot get over it.

14          All right.  Why is that -- why is that National

15   Union's problem and not Crowley's problem?

16          MR. SHUGRUE:  Well, again, Your Honor, I would say

17   this.  National Union had protection under the policy if it had

18   decided to advance the defense costs subject to a reservation

19   of rights.

20          They could have said, We're going to advance your

21   defense costs, advance Mr. Farmer's defense costs, but subject

22   to a reservation that if the affidavit is obtained and it

23   reflects that Mr. Farmer was not a target or a subject, or was

24   not identified as someone against whom a criminal proceeding

25   may commence, then we have the right to recoup those defense

1   costs.

2          They had the right in the event that Mr. Farmer was

3   convicted of criminal conduct.  They had the right under the

4   policy to seek to recoup those defense costs.

5          So National Union has built within the policy

6   protections of its interest with respect to, you know -- maybe

7   incorrectly -- advancing defense costs or advancing defense

8   costs for something that ultimately proves not to be covered.

9          You know, Crowley doesn't have any sort of, you know,

10  protection other than when the document -- the critical

11  document that everyone knew existed, but could not be

12  obtained -- no other protection than to submit the document at

13  that time and to say, As we contended, as we believed, as we

14  urged, we felt, and Mr. Farmer's counsel has felt all along,

15  and certainly believed and acted in accordance with that

16  belief, that this was a claim, that Mr. Farmer was certainly in

17  the cross-hairs of this DOJ investigation.

18          THE COURT:  I read a letter from Mr. Farmer's counsel

19  to somebody confirming that he was the subject of an

20  investigation.  I can't remember who the letter went to or when

21  it was.

22          Does that letter have anything to do with this, or

23  not?

24          MR. SHUGRUE:  Well, I know that Mr. Farmer's counsel

25  sent correspondence to National Union that indicated that he

1  had been told, or that he believed there was some writing that

2  identified Mr. Farmer.

3         Now, ultimately, we've never seen confirmation of

4  that, or we've never seen the writing that he alluded to in

5  that correspondence.

6         So the only writing that -- or writings that -- of

7  which we are aware are the plea offer that was made to

8  Mr. Farmer in 2013, and, of course, the affidavit, which --

9  and, again, we -- we have included in -- within our papers, in

10  the expert reports of Mr. Jung and Mr. Sagalow, some of the

11  excerpts from the affidavit.  We also have the affidavit in its

12  entirety.

13         THE COURT:  How is this any different -- how is this

14  any different -- I'm just trying to think about this and then

15  we're going to start to wrap up here.

16         How is this any different than if a critical witness

17  in the case died before the trial?  And you wanted to say, Boy,

18  if we had that witness, we really would be -- we really would

19  be able to -- and the other side says, Well, we don't really

20  know what that witness would have said, and now we're never

21  going to know, and so the fact finder just has to make their

22  determination on the best evidence available, it's not perfect,

23  but our system isn't perfect, and they reaped the result, and

24  that is entitled to finality in our system, we're just not --

25  we're just not good enough to be perfect, and that if we start

1   to go back and open up decisions that have been made on the

2   best available information, because of -- of things that

3   happened that we knew had happened at the time we were making

4   the decision -- that that's not what our system is set up to

5   do, what -- what principle of law am I validating by agreeing

6   with your view of this -- of the res judicata issues?

7             MR. SHUGRUE:  Well, here, Your Honor, the new facts

8   and conditions that intervene following the arbitration were

9   the judicial unsealing of the affidavit and that affidavit

10  becoming available to Crowley, Crowley tendering that affidavit

11  to National Union as proof that a claim, in fact, had been made

12  against Mr. Farmer in 2008, and asking for coverage followed by

13  National Union's denial.

14            So you have new circumstances and conditions that

15  have intervened.  You have new conduct that's intervened.  And

16  you have facts that were not part of the record in the

17  arbitration that are now available to be adjudicated.

18            Now, in your example, the -- it's not a situation

19  where the witness had given testimony -- recorded testimony and

20  everyone knew that the testimony was there, but it was filed

21  under seal and inaccessible to the parties.

22            Now, that's more a situation where the evidence isn't

23  available just because it wasn't -- you know, it couldn't have

24  been obtained by -- or it wasn't sought by the parties in the

25  litigation.

1    Now, here, we have these external issues of the

2  sealing orders that prevented Crowley from accessing the

3  affidavit and prevented the panel from considering the

4  affidavit.

5    And, again, when you look at -- I mean, if you look

6  at the record of the arbitration -- and we have provided

7  segments, excerpts of it, not the entire transcript, not the

8  entire record.

9    But it's very clear that when National Union issued

10  its denials of coverage, it said, This is based on what you've

11  given us.  If you -- if there's anything else that you think we

12  should consider, please provide that to us.

13    And one of Mr. Duffy's partners at Peabody & Arnold

14  even said, Provide that information to us at any time.

15    And when the arbitration occurred, National Union's

16  argument and position was, You, Panel, are constrained by the

17  *Office Depot* case from drawing inferences about the affidavit

18  without having the affidavit itself in front of you.

19    And they urged the panel not to draw inferences about

20  the affidavit, not to speculate about the contents of the

21  affidavit, not to hypothesize about what the affidavit

22  contained.

23    And the panel, therefore, issued a ruling that was

24  narrow, and, again, akin to a declaratory judgment ruling,

25  ruling that, On the evidence presented by Crowley to National

1   Union, we find that Crowley has not proven that a claim was

2   made against Mr. Farmer, but that information that -- you know,

3   has not yet been presented.

4          I think the "not yet been presented" is critical to

5   understanding the panel's order.  It certainly seemed to leave

6   open that that triggering event could become available and

7   could be provided subsequent to --

8          THE COURT:  Well, in fact, there was a triggering

9   event that occurred just weeks later.  And they did start to

10  pick up coverage.

11         So that could also be read to say that if a -- if a

12  claim is made, or notice of a claim is given, and it has proper

13  support, that -- that it should be paid, which is what

14  happened.  So I'm not sure how to read that, but I hear what

15  you're saying.

16         Let me ask you two quick questions, and then I'm

17  going to have to get you to --

18         MR. SHUGRUE:  Yes, Your Honor.

19         THE COURT:  Tell me why the *Trustmark* case doesn't

20  hurt you.

21         MR. SHUGRUE:  Well, Your Honor, the -- we, of course,

22  look to the *State Street Bank* case as being --

23         THE COURT:  The *Badra* case?

24         MR. SHUGRUE:  Right.

25         THE COURT:  Right.

1      MR. SHUGRUE:  -- as being the case that more properly

2  fits our circumstance, and that you have these subsequent

3  notices, separate notices, that are given after the initial

4  proceeding.

5      That's not unlike -- and I think it's analogous to

6  our case, where we have a subsequent tender of the affidavit as

7  additional evidence supporting the claim that was first

8  reported and submitted in 2008.

9      And that's based on information that became

10  subsequently available, those changed facts and circumstances,

11  those different conditions.

12      So we view the case as falling within the *State*

13  *Street Bank* provisions and holding, as opposed to the *Trustmark*

14  case.

15      And if you look at the -- the general principles that

16  were stated by the *Eleventh Circuit in the Southeast Florida*

17  *Cable versus Martin City* case -- or *Martin County* case, you

18  know, the -- those principles, we think, apply here too.

19      You have to look at the factual issues to be resolved

20  in the second cause of action and compare them with the issues

21  explored in the first cause of action.

22      And here, again, the factual issue as to the contents

23  of the affidavit and the import and implication of those

24  contents, for purposes of establishing that Mr. Farmer was a

25  potential target of a criminal proceeding, those facts were not

1    resolved in the first case.

2         THE COURT:  All right.  The second question I have

3    for you is:  Where are we in this case if I deny summary

4    judgment?

5         I understand if I grant it then the insurance company

6    wins and you lose, subject to appeal, of course.  But if I deny

7    it, where are we?  What's -- you did not cross-move.

8         MR. SHUGRUE:  Correct.

9         THE COURT:  So there's no cross-motion for summary

10   judgment.  I've now denied summary judgment.  What am I going

11   to try?

12        MR. SHUGRUE:  Well, we have completed all discovery.

13   So trial would be the next step.

14        THE COURT:  Right.

15        MR. SHUGRUE:  I think there are issues that would be

16   presented to the court for resolution.  And to the extent there

17   are policy interpretation issues -- such as, for example:  Does

18   the affidavit set forth facts and information that indicate

19   that Mr. Farmer was someone against whom a criminal proceeding

20   may be commenced, I think that would probably be a legal matter

21   for the court to resolve as a matter of interpreting the policy

22   as against those undisputed facts of the contents of the

23   affidavit.

24        There may be fact issues that would need to be

25   presented, possibly, to a jury on the reasonableness of the

1   defense costs that were incurred on Mr. Farmer's behalf, that

2   Crowley reimbursed or paid on Mr. Farmer's behalf.  But --

3          THE COURT:  What are those numbers that -- what are

4   the rough numbers of the fees that you'd be seeking in this

5   case?

6          And what are the rough numbers for the fees that were

7   paid by Crowley after the February 2013 plea agreement was

8   tendered?

9          MR. SHUGRUE:  The fees that we're seeking for the

10   fees prior to Mr. Farmer's indictment are, I believe,

11   approximately 2.5 million.  That's plus or minus, ballpark.

12          THE COURT:  Okay.

13          MR. SHUGRUE:  The fees that National Union paid for

14   Mr. Farmer's defense once he was indicted and through trial, I

15   don't know precisely what those numbers are off the top of my

16   head, but I believe they were in the -- perhaps in the

17   two-million-dollar range.  Mr. Duffy may have a better handle

18   on what those numbers were.

19          THE COURT:  Mr. Duffy, what's the approximate amount

20   there?

21          MR. DUFFY:  Your Honor, I don't know exactly.  I

22   think it's about two million dollars, but I could be wrong.

23          THE COURT:  Okay.

24          MR. DUFFY:  Approximately.

25          THE COURT:  Okay.  And, obviously, since he was

1  acquitted, that was the end of that, right?  So there wasn't an

2  appeal or anything?

3         MR. SHUGRUE:  Correct, correct.  And those fees that

4  were paid by National Union post-indictment are not something

5  that's being sought.  Obviously, those were paid.  So that's

6  not part of the damages claim.

7         THE COURT:  And is the reason that this claim isn't

8  on behalf of Crowley, as well as the others -- is that because

9  they were -- ended up being criminally implicated?

10        Is that why we're only talking about Mr. Farmer?

11        MR. SHUGRUE:  No.  We're talking about Mr. Farmer

12  because -- our view was that the affidavit most clearly

13  established that Mr. Farmer was someone against whom a criminal

14  proceeding may be commenced.

15        THE COURT:  Okay.  All right.  Thank you, sir.

16        MR. SHUGRUE:  Thank you, Your Honor.

17        THE COURT:  Just stay right there a second,

18  Mr. Duffy.

19     (Judge confers with intern.)

20        THE COURT:  Just give me a second here.  I made some

21  notes before we started.  I just wanted to make sure I've

22  covered what I -- obviously, this is -- we could talk about

23  this, I'm sure, for a long time.

24     (Judge confers with law clerk.)

25        THE COURT:  Mr. Shugrue, I have one question for you

1    on the statute of limitations.  The -- as I understand it,

2    you're making some type of continuing breach argument

3    or argument that because litigation was ongoing about this

4    matter even up until 2015 that the statute of limitations

5    didn't start -- what's the legal basis for that?

6            And I guess the question is:  Weren't the damages

7    established as of 2013, when they -- when National Union

8    started picking up the coverage?  And so didn't you know

9    what -- I guess I'm just not understanding the basis of that

10   argument.

11           MR. SHUGRUE:  Your Honor, there are two separate and

12   independent arguments on the statute of limitations --

13           THE COURT:  Right.

14           MR. SHUGRUE:  -- in connection with what you just

15   asked.  The first argument is that when you have a policy that

16   provides for coverage of defense costs --

17           THE COURT:  Right.

18           MR. SHUGRUE:  And here we had a duty to advance

19   defense costs, which Florida courts have said is the equivalent

20   of a duty to defend.

21           THE COURT:  Right.

22           MR. SHUGRUE:  But when you have a duty to defend or a

23   defense coverage policy, the time for the statute of

24   limitations to begin running, that does not start until the

25   conclusion of the underlying matter.

1          So, now, in this case it is true that National Union

2   commenced paying Mr. Farmer's legal fees post-indictment, but

3   there were fees that they didn't pay during that process.

4          There might have been issues about whether they were

5   entitled to any sort of a claw-back or reimbursement of legal

6   fees.

7          So until that matter was finally concluded with

8   Mr. Farmer's acquittal, the Florida law says that the statute

9   of limitations on defense coverage under a policy does not

10  begin to run.  So that's one basis for avoiding the statute of

11  limitations argument, or defeating it.

12         The second basis is the continuing breach argument,

13  which is that, here -- again, if you accept National Union's

14  position that there was a breach or a refusal to pay or denial

15  of coverage in May of 2008 that started the limitations period

16  running, again, Florida law -- and we've cited these -- these

17  cases -- the *Grissom* case in particular -- on the final

18  adjudication point.

19         If you have additional denials or refusals to pay

20  periodically, subsequent to the initial denial, that that

21  triggers a fresh -- the running of the statute of limitations.

22         So, here, after the initial --

23         THE COURT:  Well, but I'm looking at a case called

24  *Dinerstein* from the Eleventh Circuit.  It says, The Florida

25  Supreme Court has directly addressed this issue and held that a

1  breach of contract action on an insurance contract accrues on

2  the date the contract is breached.

3         Does that -- does that take away from your argument

4  or --

5         MR. SHUGRUE:  No.  That's when -- that's when the

6  statute of limitations would accrue, would be the date of the

7  breach.

8         THE COURT:  Right.

9         MR. SHUGRUE:  But the case law that we've cited on

10  the continuing breach point reflects that if subsequent to that

11  initial breach or denial there are subsequent additional

12  refusals to pay, denials in response to specific requests for

13  demands of payments, tenders of defense invoices, that the

14  statute of limitations refreshes again.

15         So after the initial denial in May of 2008, Crowley

16  and Mr. Farmer's lawyers periodically sent invoices to National

17  Union that National Union failed and refused to pay, all the

18  way up through a final submission prior to the arbitration of

19  December of 2012.

20         THE COURT:  Thank you.

21         Mr. Duffy, I -- I think you've addressed this, but I

22  just want you to give me a minute on it.

23         You wrote in your briefs that coverage is triggered

24  once the insured was identified in writing as being under

25  investigation.

1          And I recognize you're going to debate me whether
2    it's subject or target or whatever, but let's put that to the
3    side.
4          So isn't it, in fact, true that this person was
5    identified -- Mr. Farmer was identified in writing, it was just
6    buried under the -- in the backyard?  And so wasn't coverage
7    triggered?
8          MR. DUFFY:  No.
9          THE COURT:  Why?
10          MR. DUFFY:  Well, I guess, first of all, because I
11    would question the distinction between a subject and a target,
12    but put that to one side for the moment.
13          We're talking, as I said, about two different issues.
14    There's the definition of a claim and when a claim can be said
15    to have been made against an individual.
16          And a claim, in our view, cannot be said to have been
17    made against an individual until the individual is aware of it.
18    And Mr. Farmer may have known or believed that he was the
19    subject of an investigation, but he didn't know what that
20    affidavit said until he got a copy.  And he did not know that
21    until 2013.
22          So the claim -- even if we assume that what they say
23    about the affidavit is right, that was not a claim made against
24    Mr. Farmer until he knew that it was true.  And that didn't
25    happen until 2013, at the earliest.

1    THE COURT:  All right.  I'll give you two minutes or

2    so of rebuttal time if you want to pick out a point or two that

3    you really wanted to -- since you're the moving party, I

4    usually give you the last word, but it's just going to be very

5    brief.

6    MR. DUFFY:  Yeah, Your Honor.  And we do generally

7    rest on the papers, because everything is covered there.  I

8    want to just respond to two different cases.

9    One is the *State Street versus Badra* case.  And the

10   facts there are very different than in this case.  In that case

11   you had a lender that filed a notice of foreclosure.  The court

12   in the first case found that the notice was defective.

13   After the case was over, the lender gave a new notice

14   of foreclosure.  And the court found, on the second page, that

15   the new notice was not defective.

16   So that case is not about the discovery of facts

17   which existed before the first trial.  It's about a whole new

18   claim based on all new facts, which did not exist at the time

19   of the first trial.  So it's really very different.

20   And the second point I wanted to mention is on the

21   *Grissom* case, about the breach of the duty to defend.  When you

22   have a policy with a duty to defend -- and, by the way, this

23   policy is not a duty to defend; it's a reimbursement policy.

24   But when you have a duty to defend, if you breach the

25   duty to defend, if you wrongfully refuse to pay, the court does

 1 | say that the insured doesn't have to sue until the case is

 2 | over.   But that is only if the insurer breaches the policy by

 3 | wrongfully failing to defend.

 4 |         In this case we've already litigated that.   We know

 5 | that, based on the arbitration panel, there was no duty to pay

 6 | anything as far as 2013.

 7 |         And just to correct Mr. Shugrue on one point, we're

 8 | not saying that there was a breach of policy in 2008.   I'm --

 9 | asking somebody when there was a breach of policy is like

10 | asking you:   When did you stop beating your wife?

11 |         Because their answer is, There was no breach as far

12 | as we're concerned.   We're not saying we breached the policy in

13 | 2008.   We're saying that that's what their claim is, at least

14 | as we understand it, and, therefore, a suit more than five

15 | years later is time-barred.

16 |         Thank you.

17 |         THE COURT:   Thank you.

18 |         MR. SHUGRUE:   Your Honor -- I'm sorry -- may I have

19 | 30 seconds on one point?

20 |         THE COURT:   Yes, sir.   Yes, sir.

21 |         MR. SHUGRUE:   The statement that Mr. Duffy just made

22 | about a claim can't be made until the insured is aware of it,

23 | Mr. Farmer was aware of the claim.

24 |         He was aware that he was the target of an

25 | investigation.   He hired a lawyer to pay millions of dollars

1    for defense counsel.  And, of course, he ultimately was

2    indicted and tried on criminal antitrust conspiracy charges.

3           And the policy --

4           THE COURT:  So what he's really saying is until he

5    was aware of the affidavit, and you're saying that's not really

6    what the point is?

7           MR. SHUGRUE:  Correct, and for two reasons.  One is

8    that, of course, he was aware of the affidavit and aware that

9    the affidavit contained allegations that supported a showing of

10   probable cause for the search warrant.

11          But, secondly -- and, again, we've argued this in our

12   brief -- this policy does not require receipt of that document

13   from the investigating authority.

14          There are other policy provisions that say it's only

15   a claim that's been served, when it's received, and a companion

16   policy that National Union issued to Crowley, not the policy at

17   issue here -- actually says it isn't a claim unless and until

18   it's received by the insured.  But that requirement isn't in

19   this policy.

20          THE COURT:  Thank you.

21          MR. SHUGRUE:  Thank you, Your Honor.

22          THE COURT:  Thank you.

23          All right.  The motion is under advisement.  I will

24   issue an order as soon as I can.  We've done quite a bit of

25   work to get ready for it.  And I hope to have an opinion out

1    reasonably soon.

2           I will tell you we're pretty busy.  And, of course,

3    our criminal docket stays -- keeps us busy, so -- which gets

4    priority.

5           So I will do the best I can to get you a decision as

6    quickly as I can, but I won't predict exactly when that will

7    be.  I'll just tell you I'll do the best I can.

8           And the one question I did have before I let you-all

9    go is -- I saw that early on in the case -- I think you had

10    some engagement with Mike Tanner as a mediator.  And then I

11    think it showed -- let me make sure I'm not mixing my cases up

12    here.

13           I think it showed -- I then converted the motion to

14    dismiss to a motion for summary judgment.  Yeah.  Mike --

15    Mr. Tanner did a continuation notice on December 14th.  A week

16    later I converted the motion and then you-all were off to the

17    races.

18           But these are two business entities that want to make

19    business decisions.  And while this case is under advisement,

20    and sometimes a good opportunity to see if it could be

21    resolved, you've now both heard kind of the best shots from the

22    other side.  You don't know what the judge is going to do.

23           I will tell you, of course, I will do the best I can

24    to follow the law.  This is a relatively unusual case.  The

25    facts are kind of unusual.

1          And so it's not like I'm seeing a case directly on

2    point that says, Res judicata applies when there's an unsealed

3    criminal affidavit.  This doesn't appear to be a case like

4    that, and so -- or vice versa.

5          And so any decision I make, I assume, is likely,

6    depending on who -- somebody is going to like the decision,

7    somebody is not.  There's always the possibility of an appeal,

8    so -- anyway, I just wonder whether -- and I know there's a lot

9    of money involved.

10          But the thing about this that's good, as opposed to a

11    lot of other disputes I have, is -- this is a business dispute

12    between two very sophisticated business organizations.

13          This doesn't really -- this isn't really personal.

14    There's not -- shouldn't be personalities involved,

15    necessarily.  It really is just a business dispute that needs

16    to be resolved.

17          And if it can't be resolved with -- through

18    negotiation or mediation, then, of course, I will do my level

19    best to give you a proper decision.

20          So I guess my question is -- and I'll ask you,

21    Mr. Duffy, first.

22          In advance of a decision from the court, would

23    National Union be amenable to getting back in front of

24    Mr. Tanner, or, if -- if you wanted to, Judge Toomey -- the

25    magistrate judge would probably give you a settlement

1   conference, if I asked him nicely.

2          Is that something that National Union would be

3   interested in?  Is it something -- if you're not prepared to

4   say now, is it something that you could talk to your client

5   about and let us know?

6          What's your response to that?

7          MR. DUFFY:  Your Honor, I think I would have to talk

8   to my client before making any commitment.  But I suspect that

9   they probably would agree to do that.

10         THE COURT:  Okay.  Mr. Shugrue, what says Crowley?

11         MR. SHUGRUE:  I would say the same, Your Honor.  I'd

12  certainly have to talk -- Mr. Ficon is here, but he's got other

13  folks that he has to discuss that with.

14         But I would certainly engage in that discussion and

15  would not rule out the possibility of reengaging on the

16  settlement discussions.

17         THE COURT:  Okay.  Well -- and let me be clear with

18  everybody.  You know, I think sometimes courts get accused of

19  trying to cram settlement down people's throat.  And I'm not

20  doing that.  If y'all tell me you can't settle it, I'll decide

21  it, and I'm happy to do so.

22         It does strike me, though, that a lot of time and

23  money has already been spent.  Now everybody has kind of taken

24  their best shots at an argument, and everybody can kind of hear

25  what it sounds like.

1          And it also strikes me that every dollar -- every day

2   more dollars get spent on the matter, and will continue to be

3   spent.

4          And if there is some resolution of this that could

5   happen from a business perspective, it's probably not a

6   terrible idea.  And so I would encourage you-all to think about

7   that and to at least be open to that possibility.

8          So here's what I'll do.

9          Gosh, how did it get to be June 20th?

10          If I give you-all -- oh, that's the 4th of July.  If

11   I give you-all until, like, Friday, July 7th, or something, to

12   let me know whether the parties are willing to engage in --

13   that's a couple of weeks -- two-and-a-half weeks, but there's a

14   4th of July holiday.

15          If you need longer, I'm willing to give you longer.

16   I'm just trying to not be too long with it.  If I give you

17   until then or another date we agree on to (a) let me know

18   whether you're willing to proceed with settlement discussions

19   and (b) let me know whether you want to get back in front of

20   Mr. Tanner, or whether you would like me to ask the magistrate

21   judge to handle a settlement conference, or whether you have

22   somebody else you want to use -- any of that is fine with me.

23          Is that enough time?  Do you need a little extra

24   time?

25          Mr. Shugrue, what say you?

```
 1            MR. SHUGRUE:  Your Honor, I think that's sufficient
 2    time.
 3            THE COURT:  Okay.  Is that enough?
 4            MR. DUFFY:  That's plenty of time, Your Honor.
 5            THE COURT:  Okay.  And so what I'm anticipating is a
 6    joint notice saying the parties are willing to go forward with
 7    settlement discussion and we request that the magistrate judge
 8    conduct, or we request that Mr. Tanner, or that -- another
 9    mediator that you pick.
10            If one party or another just doesn't think it's
11    worthwhile -- I hope that won't be the answer.  I really
12    don't -- because I think what can it hurt you, really?  And you
13    may be surprised.
14            But if one party really feels strongly, then I'm not
15    going to force you to do it, but I -- I'm going to really
16    encourage you to do it.
17            And I would ask -- ask your clients -- and in the
18    notice, I don't need to -- it doesn't need to be identified who
19    objects to it.  It just -- we're ready to go forward with it or
20    we're not ready to go forward with it.
21            But I'm going to ask you-all to talk to your clients
22    and encourage them to make that effort, because, you know,
23    we're still even in the middle stages of this thing.  I've got
24    to make a decision.  And then, depending on that, somebody
25    might want to appeal and -- so...
```

1        My senior partner, even though we -- I was in a

2    litigation firm before I became a judge, he used to -- the

3    first thing he would always tell clients when he came in is

4    that litigation is a terrible way to run a business.  And

5    that's kind of true, isn't it?  It's necessary sometimes, but

6    it's not -- not really what you want to be spending your time

7    on.

8        Of course, I know an insurance company is a little

9    different.  This is what you do.  Either you pay claims or you

10   don't.

11       But, still, it's certainly -- I know insurance

12   companies have very sophisticated ways of making calculations

13   about risk and reward and what makes sense and what doesn't.

14   So, hopefully, we can -- hopefully that can be brought to bear.

15   That's my hope, anyway.

16       So I'll hear from y'all by the 7th.  The matter is

17   under advisement.  And, as I said, I will write you an opinion,

18   if I need to, and -- but it will take me a little bit of time.

19       Once I hear whether settlement is going to go forward

20   or not, it will take me a little bit of time.  But I'll just do

21   the best I can and give you the best work that I can give you.

22       Anything else, Mr. Shugrue, from Crowley today?

23       MR. SHUGRUE:  No.  Thank you, Your Honor.

24       THE COURT:  Mr. Duffy, anything else?

25       MR. DUFFY:  No, Your Honor.  Thank you.

1          THE COURT:  Okay.  Good.  Well, it's good to see

2     everybody.  And I thank you for putting on a good show for our

3     interns.  And I'm going to go eat lunch with them in a minute.

4          So what I'll ask y'all to do is just sit right there.

5     I'm going to go back for a minute.  These folks are going to go

6     about their business.  I'll come back out and we'll talk for a

7     second.  Okay?

8          All right.  Thank y'all.

9        (The proceedings concluded at 11:51 a.m.)

10                            - - -

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

### CERTIFICATE


UNITED STATES DISTRICT COURT    )
                                )
MIDDLE DISTRICT OF FLORIDA      )


       I hereby certify that the foregoing transcript is a true and correct computer-aided transcription of my stenotype notes taken at the time and place indicated herein.


       DATED this 11th day of August, 2017.



       s/Shannon M. Bishop
       Shannon M. Bishop, RDR, CRR

# Doc. 53

## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

CROWLEY MARITIME
CORPORATION,

     Plaintiff,

v.                                    Case No. 3:16-cv-1011-J-32JBT

NATIONAL UNION FIRE
INSURANCE COMPANY OF
PITTSBURG, PA.,

     Defendant.

_____

## O R D E R

     This insurance coverage dispute is before the Court on Defendant National Union Fire Insurance Company of Pittsburg, Pennsylvania's converted Motion for Summary Judgment, (Doc. 15), to which Plaintiff Crowley Maritime Corporation responded. (Docs. 20, 40). With the Court's permission National Union filed a reply. (Docs. 25, 43). On June 20, 2017, the Court held a hearing on the motion, the record of which is incorporated herein. (Doc. 49). The Magistrate Judge then conducted a settlement conference, but the parties impassed. (Doc. 52). Thus, the case is ready for a decision.

## I.     BACKGROUND

### A.   The Policy

National Union issued an Executive and Organization Liability Insurance Policy to Crowley in November, 2007. (Doc. 1 ¶ 6; Doc. 1-1 at 2).[1] The Policy limits coverage to "Claims that are first made . . . during the Policy period and reported in writing to the insurer pursuant to the terms herein." (Doc. 1-1 at 2). The Policy has a term of November 1, 2007 through November 1, 2008, and a six year run-off period to report Claims, referred to as the Discovery Period, which expired on November 1, 2013. (Doc. 1-1 at 59). The Policy also contains a relation back provision, which states:

> If during the Policy Period or during the Discovery Period (If applicable) an Organization or an Insured shall become aware of any circumstances which may reasonably be expected to give rise to a Claim being made against an Insured and shall give written notice to the Insurer of the circumstances . . . then a Claim which is subsequently made against such Insured and reported to the Insurer alleging, arising out of, based upon or attributable to such circumstances . . . shall be considered made at the time such notice of such circumstances was given.

(Doc. 1-1 ¶ 7(c)). The written notice upon which a Claim can relate back is referred to as a "notice of circumstances." (Doc. 36 at 18).

The Policy provides that the "criminal . . . investigation of an insured

---

[1] In some of the pleadings, the page numbers used by the parties do not correspond with those produced by the Court's electronic filing system. For consistency and ease of reference, this Order uses the Court filing's page numbers.

person" triggers coverage once the "insured person is identified in writing" by an "investigating authority as a person against whom" a criminal proceeding has commenced. (Doc. 1-1 ¶ 2(b)(3)(i)). The "return of an indictment, information or similar document" commences a covered criminal investigation. (Doc 1-1 ¶ 2(b)(2)). The Policy defines an "Insured Person" as any "executive of an organization; employee of an organization; or outside entity executive." (Doc. 1-1 ¶ 2(o)). Regarding coverage of defense costs, the Policy provides, "[o]nly those . . . Defense Costs which have been consented to by the Insurer shall be recoverable as loss under the terms of this Policy." (Doc. 1-1 ¶ 8). The Policy further states that "[t]he Insurer's consent shall not be unreasonably withheld." (Doc. 1-1 ¶ 8).

## B.  Department of Justice Search Warrant

On April 17, 2008, the Department of Justice executed a search warrant at Crowley Liner Services, a wholly owned subsidiary of Crowley. (Doc. 1 ¶ 15). The search warrant sought to collect various documents from Crowley Liner and four named Crowley Liner employees. (Doc. 36-2 at 2, 7). Tom Farmer, a vice president of Crowley Liner, was one of the named employees. (Doc. 36-2 at 2). Farmer was also issued a subpoena on April 17, 2008. (Doc. 36-19 at 4–5).

To support the issuance of the search warrant, FBI Special Agent Byron Thompson wrote an Affidavit. (Doc. 36-2 at 10). The Affidavit listed Farmer as a "subject" of the investigation. (Doc. 36-2 at 17). However, the Affidavit was

3

filed under seal and remained sealed until 2015. (Doc. 1 ¶ 17; Doc. 36-17 at 2).

### C.   Dispute Over Coverage and Arbitration

On April 25, 2008, Crowley provided National Union notice of a Claim under the Policy and sent National Union copies of the search warrant and Farmer's subpoena. (Doc. 36-5 at 2). Crowley also informed National Union that the Affidavit was sealed. (Doc. 1 ¶ 18; Doc. 36-5 at 4). Crowley requested that National Union advance Farmer's defense costs.[2] (Doc. 36-5 at 4). On May 27, 2008, National Union responded to Crowley's notice of the DOJ investigation, asserting that "based on the documentation currently available" the Policy did not provide coverage for Farmer because it did not identify Farmer "in writing as a target of any investigation." (Doc. 36-6 at 4). However, National Union accepted Crowley's communication as "a [N]otice of [C]ircumstances that may give rise to a Claim being made against an Insured . . . ." (Doc. 36-6 at 4). Following this response, Crowley continued to assert it had reported a Claim and National Union maintained its position that the documents Crowley submitted did not amount to a Claim. (See, e.g., Docs. 36-19, 36-20, 36-21).

Believing it was entitled to coverage, Crowley commenced an arbitration action on March 7, 2012, to recover Farmer's defense costs. (Doc. 1 ¶ 21). The

---

[2] Crowley also requested coverage for itself and three other individuals mentioned in the search warrant, but coverage of those Claims is not at issue here. (See Doc. 36-5 at 2).

parties did not obtain the Affidavit during the arbitration, and, although discussed during the proceeding, its content was not used to determine whether Crowley had submitted a Claim. (See, e.g., Doc. 36-9 at 5–6, 25–26). In a decision dated January 29, 2013, the arbitrators determined that from 2008 through 2012, "[t]he materials Crowley submitted to National Union [which did not include the sealed Affidavit] did not constitute a Claim for Injured Persons as the term 'Claim' is defined in the Policy." (Doc. 36-7 at 10).

### D.   Farmer's Acquittal and Crowley's Lawsuit

During this time, the DOJ investigation continued, and in February, 2013 the government offered Farmer a plea deal, which identified him in writing as a target of a government investigation. (Doc. 36-11 at 2–3). Consequently, beginning in February, 2013, National Union agreed to cover Farmer's subsequent defense costs because the plea deal materialized before the end of the Discovery Period. (Doc. 36-11 at 3).

Farmer did not accept the plea deal, and a jury acquitted him on May 8, 2015. (Doc. 36-32 at 2). Following Farmer's acquittal, Crowley obtained a copy of the unsealed Affidavit. (Doc. 36-32 at 2). Crowley then asked National Union to cover Farmer's defense costs from the original notice of a potential claim in 2008 until February, 2013 because in 2008 the Affidavit identified Farmer as the subject of an investigation. (Doc. 36-32 at 2).

National Union continues to deny coverage and, thus, has not advanced

the defense costs Farmer accrued from April, 2008 to February, 2013, which are alleged to be in excess of $2.5 million. (Doc. 36-33 at 2–3). Crowley filed this breach of contract action to recover Farmer's defense costs. (Doc. 1). National Union moved to dismiss the complaint on the grounds that the action was precluded by the prior arbitration and barred by the statute of limitations. (Doc. 15). The Court converted the motion to dismiss into one for summary judgment. (Doc. 28). The parties conducted discovery and filed supplemental briefing. The Court held a hearing on the motion. (Doc. 49).

National Union seeks summary judgment on three grounds. First, National Union claims the arbitration award determined that Crowley had no duty to pay Farmer's defense costs from 2008 through 2012 and thus precludes this action.[3] (Doc. 16 at 7–9). Second, National Union asserts that this breach of contract action is barred by the five-year statute of limitations because it alleges a breach occurring in 2008, but was not filed until 2016. (Doc. 16 at 10). Third, National Union argues that the claim is untimely because the Affidavit was unsealed and presented to it in 2015, after the Discovery Period.[4] (Doc. 25

---

[3] Although the parties—and the wealth of case law—couch the issue as one of res judicata, the Supreme Court has explained that res judicata often has different and conflicting definitions. Baker v. Gen. Motors Corp., 522 U.S. 222, 233 n.5 (1998). Thus, this Court will use the more precise terminology adopted by the Supreme Court: claim preclusion. Id.

[4] Crowley claims that National Union's argument based on the Discovery Period should be rejected because National Union did not raise it until its reply. (Doc. 36 at 17–18). However, the Court converted National Union's motion to

at 6–7; Doc. 37 at 12–16).

Crowley contends that the arbitration panel only determined whether Crowley had submitted a Claim to National Union at that time, and because the Affidavit was sealed during arbitration, whether the Affidavit constitutes a Claim could not have been adjudicated in the arbitration. (Doc. 20 at 2–3). Further, Crowley argues that the 2015 demand for reimbursement of Farmer's defense costs relates back to its 2008 notice of circumstances, making it timely under the Discovery Period. (Doc. 36 at 18; see Doc. 1-1 ¶ 7(c)). However, Crowley also argues that the statute of limitations did not begin to run until 2015, when it presented the Affidavit to National Union. (Doc. 20 at 3).

## II.  ANALYSIS

The resolution of this case depends on when Crowley reported a Claim for payment of Farmer's defense costs based on the Affidavit. The answer is a catch-22 for Crowley: if it was in 2008, then Crowley is precluded from relitigating the issue; if it was in 2015, Crowley's demand is barred by the plain text of the Policy's Discovery Period. As detailed below, the Court finds that Crowley's

---

dismiss into a motion for summary judgment and allowed the parties to supplement their briefing. (Doc. 28 at 1). National Union appropriately raised the Discovery Period timeliness issue in its supplement. (Doc. 25 at 6–7). Thus, National Union did not waive it. Further, both parties devoted additional briefing to the issue, (Doc. 36 at 17–19; Doc. 37 at 1, 9, 12–16; Doc. 40 at 5; Doc. 43 at 5–6), and both parties addressed this issue during the hearing. (Doc. 49 at 36–46). Therefore, neither party can claim to be surprised or prejudiced by the Court considering this issue.

demand for payment based on the Affidavit occurred in 2015, and, thus, was untimely under the Policy.

### A. Crowley's Claim based on the Affidavit is not precluded by the prior arbitration.

The Constitution's Full Faith and Credit clause gives nationwide force to valid state court judgments. <u>Baker</u>, 522 U.S. at 233. To determine the effect of a state judgment in federal court, the rendering state's preclusion rules apply. <u>Lozman v. City of Riviera Beach</u>, 713 F.3d 1066, 1074 (11th Cir. 2013). The arbitration award was rendered in Florida, (Doc. 36-7 at 2), and Florida equates a valid binding arbitration award to a court judgment. <u>See, e.g.</u>, <u>Dadeland Depot, Inc. v. St. Paul Fire & Marine Ins. Co.</u>, 945 So. 2d 1216, 1235 (Fla. 2006) (implying that a prior arbitration containing the same four identities will preclude the subsequent court action); <u>Bank of Am., N.A. v. Beverly</u>, 183 So. 3d 1099, 1102 (Fla. 4th DCA 2015) (holding that "res judicata and collateral estoppel" apply to a prior arbitration if the two actions have the required identities); <u>Bates v. Betty & Ross Co.</u>, 46 So. 3d 615, 617 (Fla. 3d DCA 2010) ("[A] determination made during an arbitration proceeding can provide an appropriate foundation for the application of collateral estoppel.") (quoting <u>Dadeland</u>, 945 So. 2d at 1235); <u>ICC Chem. Corp. v. Freeman</u>, 640 So. 2d 92, 93 (Fla. 3d DCA 1994) (upholding the dismissal of a case because it was precluded by a prior arbitration).

8

In Florida, claim preclusion bars a subsequent action for "matters actually raised and determined in the original proceeding and also to matters which could have properly been raised and determined." Id. For claim preclusion to apply the two actions must share four identities: "(1) identity of the thing sued for; (2) identity of the cause of action; (3) identity of persons and parties; and (4) identity of the quality [or capacity] of the persons for or against whom the claim is made." Lozman, 713 F.3d at 1074 (citations and internal quotation marks omitted) (applying Florida law). Claim preclusion requires that "the original claim was disposed on the merits." Id. The party asserting claim preclusion has the burden of proving that the four identities exist and that the matter was formally adjudicated on the merits. State St. Bank & Tr. Co. v. Badra, 765 So. 2d 251, 253 (Fla. 4th DCA 2000).

Crowley and National Union acknowledge that three of the required identities link the arbitration and current action: (1) the identity of the thing sued for—Farmer's defense costs from 2008 through 2012; (2) the identity of the persons and parties—Crowley and National Union; and (3) the identity of the quality of the persons for or against whom the claim is made—National Union is the adverse party in both actions. (Doc. 25 at 3). Thus, National Union must show that no genuine issue of material fact exists concerning the identity of the cause of action. See Lozman, 713 F.3d at 1077; Badra, 765 So. 2d at 253.

To determine whether two proceedings share an identity of the cause of

9

action, the Court "must consider [whether] the relationship between the facts and issues asserted [] constitutes a single transaction." AMEC Civil, LLC v. Fla. Dep't of Transp., 41 So. 3d 235, 240 (Fla. 1st DCA 2010) (citing Gordon v. Gordon, 36 So. 2d 774 (Fla. 1948)). Further, Florida does not have an expansive definition of "cause of action;" instead, "allegations of separate, wrongful acts give rise to separate causes of action, even if the wrongful acts occurred within the context of a larger set of facts or relationship." Lozman, 713 F.3d at 1077.

Florida also uses a transaction test, which precludes actually litigated causes of action and every other matter that might have been litigated within that same transaction or series of transactions. See id. at 1078. However, "[d]espite the broad 'every other matter' language, the transaction test is 'narrow' and extends to essentially connected claims that a defendant in a former action failed to raise as a defense." Id. at 1078 (quotations omitted).

Subsequent claims are only precluded if the facts and conditions at the time of the first judgment are the same in relation to the legal rights and issues of the second judgment. Badra, 765 So. 2d at 253 (citing Hialeah Race Course, Inc. v. Gulfstream Park Racing Ass'n, Inc., 245 So. 2d 625, 628 (Fla. 1971)). "When other facts or conditions intervene before the second suit, furnishing a new basis for the claims and defenses of the respective parties, the issues are no longer the same and the former judgment cannot be pleaded in bar of the second action." Id. at 254. In Badra, the trial court determined that State Street

10

failed to provide proper notice of acceleration of payment for a purchase money mortgage. <u>Id.</u> at 253. Six days after trial, State Street sent a corrected notice of acceleration, and eleven months later filed an identical complaint against Badra. <u>Id.</u> In holding that the two suits did not share the identity of the cause of action, the Fourth District Court of Appeal stated: "Since the first and second actions involved different notices of acceleration and such letters were essential to the maintenance of each action, there existed essential facts between the two cases which differed." <u>Id.</u> at 254.

Causes of action based on different evidence, especially facts occurring after the initial suit, are not precluded by prior adjudications. <u>Lozman</u>, 713 F.3d at 1076. In <u>Lozman</u>, the City of Riveria Beach filed an eviction action against Lozman. <u>Id.</u> at 1070. Lozman's second amended counterclaim alleged various violations of his constitutional rights by the City. <u>Id.</u> The eviction claim was severed from the counterclaim, which was subsequently dismissed without prejudice based on an agreement between the parties. <u>Id.</u> Lozman then filed an action in federal court. <u>Id.</u> at 1072. The Eleventh Circuit determined the federal claims were not precluded by the state eviction action because the conduct alleged in the two actions were distinct. <u>Id.</u> at 1076. Since the federal claim relied on conduct that had not yet occurred when the state action was filed, the causes of action were not identical. <u>Id.</u>

National Union contends that this suit is the same cause of action as the

arbitration because it arises out of the same transaction or series of transactions. (Doc. 16 at 8); <u>see</u> <u>Trustmark Ins. Co. v. ESLU, Inc.</u>, 299 F.3d 1265 (11th Cir. 2002); <u>AMEC</u>, 41 So. 3d at 243. In <u>Trustmark</u>, the plaintiff filed a breach of contract claim in state court. <u>Trustmark</u>, 299 F.3d at 1269–71. Later, the plaintiff learned of additional breaches and attempted to amend its state court complaint to include these additional claims. <u>Id.</u> The court denied the motion to amend, and a jury returned a verdict in favor of the defendant. <u>Id.</u> at 1266–67. The plaintiff then filed a second suit in federal court asserting the additional claims it previously attempted to include in the state court suit. <u>Id.</u> at 1267. In affirming dismissal, the Eleventh Circuit noted, "[a] series of breaches of the same contract, all occurring before filing suit, should be brought in that suit." <u>Id.</u> at 1270.[5]

---

[5] The precedential value of <u>Trustmark</u> for this case is unclear. Although the underlying causes of action in <u>Trustmark</u> are likely Florida law claims, neither the Eleventh Circuit, nor the district court, cited any Florida case law when discussing claim preclusion. See <u>Trustmark</u>, 299 F.3d at 1269–71; <u>Trustmark Ins. Co. v. ESLU, Inc.</u>, 153 F. Supp. 2d 1322, 1328–32 (M.D. Fla. 2001). Both cases cite prior Eleventh Circuit opinions discussing claim and issue preclusion under Eleventh Circuit precedent, not Florida precedent. <u>See, e.g.</u>, <u>In re Piper Aircraft Corp.</u>, 244 F.3d 1289, 1296 (11th Cir. 2001). However, the Supreme Court's decision in <u>Semtek International, Inc. v. Lockheed Martin Corp.</u>, 531 U.S. 497 (2001) mandates that federal courts sitting in diversity, such as this case, use the preclusion rules of the state in which they are located. Although "[a] comparison between Florida rules and federal rules governing claim and issue preclusion reveals that the relevant principles are largely identical," <u>SFM Holdings, Ltd. v. Banc of Am. Sec., LLC</u>, 764 F.3d 1327, 1337 (11th Cir. 2014), it appears that <u>Trustmark</u> was not decided under Florida preclusion law. <u>See</u> <u>Trustmark</u>, 299 F.3d at 1269–71 (citing <u>In re Piper</u>, 244

Similarly, the First District Court of Appeal stated that when a cause of action is breach of an indivisible contract, all claims of breach for that contract should be brought in a single action. AMEC, 41 So. 3d at 243. In AMEC, the parties' contract established a dispute review board ("DRB"), but the DRB's decisions were not binding. Id. at 236. After submitting claims to the DRB, AMEC filed suit in state court alleging breach of contract. Id. 237. While that case was pending, AMEC filed an additional sixty claims with the DRB. Id. A jury returned a verdict in AMEC's favor, but the remaining DRB claims had stalled. Id. at 238. When AMEC filed a second suit alleging the remaining breaches of contract, the First District Court of Appeal barred the action. The court held "[o]nly AMEC's strategic choice prevented the joinder of all claims. . . . [T]he numerous alleged breaches of the indivisible contract could with propriety have been litigated and determined in a single action." Id. at 243 (citations and quotations omitted).

National Union argues that the Affidavit arose out of the same transaction as the issue arbitrated: "Crowley's demand for coverage for Mr. Farmer's attorney's fees and National Union's denial of that demand." (Doc. 37 at 7); see Trustmark, 299 F.3d at 1269–71. National Union's framing of the arbitration issue is flawed—it cannot be as broad as the demand and denial of

_____

F.3d at 1296). Thus, its precedential value here is questionable.

13

Farmer's attorneys' fees. Shortly after the arbitration panel determined that Crowley had not made a Claim under the Policy, National Union accepted Farmer's plea deal as sufficient to trigger coverage. (Doc. 37 at 4). If Farmer's plea deal was not precluded by the arbitration because it was a subsequent trigger of coverage, then the Affidavit, unsealed and submitted years after the arbitration, is also a separate Claim for coverage that is not precluded. See Lozman, 713 F.3d at 1077; Badra, 765 So. 2d at 253; (Doc. 37 at 4).

Additionally, framing the arbitration issue as "recovery of the legal fees incurred by [] Farmer from 2008 through 2013" is also incorrect. (See Doc. 37 at 7). The arbitration panel only determined whether the documentation that Crowley had submitted to National Union at that point in time constituted a Claim under the Policy. (Doc. 36-7 at 6).[6] Crowley did not submit the Affidavit to National Union because it was still sealed. (Doc. 36-7 at 6).

Crowley's suit is not precluded by the 2012 arbitration because the arbitration award only determined that at that point in time, Crowley had not made a "Claim," as that term is defined by the Policy. See Lozman, 713 F.3d at 1074; (Doc. 36-7 at 6, 10). Similar to Badra, the documents submitted to the

---

[6] The arbitration panel examined "the search warrant, the Farmer subpoena, the Crowley subpoena, the Term Sheet, the [Crowley] Plea Agreement, the [Crowley] Plea Agreement Supplement, and the Investigation related thereto." (Doc. 36-7 at 6).

arbitration panel did not include the Affidavit,[7] and because the Affidavit is material to determining whether Crowley has made a Claim under the Policy, the essential facts between the arbitration and this action differ. See Badra, 765 So. 2d at 253; (Doc. 36-7 at 6, 10).

Analyzing the facts of the two actions in relation to the issues and rights of the parties, see Badra, 765 So. 2d at 253, the unsealing of the Affidavit made Crowley's 2015 demand a distinct "Claim." See Lozman, 713 F.3d at 1077. As the Eleventh Circuit explained in Lozman, a subsequent suit based on facts and evidence not in existence during the prior suit is not precluded by the prior suit. Id. at 1076. Therefore, the two actions would be separate breach of contract claims alleging separate wrongful acts by National Union: (1) not paying Farmer's defense costs based on what Crowley had submitted to National Union at the time of the arbitration; and (2) not paying Farmer's defense costs based on Crowley's 2015 submission of the Affidavit. See id. (holding that Florida's definition of cause of action is narrow and that "separate, wrongful acts give

---

[7] The Arbitration Award states that the content of the Affidavit was inferable. (Doc. 36-7 at 3). However, the award concludes that "[t]he materials Crowley submitted to National Union did not constitute a Claim for Insured Persons as the term "Claim" is defined in the Policy." (Doc. 36-7 at 10). As Crowley was unable to submit the sealed Affidavit to National Union, it could not have been considered by the arbitration panel. Further, National Union itself argued to the panel that the Affidavit should not be considered as part of the evidence in determining whether Crowley had made a claim as of that date. (Doc. 36 at 10).

rise to separate causes of action, even if the wrongful acts occurred within the context of a larger set of facts or relationship.").

Although Trustmark and AMEC appear at first blush to dictate preclusion of Crowley's suit, those cases are distinguishable. Trustmark, 299 F.3d at 1270; AMEC, 41 So. 3d at 243. Both based their decisions on the theory that known breaches of the same contract should be litigated together. See Trustmark, 299 F.3d at 1271; AMEC, 41 So. 3d at 243. However, here neither party knew the content of the Affidavit.[8] See Trustmark, 299 F.3d at 1272 (indicating that situations "in which the plaintiff had no means of knowing that a party breached the contract" would not be barred); (Doc. 20 at 5; Doc. 37 at 7). Contrary to National Union's allegations that the Affidavit is "just the later discovery of an old fact[,]" (Doc. 37 at 7) (emphasis in original), the Affidavit is more like newly discovered evidence because neither party had a reasonable ability to discover its content. See Hialeah Race Course, 245 So. 2d at 628; (Doc. 20 at 5; Doc. 37 at 7). National Union alleges that unattainable evidence known

---

[8] National Union's allegation that Crowley is to blame because it failed to file a motion to unseal the Affidavit earlier is not persuasive. (Doc. 37 at 7 n.2). Given the factual background of the underlying case, and the Court's familiarity with federal criminal proceedings, it is unlikely that a court would have been willing to jeopardize the ongoing investigation by unsealing the Affidavit just to help Crowley get insurance coverage. See generally, Bennett v. United States, No. 12–61499–CIV, 2013 WL 3821625, at *2–*8 (S.D. Fla. July 23, 2013) (explaining that the government's compelling interest in preventing prejudice to an ongoing investigation can outweigh the constitutional rights to access court documents).

to exist should be treated the same as attainable evidence that a party fails to discover. (Doc. 37 at 7). However, this would penalize Crowley for circumstances outside of its control.

Additionally, the Policy is not an indivisible contract like the one analyzed in <u>AMEC</u>. <u>See</u> <u>AMEC</u>, 41 So. 3d at 240 (explaining an indivisible contract); <u>see also</u> 15 <u>Williston on Contracts</u> § 45:16 (4th ed.). The Policy contemplated insurance for different insureds and multiple potential covered liabilities. (<u>See</u> Doc. 1-1 at 8–10). As <u>Williston</u> notes, when items are valued separately and distinctly in an insurance policy, the contract is divisible as to each different type, even if the premium is paid in gross. <u>Williston</u> § 45:16. An insurance contract that insures multiple parties for multiple different occurrences cannot be treated like the indivisible policy in <u>AMEC</u>. <u>See</u> <u>AMEC</u>, 41 So. 3d at 240; <u>Williston</u> § 45:16. Such treatment would require an insured to "save up" all of his breach claims until the end of the reporting period, otherwise the insured would risk losing the ability to sue for subsequent breaches.

Therefore, Crowley's 2015 reporting of a Claim for Farmer's defense costs based on the Affidavit is not precluded by the prior arbitration because the report was based on new factual circumstances. <u>See</u> <u>Badra</u>, 765 So. 2d at 253. However, precisely the reason that the Claim based on the Affidavit is not precluded by the arbitration—it was not reported until 2015 based on the new circumstances of the unsealing of the Affidavit—renders the Claim and its

17

reporting untimely under the Policy. It is to this issue the Court now turns.

### B. Crowley's claim is untimely.

Although National Union and Crowley each argue whether the statute of limitations bars this claim, the Court need not address those arguments because under the plain language of the Policy, Crowley's reporting of the Claim is untimely. (<u>See</u> Doc. 1-1 at 59). Endorsement #14 of the Policy states: "The Named Entity shall have the right to a period of six [] years following the Effective Date (herein referred to as the Discovery Period) in which to give written notice to the insurer of any Claim . . . ." (Doc. 1-1 at 59). The Effective Date of the Policy is November 1, 2007 and the Discovery Period ended November 1, 2013. (Doc. 36 at 19).

A claims-made-and-reported policy is a policy that provides coverage for the specific acts and omissions outlined in the policy that are reported during the policy term. <u>Jennings Constr. Servs. Corp. v. ACE Am. Ins. Co.</u>, 783 F. Supp. 2d 1209, 1212–13 (M.D. Fla. 2011); <u>Gulf Ins. Co. v. Dolan, Fertig & Curtis</u>, 433 So. 2d 512, 514 (Fla. 1983). Contrary to an occurrence policy, where "failure to timely report a claim . . . may not preclude coverage unless prejudice is established[,]" under a claims-made-and-reported policy, "if the claim is not reported during the policy period, no liability attaches." <u>Jennings</u>, 783 F. Supp. 2d at 1212–13 (citations and quotations omitted). The first page of the Policy states that coverage is limited to those claims that occur and are <u>reported</u>

18

"pursuant to the terms herein." (Doc. 1-1 at 2) (emphasis added). Because Endorsement #14 provides a Discovery Period for when all Claims must be made, the Policy is a claims-made-and-reported policy. (Doc. 1-1 at 2, 59).

Crowley argues that even though it was unable to present the content of the Affidavit to National Union until July 22, 2015, the Affidavit has a "Claim" date of April 25, 2008— the date Crowley first provided notice of a claim. (Doc. 36 at 18). Crowley relies on section 7(c) of the Policy, which allows a subsequent Claim to relate back to an earlier filed notice of circumstances. (Doc. 1-1 at 16). Thus, Crowley alleges that the July 22, 2015 disclosure of the content of the Affidavit relates back to the April 25, 2008 Notice of Circumstances. (Doc. 36 at 18).

However, Crowley cannot contend that the Affidavit was included in the 2008 Notice of Circumstances, making it timely under the Policy, but was not part of the 2008 materials for preclusion purposes. Compare (Doc. 36 at 10) (Crowley stating that the Affidavit was not included as part of the claim arbitrated because it was under seal until 2015) with (Doc. 36 at 18) (Crowley stating that the DOJ investigation was reported to National Union in 2008 and the Affidavit was part of that investigation). Crowley reported the Claim based on the Affidavit in 2015—after the Discovery Period ended. If the reporting of the Claim based on the Affidavit were to relate back to the 2008 Notice of Circumstances, as Crowley argues, then it would be precluded by the

arbitration.[9] The arbitrators determined that everything Crowley had submitted to National Union through 2012 did not amount to a Claim. (See Doc. 36-7 at 6). If the Affidavit were to relate back to 2008 (even though its content was unknown), then it would not be a change in circumstances or new evidence from that considered by the arbitrators—and the identity of the cause of action would be the same.[10] See Lozman, 713 F.3d at 1076. Conversely, once the Affidavit was unsealed in 2015, it became a change in circumstances because its content was previously unknown, and the Claim based upon its content was not reported to National Union until that time. See Jennings, 783 F. Supp. 2d at 1212–13; Badra, 765 So. 2d at 253; Lozman, 713 F.3d at 1076.

Such an outcome is not unfair. The Policy has a limited period in which Claims can be reported, and Claims reported outside of that period—regardless

---

[9] National Union continually argues that the Policy does not allow relation back to a "Claim" that predates a notice of circumstances. (Doc. 37 at 15). It contends that Crowley provided a notice of circumstances on April 25, 2008, but that the Affidavit was a "Claim" on April 16, 2008. (Doc. 37 at 15). This argument is unavailing because National Union cannot have the Affidavit be a "Claim" in 2008 for preclusion and relation back purposes, but a "Claim" in 2015 as it relates to the Discovery Period.

[10] Crowley concedes as much by stating that under the relation back provision, the claim related to the Affidavit would be "considered made when the notice of circumstances was given (i.e. April 25, 2008) because it involves the same or related Wrongful Acts as those involved in the April 2008 notice to [National Union]." (Doc. 36 at 19) (quotations omitted). If the Affidavit is considered a Claim reported in 2008 and involves the same wrongful acts as those arbitrated, then it would be precluded. But, it is not precluded because the unsealing of the Affidavit was not reported until 2015.

of the circumstances—are not covered. See Jennings, 783 F. Supp. 2d at 1212–13; (Doc. 1-1 at 2, 59). The parties are sophisticated businesses that agreed to the Policy. See Gulf Ins., 433 So. 2d at 514–15 (explaining that claims-made-and-reported policies are not against public policy and that the parties can negotiate the reporting period in relation to the premium).

Crowley asserts that National Union's argument prevents recovery under any circumstance because its demand would be untimely under either the statute of limitations if made in 2008, or the Discovery Period if made in 2015. (Doc. 40 at 4–5; Doc. 49 at 39–46). This is only true here because Crowley made the strategic decision to arbitrate without knowing the content of the Affidavit. Crowley's 2008 Notice of Circumstances was not a demand for payment until it insisted that the materials submitted constituted a "Claim," and elected to arbitrate. Had Crowley won the arbitration it would not have filed this suit. But it lost. Had Crowley waited until it had actual evidence identifying Farmer as the subject of an investigation—such as when Farmer received his plea agreement in February, 2013 (before the Discovery Period expired)—its Claim likely would have been covered for the entire period.[11]

---

[11] Had Crowley forgone arbitration, the unsealing of the Affidavit in 2015 could relate back to the 2008 Notice of Circumstances. By only granting prospective defense costs after receiving Farmer's plea agreement, National Union would be partially breaching the contract. This breach would have occurred in 2013—the date of Farmer's plea agreement—and, thus, the five-year statute of limitations would not bar the current suit. The 2015 unsealing

21

## III.  CONCLUSION

Although the Affidavit existed in 2008, its content was unknown and unattainable until 2015, and it was at that time that Crowley demanded coverage based upon the Affidavit. But at that time, the Discovery Period had expired so Crowley's reporting of the Claim was untimely. Alternatively, if, contrary to the Court's decision, the Claim based on the Affidavit is deemed reported in 2008, Crowley is precluded from bringing this action because of the intervening arbitration decision. Either way, Crowley cannot recover.

Accordingly, it is hereby

**ORDERED:**

1.  Defendant National Union's converted Motion for Summary Judgment (Doc. 15) is **GRANTED**.

2.  The Clerk shall enter judgment in favor of Defendant, National Union Fire Insurance Company of Pittsburgh, Pa. and against Plaintiff Crowley Maritime Corporation, terminate all pending motions and deadlines, and close the file.

---

of the Affidavit would relate back to the 2008 Notice of Circumstances and be timely under the Discovery Period. But this is not what Crowley chose to do.

**DONE AND ORDERED** in Jacksonville, Florida this 8th day of February, 2018.

TIMOTHY J. CORRIGAN
United States District Judge

jjb
Copies:

Counsel of record

**Doc. 54**

## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

**CROWLEY MARITIME CORPORATION,**

      **Plaintiff,**

**v.**                                         **Case No:  3:16-cv-1011-J-32JBT**

**NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURG, PA.,**

      **Defendant.**

_____

## JUDGMENT IN A CIVIL CASE

**Decision by Court.**    This action came before the Court and a decision has been rendered.

      **IT IS ORDERED AND ADJUDGED** that pursuant to this Court's Order, entered on February 8, 2018, Judgment is hereby entered in favor of Defendant, National Union Fire Insurance Company of Pittsburgh, Pa., and against Plaintiff, Crowley Maritime Corporation.

Date: February 9, 2018.

                    ELIZABETH M. WARREN,
                    CLERK

                    s/ T. Carcaba, Deputy Clerk

Copy to:

Counsel of Record
Unrepresented Parties

# CIVIL APPEALS JURISDICTION CHECKLIST

1. **Appealable Orders**: Courts of Appeals have jurisdiction conferred and strictly limited by statute:

   (a)   **Appeals from final orders pursuant to 28 U.S.C. Section 1291**: Only final orders and judgments of district courts, or final orders of bankruptcy courts which have been appealed to and fully resolved by a district court under 28 U.S.C. Section 158, generally are appealable. A final decision is one that "ends the litigation on the merits and leaves nothing for the court to do but execute the judgment." Pitney Bowes, Inc. V. Mestre, 701 F.2d 1365, 1368 (11th Cir. 1983). A magistrate judge's report and recommendation is not final and appealable until judgment thereon is entered by a district court judge. 28 U.S.C. Section 636(c).

   (b)   **In cases involving multiple parties or multiple claims**, a judgment as to fewer than all parties or all claims is not a final, appealable decision unless the district court has certified the judgment for immediate review under Fed.R.Civ.P. 54(b), Williams v. Bishop, 732 F.2d 885, 885-86 (11th Cir. 1984). A judgment which resolves all issues except matters, such as attorneys' fees and costs, that are collateral to the merits, is immediately appealable. Budinich v. Becton Dickinson & Co., 486 U.S. 196, 201, 108 S. Ct. 1717, 1721-22, 100 L.Ed.2d 178 (1988); LaChance v. Duffy's Draft House, Inc., 146 F.3d 832, 837 (11th Cir. 1998).

   (c)   **Appeals pursuant to 28 U.S.C. Section 1292(a)**: Appeals are permitted from orders "granting, continuing, modifying, refusing or dissolving injunctions or refusing to dissolve or modify injunctions..." and from "[i]nterlocutory decrees...determining the rights and liabilities of parties to admiralty cases in which appeals from final decrees are allowed." Interlocutory appeals from orders denying temporary restraining orders are not permitted.

   (d)   **Appeals pursuant to 28 U.S.C. Section 1292(b) and Fed.R.App.P.5**: The certification specified in 28 U.S.C. Section 1292(b) must be obtained before a petition for permission to appeal is filed in the Court of Appeals. The district court's denial of a motion for certification is not itself appealable.

   (e)   **Appeals pursuant to judicially created exceptions to the finality rule**: Limited exceptions are discussed in cases including, but not limited to: Cohen V. Beneficial Indus. Loan Corp., 337 U.S. 541,546,69 S.Ct. 1221, 1225-26, 93 L.Ed. 1528 (1949); Atlantic Fed. Sav. & Loan Ass'n v. Blythe Eastman Paine Webber, Inc., 890 F. 2d 371, 376 (11th Cir. 1989); Gillespie v. United States Steel Corp., 379 U.S. 148, 157, 85 S. Ct. 308, 312, 13 L.Ed.2d 199 (1964).

2. **Time for Filing:** The timely filing of a notice of appeal is mandatory and jurisdictional. Rinaldo v. Corbett, 256 F.3d 1276, 1278 (11th Cir. 2001). In civil cases, Fed.R.App.P.4(a) and (c) set the following time limits:

   (a)   **Fed.R.App.P. 4(a)(1)**: A notice of appeal in compliance with the requirements set forth in Fed.R.App.P. 3 must be filed in the district court within 30 days after the entry of the order or judgment appealed from. However, if the United States or an officer or agency thereof is a party, the notice of appeal must be filed in the district court within 60 days after such entry. **THE NOTICE MUST BE RECEIVED AND FILED IN THE DISTRICT COURT NO LATER THAN THE LAST DAY OF THE APPEAL PERIOD - no additional days are provided for mailing.** Special filing provisions for inmates are discussed below.

   (b)   **Fed.R.App.P. 4(a)(3)**: "If one party timely files a notice of appeal, any other party may file a notice of appeal within 14 days after the date when the first notice was filed, or within the time otherwise prescribed by this Rule 4(a), whichever period ends later."

   (c)   **Fed.R.App.P.4(a)(4)**: If any party makes a timely motion in the district court under the Federal Rules of Civil Procedure of a type specified in this rule, the time for appeal for all parties runs from the date of entry of the order disposing of the last such timely filed motion.

   (d)   **Fed.R.App.P.4(a)(5) and 4(a)(6)**: Under certain limited circumstances, the district court may extend the time to file a notice of appeal. Under Rule 4(a)(5), the time may be extended if a motion for an extension is filed within 30 days after expiration of the time otherwise provided to file a notice of appeal, upon a showing of excusable neglect or good cause. Under Rule 4(a)(6), the time may be extended if the district court finds upon motion that a party did not timely receive notice of the entry of the judgment or order, and that no party would be prejudiced by an extension.

   (e)   **Fed.R.App.P.4(c)**: If an inmate confined to an institution files a notice of appeal in either a civil case or a criminal case, the notice of appeal is timely if it is deposited in the institution's internal mail system on or before the last day for filing. Timely filing may be shown by a declaration in compliance with 28 U.S.C. Section 1746 or a notarized statement, either of which must set forth the date of deposit and state that first-class postage has been prepaid.

3. **Format of the notice of appeal**: Form 1, Appendix of Forms to the Federal Rules of Appellate Procedure, is a suitable format. See also Fed.R.App.P. 3(c). A pro se notice of appeal must be signed by the appellant.

4. **Effect of a notice of appeal**: A district court loses jurisdiction (authority) to act after the filing of a timely notice of appeal, except for actions in aid of appellate jurisdiction or to rule on a timely motion of the type specified in Fed.R.App.P. 4(a)(4).

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY service by UPS, postage prepaid of two (2) paper copies of the foregoing Appendix of Appellant (Volume IV) upon the following clerk of court, this 30th day of May, 2018:

>   Clerk of Court
>   U.S. Court of Appeals for the 11th Circuit
>   56 Forsyth St., N.W.
>   Atlanta, Georgia 30303

I HERBY CERTIFY that a true and correct copy of the foregoing Appendix of Appellant (Volume IV) was filed with the Clerk of Court using the CM/ECF system which will serve a Notice of Docket Activity on this 30th day of May, 2018 to the following:

>   Michael P. Duffy
>   Scarlett M. Rajbanshi
>   Peabody & Arnold, LLP, 6th Floor
>   600 Atlantic Ave.
>   Boston, MA 02210-2261
>   Email: mduffy@peabodyarnold.com
>           srajbanshi@peabodyarnold.com

>   Stephen Hunter Johnson
>   Jason Benjamin Bloom
>   Lydecker Diaz
>   1221 Brickell Ave 19th Flr
>   Miami, FL 33131-3240
>   Email: shj@lydeckerdiaz.com
>           jbloom@lydeckerdiaz.com

*/s/ Emily E. Garrison*
**Counsel for Appellant**